2022-1815, 2022-2005, 2022-2113

# United States Court of Appeals for the Federal Circuit

NEXSTEP, INC.,
*Plaintiff-Appellant,*

v.

COMCAST CABLE COMMUNICATIONS, LLC,
*Defendant-Cross-Appellant.*

Appeal from the United States District Court for the District of Delaware, Case No. 1:19-cv-01031-RGA, Judge Richard G. Andrews

**NEXSTEP, INC.'S OPENING BRIEF [NON-CONFIDENTIAL]**

Paul J. Andre
Lisa Kobialka
James R. Hannah
Christina M. Finn
KRAMER LEVIN NAFTALIS & FRANKEL LLP
333 Twin Dolphin Dr., Suite 700
Redwood Shores, CA 94065
Telephone: (650) 752-1700

Aaron M. Frankel
Cristina Martinez
Carlos J. Tirado
KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

***ATTORNEYS FOR NEXSTEP, INC.***

## PATENT CLAIMS AT ISSUE

**U.S. Patent No. 8,280,009**

1. A method of initiating a support session for a consumer device using a concierge device, the method including:

associating the concierge device with a selected consumer device;

responsive to a single action performed by a user, the concierge device communicating with a home gateway, including

causing the home gateway to buffer consumer device identification information for the selected consumer device and determine a support center for a support session; and

causing the home gateway to initiate the support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either

to bypass an automated attendant or interactive voice recognition system or

to initiate an automated support protocol.

**U.S. Patent No. 8,885,802**

1. A remote control device with slaved audio input, the device including:

a wireless link transceiver;

at least one slaved audio input built into the remote control;

a navigation control built into the remote control;

hardware resources coupled between the wireless link transceiver, the slaved audio input and the navigation control;

a stack running on the hardware resources and exchanging packets with a master device; and

an encoder logic running on the hardware resources, logically coupled to the stack, adapted to encode signals from the slaved audio input into a remote control audio format, and adapted to send audio packets in the remote control audio format to the master device;

wherein the remote control depends on the master device to transcode input from the slaved audio input to VoIP from the remote control device format and relies on the master device to respond to control signals sent by the remote control device in the packets.

## CERTIFICATE OF INTEREST

Counsel for Appellant NexStep, Inc. certifies the following:

1. The full name of all entities represented by us is:

NexStep, Inc.

2. The full name of all real parties in interest for the entities represented by us. Do not list the real party if it is the same as the entity:

Not applicable.

3. All parent corporations and any other publicly held companies that own 10 percent or more of the stock of the party:

None.

4. The names of all law firms and the partners or associates that have not entered an appearance in the appeal, and (a) appeared for the entity in the lower tribunal; or (b) are expected to appear for the entity in this court:

Jonathan S. Caplan, Benu Wells, Marcus A. Colucci, Hien Lien, Greg Proctor, and Missy G. Brenner of Kramer Levin Naftalis & Frankel LLP.

Philip A. Rovner and Jonathan A. Choa of Potter Anderson & Corroon, LLP.

5. The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

Reexamination No. 90/014,991 (USPTO)

6. Organizational Victims and Bankruptcy Cases. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6):

Not applicable.

Dated: August 18, 2022

*/s/ Paul J. Andre*

Paul J. Andre
Lisa Kobialka
James R. Hannah
Christina M. Finn
Kramer Levin Naftalis & Frankel LLP
333 Twin Dolphin Dr., Suite 700
Redwood Shores, CA 94065
Tel: (650) 752-1700
Fax: (650) 752-1800
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
cfinn@kramerlevin.com

Aaron M. Frankel
Cristina Martinez
Carlos J. Tirado
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: 212.715.9100
Fax: 212.715.8000
afrankel@kramerlevin.com
cmartinez@kramerlevin.com
ctirado@kramerlevin.com

*Attorneys for Appellant*
NexStep, Inc.

# TABLE OF CONTENTS

**Page**


PATENT CLAIMS AT ISSUE ..... i

CERTIFICATE OF INTEREST ..... iii

STATEMENT OF RELATED CASES ..... 1

JURISDICTION ..... 2

STATEMENT OF THE ISSUES ..... 3

STATEMENT OF THE CASE ..... 4

INTRODUCTION ..... 5

STATEMENT OF THE FACTS ..... 7

A. NexStep is an Innovative Technology Company, Solving Problems Relating to the Interoperability of Consumer Electronic Devices ..... 7

B. NexStep's Patents Solved Problems in the Customer Service and Voice Control Fields ..... 8

1. The '009 Patent Provides Streamlined Troubleshooting Solutions ..... 8

2. The '802 Patent Provides Low-Cost Voice Control Functionality ..... 11

C. The District Court Took Away From the Jury the Question of the Voice Remotes' Infringement of NexStep's '802 Patent ..... 12

D. The District Court Excluded the Cost-Savings Damages Opinion of NexStep's Expert Just Before Trial ..... 15

E. Comcast's MyAccount Infringes NexStep's '009 Patent ..... 19

SUMMARY OF THE ARGUMENT ....................25

INTRODUCTION ....................27

I. THE JURY'S VERDICT THAT COMCAST INFRINGES THE '009 PATENT SHOULD BE REINSTATED BECAUSE IT WAS BASED ON SUBSTANTIAL EVIDENCE ....................27

A. Standard of Review ....................27

B. The Record Contains Substantial Evidence to Support the Jury's Verdict of Infringement Under Equivalents of the '009 Patent....................28

1. Dr. Selker Provided Substantial Evidence of Three Infringement Cases ....................28

2. Dr. Selker Explained How a Single Screen Tap or a Short Sequence of Screen Taps is at Least Equivalent to a Single Action ....................33

a) A Single or a Short Sequence of Screen Taps is at Most "Insubstantially" Different From a Single Action....................34

b) MyAccount Satisfied the Single-Action Limitation Under the Function-Way-Result Test....................36

3. Additional Evidence Supported the Jury's Infringement Verdict....................41

a) Comcast Technical Documents and Source Code Supported Infringement ....................42

b) Dr. Villasenor's Cross-Examination Testimony is Further Evidence Supporting the Jury's DOE Verdict ....................43

c) Mr. Karinshak's Cross-Examination Testimony Further Supported the Jury's Verdict ....................45

C. In View of the Record Evidence, the JMOL Order Was Legal Error ....46

1. Dr. Selker Fully Explained His DOE Opinion ....47

2. Expert Opinion Testimony Was Not Needed to Establish Comcast's Infringement of the Single-Action Limitation Under DOE....50

II. SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '802 PATENT SHOULD BE REVERSED....52

A. The District Court's Construction of "VoIP" is incorrect....52

1. Standard of Review....52

2. The District Court Improperly Limited VoIP to "Voice Conversations" Between Two People Excluding Other Forms of Voice or Audio Content....53

3. Genuine Issues of Material Fact Precluded Summary Judgment, Even Under the District Court's Construction....58

III. THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING NEXSTEP'S DAMAGES CASE....61

A. Standard of Review....61

B. The District Court Abused Its Discretion in Excluding the Testimony of NexStep's Damages Expert....62

1. Mr. Reading Relied on the Specific Facts of This Case to Select the Royalty-Rate Starting Point....62

2. Mr. Reading's Opinion Complied With This Court's Precedent Because it Was Based on the Specific Facts of the Case....64

3. The District Court Ignored the Case Specific Facts That Supported Mr. Reading's Opinion....66

C. The District Court Abused Its Discretion in Failing to Allow NexStep to Try Damages to a Jury ..........................................69

CONCLUSION ..........................................................................................72

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted from the Addendum, pages Appx105-106, contains license details that were sealed in the district court.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
616 F.3d 1283 (Fed. Cir. 2010) ....................56

*Antonio v. Progressive Ins. Co.*,
795 F. App'x 128 (3d Cir. 2020) ....................64

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014 ....................70

*Apple Inc. v. Wi-LAN Inc.*,
25 F.4th 960, 971-76 (Fed. Cir. 2022) ....................71

*Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*,
876 F.3d 1350 (Fed. Cir. 2017) ....................27

*Brilliant Instruments, Inc. v. Guidetech, LLC*,
707 F.3d 1342 (Fed. Cir. 2013) ....................34

*Cardsoft, LLC v. VeriFone, Inc.*,
807 F.3d 1346 (Fed. Cir. 2015) ....................52

*Centrak, Inc. v. Sonitor Techs., Inc.*,
915 F.3d 1360 (Fed. Cir. 2019) ....................52

*Dow Chem. Co. v. Mee Indus., Inc.*,
341 F.3d 1370 (Fed. Cir. 2003) ....................70

*Fonar Corp. v. General Elec. Co.*,
107 F.3d 1543 (Fed. Cir. 1997) ....................47

*GlaxoSmithKline LLC v. Teva Pharms. U.S., Inc.*,
976 F.3d 1347 (Fed. Cir. 2020) ....................48

*Gree, Inc. v. Supercell Oy*,
No. 2:19-cv-00200, 2021 WL 514757 (E.D. Tex. Feb. 11, 2021) ....................65

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
572 U.S. 559 (2014) ....................68

*Info-Hold, Inc. v. Muzak LLC*,
783 F.3d 1365 (Fed. Cir. 2015) ....................................................................71

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001) ....................................................................48

*IOENGINE, LLC v. PayPal Holding, Inc.*,
No. 18-452-WCB, Slip Op. (D. Del. June 23, 2022)........................................69

*Issa v. Sch. Dist. Of Lancaster*,
847 F.3d 121 (3d Cir. 2017) ........................................................................61

*Markman v. Westview Instruments, Inc.*,
517 U.S. 370 (1996)......................................................................................57

*Nat'l Presto Indus., Inc. v. W. Bend Co.*,
76 F.3d 1185 (Fed. Cir. 1996) ..................................................................46, 49

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC.*,
403 F.3d 1364 (Fed. Cir. 2005) ....................................................................57

*Paice LLC v. Toyota Motor Corp.*,
504 F.3d 1293 (Fed. Cir. 2007) ....................................................................50

*Pitts v. Delaware*,
646 F.3d 151 (3d Cir. 2011) ........................................................................27

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
711 F.3d 1348 (Fed. Cir. 2013) ..................................................................61, 71

*Salas by Salas v. Wang*,
846 F.2d 897 (3d Cir. 1988) ........................................................................27

*Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharms. Inc.*,
No. 07–5855, 2011 WL 383861 (D.N.J. Feb. 3, 2011) .....................................66

*Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*,
No. 17-1734-RGA, 2021 WL 982732 (D. Del. Mar. 16, 2021)............67, 68, 70

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
574 U.S. 318 (2015)......................................................................................52

*TWM Mfg. Co. v. Dura Corp.*,
789 F.2d 895 (Fed. Cir. 1986) ....................................................................61

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ...............................................................*passim*

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
809 F. App'x 965 (Fed. Cir. 2020) ..............................................................47

*WCM Indus., Inc. v. IPS Corp.*,
721 F. App'x 959 (Fed. Cir. 2018) ..............................................................50

*Williamson v. Citrix Online, LLC*,
792 F.3d 1339 (Fed. Cir. 2015) ...................................................................70

**Statutes**

28 U.S.C. § 1295.................................................................................................2

28 U.S.C. § 1338.................................................................................................2

35 U.S.C. § 284...........................................................................................70, 71

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, NexStep, Inc. ("NexStep"), states that:

(1) no appeal other than the current appeal has been taken in or from *NexStep, Inc. v. Comcast Cable Communications, LLC*, No. 1:19-cv-01031-RGA (D. Del.);

(2) NexStep is a party to USPTO Reexamination No. 90/014,991, which involves U.S. Patent No. 8,280,009, also at issue in this appeal; and

(3) no other case may be directly affected by the Court's decision in this appeal.

## JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1338.

On May 12, 2022, the District Court granted Comcast Cable Communications, LLC's ("Comcast") motion for judgment as a matter of law ("JMOL"), resolving all issues in dispute and settling the parties' rights with respect to those issues. Appx20. NexStep timely filed a notice of appeal. Appx16829-16830.

On July 7, 2022, at the joint request of the parties, the District Court issued a Final Judgment. Appx1-3. Out of an abundance of caution, NexStep promptly filed a second notice of appeal. Appx16841-16843.

This Court has jurisdiction under 28 U.S.C. § 1295.

## STATEMENT OF THE ISSUES

1. Whether the District Court committed legal error in setting aside the jury verdict that Comcast infringed the ’009 Patent under the doctrine of equivalents in view of the substantial evidence and common sense reasoning supporting infringement.

2. Whether the District Court committed legal error in granting summary judgment of non-infringement of the ‘802 Patent based on its claim construction order that improperly construes the “VoIP” term and by ignoring genuine disputed issues.

3. Whether the District Court abused its discretion in excluding the testimony of NexStep’s damages expert, even though it was based on the specific facts of the case, and by depriving NexStep of an opportunity to seek no less than a reasonable royalty, as required by statute.

## STATEMENT OF THE CASE

NexStep sued Comcast in the United States District Court for the District of Delaware for infringement of nine patents, including U.S. Patent Nos. 8,280,009 ("'009 Patent") and 8,885,802 ("'802 Patent"), which are at issue in this appeal. Appx685-771. The other asserted patents, not at issue on appeal, are not further discussed herein. The Honorable Richard G. Andrews (the "District Court") presided over the case.

The District Court granted Comcast's motion for summary judgment that it does not infringe the '802 Patent. Appx121-123; Appx134-135.

Before trial, the District Court granted Comcast's motion to exclude the opinion of NexStep's damages expert as to the starting point for the reasonable-royalty negotiation for damages for the '009 Patent. Appx140-142; Appx143.

NexStep tried two patents to the jury, including the '009 Patent. The jury (1) found that Comcast infringed the '009 Patent under the doctrine of equivalents ("DOE"), and (2) confirmed the validity of the '009 Patent. Appx156-161.

Seven months after the jury returned its verdict, the District Court granted Comcast's motion under Rule 50(b) for judgment as a matter of law of non-infringement. Appx20.

NexStep timely appealed. Appx16829-16830; Appx16841-16843.

## INTRODUCTION

The District Court erred when it decided to act as the fact finder, supplanting the role of the jury, before trial by granting summary judgment on one patent, on the eve of trial in taking damages issues away from the jury, and after trial when it overturned the jury's verdict. In each instance, the District Court misapplied this Court's precedent and took upon itself to decide issues that should have been and, in one case were, decided by the jury.

First, the District Court erred in granting summary judgment as to non-infringement of the '802 Patent. Appx118-133; Appx134-135 (the "Summary Judgment Order"). In doing so, the District Court relied on an incorrect claim construction of "VoIP" (Voice Over Internet Protocol), which should have been rejected because it was contrary to the plain language of the asserted claims and read out the embodiments described in the patent. But even under that construction, there were genuine material disputes that should have precluded summary judgment and left it to the jury to decide if Comcast infringed the '802 Patent. Instead, the District Court erroneously resolved these factual disputes itself and took that question away from the jury. Thus, the Summary Judgment Order should be vacated and remanded for a trial on infringement of the '802 Patent.

Then, just a few days before trial on the '009 Patent, the District Court took damages away from the jury. Appx137-142; Appx143-144 (the "*Daubert* Order").

Applying an incorrect legal standard and making a clearly erroneous finding of facts, the District Court excluded the opinion of NexStep's damages expert who had proved that Comcast enjoyed massive cost savings from its infringement and based his opinions on the specific facts of the case. The Court's *Daubert* Order applied an incorrect and impossible-to-satisfy standard, which amounted to an abuse of discretion. Accordingly, the *Daubert* Order should be reversed, and the case remanded for a trial on damages.

Finally, the District Court erred as a matter of law in substituting its own judgment for the jury's and vacating the infringement verdict in this case. After hearing extensive evidence, the jury found that Comcast infringes NexStep's '009 Patent under the DOE. The infringement dispute at trial boiled down to a single, straightforward issue for the jury to decide, which it decided in NexStep's favor. Nonetheless, the District Court substituted its judgment for the jury's on purely factual questions. As such, reversal is warranted and the jury's infringement verdict should be reinstated.

## STATEMENT OF THE FACTS

### A. NexStep is an Innovative Technology Company, Solving Problems Relating to the Interoperability of Consumer Electronic Devices

Dr. Robert Stepanian, inventor of the ’009 and ’802 Patents, is a pioneer in developing personal computing devices and services to control, combine and integrate telephone and video services that come from different manufacturers and service providers. Appx686-687, ¶8. His inventions have applications in video conferencing, cable set-top boxes, multi-media PCs, and other consumer electronic devices from different sources. *Id.*

Dr. Stepanian formed NexStep in 2004 as a small startup to pursue his inventions for improving people’s interaction with technology. *Id.*; Appx6450, ¶¶44-45. At that time, consumers were accumulating many disparate home electronic devices, introducing complexity to manage all of the devices. Appx220, 1:34-2:32. Dr. Stepanian conceived of a handheld, universal multimedia human-interface device that would be capable of handling a variety of tasks, such as inputting text and controlling a mouse cursor for various devices, recognizing voice to accept voice commands from these devices, and even use a fingerprint sensor for security and to allow the device to be personalized to work with multiple users sharing the device. *Id.*, 2:10-22.

Dr. Stepanian was a visionary because he saw a need for and invented devices with these features in 2004 and 2005, long before now-ubiquitous smartphones,

Internet-of-things connected home appliances, and other smart electronics even existed.

### B. NexStep's Patents Solved Problems in the Customer Service and Voice Control Fields

Two of Dr. Stepanian's patents are at issue on appeal: the '009 and '802 Patents. NexStep asserted Claims 1, 16, and 22 of the '009 Patent and Claims 1 and 7 of the '802 Patent (the "Asserted Claims"). These patents solved important problems in the customer-service and voice-control fields.

#### 1. The '009 Patent Provides Streamlined Troubleshooting Solutions

The '009 Patent provides streamlined troubleshooting inventions for improving the way customers fix technical problems with devices in their homes. *See, e.g.*, Appx210, Claim 1. Before these inventions, customers seeking to troubleshoot their consumer devices would typically need to spend hours on the phone taking on the frustrating multi-step tasks of:

(1) figuring out the manufacturer for each home device,

(2) locating contact information for the manufacturer for a malfunctioning device,

(3) contacting the manufacturer,

(4) identifying themselves to a customer service agent providing troubleshooting services,

(5) finding the model and serial number for the malfunctioning device,

(6) providing that information to a troubleshooting agent,

(7) relaying diagnostic information to the agent, and

(8) following troubleshooting instructions from the agent.

Appx428, 315:16-317:10 (expert testimony regarding the '009 Patent); Appx197-199, 16:11-19:2. Oftentimes this process would need to be repeated if the customer was transferred to another agent or the call dropped. This process was time consuming and frustrating for consumers and expensive for service providers.

Dr. Stepanian invented a "concierge device" to simplify and improve the way consumers control and troubleshoot devices. *See* Appx201, 23:65-24:63. The concierge device acts as a remote control. Appx192, 6:60. It is further "configured to register, control and support a consumer device." Appx190, 2:45-46. After that process, the concierge device has identification information for each consumer device and is able to obtain diagnostic information from the device. Appx193, 7:43-8:5.

If one of the consumer devices is not functioning properly, a customer can use the concierge device to start a streamlined process to obtain troubleshooting services. Appx201, 23:65-24:63. The consumer device's identification information is used to determine a support center for a support session. Appx194, 9:58-10:13. When the support session is initiated, the device identification information is forwarded, so the

user can skip an automated attendant or interactive voice recognition system, or initiate an automated support protocol. Appx193, 7:43:8:5. The user skips many of the conventional steps discussed above, such as figuring out the manufacturer and contact info for a support center, obtaining device identification information and diagnostic data, and relaying that information to the support center. Appx201, 23:65-24:19.

As a result, the user obtains automated support based on the specific device identification and diagnostic data, without even needing to interact with a call center or to have a technician come to their home. Appx193, 7:43:8:31. Or, if it becomes necessary to involve a troubleshooting agent, the claimed technology avoids the initial steps of locating and providing such information to the agent. *Id.*

The service provider avoids costs by reducing the time spent and number of calls to troubleshooting service centers and for home service visits. *See id.* Comcast leveraged this technology in its infringing MyAccount App ("MyAccount") to realize substantial cost savings by using automated troubleshooting to solve problems, avoiding calls to service agents and sending a Comcast technician to a customer's home, further streamlining customer service. Appx351, 157:14-158:6.

### 2. The ‘802 Patent Provides Low-Cost Voice Control Functionality

The ‘802 Patent is directed to solving the problem of providing a low-cost voice-controlled remote control for consumer electronics products, such as cable set-top boxes. Appx220, 2:10-33. At the time of the claimed invention, there was a trend towards making remote controls high-powered mini-computers, significantly increasing their cost, in order to provide more robust features. Appx6450-6451 ¶¶46-48. For example, the ’802 Patent discusses the Treo, a contemporaneous “smart device” as “over-built and too expensive” and identifies the “opportunity … to provide a low-cost integrated consumer electronics system that includes a novel feature set and a cost-effective allocation of technical tasks between a remote and a console.” Appx220, 2:1-6. The Treo is described as “untethered, packing many features into a small form factor, not requiring a console.” *Id.*, 1:55-67.

The ’802 Patent covers inventions for providing voice-control and other complex features in an inexpensive remote control by leveraging the computational power of other, more powerful consumer electronics devices already in the customer’s home, such as a cable set-top box. According to the Asserted Claims, the remote control is “tethered” to a more powerful “master device.” Appx229-230, Claim 1.

The tethered remote control depends on the master device. The remote control has an audio input and sufficient hardware resources to capture and encode user

audio data, such as voice commands, and to send the audio data to the master device. *Id.* The master device then performs the more complex tasks of transcoding the audio input to VoIP (Voice Over Internet Protocol) packets that can be sent over the Internet to a server that is able to interpret and respond to the voice command. *Id.* Thus, the voice remote is able to provide a front-end for voice-control functionality, without requiring the expensive hardware needed for communications over the Internet. Appx220, 2:56-62.

In 2007, NexStep demonstrated the technology of the '802 Patent to Comcast's CTO, Tony Werner, and Director of Digital Technology and Standards, Bill Warga. *E.g.*, Appx14774-14775, ¶¶1392-93; Appx6876-6877. Mr. Werner and Mr. Warga praised NexStep's inventions and invited NexStep to provide documentary disclosures and further demonstrations of its inventions to Comcast. Appx14774-14775, ¶¶1392-93. NexStep actively and diligently attempted to engage in good faith negotiations with Comcast. *Id.* However, Comcast declined to partner with NexStep and instead launched an infringing line of voice remotes.

### C. The District Court Took Away From the Jury the Question of the Voice Remotes' Infringement of NexStep's '802 Patent

NexStep asserted that Comcast's XR11, XR15, and XR16 voice remote controls (the "Voice Remotes") infringe the '802 Patent. Appx702-707, ¶¶47-67; Appx6449-6502, ¶¶46-165. The District Court itself adjudicated the factual

disputes between the parties over Comcast's infringement, granting summary judgment in favor of Comcast.

The Voice Remotes, shown below, are used to remotely control Comcast cable set-top boxes, which provide video content to televisions. Appx6452-6453, ¶¶58-60.



**XR11 Remote**



**XR15 Remote**



**XR16 Remote**

Just as is claimed in the '802 Patent, Comcast's Voice Remotes accept voice commands from customers, but are unable to communicate directly over the Internet with Comcast's servers where the voice commands are interpreted and processed. Appx6451-6453, ¶¶51-52, ¶¶61-62. Instead, the Voice Remotes send voice commands to a tethered set-top box, which then puts the voice commands into VoIP format and sends them over the Internet to Comcast's servers. Appx6453, ¶¶61-62. Comcast's Voice Remotes only cost a few dollars because

they do not need to include the more powerful hardware necessary to use VoIP. Appx6505-6507 (providing unit costs for Xfinity Remotes); Appx6454, ¶83.

NexStep provided detailed proofs that Comcast's Voice Remotes satisfy all of the elements of the Asserted Claims of the '802 Patent, including numerous admissions from Comcast's engineers, Comcast's technical specification documents, Comcast's admissions, and teardown photographs. Appx6386-6398. NexStep showed that the Voice Remotes include slaved audio inputs (Appx6387-6388, Appx6390-6392), wireless link transceivers (Appx6390), navigation controls (Appx6392), hardware resources (Appx6392-6393), a software stack (Appx6393-6394), and encoder logic (Appx6394-6395).

Finally, NexStep proved the one issue that Comcast seriously disputed, that the voice commands are ultimately translated into VoIP format in order to be sent over the Internet to Comcast's servers. Appx6453, ¶¶61-62. VoIP is an acronym for Voice Over Internet Protocol. Appx122. The District Court construed VoIP to mean "protocols and data formats for transmitting voice conversations over a packet-switched network, such as the Internet." Appx47; Appx41-42. NexStep opposed summary judgment on the grounds that the vocal commands from Comcast's customers were in fact "voice conversations" and, therefore, transmission of those spoken words over the Internet satisfied the VoIP construction. Appx8473-8476.

Despite this dispute over the application of the facts to its claim construction, the District Court granted Comcast's motion for summary judgment of non-infringement of the '802 Patent. Appx121-123. The District Court found that because Comcast's Voice Remotes are not capable of carrying out a ***two-way*** voice conversation between ***two people*** they cannot use VoIP. *Id.*

### D. The District Court Excluded the Cost-Savings Damages Opinion of NexStep's Expert Just Before Trial

Just four days before the start of the jury trial on Comcast's infringement of the '009 Patent, the District Court excluded the cost-savings damages opinion of NexStep's expert, Mr. Reading. Mr. Reading determined that MyAccount's infringement of the '009 Patent permitted Comcast to resolve customer troubleshooting issues without requiring a customer service interaction or a service visit to a customer location by a Comcast technician (called a "truck roll"). Appx9217, Appx9245. Thus, he proved that Comcast enjoys significant cost savings that go straight to bottom-line profit by avoiding the costs from these calls and truck rolls due to its infringement of the Customer Troubleshooting Patent. *Id*.

Mr. Reading's cost-savings damages opinion for the '009 Patent was based on Comcast's data, established economic and damages assessment principles and methodologies, the opinions of NexStep's technical expert, and a thorough analysis of the *Georgia-Pacific* factors. Appx9217, Appx9245, Appx9250-9252.

Specifically, Mr. Reading determined a royalty base that reflected the cost of the service calls and truck rolls that Comcast avoided. He based his analysis on the accused technology and used Comcast's data to estimate the number of avoided service calls and truck rolls due to the infringing technology in MyAccount fully resolving a technical support issue. Appx9179-9180, Appx9289-9292. To determine the overall cost savings, he multiplied the number of avoided service calls and truck rolls by their respective average costs, using the same approach Comcast uses to internally estimate its cost-savings from its infringing automation of customer service. Appx9198-9199; Appx9217-9225; Appx9251-9252.

After determining the total cost savings to Comcast from its infringement, Mr. Reading analyzed how the parties would have negotiated to split those cost savings in a hypothetical reasonable-royalty negotiation. Appx9250-9252. Mr. Reading considered the specific facts of this case that would have impacted how the parties approached the hypothetical negotiation, such as the fact that the cost savings from using the patented technology would be pure profit to Comcast, the parties' relative bargaining positions, NexStep's interest in finding a first major licensee to partner with, the importance of non-patented features, and the added benefits to Comcast from increased customer satisfaction. Appx9251-9252 (incorporating by reference analysis at Appx9198-9199, Appx9217-9225, Appx9410); Appx13598, 146:1-147:4.

For example, he found that both parties would identify cost savings as a primary benefit of the patented technology because it avoided customer service interactions and truck rolls, such that Comcast would be more willing to share a higher percentage of its savings with NexStep. Appx9250-9252. At the same time, he recognized that Comcast would need an incentive to use the technology and would only agree to a license where it retained a meaningful percentage of the savings. *Id*.

Mr. Reading analyzed the parties' specific factual considerations, considered and identified Comcast's relevant internal documentation and deposition testimony, and applied the *Georgia-Pacific* factors for his opinion. He concluded that while the parties would have started their negotiation at a 50/50 split, the parties would have ultimately negotiated that Comcast ultimately would keep 60% of the cost savings, with 40% going to NexStep as a reasonable royalty. *Id*.

The Magistrate Judge assigned to the case recommended denying Comcast's *Daubert* motion to exclude Mr. Reading's damages analysis. Appx99-101. The Magistrate Judge found that Comcast's challenges to Mr. Reading's damages opinion "go to the weight of [that] opinion, and not its admissibility." *Id.*

The District Court, however, disagreed. While it denied Comcast's *Daubert* motion as to Mr. Reading's calculation of the cost-saving's royalty base, it overruled the Magistrate Judge and excluded Mr. Reading's reasonable-royalty opinion four

days before the start of the trial. Appx137-144; Appx16277, 13:10-14. It held that Mr. Reading's starting point for the reasonable-royalty negotiation was unsupported because it was based on facts that "could be true of a negotiation of cost-savings technology (or anticipated profits) ***by any two parties***, meaning that they are not particular to the facts of this case."[1] Appx141.

Given that trial was only a few days away when the District Court issued the *Daubert* Order, NexStep offered to go forward with a fact-based damages claim and also proposed that damages be bifurcated until after the conclusion of a trial on liability, so that Mr. Reading could amend his opinion to address the *Daubert* Order. Appx16198-16202; Appx16281, 29:17-30:3. The District Court denied NexStep's proposals and granted Comcast's motion to "exclude from the trial all testimony and/or evidence solely offered to prove damages." Appx136. The District Court stated that damages would not be part of the trial on infringement nor any other trial "unless [the] order of yesterday excluding the 50/50 split or this ruling is reversed by the Court of Appeals." *Id.*

[1] Unless otherwise indicated, all emphasis is added.

### E. Comcast's MyAccount Infringes NexStep's '009 Patent

The District Court presided over a four-day trial at the end of which the jury found that Comcast infringes the Asserted Claims of the '009 Patent under DOE. Appx158. As NexStep demonstrated at trial, Comcast's MyAccount (shown below) meets every element of the Asserted Claims of the '009 Patent. Appx428-453, 315:14-416:17; Appx210-211, Claims 1, 16, 22. The first image below is MyAccount's screen for selecting a device to troubleshoot, which is functionally identical to Figure 14A of the '009 Patent in allowing the user to pick a specific device to troubleshoot. The second image below is MyAccount's TV-Troubleshooting screen, which is functionally identical to Figure 14B of the '009 Patent in including a button to launch troubleshooting features for the TV.

**Xfinity MyAccount** **'009 Patent Concierge Device**







FIG. 14A

**Xfinity MyAccount**




**'009 Patent Concierge Device**




*FIG. 14B*

MyAccount Screenshots; Appx186, Figs. 14A, 14B.

During trial, NexStep presented the testimony of technical expert, Dr. Selker, who gave a detailed analysis showing that MyAccount infringes Claims 1, 16, and 22 of the '009 Patent. *See* Appx425-453, 299:25-416:20; Appx462-464, 451:10-459:8. NexStep also presented to the jury proof of Comcast's infringement from deposition testimony of Comcast executives and engineers, videos showing the

infringing functionality, source code, and documents illustrating the infringing operations of MyAccount. *See* Appx435-439, 345:15-360:18.

NexStep showed at trial that MyAccount operates on customers' smartphones and tablets, which include the requisite wireless data-communication adapter and processor. Appx442-443, 373:12-375:17 (addressing adapter and processor limitations). NexStep proved that MyAccount is associated with and troubleshoots customers' devices, such as set-top boxes, routers, and home security devices. Appx432-434, 334:7-340:6, Appx443, 376:14-378:24 (addressing device associating limitation). And, responsive to a single action from the user, MyAccount provides streamlined troubleshooting for these devices, automatically obtaining device identification and diagnostic data, selecting and contacting the appropriate support center, initiating a support session, and using device data to troubleshoot. Appx434-Appx441, 340:11-370:25 (addressing Single-Action Limitation). Thus, MyAccount infringes the Asserted Claims of the '009 Patent.

The primary infringement dispute at trial and the only infringement issue relevant to this appeal was the "Single-Action Limitation" of the Asserted Claims of the '009 Patent. *See* Appx453-462, 417:22-451:5 (cross-examination of Dr. Selker), Appx464-476, 461:11-508:18 (direct examination of Comcast's sole fact witness), Appx538-556, 599:9-671:20 (direct examination of Comcast's technical expert).

The Single-Action Limitation requires that several troubleshooting steps are initiated "responsive to a single action." *See* Appx210, Claim 1. NexStep argued the steps are initiated in response to a single tap on the touchscreen, Comcast argued that the steps were only performed after the customer tapped the screen three to five times ("screen taps"). Appx467-469, 473:3-482:13.

Either way, the single or short sequence of taps was literally or, at a minimum, the equivalent to a single action. The jury agreed with NexStep, finding infringement under DOE. Appx158, Appx161. Notably, this was the only DOE issue presented to the jury. During the trial, NexStep presented substantial evidence that, depending on how MyAccount was used, several of its troubleshooting processes were initiated in response to a single or a short sequence of screen taps. Appx437, 354:2-5; Appx481-482, 527:22-531:19; Appx562, 696:17-697:2 (showing that opening the XfinityAssistant initiates a diagnostic protocol), Appx437, 353:15-354:1; Appx560, 689:10-20 (showing that selecting "continue" on a troubleshooting page for a selected device starts a troubleshooting support session), Appx431, 329:13-330:16; Appx563, 700:25-701:21 (showing that selecting "Run Diagnostics" for a device initiates a diagnostic protocol). The jury's verdict was supported by all of this evidence.

Seven months after the trial, the District Court granted Comcast's motion under Rule 50(b) for JMOL. The District Court's JMOL Order was limited to the

single finding that NexStep's technical expert had not provided sufficient "linking" testimony to sustain the jury's infringement verdict under the DOE. *E.g.*, Appx13 ("The fatal flaw in Dr. Selker's testimony, however, is failure to provide a linking argument.").

## SUMMARY OF THE ARGUMENT

The three issues on appeal involve the same error: the District Court's decisions to act as the fact finder and resolve factual disputes that should have been or were decided by the jury.

***First,*** the jury's verdict finding that Comcast infringes the '009 Patent under the DOE should be reinstated. The key infringement dispute was if the one screen tap or a short sequence of screen taps to initiate MyAccount's troubleshooting processes was at least equivalent to the Single-Action Limitation. After the end of a trial featuring voluminous expert testimony, technical evidence, and live and deposition testimony form fact witnesses, the jury concluded that it was.

The District Court erred in substituting its judgment for the jury's because it failed to consider the whole of Dr. Selker's testimony regarding the link between the accused feature of MyAccount (the single screen tap or short sequence of screen taps) to the claimed Single-Action Limitation. Dr. Selker's faithful application of the facts of the case to the function-way-result test amply justifies the jury's infringement verdict, as does the substantial evidence of Comcast's infringement, and the jury's application of common sense to find that a single or short sequence of screen taps can be at least equivalent to a single action. Accordingly, the JMOL Order should be reversed and the jury verdict restored.

***Second,*** the Summary Judgment Order should be vacated and remanded for a trial on Comcast's infringement of the '802 Patent. The District Court's determination of non-infringement is founded upon an unsupported narrow claim construction of VoIP that contradicts the primary embodiments disclosed in the '802 Patent ***and*** the plain language of the claims. Moreover, even under the incorrect claim construction, genuine material disputes preclude summary judgment. Thus, infringement of the '802 Patent should be decided by the jury.

***Finally***, the *Daubert* Order should be vacated and the case remanded for a trial on damages. Mr. Reading's costs-savings opinion is well-founded, based on Comcast's own internal data and calculations, and tethered to the specific facts of this case for both parties, thereby satisfying the applicable legal precedent. The District Court abused its discretion due to legal error. Therefore, the question of the appropriate damages for Comcast's infringement should be restored to the jury.

# ARGUMENT

## I. THE JURY'S VERDICT THAT COMCAST INFRINGES THE '009 PATENT SHOULD BE REINSTATED BECAUSE IT WAS BASED ON SUBSTANTIAL EVIDENCE

### A. Standard of Review

Because this is an appeal from a patent case, the Court "appl[ies] the law of the regional circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1358 (Fed. Cir. 2017). Here, Third Circuit law applies to non-patent issues.

With respect to NexStep's appeal from JMOL, "[the Third Circuit]…view[s] the record evidence in the light most favorable to [NexStep as] the verdict winner, and drawing all reasonable inferences in [its] favor." *Pitts v. Delaware*, 646 F.3d 151, 155 (3d Cir. 2011). The Third Circuit has "cautioned that a court should grant judgment as a matter of law 'sparingly.'" *Id.* This "[C]ourt must not weigh evidence, engage in credibility determinations, or substitute its version of the facts for the jury's." *Id.*

The District Court's grant of JMOL should only be affirmed "if the record is 'critically deficient of the minimum quantum of evidence' upon which a jury could reasonably base its verdict." *Id.* Here the JMOL Order should be reversed because "there is evidence reasonably tending to support the recovery by plaintiff [on]" infringement under DOE. *Salas by Salas v. Wang*, 846 F.2d 897 (3d Cir. 1988).

### B. The Record Contains Substantial Evidence to Support the Jury's Verdict of Infringement Under Equivalents of the '009 Patent

Reversal is warranted because the record contains substantial evidence supporting the jury's verdict that Comcast infringes Claim 1, 16, and 22 of the '009 Patent, as shown below. For purposes of this appeal, the only relevant claim limitation is the Single-Action Limitation, which requires two troubleshooting steps to be initiated "responsive to a single action" (the "Troubleshooting Steps"). Appx210, Claim 1.[2] The jury's verdict is fully supported by the testimony of NexStep's technical expert Dr. Ted Selker, myriad technical documents, and the cross-examination of Comcast's witnesses.

#### 1. Dr. Selker Provided Substantial Evidence of Three Infringement Cases

Dr. Selker provided the jury with a detailed infringement analysis, showing that MyAccount on a smartphone or tablet has multiple functions where a single tap of the touchscreen or a short sequence of taps causes the required Troubleshooting Steps to be initiated. Each of these is an independent basis to reverse the JMOL Order and reinstate the jury verdict. Dr. Selker provided an overview of his opinion

---

[2] The Troubleshooting Steps include causing a home gateway to (1) buffer device information and determine a support center and (2) initiate a support session and forward device information. Appx210.

based on a single or short sequence of screen taps initiating the streamlined troubleshooting-process:

> When we open up the My Account already it is doing diagnosis of issues for all of the devices and actually associating them with it…if you press Xfinity Assistant, that's the second approach where that single button press goes ahead and starts diagnostic and shows you only the things that you need to deal with.
>
> So that's kind of nice. It's streamlined in that way.
>
> [F]or example, you saw me selecting television or selecting my home. Those take me as a single step in single action through the process of seeing what the status is and what the diagnosis and result was.

Appx434, 340:11-341:8.

Dr. Selker presented three different functions in MyAccount that infringe the Asserted Claims of the '009 Patent. Dr. Selker first demonstrated that MyAccount's XfinityAssistant infringes ("XfinityAssistant Infringement"). Appx437, 354:2-5. XfinityAssistant is a fully-automated trouble-shooting tool that uses artificial intelligence to detect and resolve technical problems with customer devices. For example, XfinityAssistant can detect that a customer's set-top box is malfunctioning and needs to be restarted. Appx431, 328:8-329:3. Customers launch XfinityAssistant by tapping the XfinityAssistant icon (annotated with a red rectangle below). Appx434, 340:11-341:8.




MyAccount Screenshot (showing XfinityAssistant button on left and, on right, automated troubleshooting actions that occur after tapping the XfinityAssistant button).

Dr. Selker demonstrated this functionality to the jury by showing a video of operation of MyAccount where the user starts XfinityAssistant by tapping the icon (left above). Appx428-429, 318:19-322:8. Then, without any further action from the user, XfinityAssistant detects that the user's television is malfunctioning and identifies troubleshooting solutions (right above). *Id.* Dr. Selker provided a detailed

analysis of how the XfinityAssistant causes the Troubleshooting Steps to be initiated in response to the user's single screen tap to open the XfinityAssistant. *Id.* Thus, XfinityAssistant Infringement satisfies the Single-Action Limitation.

MyAccount ***also*** infringes when a user first selects a device to troubleshoot, such as a specific TV, and is presented with a troubleshooting card indicating, for example, "TV issues have been detected" ("Troubleshooting-Card Infringement"). Appx437, 353:15-354:1; Appx560, 689:10-20 (expert testimony explaining infringement). A user can then initiate a troubleshooting process specific to the selected device (in this example, a TV). *Id.* From the troubleshooting screen for the particular TV, the user presses the "continue" button (annotated below with a red rectangle), which then triggers the Troubleshooting Steps to be initiated without any further user action. *Id.* Thus, Troubleshooting-Card Infringement satisfies the Single-Action Limitation.




MyAccount Screenshot.

MyAccount ***also*** infringes when a user selects a device from MyAccount's home screen (the first screen capture below) and then taps the "Run Diagnostics Check" button (second image below), which triggers the initiation of the Troubleshooting Steps ("Diagnostic-Check Infringement"). Without further user action, MyAccount displays "Scanning Your System" (third image below), followed by reporting on if there are any equipment issues (fourth image below). Appx431,

329:13-330:16; Appx563, 700:25-701:21 (expert testimony describing Diagnostic-Check Infringement). Thus, Diagnostic-Check Infringement also satisfies the Single-Action Limitation.




MyAccount Screenshots (illustrating Diagnostic-Check Infringement).

Dr. Selker provided a detailed analysis for each of the three infringement cases, showing the actions that are automatically performed by Comcast's servers in response to either a single or a short sequence of taps on MyAccount, satisfying the Single-Action Limitation. Appx434, 340:11-341:8, Appx437, 353:15-354:5. This alone was sufficient evidence to sustain the jury verdict and preclude JMOL.

### 2. Dr. Selker Explained How a Single Screen Tap or a Short Sequence of Screen Taps is at Least Equivalent to a Single Action

As discussed above, Dr. Selker provided detailed uncontroverted evidence regarding how Comcast infringes, namely how MyAccount satisfies the Single-

Action Limitation (as well as all other elements of the Asserted Claims of the '009 Patent, which are not at issue on appeal as they were not involved in the District Court's grant of the JMOL Order). Because Comcast contended that multiple screen taps were required to initiate the Troubleshooting Steps and disputed that a sequence of screen taps could be a single action, Dr. Selker provided an opinion that proved, at a minimum, infringement under the DOE. He pointed to a single screen tap or short sequence of taps to cause MyAccount to initiate troubleshooting as being not less than equivalent to the Single-Action Limitation.

Infringement under the DOE requires a showing that the difference between the claimed invention and the accused product was "insubstantial," which is often established by showing that the accused product performs "substantially the same function in substantially the same way with substantially the same result." *Brilliant Instruments, Inc. v. Guidetech, LLC*, 707 F.3d 1342, 1347 (Fed. Cir. 2013). Here, Dr. Selker's testimony addressed these issues in detail.

#### a) A Single or a Short Sequence of Screen Taps is at Most "Insubstantially" Different From a Single Action

Dr. Selker testified that initiating troubleshooting required a single or short sequence of screen taps which is, at most, insubstantially different from the Single-Action Limitation. This alone was sufficient to sustain the jury's infringement

verdict. In particular, Dr. Selker explained that such screen taps are part of the same single action, just as every action involves, at some level, multiple sub-parts:

> Q. In your view,… what is … a single action, can it initiate a troubleshooting process?
>
> A. Yes… a single action like fixing your modem is something that you embark to do and … whatever a single action is, let's say it's even pressing a button, you have to see the button, you have to go think about it, you have to move your finger to it, you have to go and press it and you have to see that it's responded. So whatever a single action is, whether a single press or other things, there's some parts to it. ***And I call those steps a single action***.

Appx434, 341:25-342:18.

During cross-examination, Dr. Selker reiterated his explanation that, in addition to a single tap, multiple taps are, at most, insubstantially different from a single action because every action can have multiple sub-parts, just as the single action of throwing a baseball includes multiple subparts:

> ***multiple steps might be contained in a single action***. For example, when you throw a baseball, you pick it up, you orient it, you get it in your palm, you throw it. There's several steps to…throwing a baseball.

Appx460, 444:22-445:4.

Dr. Selker then confirmed that a single or short sequence of screen taps to start troubleshooting would be at least equivalent to a single action because they represented a "single stream-like action" to initiate troubleshooting:

> to the extent the action to start the troubleshooting processing is not literally a single action, ***it is at least equivalent to a single action because a single stream-like action starts the process to begin***

> ***troubleshooting*** including collecting buffer data from customer service such as identification data.

*Id.*, 446:6-20.

Thus, Dr. Selker provided a well-reasoned opinion that the jury could have reasonably accepted that a single or short sequence of screen taps are "insubstantially different" from a single action. This testimony alone was sufficient to sustain the DOE infringement verdict and dictates reversal of the JMOL Order.

#### b) MyAccount Satisfied the Single-Action Limitation Under the Function-Way-Result Test

Dr. Selker testified that a single or short sequence of screen taps is equivalent to the Single-Action Limitation under the function-way-result test, which is a further basis to sustain the jury's infringement verdict and reverse the JMOL Order.

##### i. MyAccount Provides the Same Function as the Single-Action Limitation: a Streamlined, Consolidated Process

Dr. Selker explained that the function of the Single-Action Limitation is to provide a streamlined, consolidated troubleshooting process that does not require multiple, disparate actions by the customer:

> ***the point of this thing is that it's completely streamlined***. You don't have to give all this information about your device, get underneath it, look at the serial number, look at the model number, whatever.

Appx428, 315:16-316:7.

Referring back to his earlier testimony, Dr. Selker explained that MyAccount's single screen tap or short sequence of taps has the same function as the Single-Action Limitation: starting troubleshooting with a streamlined, consolidated process:

> even if it doesn't [literally meet the Single-Action Limitation], even if there was some…technicality about some words or something…basically ***it does the same function***. ***The whole function of this device is to allow a person to very simply with the single action cause everything to happen***. Cause all of that stuff to be buffered, all of that.
>
> ***
>
> Q. I understand that you believe that a single action is met literally, but can you explain why at the very least the single action element is met by the doctrine of equivalents?…
>
> A…when you go to debug…to diagnose your device, you're going through a single action. ***It might be that there's several button presses along the way, but I say that's the same function***. And that ***it's going to have the same purpose which is what I was talking about***.

Appx444-445, 382:20-385:1.

Dr. Selker explained that, as with the Asserted Claims, there is no need to provide MyAccount with the model or serial number for a device, because the single or short sequence of screen taps starts a process that will automatically have that information:

> we've seen several examples already that there is a direct mapping that …[MyAccount and the consumer electronic device] know about each other. The information is there. And you're going to see they're actually just opening this thing up, already ***it knows the model number and serial number of the devices*** that I'm looking at.

***

> you remember seeing when I opened up a television I could see the model number and the serial number. That device information is all right there on your Concierge device brought to you by the home gateway so that you can ensure that you're working on this.

Appx432, 334:13-18, Appx447, 392:6-10.

Thus, Dr. Selker provided a fulsome explanation to the jury of how MyAccount performs the same function as the Single-Action Limitation, fully linking the accused functionality to the limitation.

#### ii. MyAccount Operates in the Same Way as the Single-Action Limitation

Dr. Selker also testified that MyAccount operates in substantially the same way as the Single-Action Limitation. As discussed above, this element requires that, in response to a single action, a sequence of steps are initiated to commence troubleshooting. Dr. Selker summarized that the single action performs its function by triggering a series of troubleshooting steps to proceed:

> the single action is communicating with the gateway, gathering information and making decisions about what to do to solve problems for the person. And then allowing them to do it, too.

Appx428, 316:4-7.

Dr. Selker linked his infringement analysis to this limitation, explaining that the single screen tap or short sequence of taps in MyAccount does exactly that, causing each of the Troubleshooting Steps to be initiated. Appx434, 340:11-341:8; Appx435-436, 343:9-347:13 (providing a detailed analysis of how MyAccount

communicates with Comcast's CX home gateway in response to user's initiation of troubleshooting process to perform the Troubleshooting Steps). Thus, Dr. Selker provided detailed testimony linking the customer's screen taps that satisfy the Single-Action Limitation to the initiation of the Troubleshooting Steps.

Dr. Selker followed this testimony by explaining that, to the extent a single screen tap or short sequence of taps is not literally a single action, it is still performing the function in the same way, referring back to his detailed prior testimony discussed above:

> ***[i]t's done in the same way*** in that the stuff is all kept up in the cloud for the purpose of doing this and it's going to go and diagnose it using the home gateway and it's going to solve my problem without me having to go through and put in my model numbers and all of that…[it is] using this Concierge as more of a [device] to give authorization than to do the actual function.

Appx445, 384:13-385:1.

Dr. Selker's conclusion on DOE should not be read in a vacuum. In the above passage, Dr. Selker referred to and incorporated his earlier detailed testimony about how devices are registered in the cloud, communications between MyAccount and Comcast's home gateway, the exchange of data, and the troubleshooting process. Thus, viewing his testimony as a whole, Dr. Selker explained that the single screen tap or short sequence of taps authorizes MyAccount to proceed to initiate the Troubleshooting Steps, instead of requiring the user to perform each step, and that

this is the same way that the Single-Action Limitation of the Asserted Claims works. *Id.*

#### iii. MyAccount Yields the Same Result as the Single-Action Limitation

Dr. Selker testified that MyAccount provided substantially the same result as the Single-Action Limitation: initiating automated troubleshooting without the user taking a lot of disparate steps or inputting significant data:

> the point of these last two things…is where we're [solving] the person's problems, so either the problem is getting solved so they don't have to go through this interactive voice response system like you're used to … or it's going to go into this automated protocol where you go through and it helps you through the steps. ***So whatever is going to happen here it's all about you not having to put in data, you not having to figure out what's going on***. All you have to do is say, I want it fixed.

Appx441, 369:10-370:25.

Dr. Selker testified that the result of the customer initiating MyAccount with one or a short sequence of screen taps is the initiation of the troubleshooting process, which is the same result as the Single-Action Limitation:

> Q. So you push the single action of launching the XfinityAssistant; right…Tell us what happens on the back end?
>
> A. Yeah, what's happened is that as it's gone through and looked at all of my devices, it has diagnosed an issue with this television. And so that's really the only thing it was going to bother telling me about… This is going forward…now that we've initiated a troubleshooting session.

***

> So we have this I think very important part which is the back end has figured out there's a problem with my TV.

Appx429, 320:5-322:8. Thus, Dr. Selker explained that the customer's single or short sequence of taps results in the initiation of troubleshooting.

Finally, Dr. Selker confirmed that a single or short sequence of taps achieves the same result as the Single-Action Limitation under the DOE, obtaining device troubleshooting without having to go through multiple, different actions:

> the result is that this [device] is going to be restarted, refreshed, [or] whatever is going to have to happen with it without me having to tangle with understanding all of the issues of being an IT professional or whatever it takes to get this thing up.

Appx445, 385:2-9.

In sum, Dr. Selker explained that the result prong of the DOE test is satisfied because MyAccount results in the troubleshooting process being initiated without the user having to perform a sequence of involved steps. This is the same result as the Single-Action Limitation.

### 3. Additional Evidence Supported the Jury's Infringement Verdict

In addition to Dr. Selker's detailed testimony, additional evidence supported the jury's finding that MyAccount satisfies the Single-Action Limitation under the DOE.

#### a) Comcast Technical Documents and Source Code Supported Infringement

Dr. Selker substantiated his testimony with a variety of Comcast technical documents that were introduced into evidence. For example, a Comcast internal architectural document illustrates the communications between MyAccount and Comcast's CX home gateway after a customer presses a button (screen tap) initiating a support session. Appx17004-17017 (Comcast technical document). As Dr. Selker explained, this document shows that the customer's screen tap causes MyAccount to initiate communications with the home gateway, satisfying the Troubleshooting Steps. Appx435-436, 345:15-347:24 (explaining architecture documents).

Dr. Selker further substantiated his testimony with Comcast's source code for MyAccount. For example, Dr. Selker explained how the source code showed MyAccount, responsive to a single action, communicates with the home gateway. Specifically, Dr. Selker highlighted where the source code shows that MyAccount "call[s] the support server to talk to the [user's device] and to [the] back end…[about the device] issue because that's what's been detected." Appx436, 348:16-349:13.

Similarly, Dr. Selker explained how the source code proves that MyAccount causes the home gateway to determine an appropriate support center limitation. Appx438-439, 357:12-360:18. Testing screenshots of MyAccount also evidence the automated communications between MyAccount, Comcast's home gateway, and Comcast's servers in response to the customer's initiation of MyAccount

troubleshooting processes. Appx17124; Appx435, 344:8-345:4 (explaining that the loading icon in the screen capture reflects automated communications between MyAccount and Comcast's home gateway meeting the Troubleshooting Steps).

Other Comcast documents show the functionality of MyAccount after the user presses the XfinityAssistant button (one of the actions accused of satisfying the Single-Action Limitation), further supporting infringement under the DOE. For example, one document shows MyAccount reporting the detection of Internet problems and recommending a troubleshooting action (rebooting the device) in response to this button push, further evidencing that a short sequence of taps initiates the Troubleshooting Steps. Appx17118; Appx435, 345:5-14 (describing troubleshooting actions).

Guided by Dr. Selker's detailed technical testimony, the jury reasonably relied on the numerous Comcast technical documents in evidence in concluding that a single screen tap or short sequence of taps initiating troubleshooting in MyAccount was equivalent to the Single-Action Limitation.

#### b) Dr. Villasenor's Cross-Examination Testimony is Further Evidence Supporting the Jury's DOE Verdict

Comcast's infringement expert, Dr. Villasenor, conceded on cross-examination that each of the infringement cases is started by a single screen tap that causes the Troubleshooting Steps to be performed. These admissions further support the jury's DOE infringement verdict.

With respect to XfinityAssistant Infringement, Dr. Villasenor admitted that a single click starts the function, confirming that it requires only a single action.

> Q. [T]his is the home page; correct?
>
> A. This is the overview screen that you get when you log on or open the device. That's right. Yeah.
>
> Q. Okay. And you agree, just like everyone here so far, that if I hit on that little black circle, that's a single action; right?
>
> A. Yes…that itself is a single action subsequent to opening the app. That's right.

Appx562, 696:17-697:5.

Dr. Villasenor also admitted that pressing the continue button, the basis for Troubleshooting-Card Infringement, is also "a single action":

> Q. Now, during your direct testimony, you talked about this continue button…But what you didn't talk about was what happens on the back-end when that's pressed…You'd agree with me that pressing that continue button is a single action; correct?
>
> A. It is. It is one action, that's right.

Appx560, 689:10-20.

Dr. Villasenor further admitted that pressing the run-diagnostic button, the basis for Diagnostic-Check Infringement, is "a single action."

> Q. [W]hen you click on the run diagnostic button, in your view, that would be a single click; right? A single action?...You'd agree that's a single action?
>
> A. Yes, that's right.

Appx563, 700:25-701:21 (tapping run-diagnostic button is a "single action"). Thus, Dr. Villasenor conceded that in each of the three cases, a single screen tap initiates troubleshooting.

In addition to corroborating the single actions for the three infringement cases, Dr. Villasenor further confirmed on cross-examination that the infringement cases cause various of Troubleshooting Steps to be performed. Appx562-563, 695:15-700:24, Appx563-565, 701:8-707:7. This testimony included confirming that the Xfinity Backend buffers consumer device identification information, communicates with the devices, and determines the appropriate support center, in addition to, initiating automated troubleshooting to detect any issues with the Xfinity devices and automatically forwarding the consumer device identification information to the support center. *See, e.g.*, Appx560-562, 689:10-695:14.

The jury reasonably relied upon Dr. Villasenor's admissions to further conclude that MyAccount satisfies the Single-Action Limitation under the DOE.

#### c) Mr. Karinshak's Cross-Examination Testimony Further Supported the Jury's Verdict

Comcast's sole fact witness, Mr. Karinshak, also conceded on cross-examination that a single tap starts XfinityAssistant, which further confirmed Dr. Selker and Dr. Villasenor's testimony that XfinityAssistant Infringement requires only a single action to initiate:

Q. [T]he tap count is at one?

A. The first action that we took was to…launch the XfinityAssistant.

Q. Right…It's taken one tap to get there, not seven, not three, and not six. One single action will get to that screen; correct?

A. Yes. The first action that we did was to click on the XfinityAssistant.

Appx482, 531:10-19 (agreeing that "[o]ne single action" will "launch the XfinityAssistant"). Thus, Comcast's fact witness (and technical expert) confirmed that a single tap initiates troubleshooting, confirming the factual predicate for Dr. Selker's DOE opinion.

### C. In View of the Record Evidence, the JMOL Order Was Legal Error

The JMOL Order should be reversed as legally erroneous and the jury verdict reinstated. "On appellate review, the evidence at trial must be viewed in the light most favorable to [NexStep who] secured the jury verdict." *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996). This Court's "appellate role ends when there is shown to be substantial evidence, on the record as a whole, as could have been accepted by a reasonable jury as probative of the issue." *Id.* Here, substantial evidence supports Dr. Selker's opinion and the verdict that MyAccount infringes under DOE. Moreover, expert testimony is not required to establish infringement under DOE, especially in a case such as this one where the DOE issue was non-technical in nature. Thus, the District Court should not have substituted its own judgment for the jury's.

### 1. Dr. Selker Fully Explained His DOE Opinion

Dr. Selker testified that all the required functions were performed in response to a single screen tap (as NexStep and Dr. Selker contended) and, therefore, that Comcast literally infringed (because a single tap is a single action). However, after providing the very detailed infringement analysis discussed above, Dr. Selker presented the additional argument that, to the extent that Comcast was correct that several screen taps were required to trigger this functionality, that still would literally infringe (because several taps can be a single action) or, at the very least, would infringe under DOE because any difference between MyAccount and the Single-Action Limitation is insubstantial.

Viewing the evidence as a whole and in the light most favorable to NexStep, the jury could have reasonably found infringement under the DOE. *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, 809 F. App'x 965, 973 (Fed. Cir. 2020) ("Ariosa fails to demonstrate that a reasonable jury could not find infringement under [DOE]"). In particular, the jury could have reasonably concluded, and based on its verdict in fact did conclude, that the single screen tap or a short sequence of taps needed to start MyAccount's troubleshooting functionality in one or more of the infringement cases was at least equivalent to the Single-Action Limitation.

Accordingly, this Court should reverse the District Court's grant of JMOL and reinstate the jury's infringement verdict. *Fonar Corp. v. General Elec. Co.*, 107

F.3d 1543, 1556 (Fed. Cir. 1997) ("there was substantial evidence upon which the jury rendered its verdict finding that the accused machines infringed the asserted claims…under [DOE], and the district court erred in granting the motion for JMOL to the contrary."); *GlaxoSmithKline LLC v. Teva Pharms. U.S., Inc.*, 976 F.3d 1347, 1356 (Fed. Cir. 2020) ("We conclude that there was substantial evidence to support the jury's findings of induced infringement….The grant of JMOL is reversed").

As shown in Section II.B.1, Dr. Selker employed the correct legal test, explaining that any differences between the Single-Action Limitation and the sequence of taps needed to start MyAccount's troubleshooting functionality are insubstantial because they perform substantially the same function in substantially the same way, to achieve substantially the same result, as the limitation at issue in the claim. *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1382 (Fed. Cir. 2001) (affirming denial of JMOL of noninfringement seeking to overturn jury verdict finding infringement under DOE). Dr. Selker provided detailed testimony in support of each of these elements. Appx444-445, 382:20-383:10, 383:25-385:15.

The District Court's JMOL Order focused only on the conclusion of Dr. Selker's testimony when he explicitly referenced the DOE:

> Dr. Selker's DOE testimony…fails to describe what steps in Comcast's app are equivalent to the "single action" limitation. He only mentions "several button presses." Without particularized testimony on what exactly the purported equivalent is, it is difficult to understand how the

> equivalent can perform substantially the same function in substantially the same way with substantially the same result as the claimed device.

Appx14.

In incorrectly finding that Dr. Selker had not explained the several button presses at issue, the District Court failed to consider the hours of testimony that proceeded his DOE analysis, where Dr. Selker explained the three infringement cases in great detail, including the specific single tap or sequence of screen taps that triggers the Troubleshooting Steps. Section I.B.1. Instead, by focusing on the conclusion and ignoring everything that preceded it, the District Court reached the erroneous finding that Dr. Selker's DOE opinion was unsupported:

> Dr. Selker failed to provide the requisite linking argument. The function of the "single action" limitation is to cause the "home gateway" to perform four steps. Dr. Selker testified that "several button presses along the way" is the same function. The extent of his support is: "I say that's the same function." This is not testimony from a [person of ordinary skill in the art] "showing how plaintiff compares" the function of the claimed device and the accused device. *Lear Siegler*, 873 F.2d at 1425.

Appx15-16. This was erroneous because it failed to consider Dr. Selker's testimony and the supporting evidence as a whole.

There is no specific formulation of the type or content of the evidence and argument required to establish infringement under the DOE. *Nat'l Presto*, 76 F.3d at 1191. When presenting equivalence testimony, an expert is not required to "re-start his testimony at square one when transitioning to a doctrine of equivalents

analysis." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007). Instead, an expert may explicitly or implicitly incorporate his earlier testimony into the DOE analysis. *Id.* That is exactly what Dr. Selker did. Therefore, there was no basis to take away the jury's verdict based on an incorrect and overly rigid application of the DOE standard, and reversal is warranted.

**2. Expert Opinion Testimony Was Not Needed to Establish Comcast's Infringement of the Single-Action Limitation Under DOE**

Even if there was some shortcoming in the linking portion of Dr. Selker's DOE analysis (which is not the case), the jury's infringement verdict should be sustained on common sense alone. This Court has recognized that "where the technology is easily understandable without the need for expert explanatory testimony," as is the case here, "precedent does not require opinion testimony, and certainly does not require expert opinion testimony, for a finding of equivalence." *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 966 (Fed. Cir. 2018) (non-precedential).

In *WCM*, defendant sought review of the denial of its motion for judgment as a matter of law as to no infringement under the doctrine of equivalents. *Id.* at 961. The jury relied on the testimony of plaintiff's Director of Engineering, an employee, and the inventor of the infringed patents and determined that the claimed lug was equivalent to a locknut, without relying on expert testimony. *Id.* at 967.

In upholding the jury verdict of infringement under DOE, the Court explained that "proof [of infringement under DOE] can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, … by the disclosures of the prior art." *Id.* at 966. In light of this, the Court found that the jury's verdict of infringement under DOE was supported by substantial evidence.

Here, NexStep's DOE case was limited to a single element and based on substantial evidence that MyAccount performs the Troubleshooting Steps in response to one or at most a few screen taps. This included Dr. Selker's testimony (Section I.B.1) and the other record evidence (Section I.B.3), such that by the time it reached its verdict, the jury well understood the operation of MyAccount and the link between the accused functionality and the Single Action Limitation.

The battle for infringement between NexStep and Comcast boiled down to one issue—whether one screen tap or a few screen taps after MyAccount was open is the equivalent of a single action. Here, the technology is easily understandable and the jury reasonably relied on its common sense to find equivalence. This is the same as asking a jury to decide if pushing several buttons to initiate a phone call is equivalent to a single action—no expert analysis is needed to conclude that it is. Therefore, the jury's common-sense verdict should be reinstated.

## II. SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE ’802 PATENT SHOULD BE REVERSED

The Summary Judgment Order issued before trial should be vacated because it was based on an erroneous claim construction of "VoIP" and precluded by genuine issues of material fact. Thus, this case should be remanded for a trial on infringement of the ‘802 Patent so that a jury can resolve this dispute.

### A. The District Court’s Construction of "VoIP" is incorrect

#### 1. Standard of Review

The District Court’s construction of VoIP and its summary judgment grant are reviewed *de novo*. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331 (2015) ("[W]hen the district court reviews only evidence intrinsic to the patent (the patent claims and specifications, along with the patent’s prosecution history), the judge’s determination will amount solely to a determination of law, and [the Court] will review that construction de novo."); *Centrak, Inc. v. Sonitor Techs., Inc.*, 915 F.3d 1360, 1365 (Fed. Cir. 2019). Under this standard of review for summary judgment, the Court views the facts in the light most favorable to NexStep, as the nonmoving party, and draws all inferences in NexStep’s favor. *Id.*

The Court reviews the District Court’s underlying factual findings for clear error. *Id.* Before such deferential review is applied, the "district court must have actually made a factual finding in order to trigger … deferential review." *Cardsoft, LLC v. VeriFone, Inc.*, 807 F.3d 1346, 1350 (Fed. Cir. 2015).

### 2. The District Court Improperly Limited VoIP to "Voice Conversations" Between Two People Excluding Other Forms of Voice or Audio Content

It was not disputed how Comcast's Voice Remotes operate: (1) a user presses the blue microphone button on the remote (shown below with a red box) and gives a voice command (e.g., "find ESPN"), (2) the Voice Remotes send voice commands to a tethered set-top box, (3) the set-top box then puts the voice commands into VoIP format and sends them over the Internet to Comcast's servers, and (4) Comcast's servers process the command and send back data so the set-top box can show the user the desired information (e.g., the channels with ESPN). Appx6451, ¶¶50-52, Appx6453, ¶¶61-62.




Appx6891 (annotation added).

The District Court found that the Voice Remotes do not infringe the ‘802 Patent because the set-top box did not have a two-way voice conversation with the

user. Appx 122-123. The District Court construed VoIP as "[p]rotocols and data formats for transmitting voice conversations over a packet-switched network, such as the Internet." Appx41-42; Appx47. This construction, as applied by the District Court, is erroneous because it limits VoIP to two way "voice conversations." On this basis, the District Court found non-infringement, noting "NexStep has not offered any evidence showing that HTTP can carry out two-way voice conversations…." Appx122.

"VoIP" stands for "Voice over Internet Protocol." Appx3041, ¶41. It refers to a group of "protocols for sending audio data over a packet-switched network, such as the Internet." *Id.* VoIP can be used to carry any kind of audio data — from piano music, to a dog barking, to voice conversations. Appx3042, ¶42. There is nothing inherent to the VoIP protocol that limits it to voice conversations. *Id.*

Although the '802 Patent does not define VoIP, it explains that VoIP can be used for a wide range of audio content and is not limited to two-way voice conversations:

> One aspect of the remote is to provide a complete I/O platform in the palm of the user's hand. ***Features adaptable to VoIP and/or video phone operation, such as a microphone, can be used for other purposes, such as dictation, note taking, voice messaging, listening to music or remote viewing video***.

Appx221, 3:58-63.

A person of ordinary skill in the art reading the above passage to understand that scope VoIP was given in NexStep's patents would understand that each of the applications, such as "dictation, note taking, voice messaging, listening to music or remote viewing video," involves the transmission of audio data over the Internet, but not the transmission of voice conversations between two people. Appx3042, ¶42. Despite these undisputed disclosures in the specification, the District Court nonetheless construed VoIP to exclude all of this scope of VoIP, violating the principle that claim constructions that exclude embodiments are "rarely, if ever, correct." *Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*, 616 F.3d 1283, 1290 (Fed. Cir. 2010).

Similarly, reviewing the use of VoIP in the context of the asserted claims of the '802 Patent further confirms that it should not have been limited to two-way voice conversations. Claim 1 of the '802 Patent provides that the audio data sent from the remote control comprises "control signals":

> the remote control depends on the master device to transcode input from the slaved audio input to VoIP from the remote control device format and relies on the master device to respond to control signals sent by the remote control device in the packets.

Appx230.

Claim 7 describes that the master device transcodes the audio data from the remote control and sends it to the "signal source," which refers to, for example, the servers providing the audio-visual content to a set-top box:

> receives audio packets from a slaved audio input on the remote control device, transcodes the audio signal packets into transcoded audio packets and forwards the transcoded audio packets to the signal source.

Appx231.

Thus, in both of the asserted claims of the '802 Patent, the audio data refers to voice commands, not a conversation between two people. Notably, unasserted Claim 4, unlike Claims 1 and 7, recites an "audio output," which is necessary to engage in a two-way voice conversation. Under the doctrine of claim differentiation, the express inclusion of an audio-output limitation in Claim 4 compels the conclusion that there is no audio output requirement in Claims 1 and 7, further confirming that those claims do not require two-way conversations (which would require both audio inputs and outputs). *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC.*, 403 F.3d 1364, 1370 (Fed. Cir. 2005) (under claim differentiation it is improper to read limitations from one claim into another).

The construction should be reversed because it is inconsistent with these embodiments and the meaning of the claims as a whole. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389 (1996) ("[A claim] term can be defined only in a way that comports with the instrument as a whole.").

Thus, the VoIP construction conflicts with the intrinsic evidence and should be reversed. VoIP should be construed to mean "protocols and data formats for transmitting *voice data* over a packet-switched network, such as the Internet." Appx3041-3042. Under such a construction, genuine factual disputes preclude

summary judgment because it is undisputed that Comcast's Voice Remotes carry voice-instruction data over Internet Protocol. Appx6494-6502, ¶¶154-165; Appx8473-8476.

### 3. Genuine Issues of Material Fact Precluded Summary Judgment, Even Under the District Court's Construction

Even under the District Court's erroneous "voice conversation" construction, a jury should have decided whether Comcast's Voice Remotes infringe NexStep's '802 Patent because there is at least a genuine factual dispute that the messages sent by Comcast's set-top boxes are VoIP messages. Specifically, NexStep's expert opined and a jury could have reasonably found that a customer's spoken command is voice conversation data. Thus, there was a genuine dispute over the application of the claim construction for VoIP that should have precluded summary judgment.

The Voice Remotes control Comcast set-top boxes, which provide video content to customers' televisions, and accept voice commands from customers. Appx6451-6453 ¶¶50, 58, 60. It is undisputed that the Voice Remotes have audio inputs for accepting customers' spoken voice commands. Appx6871-6872 (Comcast's admission that its Voice Remotes "have an audio input for receiving voice commands."). The Voice Remotes also include a voice control button for enabling reception of audio signals through a microphone audio input, as shown below.






Appx6833 (annotation added to show voice control button); Appx6891 (showing blue microphone button for voice-control feature).




Appx6893 (photograph of XR15 remote, showing microphone) (enlargement added).

NexStep's expert, Dr. Marilyn Wolf, explained that when a customer speaks a command, such as to change to a specific channel, the Voice Remotes capture the audio of the command words spoken by the customer, convert that audio into ADPCM (an audio compression format), and send it to the set-top box using R4FCE (a special format for remote control devices). Appx6465-6466, ¶109; Appx6973-6975, ¶¶41-45.

The set-top box then converts the command to send over HTTP (an Internet Protocol format). Appx6973-6975, ¶¶43, 45. The audio data packets are voice conversation data which are sent over the Internet (a packet-switched network). Appx6975, ¶45; Appx6838-6839, 111:21-112:13 ("Q. And then the set-top box sends that data over Internet protocol to the Comcast cloud? A. Yeah. It takes the payload untouched and puts it into a protocol to be able to send it over our network to come up to…the X1 platform. Q. [I]t sends those packets by Internet protocol, correct? A. [I]t would have to because that's how it communicates up."); Appx6844-6847, ¶¶116, 131.

Given that Comcast's disagreement regarding VoIP relates to the application of the construction to its Voice Remotes, the factual disputes should have been reserved for the jury, and should not have been decided on summary judgment. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1302 (Fed. Cir. 2011) (finding

a disputed issue of fact where "the claim construction itself [was] not contested, but the application of that claim construction to the accused device [was]").

Accordingly, summary judgment of Claims 1 and 7 of the '802 Patent should be reversed and remanded for further proceedings so that a jury may resolve the factual dispute over Comcast's infringement of the '802 Patent.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION IN EXCLUDING NEXSTEP'S DAMAGES CASE

### A. Standard of Review

The District Court's decision to exclude Mr. Reading's cost-savings damages opinion is reviewed for abuse of discretion. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,* 711 F.3d 1348, 1356 (Fed. Cir. 2013). To constitute an abuse of discretion, a decision must be based on "a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *Issa v. Sch. Dist. Of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017). A decision based on legal error is per se an abuse of discretion. *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 898 (Fed. Cir. 1986).

### B. The District Court Abused Its Discretion in Excluding the Testimony of NexStep's Damages Expert

#### 1. Mr. Reading Relied on the Specific Facts of This Case to Select the Royalty-Rate Starting Point

Mr. Reading selected the starting point for the parties' royalty-rate negotiation based on the specific facts of this case. He relied on the following case-specific facts to analyze the appropriate starting point for the parties' negotiation:

- NexStep and Comcast would identify cost savings as the benefit of Comcast's infringement of the '009 Patent based on reduced customer service interactions and truck rolls. Appx9252; Appx9410; Appx9629.

- Comcast's cost savings from infringement would be pure profit to Comcast. Appx9198-9199; Appx9628-9629.

- Given its circumstances and the importance of customer service, the pure profit Comcast could realize by infringing would make it more willing to share a higher percentage of the savings with NexStep. Appx9252; Appx9410; Appx9627.

- Given its size and financial situation, Comcast would need an incentive to use the technology and thus would likely agree to a license where it retained a meaningful percentage of the savings. Appx9252; Appx9410; Appx9627.

Thus, he identified competing factual considerations specific to this case. While Comcast would have a negotiating advantage over NexStep, it would want to realize the substantial profits from its use of NexStep's patented technology that also provided its customers a desirable and convenient customer service. Further,

Comcast would also need an incentive to use the technology, which meant it would keep a large portion of the cost savings. Based on those factual considerations, Mr. Reading found that the parties would have begun their hypothetical negotiation using a 50/50 division of the cost savings as the starting point. Appx9252; Appx9410; Appx9627-9629.

Mr. Reading then applied the *Georgia-Pacific* factors to conclude that the parties would have ultimately arrived at a 40/60 split based on additional specific factual considerations of the parties. For example, he looked at Comcast's size as a "large global company" and "sophisticated contract negotiation resources," which would give it "an advantage in a typical negotiation with a smaller entity like NexStep," (resulting in a downward adjustment to the royalty rate), the nature of the accused technology and how it is used, the patent advantages (yielding an upward adjustment), nature and benefits of the invention and extent of use (small upward adjustments), and nonpatented elements (very large downward adjustment). Appx9150-9151, Appx9164-9166, Appx9193-9194, Appx9250-9252; Appx9630-9631. He determined that the net effect of all these factors was a 10% downward adjustment (i.e., to the benefit of Comcast), resulting in a 40/60 cost share split based on the specific facts of this case. Appx9252.

### 2. Mr. Reading's Opinion Complied With This Court's Precedent Because it Was Based on the Specific Facts of the Case

Because Mr. Reading grounded his opinion on the specific facts of the case, satisfying this Court's precedent, the District Court abused its discretion in excluding it. *Antonio v. Progressive Ins. Co.*, 795 F. App'x 128, 131 (3d Cir. 2020). This Court's precedent requires only that an expert identify facts in the case at issue that support the starting point, as Mr. Reading did here. *Uniloc*, 632 F.3d at 1317-18.

Specifically, *Uniloc* explains that the evidence on which damages experts rely "must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Id*. at 1318. While this Court in *Uniloc* ultimately excluded the damages opinion in that case as an arbitrary rule of thumb untied to the facts of that case, it nonetheless provided examples of the facts from different negotiating scenarios that would be relevant to the starting point for negotiations:

> (a) TinyCo and IBM over a strong patent portfolio of twelve patents covering various aspects of a pioneering hard drive, and (b) Kodak and Fuji over a single patent to a tiny improvement in a specialty film emulsion.

*Id.* at 1317.

These examples the Court provided identify the relative bargaining power of the parties and the contribution of the patented technology being licensed as appropriate grounds to identify a starting point for negotiations.

Mr. Reading's analysis was consistent with and more detailed than the examples of acceptable facts set forth in *Uniloc.* For example, Mr. Reading found that Comcast needed an incentive to use the technology because its size and financial situation meant it did not have to license the technology. As such, Comcast would likely agree to a license where it retained a meaningful percentage of the savings. Appx9252; Appx9410; Appx9627. At the same time, Mr. Reading explained that the patented technology contributed to significant cost savings for Comcast which is pure profit for Comcast, while simultaneously boosting its customers' satisfaction of their services. Thus, the significant contribution of the patented technology was incredibly valuable to Comcast at the same time. *Id*. These facts led him to his supported and well-reasoned 50/50 split as a starting point for negotiations.

Other district courts have found similar types of facts support using a 50/50 split as a permissible starting point. *See, e.g., Gree, Inc. v. Supercell Oy*, No. 2:19-cv-00200, 2021 WL 514757, at *4-5 (E.D. Tex. Feb. 11, 2021) (allowing opinion in which expert "split the difference" between low and high end of royalty range and adopted the "midpoint" based on analysis of relative bargaining power of parties, because expert's "analysis of the *Georgia-Pacific* factors is sufficiently tied to the

facts of the case"); *Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharms. Inc.*, No. 07–5855, 2011 WL 383861, at *12-13 (D.N.J. Feb. 3, 2011) (finding 50/50 profit split was based on the "specific facts of this case").

Thus, Mr. Reading's opinion complied with this Court's precedent requiring that an expert select a starting point based on the facts of a case.

#### 3. The District Court Ignored the Case Specific Facts That Supported Mr. Reading's Opinion

The District Court made an erroneous finding of fact and applied the wrong legal standard when it held that "the facts offered by [NexStep] could be true of a negotiation of cost-savings technology (or anticipated profits) ***by any two parties***, meaning that they are ***not particular to the facts of this case***." Appx141 (referencing *Uniloc* and *VirnetX Inc. v. Cisco Sys., Inc.*).

The facts were not generic and would not apply to many hypothetical negotiations that could arise in patent cases. For example, if the two negotiating parties were competitors, as opposed to licensee and promoter as here, the patentee would be unlikely to sacrifice a competitive edge for a relatively smaller share of the cost savings. If the licensor was much larger than the licensee, then the licensor might have demanded an outsized share of the cost-savings. If the licensor had an established licensing program, the set rate from the program would be the natural starting point for a reasonable-royalty rate negotiation.

These are just a few examples of the myriad different factual patterns that could have dictated a different starting point for the rate negotiation, belying the District Court's conclusion that the facts in this case were so generic that they would apply to all cases. Appx151 (*Daubert* Order excluding Mr. Reading); *Uniloc*, 632 F.3d at 1317 (relative bargaining power and the contribution of the patented technology being licensed among facts that can be used to establish starting point).

Moreover, that some of the facts in this case may apply to many other hypothetical negotiations does not render Mr. Reading's opinion arbitrary or excludable. Exclusion is only warranted when the starting point is arbitrary because it has "***no relation*** to the facts of [a] case," which was not the case here. *Uniloc*, 632 F.3d at 1318. Mr. Reading's opinion has no similarity to the opinion excluded in *Uniloc* because the "starting point of a 25 percent royalty rate had ***no relation to the facts of the case*** and as such was arbitrary, unreliable, and irrelevant." *Id*.

As discussed in the previous section, Mr. Reading reasoned that a 50/50 split would be a starting point due to the specific facts of this case. The District Court therefore erred in concluding that the facts that Mr. Reading relied on "could be true of a negotiation of cost-savings technology (or anticipated profits) ***by any two parties***." Appx141.

The *Sprint* case, which the District Court decided a few months earlier before its *Daubert* Order in this case, highlights the District Court's errors and demonstrate

why Comcast's complaints about Mr. Reading's opinion were appropriately addressed by cross-examination. *Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, No. 17-1734-RGA, 2021 WL 982732, at *10-11 (D. Del. Mar. 16, 2021). In *Sprint*, the District Court allowed an expert's reasonable-royalty opinion that started and ended with the Plaintiff receiving 100% of the cost savings because "[w]hether it makes sense to award 100% to Plaintiff in these particular cases may be challenged by cross-examination and an opposing expert's opinion." *Id*. The District Court's decision to allow a damages expert to opine that all marginal profits from cost savings should go to the plaintiff cannot be reconciled with its decision to prevent Mr. Reading from testifying that, based on the facts of this case, the parties would have started negotiations with a 50% split and ultimately ended at a 60/40 split in favor of Comcast. To allow both opinions to stand would endorse an arbitrary application of this Court's precedent which requires simply that the expert's opinion as to the starting point be sufficiently tied to the facts of the particular case and parties at hand.

The District Court's reasoning thus amounts to a clearly erroneous application of the legal standard and is, therefore, an abuse of discretion requiring reversal. *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 572 U.S. 559, 563 n.2 (2014) (abuse its discretion where district court relies on "a clearly erroneous assessment of

the evidence.”). Thus, a trial on damages should be granted to allow Mr. Reading to present the opinions set forth in his expert report.

### C. The District Court Abused Its Discretion in Failing to Allow NexStep to Try Damages to a Jury

The District Court abused its discretion in denying NexStep a trial on damages, an extreme sanction that is not warranted under the circumstances. The District Court should have allowed Mr. Reading to amend his report and for NexStep to present damages at trial because NexStep is entitled to no less than a reasonable royalty and precedent demonstrates that NexStep should have an opportunity to obtain damages if it shows infringement.

In a recent District of Delaware case, Judge Bryson, sitting by designation, bifurcated the liability and damages phases of a case to allow the patentee to amend its expert reports regarding damages (both technical and economic) and hold a later trial on damages in the event the jury found infringement, even though the court’s order striking several of the damages expert’s theories left the patentee “with essentially no damages case to present at trial.” *IOENGINE, LLC v. PayPal Holding, Inc.*, No. 18-452-WCB, Slip Op. at 2, 7-8 (D. Del. June 23, 2022).

Judge Bryson found that forcing the patentee “to proceed to trial with no damages case” and thus effectively “preclude[ing] [Plaintiff] from obtaining relief in these cases would be an extreme sanction for attempting to rely upon a damages opinion that was not frivolous but ultimately was excluded,” even though the case

was set for trial approximately one month later. *Id.* at *6. Thus, Judge Bryson permitted the patentee to provide an amended damages report and pursue damages at a later trial.

NexStep's counsel suggested a similar course of action whereby Mr. Reading would provide an amended report and damages would be bifurcated, but the District Court rejected it. Appx16281, 29:17-30:3 (suggesting bifurcation of damages in order to provide amended damages report); Appx136 (letter Order).

Thus, once the jury found infringement, the District Court's decision had the extreme effect of precluding NexStep from obtaining the reasonable royalty which is required by statute as remedy for infringement. "[35 U.S.C. § 284] is unequivocal that the district court must award damages in an amount no less than a reasonable royalty." *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1382, n.4 (Fed. Cir. 2003); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1330 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ("even if [the patentee] had not submitted expert evidence, this alone would not support a finding that zero is a reasonable royalty."). Further, the District Court imposed this severe sanction despite the absence of any bad faith or frivolous positions by NexStep, and NexStep had a solidly supported calculation of a royalty base that the District Court determined was appropriate and did not exclude. Appx150 (finding no bad faith); Appx98-101 (Magistrate denying Comcast's

Daubert motion); Appx16277, 13:10-14 (District Court agreeing that Mr. Reading's royalty base would be admissible absent his opinion regarding the rate). Comcast should not get a free pass on its infringement. The outcome is unjust and arbitrary to NexStep and a tremendous and undeserved windfall to Comcast. It cannot stand based on this Court's jurisprudence.

This Court's recent cases demonstrate that reasonable-royalty damages must be awarded where infringement is found. *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1372 (Fed. Cir. 2015) ("the exclusion of the patentee's damages evidence is not sufficient to justify … judgment [of no damages]" because "35 U.S.C. § 284 requires the district court to award damages 'in an amount no less than a reasonable royalty"). Indeed, this Court regularly remands cases to district courts for a second or sometimes even third trial on damages where the patentee's expert is deemed to have done something—or everything—wrong in their initial damages opinion and testimony.

For example, in *Apple Inc. v. Wi-LAN Inc.*, this Court remanded to the district court for a third trial on damages after the patentees first two attempts at proving damages were rejected because they were untethered to the facts of the case. 25 F.4th 960, 971-76 (Fed. Cir. 2022). Similarly, in *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, this Court vacated a damages award and granted a third trial on damages because the patentee's damages expert's invocation of the

entire market value rule was unsupported by the facts of the case, giving the patentee another opportunity to prove the reasonable royalty to which it is entitled. 904 F.3d 965, 977, 980 (Fed. Cir. 2018).

Thus, this Court's opinions demonstrate that the District Court's refusal to allow NexStep an opportunity to recover its statutorily-granted reasonable-royalty damages was unwarranted under the circumstances, particularly where it was a close call, as demonstrated by the District Court and magistrate's divergent opinions of the issue. Accordingly, this case should be remanded for a trial on damages in the first instance, allowing Mr. Reading to amend his damages report to address the *Daubert* Order.

## CONCLUSION

For the foregoing reasons (1) the JMOL Order should be reversed and the jury's verdict finding infringement of the '009 Patent reinstated, (2) the claim construction of VoIP and summary judgment of non-infringement of the '802 Patent should be reversed and remanded for a trial on infringement of the '802 Patent, and (3) the *Daubert* Order should be reversed and the case remanded for a trial on damages for Comcast's infringement of the '009 Patent.

Respectfully submitted,

Dated: August 18, 2022

By: */s/ Paul J. Andre*

Paul J. Andre
Lisa Kobialka
James R. Hannah
Christina M. Finn
Kramer Levin Naftalis
& Frankel LLP
333 Twin Dolphin Dr., Suite 700
Redwood Shores, CA 94065
Tel: 650.752.1700
pandre@kramerlevin.com
lkobialka@kramerlevin.com
jhannah@kramerlevin.com
cfinn@kramerlevin.com

Aaron M. Frankel
Cristina Martinez
Carlos J. Tirado
Kramer Levin Naftalis
& Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Tel: 212.715.9100
afrankel@kramerlevin.com
cmartinez@kramerlevin.com
ctirado@kramerlevin.com

*Attorneys for Appellant*
*NexStep, Inc.*

## ADDENDUM – TABLE OF CONTENTS


| Date Filed | Dkt. No. | Document Description | Appx No. |
|---|---|---|---|
| 07/07/2022 | 376 | Final Judgment | Appx1 |
| 05/12/2022 | 370 | Memorandum Opinion – Renewed Motions for Judgment as a Matter of Law | Appx4 |
| 05/12/2022 | 371 | Order Regarding Parties Motion's for Judgment as a Matter of Law | Appx20 |
| 10/30/2020 | 113 | Report and Recommendation Regarding Claim Construction | Appx21 |
| 08/09/2021 | 261 | Memorandum Order Regarding Report and Recommendations on | Appx47 |
| 08/20/2021 | 267 | [SEALED] Report and Recommendation Regarding Motion for Summary Judgment and to Exclude Expert Opinions | Appx53 |
| 03/29/2022 | 368 | Memorandum Opinion Regarding Objections to Report and Recommendation on Motion for Summary Judgment and to Exclude Expert | Appx118 |
| 03/29/2022 | 369 | Order Regarding Objections to Report and Recommendation on Motion for Summary Judgment and to Exclude Expert Opinions | Appx134 |
| 09/17/2021 | 363 | Letter from Judge Andrews to Counsel Regarding Motion to Strike | Appx136 |
| 09/16/2021 | 313 | Memorandum Opinion Regarding Report and Recommendations Regarding Motion to Exclude Expert Opinions | Appx137 |
| 09/16/2021 | 314 | Order Regarding Report and Recommendations Regarding Motion to | Appx143 |
| 11/17/2021 | 364 | Memorandum Opinion Regarding Comcast's Motion to Strike New Damages Theories | Appx145 |
| 11/17/2021 | 365 | Order Granting Comcast's Motion to Strike New Damages Theories | Appx152 |

## ADDENDUM – TABLE OF CONTENTS (CONT'D)


| Date Filed | Dkt. No. | Document Description | Appx No. |
|---|---|---|---|
| 09/03/2021 | 291 | Order After Pretrial Conference | Appx153 |
| 09/23/2021 | 331 | Jury Verdict (Redacted) | Appx156 |
| 09/28/2021 | 341 | Trial Verdict | Appx161 |
| 10/06/2021 | 343 | Order Granting Joint Status Report | Appx162 |
| 09/17/2021 | 319 | Memorandum Opinion | Appx169 |
| 09/17/2021 | 320 | Order Regarding Comcast's Objection to Report and Recommendations | Appx175 |
| | | U.S. Patent 8,280,009 (JTX-2) | Appx176 |
| | | U.S. Patent 8,885,802 (JTX-4) | Appx212 |
| | | U.S. Patent 9,866,697 (JTX-6) | Appx232 |


**CONFIDENTIAL MATERIAL OMITTED**

The material omitted from the Addendum, pages Appx105-106, contains license details that were sealed in the district court.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NEXSTEP, INC., Plaintiff, | ) | |
| v. | ) | C.A. No. 19-1031 (RGA) (SRF) |
| COMCAST CABLE COMMUNICATIONS, LLC, Defendant. | ) | |

**FINAL JUDGMENT**

Whereas, on June 3, 2019, Plaintiff NexStep, Inc. ("NexStep") sued Defendant Comcast Cable Communications, LLC ("Comcast") for infringement of U.S. Patent Nos. 7,444,130 ("'130 patent"), 7,542,753 ("'753 patent"), 7,907,710 ("'710 patent"), 7,697,669 ("'669 patent"), 8,494,132 ("'132 patent"), 8,885,802 ("'802 patent"), 9,614,964 ("'964 patent"), 8,280,009 ("'009 patent"), and 9,866,697 ("'697 patent"). (D.I. 1 at ¶¶ 47-267.)

Whereas, the Court granted-in-part and denied-in-part Comcast's motion for summary judgment and to exclude expert opinions (D.I. 196) on September 16, 2021 (D.I. 314), September 17, 2021 (D.I. 320), and March 29, 2022 (D.I. 369).

Whereas, a trial commenced on September 20, 2021, and the jury rendered a verdict on September 23, 2021. (D.I. 331); and

Whereas, the Court granted-in-part Comcast's motion for judgment as a matter of law (D.I. 327) on May 12, 2022 (D.I. 371).

IT IS HEREBY ORDERED AND ADJUDGED:

1. Judgment of non-infringement of claim 1 of the '753 patent is entered in favor of Comcast and against NexStep;

2. Judgment of non-infringement of claim 1 of the '710 patent is entered in favor of Comcast and against NexStep;

3. Judgment of non-infringement of claims 11 and 13 of the '669 patent is entered in favor of Comcast and against NexStep;

4. Judgment of non-infringement of claim 1 of the '132 patent is entered in favor of Comcast and against NexStep;

5. Judgment of non-infringement of claims 1 and 7 of the '802 patent is entered in favor of Comcast and against NexStep;

6. Judgment of non-infringement of claims 1, 11, 16, and 21 of the '964 patent is entered in favor of Comcast and against NexStep;

7. Judgment of non-infringement of claim 1 of the '697 patent is entered in favor of Comcast and against NexStep;

8. Judgment as a matter of law that claim 1 of the '697 patent and claims 1, 16, and 22 of the '009 patent are patent-eligible under 35 U.S.C. § 101 is entered in favor of NexStep and against Comcast;

9. Judgment of non-infringement of claims 1, 16, and 22 of the '009 patent is entered in favor of Comcast and against NexStep;

10. Judgment that claims 1, 16, and 22 of the '009 patent are not invalid is entered in favor of NexStep and against Comcast;

11. NexStep's claim for infringement of '130 patent is dismissed with prejudice; and

12. Comcast's remaining defenses are dismissed as moot.

IT IS SO ORDERED this 7 day of July, 2022.

RICHARD G. ANDREWS
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

NEXSTEP, INC,

Plaintiff,

v.

COMCAST CABLE COMMUNICATIONS, LLC,

Defendant.

Civil Action No. 19-1031-RGA

MEMORANDUM OPINION

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Paul J. Andre, Lisa Kobialka, James Hannah, KRAMER LEVIN NAFTALIS & FRANKEL LLP, Menlo Park, CA; Jonathan S. Caplan, Aaron M. Frankel, Marcus A. Colucci, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, NY;

Attorneys for Plaintiff.

Jack B. Blumenfeld, Brian P. Egan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; William F. Lee, Sarah B. Petty, Kate Saxton, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, MA; Amy Kreiger Wigmore, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C.; Mary (Mindy) V. Sooter, Nora Q.E. Passamaneck, WILMER CUTLER PICKERING HALE AND DORR LLP, Denver, CO;

Attorneys for Defendant.

May 12, 2022

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before me are Plaintiff's Renewed Motion for Judgment as a Matter of Law (D.I. 353) and Defendant's Post-Judgment Motion Under Fed. R. Civ. P. 50(b) and 59 (D.I. 350). I have considered the parties' briefing. (D.I. 351, 354, 357, 358, 360, 362). For the following reasons, NexStep's motion is DENIED and Comcast's motion is GRANTED-IN-PART.

## I. BACKGROUND

NexStep sued Comcast for infringement of six patents. (D.I. 1). On September 20–23, 2022, NexStep tried two patents, which it refers to as the "Customer Troubleshooting" patents, to a jury. (D.I. 346–49). The jury found that (1) Comcast did not literally infringe any of the four asserted claims, (2) Comcast infringed the three asserted claims of U.S. Patent No. 8,280,009 ("the '009 patent") under the doctrine of equivalents, and (3) the asserted claims of the '009 patent were not proven invalid. (D.I. 331). Each party properly moved for judgment at a matter of law ("JMOL") pursuant to Federal Rule of Civil Procedure 50(a) and now renews the motion under Rule 50(b). (D.I. 327, 329, 350, 353). Comcast also moves in the alternative for a new trial under Rule 59. (D.I. 350).

NexStep seeks JMOL that Comcast literally infringes the asserted claims of the '009 patent. (D.I. 354 at 1). Comcast seeks JMOL of noninfringement under the doctrine of equivalents (or in the alternative a new trial), JMOL of no damages, and—should I uphold the infringement verdict—JMOL of invalidity. (D.I. 351 at 1).

## II. LEGAL STANDARD

### A. Judgment as a Matter of Law

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P.

50(a)(1). "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, 'granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.'" *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (citation omitted).

"To prevail on a renewed motion for JMOL following a jury trial, a party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied by the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (cleaned up). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The Court may "not determine the credibility of the witnesses [nor] substitute its choice for that of the jury between conflicting elements in the evidence." *Perkin-Elmer*, 732 F.2d at 893. Rather, the Court must determine whether the evidence supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); 9B *Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure* § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against

whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party.").

Where the moving party bears the burden of proof, the Third Circuit applies a different standard. This standard "requires the judge to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1177 (3d Cir. 1976) (quoting *Mihalchak v. Am. Dredging Co.*, 266 F.2d 875, 877 (3d Cir. 1959)). The Court "'must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting any different finding.'" *Id.* at 1171 (quoting *Mihalchak*, 266 F.2d at 877).

**B. New Trial**

Federal Rule of Civil Procedure 59(a)(1)(A) provides, "The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir. 1993) (reviewing district court's grant or denial of new trial motion under the "abuse of discretion" standard). Although the standard for granting a new trial is less rigorous than the standard for granting judgment as a matter of law—in that the Court need not view the evidence in the light most favorable to the verdict winner—a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or where the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352–53.

## III. DISCUSSION

### A. Literal Infringement

NexStep moves for JMOL that Comcast's My Account app literally infringes the three asserted claims (claims 1, 16, and 22) of the '009 patent. (D.I. 354 at 1). All asserted claims require a "home gateway" to perform four specific steps "responsive to a single action performed by the user." For example, claim 1 states:

> A method of initiating a support session for a consumer device using a concierge device, the method including:
>
> > associating the concierge device with a selected consumer device;
> >
> > responsive to a single action performed by a user, the concierge device communicating with a home gateway, including
> >
> > causing the home gateway to buffer consumer device identification information for the selected consumer device and determine a support center for a support session; and
> >
> > causing the home gateway to initiate the support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either
> >
> > to bypass an automated attendant or interactive voice recognition system or
> >
> > to initiate an automated support protocol.

'009 Patent, cl. 1. The "single action" claim limitation was not construed and is therefore given its plain and ordinary meaning. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (articulating a "heavy presumption" that claim terms have its "ordinary and customary meaning"). The "concierge device" is construed as "A device including functionality for the remote control of at least one consumer device and that meets the other claim requirements." (D.I. 113 at 25).

NexStep points to three scenarios where a single action causes all four required steps and details the evidence presented at trial to support this contention. (*Id.* at 4–5, 15–16). NexStep must do more than show that substantial evidence supports its position. There must be

"insufficient evidence for permitting any different finding." *Fireman's Fund*, 540 F.2d at 1177. I do not think that NexStep has shown that there is insufficient evidence to support the jury's verdict of no literal infringement.

NexStep claims to have "provided unrebutted evidence that under multiple scenarios, a single tap of the screen, which is undisputedly a single action, causes all of the claimed actions to be automatically performed, thereby satisfying that Single Action Element." (D.I. 354 at 6). Comcast responds that NexStep's evidence was indeed rebutted by the testimony of Mr. Karinshak, Comcast's Chief Customer Experience Officer, and Dr. Villasenor, Comcast's noninfringement expert. (D.I. 357 at 3).

Comcast's evidence was directed to two independent bases upon which the jury could find that infringement was not proven. First, that there was no "single action" that performed all four required steps—"rather, to the extent those steps are performed at all, they are performed in response to multiple separate user actions." (*Id.*). Second, there is no "determin[ation] of a support center" as required by the claims because "each of the My Account app processes addressed in Dr. Selker's testimony sends requests to a single server." (*Id.*).

NexStep argues, "on cross-examination, Comcast's corporate representative and technical experts admitted that only a single tap—which is undisputedly a single action—is needed to trigger the performance of every claimed action." (D.I. 354 at 2). I do not think the record supports this. At most, Comcast's witnesses admitted that the "single actions" in NexStep's infringement scenarios are indeed each a "single action." (D.I. 354 at 16). NexStep does not point to concessions that, "responsive to [those] single action[s]," the home gateway performs the four required steps. '009 Patent, cl. 1.

The testimony offered by Comcast's witnesses supports the jury's verdict of no literal infringement. Mr. Karinshak provided fact testimony regarding the operation of the My Account app. Comcast argues that his testimony provided substantial evidence that there is no single user action that both "initiate[s] a support session" and "determine[s] a support center," as required by the asserted claims. (D.I. 357 at 7).

NexStep attacks Mr. Karinshak's testimony because he "admitted that he did not know the technical details of how the My Account App works." (D.I. 354 at 6). Mr. Karinshak is Comcast's Chief Customer Experience officer and is "responsible for looking across the company to make sure we're providing the best possible experience for all of our customers and across all of our products and services." (D.I. 347 at 461:19–22). Based on his role and experience, a reasonable jury could credit Mr. Karinshak's testimony regarding the functionality of the accused app.

NexStep also argues that Mr. Karinshak's testimony wrongly focused on "completion of a troubleshooting protocol" or "connection to a live agent," neither of which is required by the claims. (D.I. 362 at 3). Mr. Karinshak walked through user workflows and explained that for each scenario, the Xfinity Assistant feature only connects a user to a live agent several user actions after the customer began their support session. (D.I. 347 at 472–83). Drawing all reasonable inferences in Comcast's favor, the testimony regarding connecting with a live agent is relevant to the "determinat[ion of] a support center" claim limitation. (D.I. 357 at 6). For another user scenario involving a set-top box, Mr. Karinshak testified that it took seven user actions to "complete the troubleshooting process." (D.I. 347 at 497:15–17). During the set-top box scenario, Mr. Karinshak never described connecting to a live agent or a support center. (*Id.* at 484-497). Construing this testimony in the light most favorable to Comcast, it is a reasonable

inference that the set-top box scenario does not include "determinat[ion of] a support center" as required by the claims.

Comcast's expert witness on noninfringement, Dr. Villasenor, provided methodical testimony regarding Dr. Selker's infringement scenarios. For each scenario, Dr. Villasenor walked through each step of the user's experience and testified that each user action did not cause the four events that are required by the claims. For instance, one of NexStep's infringement scenarios is when a user presses "continue." (D.I. 354 at 4). Dr. Villasenor testified:

> Q. What's the next action the user takes in this process?
>
> A. So the user will . . . read the information on the screen about tightening the cables and so on, and then the user can continue. In order to continue, the user must press continue.
>
> Q. What did you conclude about whether this action causes all required '009 events?
>
> A. It does not.

(D.I. 348 at 629:4–13). Ultimately, Dr. Villasenor testified that he did not find "any single action . . . in the Xfinity Assistant or that Dr. Selker pointed to that causes all four of the required events to occur under the '009 patent." (*Id.* at 640:1-5). I think this is substantial evidence to support the jury's finding that the accused products did not literally infringe the '009 patent. The parties put forward competing expert testimony regarding infringement. NexStep decries Dr. Villasenor's testimony as merely "*ipse dixit* conclusion" but does not raise contentions that it was unreliable and ought to have been excluded. (D.I. 362 at 5). Dr. Villasenor described the materials he considered in forming his opinions. (D.I. 348 at 603:14–604:6 (listing source code, technical documents, the products themselves, conversations with Comcast engineers, deposition testimony, and Dr. Selker's reports)). The jury was free to credit Dr. Villasenor's testimony over

Dr. Selker's. Thus, NexStep has not shown that it is entitled to JMOL on the issue of literal infringement.

**B. Doctrine of Equivalents**

Comcast moves for JMOL of noninfringement under the doctrine of equivalents ("DOE"). "A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007). "[T]he difficulties and complexities of the doctrine require that evidence be presented to the jury . . . through the particularized testimony of a person of ordinary skill in the art, typically a qualified expert, who (on a limitation-by-limitation basis) describes the claim limitations and establishes that those skilled in the art would recognize the equivalents." *Id.* at 1329. NexStep's expert, Dr. Selker, testified as to the function/way/result test. (D.I. 347 at 383:25–385:9). The question is whether this was "sufficient particularized testimony . . . such that a reasonable jury could have made an equivalency finding." *WCM Indus., Inc. v. IPS Corp.*, 721 F. App'x 959, 967 (Fed. Cir. 2018).

At trial, the jury heard the following testimony from Dr. Selker regarding DOE:

> Q. In terms of the elements of the '009 patent, can you explain why the – I understand that you believe that a single action is met literally, but can you explain why at the very least the single action element is met by the doctrine of equivalents? And the –
>
> A. When you – when you go to debug your – to diagnose your device, you're going through a single action. It might be that there's several button presses along the way, but I say that's the same function. And that it's going to have the same purpose which is what I was talking about, I hope. I don't know if I'm –
>
> Q. No, you're doing fine, Doctor. Keep going.

> A. I was confused by that.
>
> Q. It's the same function – I'll just help you out here. So it has the same function and it's a legal doctrine and so we have to go through it. Okay? Can you explain to the jury why it's done in substantially the same way?
>
> A. Well, it's done in the same way in that the stuff is all kept up in the cloud for the purpose of doing this and it's going to go and diagnose it using the home gateway and it's going to solve my problem without me having to go through and put in my model numbers and all of that stuff. So it's really literally using – using this Concierge as more of a – somebody to give authorization than to do the actual function. I'm not down there in the machine room, you know, putting instructions into a computer to make it do each of these things.
>
> Q. And can you explain why the single action achieves substantially the same result?
>
> A. Yeah, the result is that this thing is going to be restarted, refreshed, whatever is going to have to happen with it without me having to tangle with understanding all of the issues of being an IT professional or whatever it takes to get this thing up. And so it's going to come with a result of my modem working, you know.

(D.I. 347 at 383:25–385:9).

Comcast argues that Dr. Selker's testimony was "conclusory and insufficient" and "untethered from the claim language and the details of the operation of the My Account app." (D.I. 351 at 7). I agree. Dr. Selker's testimony is too vague to support the jury's verdict.

The Federal Circuit has held, "*a patentee must ... provide particularized testimony and linking argument* as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents." *AquaTex*, 479 F.3d at 1328 (quoting *Texas Instruments, Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996)). Dr. Selker's DOE testimony suffers from a lack of precision regarding both the claim limitations and the purported equivalent. The fatal flaw in Dr. Selker's testimony, however, is failure to provide a linking argument. While the vagueness regarding the claim limitations and purported equivalent are possibly supplemented with other evidence from

the case, NexStep has simply not met its burden of providing the jury with a linking argument, and for that reason the jury's verdict cannot be sustained.

NexStep argues that the jury's verdict is supported by substantial evidence, both from Dr. Selker's DOE testimony and his lengthy and detailed testimony regarding literal infringement. (D.I. 358 at 5–7). Dr. Selker's literal infringement testimony somewhat cures the vagueness of his DOE claim limitation testimony. While "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement," *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan*, 873 F.2d 1422, 1425 (Fed. Cir. 1989), the caselaw makes clear that the plaintiff has flexibility in presenting its evidence on the doctrine of equivalents. *See WCM Indus.*, 721 F. App'x at 966 ("We agree . . . that our precedent does not require opinion testimony, and certainly does not require expert opinion testimony, for a finding of equivalence. Rather, '[p]roof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art.'" (citing *Graver Tank & Mfg. Co. v. Linde Air Prod. Co.*, 339 U.S. 605, 609))). Thus, Dr. Selker's literal infringement testimony can support NexStep's DOE contentions.

Assuming for the purposes of this opinion that Dr. Selker's prior testimony and other evidence in the case supply facts regarding each claim limitation, Dr. Selker's DOE testimony still fails to describe what steps in Comcast's app are equivalent to the "single action" limitation. He only mentions "several button presses." Without particularized testimony on what exactly the purported equivalent is, it is difficult to understand how the equivalent can perform substantially the same function in substantially the same way with substantially the same result as the claimed device.

Drawing the inference in NexStep's favor, it is possible that the jury gleaned enough about the accused My Account app through other evidence at trial to identify what "several button presses" they found to be equivalent. "While *Lear Siegler* does not go so far as to require recitation of the magic words 'function', 'way', and 'result', we think that it at least requires the *evidence* to establish *what* the function, way, and result of *both* the claimed device and the accused device are, and *why* those functions, ways, and results are substantially the same." *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1327 n.5 (Fed. Cir. 1991). Here, Dr. Selker failed to identify "*what* the function" of "*both* the claimed device and accused device are." *Id.* *Malta* requires "evidence," not necessarily testimony from a person of skill in the art (a "POSA"), and it is possible, though NexStep does not argue this point, that the jury had enough of an understanding of Comcast's accused devices to piece together on their own the function, way, and result of the accused devices.[1]

Even if the rest of the evidence sufficiently established the claim limitations and the purported equivalent, NexStep's presentation failed to "provide particularized testimony and linking argument." *AquaTex*, 479 F.3d at 1328. "Absent the proper *Graver Tank* context, i.e., a showing of how plaintiff compares the function, means, and result of its claimed invention with those of the accused device, a jury is more or less put to sea without guiding charts when called upon to determine infringement under the doctrine." *Lear Siegler*, 873 F.2d at 1425–26.

Dr. Selker failed to provide the requisite linking argument. The function of the "single action" limitation is to cause the "home gateway" to perform four steps. Dr. Selker testified that

[1] Even if this is the case for some of the accused devices, Comcast contends, "Dr. Selker presented no evidence that the 'several button presses' he referred to even ***exist*** in the My Account functionality of Comcast set-top boxes." (D.I. 351 at 8). I do not need to decide the issue because I agree with Comcast on other grounds.

"several button presses along the way" is the same function. (D.I. 347 at 384:7–8). The extent of his support is: "I say that's the same function." (*Id.*). This is not testimony from a POSA "showing how plaintiff compares" the function of the claimed device and the accused device. *Lear Siegler*, 873 F.2d at 1425.

The Federal Circuit rejected a similarly conclusory statement of function in *Malta v. Schulmerich Carillons, Inc.* 952 F. 2d 1320 (Fed. Cir. 1991). *Malta* was a case about musical handbells. *Id.* at 1321. The asserted patent claimed "striking buttons," a feature which allowed the player to quickly adjust the volume of the bell. *Id.* at 1321–22. The plaintiff's expert testified that the accused handbells had "a plurality of buttons, there's three sets, *buttons or the equivalent thereof* . . ." *Id.* at 1326. Plaintiff's expert further testified:

> Q: Do you find those buttons in [the accused] structure?
>
> A: Yes, there are buttons per se here, the felt, the opposed felt certainly are visible buttons. The opposed locations or surfaces which are related to these long slots are likewise buttons and the opposed pair of solid portions again are buttons.
>
> Q: Do you mean they're buttons or function like buttons?
>
> A: They function like buttons....

*Id*. The Federal Circuit held, "Mr. Malta's offhand and conclusory statements ('buttons or the equivalent thereof' and 'They function like buttons') are not sufficiently particularized evidence. In short, with little guidance, the jury was left to its own imagination on the technical issue of equivalency." *Id.* at 1327.

Dr. Selker's "I say that's the same function" provides about the same amount of detail as the *Malta* plaintiff's expert. It is true that Dr. Selker provides more detail regarding the other two prongs of the function/way/result test. At no point, however, did his testimony cure the fatal flaw of failure to link the functions.

Regarding the way prong, Dr. Selker testified:

> Well, it's done in the same way in that the stuff is all kept up in the cloud for the purpose of doing this and it's going to go and diagnose it using the home gateway and it's going to solve my problem without me having to go through and put in my model numbers and all of that stuff. So it's really literally using – using this Concierge as more of a – somebody to give authorization than to do the actual function. I'm not down there in the machine room, you know, putting instructions into a computer to make it do each of these things.

(D.I. 347 at 384:17–385:1). To the extent this word salad communicated anything to the jury, it did not provide particularized testimony or a linking argument for why several button presses perform the claimed method in the same way as the claimed single action.

For the result prong, Dr. Selker testified, "the result is that this thing is going to be restarted, refreshed, whatever is going to have to happen with it without me having to tangle with understanding all of the issues of being an IT professional or whatever it takes to get this thing up." (*Id.* at 385:4–9). Comcast argues, "the result of the ***claimed*** 'single action' is that the 'home gateway' performs four specific steps. Dr. Selker's DOE testimony did not address that result at all." (D.I. 351 at 10 (citations omitted)). Because Dr. Selker's testimony regarding the result is untethered from the claim language, it amounts to little more than "generalized testimony as to the overall similarity between the claims and the accused infringer's product." *Texas Instr.*, 90 F. 3d at 1567. In short, Dr. Selker's DOE testimony does not provide the requisite "particularized testimony and linking argument."

Comcast points to several other reasons why I should grant JMOL of noninfringement under the DOE. (D.I. 351 at 2–14). Because I agree that the verdict is not supported by substantial evidence, I need not address Comcast's other arguments.

### C. Judgment of No Damages

Comcast argues that I should grant judgment of no damages because NexStep did not present evidence of damages at the trial. (D.I. 351 at 14–15). NexStep responds, "Comcast's request for a judgment of no damages is not available under either Rule 50(b) or 59, upon which

Comcast moves." (D.I. 358 at 15). I agree. Rule 50 allows for judgment on matters submitted to the jury. NexStep was not "fully heard" on the issue of damages because I excluded NexStep's damages evidence prior to trial. Fed. R. Civ. P. 50(a)(1); D.I. 352-1, Ex. A. Thus, I will deny Comcast's motion for judgment of no damages and judgment of no liability for infringement.

**D. Invalidity**

Comcast requests JMOL of invalidity "if the court upholds the verdict of infringement of the '009 patent under the DOE." (D.I. 351 at 15; D.I. 360 at 8). Because I find that the infringement verdict is not supported by substantial evidence, I need not rule on Comcast's invalidity contentions.

**E. New Trial**

For the foregoing reasons, I will grant Comcast's motion for judgment as a matter of law. "If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." Fed. R. Civ. P. 50(c)(1). Comcast argues that a new trial is warranted because Dr. Selker's opinions are "inconsistent with the plain meaning of the word 'single'" and thus "should have been excluded under *Daubert*." (D.I. 351 at 13).

The Magistrate Judge recommended that I deny Comcast's *Daubert* motion on this issue. (D.I. 267 at 45–46). Comcast did not object to this recommendation. (D.I. 273; D.I. 351 at 13 n.6). Thus, I find that Comcast's *Daubert* argument is waived. *See Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F. Supp. 3d 368, 374 (D. Del. 2014) ("The failure to object [to a Magistrate Judge's recommendation] may result in waiver of the right to further review of the

recommendation or determination in the District Court by a District Judge."). I will therefore conditionally deny Comcast's motion for a new trial. (D.I. 350).

## IV. CONCLUSION

An appropriate order will issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NEXSTEP, INC,

Plaintiff,

v.

COMCAST CABLE COMMUNICATIONS, LLC,

Defendant.

Civil Action No. 19-1031-RGA

ORDER

For the reasons stated in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED:**

1. NexStep's motion for judgment as a matter of law (D.I. 329) and renewed motion for judgment as a matter of law (D.I. 353) are **DENIED**.
2. Comcast's motion for judgment as a matter of law (D.I. 327) and post-judgment motion under Fed. R. Civ. P. 50(b) and 59 (D.I. 350) are **GRANTED-IN-PART**. Comcast's motions are **GRANTED** with respect to noninfringement under the doctrine of equivalents. Pursuant to Fed. R. Civ. P. 50(c), should this judgment later be vacated or reversed, Comcast's motion for a new trial under Fed. R. Civ. P. 59(a) is **CONDITIONALLY DENIED**. Comcast's motions are otherwise **DENIED**.

Entered this 12th day of May, 2022.

/s/ Richard G. Andrews
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NEXSTEP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-1031-RGA-SRF |
| | ) | |
| COMCAST CABLE COMMUNICATIONS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

# REPORT AND RECOMMENDATION

## I. INTRODUCTION

In this patent infringement action filed by plaintiff NexStep, Inc. ("Plaintiff" or "NexStep") against defendant Comcast Cable Communications, LLC ("Defendant" or "Comcast"), Plaintiff alleges infringement of United States Patent Nos. 7,444,130 ("the '130 patent"), 7,542,753 ("the '753 patent"), 7,697,669 ("the '669 patent"), 7,907,710 ("the '710 patent"), 8,280,009 ("the '009 patent"), 8,494,132 ("the '132 patent"), 8,885,802 ("the '802 patent"), 9,614,964 ("the '964 patent"), and 9,866,697 ("the '697 patent") (collectively, the "Asserted Patents"), which are directed to personal computing devices and services to control, combine, and integrate telephone and video services.[1] (D.I. 1 at ¶ 8) This decision sets forth the court's recommendations of constructions for the disputed claim terms discussed in the briefing and at the *Markman* hearing held on September 15, 2020.

1 The briefing and other filings made in support of the parties' claim construction positions are found at D.I. 82 and D.I. 83.

## II. BACKGROUND

The United States Patent and Trademark Office ("USPTO") issued the Asserted Patents to Dr. Robert Stepanian, the founder of NexStep, between 2008 and 2018. (D.I. 1 at ¶¶ 8, 10-18) The Asserted Patents recite systems and methods for controlling and integrating a variety of devices, "such as TVs, set-top boxes, DVRs, VoIP (telephone) systems, and home devices (e.g., security cameras, electrical outlets, and thermostats) using a hand-held device." (*Id.* at ¶ 19) The Asserted Patents claim priority to an original provisional application filed on August 19, 2005. (D.I. 82 at 4) The '130, '753, '669, '710, '132, and '802 patents share a common specification and are directed to simple, inexpensive remote controls that operate in conjunction with multi-media consoles. ('130 patent, col. 1:26-32) The '009 and '697 patents share a common specification and are directed to streamlining consumer access to customer support services for their devices. ('009 patent, col. 2:51-58) The '964 patent also shares a common specification with the '009 and '697 patents. The '964 patent is directed to improving the interconnection of consumer devices. ('964 patent, col. 2:25-56)

Defendant Comcast provides Internet, video, voice, and security services. (D.I. 1 at ¶ 24) In its complaint filed on June 3, 2019, NexStep alleges that Comcast's modems, gateways, routers, set-top boxes, remote controls, home security sensors and video surveillance cameras, smartphone and tablet devices, and smartphone applications for controlling and integrating these devices infringe the Asserted Patents. (*Id.*) The complaint suggests that Comcast's executive officers met with Dr. Stepanian in the summer of 2007 to discuss NexStep's technology and, after rejecting the opportunity to work with NexStep on the development of Comcast's technology, Comcast used the information gleaned from those meetings to develop its own infringing technology. (*Id.* at ¶¶ 20-23)

## III. LEGAL STANDARD

Construing the claims of a patent presents a question of law, although subsidiary fact finding is sometimes necessary. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837-38 (2015) (citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977-78 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370, 388-90 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (internal quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction." *Id.* at 1324. Instead, the court may attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

The words of the claims "are generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted); *see also Eon Corp. IP Holdings v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016). Claim terms are typically used consistently throughout the patent, and "usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314 (observing that "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . [b]ecause claim terms are normally used consistently throughout the patent . . . .").

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a

presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003) (citing *Ecolab Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1375 (Fed. Cir. 2002)).

Other intrinsic evidence, including the patent specification, "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316 (citing *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)). It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (internal quotation marks omitted). The specification "is not a substitute for, nor can it be used to rewrite, the chosen claim language." *SuperGuide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman*, 52 F.3d at 980. The prosecution history, which is also "intrinsic evidence," "consists of the complete record of the proceedings before the PTO [Patent and Trademark Office] and includes the prior art cited during the examination of the patent."

*Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

A court also may rely on "extrinsic evidence," which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."). Overall, while extrinsic evidence may be useful to the court, it is less reliable than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Ultimately, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' Per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

## IV. CONSTRUCTION OF DISPUTED TERMS

### A. "Palm held remote" ('130 patent, claims 10, 11, 15)

| Plaintiff | Defendant | Court |
|---|---|---|
| Plain and ordinary meaning; No construction required.<br><br>The plain and ordinary meaning is a hand-held remote control device that meets the other claim requirements | "a simple handheld device that, in contrast to a smartphone, cannot decode complex data streams, such as IPTV or VoIP" | "a simple handheld device that, in contrast to a smartphone, cannot decode complex data streams, such as IPTV or VoIP" |

I recommend that the court adopt Defendant's proposed construction and construe the term "palm held remote" to mean "a simple handheld device that, in contrast to a smartphone, cannot decode complex data streams, such as IPTV or VoIP." Defendant's proposed construction is consistent with the claim language, the specification, and the prosecution history of the '130 patent.

The focus of the parties' dispute is whether the term "palm held remote" should be construed to exclude smartphones. Plaintiff argues that Defendant's proposed construction, which would exclude smartphones from the definition of "palm held remote," is inconsistent with the intrinsic record, it imports non-limiting examples from the specification into the claims, and it excludes embodiments disclosed in the specification. (D.I. 82 at 13-15) In response, Defendant contends that the applicant unambiguously distinguished the invention from a smartphone during prosecution of the '130 patent. (*Id.* at 16-18) Moreover, Defendant alleges that the specification of the '130 patent confirms that the tethered "palm held remote" in the claims excludes untethered smartphones, which are complex and expensive devices by comparison. (*Id.* at 19-21)

The claim language and specification of the ’130 patent do not support a construction of “palm held remote” that would include smartphones. The specification of the ’130 patent acknowledges that, while “[t]he remote may resemble a handheld personal computer (HPC), a palm-held personal computer (PPC or PDA) or a smartphone,” it is distinguishable from those devices because it “has a low cost and feature set supported by the console that is novel in the consumer electronics market.” (’130 patent, col. 1:32-36; *see also* D.I. 83, Ex. C-8 at ¶ 39) The specification explains that the palm held remote is reliant on a tethered console for processing power:

> A tethered digital butler produces a low cost, palm-held remote with a novel combination of features that are implemented by logic and resources of the console, connected wirelessly to the palm-held remote. Tethering the palm-held device, so that it depends on logic and resources of the console, runs against the trends and teachings of the consumer electronics industry and particularly against the trend toward more powerful smartphones.

(’130 patent, col. 2:49-56)

The ’130 patent differentiates smartphones as devices that are “untethered, packing many features into a small form factor, not requiring a console.” (’130 patent, col. 1:53-54) By describing “[t]he present invention” as a “tethered digital butler,” the applicant expressly distinguishes the invention from untethered smartphones operating independent from a console. (’130 patent, cols. 1:27-36; 2:3-12) Such characterizations of the “present invention” serve to notify the public of the scope of the invention, in this case limiting the palm held remote to a tethered device reliant on a console. *See Honeywell Int’l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006) (holding that “[t]he public is entitled to take the patentee at his word and the word was that the invention is a fuel filter” where the specification repeatedly referenced “this invention” or “the present invention” as relating to a fuel filter). By describing

smartphones as untethered devices operating independent from a console, the specification supports a construction of "palm held remote" that excludes smartphones.

Independent claim 10 of the '130 patent confirms that the palm held remote depends on the console component for processing power. ('130 patent, col. 22:42-23:13) Specifically, claim 10 recites a palm held remote having a speaker, a microphone, a display, a cursor control and trigger, a keypad, and a limited range radio for communication with the console. (*Id.*, col. 22:46-58) Complex processing functions are reserved for the console component, which has a media card reader or hard drive, a network port, and logic and resources capable of decoding VoIP or digital content from the media card reader or hard drive.[2] (*Id.*, col. 22:59-23:6) Claim 10 states that "the palm-held remote allows a user to select among and use" the features of the console component "without performing the decoding of VoIP or digital content from the media card reader or hard drive [p]erformed by the resources of the console component." (*Id.*, col. 23:7-13)

Plaintiff contends that Defendant's proposed construction would read certain embodiments out of the scope of the '130 patent. (D.I. 82 at 14-15) Plaintiff highlights Figure 7

---

[2] Plaintiff contends that Defendant's proposed construction would violate the doctrine of claim differentiation because some, but not all, claims recite that the master device must process at least one audio stream for the remote. (D.I. 82 at 25) According to Plaintiff, claims not reciting this limitation were not intended to be so limited. (*Id.*) But Plaintiff has not identified a claim in which the remote control does not depend on the master device or console to process an audio stream. To the contrary, Defendant has shown that all claims recite the console or master device performing audio or video processing. For example, claim 1 of the '753 patent states that the remote control "depends on the master device to process at least one audio stream. ('753 patent, col. 21:23-27) Claim 10 of the '130 patent recites that the console component is adapted to "decode VoIP to a remote control device format and decode digital content from the media card reader or hard drive." ('130 patent, cols. 22:59-23:3) Claim 11 of the '669 patent recites "the remote control depends on the master device to transcode input from and output to the slaved microphone and an audio output between VoIP and the remote control device format." ('669 patent, col. 22:63-66) Claim 1 of the '710 patent likewise recites "the remote control depends on the master device to transcode audio output from VoIP to the remote control device format." ('710 patent, col. 21:6-8)

of the '130 patent, which discloses an XScale processor having a camera module and/or memory card reader. ('130 patent, col. 15:22-25) But the specification discloses the XScale processor as a hardware component, without identifying any processing or decoding of complex data streams performed by the remote itself. (*Id.*, col. 15:22-59) Plaintiff further relies on the disclosure of a fifth embodiment in the specification to suggest that the palm held remote may have the processing power of a smartphone:

> In a fifth embodiment, the remote is emphasized. One aspect of the remote is to provide a complete I/O platform in the palm of the user's hand. Features adaptable to VoIP and/or video phone operation, such as a microphone, can be used for other purposes, such as dictation, note taking, voice messaging, listening to music or remote viewing video. To support the high demands of streaming video, a broader communications channel, such as Bluetooth version 2 or later or 802.11n, and a more powerful processor are included. The remote may function in tandem with a console, PC or set top cable or satellite box. It also could be configured to control other consumer electronics device such as a TV, IP-TV, home theater system, component stereo, digital video recorder, DVD player or recorder, VCR, etc.

('130 patent, col. 3:51-64) Although this embodiment states that the palm held remote has "[f]eatures *adaptable* to VoIP and/or video phone operation," such as a microphone, which can also be used for purposes such as dictation or voice messaging, it does not suggest that the palm held remote itself decodes VoIP or IPTV signals. (*Id.*, col. 3:53-56) In this regard, the description of the fifth embodiment does not depart from the balance of the specification or independent claims 1, 6, 10, 17, and 34, which specify that the palm held remote relies on a console component or master device to decode VoIP signals. (*Id.*, cols. 20:59-26:34)

Defendant argues that Plaintiff disavowed a construction of "palm held remote" that would include smartphones during prosecution of the '130 patent. (D.I. 82 at 16-19) "[T]he standard for disavowal is exacting, requiring clear and unequivocal evidence that the claimed invention includes or does not include a particular feature." *Poly-Am., L.P. v. API Indus., Inc.*,

839 F.3d 1131, 1136 (Fed. Cir. 2016); *see Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (holding that the doctrine of prosecution disclaimer does not extend to situations where the supposed disavowal of claim scope is ambiguous). The prosecution history of the ’130 patent reflects an express disavowal of a remote control device capable of processing or decoding IPTV or VoIP signals. (*See, e.g.*, D.I. 84, Ex. B-50 at 7; Ex. B-2 at 12; Ex. B-4 at 12-14) In this regard, the prosecution history provides further support for Defendant’s proposed construction of “palm held remote.”

During prosecution of U.S. Patent No. 7,389,103 (“the ’103 patent”), to which the ’130 patent claims priority, the applicant overcame a prior art rejection based on the McQuaide reference, which disclosed a remote control device capable of receiving Internet Protocol television and telephony signals. (D.I. 83, Ex. C-2 at Abstract) The applicant distinguished the McQuaide reference by contrasting the complex processing power of McQuaide’s IP Smart Phone with the simple, inexpensive remote control of the ’103 patent that relies on a console for complex processing:

> In the marketplace, which has a role in determining what is non-obvious that was reconfirmed by *KSR*, a remote control at a low price point has entirely different functionality than a McQuaide’s IP Smart Phone. The remote claims in the companion case include positive limitations that specify a data feed which is unavailable in the exchange between McQuaide’s IP Smart Phone and the simple IP router to which it connects. The form of data feed and collection of features claimed have been discovered to create new functionality at a price point which will be attractive in the marketplace.

(D.I. 84, Ex. B-50 at 7) In a December 18, 2007 Amendment and Response to the Examiner’s Office Action during prosecution of the ’130 patent, the applicant amended the claims to distinguish the McQuaide reference by “address[ing] the interface with the remote, which dramatically impacts the complexity and cost of the remote.” (D.I. 84, Ex. B-2 at 12) Unlike the McQuaide reference, which claims an expensive “handheld device capab[le] of decoding IPTV

and IP Phone signals" through a direct connection to an IP router, the applicant explained that the palm held remote claimed in the '130 patent "interacts with something more sophisticated than a simple router, such as a set top box, a TV or a media center." (*Id.*) Consequently, the palm held remote recited in the '130 patent "is much simpler than McQuaide's complex handheld device" and "could be produced at one-tenth or less the cost of building McQuaide's handheld." (*Id.*)

In the May 23, 2008 Amendment and Response to the Examiner's Final Office Action, the applicant distinguished the prior art McQuaide reference by explaining that the claimed Portable Set Top Box of McQuaide "interact[s] directly with complex audio and video sources that require extensive decoding logic," an approach which "is very expensive and inappropriate for use as a common remote control." (D.I. 84, Ex. B-4 at 12) In contrast, the applicant expressly disavowed a palm held remote having "elaborate decoders for IPTV and IP Phone built in," and instead explained that the invention connects to a set top box or similar device which "performs the extensive decoding required for IPTV, IP Phone, Flash Media and similar signals" before relaying a simplified signal to the remote. (*Id.* at 13) The applicant consistently characterized the invention in terms of its simplicity and low cost resulting from its reliance on a master device for complex processing:

> Our Remote I/O Platform relies on a set top box, a home media player or another relatively expensive master system that already has extensive computer power to do the heavy lifting of decoding IPTV, IP phone, and similar highly encoded media sources. As a result, the Remote I/O Platform becomes something entirely different from a Portable Set Top Box. . . . The availability of a simplified, two-way data stream with slaved inputs and outputs produces new functionality in the consumer's living room. Tethering the palm-held device, so that it depends on logic and resources of the console, runs against the trends and teachings of the consumer electronics industry and particularly against the trend toward more powerful smart phones.

(*Id.* at 14) The examiner subsequently issued a notice of allowance "[b]ecause McQuaide does not disclose that the remote control depends on the master device to transcode input from and output to the slaved microphone and audio output between VoIP and the remote control format." (D.I. 84, Ex. B-6 at 2) Thus, the applicant's express disavowal of a palm held device capable of decoding IPTV, VoIP, or other complex signals led to the examiner's allowance of the '130 patent over McQuaide.

Plaintiff argues that the court should reject Defendant's proposed construction because it incorporates a negative limitation by specifying that the claimed palm held remote "cannot decode complex data streams, such as IPTV or VoIP." (9/15/2020 Tr. at 13:22-25) But the Federal Circuit has held that a negative limitation may be included in the construction of a disputed claim term where, as here, the negative limitation is supported by an "express disclaimer or independent lexicography in the written description." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003). More recently, the Federal Circuit upheld a district court's construction of a claim term having a negative limitation even in the absence of an express disavowal during prosecution or independent lexicography in the specification. *See Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1375 (Fed. Cir. 2020) (upholding a construction of "passageway" that does not "encompass a receptacle that [has] no bottom or utilized a broad-thin, mesh," without a finding of express disavowal or lexicography). The disavowal of scope in the prosecution history of the '130 patent, viewed in combination with the written description, are more than sufficient to support Defendant's proposed negative limitation under Federal Circuit precedent.

The Federal Circuit has cautioned against construing claim terms in the abstract, explaining that "a term's ordinary meaning must be considered in the context of all the intrinsic

evidence, including the claims, specification, and prosecution history." *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1094 (Fed. Cir. 2013). Here, the claims of the '130 patent disclose a palm held remote dependent on a master device or console for complex processing, and the specification expressly distinguishes the claimed palm held device from a smartphone based on its lower price point and limited processing capabilities. Consistent with the written description, the applicant repeatedly emphasized the invention's simplicity and dependence on a master device as compared to the complex processing capabilities of a smartphone during prosecution. *See Fenner Investments, Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1322-23 (Fed. Cir. 2015) ("Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to 'capture the scope of the actual invention' that is disclosed, described, and patented."(quoting *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1305 (Fed. Cir. 2011)). For these reasons, I recommend that the court adopt Defendant's proposed construction of the term "palm held remote."

**B. "Remote control device" ('753 patent, claims 1, 19; '669 patent, claims 11, 12, 13; '710 patent, claims 1, 2, 4, 12, 16; '132 patent, claims 1, 4, 11, 16, 19; '802 patent, claims 1, 2)**

| Plaintiff | Defendant | Court |
|---|---|---|
| Plain and ordinary meaning; No construction required.<br><br>The plain and ordinary meaning is a device for remote control of other devices that meets the other claim requirements. | "a simple handheld device that, in contrast to a smartphone, cannot decode complex data streams, such as IPTV or VoIP" | "a simple handheld device that, in contrast to a smartphone, cannot decode complex data streams, such as IPTV or VoIP" |

I recommend that the court adopt Defendant's proposed construction and construe the term "remote control device" to mean "a simple handheld device that, in contrast to a

smartphone, cannot decode complex data streams, such as IPTV or VoIP." The parties agree that the same arguments presented in connection with the term "palm held remote" apply equally to "remote control device." (D.I. 82 at 31) In his declaration, Dr. Chatterjee confirmed "[a] POSITA would have understood that the Tether patent[3] terms "remote control device" and "palm-held remote" are used interchangeably and should be construed the same way." (D.I. 83, Ex. C-8 at ¶ 36) The '753, '669, '710, '132, and '802 patents share a specification with the '130 patent, and the prosecution history of the '130 patent further supports the court's analysis of the common specification as explained at § IV.A, *supra*.

Plaintiff argues that Defendant's proposed construction violates the doctrine of claim differentiation. By way of example, Plaintiff alleges that unasserted claim 14 of the '753 patent and claim 1 of the '802 patent recite a remote control dependent on a master device to process or transcode audio data, while other claims are silent on these particular limitations. (D.I. 82 at 30-31) Notably, Plaintiff does not identify any specific claims in the '753 or '802 patents which lack limitations rendering the remote control device dependent on a master device for the processing of audio or other complex data streams. (*Id.*)

For the reasons set forth herein and at § IV.A, *supra*, I recommend that the court construe "remote control device" in accordance with Defendant's proposed construction as "a simple handheld device that, in contrast to a smartphone, cannot decode complex data streams, such as IPTV or VoIP."

[3] In its briefing, Defendant defines the '130, '753, '669, '710, '132, and '802 patents as the "tether patents," grouping them in this fashion because they share a common specification and are directed to "tethered digital butlers," that can operate only in conjunction with a console. (D.I. 82 at 5)

**C. "Control device" ('964 patent, claims 1, 11, 16, 21)**

| Plaintiff | Defendant | Court |
| --- | --- | --- |
| Plain and ordinary meaning; No construction required.<br><br>The plain and ordinary meaning is a device capable of controlling a controlled device. | "a simple apparatus, not a universal remote control or smart phone capable of acting as a universal remote control, for controlling a device" | "a simple apparatus, not a universal remote control or smart phone capable of acting as a universal remote control, for controlling a device" |

I recommend that the court adopt Defendant's proposed construction and construe the term "control device" to mean "a simple apparatus, not a universal remote control or smart phone capable of acting as a universal remote control, for controlling a device." Plaintiff represents that "[c]onstruction for 'control device' is parallel to that for 'palm held remote' and 'remote control device,' discussed above." (D.I. 82 at 32) Defendant's proposed construction is consistent with the specification and the prosecution history of the '964 patent.

Plaintiff argues that the plain and ordinary meaning of "control device" should apply, which is broad enough in scope to include a smartphone or a universal remote control. (D.I. 82 at 32-33; D.I. 83, Ex. C-7 at ¶ 34) Specifically, Plaintiff alleges that "[t]he '964 patent discloses an embodiment where the control device is a smart phone used to control a controllable device." (D.I. 82 at 33) However, the cited embodiment states that "the *concierge device* may be a smart phone that runs a concierge application." (*Id.*; '964 patent, col. 10:50-55; D.I. 83, Ex. C-7 at ¶ 34) (emphasis added) The specification of the '964 patent expressly distinguishes the term "concierge device" from "control device." For example, the specification explains that the concierge device "can be configured to register, control and/or support" a consumer device, and "can manage on boarding of components . . . including home control devices." ('964 patent, cols. 2:37-38; 2:51-56; 3:54-56) Plaintiff does not identify any disclosed embodiment in which a control device, as opposed to a concierge device, encompasses a smartphone. (*Cf.* '964 patent,

col. 12:27-31) ("FIG. 8 depicts a concierge device with an integrated bridge and display. . . . The concierge device may be implemented in this configuration as an application running on a smart phone, tablet or similar device."). Embodiments tying the concierge device to a smartphone do not advance Plaintiff's argument that a control device may be a smartphone.

The portions of the '964 patent specification describing the control device, as opposed to the concierge device, confirm that the control device is a simple device. For instance, the specification describes Fig. 12B as showing "an example of an alert that a new home control device, a switch is available for on-boarding." ('964 patent, cols. 3:23-25, 13:51-52) The Summary of the Invention describes control devices and controllable devices as switches and lamps, respectively, consistent with other examples in the specification identifying a home control device as "a wireless switch (SW)." (*Id.*, cols. 2:50-56; 12:3-6)

Plaintiff does not point to any portion of the specification describing the control device as having the capabilities of a smartphone or a universal remote control. The portions of the specification relied upon by Plaintiff generally describe the control device as a programmable device with a display ('964 patent, col. 37:23-39), a device with input sensors, a display, menus, and control codes (*id.*, col. 42:19-27), a device capable of conducting a support call using a video camera (*id.*, col. 42:58-62), and a device capable of displaying advertisements (*id.*, col. 43:5-9). The specification does not characterize these features as features of a universal remote control or a smartphone.

Moreover, the applicant further limited the scope of the term by repeatedly disavowing a universal remote control from the scope of the term "control device" during prosecution of the '964 patent in its efforts to overcome multiple rejections:

> The distinction between a simple home control device and a universal remote control in these claims has not been given adequate consideration and patentable

> weight. Our Figure 7, which we went over during our interview, illustrates a simple switch in contrast to a smart phone capable of acting as a universal remote control.

(D.I. 84, Ex. B-34 at 12; Ex. B-37 at 16) Consistent with disclosures made in the specification of the ’964 patent, the applicant described the control device as a simple switch during prosecution to distinguish the invention from prior art references disclosing a universal remote control or smartphones. (D.I. 84, Ex. B-34 at 12-13; Ex. B-35 at 11 (“New claim 36 . . . further differentiates between our simple (SW) and Maymudes’ improved universal remote control” that can “control multiple different devices”)) The applicant similarly disclaimed the universal remote control disclosed in the Hayes prior art reference, representing that Hayes “includes only a universal remote control, not a control device at all.” (D.I. 84, Ex. B-39 at 17; *see also* D.I. 84, Ex. B-38 at 21 (explaining that Hayes “relates to a system and associated methods for controlling and operating a plurality of home appliances” using a universal remote control); Ex. B-39 at 11-12 (identifying no feature of the Hayes reference as equivalent to the claimed control device)). Because the applicant disavowed the inclusion of a universal remote control or smartphone within the scope of the term “control device” during prosecution of the ’964 patent, the court may adopt the negative limitation excluding a universal remote control in Defendant’s proposed construction. *See Omega Eng’g*, 334 F.3d at 1323.

During the *Markman* hearing, Plaintiff presented a claim differentiation argument based on the recitation of the control device as a switch in certain dependent claims. (9/15/2020 Tr. at 63:9-15) But Defendant’s proposed construction does not limit the claimed control device to a switch. Defendant acknowledged that a simple switch is an example of a control device supported by the specification, without attempting to restrict the definition of “control device” to

a switch in its proposed construction. (*Id.* at 67:10-12) ("One example that is used frequently throughout the patent for the control device is a switch. . . .").

On this record, a person of ordinary skill would understand that the claimed control device is a simple device that does not encompass a universal remote control or smartphone.

**D. Concierge—Device ('009 patent, claims 1, 3, 6, 8, 11, 12, 13, 16, 20, 22, 27; '697 patent, claims 1, 2, 3, 4, 7; '964 patent, claims 1, 6, 11, 16, 21)**

| Plaintiff | Defendant | Court |
|---|---|---|
| A device including functionality for the remote control of at least one consumer device and that meets the other claim requirements. | "A device with at least a microphone, a speaker, a function button or input sensor, a memory, and a wireless transceiver." | A device including functionality for the remote control of at least one consumer device and that meets the other claim requirements. |

I recommend that the court adopt Plaintiff's proposed construction and construe the term "concierge device" to mean "[a] device including functionality for the remote control of at least one consumer device and that meets the other claim requirements." Plaintiff's proposed construction is consistent with the claim language of the '009, '697, and '964 patents.

The parties dispute whether the five components included in Defendant's proposed construction (namely, the microphone, speaker, function button or input sensor, memory, and wireless transceiver) are required features of the concierge device, or whether the intrinsic record supports a broader construction which would permit, but not require, these features in various configurations. The common specification of the '009, '697, and '964 patents discloses that features of the claimed concierge device "can be combined in a variety of ways, depending on the configuration of the concierge device. In this disclosure, the concierge device is really a family of devices connecting to the cloud, as shown in the figures." ('009 patent, col. 21:1-5)

Defendant points to multiple portions of the common specification describing the "simplest" concierge device as a device that includes the five components enumerated in Defendant's proposed construction. For example, the specification of the '009 patent explains that "[t]he simplest concierge device lacks a display or includes a minimal monochrome display. It need only have a microphone, speaker, one to a few function buttons or input sensors, a memory and at least one wireless transceiver." ('009 patent, col. 8:32-35; *see also* col. 31:2-6) Consistent with this characterization, the specification goes on to describe a "low cost concierge device with minimal processing power, a microphone, a speaker, one to a few function buttons and a wireless transceiver." ('009 patent, col. 14:62-65) The specification does not state whether different or more complex versions of the concierge device must also possess each of these basic features.

The claim language allows for an interpretation of "concierge device" that is not limited to the five features identified by Defendant. For instance, independent claim 21 of the '964 patent discloses a concierge device receiving a dedication command without explicitly defining the mechanism by which that dedication command is received. ('964 patent, cols. 47:34-48:20) In dependent claim 24, the inventor specifies that the dedication command is received by a microphone: "The system of claim 21, wherein the dedication command is received from the user via a microphone on the handheld concierge device as an audible command." (*Id.*, col. 48:29-31) In dependent claim 25, the inventor represents that the dedication command is received via a display screen, indicating that the display screen acts as a substitute for the microphone of dependent claim 24. (*Id.*, col. 48:32-34) Thus, the specification's description of the components in the "simplest" concierge device does not necessarily mean that each of those components is also present in other, possibly more complex iterations of the concierge device.

Similarly, independent claim 16 of the ’009 patent generically discloses “one or more outputs,” while dependent claim 18 discloses that the output is an audio menu and dependent claim 19 discloses that the output for displaying a menu must be a visual display, as opposed to an audio device such as a speaker. (’009 patent, cols. 43:43-44:8; 44:13-16) The specification clarifies that the speaker and the visual display in the dependent claims are claimed as alternative forms of output:

> A concierge device with a speaker or other audio output can receive voice prompts for confirming registration of the new device and can accept single user actions in response to the prompts, such as button presses, menu selections or verbal responses to the verbal prompts. Alternatively, a concierge device with a display can receive visual prompts for confirming registration of the new device and can accept single user actions in response to the prompts, such as button presses, menu selections or verbal responses to the visual prompts.

(’009 patent, col. 4:33-42) While the specification discloses that “[a] simple concierge device can include a microphone and speaker, without a display,” an alternative concierge device may include “a keyboard for input and display for output.” (*Id.*, col. 21:5-15)

The intrinsic record contains insufficient support for Defendant’s proposed construction in the absence of claim language or express lexicography requiring that all concierge devices contain the five components identified in the “simplest” concierge device. Even if all embodiments in the common specification disclose the five limitations identified in Defendant’s proposed construction, those embodiments are not controlling where, as here, “[t]he claim language of the asserted claims . . . is not so limited.” *Intuitive Surgical, Inc. v. Auris Health, Inc.*, C.A. No. 18-1359-MN, 2019 WL 6840327, at *5 (D. Del. Dec. 16, 2019) (citing *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012) (“It is ... not enough that the only embodiments, or all of the embodiments, contain a particular limitation to limit a claim term beyond its ordinary meaning.”)).

### E. VoIP ('130 patent, claim 10; '753 patent, claim 1; '669 patent, claim 11; '710 patent, claim 1; '132 patent, claim 1; '802 patent, claims 1 and 7)

| Plaintiff | Defendant | Court |
|---|---|---|
| A protocol for sending audio data over a packet-switched network, such as the Internet. | "protocols and data formats for transmitting voice conversations over Internet Protocol" | Protocols and data formats for transmitting voice conversations over a packet-switched network, such as the Internet. |

I recommend that the court adopt a hybrid of the parties' proposed constructions and construe "VoIP" to mean "protocols and data formats for transmitting voice conversations over a packet-switched network, such as the Internet." During the *Markman* hearing, the parties agreed that the term "VoIP" is no longer understood to be limited to the original Internet Protocol. (9/15/2020 Tr. at 98:9-23; 106:5-16) The parties further agreed that this term is an industry standard term, and the patentee did not deviate from the plain and ordinary meaning of the term as understood by a person of ordinary skill in the art in the specification. (*Id.* at 101:3-10; 102:7-103:8) To the extent that Defendant's proposed construction limits the term to transmitting voice conversations, it is consistent with the plain and ordinary meaning of the term in accordance with the industry standard and the intrinsic record.

Evidence of the industry standard definition for VoIP supports Defendant's proposed construction limiting the term to voice conversations or telephony. VoIP is defined in Newton's Telecom Dictionary as "[t]he technology used to transmit voice conversations over a data network," and in the Dictionary of Computer and Internet Terms as "the transmission of voice telephone conversations through the Internet or through IP networks." (D.I. 83, Exs. C-4 at 918, C-5 at 549) Plaintiff's evidence in support of a broader definition in the industry that would encompass all audio data is limited to the expert declaration of Dr. Selker. (9/15/2020 Tr. at

101:12-15) But the underlying sources relied upon by Dr. Selker in drafting his declaration support Defendant's proposal that the term refers to voice communications:

> VoIP is a category of technologies that route real-time voice conversations over the internet. VoIP can be used to describe everything from a computer-to-computer voice conversation, to a call between an Internet-connected computer and a standard telephone, to a long-distance call between two ordinary telephones where the long distance provider routes the calls over the Internet.

(D.I. 83, Ex. C-7 at Ex. 2 at 445) Because the term "VoIP" is an industry standard term, and because the extrinsic evidence uniformly defines the term in the context of voice communications, I recommend that the court adopt Defendant's proposed construction in this regard.

Plaintiff contends that the proper construction of VoIP should not be limited to voice conversations because it can include a wide range of audio content. (9/15/2020 Tr. at 100:8-21; D.I. 83, Ex. C-7 at ¶ 42) Plaintiff relies on an excerpt of the '669 patent specification, which states that "[f]eatures adaptable to VoIP and/or Video phone operation, such as a microphone, can be used for other purposes. Such as dictation, note taking, Voice messaging, listening to music or remote viewing video. ('669 patent, col. 3:53-56) But, as Defendant's expert Dr. Chatterjee explained, "[t]he 'features' referred to are simply hardware components (e.g., microphone, speaker, display, etc.) that the specification says can also be used for things in addition to VoIP. Thus, this statement in the Tether patents about 'features' does not suggest a definition of VoIP that strays from its industry-standard." (D.I. 83, Ex. C-9 at ¶ 56)

**F. Master Device ('753 patent, claims 1, 19; '669 patent, claims 11, 12, 13; '710 patent, claims 1, 2, 4, 12, 16; '802 patent, claims 1, 2, 7)**

| Plaintiff | Defendant | Court |
|---|---|---|
| Plain and ordinary meaning; No construction required.<br><br>The plain and ordinary meaning is a device that satisfies the other claim requirements for controlling functionality of the remote control device. | "a console, i.e., a set top box, a TV, media center or any similar consumer electronics" | Plain and ordinary meaning; No construction required.<br><br>The plain and ordinary meaning is a device that satisfies the other claim requirements for controlling functionality of the remote control device. |

I recommend that the court adopt Plaintiff's proposal and construe the term "master device" in accordance with its plain and ordinary meaning as a device that satisfies the other claim requirements for controlling functionality of the remote control device. The term "master device" appears only in the claims of the '753, '669, '710, and '802 patents, and not in the specification. Defendant does not dispute Plaintiff's assertion that the term "master device" has a plain and ordinary meaning to a person of ordinary skill in the art. (9/15/2020 Tr. at 123:3-9) The plain and ordinary meaning therefore forms the basis for the court's construction.

The parties dispute whether the terms "master device" and "console" are used interchangeably in the patents. But the claims of the '753, '669, '710, or '802 patents do not restrict the scope of the term "master device" to the scope of the term "console," and the specification is silent on the meaning of the term "master device." As a result, the focus of the parties' dispute rests on the prosecution history of the parent '130 patent. In the May 23, 2008 Amendment and Response to Final Office Action, the applicant addressed the term "master device" as follows: "Pulse code modulation decoding by the remote is described in [0075] lines 7-11, while reliance on the master device to decode IPTV, MPEG-2, MPEG-4 and DVD playback is described at [0015] and [0100], lines 23 to 24. Also, compare [0099], line 20 with

[0110], line 16." (D.I. 84, Ex. B-4 at 15) The citations refer back to portions of the specification discussing the logic and resources of the console which performs decoding functions for the remote. ('130 patent, cols. 2:49-56, 18:50-58) The portions of the specification relied upon by the applicant to support the term "master device" do not include any discussion of the console as a consumer electronics device, and the statement made during prosecution does not amount to a clear and unmistakable disavowal of scope limiting the term "master device" to the same scope as "console." Instead, the statement made during prosecution indicates that the master device is similar to the console to the extent that it controls the functionality of the slaved device or remote.

Defendant alleges that, if "master device" is construed to have a broader scope than "console," the claims would be rendered invalid under § 112. (D.I. 82 at 66-67; 9/15/2020 Tr. at 119:23-120:5) Although a patent claim should generally be construed to preserve its validity, the court "may not judicially rewrite the claim to do so." *Microchip Tech., Inc. v. Scenix Semiconductor, Inc.*, 250 F.3d 759; 2000 WL 945308, at *5 (Fed. Cir. 2000) (citing *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999)). Plaintiff has not addressed the substance of Defendant's § 112 arguments. (9/15/2020 Tr. at 119:23-24) On this record and at this stage of the proceedings, the court renders no opinion on the substance of Defendant's arguments under § 112. *See Microchip*, 2000 WL 945308, at *5.

## V. CONCLUSION

For the reasons set forth above, I recommend that the court construe disputed terms as follows:

| **Claim Term** | **Recommended Construction** |
|---|---|
| "Palm held remote" ('130 patent, claims 10, 11, 15) | a simple handheld device that, in contrast to a smartphone, cannot decode complex data streams, such as IPTV or VoIP |
| "Remote control device" ('753 patent, claims 1, 19; '669 patent, claims 11, 12, 13; '710 patent, claims 1, 2, 4, 12, 16; '132 patent, claims 1, 4, 11, 16, 19; '802 patent, claims 1, 2) | a simple handheld device that, in contrast to a smartphone, cannot decode complex data streams, such as IPTV or VoIP |
| "Control device" ('964 patent, claims 1, 11, 16, 21) | a simple apparatus, not a universal remote control or smart phone capable of acting as a universal remote control, for controlling a device |
| Concierge—Device ('009 patent, claims 1, 3, 6, 8, 11, 12, 13, 16, 20, 22, 27; '697 patent, claims 1, 2, 3, 4, 7; '964 patent, claims 1, 6, 11, 16, 21) | A device including functionality for the remote control of at least one consumer device and that meets the other claim requirements. |
| VoIP ('130 patent, claim 10; '753 patent, claim 1; '669 patent, claim 11; '710 patent, claim 1; '132 patent, claim 1; '802 patent, claims 1, 7) | Protocols and data formats for transmitting voice conversations over a packet-switched network, such as the Internet. |
| Master Device ('753 patent, claims 1, 19; '669 patent, claims 11, 12, 13; '710 patent, claims 1, 2, 4, 12, 16; '802 patent, claims 1, 2, 7) | Plain and ordinary meaning; No construction required.<br><br>The plain and ordinary meaning is a device that satisfies the other claim requirements for controlling functionality of the remote control device. |

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right

to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: October 30, 2020

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NEXSTEP, INC., Plaintiff, v. COMCAST CABLE COMMUNICATION, LLC, Defendant. | : | Civil Action No. 19-1031-RGA |

**MEMORANDUM ORDER**

I referred this patent case to a magistrate judge. (D.I. 16). In due course, after briefing, the magistrate judge held a *Markman* hearing. (D.I. 93). The magistrate judge issued a *Markman* opinion. (D.I. 113). Plaintiff objects to some of the constructions, and Defendant responds in support of those constructions. (D.I. 128, 143). I now review *de novo* the constructions to which Plaintiff objects.

While Plaintiff purports to object to four constructions, on the fourth construction – "VoIP" – the objection is essentially just an incorporation by reference of earlier briefing. Since that is insufficient to raise an objection, the purported objection to "VoIP" is overruled.

Plaintiff's objections to the other terms – (1) control device and (2) palm held remote/remote control device – are related. (*See* D.I. 82 at 32) ("Construction for 'control device' is parallel to that for 'palm held remote' and 'remote control device.'"). Nevertheless, I reach different conclusions on the objections.

Plaintiff's argument before the magistrate judge was that "control device" – a term in the '964 patent – had a plain and ordinary meaning, which it described as "a device capable of

controlling a controlled device." (D.I. 113 at 15). It now states that plain and ordinary meaning in more of a means plus function format: "a device for controlling another device." (D.I. 128 at 1). The magistrate judge adopted Defendant's proposed construction – "a simple apparatus, not a universal remote or smart phone capable of acting as a universal remote control, for controlling a device." (D.I. 113 at 15).

Defendant argued prosecution disclaimer, and the magistrate judge agreed. (*Id.* at 16-17). Plaintiff raises numerous objections to the magistrate judge's ruling (D.I. 128 at 1-4), but none of the objections matter unless the fifth objection is correct. The fifth objection is that there was no prosecution disclaimer. (*Id.* at 4-5).

The '964 patent issued in 2017, but it claims priority to a patent application filed in 2006 and further to a provisional application filed in 2005. (D.I. 1-1, Ex. 8, '964 patent at 1:7-47).

The magistrate judge cited five different instances in the prosecution history as the basis for disclaimer. (D.I. 113 at 17, citing D.I. 84, ex. B-34 (Response to Final Office Action (Aug. 4, 2015)), B-35 (Interview Summary and Supplemental Response after RCE to Final Office Action (Sept. 11, 2015)), B-37 at 16 (Applicant's Response to Office Action (Feb. 8, 2016)), B-38 (Final Office Action (March 9, 2016)), B-39 (Applicant's Response to Final Office Action (September 8, 2016))). In its objections, Plaintiff cites one of those five (B-37 at 15), arguing that what is cited is not clear and unmistakable prosecution disclaimer, but merely reliance on "limitations already present in the claims." (D.I. 128 at 5). In response, Defendant (unintentionally) concedes that the magistrate judge's construction may be too limiting: "at most, . . . a control device may include a display, menu, input sensors, and/or send and receive signals." (D.I. 143 at 3).

Upon my independent review, I agree with the magistrate judge that there was disclaimer. The clearest place is the chart in which the Applicant lists the "control device" of the invention, and contrasts that with Hayes, about which the Applicant says, "none, only a universal remote control." (D.I. 84-1 (B-39) at 366 of 442). The Applicant twice says, "The distinction between a simple home control device and a universal remote control in these claims has not been given adequate consideration and patentable weight. Our Figure 7 . . . illustrates a simple switch in contrast to a smart phone capable of acting as a universal remote control." (D.I. 84-1 (B-34) at 287 of 442; (B-37) at 319 of 442). What I think was disclaimed was a universal remote control and a smart phone capable of acting as a universal remote control. Thus, based on the entire record, I modify the magistrate judge's proposed construction, and I construe "control device" as "a device, not a universal remote control or smart phone capable of acting as a universal remote control, for controlling another device."

"Palm held remote" appears in the '130 patent. "Remote control device" appears in five other patents (the '753, '669, '710, '132, and '802 patents). The magistrate judge gave both terms the same construction: "a simple handheld device that, in contrast to a smartphone, cannot decode complex data streams, such as IPTV or VoIP." (D.I. 113 at 6, 13).

I note a certain discomfort with the proposed constructions, in that they seem to ignore the "remote" part of the claim. Even though Plaintiff does not object on that basis, Plaintiff does note the plain and ordinary meaning, "devices used to control other devices from a distance." I do not doubt that is the plain and ordinary meaning of a "remote control device," although I do doubt that it captures the "palm held" portion of "palm held remote."

One of Plaintiff's objections is that the magistrate judge relied upon prosecution disclaimer in the '130 patent to limit the different term in the other five patents. (D.I. 128 at 10).

Defendant's response essentially is that Plaintiff conceded the point when it wrote, "The same arguments [made in the reply discussion of palm-held remote] equally apply to 'remote control device.'" (D.I. 143 at 10, citing D.I. 82 at 31). If that were all Plaintiff said, perhaps Defendant would have a point. But on the same page that Defendant points to, Plaintiff writes two sentences that make it clear as day that Plaintiff did not concede that point: "Comcast's citations to the file history are limited to the '130 Patent application . . . . Comcast does not identify **anything** in the file histories [of the five patents] as purportedly supporting its proposed construction [of remote control device]." (D.I. 82 at 31) (emphasis in original). The briefing before me does not assert that the '130 patent prosecution history is relevant to the other five patents (although I do see that all the asserted patents are said to descend from the same provisional patent application (D.I. 82 at 4)). The six patents have a common specification. (D.I. 113 at 14). It appears that the five patents are continuations of the '130 patent, which was a continuation-in-part of the unasserted '103 patent. I do not think disclaimer with regard to a term in a parent patent is necessarily binding (or perhaps even relevant) to the construction of a different term in a child patent.[1]

I have read the sections of the specification that the magistrate judge relied upon to limit the palm held remote. I do not agree with the magistrate judge's analysis of the specification. In no particular order, (1) I do not think the description of the console necessarily means that the palm held remote does not have some or all of the features of the console; it merely means that whether or not the palm held remote has them, the console has to have them; (2) the palm held remote "integrates at least" several limitations, including (and I'm paraphrasing) that it be usable as a telephone, has a display, has the ability "to select and control resources of the console," has

[1] In light of my ultimate determination, I do not have to decide the issue.

a keypad, has keys suitable for "web browsing" and has the ability to communicate with the console wirelessly; the "integrates at least" language indicates there can be more unclaimed features; and (3) I do not read the references to the cost or power of a smartphone as disparaging them such that they are disclaimed; rather, they are not required. The magistrate judge cites claim 10 for the proposition that the palm held remote "depends" upon the console for processing power. If that is correct, and a smart phone does not so depend in the accused system, then it won't infringe, but it won't be because it's a smart phone, it will be because it does not meet another limitation. Ditto for the limitation that the console has "resources adapted to" "decode VoIP to a remote control device format . . . ." The console has to have those resources. That does not mean that they are excluded from being a part of the palm held remote.

What about prosecution disclaimer for the '130 patent? Defendant points to various statements in which the Applicant said some version of, "the remote of the invention is a lot simpler and/or cheaper than a smartphone." (D.I. 84-1, Ex. B-2 at 12 ("simpler" and "one-tenth or less the cost of building McQuaide's handheld"); Ex. B-4 at 13-14 ("[favorable] price point" contrasted with "expensive"); Ex. B-50 at 7("price point which will be attractive in the marketplace")).

Prosecution disclaimer is an exacting standard. I do not think it is met here. Essentially, the Applicant claimed "a multi-media and communications system" with many included features. ('130 patent, claim 10). I think the prosecution history is saying that the system works with a simple remote control. That is why it is an improvement over the prior art. That is why it can be a lot cheaper. But the system does not require that the simple remote control have no additional features. It just doesn't need to have any additional features. If those features are in an accused product, it won't matter that they are, because they are simply additional unclaimed features.

Thus, for the '130 patent, I reject the magistrate judge's construction. I agree with Plaintiff that "palm held remote" does not need construction. Jurors will understand the plain meaning of the term. For the other five patents, since "remote control device" is based on the same specification, and since the only prosecution disclaimer asserted is, at most, no more persuasive as to them than it is as to the "palm held remote" term of the '130 patent, I also reject the magistrate judge's construction for "remote control device" and construe it to have its plain meaning.

IT IS SO ORDERED this 9th day of August 2021.

United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NEXSTEP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-1031-RGA-SRF |
| | ) | |
| COMCAST CABLE COMMUNICATIONS, LLC, | ) | **UNDER SEAL** |
| | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

## I. INTRODUCTION

Presently before the court in this patent infringement action are cross-motions for summary judgment and to exclude expert opinions or testimony filed by plaintiff NexStep, Inc. ("Plaintiff" or "NexStep") (D.I. 197) and defendant Comcast Cable Communications, LLC ("Defendant" or "Comcast") (D.I. 196).[1] For the following reasons, I recommend that the court GRANT-IN-PART Plaintiff's motion and GRANT-IN-PART Defendant's motion.

## II. BACKGROUND

Plaintiff brought this suit in June 2019, alleging infringement of United States Patent Nos. 7,444,130 ("the '130 patent"), 7,542,753 ("the '753 patent"), 7,697,669 ("the '669 patent"), 7,907,710 ("the '710 patent"), 8,280,009 ("the '009 patent"), 8,494,132 ("the '132 patent"), 8,885,802 ("the '802 patent"), 9,614,964 ("the '964 patent"), and 9,866,697 ("the '697 patent"), which are directed to personal computing devices and services to control, combine, and integrate

---

[1] The briefing and filings related to Plaintiff's pending motion are found at D.I. 200, D.I. 201, D.I. 202, D.I. 203, D.I. 213, D.I. 217, D.I. 218, D.I. 242, D.I. 244, D.I. 245, D.I. 252, and D.I. 262. The briefing and filings related to Defendant's pending motion are found at D.I. 198, D.I. 199, D.I. 214, D.I. 215, D.I. 216, D.I. 241, D.I. 243, D.I. 258, D.I. 263, and D.I. 266.

telephone and video services. (D.I. 1 at ¶ 8) The United States Patent and Trademark Office ("USPTO") issued the patents to Dr. Robert Stepanian, the founder of NexStep, between 2008 and 2018. (D.I. 1 at ¶¶ 8, 10-18) The patents recite systems and methods for controlling and integrating a variety of devices, "such as TVs, set-top boxes, DVRs, VoIP (telephone) systems, and home devices (e.g., security cameras, electrical outlets, and thermostats) using a hand-held device." (*Id.* at ¶ 19) Plaintiff alleges that Comcast markets and sells services, equipment, and apps under the Xfinity brand name that infringe the patents. (*Id.* at ¶ 24)

The parties have engaged in several rounds of case narrowing. (11/13/2019 Oral Order; D.I. 190 at 1) As a result, Plaintiff is no longer asserting infringement of the '130 patent. (D.I. 200 at 1; D.I. 214 at 20) The remaining patents asserted by Plaintiff are divided into three groups: (1) the Customer Troubleshooting patents (the '009 and '697 patents); (2) the Enrollment patent (the '964 patent); and (3) the Tether patents (the '753, '669, '710, '132, and '802 patents). The Customer Troubleshooting, Enrollment, and Tether patents (collectively, the "Asserted Patents") claim priority to Provisional Application No. 60/709,666, which was filed on August 19, 2005. The Customer Troubleshooting patents share a common specification, and they are directed to streamlining consumer access to customer support services for their devices. ('009 patent, col. 2:51-58) The Enrollment patent shares a common specification with the Customer Troubleshooting patents, and it is directed to improving the interconnection of consumer devices by on-boarding new consumer devices into a networked home system using a concierge device. ('964 patent, col. 2:25-26) The Tether patents share a common specification, and they are directed to simple, inexpensive remote controls that operate in conjunction with multi-media consoles. ('753 patent, col. 2:49-56)

Defendant Comcast provides Internet, video, voice, and security services. (D.I. 1 at ¶ 24) In its complaint filed on June 3, 2019, NexStep alleges that Comcast's modems, gateways, routers, set-top boxes, remote controls, home security sensors and video surveillance cameras, smartphone and tablet devices, and smartphone applications for controlling and integrating these devices infringe the Asserted Patents. (*Id.*) The complaint suggests that Comcast's executive officers met with Dr. Stepanian in the summer of 2007 to discuss NexStep's technology and, after rejecting the opportunity to work with NexStep on the development of Comcast's technology, Comcast used the information gleaned from those meetings to develop its own infringing technology. (*Id.* at ¶¶ 20-23)

On October 31, 2019, the court issued a Report and Recommendation granting-in-part Defendant's motion to dismiss. (D.I. 20) After no objections to the Report and Recommendation were filed, the assigned District Judge adopted the decision and granted Plaintiff ten days to file an amended complaint. (D.I. 27) No amended complaint was filed.

The court held a *Markman* hearing on September 15, 2020 and issued a Report and Recommendation on claim construction on October 30, 2020. (D.I. 93; D.I. 113) Plaintiff filed objections to the court's Report and Recommendation on claim construction, and on August 9, 2021, the court sustained the objections with respect to two terms: "palm held remote" and "remote control device." (D.I. 128; D.I. 261) The term "palm held remote" appears only in the '130 patent, which is no longer at issue in this litigation. The term "remote control device" appears throughout the Tether Patents.

Oral argument on the pending motions for summary judgment and *Daubert* motions was held on August 6, 2021. A pretrial conference is scheduled for September 3, 2021, and a jury trial is scheduled to begin on September 20, 2021. (D.I. 178 at 2)

## III. LEGAL STANDARDS

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460-61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute. . . ." Fed. R. Civ. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*,

476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247-49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex*, 477 U.S. at 322.

**B. Daubert Motions**

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The trial court has the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 594, 597 (1993).

The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation;' the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury.

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003) (footnote and internal citations omitted).[2] At base, "the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). Indeed, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## IV. SUMMARY JUDGMENT

### A. Patent Eligibility of the Customer Troubleshooting Patents Under § 101

Section 101 of the Patent Act defines patent-eligible subject matter as follows: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. Laws of nature, natural phenomena, and abstract ideas are the three categories of subject matter that are not eligible for patents. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The purpose of these exceptions is to protect the "basic tools of scientific and technological work." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012). "[A] process is not unpatentable simply because it contains a law of nature or a mathematical algorithm" because "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent

[2] The Court of Appeals wrote under an earlier version of Rule 702, but the subsequent amendments to it were not intended to make any substantive change.

protection." *Id.* (internal quotation marks and emphasis omitted). To transform an unpatentable concept into a patent-eligible application, "one must do more than simply state the [ineligible concept] while adding the words 'apply it.'" *Id.* at 72 (emphasis omitted).

In *Alice*, the Supreme Court reaffirmed the two-step framework laid out in *Mayo* for distinguishing patents that claim ineligible subject matter from those that claim patent-eligible applications of those concepts. *Alice*, 573 U.S. at 217. First, the court must determine whether the claims are drawn to a patent-ineligible concept. *Id.* To do so, the court examines whether the focus of the claims is on "the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018) (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016)).

If the claims are drawn to an abstract idea, the court must look to "the elements of the claim both individually and as an ordered combination" to see if there is an "inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217-18. "A claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Id.* at 221. Moreover, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Id.* at 222 (quoting *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010)).

**1. *Alice* Step One**

Defendant contends that the Customer Troubleshooting Patents are directed to the abstract idea of obtaining customer support. (D.I. 198 at 7) According to Defendant, eliminating

the need for customers to identify themselves or the specifics of their devices does nothing more than automate conventional process for obtaining customer service. (*Id.* at 7-8)

Plaintiff alleges that, despite Defendant's attempts to oversimplify the claims, the Customer Troubleshooting Patents cover a concrete and specific implementation of customer support services that was not comparable to other customer support systems in existence at the time of the invention. (D.I. 214 at 3-4) Plaintiff explains that the Customer Troubleshooting Patents are directed to an improvement to technology because conventional consumer devices did not communicate data to other devices, they were not managed in the home, and they were not connected to a cloud-based service. (*Id.*)

Defendant identifies claim 1 of the '009 patent as representative of all of the asserted claims in the Customer Troubleshooting Patents. (D.I. 198 at 6-7) Plaintiff generally cautions against oversimplification of the asserted claims in the Customer Troubleshooting Patents and suggests "that the specific claims should be assessed to see if they provide a specific and concrete solution" at step one. (D.I. 214 at 6) Plaintiff does not specifically identify any limitations in other claims which are not captured by claim 1 of the '009 patent. Claim 1 of the '009 patent recites:

> A method of initiating a support session for a consumer device using a concierge device, the method including:
> associating the concierge device with a selected consumer device;
> responsive to a single action performed by a user, the concierge device
> communicating with a home gateway, including
> causing the home gateway to buffer consumer device identification information for the selected consumer device and determine a support center for a support session; and
> causing the home gateway to initiate the support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either
> to bypass an automated attendant or interactive voice recognition system or

to initiate an automated support protocol.

('009 patent, col. 42:45-63)

The asserted claims of the Customer Troubleshooting Patents are not ineligible at step one of the *Alice* inquiry. Instead, the focus of the asserted claims is directed to a specific improvement to technology beyond improving the efficiency of a computer. *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368-69 (Fed. Cir. 2020). The language of the claims describes a specific implementation to facilitate customer service, as opposed to a broad description covering any form of customer support service. *Id.* The focus on the capabilities of the concierge device and its interaction with the home gateway to initiate a support session invokes a specific improvement to a method of obtaining customer support, as opposed to a result or effect that is itself the abstract idea. *Id.* at 1368.

The written description confirms that the claimed concierge device provides a technological solution by managing the troubleshooting process for multiple devices registered with a cloud-based service. ('009 patent, cols. 14:50-15:2) The specification explains that conventional consumer devices were not capable of communicating data to other devices, they could not be managed in the home, and they were not interconnected by way of a cloud-based service. (*Id.*, cols. 3:64-4:1, 23:65-25:44) Moreover, the hardware components of the claims are configured by the claimed software protocols to improve the operation of the hardware devices. ('009 patent, cols. 43:43-44:8) The focus of the invention is on "improving the process by which multiple devices are programmed to communicate with each other and collect diagnostic information." (D.I. 215, Ex. A at ¶ 1411)

In this regard, the asserted claims of the Customer Troubleshooting Patents are similar to those at issue in *CardioNet, LLC v. InfoBionic, Inc.*, which assessed the eligibility of claims

directed to a cardiac monitoring device. Because the claims were focused on an improvement in cardiac monitoring devices, they were deemed eligible under § 101. *CardioNet*, 955 F.3d at 1368-69. The same is true of the claims of the Customer Troubleshooting Patents. Instead of focusing on generic steps for providing customer service, the claims are directed to a specific manner of providing customer troubleshooting services via a concierge device networked with a host of consumer devices and linked to the cloud. This specific technological solution is not comparable to the generic claims recited in the cases relied upon by Defendant. *Cf. Uniloc USA, Inc. v. Big Fish Games, Inc.*, 320 F. Supp. 3d 1178, 1185 (W.D. Wash. 2018) (reciting generic steps of receiving a request for a service from a customer; relaying the request to a service facility; determining the components needed for the requested service; and providing the service to the customer); *24/7 Customer, Inc. v. LivePerson, Inc.*, 2017 WL 2311272, at *3-4 (N.D. Cal. May 25, 2017) (invalidating claims "directed to the abstract idea of routing a call to a customer service agent based on information about the caller."); *Intellectual Ventures I LLC v. AT&T Mobility LLC*, 235 F. Supp. 3d 577, 590 (D. Del. 2016) (finding claims were "directed to the abstract idea of account management"); *Pragmatus Telecom, LLC v. Genesys Telecommc'ns Labs., Inc.*, 114 F. Supp. 3d 192, 200 (D. Del. 2015) (finding ineligible claims directed to an automated call distribution system connecting a customer to a call center via a server and using a customer terminal); *Univ., of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019) ("[The] patent nowhere identifies, and we cannot see in the claims, any specific improvement to the way computers operate.'"); *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018) ("[The] benefits [alleged by Patent Owner] are not improvements to database functionality[,] . . . [but instead] are benefits that flow from performing an abstract idea

in conjunction with a well-known database structure. . . . [T]he focus of [the] claims is unrelated to how databases function.").

The supplemental authority cited by Defendant is likewise distinguishable because the claims in those cases were similarly directed to abstract data management concepts implemented on generic computer components. In *PersonalWeb Techs. LLC v. Google LLC*, 2021 WL 3556889 (Fed. Cir. Aug. 12, 2021), the Federal Circuit affirmed the District Court's conclusion that the claims were directed to the generic steps of (1) receiving a request containing a content-based identifier for a data item, (2) comparing the content-based identifier to a plurality of values, and (3) granting or disallowing access to the data item based on the comparison. Specifically, the Federal Circuit noted that these functions could be performed in the human mind. *Id.* No similar argument can be made for the claims in this case, which specifically require a concierge device, a home gateway, and a cloud-based service.

The court's decision in *SynKloud Techs., LLC v. HP Inc., et al.*, C.A. No. 19-1360-RGA et al., 2021 WL 3568371 (D. Del. Aug. 12, 2021) is also distinguishable, first because it arose in the context of a Rule 12(c) motion. The court found that remotely accessing and retrieving user-specified information was abstract because it implemented only generic technology such as a generic server and wireless device. *Id.* at *4. Here, in contrast, the concierge device and other technological components are specific devices performing unique functions described in the written description.

Finally, the Federal Circuit's decision in *MyMail, Ltd. v. ooVoo, LLC*, 2021 WL 3671364 (Fed. Cir. Aug. 19, 2021) is distinguishable. The case involved a Rule 12(c) challenge to the eligibility of claims directed to a method for modifying a toolbar over a network without user intervention. *Id.* The Federal Circuit concluded that the claims invoked computers as a tool to

perform the abstract steps of collecting, analyzing, and presenting information, without any improvement to technology. *Id.* Here, in contrast, the focus of the claims is on a specific manner of providing customer troubleshooting services via a concierge device networked with a host of consumer devices and linked to the cloud.

**2. *Alice* Step Two**

Having determined that the Customer Troubleshooting Patents are directed to an improvement to technology in the first step of the *Alice* analysis, the court need not reach step two of the analysis. *See Data Engine Techs. LLC v. Google LLC*, 906 F.3d 999, 1007 (Fed. Cir. 2018) ("If the claims are not directed to a patent-ineligible concept under *Alice* step 1, the claims satisfy § 101 and we need not proceed to the second step.").

Moreover, Defendant does not address the claim limitations as an ordered combination to determine whether the additional elements transform the nature of the claim into a patent eligible application, as required at step two of the analysis. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018). Instead, Defendant separately addresses each claim limitation before adding in a conclusory fashion that "[t]here is also nothing inventive about the ordered combination of these elements." (D.I. 198 at 9-14)[3] For this additional reason, Defendant has not established as a matter of law that the asserted claims of the Customer Troubleshooting Patents are ineligible under 35 U.S.C. § 101. *Alice*, 573 U.S. at 217-18 (describing the second step as "a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is

[3] The subheading for Defendant's analysis at step two is titled "No Technological Improvements." (D.I. 198 at 9) Although there is some overlap between the two steps of the *Alice* inquiry, *see Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1349 (Fed. Cir. 2018), the focus at step two is generally on whether the claims recite an inventive concept, *see Alice*, 573 U.S. at 217-18. The existence of an improvement to technology is usually determined at step one of the analysis. *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020).

sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.").

### B. Noninfringement of the Customer Troubleshooting Patents

Defendant contends that Plaintiff's infringement arguments regarding the Customer Troubleshooting patents fail as a matter of law because Defendant's accused My Account App cannot satisfy the requirement that a "single" user action causes a series of events to occur in response to that action. (D.I. 198 at 14-17) In response, Plaintiff contends that the accused My Account App meets the "single action" requirement because a single action, such as a button press, initiates a process satisfying each of the claimed method steps. (D.I. 214 at 9-12)

I recommend that the court deny Defendant's motion for summary judgment of non-infringement of the Customer Troubleshooting patents because a genuine issue of material fact exists regarding whether the accused My Account App meets the "single action" limitation of the asserted claims. Claim 1 of the '009 patent recites that,

> responsive to a single action performed by a user, the concierge device communicating with a home gateway, including
>
> causing the home gateway to buffer the consumer device identification information for the selected consumer device and determine a support center for a support session; and
>
> causing the home gateway to initiate the support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either
>
> to bypass an automated attendant or interactive voice recognition system or
>
> to initiate an automated support protocol.

('009 patent, col. 42:45-63) This claim language suggests that the "single action" is one action by the user that results in all of the subsequent claimed actions being performed by the home

gateway without additional user input. (*Id.*; *see also* '009 patent, cols. 12:21-22; 8:39-44; 31:6-8; Fig. 9) The written description includes the various forms a single user action may take. ('009 patent, col. 4:33-37) Figures 14A, 14B, and 15 suggest that the user may perform a single action such as pushing a button to select a device to initiate a support session. ('009 patent, Figs. 14A, 14B, 15) But the Figures illustrate that the user must then make another selection to start or end a customer support call. (*Id.*; col. 3:40-44)

A genuine issue of material fact exists regarding whether Defendant's accused My Account App infringes the Customer Troubleshooting patents. Plaintiff's expert, Dr. Ted Selker, opines that a user of the My Account App may perform a single action such as selecting "Internet" as the consumer device to initiate an automated support protocol that tests the selected device and provides a troubleshooting recommendation. (D.I. 215, Ex. D at ¶ 133; Ex. E at ¶ 159) In accordance with the automated steps outlined in the '009 patent, Dr. Selker explains how each step may be performed using the My Account App in response to the single action, including: (1) determining a support center for a support session; (2) initiating a support session for a selected consumer device; (3) automatically forwarding consumer device information during the support session; and (4) initiating an automated support protocol or causing a troubleshooting session to start with an agent without going through an automated attendant. ('009 patent, col. 42:49-63; D.I. 199, Ex. 16 at ¶ 395; D.I. 215, Ex. D at ¶¶ 269-270) As explained in more detail at § V.A, *infra*, Dr. Selker's opinion is well-supported by documents and other evidence.

Defendant's expert, Dr. John Villasenor, offers opinions and evidence rebutting Dr. Selker's position that each element of the claims is satisfied by the My Account App. For example, Dr. Villasenor opines that the My Account App does not satisfy the "single action"

requirement because the user must visit a standard webpage displaying troubleshooting instructions before selecting a "Continue" option that prompts the server to scan the system and return a device selection page. (D.I. 243, Ex. 4 at ¶¶ 464-473) But Dr. Villasenor's interpretation of the "single action" requirement conflicts with testimony from the inventor, Dr. Stepanian, who explained that the words "single action" were "meant to convey to the end user how simple the process is, how it can easily get into, if you will, a wizard-type scenario, where a single action allows you to then compress a thousand more actions in to [about] four steps." (D.I. 215, Ex. B at 319:1-7)

Dr. Villasenor also takes the position that no single action causes the My Account App to both buffer consumer device identification information and automatically forward such identification information. (D.I. 243, Ex. 4 at ¶ 465) In contrast, Dr. Selker's report suggests that this is not the case, opining that the My Account App causes the home gateway to buffer consumer device information and use that information to determine a support center for a support session. (D.I. 215, Ex. D at ¶¶ 204-211) Dr. Selker specifically states that "[t]he request for service and associated consumer device information is sent to the support center from the My Account App via Comcast's customer support system." (*Id.* at ¶ 212) The conflicting evidence in the present record gives rise to a genuine issue of material fact. I therefore recommend that the court deny Defendant's motion for summary judgment of non-infringement of the Customer Troubleshooting Patents.

**C. Noninfringement of the Enrollment Patent**

In the August 9, 2021 Memorandum Order on claim construction, the court overruled the objections to the Report and Recommendation's construction of "control device" and construed

the term to mean "a device, not a universal remote control or smart phone capable of acting as a universal remote control, for controlling another device." (D.I. 261 at 3)

Defendant argues that summary judgment of non-infringement of the Enrollment Patent is warranted because there is no dispute that the Xfinity Home App running on a smartphone, the Xfinity Set Top Box paired to an Xfinity Remote, and the Xfinity Home Touchscreen do not satisfy the "control device" limitation of the '964 patent under the court's construction of the term. (D.I. 198 at 18) Plaintiff does not dispute that the three devices identified by Defendant do not meet the requirements of the claimed "control device" under the court's construction. (D.I. 214 at 13-14) Instead, Plaintiff argues that Defendant's Xfinity Remote independently meets the "control device" limitation to literally infringe the Enrollment Patent, and the Xfinity Home App independently satisfies the "control device" limitation under the doctrine of equivalents. (*Id.* at 15-17)

**1. Xfinity Remotes**

Plaintiff argues that the accused Xfinity Remotes are "control devices" because they are neither universal remote controls nor smartphones, even when paired with a set top box. (D.I. 214 at 15) Whereas a universal remote control is programmed to control different devices of different brands, Plaintiff explains that an Xfinity Remote directly controls a paired set top box and is not pre-programmed to control other devices. (*Id.* at 16) Defendant replies that an Xfinity Remote cannot be a "control device" under the court's construction because it operates as a universal remote control having infrared capabilities. (D.I. 241 at 8-9)

The evidence of record does not support Plaintiff's position that the Xfinity Remotes meet the requirements of the claimed "control device," as construed by the court. Dr. Selker opines that an Xfinity Remote is not a universal remote control because it does not have infrared

capabilities and cannot control devices such as a VCR, DVD or Blu-Ray player, A/V receiver, or other devices controllable via infrared signals. (D.I. 215, Ex. E at ¶¶ 331-332) But the hardware specifications for the Xfinity Remotes describe them as "high-end remote[s]" that "support[] an Infrared (IR) database that enables users to program their remote for control of a TV, Audio Video Receiver (AVR), or soundbar." (D.I. 243, Ex. 7 at COM_NEX001011359; Ex. 8 at COM_NEX000849781) Dr. Selker cites no documents showing otherwise.[4] Because the evidence of record demonstrates that the features of the Xfinity Remotes are consistent with the standard features of a universal remote control, as defined by Dr. Selker, the Xfinity Remotes do not meet the definition of a "control device" under the court's construction.

### 2. Xfinity Home App

There is no dispute that the accused Xfinity Home App does not literally infringe the Enrollment patent under the operative claim construction of the term "control device." (D.I. 215, Ex. D at ¶¶ 594-97) Instead, the focus of the parties' dispute is on whether the Xfinity Home App meets the "control device" limitation under the doctrine of equivalents. (*Id.*) Defendant argues that the accused Xfinity Home App is software that cannot satisfy the hardware requirements of the claimed control device, and it contains tens of thousands of lines of code that render implausible any characterization of the application as "simple." (D.I. 241 at 10) But

[4] Dr. Selker cites only one document in support of his opinion on this topic. (D.I. 215, Ex. E at ¶ 332) (citing NexStep 0154366-90). The excerpt of the document included in his reply expert report does not unambiguously support his position that "the Xfinity Remote is not considered a 'universal remote control.'" (*Id.*) Instead, the excerpt states that customers "looking for a way to control Xfinity and Xfinity X1 seamlessly as well as any other device that you may have . . . probably want a universal remote. While you can try to use one of Comcast's remotes, there are other options available that will work just as well with your Xfinity box." (*Id.*) This passage suggests that Comcast's remotes function as universal remotes, capable of pairing not only with the Xfinity set top box, but also "any other device that you may have." (*Id.*) Dr. Selker's reliance on this document does not create a genuine issue of material fact.

Plaintiff insists that Defendant's Xfinity Home App could run on a smartphone that is not capable of acting as a universal remote control, and this would satisfy the court's construction of "control device." (D.I. 214 at 16-17)

Plaintiff's doctrine of equivalents argument fails as a matter of law because there is no dispute that the Xfinity Home App, by itself, has no hardware that might otherwise render it equivalent to the claimed control device which was defined by the court as an "apparatus" having a physical structure. (D.I. 214 at 16) ("The Home App is a simple apparatus because it is a software application for controlling other devices and does not itself encompass any hardware."); *see Lighthouse Consulting Grp., LLC v. BB&T Corp.*, 476 F. Supp. 3d 532, 544 (W.D. Tex. Aug. 4, 2020) (holding that "no jury could reasonably find that software could be equivalent to a physical" claim limitation having physical properties). In his opening expert report, Dr. Selker stated that the Xfinity Home App would operate on a physical smartphone to constitute a "control device," but he acknowledged at his deposition that this opinion would not establish infringement under the operative construction of "control device" adopted by the court. (D.I. 215, Ex. D at ¶ 592; D.I. 199, Ex. 13 at 128:6-17) Dr. Selker does not suggest that the Xfinity Home App is capable of operating on any hardware other than a smartphone.

For the foregoing reasons, I recommend that the court grant Defendant's motion for summary judgment of non-infringement of the Enrollment Patent.

**D. Noninfringement of the Tether Patents**

**1. Lack of "remote control device" requirement**

In its August 9, 2021 Memorandum Order on claim construction, the court sustained Plaintiff's objection to the Report and Recommendation's construction of "remote control device" and construed the term to have its plain and ordinary meaning. (D.I. 261 at 6) The

court's construction renders moot Defendant's motion for summary judgment of non-infringement of the Tether Patents insofar as it depended on the Report and Recommendation's construction of "remote control device." (D.I. 264 at 4)

**2. Lack of "VoIP" requirement**

In the August 9, 2021 Memorandum Order on claim construction, the court overruled objections to the Report and Recommendation's construction of the term "VoIP" to mean "[p]rotocols and data formats for transmitting voice conversations over a packet-switched network, such as the Internet." (D.I. 261 at 1; D.I. 113 at 21) The court specifically rejected Plaintiff's effort to broaden the definition to encompass all audio data, instead finding that the industry standard definition of the term limited it to the realm of voice conversations or telephony. (D.I. 113 at 21-22) Defendant argues that Plaintiff continues to interpret the term "VoIP" to include all audio data, despite the court's construction limiting the term to the transmission of voice conversations or telephony. (D.I. 198 at 26-27) Because Plaintiff does not suggest that Defendant's accused products are capable of two-way voice conversations, there is no genuine dispute that Defendant's accused products do not satisfy the VoIP requirement of the asserted claims of the Tether patents. (D.I. 214 at 24) ("VoIP protocols can . . . be used to carry spoken words in one direction."). Consequently, I recommend that the court grant Defendant's motion for summary judgment of noninfringement of the Tether patents.

**a. The '802 patent and the accused Voice Remotes[5]**

**i. Literal infringement**

Defendant argues that there can be no literal infringement of the VoIP limitation in claims 1 and 7 of the '802 patent because there is no evidence that the accused Voice Remotes are capable of participating in voice conversations in accordance with the controlling construction of "VoIP." (D.I. 198 at 28) Instead, Defendant explains that the accused Voice Remotes send one-way voice commands to a set top box, which cannot respond with audio or voice data that might otherwise satisfy the "voice conversation" requirement. (*Id.* at 29)

In response, Plaintiff argues that Defendant's accused Voice Remotes satisfy the VoIP requirement because they depend on voice-compatible set top boxes to transcode audio data into VoIP messages. (D.I. 214 at 22) According to Plaintiff, the voice commands spoken by the customer and allegedly transcoded by the set top boxes constitute a voice conversation. (*Id.* at 23) Plaintiff stresses that VoIP protocols can be used to carry one-way conversation messages in addition to two-way conversations. (*Id.* at 24)

I recommend that the court grant Defendant's motion for summary judgment of no literal infringement of the asserted claims of the '802 patent because Plaintiff has presented no evidence that the accused Voice Remotes satisfy the requisite aspects of the VoIP limitation. Although Plaintiff argues that one-way communication of audio data may constitute a "voice conversation," (D.I. 214 at 24), Plaintiff's expert, Dr. Reinman, confirms that a voice conversation requires two-way communication, (D.I. 199, Ex. 31 at 89:12-16, 91:8-19). The record otherwise shows that Plaintiff's experts attempt to downplay or disregard the court's

[5] The term "Voice Remotes" as used herein refers to Comcast's Xfinity XR11, XR15, and XR16 remotes which are accused of infringing claims 1 and 7 of the '802 patent. (D.I. 198 at 27-28; D.I. 214 at 22)

construction of the term "VoIP" in rendering their opinions. (*Id.* at 89:4-92:24; Ex. 23 at ¶ 27; D.I. 201, Ex. 26 at ¶ 43; D.I. 215, Ex. M at ¶ 72) Because Plaintiff's experts do not wholly accept the court's construction of "VoIP," this case is distinguishable from *Uniloc*, which involved factual disputes regarding the application of the claim construction to the accused device. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1302 (Fed. Cir. 2011). Plaintiff does not provide evidence in support of its theory that a one-way voice command may constitute a "voice conversation" as required by the court's construction of "VoIP." Consequently, there is no genuine dispute that the voice commands sent from the accused Voice Remotes to the set top box and server are one-way audio communications that do not amount to a "voice conversation."[6] *See E.I. DuPont de Nemours & Co. v. Unifrax I LLC*, C.A. No. 14-1250-RGA, 2017 WL 1822279, at *1 (D. Del. May 5, 2017) ("A dispute is 'genuine' only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986)).

The record before the court contains no evidence that the accused Voice Remotes are capable of satisfying the "voice conversations" requirement of the VoIP limitation. Plaintiff's expert, Dr. Wolf, concedes that the Voice Remotes are only capable of "one-way communication of sound recordings via HTTP" to transmit voice commands. (D.I. 199, Ex. 24 at ¶ 42) Dr. Wolf was unable to testify that the accused Voice Remotes allow for two-way real-time voice conversations. (*Id.*, Ex. 27 at 195:2-25, 250:4-14) Consistent with the opinion of Dr. Wolf, Defendant's expert, Dr. Chatterjee, represents that "[t]he Xfinity Set-Top Box does not send any

[6] Plaintiff cites the definition of "VoIP" in Newton's Telecommunication Dictionary in support of its position that the term can encompass one-way communications. (D.I. 214 at 24 (citing D.I. 215, Ex. K at 979)) Plaintiff's dictionary definition confirms that VoIP protocols must be capable of facilitating "phone calls" and may include additional new services such as voice emails. (D.I. 215, Ex. K at 979)

information received from the . . . server to the Xfinity Voice Remote," nor does the server send any audio to the set top box. (*Id.*, Ex. 22 at ¶¶ 208-09) Accordingly, there is no evidence to support a conclusion that the information transmitted among the Voice Remotes, the set top box, and the server meets the definition of "VoIP." *See Cradle IP, LLC v. Tex. Instruments, Inc.*, 5 F. Supp. 3d 626, 639 (D. Del. 2013) ("Issues of fact are raised by conflicting evidence, not by attorney argument or conclusory expert opinions."). For these reasons, I recommend that the court grant Defendant's motion for summary judgment of no literal infringement of claims 1 and 7 of the '802 patent.

**ii. Doctrine of equivalents**

Defendant alleges that Plaintiff is barred under the doctrine of prosecution history estoppel from asserting a doctrine of equivalents ("DOE") theory of infringement for the VoIP limitation because Plaintiff is presumed to have added the VoIP limitation in prosecution to render the application patentable. (D.I. 198 at 31; D.I. 241 at 15) Moreover, Defendant argues that Plaintiff offers no evidentiary support for its position that the HTTP protocol is equivalent to VoIP or that the error sound emitted by the Voice Remotes is equivalent to a voice conversation. (D.I. 198 at 32)

In response, Plaintiff contends that the Voice Remotes are equivalent to the asserted claim limitations because they rely on the set top box to transmit audio data over the Internet. (D.I. 214 at 25) Plaintiff rejects the notion of disclaimer during prosecution because the relevant prior art reference claimed a remote control that did not depend on a master device to transmit audio data. (*Id.*)

I recommend that the court grant Defendant's motion for summary judgment of no infringement of claims 1 and 7 of the '802 patent under the doctrine of equivalents. Plaintiff's

doctrine of equivalents position is barred under the doctrine of prosecution history estoppel because the patentee added the VoIP limitation during prosecution of the parent application to overcome a prior art rejection based on the McQuaide reference. (D.I. 243, Ex. 10 at NexStep 0000300-317; NexStep 0000368; D.I. 199, Ex. 25 at ¶¶ 78-81, 85-86) Where, as here, a limitation is added during prosecution to overcome a rejection, "[t]he doctrine of prosecution history estoppel acts as a 'legal limitation on the doctrine of equivalents.'" *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 493 F.3d 1368, 1377 (Fed. Cir. 2007).

In this case, Plaintiff has not met its burden "to establish that the reason for the amendment was unrelated to patentability." *Id.* Instead, Plaintiff's expert, Dr. Wolf, acknowledges that amendments in the parent application to include the VoIP limitation were made to overcome the McQuaide reference. (D.I. 215, Ex. M at ¶ 75) Because Plaintiff has not met its burden, "the court must presume that the patentee 'had a substantial reason related to patentability for including the limiting element added by amendment.'" *Id.* (quoting *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 33 (1997)). Further bolstering this presumption, the record confirms that the examiner expressly allowed the parent application after the VoIP limitation was added "[b]ecause McQuaide . . . does not disclose that the resources of the console are adapted to decode VoIP to a remote control device format." (D.I. 243, Ex. 10 at NexStep 0000391) Accordingly, Plaintiff's DOE theory of infringement of the '802 patent fails as a matter of law, and granting summary judgment of non-infringement in Defendant's favor is recommended. *See Acceleration Bay LLC v. Take-Two Interactive Software, Inc.*, C.A. No. 16-455-RGA, 2020 WL 1333131, at *9 (D. Del. Mar. 23, 2020) (applying prosecution history estoppel to patentee's DOE theory of infringement because, "[w]ere it otherwise, the inventor might avoid the PTO's gatekeeping role and seek to recapture in an infringement action the very

subject matter surrendered as a condition of receiving the patent." (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734 (2002))).

Having recommended that the court grant Defendant's motion for summary judgment of non-infringement of the '802 patent, I further recommend that the court deny Plaintiff's motion for summary judgment of infringement of the '802 patent, as discussed at § IV.G, *infra*.

**b. The '753, '669, '710, and '132 patents and the accused Voice Remote Apps**

Defendant also seeks summary judgment of non-infringement of claim 1 of the '753 patent, claims 11 and 13 of the '669 patent, claim 1 of the '132 patent, and claim 1 of the '710 patent, alleging that the accused Xfinity Stream App and Xfinity TV Remote App (together, the "Voice Remote Apps") do not satisfy the VoIP limitation of those claims. (D.I. 198 at 32) According to Defendant, dialogue in one-way streaming content through the Xfinity Stream App is not a "voice conversation," and Plaintiff's expert, Dr. Singh, offers no opinion regarding how the Xfinity TV Remote App satisfies the claim limitations. (*Id.* at 33)

Plaintiff responds that the accused Voice Remote Apps satisfy the VoIP claim limitation because they transmit streaming video content, including encoded voice conversations, over the Internet. (D.I. 214 at 26) Plaintiff further argues that the Voice Remote Apps' ability to capture audio data and convert it into transcription data that is sent over the Internet to Defendant's servers satisfies the VoIP limitation under the doctrine of equivalents.[7] (*Id.*)

I recommend that the court grant Defendant's motion for summary judgment of non-infringement of claim 1 of the '753 patent, claims 11 and 13 of the '669 patent, claim 1 of the

---

[7] The portions of Dr. Singh's report cited by Plaintiff include Dr. Singh's DOE opinion on the "remote control device" term and the "slaved audio inputs and outputs" limitation, not the "VoIP" term. (D.I. 215, Ex. H at ¶¶ 102-110; Ex. I at ¶¶ 79-83) Dr. Singh's report contains no DOE opinion for the "VoIP" term. (*Id.*, Ex. H at ¶¶ 154-157)

’132 patent, and claim 1 of the ’710 patent because there is no evidence from which a reasonable jury could conclude that the accused Voice Remote Apps satisfy the VoIP limitation of the claims. Plaintiff's expert, Dr. Singh, opines that the accused Voice Remote Apps transmit voice conversations because the streaming content includes “conversations within television shows and movies.” (D.I. 199, Ex. 19 at ¶ 156) For the reasons previously explained at § IV.D.2.a.i, *supra*, one-way audio communications such as dialogue within a streamed movie or television show is not a “voice conversation.” Moreover, Defendant’s technical documents depicting voice commands from the user converted into “utterance text” does not plausibly satisfy the “voice conversation” requirement—no explanation is offered regarding how text can constitute a voice conversation. (D.I. 214 at 26-27; D.I. 215, Ex. N at COM_NEX000022977)

Dr. Singh’s expert reports do not create a genuine issue of fact on this topic because the assertions therein are unsupported by the evidence of record. *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) (“Conclusory expert assertions cannot raise triable issues of material fact on summary judgment.”). Dr. Singh relies on the same definition of “VoIP” from Newton’s Telecommunications Dictionary that was previously discussed to suggest that the term “voice conversation” “do[es] not require real-time interactive voice conversations (although VoIP can also include real-time, interactive voice conversations).” (*Id.*, Ex. 21 at ¶ 55) For the reasons set forth at § IV.D.2.a.i, *supra*, this definition is insufficient to establish that one-way audio communications satisfy the “voice conversation” requirement. Moreover, the documents underlying Dr. Singh’s opinion do not reference VoIP or voice conversations. (D.I. 215, Ex. H at ¶ 156) Because the present record lacks sufficient evidence upon which a reasonable jury could reach a conclusion in favor of Plaintiff, I recommend that the court grant Defendant’s motion for summary judgment of non-infringement of claim 1 of the ’753 patent, claims 11 and

13 of the '669 patent, claim 1 of the '132 patent, and claim 1 of the '710 patent with respect to the VoIP limitation. *See E.I. DuPont de Nemours & Co. v. Unifrax I LLC*, C.A. No. 14-1250-RGA, 2017 WL 1822279, at *1 (D. Del. May 5, 2017) ("A dispute is 'genuine' only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.") (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986)).

**E. No Willfulness**

Enhanced patent infringement damages may be awarded under 35 U.S.C. § 284 if the patentee proves by a preponderance of the evidence facts supporting a finding of willful infringement. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1933 (2016). The patentee must show that the accused infringer acted with knowledge of the patent, and with the intent of infringing the patent. *Id.* at 1932-36; *SRI Int'l, Inc. v. Cisco Sys.*, 930 F.3d 1295, 1308 (Fed. Cir. 2019). "[W]illful infringement can simply be 'deliberate' infringement." *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1379 (Fed. Cir. 2020). Generally, however, findings of willful infringement are "reserved for egregious cases of culpable behavior." *Halo Elecs.*, 136 S. Ct. at 1933.

Although Defendant challenges Plaintiff's continued reliance on pre-suit interactions between the parties to support allegations of willfulness, Plaintiff does not suggest it is pursuing a claim for pre-suit willfulness. (D.I. 198 at 33-34; D.I. 214 at 27-28; D.I. 241 at 17; D.I. 199, Ex. 34 at 12) Therefore, Defendant's motion is moot to the extent that it seeks relief regarding pre-suit willfulness. *See Cal. Inst. of Tech. v. Broadcom Ltd.*, 2019 WL 8807924, at *4 (C.D. Cal. Nov. 21, 2019) (denying as moot a motion for summary judgment of no pre-suit willfulness as to defendant Apple based on plaintiff's representation that it claimed only post-suit willful infringement against Apple).

With respect to post-suit willfulness, Defendant contends that its continued offering of the accused products is not enough to show willfulness because Defendant has consistently maintained that it does not infringe and the patents-in-suit are invalid. (D.I. 198 at 34) Plaintiff responds that Defendant acted egregiously by continuing to infringe and making no effort to implement non-infringing alternatives or design-arounds since learning of the alleged infringement. (D.I. 214 at 27) Plaintiff also refers back to Defendant's pre-suit meetings with Plaintiff and its investigation of Plaintiff's technology, suggesting that Defendant should have monitored Plaintiff's patent activity after the meetings. (*Id.*)

After drawing all reasonable inferences in favor of Plaintiff, the court finds that the record contains insufficient evidence to raise a genuine issue of material fact as to post-suit willfulness. Evidence showing that Defendant continues to offer the accused products to its customers, by itself, is insufficient to support a finding of willful infringement. *See SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1309 (Fed. Cir. 2019) (finding that "proof that [the defendant] directly infringed and induced others to infringe the patents-in-suit" was insufficient to support a jury's finding of willful infringement). This is because such activity by the accused infringer is standard procedure, and not egregious, in patent cases: "Most torts do not continue while the litigation related to them proceeds. Not so in patent cases, where the usual course is that the defendant keeps on selling the accused product or practicing the accused method after the lawsuit is filed." *Bioverativ Inc. v. CSL Behring LLC*, C.A. No. 17-914-RGA, 2020 WL 1332921, at *3 (D. Del. Mar. 23, 2020) (granting summary judgment of no willfulness). Accordingly, courts within this district have found that a defendant's post-complaint offering of the accused products is insufficient to create a fact issue regarding post-suit willfulness, particularly when the patentee did not seek a preliminary injunction and the alleged infringer

asserted reasonable defenses to infringement. *See Plastic Omnium Advanced Innovation & Research v. Donghee Am., Inc.*, 387 F. Supp. 3d 404, 422 (D. Del. 2018); *see also Intellectual Ventures I LLC v. Symantec Corp.*, 234 F. Supp. 3d 601, 612 (D. Del. 2017) ("[Plaintiff] identifies no evidence of behavior beyond typical infringement.").

Defendant's failure to adopt a non-infringing alternative is also not sufficient to support a finding of willful infringement. *See bioMérieux S.A. v. Hologic, Inc.*, C.A. No. 18-21-LPS, 2020 WL 759546, at *12 (D. Del. Feb. 7, 2020) ("That Defendants continued to market the products they sold . . . and did not shift to another product . . . does not show that they subjectively intended to infringe."); *see also Vaporstream, Inc. v . Snap Inc.*, 2020 WL 136591, at *21 (C.D. Cal. Jan. 13, 2020) (finding insufficient evidence of egregious conduct or atypical infringing behavior by the accused infringer ). Plaintiff points only to Defendant's interrogatory response regarding non-infringing alternatives, which does not address the feasibility of implementing any of those alternatives. (D.I. 201, Ex. 3 at 28-39) Plaintiff also relies on the court's decision in *Zimmer Surgical, Inc. v. Stryker Corp.* in support of its position that a reasonable jury could find Defendant's post-suit conduct constituted willful infringement. (D.I. 214 at 28) The *Zimmer* court identified three reasons for denying summary judgment of no willfulness: (1) the defendant's continued infringement; (2) the defendant's failure to undertake efforts to design around the asserted patent; and (3) the defendant asserted defenses that it knew to be unreasonable. *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 492 (D. Del. 2019). For the reasons previously stated, the first two reasons by themselves are insufficient to create a genuine issue of material fact. As to the third reason, Plaintiff offers no argument or evidence to show that Defendant's defenses to the infringement allegations are unreasonable.

Moreover, Plaintiff has not shown how evidence that was found to be insufficient to support pre-suit willfulness can now support a cause of action for post-suit willfulness. The court previously determined that the same evidence Plaintiff now relies on was insufficient to show willfulness. Consequently, this evidence cannot now give rise to a genuine issue of material fact. Because no reasonable jury could find from the totality of the evidence that Defendant willfully intended to infringe the asserted claims of the patents-in-suit, I recommend that the court grant Defendant's motion for summary judgment of no willfulness.

**F. No Pre-Suit Damages**

Pursuant to 35 U.S.C. § 287(a), a patentee who makes or sells a patented article must mark the article or notify infringers of the patent to recover damages. *See Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1365 (Fed. Cir. 2017). The statute requires that the patented article include the word "patent" or its abbreviated form, together with the number of the patent. *Id.* at 1365-66. The patentee bears the burden of proving compliance with the marking requirement. *Id.* at 1366. If the patentee fails to meet this burden, the patentee's damages are limited to those incurred after the date of actual notice. *Id.* Compliance with § 287 is a question of fact. *Id.*

Defendant alleges that Plaintiff is not entitled to any damages for the period prior to the filing of this litigation on June 3, 2019 because Plaintiff did not mark its prototypes with the numbers of the asserted patents or otherwise provide notice of infringement as required under § 287(a). (D.I. 198 at 35-37) In response, Plaintiff argues that it consistently marked its prototypes since the issuance of the first asserted patent on June 2, 2009. (D.I. 214 at 28) Plaintiff points to Dr. Stepanian's unrebutted testimony and photographic evidence of the prototypes in support of its position. (*Id.* at 29)

I recommend that the court deny Defendant's motion for summary judgment of no pre-suit damages because genuine issues of fact remain in dispute. Plaintiff produced photographic evidence that it marked at least one prototype in compliance with the marking statute. (D.I. 216, Ex. S at NexStep 0154533-34) Defendant argues that evidence of proper markings on one device is insufficient in light of other evidence showing that numerous other prototypes were not marked. (D.I. 198 at 38 (citing D.I. 199, Ex. 43)) But Dr. Stepanian explains that the photographs relied on by Defendant show CAD drawings, design drawings, concept mockup images, or studio photographs of prototypes for potential use in marketing materials, as opposed to actual demonstration prototypes. (D.I. 215, Ex. R at ¶ 8) Defendant's apples-to-oranges comparison of photographs is therefore insufficient to definitively establish that Plaintiff did not regularly mark all of its demonstration prototypes. In fact, Dr. Stepanian testified that he regularly checked "the latest set of patents that would apply to this device for a particular demo, and [he] would print a label and affix it" to the prototype. (*Id.*, Ex. T at 878:24-879:13; *see also* D.I. 199, Ex. 41 at 6-9) A reasonable factfinder considering this evidence could credit Dr. Stepanian's testimony and conclude that the marking practices shown in the photographs at Exhibit S extended to all of the prototypes used in demonstrations following the issuance of the patents-in-suit. *See Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005) (holding that evidence in the form of an affidavit stating that products were marked, together with documents showing sales during the relevant period, was sufficient to create a fact issue regarding constructive notice, thereby precluding an award of summary judgment).

**G. Infringement of the '802 Patent**

Claim 1 of the '802 patent requires, among other elements, a remote control dependent on a master device "to transcode input from the slaved audio input to VoIP from the remote control

device format." ('802 patent, col. 21:11-15) Plaintiff contends that claim 1 of the '802 patent is infringed by the accused Voice Remotes as a matter of law. (D.I. 200 at 2) For the reasons set forth at § IV.D.2, *supra*, the evidence of record uniformly supports the conclusion that the accused Voice Remotes do not satisfy the VoIP limitation under the operative claim construction of that term. Where, as here, the plaintiff cannot show that each element of the asserted claims is met as a matter of law, summary judgment of infringement must be denied. *See TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 784-85 (Fed. Cir. 2019) ("An accused product infringes a claim if it embodies each claim element or its equivalent." (citing *Jeneric/Pentron, Inc. v. Dillon Co.*, 205 F.3d 1377, 1380 (Fed. Cir. 2000)). Consequently, I recommend that the court deny Plaintiff's motion for summary judgment of infringement of the '802 patent.

Having determined that one element of the '802 patent is not met by the accused Voice Remotes, the court need not proceed further. Nonetheless, the court briefly addresses Defendant's position that elements 1(c) and 1(h) of the '802 patent are not met by the accused Voice Remotes. (D.I. 213 at 5-10) Because genuine issues of material fact remain with respect to these two claim elements, summary judgment cannot be granted on those bases. *See Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (explaining that material facts "could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party.").

First, the parties dispute whether the accused Voice Remotes satisfy the requirement at claim 1(c) of the '802 patent that the microphone must be a "slaved audio input."[8] Plaintiff

[8] Plaintiff explains that, "[a]t the time of the invention of the '802 patent, the terms 'master' and 'slave' were regularly used in the common parlance of the person of ordinary skill in the art," but "[t]oday, there is a movement to switch to terms to convey the same technical meaning without referring to slavery." (D.I. 200 at 7 n.3; *see* D.I. 242 at 2 n.1)

argues that the microphone, as part of the Voice Remote, is slaved to the set top box. (D.I. 200 at 6-8) In response, Defendant contends that the master / slave relationship between the set top box and the Voice Remote is insufficient to establish that the microphone depends on the set top box. (D.I. 213 at 4-7) Instead, Defendant argues that the Voice Remote controls the operation of the microphone, and there is no dispute that the Voice Remote is not a master device. (*Id.* at 7) The evidence of record supports the existence of a genuine issue of material fact regarding whether the microphone depends on the Voice Remote or the set top box in the context of the requisite master/slave relationship. (D.I. 244, Ex. 61 at ¶¶ 33-36; D.I. 217, Ex. 3 at ¶¶ 106-115; Ex. 4 at ¶¶ 148-152; Ex. 8 at 35:5-36:23; Ex. 9 at COM_NEX000016691)

Next, the parties dispute whether the accused Voice Remotes meet the requirement at claim 1(h) of the ’802 patent that the remote control device must “depend[] on the master device to transcode input from the slaved audio input to VoIP.” (D.I. 200 at 11-13; D.I. 213 at 7-10; ’802 patent, col. 21:11-15) Plaintiff alleges that the accused Voice Remotes rely on the set top boxes to transcode audio data from the remote control format, known as RF4CE,[9] to VoIP. (D.I. 200 at 11-13) But Defendant contends that the set top box does not transcode audio data received from the accused Voice Remotes, and any transcoding of audio data instead occurs within the Voice Remotes themselves. (D.I. 213 at 7-10) Specifically, Defendant argues that the Voice Remotes transcode the captured speech from PCM[10] to ADPCM[11] format before sending the audio data through the set top box to other servers in the same ADPCM format. (*Id.* at 8) The record before the court supports the conclusion that a genuine issue of material fact exists as

---

[9] “RF4CE” stands for “Radio Frequency For Consumer Electronics.” (D.I. 201, Ex. 3 at 56)
[10] “PCM” stands for “pulse control modulation.” (D.I. 201, Ex. 3 at 67-68) Pulse density modulated (“PDM”) data is transcoded into PCM audio format. (D.I. 217, Ex. 4 at ¶ 115)
[11] “ADPCM” refers to “adaptive differential pulse code modulation.” (D.I. 217, Ex. 5 at 134:3-5)

to whether the set top box's ability to convert ADPCM-RF4CE packets to ADPCM-VoIP format amounts to "transcoding" audio data. (D.I. 201, Ex. 1 at ¶¶ 155-161; Ex. 5 at 191:2-9; Ex. 6 at 38:13-23, 67:3-68:19; Ex. 26 at ¶¶ 44-45; Ex. 27; Ex. 28 at COM-NEX000027053; D.I. 217, Ex. 4 at ¶ 115; Ex. 8 at 37:2-38:4, 43:20-44:2; Ex. 10 at COM_NEX000022126) Consequently, I recommend that the court deny Plaintiff's motion for summary judgment of infringement of the '802 patent.

**H. Definiteness of the Customer Troubleshooting Patents Under 35 U.S.C. § 112**

Plaintiff has withdrawn the assertion of claim 27 of the '009 patent and claim 4 of the '697 patent. (D.I. 257) Correspondingly, Plaintiff withdraws the portion of its motion for summary judgment challenging the validity of claim 27 of the '009 patent and claim 4 of the '697 patent. (*Id.*) Therefore, the court need not address this issue.

**I. Written Description of the Enrollment Patent Under 35 U.S.C. § 112**

To satisfy the written description requirement, a patent applicant must clearly describe the invention in the specification "so that the public will know what it is and that he or she has truly made the claimed invention" as of the requested filing date. *AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298 (Fed. Cir. 2014); *see Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1348 (Fed. Cir. 2011). "Whether the written description adequately supports a patent claim is a question of fact." *Flash-Control, LLC v. Intel Corp.*, 2021 WL 2944592, at *3 (Fed. Cir. July 14, 2021) (citing *Vasudevan Software v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015)). Defendant takes the position that the asserted claims of the Enrollment Patent are invalid for lack of written description support regarding four limitations: (1) a two way wireless channel over which a controllable device sends an enrollment signal and receives command strings; (2) determining command strings from a cached database;

(3) receiving a dedication command; and (4) sending command strings via the concierge device. (D.I. 213 at 14-15) Plaintiff moves for summary judgment regarding the validity of the Enrollment Patent, arguing that the four challenged elements of claims 1, 11, and 21 of the '964 patent are disclosed in the specification and therefore satisfy the written description requirement as a matter of law. (D.I. 200 at 17) For the following reasons, I recommend that the court deny Plaintiff's motion for summary judgment of sufficient written description of the Enrollment Patent.

**1. Receiving an enrollment signal**

Plaintiff first argues that the specification of the '964 patent discloses "receiving a first enrollment signal sent by a first controllable device via a two way wireless channel used by the first controllable device to receive command strings, wherein the enrollment signal includes a device identifier that identifies the first controllable device." (D.I. 200 at 18) According to Plaintiff, the asserted claims should not be rewritten to require the use of a single two-way wireless channel for all communications between the concierge devices and controlled devices because the specification discloses using multiple channels for exchanging such signals. (*Id.*) Plaintiff contends that Defendant's argument would result in the exclusion of preferred embodiments. (*Id.* at 19)

But Defendant contends that the disclosure requirements are not met because the specification does not disclose a two-way wireless channel over which the controllable device can both send an enrollment signal and receive command strings. (D.I. 213 at 15) Instead, Defendant explains that the portion of the specification relied upon by Plaintiff offers a general discussion of the concept of wireless communications among devices, without describing a "two

way wireless channel" used for both receiving an enrollment signal and receiving command strings. (*Id.* at 16-17)

A genuine issue of material fact exists as to whether a person of ordinary skill in the art would understand the specification of the '964 patent to disclose a two-way wireless channel over which the controllable device can both send an enrollment signal with a device identifier and receive command strings. The specification discloses two-way wireless communication between the controllable device and the concierge device, stating that "[t]he concierge device can be coupled in communication with at least one consumer device through the in-home management bridge. This communication can be direct, through the in-home management bridge or through a wireless access point." ('964 patent, col. 41:41-45) But this portion of the specification does not refer to the sending of an enrollment signal with a device identifier or the receipt of command strings.

Instead, the specification discusses the receipt of an enrollment signal from a controllable device that uniquely identifies the controllable device in separate implementations of the invention. ('964 patent, cols. 34:28-30, 35:61-63, 38:22-24, 39:40-42) This discussion of the enrollment signal, however, does not specify that the enrollment signal is received via a two-way wireless channel that is also used by the controllable device to receive command strings.[12] (*Id.*) The specification's discussion of a "two-way wireless RF connection" is likewise disconnected from the portions of the specification relating to the enrollment of a consumer device or the

[12] Plaintiff's expert , Dr. Ravin Balakrishnan, represents that "the Specification describes numerous implementations that teach and describe receiving a first enrollment signal sent by a controllable device with a device identifier and receiving command strings," but he provides no citations in support of this particular proposition. (D.I. 201, Ex. 29 at ¶ 1456)

transmission of an enrollment signal that includes a device identifier. ('964 patent, col. 44:37-43)

The descriptions of Figures 6, 7, and 8 in the '964 patent specification likewise fail to show the receipt of an enrollment signal having a device identifier from the controllable device, or the use of the same two-way wireless channel to both send enrollment signals and receive command strings. ('964 patent, Figs. 6-8; col. 12:10-31; D.I. 201, Ex. 29 at ¶ 1457; D.I. 217, Ex. 13 at ¶ 1020) While the specification discloses portions of the challenged limitation in separate implementations, the issue of whether a person of ordinary skill in the art would associate these different portions of the specification to arrive at the claimed limitation is an issue of fact to be reserved for the jury. *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) ("[T]he hallmark of written description is disclosure. . . . [T]he test requires an objective inquiry into the four corners of the specification from the perspective of a [POSITA].").

**2. Cached database**

Next, Plaintiff contends that the specification of the '964 patent adequately describes "registering the second control device with a cloud based service and using its device identifier to determine from a cloud based or cached database control commands that it produces in response to user operation." (D.I. 200 at 20) Defendant alleges that the '964 patent specification does not disclose a "cached database" that allows a controllable device to look up its "controllable functions and corresponding command strings" using its device identifier. (D.I. 213 at 17) But according to Plaintiff, the specification discloses that the controllable device's identifier is used by the cached database to replicate control menus for controlling the device, and a person of ordinary skill would understand the control menu to include command strings. (D.I. 242 at 10-11)

The question of whether the '964 patent specification contains adequate disclosure of the claimed "cached database" presents factual disputes which are not appropriately resolved at this stage of the proceedings. The specification discloses that "[t]he home management bridge may already have cached or permanently installed information for the specific associated consumer device, for instance cached from the cloud." ('964 patent, col. 6:23-26) But this disclosure does not suggest that the cached information uses the control device's identifier to determine its control commands. Plaintiff suggests that Implementation #18 teaches the claim limitation, but Implementation #18 does not disclose cached information. ('964 patent, col. 38:10-39:24; D.I. 201, Ex. 29 at ¶ 1462) The issue of whether a person of ordinary skill would understand Implementation #18 to include cached data presents a question of disputed fact.

**3. Receiving a dedication command**

Plaintiff further contends that the '964 patent specification provides adequate written description for the element of "receiving a dedication command and responsively configuring a combination of the first controllable device, the handheld concierge device, the control gateway, and the second control device so that user operation of the second control device is dedicated to controlling at least some of the controllable functions by causing the command strings to be sent to the first controllable device when the user operates the second control device." (D.I. 200 at 21) Plaintiff explains that the specification describes configuring the concierge device in connection with a dedication command used to configure a controllable device, which establishes that both the concierge device and the controllable device are configured in response to the dedication command. (*Id.* at 22)

In response, Defendant contends that the '964 patent does not disclose a dedication command that configures a concierge device, and "configuring devices that are controlled by the

concierge device" does not establish written description support for configuring the claimed concierge device. (D.I. 213 at 18-19) Although the specification describes a "dedication signal" that configures a control device, a controllable device, and a control gateway, Defendant argues that it does not mention the configuration of a concierge device. (*Id.* at 19)

Disputed issues of material fact preclude summary judgment of sufficient written description regarding the "dedication command" limitation of the '964 patent. There is no dispute that the dedication command is referenced only in the claims of the '964 patent, and not in the specification. References to receiving the "dedication signal" or "dedicating action" in the specification do not mention configuring the concierge device, and instead discuss only the management bridge, the control device, and the controllable device. ('964 patent cols. 34:33-39, 35:66-36:4, 38:27-32) The specification discloses "automatically configuring a concierge device to control the controllable device," but it does not state that the configuration of the concierge device occurs by way of a dedication signal, dedicating action, or dedication command. ('964 patent, col. 38:51-67) To the extent that Plaintiff argues a person of ordinary skill in the art would understand these portions of the specification and Implementation #19 to extend to the configuration of concierge devices with a dedication signal, the issue is appropriately reserved for the finder of fact. (D.I. 201, Ex. 29 at ¶ 1465)

**4. Sending command strings**

Finally, Plaintiff argues that the specification of the '964 patent provides sufficient written description for "command strings [being] sent from the second control device to the first controllable device via the handheld concierge device following user operation of the second control device." (D.I. 200 at 23) According to Plaintiff, the specification provides multiple

examples of a concierge device relaying signals between a control device and a controllable device. (*Id.*)

Defendant responds that the specification's reference to an in-home bridge relaying messages, handling communications, and forwarding signals from home control devices to controllable devices is not sufficient to explain how the concierge device relays messages between the control device and the controllable device. (D.I. 213 at 19-20) Although the functions of home control devices may be replicated on the concierge device, Defendant argues that this falls short of disclosing the concierge device relaying command strings from a control device to a controllable device. (*Id.* at 20)

A genuine issue of material fact exists regarding whether the '964 patent discloses a control device that sends command strings to a controllable device via a concierge device. The specification indicates that a bridge can relay signals between a control unit and a controllable unit, and the bridge can be incorporated into a concierge device. ('964 patent, cols. 12:14-15, 37:4-12) But, to the extent that the "bridge" refers to the claimed control gateway, the asserted claims suggest that the control gateway expressly cannot be incorporated into the concierge device: "[T]he command strings are sent from the second control device to the first controllable device by the control gateway, which is a separate physical device from the handheld concierge device." ('964 patent, col. 45:31-34; D.I. 217, Ex. 12 at ¶ 1207)

Plaintiff's expert, Dr. Balakrishnan, points to Figures 5-9 and 17 to show that the concierge device may be physically separate from the bridge while relaying signals between a control device and a controllable device. (D.I. 201, Ex. 29 at ¶ 1467) But Defendant's expert contends that Dr. Balakrishnan fails to identify which components of these Figures function as the control device, controllable device, and concierge device in a manner consistent with the

balance of the specification. (D.I. 217, Ex. 13 at ¶¶ 1035-1036) The experts' factual disputes regarding how a person of ordinary skill in the art would understand the disclosure of the '964 patent preclude an award of summary judgment in Plaintiff's favor. For these reasons, I recommend that the court deny Plaintiff's motion for summary judgment of sufficient written description of the '964 patent.

**J. Validity of the Enrollment Patent Over the Prior Art**

A patent claim is invalid as obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103(a); *see also KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406-07 (2007). Obviousness is a question of law that depends on the following factual inquiries: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the relevant art; and (4) any objective considerations such as commercial success, long felt but unsolved need, and the failure of others. *See KSR*, 550 U.S. at 406; *see also Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1347 (Fed. Cir. 2012). To prove obviousness by clear and convincing evidence, a party must show that a person having ordinary skill in the art would be motivated to combine the claimed combinations with a reasonable expectation of success. *Allergan, Inc. v. Sandoz Inc.*, 726 F.3d 1286, 1291 (Fed. Cir. 2013).

Defendant argues that the '964 patent is invalid over the prior art because two prior art systems, the iControl and uControl home security systems, meet the asserted claims of the '964 patent. (D.I. 213 at 21-22) The record before the court establishes that the iControl system was developed by iControl Home Networks, Inc., which began selling the iControl smart home

system in 2006. (Ex. 15 at COM_NEX001250976) In 2010, iControl merged with uControl, Inc., which had also been selling smart home systems since 2006. (Ex. 17 at COM_NEX001251051; Ex. 18 at COM_NEX001251201-03) Defendant alleges that, by 2010, the iControl and uControl systems included many of the same features as Defendant's Xfinity Home System that Plaintiff now accuses of infringement. (D.I. 213 at 21) Defendant acquired iControl in 2017, and iControl remains a subsidiary of Defendant. (*Id.* at 21-22) Plaintiff moves for summary judgment of no obviousness based on the iControl and uControl home security systems, arguing that Defendant has not met its burden of proof on invalidity. (D.I. 200 at 23-24)

### 1. Whether the iControl and uControl systems are prior art

First, Plaintiff argues that Defendant has not adequately shown evidence that the iControl or uControl products were on sale or in public use prior to March 2011, the alleged conception date of the '964 patent. (D.I. 200 at 24-25) In response, Defendant alleges that reliance on the inventor's testimony, without corroborating evidence, is insufficient to satisfy Plaintiff's burden of demonstrating conception of the '964 patent and the diligence of the inventor towards reducing the invention to practice. (D.I. 213 at 23-24) Because Plaintiff has not proved the alleged priority date for the '964 patent, Defendant asks the court to grant summary judgment in Defendant's favor. (*Id.* at 23 n.14)

Disputed issues of fact remain with respect to the dates of conception and reduction to practice of the '964 patent. The record includes testimony from the inventor of the '964 patent, Dr. Stepanian, stating that he created prototypes embodying the claims and demonstrated products embodying the claims at conferences, but the excerpts of his testimony that have been provided to the court do not include dates or time frames establishing when he did either of these

things. (D.I. 201, Ex. 32 at 176:11-14, 256:21-258:21) Plaintiff provides evidence of undated prototype photographs (D.I. 244, Ex. 65), a freeze frame of a video purportedly showing an operating prototype at a 2011 trade show (*id.*, Ex. 66), a website showing the dates of a trade show (*id.*, Ex. 67), March 2011 email communications between Dr. Stepanian and a third party regarding an unspecified "project" (*id.*, Ex. 68), July 2011 email communications regarding components to be included in a "prototype proof of concept" (*id.*, Ex. 69), and March 2011 emails about the potential development of a prototype cloud / gateway system (*id.*, Ex. 70). Whether this evidence is sufficient to show that Dr. Stepanian was in possession of the recited features of the Enrollment Patent is a disputed issue of fact. (D.I. 217, Ex. 13 at ¶ 63) The issue of whether the iControl and uControl systems were publicly available prior to the conception date of the '964 patent cannot be reached until the conception date of the '964 patent is established. Because Dr. Balakrishnan bases his analysis on this point on the assumption that the March 2011 conception date is accurate, the issue cannot be assessed on the present record. (D.I. 201, Ex. 29 at ¶ 130)

Plaintiff also contends that dates on the face of the iControl and uControl marketing documents are inadmissible hearsay, and Defendant has not provided corroborating proof of the documents' publication dates and the commercial availability of the systems at the time. (D.I. 200 at 25-26) But as Defendant explains, the documents can be authenticated and corroborated by witness testimony. (D.I. 213 at 26-27) "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Such evidence includes testimony of a witness with knowledge, consistent with Defendant's proposal to obtain this testimony from Mr. Kitchen. *See* Fed. R. Evid. 901(b)(1).

**2. Whether the iControl and uControl systems were a single system in public use or on sale**

Plaintiff also alleges that the marketing documents relied on by Defendant do not reflect a single system that was in public use or on sale, but instead show numerous versions of the systems over a date range of more than five years. (D.I. 200 at 27) Because Defendant has not offered evidence that this collection of documents reflects the functionality of a specific version of iControl or uControl that was in public use or on sale, Plaintiff argues that summary judgment is warranted. (D.I. 252 at 2-3) Defendant responds that both the iControl and uControl systems were separately and publicly offered for sale as a complete home monitoring and automation system by the date of their merger in 2010. (D.I. 213 at 27)

Issues of fact remain regarding the public use or sale of the iControl and uControl systems. Although multiple versions of the alleged prior art systems were developed over the years, the record contains evidence that certain versions with specific features were publicly available and "widely deployed" prior to September 1, 2011. (D.I. 252, Ex. 71 at 17:5-19; D.I. 245, Ex. 28 at ¶ 6) Mr. Kitchen's deposition testimony establishes that documents and specifications marked "draft" may signify that one isolated feature of the system was undergoing minor updates, even though the system itself was previously deployed with prior versions of that feature. (*Id.* at 49:2-50:6) To the extent that Plaintiff argues no version of the iControl or uControl systems was in public use or on sale during the relevant time period, the issue should be reserved for the factfinder to weigh the documentary evidence and testimony. *See ART+COM Innovationpool GmbH v. Google Inc.*, 155 F. Supp. 3d 489, 509-510 (D. Del. 2016) ("[E]xperts are routinely permitted to rely on documentary evidence which purports to describe systems that were placed in public use.").

### 3. Whether the iControl and uControl systems disclose the claimed "control device"

Finally, Plaintiff alleges that summary judgment of validity over iControl and uControl is warranted because Defendant has not identified the requisite "control device" in the alleged prior art. (D.I. 200 at 28) While Defendant's expert identifies a key fob as the control device in his invalidity report, Plaintiff argues that there is no evidence that the key fob in the iControl or uControl devices has the requisite device identifier or registration with a cloud-based service. (*Id.*) In response, Defendant contends that various components of the iControl and uControl satisfy the "control device" requirement of the '964 patent, such as a smartphone and apps operating on a smartphone,[13] a keychain remote, a key fob, and a keypad. (D.I. 213 at 28-29) But according to Plaintiff, the evidence of record confirms that the iControl and uControl systems do not have "control devices" because their keychains, key fobs and keypads are conventional home security controls that are not registered with a cloud-based service. (D.I. 252 at 1)

The present record does not support a conclusion that any feature of the iControl or uControl systems satisfies the "control device" limitation of the Enrollment Patent. The evidence of record shows that the iControl system may utilize a keychain with programmable buttons, and the uControl system similarly includes a key fob or keypad. (D.I. 201, Ex. 29 at ¶¶ 978, 1050-1051) Defendant's expert, Dr. John Villasenor, opines that the keychain, key fob, and keypad function as "control devices" because they may be programmed to control a number of home devices such as garage doors, lights, and door locks. (*Id.*, Ex. 31 at ¶ 606) But Dr.

[13] The "control device" of the iControl or uControl systems cannot be a smartphone because the court's construction expressly excludes a smartphone from the definition of "control device." (D.I. 113 at 15-18) Similarly, an app running on a smartphone cannot satisfy the "control device" limitation of the '964 patent. *See* § IV.C.2, *supra*.

Villasenor offers only a conclusory opinion suggesting that a person of ordinary skill would understand that these "control devices" are registered with a cloud-based service, relying on documents that show cell phone or Internet connectivity without indicating registration with a cloud-based service. (D.I. 217, Ex. 12 at ¶¶ 572, 625) This is not enough to establish the existence of a genuine fact issue. *See Sitrick v. Dreamworks, LLC*, 516 F.3d 993, 1001 (Fed. Cir. 2008) (upholding grant of summary judgment upon finding expert's testimony raised no triable issue of fact because it was "conclusory and unsupported by any actual information."). Dr. Villasenor later testified that "the mere fact of having a key fob doesn't mean you've got a control device that does all the things that are required of the control device in the claim." (D.I. 201, Ex. 36 at 124:12-14) Instead, the evidence confirms that these "control device" features of the iControl and uControl systems enabled simple functionality and were not cloud-based devices. (D.I. 252, Ex. 71 at 23:4-24:4, 29:1-30:9)

Thus, even if the prior art status of the iControl and uControl systems could be established as a matter of law at this stage, summary judgment of the validity of the Enrollment Patent over the iControl and uControl systems is warranted because the keychain, key fob, and keypad of the iControl and uControl systems do not meet the claimed requirements of the "control device" limitation in the '964 patent. For this reason, I recommend that the court grant Plaintiff's motion for summary judgment of validity of the Enrollment Patent over the iControl and uControl systems.

## V. *DAUBERT* MOTIONS

### A. Dr. Selker's Infringement Opinion on the Customer Troubleshooting Patents

Defendant argues that Dr. Selker's failure to identify any "single action" causing all of the required ensuing events to occur under the plain and ordinary meaning of "single action"

supports Defendant's request to exclude the unreliable opinion. (D.I. 198 at 17) In response, Plaintiff contends that Dr. Selker's infringement opinions apply even under Defendant's proposed definition of "single action" and, therefore, there is no basis to exclude those opinions as unreliable. (D.I. 214 at 13)

For the reasons set forth at § IV.B, *supra*, a genuine issue of material fact exists regarding whether the My Account App satisfies the "single action" limitation of the Customer Troubleshooting Patents. Dr. Selker's opinions are supported by extensive citations to the evidentiary record. (*See, e.g.*, D.I. 215, Ex. D at ¶¶ 204-222; Ex. E at ¶¶ 159-160) Because there is a logical basis for Dr. Selker's opinion, I recommend that the court deny Defendant's Daubert motion and allow Defendant to test the weight and credibility of Dr. Selker's opinions through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 92 (D. Del. 2016) (quoting *Daubert*, 509 U.S. at 596).

**B. Dr. Selker's Infringement Opinion on the Enrollment Patent**

For the reasons set forth at § IV.C, *supra*, I recommend that the court grant Defendant's motion for summary judgment of non-infringement of the Enrollment Patent. To the extent that the court adopts that recommendation, the admissibility of Dr. Selker's infringement opinion on the Enrollment Patent is moot. *See ViaTech Tech. Inc. v. Microsoft Corp.*, C.A. No. 14-1226-RGA, 2017 WL 2538570, at *9 (D. Del. June 12, 2017).

**C. Mr. Reading's Damages Opinion**

Defendant argues that Mr. Reading's damages opinion should be excluded because it is not based on sufficient facts or data and it is not the product of reliable principles and methods. (D.I. 198 at 39) In response, Plaintiff contends that Mr. Reading provides a cost-savings

damages opinion for the Customer Troubleshooting and Enrollment Patents and a per-device royalty opinion for the Voice Remote Patents based on a comparable license agreement, and the disagreements raised by Defendant go to the weight to be given Mr. Reading's opinion. (D.I. 214 at 30-31)

For the reasons set forth below, the court agrees with Plaintiff that the challenges to Mr. Reading's damages opinion go to the weight of that opinion, and not its admissibility. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012); *Shire Viropharma Inc. v. CSL Behring LLC*, C.A. No. 17-414, 2021 WL 1227097, at *26 (D. Del. Mar. 31, 2021). Therefore, I recommend that the court deny Defendant's motion to exclude Mr. Reading's damages opinion.

**1. Customer Troubleshooting and Enrollment Patents**

Defendant first challenges Mr. Reading's calculation of the royalty bases for the Customer Troubleshooting Patents, alleging that Mr. Reading ignored alternative ways for customers to avoid a service call or truck roll without using the accused features of the My Account App. (D.I. 198 at 40) But these alleged weaknesses in Mr. Reading's damages assessment reflect Defendant's disagreements with Mr. Reading's conclusions more than a fundamental unreliability in Mr. Reading's methodology. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012). The record shows that Mr. Reading calculated the royalty base for the Customer Troubleshooting patents based on the number of service calls and truck rolls avoided by Defendant's use of the accused My Account App. (D.I. 216, Ex. V at ¶¶ 118-22) Mr. Reading applied the 7-day containment rate to count only digital repairs that did not lead to a call to customer service, which appears to be consistent with Defendant's internal methodology for calculating reduced service calls. (*Id.* at ¶ 120; Ex.

DD) To the extent that Defendant believes there are flaws in Mr. Reading's royalty base calculation stemming from a failure to properly account for digital repairs, those issues go to the weight of Mr. Reading's opinion, not its admissibility, and they can be explored through cross-examination.

For the Enrollment Patent, Defendant argues that Mr. Reading erroneously based his royalty calculations on the assumption that Defendant would save one or two post-installation truck rolls per Xfinity Home System by allowing customers to install additional devices through the Xfinity Home App. (D.I. 198 at 41) Mr. Reading's opinion shows that he based his royalty calculations on the number of Xfinity Home Systems sold during the damages period and an estimate of how many add-on devices customers would self-install. (D.I. 216, Ex. V at ¶¶ 123-26, 262-68) Because Defendant does not track the number of devices self-installed by customers, Mr. Reading had no alternative to relying on an estimate for this information. (*Id.* at ¶¶ 124, 126) ("Comcast has represented that it does not track the number of Comcast hardware devices that were installed by customers after the initial installation of the Xfinity Home System."). To the extent that Defendant now argues Mr. Reading's analysis is based on speculation regarding the portion of self-installed add-on devices, Defendant may probe this on cross-examination.

Next, Defendant contends that Mr. Reading's cost-savings allocation on the Customer Troubleshooting and Enrollment Patents should be excluded because he applies an arbitrary 50/50 split of alleged cost savings with a 10% downward adjustment to determine a 40% royalty rate. (D.I. 198 at 42-43) In response, Plaintiff contends that cost savings is a proper basis for a reasonable royalty, and Defendant saves costs through its use of the infringing technology by

avoiding the expense of calls to a customer service agent or a truck roll by a service technician. (D.I. 214 at 31-32)

The Federal Circuit has endorsed the use of a cost-savings allocation "where the infringer's usual net profit is subtracted from its anticipated net profit realized from sales of infringing products." *Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, C.A. No. 17-1734-RGA, 2021 WL 982732, at *11 (D. Del. Mar. 16, 2021) (citing *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986); *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)). "Although a patentee must carefully tie proof of damages to the claimed invention's footprint in the market place, that requirement for valuing the patented technology can be met if the patentee adequately shows that the defendant's infringement allowed it to avoid taking a different, more costly course of action." *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1376 (Fed. Cir. 2017) (internal citations and quotations omitted).

Mr. Reading applies this cost-savings methodology in the context of the Georgia-Pacific factors and observes that Defendant's own documents and testimony confirm the cost savings found in his report. (D.I. 216, Ex. V at ¶¶ 243, 246-61, 369-79; Ex. Z at ¶¶ 131-32, 145) To the extent that Defendant challenges the 40% royalty rate applied by Mr. Reading under this methodology, the facts underlying that estimate may be explored through cross-examination. *See Sprint*, 2021 WL 982732, at *11 ("Whether it makes sense to award 100% to Plaintiff in these particular cases may be challenged by cross-examination and an opposing expert's opinion."). For these reasons, I recommend that the court deny Defendant's motion to exclude Mr. Reading's opinions regarding the Customer Troubleshooting and Enrollment Patents.

**2. Tether Patents**

Defendant challenges Mr. Reading's conversion of a lump-sum payment to a running royalty in his analysis of the Katz Agreement. (D.I. 198 at 44-45) According to Defendant, the "Most Favorable Pricing" lump-sum provision in the Katz Agreement is not comparable to a per-subscriber running royalty in the hypothetical negotiation here. (*Id.* at 46)

In response, Plaintiff contends that the undisputed comparability of the Katz Agreement informs Plaintiff's running royalty calculation, which is apportioned to the infringing technology and applied to the number of accused products. (D.I. 214 at 43-44) Plaintiff explains that Mr. Reading weighed the per-device royalty to reflect the apportionment analysis performed by Dr. Cole to achieve the royalty rate for each type of device, before making a net upward adjustment based on the Georgia Pacific factors. (*Id.* at 44-45)

So long as the jury is given a basis "to recalculate in a meaningful way the value of any of the running royalty agreements to arrive at the lump-sum damages award," those agreements can be relevant to determining the damages award. *Intuitive Surgical, Inc. v. Auris Health, Inc.*, C.A. No. 18-1359-MN, 2021 WL 3662842, at *4 (D. Del. Aug. 18, 2021) (quoting *Lucent Techs.*, 580 F.3d at 1330). The inverse is also true—a license agreement featuring a lump-sum structure can be relevant to determining a running royalty damages award if a sufficient basis is given for recalculating the amount. *See Bio-Rad Labs.*, 967 F.3d at 1373 (recognizing that a license with a lump sum payment can be used to calculate a running royalty because "the differences permit[] the jury to properly discount" the license). Mr. Reading's opinion provides a sufficient basis for recalculation. First, he describes how he analyzed the Katz Agreement and Dr. Cole's apportionment analysis to arrive at a per-device royalty. (D.I. 216, Ex. V at ¶¶ 132-40, 145-47, 340-47) Specifically, Mr. Reading took the lump sum amount of the Katz

Agreement and divided it based on the number of subscribers. (*Id.* at ¶ 340) Mr. Reading then took the percentage of patents licensed under the Katz Agreement that are comparable to the Tether Patents, as calculated by Dr. Cole, and used this to adjust the per subscriber rate for the Tether Patents in this case. (*Id.* at ¶¶ 341-42) This explanation of the methodology used and the data on which the calculation is based is sufficient for admissibility. *See Shire Viropharma Inc. v. CSL Behring LLC*, C.A. No. 17-414, 2021 WL 1227097, at *26 (D. Del. Mar. 31, 2021) ("Establishing a reasonable royalty 'is not an exact science,' and 'there may be more than one reliable method for estimating a reasonable royalty.'" (quoting *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.2d 1283, 1296 (Fed. Cir. 2015)); *Intuitive Surgical*, 2021 WL 3662842, at *5 (distinguishing the Federal Circuit's decision in *ResQNet.com*, 594 F.3d at 873, which concerned the sufficiency of the evidence to support a jury award, and not the admissibility of such evidence). Defendant's challenges to Mr. Reading's calculation go to the weight of the opinion, and not its admissibility.

Defendant further contends that the remaining steps of Mr. Reading's damages opinion on the Tether Patents are unreliable and unsupported. (D.I. 198 at 46) According to Defendant, (1) there is no supportable basis to convert the per subscriber rate to a per device rate, and the Katz Agreement does not discuss a per-device running royalty, (*id.* at 47); (2) Mr. Reading's "relative weighting" approach is unreliable because it is based on the value of one accused device relative to the others instead of the value of the accused features relative to the non-accused features, (*id.* at 47-48); and (3) Mr. Reading fails to provide a mathematical basis for how he reached a $0.05 per unit upward adjustment and fails to make a downward adjustment based on the fact that the parties are not competitors, (*id.* at 49).

In response, Plaintiff first contends that Mr. Reading's use of the per-subscriber rate to calculate the per-device rate was necessary to adjust the lump sum payment of the Katz Agreement to the circumstances here, including the larger number of subscribers and accused products. (D.I. 214 at 47-48) Second, Plaintiff alleges that Mr. Reading's relative weighting methodology is appropriate because he already apportioned the royalty rate before applying it on a separate, per-device basis instead of assuming that each accused device would have the same royalty rate. (*Id.* at 48-49) Third, Plaintiff argues that Mr. Reading thoroughly analyzed all fifteen Georgia-Pacific factors to calculate the upward and downward adjustments to the royalty rate. (*Id.* at 49-50)

Each of these three issues goes to the weight of Mr. Reading's opinion, not to its admissibility. First, Mr. Reading's analysis applies the per-subscriber rate from the Katz Agreement and adapts it to this case on a per-device basis to ensure that the royalty reflects only the footprint of the claimed invention's accused features. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) ("[T]he trial court must carefully tie proof of damages to the claimed invention's footprint in the marketplace."). In doing so, Mr. Reading made assumptions about the number of set-top boxes per subscriber and used evidence to determine the average number of devices per subscriber. (D.I. 216, Ex. V at ¶¶ 329, 339-47) Defendant may challenge the weight and credibility of Mr. Reading's process for arriving at the per-device rate through cross-examination.

Second, Mr. Reading's use of relative weighting to determine a separate per-device royalty for each accused product also does not warrant exclusion of his damages opinion. As previously discussed, Mr. Reading used Dr. Cole's apportionment analysis of the Katz Agreement. (D.I. 216, Ex. V at ¶¶ 341-43) Thereafter, Mr. Reading adjusted the rate for each of

the four accused devices to account for differences in the values of the accused voice command feature in each accused product. (D.I. 216, Ex. Z at ¶¶ 110-15) Mr. Reading explained the basis for his calculations, and Defendant may challenge the substance of Mr. Reading's calculations on cross-examination.

Third, Mr. Reading explains the underlying reasoning for the upward and downward adjustments made to the royalty rate in his analysis of the Georgia-Pacific factors. (*See, e.g.*, D.I. 216, Ex. V at ¶¶ 176-78, 225-42, 352-56) Defendant argues there is no mathematical formula supporting Mr. Reading's opinion on the upward and downward adjustments, but case law from this District indicates that no such mathematical formula is required in determining the admissibility of an expert damages opinion. *See Comcast IP Holdings I, LLC v. Sprint Commc'ns Co. L.P.*, C.A. No. 12-205-RGA, 2015 WL 4730899, at *7 (D. Del. Aug. 10, 2015). Rather, a determination of the reasonable royalty "can involve some approximation," and a lack of a mathematical formula supporting a result "does not mean that [the expert's] opinion was not based on a sound methodology." *Id.* Consequently, I recommend that the court deny Defendant's motion to exclude Mr. Reading's damages opinion regarding the Tether Patents.

**D. Mr. Huston's Damages Opinion**

Defendant has offered the opinion of Mr. Hance Huston in support of Defendant's damages theories in this action. (D.I. 202, Ex. 37) Mr. Huston bases his damages opinion on a comparison between eight prior licenses (the "Comcast licenses")[14] entered into by Defendant

[14] The Comcast licenses include: (1) Comcast-AST-Thermo Agreement with a lump sum payment of [redacted] (D.I. 202, Ex. 39); (2) Comcast-AST-Adapt-2 Agreement with a lump sum payment of [redacted] (*id.*, Ex. 40); (3) Comcast-AST-Adapt-1 Agreement with a lump sum payment of [redacted] (*id.*, Ex. 41); (4) Comcast-Cox Agreement with a lump sum payment of [redacted] (*id.*, Ex. 42); (5) Comcast-RPX-Dominion Harbor Agreement with a lump sum payment of [redacted] (*id.*, Ex. 43); (6) Comcast-RPX-Excalibur Agreement with a lump sum payment of [redacted] (*id.*, Ex. 44); (7) Comcast-L3Harris Agreement with a lump sum payment

and the Asserted Patents and accused products at issue in this case. (D.I. 202, Exs. 37, 39-46) For the following reasons, I recommend that the court deny Plaintiff's motion to exclude Mr. Huston's damages opinion.

### 1. Comparability of seven Comcast licenses

Plaintiff contends that Mr. Huston's damages opinion should be excluded because he did not adequately analyze the eight selected license agreements to establish their economic comparability. (D.I. 200 at 30) In particular, Plaintiff argues that Mr. Huston accepted the licenses selected by Mr. Mark Dellinger as the basis for his opinion without independently reviewing them, even though Mr. Dellinger is a fact witness with no economic expertise and no technical experience regarding the licensed technology. (*Id.* at 32, 36-37) Because this process of license identification was targeted on low payment cost-sharing agreements with patent aggregators, Plaintiff alleges that Mr. Huston's analysis is flawed and unreliable. (*Id.* at 36)

In response, Defendant argues that Mr. Huston properly conducted an independent review of the thirty-five agreements produced by Defendant, and he identified the eight most technologically and economically comparable agreements from that set. (D.I. 213 at 36)

Issues regarding the comparability of the Comcast licenses go to the weight of the evidence, and not its admissibility. Mr. Huston represents that he independently reviewed each of the thirty-five agreements produced by Defendant in this litigation and selected the eight most comparable agreements from that group for purposes of his damages analysis. (D.I. 218, Ex. 35 at ¶ 39; D.I. 202, Ex. 38 at 46:21-24, 93:4-22) Mr. Huston's expert report establishes that he evaluated each of the eight agreements in the context of their economic and technological

---

of [redacted] (*id.*, Ex. 45); and (8) the Katz-TCI agreement (the "Katz Agreement") with a lump sum payment of [redacted] (*id.*, Ex. 46). There is no dispute regarding the comparability of the Katz Agreement.

comparability to the Asserted Patents. (D.I. 202, Ex. 37 at ¶¶ 205-218, 223-235, 241-253, 264-276, 287-300, 307-320, 333-345, 356-370) To the extent that Plaintiff alleges Mr. Huston did not adequately consider factors such as the relative bargaining positions or objectives of the parties to the Comcast licenses, the extent of use, or the nature of Defendant's products at issue for each agreement, these matters go to the weight of Mr. Huston's opinion, and they are appropriately addressed on cross-examination.

**2. Reliability of royalty amount based on prior Comcast licenses**

**a. Technological comparability of the Comcast licenses**

Plaintiff argues that Mr. Huston's technological comparability analysis of the eight Comcast licenses is deficient because he lacks experience in the technology of the patents-in-suit, he did not review most of the patents in the licensed portfolios, and he admits that the licensed patents do not relate to the subject matter of the patents-in-suit. (D.I. 200 at 38-39)

Defendant contends that Mr. Huston provided a detailed analysis for each agreement showing the comparability of the technology in the licensed patents to the technology of the patents-in-suit. (D.I. 213 at 37) In support, Defendant points to Mr. Huston's opinions regarding the similarity of the technological features, the goal of addressing similar technological problems, and the similar benefits achieved by the licensed technology and the patents-in-suit. (*Id.*) According to Defendant, Mr. Huston properly relied on his own extensive experience to determine the technological comparability of the licenses and had no need to rely on other experts for the analysis. (*Id.* at 38)

Mr. Huston's opinions should not be excluded under the *Daubert* standard based on the technological comparability of the license agreements. The parties do not dispute that the patents in the Katz Agreement are technologically comparable to the patents asserted in this case.

(D.I. 218, Ex. 35 at ¶¶ 361-62; Ex. 40 at 249:5-13; Ex. 41 at ¶¶ 134-43) With respect to the seven remaining license agreements, the law is well-established that a baseline comparability in a similar technological field is sufficient. *See Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1373-74 (Fed. Cir. 2020); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1330 (Fed. Cir. 2014) ("[W]e have never required identity of circumstances; on the contrary, we have long acknowledged that any reasonable royalty analysis necessarily involves an element of approximation and uncertainty"). "[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227-28 (Fed. Cir. 2014). Mr. Huston thoroughly analyzed the technological comparability of the license agreements, which covered patents for "devices, and methods of using those devices, for controlling and/or accessing other devices or services over a network" like the Asserted Patents. (D.I. 218, Ex. 35 at ¶ 210; *see also id.* at ¶¶ 210-18, 228-35, 245-53, 268-76, 292-300, 312-20, 337-45, 361-70) Any deficiencies in his analysis of the technological comparability may be addressed through cross-examination. *See Intuitive Surgical*, 2021 WL 3662842, at *5.

**b. Economic comparability of the Comcast licenses**

Plaintiff also asserts that Mr. Huston's opinion ignores critical economic differences between seven of the Comcast licenses and the underlying circumstances of the hypothetical negotiation in this case. (D.I. 200 at 40) According to Plaintiff, Mr. Huston also failed to consider whether the parties investigated infringement or validity issues before executing the license agreements, whether Defendant is using any of the licensed patents, or whether any of the license agreements were entered into under the threat of litigation. (*Id.* at 41-42) Plaintiff further highlights the different business models and bargaining positions of the five licenses

executed by patent aggregators, which were not addressed by Mr. Huston. (*Id.* at 42) Plaintiff represents that the two non-patent aggregator licenses are also distinguishable from the current circumstances because one was executed by competitors and joint investors planning to purchase a third-party company, and the other was entered into in the context of litigation. (*Id.* at 43)

Defendant argues that Mr. Huston evaluated multiple factors supporting the economic comparability of the Comcast licenses to a hypothetical license to the patents-in-suit in this case, including that each agreement: (1) was a one-way patent license; (2) was based on the market value of the licensed patents; (3) was a transfer of non-exclusive patent rights, not a cross-license; (4) covered the life of the patents at issue; (5) involved a lump-sum payment structure; (6) involved parties with comparable economic and negotiating positions; and (7) was comparable in duration to the license period for the patents-in-suit resulting from a hypothetical negotiation. (D.I. 213 at 40) Defendant also contends that Mr. Huston adequately considered the use or benefits of the licensed patents in his comparability analysis, and he accounted for the fact that the accused features do not provide significant benefits compared to the balance of features in the accused products. (*Id.* at 40-41) Defendant explains that Mr. Huston accounts for differences such as the competitive relationship between the licensing parties and their role as investors in the technology. (*Id.* at 41-42)

Disputes regarding the degree of economic comparability of the license agreements go to the weight, and not the admissibility of an expert opinion. *See i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 852-54 (Fed. Cir. 2012); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) (concluding that the "degree of comparability" of agreements is "best addressed by cross examination and not by exclusion"). Mr. Huston's rebuttal expert report examines the economic comparability of the licenses at issue by considering numerous

aspects of the agreements. Mr. Huston determined that the license agreements and the circumstances of the hypothetical negotiation both involved a one-way patent license, they were based on the market value of the licensed patents and not on a litigation settlement, they involved a transfer of non-exclusive patent rights and not a cross license, they covered the life of the patents at issue, they involved a lump-sum royalty payment, and the parties had comparable negotiating positions. (*See, e.g.*, D.I. 218, Ex. 35 at ¶¶ 207-09, 226-27, 244, 267, 289-91, 311, 336, 360, 385-87, 402-04) Because Mr. Huston considered factors such as the licensed technology, the royalty structure, and the identity of the parties and applied these comparisons in the context of the Georgia Pacific factors, I recommend that the court deny Plaintiff's motion to exclude Mr. Huston's expert opinion on damages. *See Vehicle IP, LLC v. AT&T Mobility LLC*, 227 F. Supp. 3d 319, 324 (D. Del. 2016) (denying Daubert motion where expert "analyzed the nature of the licenses at issue, considering factors such as the licensed technology, products, royalty structure, identity of parties, and date of licensing.").

**3. Reliability of Mr. Huston's royalty amount**

Plaintiff also alleges that Mr. Huston's damages estimate based on the eight Comcast licenses is unreliable because it is based on flawed methodology and insufficient data. (D.I. 200 at 43) Plaintiff cites Mr. Huston's use of the lump sum amounts in the Comcast licenses as the amounts that would be agreed to during a hypothetical negotiation, without further analysis of the products covered by the licenses, or the extent of use or cost savings underlying the license agreements. (*Id.* at 44) Plaintiff references the wide range of lump sums across the eight Comcast license agreements as further evidence that Mr. Huston's methodology was arbitrary and unreliable. (*Id.*)

But Defendant responds that Mr. Huston's proposed damages range is reliable because it is based on the comparable agreements, which independently provide reasonable damages numbers. (D.I. 213 at 43) Defendant argues that Mr. Huston is not required to adjust the payment amount of a comparable agreement to calculate an appropriate damages number. (*Id.* at 43-44) Defendant also defends Mr. Huston's use of an average of the damages range based on comparable agreements, noting that it is an accepted methodology in the industry. (*Id.* at 44) Mr. Huston's damages calculation in this case is distinguishable from the circumstances in *Lucent* and *Wordtech* because Mr. Huston provided a comprehensive comparability analysis. (*Id.* at 45) Mr. Huston also addresses each of the fifteen Georgia Pacific factors. (*Id.*) (citing Ex. 35 at ¶¶ 382-429)

Mr. Huston's methodology in reaching his reasonable royalty calculation is not so unsupported or conclusory as to be inadmissible. Mr. Huston's rebuttal report establishes that he relied on comparable license agreements (D.I. 218, Ex. 35 at ¶¶ 430-53), and the Federal Circuit has held that "[o]ur case law does not require more." *Bio-Rad Labs., Inc.*, 967 F.3d at 1376-77 (concluding that expert was not required to adjust the royalty rate under apportionment principles because the analysis of comparable licenses "could reasonably be found to incorporate the required apportionment."); *see also VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1328 (Fed. Cir. 2014) ("[W]e note that we have never required absolute precision in [applying the principles of apportionment]; on the contrary, it is well-understood that this process may involve some degree of approximation and uncertainty."); *Ericsson, Inc.*, 773 F.3d at 1227 (recognizing that, even though "[p]rior licenses ... are almost never perfectly analogous to the infringement action," if accompanied by testimony accounting for the distinguishing facts, prior licenses may help the

jury decide an appropriate royalty award). Accordingly, I recommend denying Plaintiff's motion to exclude Mr. Huston's opinion on this basis.

**4. Mr. Huston's qualifications**

Finally, Plaintiff argues that Mr. Huston is not qualified to serve as a patent damages expert because he has no degree or formal education in economics, finance, or related subject areas. (D.I. 200 at 29, 46-47) Although he primarily dealt with licensing of patents and intellectual property in his decades-long career at IBM, Plaintiff notes that he never published any peer reviewed papers or taught courses on the subject. (*Id.*)

In response, Defendant emphasizes that Mr. Huston holds science and engineering degrees and he worked for more than three decades at IBM, two of which were spent valuing patents and negotiating patent license agreements regarding technologies comparable to those at issue in this case. (D.I. 213 at 31-33) Defendant notes that Mr. Huston has qualified as an expert in patent licensing and valuation in two separate patent trials, providing opinions based on comparable licensing agreements in those cases. (*Id.* at 33 n.23) According to Defendant, a degree in economics or accounting is not required to provide a damages opinion. (*Id.* at 33)

Mr. Huston meets the minimum technological and economic qualifications necessary to testify as an expert. The record establishes that Mr. Huston has degrees in "Engineering Science," but no degree in economics or accounting that would provide an economic background for offering an opinion on damages in this case. (D.I. 218, Ex. 35 at ¶¶ 33-34) Nonetheless, the Federal Circuit has held that specific academic credentials are not required under Rule 702 because "knowledge," "skill," and "experience" provide alternative bases of qualification. *See Carnegie Mellon Univ. v. Marvell Tech. Grp.*, 807 F.3d 1283, 1303 (Fed. Cir. 2015).

The record establishes that Mr. Huston has extensive experience in licensing technologies related to consumer electronics, networking, and other technological areas relating to the Asserted Patents in this case. (D.I. 202, Ex. 37 at ¶ 15) His responsibilities included analyzing thousands of relevant patents for valuation and potential use by IBM, as well as negotiating, licensing, and selling IBM's patents in the United States. (*Id.* at ¶¶ 16, 21, 24, 26, 28) Mr. Huston's extensive experience in negotiating more than 500 patent licenses and reviewing more than 2,000 patent licenses relating to the relevant technologies is sufficient to qualify as a damages expert. (*Id.* at ¶ 28); *see Carnegie Mellon*, 807 F.3d at 1303. Plaintiff's challenges to Mr. Huston's expertise go to his credibility, as opposed to the admissibility of his testimony, and these issues may be properly raised on cross examination. *See Robocast, Inc. v. Microsoft Corp.*, C.A. No. 10-1055-RGA, 2014 WL 202399, at *1-2 (D. Del. Jan. 16, 2014) (holding that expert's background as a software engineer, his experience in internet advertising, and his general familiarity with the metrics used in the field were sufficient qualifications). Consequently, I recommend that the court deny Plaintiff's motion to exclude Mr. Huston's damages opinion.

**E. Dr. Becker's Damages Opinion**

**1. Cumulativeness of Dr. Becker's opinion**

Plaintiff argues that Dr. Becker's opinion should be excluded because he offers no opinion on the appropriate amount of damages or how that amount should be calculated, nor did he conduct an analysis of the Georgia Pacific factors. (D.I. 200 at 48) Instead, Dr. Becker reiterates the amount of damages suggested by Mr. Huston by duplicating Mr. Huston's analysis. (*Id.*)

In response, Defendant argues that Dr. Becker's opinion is not duplicative of Mr. Huston's opinion because Mr. Huston focused on an analysis of the Georgia Pacific factors and

the economic and technological comparability of the license agreements, whereas Dr. Becker focuses his opinion on a critique of Mr. Reading's damages opinion. (D.I. 213 at 46) Defendant contends that a rebuttal damages expert such as Dr. Becker need not provide an affirmative damages amount because Plaintiff bears the burden of proof on the issue of damages. (*Id.*)

Dr. Becker's report is intended to address "improper assumptions and flaws in Mr. Reading's analysis that render his opinions of the appropriate damages overstated and unreliable." (D.I. 218, Ex. 42 at ¶ 121) Although Dr. Becker references Mr. Huston's opinion at times in his analysis, the focus of Dr. Becker's opinion is on rebutting the opinions expressed by Mr. Reading. (*Id.* at ¶¶ 121-242) That Dr. Becker's opinion reinforces the conclusions reached in Mr. Huston's opinion does not signify that the opinions are cumulative. *See Am. Cruise Lines, Inc. v. HMS Am. Queen Steamboat Co. LLC*, C.A. No. 13-324-RGA, 2017 WL 3528606, at *8 (D. Del. Aug. 14, 2017) ("[E]xperts are not necessarily cumulative of one another because each reaches a conclusion . . . via a different route"); *Sanofi v. Glenmark Pharms. Inc.*, C.A. No. 14-264-RGA, 2016 WL 10957311, at *2 (D. Del. May 12, 2016) (denying Daubert motion arguing that the expert's "testimony will be cumulative of testimony from [another expert]" because "[t]his does not provide grounds for exclusion under *Daubert*," and is more appropriately handled at trial).

**2. Reliability of Dr. Becker's 22% extent of use of apportionment**

Plaintiff further contends that Dr. Becker's 22% apportionment factor should be excluded as unreliable and unsupported by evidence of the extent to which the claimed functionality is used by consumers. (D.I. 200 at 49) In particular, Plaintiff challenges Dr. Becker's reliance on third-party surveys not specifically tied to the claimed functionality. (*Id.* at 49-50) Instead of limiting his analysis to flaws in Mr. Reading's opinion, Plaintiff alleges that Dr. Becker purports

to quantitatively correct Mr. Reading's calculation by applying a specific discount based on a specific alleged usage rate. (D.I 242 at 23-24)

In response, Defendant argues that Dr. Becker's narrow opinion regarding Mr. Reading's failure to apportion the royalty base is proper, and it was Mr. Reading who first relied on the third-party survey evidence now challenged by Plaintiff. (D.I. 213 at 49)

Dr. Becker discusses the third-party survey data in response to Dr. Mona Singh and Mr. Reading's analysis of the same evidence, arguing that those opinions failed to take into account the extent to which the accused functionality is used by consumers. (D.I. 218, Ex. 42 at ¶¶ 148-53; Ex. 44 at ¶¶ 225-28; Ex. 45 at ¶¶ 92-95) Dr. Becker made clear that his opinion on apportionment was offered only in the context of Mr. Reading's reliance on the survey data, and he was "not advocating for an affirmative damages opinion here." (*Id.*, Ex. 43 at 187:6-191:6) Plaintiff's challenges to Dr. Becker's apportionment opinion present fact issues that go to the weight of the opinion and are therefore best addressed through cross-examination. *See EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 92 (D. Del. 2016) (quoting *Daubert*, 509 U.S. at 596). Consequently, I recommend that the court deny Plaintiff's motion to exclude Dr. Becker's damages opinion.

## VI. CONCLUSION

For the reasons set forth above, I recommend that the court GRANT-IN-PART Defendant's motion (D.I. 196) as follows:

| HEADING | ISSUE ON SUMMARY JUDGMENT | RECOMMENDATION |
|---|---|---|
| A. | Patent Eligibility of the Customer Troubleshooting Patents Under § 101 | DENY |
| B. | Non-Infringement of the Customer Troubleshooting Patents | DENY |
| C. | Non-Infringement of the Enrollment Patents | GRANT |

| | | |
|---|---|---|
| D. | Non-Infringement of the Tether Patents | GRANT |
| E. | No Willfulness | GRANT |
| F. | No Pre-Suit Damages | DENY |
| **HEADING** | ***DAUBERT* ISSUE** | **RECOMMENDATION** |
| A. | Dr. Selker's Infringement Opinion on the Customer Troubleshooting Patents | DENY |
| B. | Dr. Selker's Infringement Opinion on the Enrollment Patent | DENY |
| C. | Mr. Reading's Damages Opinion | DENY |

I further recommend that the court GRANT-IN-PART Plaintiff's motion (D.I. 197) as follows:

| **HEADING** | **ISSUE ON SUMMARY JUDGMENT** | **RECOMMENDATION** |
|---|---|---|
| G. | Infringement of the '802 Patent | DENY |
| H. | Definiteness of the Customer Troubleshooting Patents | WITHDRAWN |
| I. | Written Description of the Enrollment Patent | DENY |
| J. | Validity of the Enrollment Patent over the Prior Art | GRANT |
| **HEADING** | ***DAUBERT* ISSUE** | **RECOMMENDATION** |
| C. | Mr. Huston's Damages Opinion | DENY |
| D. | Dr. Becker's Damages Opinion | DENY |

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties shall jointly submit a proposed redacted version by no later than **August 27, 2021**, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any

proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)). If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within thirty (30) days of the date the Report and Recommendation issued.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: August 20, 2021

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NEXSTEP, INC.,<br><br>Plaintiff;<br><br>v.<br><br>COMCAST CABLE COMMUNICATIONS, LLC,<br><br>Defendant. | Civil Action No. 19-1031-RGA |

MEMORANDUM OPINION

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Paul J. Andre, Lisa Kobialka, James Hannah, KRAMER LEVIN NAFTALIS & FRANKEL LLP, Menlo Park, CA; Jonathan S. Caplan, Aaron M. Frankel, Marcus A. Colucci, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, NY;

Attorneys for Plaintiff.

Jack B. Blumenfeld, Brian P. Egan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; William F. Lee, Sarah B. Petty, Kate Saxton, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, MA; Amy Kreiger Wigmore, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, DC; Mary (Mindy) V. Sooter, Nora Q.E. Passamaneck, WILMER CUTLER PICKERING HALE AND DORR LLP, Denver, CO;

Attorneys for Defendant.

March 28, 2022

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me are NexStep's objections (D.I. 276) and Comcast's unresolved objections (D.I. 273) to the Magistrate Judge's Report and Recommendation. (D.I. 267). I have considered the parties' briefing. (D.I. 273, 276, 286, 287). For the following reasons, NexStep's objections are OVERRULED and Comcast's objections are SUSTAINED-IN-PART.

## I. BACKGROUND

NexStep sued Comcast for infringement of several patents across three groups. (D.I. 1). The parties cross-moved for summary judgment and to exclude expert testimony. (D.I. 196, 197). The Magistrate Judge issued a Report and Recommendation on August 20, 2021. (D.I. 267).

On September 20–23, NexStep tried the patents in the "Customer Troubleshooting" group to a jury. (D.I. 346–49). Before that trial, I considered some of Comcast's objections to the Report and Recommendation. I overruled Comcast's objection to the Report's recommendation regarding the patent eligibility of the Customer Troubleshooting Patents (D.I. 320) and sustained Comcast's objection to the Report's recommendation regarding Mr. Reading's expert testimony on the Customer Troubleshooting Patents. (D.I. 314). This memorandum opinion addresses Comcast's other objections along with NexStep's objections to the Report and Recommendation.

To the extent there is no objection to various of the Magistrate Judge's recommendations, I will adopt them without further discussion.

## II. LEGAL STANDARD

### A. Summary Judgment.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007). A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

**B. *Daubert***

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's

> 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[1]

### C. Standard of Review

The parties agree that the standard of review for the Magistrate Judge's Report and Recommendation on summary judgment is *de novo*. (D.I. 273 at 1; D.I. 276 at 1). For a motion to exclude expert opinions, the standard of review is "clearly erroneous or is contrary to law." (D.I. 273 at 1; D.I. 286 at 3).

## III. DISCUSSION

### A. NexStep's Objections

NexStep objects to the Report's recommendation that I grant summary judgment of noninfringement of U.S. Patent Nos. 8,885,802 ("the '802 patent"), 9,614,964 ("the '964 patent"), 7,697,669 ("the '669 patent"), and 8,494,132 ("the '132 patent"). The '802, '669, and '132 patents are in the "Tether Patents" group and the '964 patent is the "Enrollment Patent." (D.I. 267 at 2).

#### 1. Noninfringement of the '802 Patent

[1] The Court of Appeals wrote under an earlier version of Rule 702, but the subsequent amendments to it were not intended to make any substantive change.

The '802 patent requires the use of Voice over Internet Protocol ("VoIP"). '802 Patent, Cl. 1. "VoIP" is construed as "[p]rotocols and data formats for transmitting voice conversations over a packet-switched network, such as the Internet." (D.I. 113 at 21; D.I. 261 at 1). NexStep argues that the accused devices' use of HTTP is use of VoIP. (D.I. 276 at 1). The Magistrate Judge disagreed. (D.I. 267 at 20).

There does not appear to be any dispute regarding how the accused devices operate. As Comcast explains, "A user speaks a command (e.g., 'watch NBC') into the microphone of the voice remote, and the captured audio is sent by the set-top box over a protocol called HTTP to Comcast's servers." (D.I. 287 at 6).

NexStep asserts that any protocol that can carry voice data qualifies as VoIP. (*See* D.I. 276 at 2 ("[T]he VoIP element . . . is satisfied because Comcast's accused products use a number of protocols that can carry voice data, i.e., a conversation over the Internet. There is no need to show that the accused products are used for actual two-way conversations . . . ."). NexStep advances several claim construction arguments in support of its theory. (*See* D.I. 276 at 3–4). As the Magistrate Judge noted, however, "The court specifically rejected Plaintiff's effort to broaden the definition to encompass all audio data, instead finding that the industry standard definition of the term limited it to the realm of voice conversations or telephony." (D.I. 267 at 19).

The VoIP limitation requires use of a protocol capable of transmitting a "voice conversation." A conversation requires at least two people. A "voice conversation" transmitted over the internet implies two-way transmission. NexStep has not offered any evidence showing that HTTP can carry out two-way voice conversations. NexStep's expert presents only conclusory statements that HTTP is VoIP. (*See* D.I. 199-2, Ex. 23, ¶¶155–160, 189–192

(asserting that transmission over HTTP is VoIP without showing that HTTP is capable of transmitting voice conversations); D.I. 199-2, Ex. 24, ¶ 41 (asserting that "HTTP is a request-response protocol . . . that is capable of transmitting voice conversations"). The dictionary definition of "VoIP" cited by NexStep's expert undermines the expert's conclusory assertion that a person of skill in the art (a "POSITA") would understand that "VoIP protocols and formats for transmitting voice conversations do not require real-time interactive voice conversations." (D.I. 199-2, Ex. 24, ¶ 43; *see also* D.I. 215-1, Ex. K at 979 (defining "VoIP")). As the Magistrate Judge noted, "Plaintiff's dictionary definition confirms that VoIP protocols must be capable of facilitating 'phone calls' and may include additional new services such as voice emails." (D.I. 267 at 21 n.6.). Thus, I will follow the Report's recommendation and grant summary judgment of noninfringement of the '802 patent.

**2. Noninfringement of the '964 Patent**

The '964 patent requires a "control device," which I construed as "a device, not a universal remote control or smart phone capable of acting as a universal remote control, for controlling another device." (D.I. 261 at 3). NexStep argues, "the application of the Court's construction of 'control device' to the Accused Control Devices is a factual dispute that should have precluded summary judgment." (D.I. 276 at 5). Comcast responds that NexStep has waived many of its arguments by failing to raise them before the Magistrate Judge. (D.I. 287 at 1).

Further procedural history is necessary to understand the parties' positions on this point. The Magistrate Judge issued a Report and Recommendation regarding claim construction. (D.I. 113). NexStep objected. (D.I. 128). On August 9, 2021, I issued a Memorandum Order modifying the Magistrate Judge's construction of "control device." (D.I. 261). The Magistrate

Judge had recommended the construction: "a simple apparatus, not a universal remote or smart phone capable of acting as a universal remote control, for controlling a device." (D.I. 113 at 25). I removed the "simple apparatus" language and construed "control device" as "a device, not a universal remote control or smart phone capable of acting as a universal remote control, for controlling another device." (D.I. 261 at 3).

By the time my Memorandum Order issued, the parties had already briefed their motions for summary judgment. On August 10, 2021, the Magistrate Judge ordered the parties to provide a joint status report regarding "their respective positions on the August 9, 2021 Memorandum Order on claim construction and its effect, if any, on the pending motions for summary judgment and Daubert motions." The parties filed a joint status report (D.I. 264) on August 17, 2021 and the Magistrate Judge issued the Report and Recommendation (D.I. 267) three days later.

NexStep's position in the joint status report was: "As set forth in NexStep's Opposition, Comcast's Home App infringes Claim 11 and 21 of the '964 Patent by way of three infringing scenarios, in which the 'control device' can include Comcast's Home App (scenario 1) or Comcast's Xfinity Remotes (scenarios 2 and 3)." (D.I. 264 at 2).

In its objections, NexStep adds an infringing scenario in which the set-top box is a control device. (D.I. 276 at 9). NexStep had the opportunity to tell the Magistrate Judge that the claim construction yielded a new infringement theory. NexStep did not. Thus, NexStep is precluded from arguing the set-top box theory now. *See* Oct. 9, 2013 Standing Order for Objections Filed Under Fed. R. Civ. P. 72, https://www.ded.uscourts.gov/sites/ded/files/general-orders/Objections-filed-under-Fed-R-Civ-P-72.pdf.

In addition, I will not consider new evidence from NexStep's expert's supplemental report, which was not before the Magistrate Judge. (D.I. 276-1, Ex. 2). NexStep identifies the

supplemental expert report as a new argument in its certification pursuant to the Standing Order for Objections Filed Under Fed. R. Civ. P. 72. (D.I. 276-2). NexStep asserts good cause because the parties entered a stipulation "whereby they agreed to exchange addenda to their experts' reports to address the revised claim construction." (*Id.*).

I do not think there is good cause to consider the new evidence. NexStep was asked to disclose what "effect, if any" the modified claim construction had "on the pending motions for summary judgment." (Aug. 10, 2021 Oral Order). In the responsive joint status report, NexStep did not raise the possibility of new summary judgment arguments stemming from a new supplemental expert report. (D.I. 264). Just eight days after NexStep submitted the joint status report, and just five days after the Magistrate Judge issued the Report and Recommendation, the parties proposed the stipulation. (D.I. 269). I granted the stipulation the next day, which allows for limited supplementation of "issues relating directly to the terms 'remote control device' . . . and 'control device'" and provides that the parties' "infringement contentions will be deemed to incorporate their supplementations." (D.I. 270 at 1–2). The stipulation does not state anything regarding summary judgment. Given NexStep's representations to the Magistrate Judge just eight days prior, the stipulation does not give NexStep good cause to raise new arguments in its objections.

I will accordingly only consider NexStep's objections that pertain to the infringement theories before the Magistrate Judge.

**a. Home App**

NexStep argues Comcast's Xfinity Home App is a control device. The Home App is software and does not include any hardware. (D.I. 214 at 16). Before the Magistrate Judge, NexStep argued that the Home App infringed under the doctrine of equivalents. (D.I. 214 at 16–

17). The Magistrate Judge rejected this argument, because "the Xfinity Home App, by itself, has no hardware that might otherwise render it equivalent to the claimed control device which was defined by the court as an 'apparatus' having a physical structure." (D.I. 267 at 18). Even though the Magistrate Judge's opinion uses the "apparatus" terminology, the reasoning applies equally well under the "device" construction. A device, like an apparatus, is physical. "[N]o jury could reasonably find that software could be equivalent to a physical" claim limitation. *Lighthouse Consulting Grp., LLC v. BB&T Corp.*, 476 F. Supp. 3d 532, 544 (W.D. Tex. 2020). Thus, I agree with the Magistrate Judge that the Home App does not infringe the '964 patent.

**b. Home App on a Smartphone or Tablet**

NexStep asserts that the Home App in combination with a smartphone is a control device. (D.I. 276 at 6–9). Comcast replies that this argument is waived. (D.I. 287 at 4). Before the Magistrate Judge, NexStep argued that the Home App infringed under the doctrine of equivalents. (D.I. 214 at 16–17). In its objections, NexStep appears to object on the basis that the Home App on a smartphone literally infringes. (D.I. 276 at 7 ("Dr. Selker's opinion under this Court's current construction is that the combination of the Xfinity Home App and a smartphone is literally a 'control device.'" (citations omitted))). I agree with Comcast that the literal infringement argument is waived. In the joint status report, NexStep did not clarify that the modified construction of "control device" gave rise to a literal infringement argument. (D.I. 264 at 3–4). Thus, I will adopt the Magistrate Judge's recommendation to grant Comcast's motion for noninfringement of the '964 patent as it relates to the Home App.

**c. Xfinity Remotes**

NexStep argues that the Xfinity Remotes are control devices. (D.I. 276 at 8). The Magistrate Judge disagreed because "the evidence of record demonstrates that the features of the

Xfinity Remotes are consistent with the standard features of a universal remote control, as defined by Dr. Selker." (D.I. 267 at 17). Under the claim construction, a control device cannot be a universal remote control. (D.I. 261 at 3). Thus, the Report recommends I grant summary judgment of noninfringement for the Xfinity Remotes.

In its objections, NexStep argues that Dr. Selker opined before the Magistrate Judge that Xfinity Remotes are not a universal remote control because they cannot control "***all*** the functionality" of the controlled devices. (D.I. 276 at 8). The opinion that universal remote controls must control "all" the functionality of a controlled device was not present in the materials cited to the Magistrate Judge. (*See* D.I. 214 at 15–16 (citing 215-1, Ex. E ¶¶ 330–35)). Dr. Selker's opening and reply expert reports on this point were thin. As the Magistrate Judge notes, "Dr. Selker cites only one document in support of his opinion on this topic." (D.I. 267 at 17 n.4). For the reasons explained by the Magistrate Judge, that document is not enough to raise a genuine issue of material fact. (*Id.*). I will not consider new opinions raised in Dr. Selker's addendum. Thus, NexStep has failed to raise a genuine issue of material fact.

For the foregoing reasons, NexStep's objections to the Report's recommendation that I grant summary judgment of noninfringement of the '964 patent are overruled.

**3. Noninfringement of the '669 and '132 Patents**

NexStep accuses Comcast's TV Remote and Stream Apps of infringing the '669 and '132 patents. The Report recommends I grant Comcast summary judgment of noninfringement because the accused products do not satisfy the VoIP limitation of the asserted claims. (D.I. 267 at 25). Under the claim construction, VoIP requires transmission of "voice conversations." (D.I. 113 at 21; D.I. 261 at 1).

NexStep's first infringement scenario involves one-way audio transmission. (*See* D.I. 276 at 10). This does not meet the VoIP limitation for the reasons discussed in § III.A.1 *supra*. NexStep's second infringement scenario involves "streaming video content with encoded voice conversations." (D.I. 276 at 10). As the Magistrate Judge found, this is still one-way audio communication and not a voice conversation as required by the claims. (D.I. 267 at 25). NexStep's third infringement scenario involves the transmission of text that has been converted from a user's speech. (D.I. 276 at 10). Not only is this one-way transmission, but it is not plausible that text is a "voice conversation." NexStep has failed to raise a genuine issue regarding infringement under the doctrine of equivalents because NexStep's expert did not offer a doctrine of equivalents opinion on the VoIP limitation. (*See* D.I. 267 at 24 n.7). Thus, I will adopt the Report's recommendation and grant summary judgment of noninfringement for the '669 and '132 Patents.

**B. Comcast's Objections**

Comcast objects to the Report's recommendation that I (1) deny Comcast's motion to exclude Mr. Reading's damages opinions,[2] (2) deny Comcast's motion for summary judgment of no pre-suit damages, and (3) grant NexStep's motion for summary judgment of validity of the '964 patent over the prior art. (D.I. 273).

**1. Mr. Reading's Damages Opinions**

For the reasons stated in my September 16, 2021 Memorandum Opinion (D.I. 313), I will grant Comcast's motion to exclude Mr. Reading's damages opinion based on the hypothetical negotiation of cost savings associated with the Enrollment Patent.

[2] I already resolved Comcast's objections to Mr. Reading's testimony regarding the Customer Troubleshooting Patents. (*See* D.I. 314).

Comcast argues that Mr. Reading's royalty base rests on flawed assumptions and should be excluded. (D.I. 273 at 6). Mr. Reading assumes that Comcast saved "at least one or two truck rolls per installed Home system." (*Id.* at 7 (citing D.I. 199-4, Ex. 46 ¶ 126)). This estimate is based on the data Mr. Reading had available. As the Magistrate Judge noted, "Because Defendant does not track the number of devices self-installed by customers, Mr. Reading had no alternative to relying on an estimate for this information." (D.I. 267 at 48). I agree with the Magistrate Judge that this goes to the weight, not the admissibility, of the evidence.

Comcast also objects to the Report's recommendation that I deny Comcast's motion to exclude Mr. Reading's damages opinions for the Tether Patents. (D.I. 273 at 7). In one paragraph, Comcast asserts that the Magistrate Judge erred on four separate grounds. Comcast presents no argument for how the Magistrate Judge erred. Instead, Comcast directs me to its briefing before the Magistrate Judge. (*Id.*). For the reasons stated by the Magistrate Judge, I see no reason to exclude Mr. Reading's damages opinions on the Tether Patents. (D.I. 267 at 50–53).

**2. Pre-suit Damages**

Comcast objects to the Report's recommendation that I deny Comcast's motion for summary judgment of no pre-suit damages. A patentee who makes or sells a patented article must mark the article or notify infringers of the patent to recover damages. 35 U.S.C. § 287(a). "Full compliance" with the § 287(a) requires that "substantially all" of the patented products are "consistently marked." *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993). NexStep argues that it consistently marked its prototypes since the first asserted patent issued in 2009. (D.I. 214 at 28). Comcast disagrees and points to evidence in the form of photos of unmarked devices. (D.I. 273 at 8). According to the inventor, Dr. Stepanian, these photos

depict various items not subject to marking, such as "CAD drawings, design drawings, concept mockup images, or studio photographs of prototypes for potential use in print marketing materials. . . . There are only a few photographs in this compilation of actual demonstration prototypes, and all of the demonstration prototypes are labeled with patent markings." (D.I. 215-1, Ex. R ¶ 8).

Dr. Stepanian also states, "As NexStep began to obtain utility patents that applied to its demonstration prototypes, I would regularly update the patent marking labels to specifically identify the issued patent numbers applicable to each demonstration prototype." (*Id.* ¶ 7). Comcast argues that I should disregard this declaration. (D.I. 273 at 8). According to Comcast, the declaration contradicts Dr. Stepanian's "testimony as NexStep's corporate representative that he did not remember whether he ever demonstrated devices embodying an Asserted Patent that were not properly marked." (*Id.*). I do not think the declaration and deposition testimony are directly contradictory. The statement here is barely inconsistent. Dr. Stepanian does not now say that he remembers that he never demonstrated an unmarked device. Thus, it is not "clear that [the] affidavit is offered solely for the purpose of defeating summary judgment." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). Because Dr. Stepanian's statements have raised a genuine issue of material fact regarding whether he consistently marked, I will adopt the Report's recommendation that I deny Comcast's motion for no pre-suit damages.

**3. Validity of the Enrollment Patent over Prior Art**

Comcast argues that two pieces of prior art, the iControl and uControl home security systems, render the Enrollment Patent obvious. (D.I. 213 at 21–22). NexStep seeks summary judgment of validity over the iControl and uControl systems, arguing that Comcast has failed to raise a genuine issue of material fact in support of its obviousness contentions. (D.I. 200 at 23).

A patent claim is obvious if "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103(a).

The Enrollment Patent requires that the "control device" is registered with a cloud-based service. '964 Patent, Cl. 1. Claim 1 recites, "receiving a second enrollment signal sent by a second control device . . .; registering the second control device with a cloud based service . . . ." *Id.* Comcast's expert opines that the iControl and uControl systems have devices such as keychain remotes or key fobs that meet the "control device" limitation. (D.I. 213 at 29). The Magistrate Judge disagreed, finding that Comcast lacked evidence showing that the devices were registered with a cloud-based system. (D.I. 267 at 44–45).

On my review of the evidence, I think Comcast has raised a genuine dispute of material fact. Much of the evidence comes from Comcast's expert, Dr. Villasenor, who opines:

> [T]he iControl system allows a customer to remotely access and control controllable devices, for example by using a keychain remote or by using the web or mobile portal. . . . A POSITA would have understood based upon their own knowledge and the features of the iControl system, that control devices, like a mobile phone or keychain remote, would have to be registered with the cloud-based service in order for the control devices to be able to access and control the controllable devices.

(D.I. 217-1, Ex. 12 ¶ 572; *see also id.* ¶ 625 (providing the same opinion for the uControl system)). Based on these paragraphs, the Magistrate Judge noted, "Dr. Villasenor offers only a conclusory opinion suggesting that a person of ordinary skill would understand that these 'control devices' are registered with a cloud-based service, relying on documents that show cell phone or Internet connectivity without indicating registration with a cloud-based service." (D.I. 267 at 44–45). Elsewhere in Dr. Villasenor's opinion, however, he gives more detail regarding why a POSITA would understand the keychain remotes and key fobs to be registered with a

cloud-based service. Under Dr. Villasenor's theory, the enrollment process results in registration with a cloud-based service. (*E.g.*, D.I. 217-1, Ex. 13 ¶ 362). As Dr. Villasenor summarizes in his reply:

> [T]he iControl system discloses that the enrollment process for controllable devices includes that those devices send identifiers to the back-end servers. A POSITA would have understood that the procedure for enrolling devices in the iControl system is equally applicable to controllable devices and control devices, which would allow the system to track which control and controllable devices a customer has connected to their system and would allow the customer remote access and control of a controllable device. A POSITA would have appreciated that a device identifier from a control device would be necessary to enroll and differentiate the control devices within the system.

(D.I. 217-1, Ex. 13 ¶ 358 (citations omitted); *see also id.* ¶ 398 (giving the same opinion for the uControl system)).

The Magistrate Judge also relied on the deposition testimony of Jim Kitchen, one of the founders of uControl, to find "the evidence confirms that these 'control device' features of the iControl and uControl systems enabled simple functionality and were not cloud-based devices." (D.I. 267 at 45). Mr. Kitchen's testimony included:

> Q. So the key fob wasn't – it wasn't like a cloud-based device. It was kind of more tied to the touchscreen itself, correct?
> A. It is – yeah, it was paired with the touchscreen's Zigbee network in the home. Again, just – just like all the other sensors . . .

(D.I. 252-1, Ex. 71 at 30:4–9). Comcast contests the "cloud-based device" language, arguing that the claims do not require a "cloud-based device" but only that the device be registered with a cloud-based service. (D.I. 273 at 10). I agree with Comcast. Furthermore, the deposition question was compound: (1) whether the key fob "wasn't like a cloud-based device," and (2) whether the key fob "was kind of more tied to the touchscreen itself." Mr. Kitchen only clearly answered the second inquiry. I do not think Mr. Kitchen's answer sheds much light on whether the device was registered with a cloud-based service, as required by the claims.

Viewed as a whole, Mr. Kitchen's testimony could lend support to Dr. Villasenor's opinion. Mr. Kitchen testified that the key fob "was paired with the system the same way any other Zigbee system was paired, so similar to the pairing process of a door/window or a motion sensor."[3] (D.I. 252-1 Ex. 71 at 29:18–20). Dr. Villasenor opines that "sensors" are "controllable devices." (*See* D.I. 217-1, Ex. 12 ¶ 554). As explained above, Dr. Villasenor's theory is that a POSITA would have understood that control devices were enrolled in the same way as controllable devices. (*See also id.* ¶ 569). Mr. Kitchen's testimony that control devices and controllable devices were paired using a "similar" process lends support to Dr. Villasenor's theory. Thus, I will sustain Comcast's objection to the Magistrate Judge's recommendation that there is no disputed fact that the Enrollment Patent is not invalid over the iControl and uControl systems.

Comcast also asserts that iControl and uControl apps running on smartphones qualify as control devices. Since I will not allow NexStep to advance the infringement theory based on the Home App running on a smartphone, I will not allow Comcast to advance the invalidity theory based on the iControl and uControl apps operating on a smartphone. *See 01Communique Lab'y, Inc. v. Citrix Sys., Inc.*, 889 F.3d 735, 742-43 (Fed. Cir. 2018).

## IV. CONCLUSION

An appropriate order will issue.

---

[3] Comcast's expert Dr. Reinman explains that "ZigBee" is a type of communication protocol "intended for use with battery-powered devices." (D.I. 217-1, Ex. 7 ¶ 39).

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NEXSTEP, INC,

Plaintiff,

v.

COMCAST CABLE COMMUNICATIONS, LLC,

Defendant.

Civil Action No. 19-1031-RGA

ORDER

For the reasons stated in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED:**

1. Comcast's objections (D.I. 273) to the Magistrate Judge's Report and Recommendation (D.I. 267) regarding (1) Comcast's motion for summary judgment of no pre-suit damages, (2) Mr. Reading's royalty base for the Enrollment Patent, and (3) Mr. Reading's damages opinion for the Tether Patents are **OVERRULED**. Comcast's objections regarding (1) Mr. Reading's opinion on the hypothetical negotiation of cost savings on the Enrollment Patent and (2) NexStep's motion for summary judgment of validity over U.S. Patent No. 9,614,964 are **SUSTAINED**.
2. NexStep's objections (D.I. 276) to the Magistrate Judge's Report and Recommendation are **OVERRULED**.

3. The Report and Recommendation (D.I. 267) is **ADOPTED** with the exceptions of its recommendations to deny Comcast's motion to exclude Mr. Reading's damages opinion and to grant NexStep's motion for validity of the Enrollment Patent over the prior art.
4. Comcast's motion for summary judgment and to exclude expert opinions (D.I. 196) is **GRANTED-IN-PART**. Comcast's motion is **GRANTED** with respect to noninfringement of the Enrollment Patent and the Tether Patents and Mr. Reading's opinion on the hypothetical negotiation of cost savings on the Enrollment Patent.[1] Comcast's motion is otherwise **DENIED**.
5. NexStep's motion for summary judgment and to exclude expert opinions (D.I. 197) is **DENIED**.

Entered this 28 day of March, 2022.

[signature]
United States District Judge

[1] Comcast's motion to exclude the expert testimony of Mr. Reading was previously granted with respect to Mr. Reading's damages opinion based on the hypothetical negotiation of cost savings associated with the Customer Troubleshooting Patents. Comcast's motion for no willfulness was granted by the Magistrate Judge with no objection.

REDACTED

**Sent:** Friday, September 17, 2021 5:33 PM
**To:** began@mnat.com; jblumenfeld@mnat.com; provner@potteranderson.com
**Subject:** NexStep v. Comcast, No. 19-1031-RGA

Counsel,

I have considered your arguments and the emails submitted earlier this afternoon. I am going to grant the motion to strike. (D.I. 317). I exclude from the trial all testimony and/or evidence solely offered to prove damages. I do not think any viable damages theory has been properly and timely disclosed. Thus, the jury coming in Monday will not consider damages. I do not expect to have a separate damages trial unless my order of yesterday excluding the 50/50 split or this ruling is reversed by the Court of Appeals.
I will give a fuller explanation in writing in due course.
Thank you

Judge Andrews

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NEXSTEP, INC.,

Plaintiff;

v.

COMCAST CABLE COMMUNICATIONS, LLC,

Defendant.

Civil Action No. 19-1031-RGA

MEMORANDUM OPINION

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON, LLP, Wilmington, DE; Paul J. Andre, Lisa Kobialka, KRAMER LEVIN NAFTALIS & FRANKEL LLP, Menlo Park, CA; Jonathan S. Caplan, Aaron M. Frankel, Marcus A. Colucci, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, NY.

Attorneys for Plaintiff.

Jack B. Blumenfeld, Brian P. Egan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; William F. Lee, Sarah B. Petty, Kate Saxton, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, MA; Amy Kreiger Wigmore, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, DC; Mary (Mindy) V. Sooter, Nora Q.E. Passamaneck, WILMER CUTLER PICKERING HALE AND DORR LLP, Denver, CO.

Attorneys for Defendant.

September 16, 2021

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is the Magistrate Judge's Report and Recommendations (D.I. 267) regarding Plaintiff's and Defendant's Motions for Summary Judgment and to Exclude Expert Opinions (D.I. 196, D.I. 197). I have considered the parties' objections and responses, but only in relation to the issues raised concerning the two "trouble-shooting" patents. (D.I. 273, D.I. 286). For the reasons set forth below, I am adopting the Report and Recommendation of the Magistrate Judge on all issues except for Mr. Reading's damages opinion. Defendant's motion to exclude Mr. Reading's opinion is granted.

## I. BACKGROUND

Plaintiff NexStep filed this lawsuit against Defendant Comcast, alleging infringement of several patents relating to personal computing devices and services. The parties cross-moved for summary judgment and to exclude the opposing party's expert reports. (D.I. 196, 197). The Magistrate Judge issued a Report and Recommendation regarding the disposition of those motions. (D.I. 267).

## II. LEGAL STANDARD

### A. Standard of Review

The parties agree that the standard of review for a motion to exclude expert opinions is "clearly erroneous or is contrary to law." FED. R. CIV. P. 72(a); (D.I. 273 at 1; D.I. 286 at 3). "A Magistrate Judge's order is contrary to law when the magistrate judge has misinterpreted or misapplied the applicable law." *Masimo Corp. v. Philips Elec. N. Am. Corp.*, 62 F. Supp. 3d 368, 388 (D. Del. 2014) (internal citations and quotations omitted).

### B. Daubert

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."
>
> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404–05 (3d Cir. 2003) (footnote and internal citations omitted).[1]

## III. DISCUSSION

Defendant seeks to exclude Mr. Reading's opinions and testimony regarding damages as arbitrary and thus contrary to Federal Circuit precedent. (D.I. 196, D.I. 273 at 4). Plaintiff argues that Mr. Reading's report is adequately based on the facts of this case. (D.I. 286 at 6).

In his expert report, Mr. Reading states that the appropriate royalty rate for the Customer Troubleshooting Patents is based on Comcast's cost savings due to reduced service calls and truck rolls. (D.I. 216 Ex. V ¶ 376). Mr. Reading then notes:

> Clearly, Comcast would not pay 100% of the cost savings realized from the use of this technology, as it would have no incentive to utilize the technology in that case. It is reasonable to conclude that a 50/50 split of the cost savings would be a reasonable starting point for a negotiation of the sharing of the cost savings. (*Id.* ¶ 377).

Finally, Mr. Reading applies the Georgia-Pacific factors to "determine their effect on the 50/50 split" (D.I. 214 at 40) and arrives at a royalty rate of 40% after a net downward adjustment. (D.I. 216 Ex. V ¶¶ 378-79).

Defendant argues that Mr. Reading's choice of a 50/50 starting point for a hypothetical negotiation is a "rule of thumb" that is "unrelated to the facts." (D.I. 273 at 5 (citing *VirnetX Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014))). Plaintiff replies that Mr. Reading's expert report is based on facts specific to this case. First, both parties would recognize that Comcast's use of the patents would result in cost savings "which would be pure profit to Comcast," making Comcast willing to share a high percentage of the cost savings with NexStep.

---

[1] The Court of Appeals wrote under an earlier version of Rule 702, but the subsequent amendments to it were not intended to make any substantive change.

(D.I. 214 at 40). Second, Comcast "would need an incentive to use the technology and thus would likely agree to a license where it retained a meaningful percentage of the savings." (*Id.*).

The Federal Circuit has made it clear that the starting point for a hypothetical negotiation must be tied to "the facts of the case at issue." *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011). Here, the facts offered by Plaintiff could be true of a negotiation of cost-savings technology (or anticipated profits) by any two parties, meaning that they are not particular to the facts of this case.

In *VirnetX, Inc. v. Cisco Systems, Inc.*, the Federal Circuit rejected a 50/50 starting point based on the Nash Bargaining Solution "without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand." 767 F.3d at 1332. Although the *VirnetX* expert opinion estimated royalty rates based on incremental profits, *id.* at 1331, the *VirnetX* court's rationale is equally applicable to the cost savings at issue in the present case, which Plaintiff has acknowledged to be "pure profit to Comcast." (D.I. 214 at 40). While Mr. Reading did not mention the Nash Bargaining Solution, his defense of the use of a 50/50 split as "reasonable" without support by facts specific to these parties does not fare any better. (D.I. 216 Ex. Z ¶ 132). A "25 percent rule of thumb" was similarly rejected by the Federal Circuit in *Uniloc,* 632 F.3d at 1315.

It is true that Mr. Reading applies the Georgia Pacific factors to adjust the 50/50 starting point, but as the *Uniloc* court pointed out, "[b]eginning from a fundamentally flawed premise and adjusting it based on legitimate considerations specific to the facts of the case nevertheless results in a fundamentally flawed conclusion." *Id.* at 1317.[2]

---

[2] Plaintiff's citation to *Gree, Inc. v. Supercell Oy*, 2021 WL 514757, at *4-5 (E.D. Tex. Feb. 11, 2021) also falls flat due to the stage of the analysis at which Mr. Reading applied the case-

Because Mr. Reading's opinion failed to support a 50/50 starting point with facts specific to the case at hand, I will grant Defendant's *Daubert* motion with regards to Mr. Reading's damages testimony.

## IV. CONCLUSION

An appropriate order will issue.

---

specific factors. In *Gree*, "[a]fter analyzing the *Georgia-Pacific* factors, [the expert witness] concluded that neither party would have had stronger bargaining power, and thus the parties were likely to meet at the midpoint." *Id.* at *4. In other words, it appears from the opinion that the *Gree* expert analyzed specific factors relating to the case before coming to the conclusion that the parties would "split the difference."

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NEXSTEP, INC,

Plaintiff,

v.

COMCAST CABLE COMMUNICATION, LLC,

Defendant.

Civil Action No. 19-1031-RGA

ORDER

For the reasons stated in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that:

1. Comcast's objection (D.I. 273) to the Magistrate Judge's Report and Recommendations (D.I. 267) regarding Comcast's motion to exclude expert testimony of Mr. Reading on the basis of its cost-split methodology is **SUSTAINED**.
2. Comcast's motion to exclude the expert testimony of Mr. Reading (D.I. 196) is **GRANTED** with respect to Mr. Reading's damages opinion based on the hypothetical negotiation of cost savings associated with the Customer Troubleshooting Patents.
3. The Court **OVERRULES** Comcast's three other objections relating to the Customer Troubleshooting Patents (D.I. 196 at 1-4, 6-7, 8) and will enter a separate order in regard to the § 101 issue.

Entered this 16th day of September, 2021.

United States District Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

NEXSTEP, INC.,

Plaintiff;

v.

COMCAST CABLE COMMUNICATIONS, LLC,

Defendant.

Civil Action No. 19-1031-RGA

MEMORANDUM OPINION

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Paul J. Andre, Lisa Kobialka, James Hannah, KRAMER LEVIN NAFTALIS & FRANKEL LLP, Menlo Park, CA; Jonathan S. Caplan, Aaron M. Frankel, Marcus A. Colucci, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, NY;

Attorneys for Plaintiff.

Jack B. Blumenfeld, Brian P. Egan, Andrew M. Moshos, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; William F. Lee, Sarah Beigbeder Petty, Kate Saxton, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, MA; Amy Kreiger Wigmore, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, DC; Mary (Mindy) V. Sooter, Nora Q.E. Passamaneck, WILMER CUTLER PICKERING HALE AND DORR LLP, Denver, CO;

Attorneys for Defendant.

November 17, 2021

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is Comcast's motion to strike NexStep's new damages theories. (D.I. 317). I heard oral argument via teleconference on September 17, 2021. After reviewing Comcast's letter (D.I. 318), NexStep's response (D.I. 321), and the documents discussed at oral argument, which are available as exhibits to D.I. 326, I indicated that I would grant Comcast's motion. (D.I. 363). This opinion provides a fuller explanation of my decision.

## I. BACKGROUND

Plaintiff NexStep filed this lawsuit against Defendant Comcast, alleging infringement of several patents relating to personal computing devices and services. The parties cross-moved for summary judgment and to exclude the opposing party's expert reports. (D.I. 196, 197). On September 16, 2021, I issued an order granting Comcast's motion to exclude the expert opinion of NexStep's expert, Mr. Reading, regarding the hypothetical negotiation of cost savings associated with the Customer Troubleshooting Patents. (D.I. 314).

The next day—the Friday before the trial—the parties met and conferred regarding NexStep's damages theories. (D.I. 318 at 1). Subsequently, Comcast filed a motion to strike new damages theories (D.I. 317) with a letter in support (D.I. 318) claiming that at the meet and confer, "NexStep was unable to identify what the new alleged royalty rate would be." (*Id.* at 1).

On Friday afternoon, NexStep responded with a description of its damages theory. (D.I. 321). NexStep proposed that NexStep's CEO, Dr. Stepanian, would give fact testimony that NexStep's business plan during the relevant timeframe identified a 30% royalty rate for the Customer Troubleshooting patents and Mr. Reading would give an expert opinion "establishing what the cost savings would be and the parties' positioning at the hypothetical negotiation." (D.I. 321 at 1, 4).

The parties disputed the extent to which the facts and theories underlying NexStep's proposed damages case were disclosed during discovery. The issue is whether NexStep met the disclosure requirements of Rule 26, and, if not, whether I should nevertheless allow the evidence at trial under Rule 37(c)(1).

## II. LEGAL STANDARD

Rule 26(a)(1)(A)(iii) of the Federal Rules of Civil Procedure provides for initial discovery disclosures including:

> a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered[.]

Rule 26(a) "does expressly require an initial computation and disclosure of the evidence that will be relied on to the full extent the patent plaintiff could or should know of it." *Brandywine Commc'ns Techs., LLC v. Cisco Sys., Inc.*, 2012 WL 5504036 at *2 (N.D. Cal. Nov. 13, 2012).

"If a party fails to provide information or identify a witness as required by Rule 26(a) …, the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). The decision to exclude testimony at trial is a "decision peculiarly within the discretion of the trial judge." *DCK TTEC, LLC v. Postel Indus., Inc.*, 602 F. App'x 895, 898 (3d Cir. 2015) (internal citations omitted). In the Third Circuit, courts consider the *Pennypack* factors to determine whether exclusion of evidence is appropriate: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or other cases in the court, and (4) bad faith or willfulness in failing to comply with the district court's order." *Konstantopoulos v.*

*Westvaco Corp.*, 112 F.3d 710, 719 (3d Cir. 1997) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894, 904–05 (3d Cir. 1977)).

**III. DISCUSSION**

Comcast argued that NexStep failed to meet its Rule 26 disclosure requirements because NexStep had not previously identified a 30% royalty rate. (D.I. 318 at 1-2). Comcast also argued that NexStep should be precluded from offering Dr. Stepanian's testimony because NexStep represented in interrogatories that the damages theory would be a matter of expert testimony, not testimony from a fact witness. (*Id.* at 2). Finally, Comcast asserted that NexStep could not offer any of Mr. Reading's opinions regarding the hypothetical negotiation based on my September 16th order. (*Id.* (citing D.I. 196)).

NexStep responded that a business plan slide deck supporting a 30% royalty rate was included in NexStep's response to Comcast's Interrogatory No. 2. That interrogatory "related to the earliest making, using, selling, offering for sale, and disclosure" of the inventions at issue. (D.I. 321 at 3; *see* D.I. 326-1 Ex. 3 at 19). Part of the response to the interrogatory, dated November 27, 2020, was by citation to documents pursuant to Rule 33. One such cited document was the slide deck. The slide deck—along with the rest of Interrogatory No. 2—was then incorporated by reference in the response, dated December 23, 2020, to Interrogatory No. 9, requesting NexStep's damages documents. (D.I. 326-1, Ex. 6 at 9 ("NexStep incorporates by reference its response to Interrogatory No. 2 regarding the benefits of the technology of the Asserted Patents."). Furthermore, NexStep argued that Comcast had the opportunity to depose Dr. Stepanian regarding his licensing efforts and failed to ask about the business plan slide deck. (D.I. 326 at 4). Finally, NexStep asserted that my September 16th order only struck a portion of Mr. Reading's report. (*Id.* at 3-4).

The Federal Circuit recently considered Rule 26 disclosure of damages in *MCL Intell. Prop., LLC, v. Micron Tech., Inc.*, 10 F.4th 1358 (Fed. Cir. 2021). In that case, the district court struck portions of an expert report because the plaintiff, MCL, failed to disclose "what it believed was an appropriate royalty rate, that it believed the Hynix and Toshiba licenses reflect a 0.25% royalty rate, and the extrinsic evidence on which [the expert] relied in support of his belief." *Id.* at 1369.

The Federal Circuit found that the district court erred in its finding that Plaintiff had not produced the licenses but upheld the district court's decision as "well within its discretion" because, despite the production of the licenses, there was no way for defendant to know that the licenses reflected a .25% royalty rate. *Id.* at 1370. In short, the district court did not err in requiring the plaintiff's Rule 26(a) damages disclosure to include the royalty rate and the factual underpinnings of the rate. *Cf. Shanghai Weiyi Int'l Trade Co. v. Focus 2000 Corp*., 2017 WL 2840279, at *4 n.8 (S.D.N.Y. June 27, 2017) (requiring the plaintiff to "provide sufficient detail to explain its calculations for each category of damages claimed, to identify the documents or other evidentiary materials that provided the bases for the calculations, … and to tie each step of its calculation to the specific documents or other evidentiary materials that support it." (cleaned up)).

In the case at hand, NexStep proposed a new hypothetical negotiation theory on the last business day—a Friday—before trial. The previous hypothetical negotiation started at an arbitrary 50/50 split (which I excluded, D.I. 314) and was adjusted to a 40% royalty rate based on the expert's consideration of the *Georgia Pacific* factors. (*See* D.I. 216 Ex. V ¶ 379). Under NexStep's new theory, the hypothetical negotiation would be determined based on NexStep's plan for a 30% royalty based on factual testimony and the jury's consideration of an appropriate

adjustment based on expert testimony about the *Georgia Pacific* factors.[1] (D.I. 321). NexStep argued that each piece of the new damages theory was disclosed in some fashion—the slide deck[2] was incorporated by reference into the damages interrogatory and Comcast had the opportunity to depose Dr. Stepanian about his licensing efforts. (D.I. 326 at 2-4). Despite this piecemeal disclosure, I find that NexStep did not meet the disclosure requirements of Rule 26(a). NexStep failed to "to tie each step of its calculation to the specific documents or other evidentiary materials that support it." *Shanghai Weiyi Int'l Trade Co.*, 2017 WL 2840279, at *4 n.8 (cleaned up). It is not as though NexStep provided alternative damages theories, and the exclusion of one leaves another one to be litigated. NexStep simply has cobbled together a new theory using some parts of the old theory and some parts that were previously ignored by both sides.

The *Pennypack* factors counseled in favor of my decision to exclude NexStep's damages theory under Rule 37(c)(1). There was no bad faith on NexStep's part, but the inclusion of such evidence would have been prejudicial to Comcast and Comcast would have been unlikely to be able to cure that prejudice. Comcast had been preparing to respond to an expert's opinion on NexStep's royalty rate, not factual testimony. Allowing the new theory would have meant that Comcast could not have obtained targeted discovery around the factual basis of the theory. *See Agence France Presse v. Morel*, 293 F.R.D. 682, 686 (S.D.N.Y. 2013) (noting that courts have precluded plaintiffs' damages theories "where a party's failure to disclose its damages theory in a

---

[1] I have serious doubts that NexStep's proposal could provide sufficient evidence that would lead to a jury verdict that could be upheld. The 30% royalty rate—which essentially appears to be a number plucked out of thin air and written by Dr. Stepanian into a business plan—could represent what Dr. Stepanian wanted. What about what Comcast wanted, though? Without expert testimony, there is no basis for a starting point to which an expert can apply the *Georgia Pacific* factors. Without a starting point, talking about adjustments makes no sense.
[2] The relevant pages of the slide deck are at D.I. 326-1, Ex. 2 at 248 & 256 of 268.

timely manner prevented its adversary from pursuing discovery targeted at that theory."). It is irrelevant that Comcast could have asked Dr. Stepanian pertinent questions at his deposition. Comcast had no reason to ask questions about a theory that NexStep had not yet thought of or disclosed. Further, NexStep's new theory would require the jury to speculate about the ultimate royalty rate based on testimony from NexStep's witnesses, and Comcast should have had the opportunity to prepare and present its own witnesses in rebuttal. The orderly and efficient trial of the case had already been disrupted, as, instead of one trial with liability and damages, we tried the liability portion since there was no possibility of ameliorating the prejudice to Comcast the weekend before trial. Thus, I found that exclusion was appropriate under Rule 37(c)(1).

## IV. CONCLUSION

An appropriate order will issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NEXSTEP, INC.,

Plaintiff;

v.

COMCAST CABLE COMMUNICATIONS, LLC,

Defendant.

Civil Action No. 19-1031-RGA

ORDER

For the reasons stated in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that Comcast's motion to strike new damages theories (D.I. 317) is GRANTED.

Entered this 17th day of November, 2021.

_/s/ Richard G. Andrews___
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NEXSTEP, INC., a Delaware Corporation, :
:
Plaintiff, :
:
v. : Civil Action No. 19-1031-RGA-SRF
:
COMCAST CABLE COMMUNICATIONS, LLC. a Delaware Limited Liability Company :
:
Defendant. :

ORDER AFTER PRETRIAL CONFERENCE

Now, this 3rd day of September, 2021, after a pretrial conference, and upon consideration of the proposed pretrial order (D.I. 277) and the discussion at the pretrial conference, IT IS HEREBY ORDERED that:

1. The parties are to submit promptly a revised Pretrial Order (without the attachments) to incorporate the Court's rulings at the pretrial conference.

2. A jury trial will begin on Monday, September 20, 2021 at 9:30 a.m. with jury selection. The trial will only concern the so-called "Troubleshooting Patents." Each party should be prepared to present its case until 5:00 p.m. of each trial day, although the end of the trial day may, in the discretion of the Court, be earlier than 5:00 p.m.

3. The trial is timed. Each side is allowed **twelve (12) hours** for its opening statement and its direct and cross-examination of witnesses. Time during the trial day that does not neatly fit into one of those categories will be attributed to one side or the other as the Court thinks most appropriate. The amount of time allowed for closing argument will be decided during trial.

4. Trial counsel are to be present and ready to proceed at 9:00 a.m. each and every day of trial. **COUNSEL SHOULD UNDERSTAND THAT THERE MAY BE LONG LINES (PARTICULARLY WHEN A JURY IS BEING SELECTED) TO ENTER THE COURTHOUSE AND SHOULD PLAN ACCORDINGLY.** Issues that need to be addressed outside the presence of the jury will be taken up at 9 a.m. and at the end of the day. There will be an hour for lunch and a fifteen-minute break in both the morning and the afternoon. The Court does not generally want to use the lunch and break time to take up issues that need to be addressed outside the presence of the jury.

5. Unless otherwise ordered, Plaintiff is responsible for the preparation and revising of the jury instructions and verdict form that will be given to the jury. The Court requested that, by **8 p.m. on the second day of trial**, the parties submit their best effort at a joint set of final jury instructions and a verdict form. The Court expects to give the bulk of the jury instructions before the closing arguments are made.

6. The Court resolved the motions in limine on the record. In brief, the resolutions were as follows. Plaintiff's Motion in Limine #1 is **DISMISSED** as moot. Plaintiff's Motion in Limine #2 (in regard to file histories) is **GRANTED** with leave for Defendant to reraise, outside the presence of the jury, one or more of the issues depending on what actually happens at trial. Plaintiff's Motion in Limine #3 (in regard to Plaintiff's and Dr. Stepanian's finances, including litigation funding) is **GRANTED** as stated at the pretrial conference, with the understanding that Defendant can reraise, outside of the presence of the jury, one or more of the issues should Plaintiff open the door. Defendant's Motion in Limine #1 is **GRANTED** without opposition based on the understanding that neither side intends to raise the NexStep/Comcast 2007 interactions and that Defendant's evidence relating to no commercial offering or the like will

only postdate the earliest possible conception date, said by Plaintiff to be March 2010. Defendant's Motion in Limine #2 is **GRANTED** with the understanding that the greatest number Plaintiff is going to introduce is the sum of the "cost savings" and the actual truck roll and related expenses.[1] Defendant's Motion in Limine #3 is **GRANTED** without much opposition, as Plaintiff stated that its expert, Dr. Balakrishnan, is going to limit his conception and reduction to practice testimony to the technical issues concerning the provisional application. Plaintiff stated it will not seek any state of mind testimony in relation to secondary considerations (i.e., industry recognition) from Dr. Balakrishnan. The parties recognized and agreed that interactions between Dr. Stepanian and IBM were a relevant subject. The parties were advised to make contemporaneous objections if necessary to any improper questions concerning the subjects of MIL #3.

7. The parties consented to the Court's excusing of jurors in advance of trial along the lines discussed during the pretrial conference. The parties were requested to prepare a list of witnesses suitable for providing to the jury during voir dire.

8. Any trial logistics should be coordinated through the Courtroom Deputy.

_/s/ Richard G. Andrews___
United States District Judge

[1] I think the parties have an understanding of what I am saying here, based on the discussion at the pretrial conference. If I have misstated this in any significant way, the parties should bring it to my attention.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NEXSTEP, INC., a Delaware Corporation,<br><br>Plaintiff,<br>v. | ) | |
| | ) | C.A. No. 19-1031-RGA-SRF |
| COMCAST CABLE COMMUNICATIONS, LLC a Delaware Limited Liability Company<br><br>Defendant. | ) | |

**VERDICT FORM**

**INSTRUCTIONS**:

When answering the following questions and filling out this Verdict Form, please follow the directions provided throughout this Verdict Form. Your answer to each question must be unanimous. Some of the questions contain legal terms that are defined and explained in detail in the Jury Instructions. Please refer to the Jury Instructions if you are unsure about the meaning or usage of any legal term that appears in the questions below.

We, the jury, unanimously agree to the answers to the following questions and return them under the instructions of this court as our verdict in this case.

## Question 1: Literal Infringement

Did NexStep prove by a preponderance of the evidence that Comcast infringes the identified claim of the Asserted Patents by means of literal infringement?

**Answer "Yes" or "No" for each claim. "Yes" is in favor of NexStep and "No" is in favor of Comcast.**

| | |
|---|---|
| **'009 Patent** | Claim 1 NO<br>Claim 16 NO<br>Claim 22 NO |
| **'697 Patent** | Claim 1 No |

## Question 2: Infringement by Doctrine of Equivalents

Did NexStep prove by a preponderance of the evidence that Comcast infringes the identified claim of the Asserted Patents by means of infringement under the doctrine of equivalents?

**Answer "Yes" or "No" for each claim. "Yes" is in favor of NexStep and "No" is in favor of Comcast.**

| | |
|---|---|
| **'009 Patent** | Claim 1 YES<br>Claim 16 YES<br>Claim 22 YES |
| **'697 Patent** | Claim 1 NO |

**For any claims that you found infringed in Question 1 or 2, answer Question 3 for those claims only. If you did not find infringement for any claim in Question 1 or 2, then skip Question 3.**

**Question 3: Invalidity**

For each claim that you found infringed in Question 1 or 2 above, did Comcast prove by clear and convincing evidence that the claim is invalid?

**Answer "Yes" or "No" for each claim that you found infringed in Question 1 or 2 above. "Yes" is in favor of Comcast and "No" is in favor of NexStep.**

| | |
|---|---|
| **'009 Patent** | Claim 1 No<br>Claim 16 No<br>Claim 22 No |
| **'697 Patent** | Claim 1 ____ |

**Please proceed to the Final Page of the Verdict Form.**

**Final Page of the Jury Verdict**

You have now reached the end of the verdict form and should review it to ensure it accurately reflects your unanimous determinations. The foreperson should then sign and date the verdict form in the spaces below and notify the Court Security Officer that you have reached a verdict.

The foreperson should retain possession of the verdict form and bring it when the jury is brought back into the courtroom.

[redacted]
Signature

9/23/2021
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NEXSTEP, INC., | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. 19-1031-RGA |
| COMCAST CABLE COMMUNICATION, LLC, | : | |
| Defendant. | : | |

**TRIAL VERDICT**

The jury having deliberated on Plaintiff NexStep's Counts IX, X, and XVII, and having reached a verdict, judgment of infringement is entered for Plaintiff NexStep and against Defendant Comcast on Counts IX and X (the '009 patent) and judgment of non-infringement is entered for Defendant Comcast and against Plaintiff NexStep on Count XVII (the '697 patent).

IT IS SO ORDERED this 28th day of September 2021.

[signature]
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NEXSTEP, INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>COMCAST CABLE COMMUNICATIONS, LLC, a Delaware Limited Liability Company<br><br>Defendant. | ) | C.A. No. 19-1031-RGA-SRF |

**JOINT STATUS REPORT AND [PROPOSED] ORDER**

As directed by the Court (9/23/21 Trial Tr. at 942:20-943:4), Plaintiff NexStep, Inc. ("NexStep") and Defendant Comcast Cable Communications, LLC ("Comcast") submit this Joint Status Report and Proposed Order.

The Court presided over a trial on NexStep's Counts IX, X, and XVII from September 20 to September 23, 2021. On September 23, 2021, the jury returned a verdict in favor of NexStep on Counts IX and X (infringement of U.S. Patent No. 8,280,009 under the doctrine of equivalents) and in favor of Comcast on Count XVII (infringement of U.S. Patent No. 9,866,697). D.I. 331, D.I. 341.

**Post-Trial Motions**: The parties agree that any motions under Fed. R. Civ. P. 50(b) and Fed. R. Civ. P. 59 regarding trial on the '009 and '697 Patents are due October 26, 2021; i.e., 28 days from the Court's September 28, 2021 entry of the Trial Verdict (D.I. 341).

**Pending Objections**: On August 20, 2021, Judge Fallon issued a Report and Recommendation (the "R&R") on the parties' summary judgment and *Daubert* motions. D.I. 267. On August 27, 2021, the parties submitted objections to the R&R; on September 1, 2021, the parties submitted responses to the objections. D.I. 273, 276, 286, 287. During the September 3,

2021 final pretrial conference, the Court indicated that the trial beginning September 20, 2021 would be limited to the ’009 and ’697 Patents and that it would rule on Comcast’s objections to the R&R relating to the ’009 and ’697 Patents before the trial. 9/3/21 Hearing Tr. at 2:24-3:7, 71:12-74:11.

The following table lists the objections that remain pending before the Court along with citations to the relevant portions of the parties’ briefing and the R&R:

| Issue | Objecting Party | Objection to R&R | Response to Objection | Relevant Portion of R&R |
|---|---|---|---|---|
| No infringement of the ’802 Patent | NexStep | D.I. 276, § II at 1-5 | D.I. 287, § I at 1-6 | D.I. 267, § IV.D.2 at 19-26, IV.G at 30-33 |
| No infringement of the ’964 Patent[1] | NexStep | D.I. 276, § III at 5-9 | D.I. 287, § II.A-C at 6-9 | D.I. 267, § IV.C at 15-18 |
| No infringement of the ’132 and ’669 Patents | NexStep | D.I. 276, § IV at 10 | D.I. 287, § II.D at 9-10 | D.I. 267, § IV.D.2 at 19-26 |
| Damages Opinion for the ’802, ’132, and ’669 Patents | Comcast | D.I. 273, § II.C at 7-8 | D.I. 286, § II.B at 8-9 | D.I. 267, § V.C.2 at 50-53 |
| Validity of the ’964 Patent Over iControl and uControl | Comcast | D.I. 273, § IV at 9-10 | D.I. 286, § IV at 10 | D.I. 267, § IV.J at 40-45 |

The parties propose that, after the Court issues a ruling on the pending objections, the parties will meet and confer and provide the Court with a further Joint Report indicating the parties’ proposals for how the remainder of the case should be resolved.

**Requests for Fees and Costs**: The parties agree that, pursuant to Local Rule 54.1(a)(1), any motions for fees and costs under FRCP 54(d) or 35 U.S.C. § 285 are not due until 21 days

[1] **Comcast’s Position:** The Court sustained Comcast’s objection to the R&R with respect to the cost-split methodology of NexStep’s damages expert, Mr. Reading. D.I. 314 (item 1). NexStep’s damages theory pertaining to the ’964 Patent is therefore excluded for the same reason as NexStep’s damages theory pertaining to the ’009 and ’697 Patents. *See* D.I. 196, 198 § XIII.A, 267 § V.C.1, 273 § II.A, 313. **NexStep’s Position:** The Court has not yet ruled on NexStep’s objections to the R&R as to the ‘964 Patent. Therefore, it is premature to determine the impact, if any, of the Court’s prior rulings on damages for the ‘964 Patent.

after the time for appeal has expired for all claims asserted in this action or within 21 days after the issuance of the mandate of the appellate court.

**Comcast's Request for Judgment Pursuant to Fed. R. Civ. P. 54(b)**:

**Comcast's Position:** In view of the September 28, 2021 Trial Verdict (D.I. 341), the parties' pretrial submissions, and the Court's September 16, 2021 Memorandum Opinion and Order (D.I. 313, 314), NexStep's Counts IX, X, XVII, and XVIII, and NexStep's claim for damages in relation to those counts, have been resolved. Accordingly, there being no just reason for delay, Comcast proposes that the Court enter judgment pursuant to Fed. R. Civ. P. 54(b) (1) in favor of NexStep under the doctrine of equivalents on Counts IX and X, with no damages awarded; and (2) in favor of Comcast on Counts XVII and XVIII. Comcast's proposed judgment is attached hereto as Exhibit A.[2]

**NexStep's Position:** NexStep objects to Comcast's proposed judgment pursuant to FRCP 54(b). Entry of judgment in this action is premature given that NexStep has a number of pending claims that have not yet been resolved, and there is no reason to issue a judgment until those claims are adjudicated. It would be inefficient for the Court and the parties to address post-judgment issues or appeal piecemeal based on partial judgments. Indeed, a further trial will be necessary if the Court sustains one or more of NexStep's objections to the R&R.

[2] **Comcast's Position:** Comcast maintains and reserves its defenses to infringement under the doctrine of equivalents, including prosecution history estoppel, ensnarement of the prior art, and claim vitiation (D.I. 306 (Pretrial Order); D.I. 309 (Oral Order regarding Revised Pretrial Order); D.I. 323 (Comcast Proffer on Equitable Defenses); D.I. 327 (Comcast Rule 50(a) JMOL Motion)), and will brief those defenses in post-judgment motions pursuant to Fed. R. Civ. P. 50 and 59. **NexStep's Position:** As NexStep will set forth in opposition to any motions filed by Comcast, Comcast either does not have grounds to assert such equitable defenses or has waived its purported defenses to infringement under the doctrine of equivalents.

**Stipulations:** IT IS STIPULATED by the parties, subject to the approval of the Court, that:

1. The parties need not file oppositions to the other party's motions for judgment as a matter of law under FRCP 50(a) (D.I. 327, 329);
2. The parties will file any motions under Fed. R. Civ. P. 50(b) and Fed. R. Civ. P. 59 regarding trial on the '009 and '697 Patents on or before October 26, 2021;
3. Any motions or applications for fees or costs under FRCP 54(d) or 35 U.S.C. § 285 need not be filed until 21 days after the time for appeal has expired for all claims asserted in this action or within 21 days after the issuance of the mandate of the appellate court; and
4. Within 14 days after the Court issues a ruling on the pending objections to the R&R, the parties will meet and confer and file a further Joint Report indicating the parties' proposals for how the remainder of the case should be resolved.

POTTER ANDERSON & CORROON LLP

By: */s/ Philip A. Rovner*
Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
Hercules Plaza
P.O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Plaintiff*
*NexStep, Inc.*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

By: */s/ Jack B. Blumenfeld*
Jack B. Blumenfeld (#1014)
Brian P. Egan (#6227)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
began@morrisnichols.com

*Attorneys for Defendant*
*Comcast Cable Communications, LLC*

Dated: October 1, 2021

SO ORDERED this 6 day of October 2021, as to the 4 stipulations above.

/s/ Richard G. Andrews
United States District Court Judge

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| NEXSTEP, INC., a Delaware Corporation,<br><br>Plaintiff,<br>v.<br><br>COMCAST CABLE COMMUNICATIONS, LLC a Delaware Limited Liability Company,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No. 19-1031-RGA-SRF |

**[COMCAST'S PROPOSED] JUDGMENT PURSUANT TO FED. R. CIV. P. 54(B)**

The jury having deliberated on Plaintiff NexStep's Counts IX, X, XVII and having reached a verdict, Plaintiff NexStep's Count XVIII having been abandoned, and there being no just reason for delay, the Court hereby enters judgment as follows:

1. Judgment of infringement under the doctrine of equivalents is entered for Plaintiff NexStep and against Defendant Comcast on Counts IX and X (the '009 patent), but Plaintiff is awarded no damages on those Counts; and

2. Judgment of noninfringement is entered for Defendant Comcast and against Plaintiff NexStep on Counts XVII and XVIII (the '697 patent).

IT IS SO ORDERED this _________ day of ____________, 2021.

______________________________
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| NEXSTEP, INC.,<br><br>Plaintiff;<br><br>v.<br><br>COMCAST CABLE COMMUNICATIONS, LLC,<br><br>Defendant. | Civil Action No. 19-1031-RGA |

MEMORANDUM OPINION

Philip A. Rovner, Jonathan A. Choa, POTTER ANDERSON & CORROON, LLP, Wilmington, DE; Paul J. Andre, Lisa Kobialka, KRAMER LEVIN NAFTALIS & FRANKEL LLP, Menlo Park, CA; Jonathan S. Caplan, Aaron M. Frankel, Marcus A. Colucci, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, NY.

Attorneys for Plaintiff.

Jack B. Blumenfeld, Brian P. Egan, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, DE; William F. Lee, Sarah B. Petty, Kate Saxton, WILMER CUTLER PICKERING HALE AND DORR LLP, Boston, MA; Amy Kreiger Wigmore, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, DC; Mary (Mindy) V. Sooter, Nora Q.E. Passamaneck, WILMER CUTLER PICKERING HALE AND DORR LLP, Denver, CO.

Attorneys for Defendant.

September 17, 2021

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is the Magistrate Judge's Report and Recommendations (D.I. 267) regarding Plaintiff's and Defendant's Motions for Summary Judgment and to Exclude Expert Opinions (D.I. 196, D.I. 197). I have considered the parties' objections and responses, but only in relation to the issues raised concerning the two "trouble-shooting" patents. (D.I. 273, 286). For the reasons set forth below, I am adopting the Report and Recommendation of the Magistrate Judge regarding the patent eligibility of the Customer Troubleshooting Patents. Defendant's motion for summary judgment of invalidity of the Customer Troubleshooting patents under 35 U.S.C. § 101 is DENIED.

## I. BACKGROUND

Plaintiff NexStep filed this lawsuit against Defendant Comcast, alleging infringement of several patents relating to personal computing devices and services. The parties cross-moved for summary judgment and to exclude the opposing party's expert reports. (D.I. 196, 197). The Magistrate Judge issued a Report and Recommendation regarding the disposition of those motions. (D.I. 267).

## II. LEGAL STANDARD

### A. Standard of Review

A magistrate judge's report and recommendation on a dispositive motion is reviewed *de novo*. FED. R. CIV. P. 72(b)(3). A motion for summary judgment is a dispositive motion and thus I will consider Comcast's objection to the Magistrate Judge's Report and Recommendation regarding patent eligibility *de novo*.

**B. Patentability**

Section 101 of the Patent Act defines patent-eligible subject matter. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court recognizes three categories of subject matter that are not eligible for patents—laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). "[A] process is not unpatentable simply because it contains a law of nature or a mathematical algorithm," as "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) (cleaned up).

In *Alice*, the Supreme Court reaffirmed the framework laid out in *Mayo* "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." 573 U.S. at 217. First, the court must determine whether the claims are drawn to a patent-ineligible concept. *Id.* At this step, the court considers claims "in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) (internal citations omitted). If the answer is yes, the court must look to "the elements of the claim both individually and as an ordered combination" to see if there is an "inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217-18 (cleaned up).

"A claim that recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Id.* at 221 (cleaned up). Further, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Id.* at 222 (alteration in original) (quoting *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010)). Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* at 223.

## III. DISCUSSION

Defendant argues that the Customer Troubleshooting Patents are directed to the abstract concept of "obtaining customer support" and thus not patent eligible. (D.I. 273 at 1). Plaintiff asserts that the claims at issue are not abstract because they provide a "specific and concrete improvement" through the use of a "concierge device." (D.I. 214 at 2).

Defendant points to claim 1 of the 8,280,009 patent ("the '009 patent") as representative:

A method of initiating a support session for a consumer device using a concierge device, the method including:

> associating the concierge device with a selected consumer device;
>
> responsive to a single action performed by a user, the concierge device communicating with a home gateway, including
>
> > causing the home gateway to buffer consumer device identification information for the selected consumer device and determine a support center for a support session; and
> >
> > causing the home gateway to initiate the support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either
> >
> > > to bypass an automated attendant or interactive voice recognition system or
> > >
> > > to initiate an automated support protocol.

Although Defendant attempts to overgeneralize the patents as directed to the abstract idea of "a user initiating a support call, identifying their device, and receiving customer service," (D.I. 273 at 3), this is not a case where Plaintiff has patented "claims that abstractly cover results where it matters not by what process or machinery the result is accomplished." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (cleaned up). Patents that automate a manual process can be valid. *See, e.g.*, *id.* (automating animated lip synching). But patents that merely "add[] computer functionality to increase the speed or efficiency of the process do not confer patent eligibility on an otherwise abstract idea." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363 (Fed. Cir. 2015). A "specific asserted improvement in computer capabilities" is required. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016). The claims of the Customer Troubleshooting Patents do not merely add automation to increase the efficiency of customer service interactions. They describe a particular improvement over prior computing technologies in the form of a concierge device that links to consumer devices and forwards a malfunctioning device's identification information and diagnostic data to customer service. (D.I. 214 at 2-3).

The "written description's recitation of the advantages of the claimed invention" further supports a finding of validity. *CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1371 (Fed. Cir. 2020). The '009 patent describes the advantages of the claimed concierge device over conventional methods of obtaining customer support. (cols. 3:64-4:1, 14:50-15:2, 23:65-25:44). As the plaintiff summarizes, "the '009 Patent notes that the conventional consumer devices were not traditionally smart (i.e., they did not communicate data to other devices), were not managed in the home (through a device like the concierge device), and were not connected to a cloud based service." (D.I. 214 at 3).

The Customer Troubleshooting Patents, in short, articulate a specific technological improvement and the claimed invention is more than the mere automation of conventional customer support interactions. As such, the claims are patent eligible.

## IV. CONCLUSION

For the foregoing reasons, I find that the Customer Troubleshooting Patents are not, as a matter of law, directed to an abstract idea at *Alice* step one and thus deny defendant's motion for summary judgment on the issue of invalidity.

An appropriate order will issue.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NEXSTEP, INC,

Plaintiff,

v.

COMCAST CABLE COMMUNICATION, LLC,

Defendant.

Civil Action No. 19-1031-RGA

ORDER

For the reasons stated in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that

1. Comcast's objection (D.I. 273) to the Magistrate Judge's Report and Recommendations (D.I. 267) regarding Comcast's motion for summary judgment on the patent eligibility of the Customer Troubleshooting Patents under § 101 is **OVERRULED**.
2. Comcast's motion for summary judgment on the issue of patent eligibility of the Customer Troubleshooting Patents (D.I. 196 at 1) is **DENIED**.

Entered this 17th day of September, 2021.

[signature]
United States District Judge

US008280009B2

(12) **United States Patent**
**Stepanian**

(10) **Patent No.: US 8,280,009 B2**
(45) **Date of Patent: Oct. 2, 2012**

(54) **CONSUMER ELECTRONIC REGISTRATION, CONTROL AND SUPPORT CONCIERGE DEVICE AND METHOD**

(75) Inventor: **Robert Stepanian**, San Jose, CA (US)

(73) Assignee: **NexStep, Inc.**, San Jose, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **13/345,447**

(22) Filed: **Jan. 6, 2012**

(65) **Prior Publication Data**

US 2012/0108230 A1 May 3, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 13/344,529, filed on Jan. 5, 2012, which is a continuation-in-part of application No. 13/047,445, filed on Mar. 14, 2011, which is a continuation of application No. 12/758,241, filed on Apr. 12, 2010, now Pat. No. 7,907,710, which is a continuation of application No. 12/572,677, filed on Oct. 2, 2009, now Pat. No. 7,697,669, which is a continuation of application No. 12/420,723, filed on Apr. 8, 2009, now Pat. No. 7,609,824, which is a continuation of application No. 12/210,782, filed on Sep. 15, 2008, now Pat. No. 7,542,753, which is a continuation of application No. 11/465,749, filed on Aug. 18, 2006, now Pat. No. 7,444,130, which is a continuation-in-part of application No. 11/350,980, filed on Feb. 8, 2006, now Pat. No. 7,389,103, said application No. 13/344,529 is a continuation of application No. PCT/US2012/020363, filed on Jan. 5, 2012.

(60) Provisional application No. 61/561,732, filed on Nov. 18, 2011, provisional application No. 61/530,370, filed on Sep. 1, 2011, provisional application No. 61/430,099, filed on Jan. 5, 2011, provisional application No. 61/430,103, filed on Jan. 5, 2011, provisional application No. 60/709,666, filed on Aug. 19, 2005.

(51) **Int. Cl.**
*H04M 1/24* (2006.01)

(52) **U.S. Cl.** .................................. **379/1.01**; 348/14.04

(58) **Field of Classification Search** ................ 379/1.01, 379/14.01, 10.01, 2, 9.02, 9.03, 27.01, 15.05, 379/93.01, 93.02, 93.06, 93.23; 348/14.04
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,097,441 A * 8/2000 Allport ........................ 348/552
(Continued)

OTHER PUBLICATIONS

Prosyst.com, Technical White Paper—'The world's smallest OSGI solution', pp. 1-3, Sep. 2010, www.prosyst.com.

(Continued)

*Primary Examiner* — Olisa Anwah
(74) *Attorney, Agent, or Firm* — Haynes Beffel & Wolfeld LLP; Ernest J. Beffel, Jr.

(57) **ABSTRACT**

We disclose a concierge device that can be configured to register, control and support a consumer device. It can alternatively or redundantly connect to a home management bridge and/or cloud-based management servers. It can accept menus that allow a single concierge device to provide a wide range of functions for various consumer devices. The concierge device allows the user in a single action to initiate a support session, automatically identifying the consumer device. The concierge device can be configured for voice or video support calls. The concierge device in conjunction with a home management bridge or gateway can manage on boarding of components of an automated home, such as switches and lamps. Implementations of the concierge device that include a display can show supplemental information, such as advertising, optionally in coordination with media being played on a consumer device coupled in communication with the concierge device.

**29 Claims, 12 Drawing Sheets**




Joint Trial Exhibit
**JTX-2**
Case No. 19-cv-01031-RGA

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 7,467,186 | B2 | 12/2008 | Attar et al. | |
| 7,526,539 | B1 | 4/2009 | Hsu | |
| 2002/0095269 | A1 | 7/2002 | Natalini et al. | |
| 2003/0100293 | A1 | 5/2003 | Hunt | |
| 2003/0210126 | A1* | 11/2003 | Kanazawa | 340/5.5 |
| 2004/0249925 | A1* | 12/2004 | Jeon et al. | 709/223 |
| 2006/0208889 | A1* | 9/2006 | Shaffer et al. | 340/572.1 |
| 2008/0263621 | A1 | 10/2008 | Austerlitz et al. | |
| 2009/0009586 | A1* | 1/2009 | Cassanova | 348/14.04 |
| 2009/0083000 | A1 | 3/2009 | Sherman et al. | |
| 2010/0262467 | A1 | 10/2010 | Barnhill, Jr. et al. | |
| 2011/0298581 | A1* | 12/2011 | Hsu | 340/4.3 |

OTHER PUBLICATIONS

Santo, Brian, 'The Evolution of Residential Gateways', pp. 1-7, May 31, 2011, Communications, Engineering and Design (CED) Magazine.

Prosyst.com, Smart Home, 'Best of Breed Home Gateway Middleware—and beyond', pp. 1-2, accessed May 8, 2012 www.prosyst.com/index.php/de/html/content/38/Smart-Home-Products/.

Prosyst.com, Smart Home, 'We help you creat your Solution', Jun. 22, 2011, pp. 1-2, www.prosyst.com.

Motorola, 'Motorola's 4home Software Solutions', pp. 1-5, Feb. 11, 2011, www.motorola.com/Video-Solutions/US-EN/Products-and-Services/Software/4Home-Software-Solutions/4HOME-CONTROL-HOME-MANAGEMENT-US-EN.

Ionics, Ionics Stratus Plug, Feb. 9, 2010, pp. 1-3, www.ionicsplug.com/stratus.html.

International Search Report and Written Opinion, PCT application No. PCT/US2012020363, mailed Jun. 29, 2012.

* cited by examiner


Service Delivery Platform
In-home bridge
Consumer Electronics Ecosystem
Cloud Remote™

FIG. 1

FIG. 2






FIG. 3




FIG. 4




FIG. 5

FIG. 6

FIG. 7

FIG. 8

FIG. 9


Associate Con w CD
Single action
Message to Gateway
Buffer CD info
Initiate Call
Send Info for Call
Automated Trouble Shooting
Concierge Device (Con)
911
In-home bridge
Support
Transfer via Con
Gateway to CD
CD info entered
Consumer Devices (CD)
TV
Light
Refrigerator/ Washer
SW




FIG. 10A




FIG. 10B




FIG. 11A




FIG. 11B




FIG. 12A




FIG. 12B




FIG. 13A




FIG. 13B




FIG. 14A




FIG. 14B



09:44 AM
75%
NeXStep
Call duration: 12:48
Cloud Connect Concierge SM
CLOSE VIDEO CALL


FIG. 15

FIG. 16


Device 1
Device 2
Device N
Remote 1
Remote 2
Remote N
Person 1
Person 2
Person N
Cloud
Home Management, Support and Analytics in the Cloud
AP/ LAN/ cell
Router
In-home bridge
Concierge Device
Warehouse
1
2
N
Device Category
1
2
N
...
Household 1
Household 2
Household N
CE Company
1
2
N
Retail Store
1
2
N
Manufacturer
1
2
N
Fab Plant
1
2
N
Industry
1
2
N
Contract Manfc
1
2
N

FIG. 17


Concierge
Device (Con)
Initiate Call
Send Info
for Call
Guided
Trouble
Shooting
Human
Support
1711
In-home
bridge
Support
Consumer
Devices (CD)
TV
Light
Refrigerator/
Washer
SW

FIG. 18


Documentation
Pre-Support Checklist
General items
Diagnosed items
Self-help guidance
Backtracking link
Alternative directions

# CONSUMER ELECTRONIC REGISTRATION, CONTROL AND SUPPORT CONCIERGE DEVICE AND METHOD

## RELATED APPLICATIONS

This application is related to and claims the benefit of the following provisional applications: U.S. Prov. App. No. 61/561,732 filed 18 Nov. 2011, entitled "Consumer Electronic Registration, Control and Support Concierge Device and Method" (NEXS 1010-2); U.S. Prov. App. No. 61/530,370 filed 1 Sep. 2011, entitled "Consumer Electronic Registration, Control and Support Concierge Device and Method" (NEXS 1010-1); U.S. Prov. App. No. 61/430,099 filed 5 Jan. 2011, entitled "Consumer Electronic Support Concierge Device and Method" (NEXS 1007-1); and U.S. Prov. App. No. 61/430,103 filed 5 Jan. 2011, entitled "Advertising on a Tethered Digital Butler Consumer Electronic Device and Method" (NEXS 1008-1). These provisional applications are hereby incorporated by reference.

This application is further related to and claims priority as a Continuation-in-Part of U.S. App. No. 13/047,445 filed 14 Mar. 2011, entitled "Tethered Digital Butler Consumer Electronic Remote Control Device and Method" (NEXS 1000-15); which is a Continuation of U.S. application Ser. No. 12/758,241 filed on 12 Apr. 2010 entitled "Tethered Digital Butler Consumer Electronic Remote Control Device And Method", now U.S. Pat. No. 7,907,710 (NEXS 1000-13); which is in turn a Continuation of U.S. application Ser. No. 12/572,677 filed on 2 Oct. 2009, entitled "Tethered Digital Butler Consumer Electronic Remote Control Device And Method" (NEXS 1000-11), now U.S. Pat. No. 7,697,669; which is in turn a Continuation of U.S. application Ser. No. 12/420,723 filed on 8 Apr. 2009, entitled "Tethered Digital Butler Consumer Electronic Device And Method" (NEXS 1000-9), now U.S. Pat. No. 7,609,824; which is in turn a Continuation of U.S. application Ser. No. 12/210,782 filed on 15 Sep. 2008, entitled "Tethered Digital Butler Consumer Electronic Device And Method" (NEXS 1000-8), now U.S. Pat. No. 7,542,753; which is in turn a Continuation of U.S. application Ser. No. 11/465,749 filed on 18 Aug. 2006, entitled "Tethered Digital Butler Consumer Electronic Device And Method" (NEXS 1000-3), now U.S. Pat. No. 7,444,130; which is in turn a Continuation-in-Part U.S. application Ser. No. 11/350,980 filed on 8 Feb. 2006, entitled "Tethered Digital Butler Consumer Electronic Device And Method" (NEXS 1000-2), now U.S. Pat. No. 7,389,103; which claims the benefit under 35 USC **119**(*e*) of U.S. Prov. App. No. 60/709,666 filed on 19 Aug. 2005, entitled "Tethered Digital Butler Consumer Electronic Device And Method" (NEXS 1000-1). The applications in this priority chain are hereby incorporated by reference.

This application is further related to and claims priority as Continuation of PCT App. No. PCT/US12/20363 (NEXS 1010-3) filed in English in the U.S. receiving office on Jan. 5, 2012, which claims priority to the provisional applications listed in paragraph 0001. The PCT application is hereby incorporated by reference.

This application is further related to and claims priority as a Continuation of U.S. App. No. 13/344,529 entitled "Consumer Electronic Registration, Control and Support Concierge Device and Method" (NEXS 1010-5) filed on Jan. 5, 2012, which claims priority to the provisional applications listed in paragraph 0001 and the non-provisional application and chain of priority listed in paragraph 0002. The non-provisional U.S. application filed on Jan. 5, 2012 is hereby incorporated by reference.



## BACKGROUND

The field of this disclosure for selection of an Art Unit to examine this application includes systems, processes and devices for remote control, in communication with consumer devices such as lighting, entertainment appliances, heating, ventilation, air conditioning, laundry, and kitchen appliances. The systems, processes and devices communicate with cloud-based resources via a telephone line (e.g., DSL) or other two-way electromagnetic or optical transmission. One feature of some implementations is enabling conversation; another is transmission of speech or the like.

The home of the future has captured our imagination for decades and probably for centuries. For instance, Disneyland hosted a home of the future from 1957 to 1967, as a joint project of Monsanto, MIT and Disney. In that era, resources were plentiful and computers were expensive corporate devices.

Recently, IBM has published "The IBM vision of a smarter home enabled by cloud technology" (September 2010), which offers a much different vision of the home of the future, one supported by evolving cloud-based analytics. This white paper, which describes IBM's vision of a connected home and of the "Internet of things," accompanied one or more of the provisional applications and is hereby incorporated by reference.

The evolving vision of the home of the future creates an ongoing opportunity for innovation, for communication devices and home accessories that will improve our lives, control and support the interconnection of our consumer devices with services outside our homes. For some purposes, one can distinguish between consumer appliances (CA) and consumer electronics (CE), distinguishing between appliances such as dishwashers, washing machines, heaters, air conditioners, lighting and the like, versus CE television, entertainment and media center devices. New methods and devices may enhance the service experience of consumers, particularly users of leading consumer electrical and electronic devices.

## SUMMARY

We disclose a concierge device that can be configured to register, control and support a consumer device. In various implementations, it alternatively or redundantly connects to a home management bridge and/or to cloud-based management servers. It can dynamically accept menus that allow a single concierge device to provide a wide range of functions customized to particular consumer devices in a home. The concierge device, when associated with a consumer device, allows the user in a single action to initiate a support call, automatically identify the consumer device, and optionally either bypass automated attendant choice trees or invoke an interactive voice response protocol or invoke a visual interaction protocol that takes into account information about the consumer device in the home. The concierge device can be configured for voice or video support calls. The concierge device in conjunction with a home management bridge or gateway can manage on boarding of components of an automated home, including home control devices and controllable devices such as switches and lamps that are connected wirelessly. Implementations of the concierge device that include a display can show supplemental information, such as advertising, optionally in coordination with media being played on a consumer device coupled in communication with the con-

cierge device. Particular aspects of the present invention are described in the claims, specification and drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a high level conceptual diagram that includes a concierge device, a variety of consumer devices in a home, a home management bridge and a cloud-based system delivery platform connected by a network.

FIG. **2** depicts a concierge device in a variety of form factors.

FIG. **3** depicts telephone and support service as functions that might be selected using a concierge device.

FIGS. **4-8** show configurations of concierge device and home management bridge, either integrated or standalone.

FIG. **4** depicts a concierge device built into a refrigerator or other major appliance.

FIGS. **5** and **6** depict scenarios using a concierge device without a display.

FIG. **7** depicts a concierge device that includes a display, in use with a home management bridge or alternatively connecting directly to cloud-based management servers.

FIG. **8** depicts a concierge device with an integrated bridge and touch screen display.

FIG. **9** is a flowchart of methods consistent with this disclosure.

FIGS. **10-15** are example screens for a concierge device that includes a display. In FIG. **10**A, users are presented with choices, including invoking the concierge service described. FIG. **10**B depicts selection of TV channels from live TV.

FIGS. **11**A-B depict a video phone call.

FIG. **12**A shows an example of user authentication using biometric data. FIG. **12**B shows an example of an alert that a new home control device, a switch is available for on-boarding.

FIG. **13**A is an example GUI that used to select among device types to which a user can connect the new switch. FIG. **13**B is an example GUI that presents devices that a user can connect to the new switch.

FIG. **14**A is an example of GUI from which a user can select a device and cause initiation of a support session. FIG. **14**B is an example of a suggested fix presented to a user in a support session prior to connection with a human agent.

FIG. **15** depicts a video call with a human support agent.

FIG. **16** depicts information that may be useful for the home management bridge or the concierge device to communicate to the support center.

FIG. **17** is a high level diagram of adding to support an automated interaction for the user.

FIG. **18** represents a sample of information that may be supplied as part of an automated interaction.

## DETAILED DESCRIPTION

The following detailed description is made with reference to the figures. Preferred embodiments are described to illustrate the technology disclosed, not to limit its scope, which is defined by the claims. Those of ordinary skill in the art will recognize a variety of equivalent variations on the description that follows.

### Concierge Device Range of Capabilities

We disclose a concierge device that can be configured to register, control and/or support a consumer appliance or electronics device (collectively, "consumer devices"). It is particularly innovative to register, control and/or support consumer appliance devices, as appliances have not traditionally been smart, have not been managed in the home, and have not been connected to the cloud. The concierge device, in various implementations, may connect to a home management bridge or to cloud-based management servers. In other implementations, it uses one as a back-up to the other.

In some implementations, the concierge device accepts consumer device control menus from either a home management bridge or cloud-based servers that are appropriate to a registered consumer device. These dynamically accepted menus allow a single concierge device to provide a wide range of functions customized to particular consumer devices in a home. Optional authentication security can be implemented to satisfy security conscious home owners.

The concierge device also can, in some implementations, display supplemental information to the user, such as targeted or interactive advertising.

While this disclosure refers to a home, the technology disclosed can also be applied in a business, such as a small business. Where reference is made to "in-home" technology, this translates to "on premises" for a business.

### Easy On Boarding Devices to Home Automation

Easy on boarding of a new device in the home can be part of a registration process. This registration process can be made secure by authentication. Any of the concierge device, home management bridge, or cloud-based service can recognize the presence of the new device in the home network. The new device can communicate via a wireless or wired protocol as part of the home network. Optionally, the new device could communicate with the concierge device and the concierge device could relay registration communications between the new device and the bridge, the cloud based service or both.

The concierge device can participate in registration and, optionally, authentication of the new device being on boarded. A concierge device with a speaker or other audio output can receive voice prompts for confirming registration of the new device and can accept single user actions in response to the prompts, such as button presses, menu selections or verbal responses to the verbal prompts. Alternatively, a concierge device with a display can receive visual prompts for confirming registration of the new device and can accept single user actions in response to the prompts, such as button presses, menu selections or verbal responses to the visual prompts.

### Authenticated On Boarding

Easy on boarding can be made secure by an authentication protocol. One authentication protocol would rely on voice prints. The concierge device preferably would relay spoken words to the in home bridge or the cloud-based service and rely on the other device to use voice printing or another biometric analysis of the voice to authorize on boarding the new device. Alternatively, the concierge device could, at a higher cost, analyze spoke words using resources built into the concierge device and perform local authentication from spoken words. Another authentication protocol would involve reading a user's fingerprint, using a fingerprint reader. The concierge device preferably would relay raw fingerprint data to the bridge or cloud based service. Alternatively, again at an increased device cost, the concierge device could locally process the fingerprint data for authentication. Other challenge and response authentication protocols could easily be implemented using the concierge device in communication with the bridge or cloud based service or using local resources of the concierge device. Possession of the concierge device combined with an additional authentication would provide two-factor authentication.

At the simplest authentication level, the concierge device could be paired with the bridge or cloud based service and a single press of a button, shake of the device (sensed by an

accelerometer, compass, gyroscope or other motion sensitive electronic, MEMS or other device) or spoken response to complete the on boarding. In this simple case, possession of the concierge device and a single user action would be enough to satisfy one factor authentication of the new device. Requiring such authentication inhibits new devices from registering themselves and becoming viruses or Trojans on a home network.

In combination with either one or two factor authentication, the bridge or cloud based service could describe the device being on boarded or added to the home network and have the user confirm that the device being added matches the description. The description could be either audio or visual. This is an additional safeguard against mistaken or malicious registration of new devices onto the network.

Among the functions that can be implemented, the concierge device may rely on either the bridge or cloud-based services to transcode media from other sources to a concierge-standard format, which reduces the complexity and cost of the concierge device. Optionally, the concierge device, when associated with a consumer device, allows the user in a single action to initiate a support call without requiring the user to look up or recall the support phone number, automatically identifying at least the consumer device and optionally the user or household. Using the automatically provided information, the concierge device, optionally, could further allow a user to bypass automated attendant choice trees, to invoke an interactive voice response protocol that takes into account information about the consumer device in the home, to invoke a session using a display of the concierge device (when it includes a display), and/or to initiate a coordinated browser-based session involving a home computer. Examples of consumer devices include televisions, stereos, A/V receivers, satellite and cable receivers, DVD players, media servers, telephone systems, dishwashers, ovens, refrigerators, other kitchen appliances, washing machines, dryers, spas, HVAC, pool equipment, lighting, security sensors, medical devices, vehicles, utilities, personal computers, and network attached appliances.

A concierge device, in some implementations, alternatively connects through redundant devices, which reduces the chance of consumer frustration with a smart home that needs to be rebooted or that has inaccessible functions, due to management device malfunctions or inaccessibility. By redundant devices, we mean a home management bridge and one or more cloud-based management servers. Examples of home management bridges include those under development (at the time of this application) by Ionics EMS and 4Home. These devices are sometimes referred to as gateways. Being cloud-based, the management servers are accessed via the Internet or another network such as a telephone, cellular, cable or fiber optic connection to a home network. By server, we mean a computing device that can be a workstation, server, server cluster, server farm or the like. The server may be an array of servers connected to a load-balancing device.

The concierge device is wirelessly coupled to the home management bridge and/or the cloud-based management servers. In some environments, it is coupled through an access point, which is connected in turn to both the Internet and an in-home network. Many other configurations are possible, consistent with this disclosure, that also afford alternative connections from the concierge device to the home management bridge and/or the cloud-based management servers.

The concierge device's first choice between alternative connections can be the in-home device, as latency on a local network should be less than latency in connecting to a cloud-based service. The in-home device can store information that the user does not want to have leave the home. The in-home device can obtain information as necessary from the cloud-based servers, connecting with them via the Internet or another network. For cloud-based services, a telecom or cable company could respond to IP messages from a concierge device without the messages ever leaving the company's network, without a hand-off from the originating network to a network owned by a second entity. Both connection via the network and a connection hosted by or affiliated with a last mile service provider are part of what we refer to as cloud-based.

Alternatively, the concierge device may first attempt to connect to the cloud-based service and then fall back to an in-home bridge as an alternative. The fall back may result from unavailability of or excessive latency in connecting to the cloud-based home management server.

The home management bridge, in one implementation, mediates registration and deployment of menus to the concierge device. The concierge device connects to the home management bridge to register an associated consumer device. The operation of the home management bridge is transparent to the concierge device. The home management bridge may already have cached or permanently installed information for the specific associated consumer device, for instance cached from the cloud. Or, it may have manufacturer connection information that allows the bridge to resolve a particular model number of the associated consumer device, register that type of device, retrieve control menus and retrieve other information. Alternatively, the bridge may rely on information initially stored by the associated consumer device. This information may be forwarded by the concierge device or obtained by the bridge directly.

In another implementation, the concierge device and associated consumer device begins by interacting with the cloud-based home management server and the role of the home management bridge is to back up information solicited by the concierge device or associated consumer device from the cloud-based home management server.

Virtual Apps—Downloaded Menus

Following registration either with, through or bypassing any in-home bridge, the concierge device receives and optionally stores menus and/or control codes for the registered consumer devices. Periodically, the concierge device may check for updated menus and/or control codes. It can check with the home management bridge or with cloud-based servers. The home management bridge may periodically refresh a cache of menus and control codes for devices registered by the concierge devices and other in-home devices that it can detect.

A concierge device can obtain from a home management bridge menu, control code and other information, even if the concierge device was not involved in registration of in-home consumer devices. For instance, a replacement or second concierge device can be reloaded by the home management bridge with information previously used by a first concierge device. Or, a first concierge device can be introduced into a home in which the bridge already had discovered consumer devices and downloaded appropriate information from cloud-based management servers.

One use of the concierge device is as a remote control. Another is to control display of information buffered by the home management bridge on a television or other available on the same network as the bridge. A further use of the concierge device is to provide support for the consumer device.

Concierge Device for One Action Support

Four levels of support automation are described. At the basic level, the concierge device provides telephone support,

following automatic identification of user/household and/or consumer device to the support center by either the concierge device or a home management bridge.

At the next level, the concierge device includes a camera that provides still or video information to a support center during the support call. Optionally, a personal computer, television or other device with a display can receive visual information to assist the user during the support call. The visual information may be an image of the support person, pictures illustrating aspects of the consumer device, textual instructions or a combination thereof.

Automated troubleshooting can be pursued before a user is connected with a human support agent, using either a visual based interaction or an interactive voice system. The automated trouble shooting may require mandatory responses from the user, or it may be optional: opt in by asking a user if they want to try automated trouble shooting; opt out by starting the automated protocol and giving the user the option to proceed to human support without further automated support; or opt in combined with opt out. Alternatively, the automated troubleshooting may happen while waiting in queue to be connected to a human support agent. The troubleshooting may involve a traditional interactive voice response system, a browser-based visual troubleshooting protocol, or an advanced interactive system based on the Watson artificial intelligence technology demonstrated by IBM. Trying the automated trouble shooting may be optional during the queue period. A support system may be configured to allow a user to postpone human support, if automated support seems to be working, either by using the support interface or by telling the human support agent to come back later. A user whose turn to talk to a human support agent comes up in queue while pursuing automated trouble shooting may be kept at the top of the queue, so that they receive assistance promptly after completing automated trouble shooting, to improve user reception of the automated trouble shooting option.

Instead of performing automated trouble shooting with a display, an automated voice response (AVR) system could be used to collect information and lead the user through basic troubleshooting steps. Much of what can be done with a display could, alternatively, be done using voice interactions with an automated system.

At the third level, the concierge device causes diagnostic status information to be forwarded from the consumer device to the support center. This level optionally includes the camera of the previous level. Alternatively, configuration of the concierge device with the consumer device and the home management bridge may enable the consumer device periodically or occasionally to provide status and/or diagnostic information to a support center, without the need for the user to initiate a support call. Then, when the user initiates a support call, the support center may already have the information needed to identify problems with the consumer device, not necessarily limited to the problem that leads to the support call. Optionally, automated troubleshooting, described above, also can be pursued before a user is connected with a human support agent. The availability of this feature and option, of course, depends on the status of the consumer device. The device may be dead, diagnostically accessible, or working and diagnostically accessible. By "dead," we mean that there is no electronic communication with the consumer device, either directly or indirectly. By diagnostically accessible, we mean that the concierge device or a bridge working with the concierge device is able to communicate with the consumer device, at least for diagnostic purposes. This may involve a special mode, such as the "safe boot mode" on a personal computer. By working and diagnostically accessible, we mean that the consumer device is largely functional, but requires support. The diagnostic information forwarded may include one or more status codes. It may include software/firmware version information and component inspection results.

At the fourth level, the concierge device or a bridge working with the concierge device relays communications between the consumer device and the support center in a diagnostic session. This level optionally includes features of the prior levels and nicely builds upon them. The diagnostic session may involve the support center triggering a self-diagnostic routine or selective retrieval of information helpful to diagnostics, such as a history of status/error codes or operating status, configuration information, or a dump created when the consumer device malfunctioned. It also may involve sending information from the support center to the consumer device, such as new firmware, revised configuration data or reset commands. The stream of communication or diagnostic session status information optionally may be displayed or summarized for the user to monitor on a personal computer, television or other device with the display. Even before a human support agent becomes involved, an automated support protocol could, optionally, be used to engage the user in the communications between the consumer device and the support center diagnostics. A system could automate such routine tasks as obtaining the user's permission to engage in interactive diagnostics, obtaining user visual observations of the device, identifying procedures that the user already has followed, obtaining user contact and/or registration information. A wide range of information collection and diagnostics could be automated, not limited to these examples.

The simplest concierge device lacks a display or includes a minimal monochrome display. It need only have a microphone, speaker, one to a few function buttons or input sensors, a memory and at least one wireless transceiver. The simple concierge device could rely on a bridge to transcode voice communications and, optionally, pictures. It also relies on the bridge to maintain communications with the support center during the support call. In operation, the simple concierge device is associated with the consumer device and then the user initiates the support call for the associated consumer device with a single action. For instance, the user could press a support button or utter a command that the concierge device or the bridge would interpret. Then, the user proceeds with the support call.

The bridge can communicate directly with the Internet or a private network or may be attached through a router, bridge or other network device. The bridge may include router and/or modem functionality, as is found among cable and DSL modems. Preferably, malfunctioning of the home management bridge will not interfere with connection to the Internet or a private network.

The concierge device, even in its simplest configuration, can support multiple devices and/or multiple brands of devices. Given the functionality and alternative protocols disclosed, almost any configuration of concierge device could be used with a TV from one manufacturer, a DVR from another, and a washing machine from a third manufacturer. The one exception might be a crippled configuration shipped with a device and purposely limited to a single device or single manufacturer.

Associating (Linking) the Concierge Device and Consumer Devices

There are a variety of options for associating the simple concierge device with a particular consumer device for support calls. One association model is the familiar Bluetooth pairing model, in which the consumer appliance or electronic

device and simple concierge device are placed in pairing mode and allowed to pair. Information is transferred from the consumer device to the concierge device during or following the pairing. Another option is for the in home bridge to discover consumer devices and for the concierge device to pair with the bridge, without having to pair with any of the consumer devices. In some implementations, a consumer may find it more convenient to pair just once with a bridge than to pair repeatedly with a wide variety of devices. Pairing with just one bridge would save the consumer from recognizing slight variations on pairing protocols that would inevitably follow from pairing with devices of all sizes, shapes and origins.

Information provided by the consumer device to the concierge device or bridge may be as simple as a serial number or it may include further information that identifies the device manufacturer and model number. Alternative identifiers may be globally unique user identifiers (GUIDs) or identifiers that are unique within a realm, such as unique to a manufacturer or a trade group. Optionally, it may identify the device category and/or family so that appropriate support staff can be reached, even if the precise model number is not in a support database. The consumer device may have embedded a unique resource identifier (URI), such as a universal resource locator (URL), with or without additional parameters, that identifies or allows lookup of the support center, as an alternative to identifying the manufacturer and model. Pre-installation inventory of control and/or controllable device components can be accomplished using camera or bar code reader to read a bar code or similar label. Or, an RFID reader can be used to read a tag. Optionally, a digital floor plan could be used to ease the burden of commissioning or on boarding of devices.

Another association model uses the home management bridge to associate the concierge device with the particular consumer device that needs support. The home management bridge can be used to register one or more consumer devices with at least one support center. The bridge and the simple concierge device are paired or at least coupled in communication. The user interacts with the bridge to select the particular consumer device that needs service. Then, a single action at the concierge device or bridge initiates the support call. The concierge device participates in a support session at one of the support levels described above.

A third association model programs the concierge device with the consumer device information without requiring direct communication with the particular consumer device by either the home management bridge or the concierge device. For instance, the concierge device can be preprogrammed at the factory. Or, it can be programmed using the bridge or any personal computer, television or other device with the display. For instance, it could be coupled using a wired USB connection or a wireless Bluetooth connection to a personal computer, television or DVD player that runs a small application which loads the consumer device information into the concierge device.

Of course, other association models could be used and remain consistent with the teachings of this disclosure.

Example of Support Session Implementation

At the outset of the support session, the bridge sends the support center at least consumer device information and, preferably, user identification information. The user identification information can be as simple as a globally unique identifier (GUID) of the concierge device, home management bridge or consumer. For the concierge device and home management bridge, a MAC address may serve as a GUID. This GUID may be registered with the support center before the support call or registration information may be collected during the support call. Preferably, the user's name would be associated with the GUID. The user identification information may be household related, individual related, or both. Either a household or individual can have more than one concierge device. Information about the consumer device or a plurality of consumer devices may be implied in the GUID. Optionally, the GUID, the particular consumer device identification or a combination of the GUID and consumer device identification can be associated with a premium support level, such as contract support or extended support. Premium support association entitles the support call to special handling, such as a shorter wait queue or different support personnel.



A display equipped concierge device adds a display to the simple concierge device. The display equipped concierge device can have navigation controls or a touch sensitive screen. It can have a keyboard implemented with buttons or on-screen. The display equipped concierge device can interact with the bridge and the support center without involvement of a personal computer television. The display equipped concierge device can be used to register the consumer devices with the support center or to enter information that will be useful at the outset of the support call. It also can be used to answer diagnostic questions at the beginning of the support session, before a support person comes on the phone. The diagnostic questions may depend on the consumer device information supplied to the support center.

The display equipped concierge device can rely on the home management bridge for services including transcoding voice communications and, optionally, pictures and maintaining communications with the support center.

Another hardware configuration includes the concierge device with integrated bridge. For instance, the concierge device may be a smart phone that runs a concierge application. If the consumer already owns an Android phone, an iPhone, an iPad or other portable device that includes wireless communication, a concierge application may be a low cost implementation of the concierge device. The service levels and association models described above still apply to concierge device with integrated bridge.

In yet another configuration, the concierge device is built into the consumer device, in the sense that the speaker and microphone are built into a major appliance, apropos to Internet surfing on a refrigerator door. In this configuration, the bridge could be built into the major appliance (integrated bridge) or it could be a separate device coupled wirelessly or by powerline connection to the major appliance.

The home management bridge, again, optionally transcodes voice communications and, as a further option, pictures. The bridge establishes and maintains communications with the support center during the support call. It includes in the data stream with the support center identification information and, optionally, diagnostic information, consistent with the four service levels identified above or variations on those service levels.

Description Of Figures

FIG. **1** is a high level conceptual diagram that includes a concierge device, labeled Cloud Remote™, a home management bridge, a variety of consumer devices in a home and a service delivery platform connected by a network to the home. The service delivery platform can provide functionality such as navigation, communication, personalization security, search and ad display, digital rights management, gaming and virtual entertainment, data access and upload and place shift. The service delivery platform provides cloud-based management servers. While there is a significant list of functions in this figure, many additional functions could be sup-

plied upon connecting a consumer device through the technology disclosed to services accessible via a network.

The concierge device may take on a variety of form factors as depicted in FIG. **2**. In FIG. **2**, from left to right, we see a wand, which includes one or more function buttons, a speaker and microphone. With voice activation, even the button might be eliminated, in favor of a microphone and speaker. The device could turn on with motion sensing instead of button activation, utilizing an electronic or MEMS sensor of motion or orientation such as an accelerometer, inclinometer, compass or gyroscope. In the middle is a simple concierge device with a thumb board and navigation controls. To the right is a concierge device with a touch screen. The concierge device can take on any of these form factors. Some of the scenarios described in this disclosure vary, depending on whether the form factor of the concierge device includes a display or not.

FIG. **3**. depicts telephone and support service as functions that might be selected using a concierge device. A dedicated button on the concierge device might select a support call or navigation keys on the concierge device might be used with a single click to initiate a support call or session.

FIGS. **4**-**8** show configurations of concierge device and bridge, either integrated or standalone. FIGS. **5** and **6** depict scenarios using a concierge device without a display. In these scenarios, AVR automated troubleshooting could be made available, in any of the modes described above. In FIG. **5**, the concierge device can be associated directly with one of the consumer devices, such as a TV, light, refrigerator or washer or coupled to the consumer devices through the bridge. A computer, TV or other monitor can be used to confirm actions performed using the concierge device or for configuration of the concierge device. Any of these monitors can be used for visually based automated trouble shooting, as described above. Alternatively, verbal commands and confirmations could be exchanged between the concierge device and the home management bridge. Upon request, the bridge can initiate a phone call, using the concierge device as a handset. This support session will typically be handled via VoIP through the Internet to a support server. Alternatively, cloud-based management servers coupled in communication with the concierge device could be used to initiate the phone call.

Optionally, the concierge device may communicate with the in-home bridge via **511** through a built in or separate access point or through an in home network. The concierge device can rely on the in-home bridge to relay its messages to other devices or to process its messages directly. In this scenario, a home management bridge handles communications between the concierge device and consumer devices. In some implementations, the home management bridge also forwards signals from home control devices such as a wireless switch (SW) to controllable devices, such as the TV, light, refrigerator or washer. The functions of such home control devices may be replicated on the concierge device, especially when the device has a display, as in FIGS. **7**-**8**.

In FIG. **6**, the bridge is built into the television. Given the functionality included in televisions, the bridge described in this disclosure could readily be incorporated into a TV. Many TVs already are capable of communication through the Internet to a server. Alternatively, the bridge could be built into the concierge device and the TV used merely as a monitor to confirm actions being taken by the concierge device.

FIG. **7** depicts a concierge device that includes a display, in use with a home management bridge that is a separate and distinct physical device. Because this concierge device includes a display, it is unnecessary to use a personal computer or television to confirm actions being taken. Optionally, the concierge device may communicate with the in-home bridge via **711** through a built in or separate access point and rely on the in-home bridge to relay its messages to other devices or process its messages directly.

FIG. **8** depicts a concierge device with an integrated bridge and display. In this figure, a touch screen device is depicted. The concierge device may be implemented in this configuration as an application running on a smart phone, tablet or similar device.

FIG. **4** depicts a concierge device built into a refrigerator or other major appliance. In this illustration, the bridge would be built into the refrigerator as well as the concierge device. Alternatively, as depicted in FIGS. **5**-**6**, the bridge could be a standalone device or built into a TV or signal source for a TV, such as an A/V receiver, a DVD, cable or satellite box.

FIG. **9** is a flowchart of methods consistent with this disclosure. In the left column are a series of actions. First, the concierge device is associated with the consumer device. Several ways of handling this association are described in the body and claims of this document. A single action using the concierge device initiates the support activities that follow. The single action could be a button press, a single or double tap of a pad, a wave of the device or spoken word(s). Responsive to the single action, the concierge device causes a message to be sent to the bridge. The bridge buffers consumer device information for use in a support call and then initiates the call, responsive to the single action. The bridge sends information to the support center in support of the call. The information may be used to bypass automated response trees and menus, to personalize the user experience. The information optionally may be used to offer or initiate automated troubleshooting, as described above. The bridge also may send consumer device status information in aid of troubleshooting or, in some cases, even bridge a diagnostic session between a support server and the consumer device being supported. In the right-hand column of FIG. **9**, we see alternative ways in which consumer electronic information can be buffered to the bridge. It could be transferred via the concierge device. The bridge could communicate directly with the consumer device. Or, the consumer device information could be entered using any general data entry method, such as a keyboard or voice recognition. Optionally, the concierge device may communicate with the in-home bridge via **911** through a built in or separate access point and rely on the in-home bridge to communicate relay its messages to other devices or process its messages directly.

FIG. **17** is a high level diagram of adding to support an automated interaction for the user. Building on FIG. **9**, this figure illustrates using the information sent to support to generate or select a relevant automated interaction. For instance, the system sends the user a document for display with troubleshooting hints and directions. The interaction may be optional, as some users may prefer guided trouble shooting to talking with a support person. Or, an automated protocol may be a required preliminary that addresses frequently encountered issues. More alternative modes of automated or guided trouble shooting are given above. Optionally, the concierge device may communicate with the in-home bridge via **1711** through a built in or separate access point and rely on the in-home bridge to communicate relay its messages to other devices or process its messages directly.

FIG. **18** represents a sample of information that may be supplied as part of an automated interaction. For instance, a variety of documentation such as manuals, data sheets, part lists and feature guides can be available. Pre-support checklists can be provided to cover steps such as checking the power and rebooting the device. Support can be provided in response to general questions from a user. Alternatively, sup-

port can be provided for diagnosed faults. These faults may be reported with status or configuration data or diagnosed using status and configuration data. The data available from the consumer device can be combined with user responses to focus the investigation. Self-help guidance can be provided for those interested.

FIGS. **10-15** are exemplary screens for a concierge device that includes a display. In FIG. **10**A users are presented with choices, including invoking a concierge service to initiate a support call. Users are presented with choices of watching live TV or IP TV, controlling consumer devices within the home, initiating a VoIP call, playing games or invoking the concierge service to initiate a support session.

FIG. **10**B depicts selection of TV channels from live TV. Customizable buttons can be provided and a user's favorite channels featured.

FIGS. **11**A-B depict a video phone call. FIG. **11**A is an example of a contacts list used to initiate calls. FIG. **11**B is an example of a video phone call in progress.

FIG. **12**A shows an example of user authentication using biometric data. In this example, use of a fingerprint for authentication is illustrated. Voice prints or facial recognition also can be implemented on a concierge device, as can many forms of challenge and response.

FIG. **12**B shows an example of an alert that a new home control device, a switch is available for on-boarding. The home management bridge monitors the availability of new devices for on boarding. It can listen continuously for new signals or can be placed in a listening, pairing or enrollment mode when a new device is to be added. The concierge device receive alerts from the bridge and alerts the user by visual, audible or tactile cues.

FIG. **13**A is an example GUI that presents devices that a user can connect to the new switch.

FIG. **13**B is an example GUI that used to select a device to control. When a device is selected, another screen may appear that provides access to controls beyond a simple toggle.

FIG. **14**A is an example of GUI from which a user can select a device and cause initiation of a support session. The devices illustrated as having available concierge support include a TV, projecter, home theater, radio, washer and oven. As easy as identifying devices for remote control, the concierge panel allows a user to select a device and cause initiation of a support telephone call. The call may be a video call or audio-only. The system may automatically select the best communications available. A video call may include pictures from a front facing camera, directed towards the user, a back facing camera directed to the device that is being serviced or some combination of the two. The information displayed from the support center may be directions, photographs of what to look for, or the support person. As illustrated in other figures, interaction with a human support agent may be preceded by an automatic support protocol, optionally with diagnostic responses by the consumer device to queries received at the outset of a support session.

FIG. **14**B is an example of a suggested fix presented to a user in a support session prior to connection with a human agent. The session example involves a television. Status information and, optionally, diagnostic responses to queries have been provided digitally to the support session. An automated support protocol has been invoked to suggest possible resolutions of the user's problems. The problems resolved may be suggested by the user, the support servers or both. For instance, in this example, the user might only have mentioned a video resolution problem. Upon detecting a similar audio resolution problem the suggested fix can be extended from the first problem that the user presented to another, related problem. The user has the option of moving forward with human agent contact by pressing the "start call" button.

FIG. **15** depicts a video call with a human support agent.

FIG. **16** depicts types of information that may be useful to the support center. In a home, devices **1** through N may be present. Controls **1** through N may correspond to individual devices or persons within the home. They may be linked through the bridge or directly to the Internet. The form factors for the concierge device may include any of the form factors in FIG. **2**, or built into a major appliance, or as an application running on a smart device such as a tablet or smart phone. Alternatively, a programmable face plate or remote could be mounted on a switch box, cradled in a charger or surface mounted on the wall. May be portable, especially from the charger. A screen saver of this remote could be a dimmer control. A home computer could also be used as a remote device, although the range of communications via Bluetooth or Zigbee may be more difficult to accomplish between a stationary computer and a consumer device.

In the left-hand column, any number of persons may be located in the same household as the consumer electronic and concierge devices.

More generally, the support service needs to handle multiple households. Consumer electronic information that may be of interest for service purposes includes the company that marketed the device, the manufacturer of the device, or the industry supported. For an individual device, the warehouse that shipped the device and the device category may be of interest, as may be the retail store that sold it, and either the fabrication plant or contract manufacturer that produced the device. In a full implementation, analytics hosted at a support center accessed via the Internet or so-called cloud helps the support staff quickly diagnose the problem being encountered. These analytics may take advantage of information about the device manufacturing, but beyond the information that the consumer is able to supply. Given the reliable transmission of information from the household through the bridge and network to the support center, it is anticipated that service will be significantly improved.

Problems and Solutions

The technology disclosed is useful to address a variety of problems. For instance, the problem of providing a user centric, multi-purpose interface to diverse consumer devices (CA and CE devices) in a home can be addressed using a handheld concierge device (a remote control) that relies redundantly or alternately on a home management bridge and/or cloud-based management servers, depending on their availability and the configuration selected. This concierge device sends input to and relies on the home management bridge, working in conjunction with the cloud-based management servers, to register devices in the home to be managed consumer devices. It accepts dynamically supplied menus verified to be up-to-date for control of the managed consumer devices. These menus may be updated from time to time, either to fix bugs or as device capabilities are updated. It can act as a remote control for the consumer devices, using the dynamically supplied menus. In some implementations, it relies on the home management bridge or the cloud-based management servers to transcode multimedia to format used by the remote control.

Another problem of providing efficiently connecting a user to technical support can be solved by the technology disclosed using a low cost concierge device with minimal processing power, a microphone, a speaker, one to a few function buttons and a wireless transceiver; and by pairing the concierge device with a consumer device, pressing one of the function buttons to initiate a call to a service center and utilizing resources in a bridge to 1) identify the consumer

device and any current status codes to the service center and 2) convert voice communications between the concierge device and the bridge to a VoIP and relay the VoIP communications to the service center.

One option is for the consumer device to communicate with the bridge, after setting up the bridge with household information and enrolling the consumer device with the bridge. The bridge could be a computer or TV with a wireless or powerline connection to particular consumer devices and pairing protocols. A wireless connection could be direct or via a mesh, per Zigbee, Zwave, Lutron ClearConnect™ or enOcean-like communication protocols. The wireless connection may be WiFi, 3G, BT, DECT, Zwave, Zigbee or virtually any RF that is low cost. The distinguishing protocol could involve promiscuous identification of visible consumer devices, graphic depiction from a cache or network connection of the consumer devices identified on a display, accepting selection of a particular consumer device from a display, and instructing a user to adjust one or more settings of the particular consumer device to confirm pairing.

Consider the following example of on boarding a lamp to a home network and using the concierge device to control the lamp. The in home gateway detects the new lamp and communicates with the Cloud Remote™ resulting in an alert such as, "detected a new connected device 'Lamp'. To Accept device please voice authenticate by saying 'Confirm'" The user says "Confirm." Simple menu screen is loaded onto the concierge device following the registration, which optionally may include authentication by voice authentication. Optionally, a default or custom setup screen for the lamp setup appears with a few parameters. User presses "Defaults Accepted" on this screen. Of course, some devices may be so simple that no user setup is required, beyond registration. Subsequent menus of "Devices" include the now-registered lamp. The user can turn the lamp on and off from this screen. The user also can on board a switch and dedicate that switch to controlling the lamp. Then, the user can use either the switch or the concierge device to control the lamp.

The bridge alternatively could be a network appliance with a web server that is accessed from a computer or TV that provides a display. The bridge has a wireless or powerline connection to particular consumer devices and a pairing protocol that distinguishes consumer devices in the household from consumer devices visible but outside the household. The distinguishing protocol could involve promiscuous identification of visible consumer devices, serving a graphic depiction from a cache or network connection of the consumer devices identified on a display, accepting selection of a particular consumer device from a display, and instructing a user to adjust one or more settings of the particular consumer device to confirm pairing. The installation optionally includes reading a bar code on a device being coupled to the home management bridge.

Another option is for the concierge device to communicate with both the paired consumer device and a paired bridge, relaying information from the consumer device to the bridge.

The information relayed from the consumer device to the bridge could be pairing information that enables the consumer device and the bridge to pair, based on the concierge device having paired with each, or at least with the bridge.

Alternatively, the bridge could be a computer with a Bluetooth adapter and a device pairing protocol for pairing with the concierge device. The computer could set up the bridge with household information and enroll particular consumer devices with the bridge, using the concierge device to manage pairing. Or, the bridge could be housed in a refrigerator or other major appliance. Some refrigerators now include a display and even a Windows-based operating system. Similarly, A/V receivers and DVD players include substantial resources that could be harnessed by a bridge application and, optionally, a digital concierge application.



The concierge device could further include a camera that allows the user to show the service center a problem with the consumer device. The bridge could cause instructional images to be relayed to a display on the concierge device.

Sample Support Dialogs

Problems with a TV

1) Picture Resolution—In this dialogue, system configuration information has been relayed from the consumer device to the support center for use by the support person. The information may be relayed when the support call is initiated, after it begins, or even before the call, if it was sent by the consumer device to the support center in advance, following the disclosed setup. However the information is relayed to the support center, it is available in the support call without the user needing to verbalize or print and fax the configuration parameters. During the session, the support staff remotely reconfigures settings on the device. In practice, the dialog may require additional permission steps, such as verbally granting permission or taking an action using the concierge device or controls of the consumer device to give permission to the support staff to adjust settings. The user and support parts of the dialog are illustrated below:

USER: I cannot see the corners of the picture on the screen. The picture seems to be cropped.

SUPPORT: I see that even though your TV supports 1080P HD resolution, its resolution is set to 480i Video letter box mode. I have now adjusted the resolution to be set to 1080P full screen mode when you operate your set top box, Blu-Ray Player and gaming box which I see as the devices connected through your receiver to the screen. Can you see a full Test pattern on your screen now?

USER: Oh yes, thanks! The problem seems to have been resolved now.

2) Audio Fidelity—In this dialog, the support staff again uses configuration information and remote configuration adjustment to solve the user's problem.

USER: I cannot hear any sound from the rear speakers at all in my surround sound system.

SUPPORT: I see that the audio on your receiver is set to Dolby 2.1 mode. I will now change that to Dolby 5.1. Can you confirm audio from the rear speakers now?

USER: Oh yes, thanks! The problem seems to be resolved now.

3) Download issues—In this dialog, identification of the household or user allows the support person to spot an issue that has not generated a very informative error message.

USER: I don't seem to be able to download any movies. Can you please help me with that?

SUPPORT: Certainly. My Log shows that the Internet connection to your household has been up and running for the last 2 weeks without any interruptions. However, I am showing here that the primary credit card on your file has expired. Would you like me to update that information now? I can link the card ending in digits 5202 as the valid credit card. Is that OK?

USER: Oh yes, thank you.

SUPPORT: You should be able to download any movies at this point.

USER: Thank you!

4) Gamebox connection and control—Information from multiple devices is used for problem solving in this dialog. The bridge has been configured to forward information to the support center for more than just the Gamebox. This infor-

mation may be forwarded after configuration of the TV to work with the bridge, as described above, or during the diagnostic session. Further permission dialog may be required to cause status information to be forwarded by more than just the Gamebox.

USER: Hi, I don't seem to be able to connect my Gamebox to my receiver and TV. Can you help me with that?

SUPPORT: Oh, certainly. I am showing here that your Gamebox reports correct functionality. However, your receiver is not set to select the proper video input when selecting the Gamebox. May I take corrective action for that?

USER: Yes, please.

SUPPORT: OK. The problem is now resolved. Also, your remote control programming has been set the proper input settings for next time.

USER: Great, thank you.

5) Gifting or cross-selling—In combination with problem solving, the support staff can either offer a gift or cross-sell a product or service that a happy customer might be enticed to buy:

If Picture problem, then Audio gift

If Audio problem, then Picture gift

Free movie/trailer download

6) Coupon: Support assistance redeeming a free music/movie download coupon

SUPPORT: Can I help you with anything else?

USER: Oh yes . . . . Can you tell me what this means? User holds up a coupon in front of the remote camera for which a video image is seen: coupon is recognized.

SUPPORT: Oh you're entitled to a free view of the new feature film "Help". Would you like me to authorize that?

USER: Certainly.

SUPPORT: Anything else I can do?

USER: No thank you, appreciate the help

SUPPORT: You're welcome. And thank you for using CCC. Until next time, Goodbye!

USER: So long!

7) Market Research: survey followed by a free movie download coupon

SUPPORT: Before we finish the call, I would like to offer you a free movie download coupon in exchange for a few minutes of your time to conduct a brief survey on your most recent consumer device purchase. Would you like to accept the offer?

USER: Yes, of course.

SUPPORT: I am showing that the TV is your most recent purchase, is that right?

USER: Yes, that is correct.

SUPPORT: What is the one feature that you're the most happy with?

USER: The fact that it has a very easy-to-use customer support feature!

SUPPORT: Thank you. What is the one feature you're the least happy with?

USER: The intrusive nature of firmware updates. I wish I did not have to deal with that!

SUPPORT: What is the one feature that is missing that you would love to have on the next generation device?

USER: Automatic remote control configuration without me having to do anything or download an App.

SUPPORT: How can we improve our products or service for you?

USER: I wish I did not have to download a new app for every new device I purchase. And also, I am tired of trying to manage my applications . . . . This should all be a whole lot simpler given the degree of connectivity and intelligence in these devices.



SUPPORT: What is the next consumer device that you're planning to purchase?

USER: A Blu-ray player

SUPPORT: Thanks! We would like to show you a promotional video on our new advanced Blu-Ray player that would be a perfect match for your current system. You will receive your coupon for free movie

Problems with the Washing Machine

1) Not washing properly

USER: My washing machine is working but the clothes do not smell clean anymore.

SUPPORT: I see that you've run **20** wash cycles without a clean cycle. Lingering bacteria from multiple washes builds up after a while. I would suggest that you leave the washer door open after you're done with the washer. You can also use clean cycle chemicals for maximum affect. I can send you a sample . . . if you order online here's a coupon for 20% off.

2) Cross selling—The support staff uses supply level information to offer refills, supplies and content in the following samples:

SUPPORT: Water filter on your refrigerator needs to be replaced. May I send you a refill pack?

SUPPORT: AC filter needs to be replaced. May I send you a refill pack?

SUPPORT: There are free promotional downloads for the Blu-Ray player that you recently purchased. May I authorize the downloads for you?

3) Coupon for free sample detergent, similar to above.

SUPPORT: Can I help you with anything else?

USER: Oh yes . . . . Can you tell me what this means? User holds up a coupon in front of the remote camera for which a video image is seen: coupon is recognized

SUPPORT: Oh you're entitled to free samples of detergent and fabric softener. May I have them sent to you?

USER: Certainly.

SUPPORT: Anything else I can do?

USER: No thank you, appreciate the help

4) Market Research, as illustrated above.

High Level Description

The Concierge Connect Button

This button or other input sensor provides a convenient way for the user to request service for a device. When a support call is made using the concierge device—without having to even look up the number—the service person on the other side will be made aware of where the problem most probably lies. This can rely on Text, Voice or on Video+Voice. It is a game-changer when it comes to the convenience it provides for both the consumer and the consumer device manufacturer. For the consumer, it means that no number needs to be looked up. The nature of the problem may already be apparent in the main database, sorted out by cloud analytics engines. Hours of wasted time can be prevented with this scheme. For the service person, it means that he is no longer at the mercy of the customer's description of the problem. The fact that the device is connected to the cloud and reports its status and any fault data to the cloud automatically, without any consumer intervention, facilitates the diagnosis and resolution of the issue by the customer service personnel, almost simultaneously as the call is made. For the consumer device company, it means that unnecessary product returns can be avoided. There is a reduced need to deeply educate the customer service personnel on all fault possibilities for all devices. The cloud computing resources sort out the problem proactively and can even provide the service personnel with appropriate actions to be taken automatically and proactively. The concierge device implementation need not be limited to

thin clients. It can be provisioned as an application running on a mobile phone, tablet, and PC or other connected device.

Device Management

Upon connecting the disclosed concierge device to the Internet, it becomes possible to handle any other consumer device connected to the cloud. The concierge devices and methods of this disclosure afford several advantages. With this technology, any consumer device can connect to the cloud securely. It can interact with the cloud securely. It can use a cloud-based UI and device management. The technology disclosed caters to virtual apps: as soon as the consumer device is connected to the cloud, it is fully configured; its pre-packaged UI is associated with any concierge device, with its diagnostics/analytics package running in the cloud and ready to be leveraged. Menus, sometimes called thin clients or virtual apps, for the consumer device can be implemented on the concierge device dynamically or with a small cache. Such light weight virtual apps would not require user updating, though user permission to update could optionally be required on a device life or per installation basis. Consumer devices coupled to a concierge device are ready to be personalized, based on associated users' profiles. The are ready to be leveraged in advertising generated in the cloud, whether for purchasing related accessories or viewing relevant media.

Enhanced Concierge Device Configuration

Manufacturers should be encouraged by this technology to join a single centralized service or, at least, to rely on a single concierge device and connection with cloud-based services. A single concierge device should work with the consumer devices from at least a common manufacturer and also should work with several manufacturers' devices. The cloud could supply menus and remote control commands required for the concierge device to work with any device from any manufacturer.

Advertising Options on a Concierge Device with a Display

The concierge device configurations that include displays can be used to show advertising on the displays. U.S. application Ser. Nos. 11/350,980 and 60/709,666 filed Feb. 8, 2006 and Aug. 19, 2005, respectively, both entitled "Tethered Digital Butler Consumer Electronic Device and Method" depict devices that include displays. One of skill in the art will recognize that chipsets have changed since those applications were filed. At present, there are numerous suppliers of chipsets from which a designer might choose, including Broadcom, Texas Instruments, Intel, Marvell, ST Microelectronics, Nvidia and IBM.

When the concierge device is coupled to a television or source for a television signal, the display on the concierge device can be a secondary or supplemental display for supplemental information. Ads may be displayed as supplement information at opportune times. For instance, ads may be displayed while the user is fast forwarding rewinding or skipping through an ad or a series of advertisements. On the concierge device display, the user may see an ad logo, a program logo or some text. Analytics may be applied to determine the best content for the supplemental display. Alternatively, ads may be displayed while a user is viewing, fast forwarding or skipping through a program. The program logo, an ad logo, or chapter location information may be displayed on the supplemental display.

Ads that appear on the concierge device display may be synchronized with or independent of content being shown as the main program. For instance, when the main program reaches a sequence that involves product placement, such as product placement for advertising purposes, a coordinated ad may appear on the supplemental display. That is, if Ford has paid for a particular model of truck to appear in the program, the Ford logo may appear on the supplemental display or a picture of the particular truck may appear with a link for navigating to or remembering interest in that truck. Alternatively, ads for a competitor might appear on the supplemental display at the same time as the product placement. Similarly, ads may be directed to the supplemental display while advertising is being shown. On the supplemental display, the user may have a link or an option for remembering their interest in the product advertised on the main display. Alternatively, ads for competitors might appear on the supplemental display at the same time as the advertising on the main display. A variety of competitive alternatives may be offered in a single image on the supplemental display, coordinated with either the product placement or advertising on the main display.

The ad content on the concierge device may be audio, video, pictures, graphics, or web content. It may appear during a program or during advertising within a program. The ad selected for display on the supplemental screen may be program related, ad related, personal information related, user feedback related, user search related or user device related. Or, they may be served as banner ads, without consideration of user identity or recent user activity.

A server connected by a network may supply analytics for ad selection or personalization. The server may recognize the format of display on the concierge device or coordinated display and make sure that the ad is properly sized. The server may control the timing of ad delivery and which channel, audio or video, and is used to display the advertising. For instance: advertisements may relate to searches performed by the user via the remote. During a purchase cycle, ads may identify auxiliary device purchase suggestions. With an in-home device inventory, ads may describe available device upgrades based on existing devices at home. The ads may suggest media purchases related to existing devices

Advertising can be displayed on the concierge device's display while a user is watching a program on TV. For instance, ads may get the user's attention while fast-forwarding through commercials. During the fast-forwarding, the concierge device may present an ad, an ad logo, or program logo, on the displayed of the remote. While fast-forwarding through a program, the program logo, or ad logo, can be displayed on the remote. Ads, can be directed to concierge device's display at anytime, independent of or dependent on—i.e., synced up—with the main program. Ads can play on the concierge device while a main program is running on main screen. Such ads may be, or not, related to main program content.

Ads shown on the concierge device may be identical to or secondary to ads a main ad is playing on main screen.

Virtually any content can be delivered by a concierge device with a display. The ad content may be audio, video, pictures or graphics or even web content, in its many forms.

Ads may be presented on the concierge during a program showing on a main screen or as alternative content as an ad is on-screen.

Targeted or interactive ads can be selected. Many selection criteria an be applied to ad display: ads may be program related, ad related, personal info related, user feedback related, user search related, user device related or general random.

Cloud-based servers can play a variety of roles in the systems disclosed. The cloud-based servers can provide analytics, ad selection, ad personalization, ad format, ad timing and/or an ad delivery mechanism. Virtually all ad-related functions can be served from the cloud.

Features of a concierge device can be combined in a variety of ways, depending on the configuration of the concierge device. In this disclosure, the concierge device is really a family of devices connecting to the cloud, as shown in the figures. A simple concierge device can include a microphone and speaker, without a display. On this simple device, programming options include using local or remote voice interaction to do the programming based on prompts from the device. Or, the concierge device could be programmed using a PC.

An alternative concierge device configuration includes with a thumb board or similar keyboard. In some implementations, this level of device will be similar to the simple concierge device, but with a keyboard for input and display for output.

In some implementations, a touch screen is built into a simple concierge device. The touch screen provides for input/output.

The connection architecture of a concierge device depends on the extent to which bridge and routing capabilities are built in. With an integrated router and bridge, a concierge device is direct to cloud ready (DTCR). The concierge device can interact with server in the cloud using a browser, such as a lightweight browser. Alternatively, with an integrated bridge, the concierge device interacts direct to cloud via Bridge (DTCB). The bridge has the intelligence to set up communication destinations and sessions. In some implementations, a host is built into the consumer device, such as a television or refrigerator. The concierge device communicates direct to cloud via Host (DTCH). It relies on intelligence built into the host.

Existing protocols can be adapted to the concierge devices capabilities and architectures described. Well-established protocols can be selected to handle pairing, connection, authentication and communication.

When a device, whether a concierge device, a home control device, a controllable device or a consumer device, is to be registered, cloud resource optionally are invoked. The concierge device can be registered to a cloud-based server, just like any other device. An appliance gets registered to cloud, either directly or by association with the remote.

Registration with a cloud based server can have utility in many ways. A cloud-based database can associate concierge devices with consumer devices. It can record specifics of devices, including specifics of concierge devices with differing capabilities. When a concierge device initiates a call, the database allows support personnel to know the user, device and history of problems with the specific device and the device family. The database provides friendly script for the support person to follow.

One-touch support button can be realized, optionally accompanied by advertising during the support session. By virtue of pre-existing remote and device-aware database in the Cloud, a support person or automated protocol knows what to address and who is asking. This eliminates preliminaries that sometimes dominate support sessions. The resulting support session may involve text exchanges, a voice or video connection and/or feedback on the concierge device or an nearby monitor (TV or PC). The advertising on concierge device, as described above, can be targeted based on key searches, programs being viewed, problematic appliances and/or relevant appliance upgrades. Optionally, the concierge device supports voice commands which may be recognized locally or reported to a server for recognition using, for instance, a VoIP connection.

A thin client model fits the concierge device architecture and hardware. A thin client can support the architectures identified above: direct to cloud (DTCR), device/cloud interaction through a lightweight browser; direct to cloud via Bridge (DTCB), in which the Bridge has the intelligence to set things up; or direct to cloud via Host (DTCH), in which the Host appliance has the intelligence. Going to the cloud is useful for several reasons. The UI can be generated in the cloud or with minimal effort on the device. Ads can be targeted from the cloud to users. Auto configuration routines and devices can be hosted and maintained in the cloud.

A variety of additional features can be disclosed at this point. Some implementations include tagging of devices so that concierge device can automatically recognize the tagged devices based on proximity to device. Tags using RFID, near field communication or similar technology can be suitably employed.

Personalization can include user recognition and/or authentication based on voice, fingerprints, RFID credentials, facial scans or event the way a user holds the concierge device, sensing the user's tremor pattern. Concierge devices can be initialized directly or in communication with a PC.

A direct-to-cloud API can support either remote procedure control or Web Services document exchange protocols to connect any device for cloud concierge support.

Virtual Apps, user interfaces and device management can be consolidated in the cloud. This consolidation would eliminate any need to download any apps. Consolidation in the cloud would assure that the concierge device was always up-to-date. The majority of UI requirements can be managed in the cloud, instead of on the local device. Learned user preferences can be used to target ads.

Each device can be given a unique permanent serial number. This ID can be programmed when the device is manufactured. The same database in the cloud can track a device from birth to death, from manufacturing to retail to home and on to when it is junked.

Services can be provided by a cloud-based platform. A premium human support service loosely analogous to GM's On-Star™ service for cars can be provided for home appliances/gadgets/etc. Automatic configuration can be fed to a connected device. Automatic UI generation can be hosted in the cloud. Light weight client and simple interfaces eliminate any need to download any apps. Control can be implemented even on a concierge device without a display using voice commands and prompts. Appliances can be shut down in cases of emergency. With the concierge device and/or a home management gateway acting in the background to monitor status without user direction, fault notification can be delivered via email, text or other messaging medium, sometimes before the user notices a problem.

Device configuration can be improved from defaults to take into account devices on the network that interacting with the device being configured.

The concierge device has the advantage of inducing one or more uniform data types, whether text, audio or video, which can be used to support all devices of interest. Moreover, support for user authentication makes the concierge device secure.

Example and Summary of Main Demo Screens

Home Screen

A variation on FIG. **10**A can include icons for each of the following:

Cloud Connect Concierge Screen

VoIP/Video Call Screen

Credit Card Transaction/Security Screen

Interactive Remote Display Screen

Touching an icon takes the user to a specific further screen.

Screen **1**

FIG. **14**A is the concierge support home screen. It showcases the essence and ease-of-use with which support and services may be invoked. In some implementations, clicking on a device highlights the device briefly and transitions to Screen **2**. In other implementations, screen **2** may be preceded by an automated diagnostic protocol, as in the example of FIG. **14**B.

Screen **2**

FIG. **15** is a webcam shot of a concierge support person at their desk. This leads to an interaction—with full audio and, optionally, with video—between the user and the service personnel.

There is a "Close Video Call" control which upon pressing transitions to Screen **3**.

Screen **3**

Following a support session, the display shows a summary for the problem just resolved. The statement may be generic enough to be applicable to any device/appliance chosen on or it may track the problem and solution reached during the support session. An ad may be positioned on this screen.

Screen **4**

The VoIP/Video call screens, FIGS. **11**A-B showcase a simple VoIP/Videocon interface.

There may be a banner ad on top of the contacts list screen, FIG. **11**A.

Upon touching a name, go to FIG. **11**B. Alternatively, upon launching a concierge support session, go to FIG. **15**.

Screen **5**

FIG. **15** is again a webcam shot of the concierge person at their desk. There is provision to turn video off for voice-only calls.

There may be a banner ad on top of this screen.

Screen **6**

The Credit Card Transaction Screen has the picture of a credit card on top. It is not shown in these figures.

Below it is a dotted box on the screen used for finger print authentication purposes. FIG. **12**A.

There may be a banner ad on top of the screen.

There can be a message saying the following: "Please touch the dotted box for secure authentication, or simply say 'I, John Smith, approve.'"

Upon touching the dotted box, a message pops us saying "Transaction Approved."

Screen **7**

FIG. **10**A is a variation on an example interactive screen that displays some form of the screen below with the following four icons: LiveTV, IPTV, Home Control, and VoIP (No Games/Chat/Contacts/Settings).

There may be a banner ad on top of the screen.

Some Particular Embodiments

The technology disclosed may be practiced as a method, device or article of manufacture. One or more features of an implementation can be combined with the base implementation. Implementations that are not mutually exclusive are taught to be combinable. One or more features of an implementation can be combined with other implementations. This disclosure periodically reminds the user of these options. Omission from some implementations of recitations that repeat these options should not be taken as limiting the combinations taught—these recitations are hereby incorporated forward by reference into each of the following implementations.

Single Action Support

Implementation #1

One group of methods, devices, systems and articles of manufacture relates to using a concierge device to support consumer devices such as appliances and consumer electronics. In one implementation, a method is described that includes initiating a support session for a consumer device using a concierge device. The method includes: associating the concierge device with a selected consumer device; responsive to a single action performed by a user, the concierge device communicating with a home gateway. Communicating with the home gateway includes: causing the home gateway to buffer consumer device identification information for the selected consumer device; and causing the home gateway to initiate a support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either to bypass an automated attendant or interactive voice recognition system or to initiate an automated support protocol. Optionally, communicating with the home gateway further includes causing the home gateway to determine a support center for a support session. This eliminates any need for the user to be aware of the support center contact information.

This method and other implementations of the technology disclosed can each optionally include one or more of the following features.

Associating can further include wirelessly pairing the concierge device with the selected consumer device and identifying the paired selected consumer device to the home gateway. Or, it can further include selecting the consumer device from a menu of candidate consumer devices known to the home gateway. The menu can be an audio menu or be displayed visually.

The home gateway can be a physical device separate and distinct from the concierge device, to which the concierge device sends messages via an in-home network. Or, it can be part of the same physical device as the concierge device. Alternatively, the home gateway can be a cloud-based device to which the concierge device sends messages via a network that extends outside the home.

The method can further include the concierge device receiving status information from the selected consumer device and forwarding the status information to the home gateway for use in the support session. Or, connecting with and receiving status information from the selected consumer device and using the status information in the support session.

The home gateway can feature relaying messages to and from the selected consumer device during the support session.

The method can further include displaying information received during the automated support protocol on a display of the concierge device. The information can include supplemental information displayed as the user is participating in the support session. This supplemental information can include a targeted or interactive advertisement.

The information transmitted during the support session can enable a user of the concierge device to bypass interactive response systems and begin the support session by talking to a human support agent, based on the forwarded consumer device identification information.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Implementation #2

Another implementation of the technology disclosed is a concierge device including at least one wireless data communication adapter, one or more input sensors, one or more

outputs, and memory; and at least one processor configured to perform operations. Those operations are including: associating the concierge device with a selected consumer device; responsive to a single action performed by a user, the concierge device communicating with a home gateway. Communicating with the home gateway includes causing the home gateway to buffer consumer device identification information for the selected consumer device; and causing the home gateway to initiate a support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either to bypass an automated attendant or interactive voice recognition system or to initiate an automated support protocol. Optionally, communicating with the home gateway further includes causing the home gateway to determine a support center for a support session.

This device and other implementations of the technology disclosed can each optionally include one or more of the following features.

Associating can further include wirelessly pairing the concierge device with the selected consumer device and identifying the paired selected consumer device to the home gateway. Or, it can include selecting the consumer device from a menu of candidate consumer devices known to the home gateway. The menu can be an audio menu or it can be displayed visually.

The home gateway can be a physical device separate and distinct from the concierge device and having its own processor, to which the concierge device is configured to send messages via an in-home network. Or, it can be a part of the same physical device as the concierge device. Alternatively, the home gateway can be a cloud-based device to which the concierge device sends messages via a network that extends outside the home.

The processor of the concierge device can be further configured to perform operations that include displaying information received during the automated support protocol on a display of the concierge device. The information can include supplemental information displayed as the user is participating in the support session. This supplemental information can include a targeted or interactive advertisement.

Generally, the processor(s) implementing this technology can be configured to perform operations reflecting any of forgoing methods and their aspects or features.

Implementation #3

Another implementation of the technology disclosed is a concierge device that includes: at least one wireless data communication adapter, one or more input sensors, one or more outputs, and memory; and at least one processor configured to perform operations. Those operations are including: linking the concierge device to data that uniquely identifies a particular consumer device to be supported; and responsive to a single user action sensed by the input sensors, causing a home gateway to initiate contact with a service center that supports the particular consumer device, including automatically transmitting information from which the service center can uniquely identify the particular consumer device and determine whether to engage an automated support protocol based on the particular consumer device to be supported. The information can, for instance, be a serial number or locally unique assigned name plus a concierge device, household or home gateway identifier.

This device and other implementations of the technology disclosed can each optionally include one or more of the following features.

The device may be configured to perform operations including selecting the particular consumer device to be supported from a plurality of consumer devices. It also may determine which of several support centers to initiate contact with to support the particular consumer device.

It may further include a display; and further be configured to perform operations including: automatically transmitting status information regarding the particular consumer device to the service center; and displaying information received from the service center during the automated support protocol.

The concierge device processor can further be configured to perform operations including: causing the particular consumer device to be coupled in data communication with the support center, thereby allowing diagnostic communications between the particular consumer device and the support center. The communications between the particular consumer device and the support center can be relayed or direct, peer-to-peer.

In some implementations, the concierge device processor further configured to perform operations including conducting a support call with the support processor regarding the particular consumer device using the concierge device to capture the user's voice and to reproduce audio for the user to hear.

Some implementations of the technology disclosed include a service center that provides diagnostic support of a particular consumer device, the service center coupled in communication with the concierge device; wherein the service center includes at least one service processor configured to perform operations including: identifying the particular consumer device from the automatically transmitted information; and engaging in an automated support protocol based on the particular consumer device to be supported. alternatively, the service processor can be configured to perform operations including: determining from the automatically transmitted information to bypass automated support and connect the user with a human; and engaging in at least audio communications with the concierge device.

Other implementations include a gateway device coupled in communication with the concierge device; wherein the gateway device includes at least one gateway processor configured to perform operations including: relaying communications between the concierge device and the service center; registering a plurality of consumer devices that are linkable to the concierge device; and providing a menu from which to select of the particular consumer device for the concierge device to support. The menu services involve perceptible communications with the user using the input sensors and outputs of the concierge device.

Implementation #4

Another implementation of the concierge device includes at least one wireless data communication adapter, one or more input sensors, one or more outputs, and memory; and at least one processor configured to perform operations. The operations are including: linking the concierge device to data that uniquely identifies a particular consumer device to be supported; responsive to a single user action directed to the concierge device, initiating at least voice contact with a service center that supports the particular consumer device, including automatically transmitting to the service center information from which the service center can uniquely identify the particular consumer device; and conducting a support call with the service center regarding the particular consumer device using the concierge device to capture the user's voice and to reproduce audio for the user to hear.

The concierge device processor can further be configured to perform operations including causing the particular con-

sumer device to be coupled in communication with the support center during the support call.

The concierge device may further include a display on the concierge device that provides visual information to the user during the support call and/or a camera on the concierge device that provides visual information to the support center during the support call.

Implementation #5

The technology disclosed can be implemented in a consumer appliance with an integrated concierge device, based on any of the devices, aspects or features described above. For instance, the concierge device can be integrated into a refrigerator, washing machine, dryer, exercise equipment, television, A/V center, stove, among other consumer appliances and electronic devices.

Generally, the technology can be implemented as a consumer appliance with an integrated concierge device, including: a consumer device with appliance features, adapted to report status information; at least one network adapter; a memory; at least one input sensor; at least one audio input; an audio output; a processor coupled to the network adapter, the memory, the audio input, and the audio output; instructions running on the processor. The instructions running on the processor may cause the integrated device to communicate with a home management gateway; and cause the gateway to initiate a support call, responsive to a user interacting with the input sensor, and to provide information regarding the associated consumer device that allows the support call to bypass an automated attendant or interactive voice recognition system and that identifies the associated consumer device to be supported. In some implementations, the consumer device can have an integrated home management gateway.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a method including actions implemented by the processors of the device of system as described above.

Implementation #6

In another implementation, a method is described that includes initiating a support session responsive to a single user action. This includes linking a concierge device to data that uniquely identifies a particular consumer device to be supported; and, responsive to a single user action sensed by one or more input sensors of the concierge device, initiating contact with a service center that supports the particular consumer device, including automatically transmitting information from which the service center can uniquely identify the particular consumer device and determine whether to engage an automated support protocol based on the particular consumer device to be supported.

This method and other implementations of the technology disclosed can each optionally include one or more of the following features.

The method may further include selecting the particular consumer device to be supported at a particular time from a plurality of consumer devices and/or determining which of several support centers to initiate contact with to support the particular consumer device.

Other implementations can include automatically transmitting status information regarding the particular consumer device to the service center; and displaying information received from the service center during the automated support protocol on a display of the concierge device.

Another optional feature includes causing the particular consumer device to be coupled in data communication with the support center, thereby allowing diagnostic communications between the particular consumer device and the support center. The communications may be relayed or direct, peer-to-peer. Some implementations include conducting a support call with the support processor regarding the particular consumer device using the concierge device to capture the user's voice and to reproduce audio for the user to hear.



The method may further include actions of a service center, including: identifying the particular consumer device from the automatically transmitted information; and engaging in an automated support protocol based on the particular consumer device to be supported. Alternatively, the service center can determine from the automatically transmitted information to bypass automated support and connect the user with a human; and to engage in at least audio communications with the concierge device.

The method may further include actions of a gateway device coupled in communication with the concierge device including: relaying communications between the concierge device and the service center; registering a plurality of consumer devices that are linkable to the concierge device; and providing a menu from which to select the particular consumer device for the concierge device to support. It also can include menu services as describe above.

Implementation #7

In another implementation, a method is described that includes: linking a concierge device to data that uniquely identifies a particular consumer device to be supported; responsive to a single user action directed to the concierge device, initiating at least voice contact with a service center that supports the particular consumer device, including automatically transmitting to the service center information from which the service center can uniquely identify the particular consumer device; and conducting a support call with the service center regarding the particular consumer device using the concierge device to capture the user's voice and to reproduce audio for the user to hear.

The method can further include causing the particular consumer device to be coupled in communication with the support center during the support call.

In some implementations, the method further includes a camera on the concierge device displaying visual information from or sending it sending to the support center during the support call.

Linking can further include the concierge device interacting with an home management gateway that maintains a copy of the data that uniquely identifies the particular consumer device. Or, it can include the concierge device interacting with the home management gateway that maintains a copy of the data that uniquely identifies the particular consumer device.

Automatically transmitting may include sending product model information for the particular consumer device and user identifiable information to the support center.

In some implementations, the user could be directed in the support call to interact with an artificial intelligence that converses.

Implementations #8

Another implementation involves a method of initiating a service call for a consumer device using a concierge device, including: pairing the concierge device wirelessly with the consumer device; receiving from the paired consumer device some consumer device identification information; and responsive to a single action performed by a user, the concierge device communicating with a home management gateway. Communicating with the home management gateway includes forwarding the consumer device identification information to the home management gateway; and causing the

gateway to initiate a support call for the consumer device and to forward the consumer device identification information during the support call, thereby allowing the support call to bypass an automated attendant or interactive voice recognition system or to engage with an online or alternative support protocol and identifying the associated consumer device to be supported.

Some implementations further include the concierge device receiving status information from the paired consumer device and forwarding the status information to the home management gateway for use during the support call.

Implementations #9-10

Another implementation involves a method of initiating a service call for a consumer device using a concierge device, the method including: selecting the consumer device from a display of candidate consumer devices known to a home management gateway. Following this initial selecting action, aspects and implementations of this method are as in the preceding methods, aspects and implementations. Another alternative for this initiating action includes: pairing the concierge device wirelessly with the consumer device; receiving from the paired consumer device some consumer device identification information; and responsive to a single action performed by a user, the concierge device communicating with a home management gateway.

Another optional feature of this technology is the home management gateway connecting with and receiving status information from the associated consumer device and forwarding the status information to a service center in advance of the service call.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Implementation #11

One method involves initiating a support call for the consumer device using the concierge device. This method begins with associating the concierge device with the selected consumer device. Responsive to a single action performed by user, the concierge device communicates with the home management bridge. This communication causes the home management bridge to buffer consumer electronic identification information for the associated consumer device. It further causes the bridge to initiate a support call for the consumer device and to forward the consumer electronic information during the support call. Forwarding this information, optionally, allows the support call to bypass an automated attendant or interactive voice recognition system. Or, it could be used to select a tailored interactive voice or visual protocol for trouble shooting. It also could be used to initiate an artificially intelligent interaction using technology such as the Watson technology demonstrated in 2011 by IBM. It further identifies the associated consumer device to be supported. This should greatly improve the user support experience.

We refer to associating the consumer device with the concierge device, because there are several ways in which this association may take place. The concierge device may be wirelessly paired with the selected consumer device. Identification of the consumer device may be programmed into the concierge device memory, either at the factory or locally using a PC or similar device. The programming may be accomplished wirelessly using a USB connection. Alternatively, the home management bridge can be used to display candidate consumer devices and select one for temporary



association with the concierge device. The concierge device can greatly simplify on boarding and optionally provide authentication during an on boarding process, which would provide a degree of assurance to consumers who are weary of home appliances connected to a cloud.

We refer to buffering consumer electronic identification information, as there are several ways in which the bridge may obtain this information. First, the home management bridge may receive consumer electronic status information associated with the consumer device from the concierge device, relayed to the bridge after pairing between the concierge device and the consumer device. Second, it may receive the information directly by communicating with the consumer device identified by the concierge device, after pairing between the concierge device and the consumer device. Third, the concierge device may identify the consumer device to the bridge and the bridge may obtain the information needed from the consumer device directly. Fourth, the relevant information can be input into the bridge, using a conventional input, such as a keyboard, mouse, touch screen or voice recognition. Fifth, information can be obtained from a cloud-based data source. For instance, the device may be registered at its point of sale with a cloud-based management server.

Methods of initiating a support call can be more directly stated, beginning with the manner in which the concierge device is associated with the consumer device. One method variation of initiating a support call for the consumer device using the concierge device begins with pairing the concierge device wirelessly with the consumer device. Those familiar with pairing Bluetooth headsets to wireless telephones or recognize a wide variety of pairing options. The method proceeds with the concierge device receiving from the paired consumer device some consumer electronic identification information. Responsive to a single action performed by user, the concierge device communicates with the home management bridge. It forwards consumer electronic information to the home management bridge and causes the home management bridge to initiate a support call. The bridge forwards the consumer electronic identification information during the support call, thereby allowing the support call to bypass an automated attendant or interactive voice recognition system. The bridge identifies the associated consumer device to be supported during the call.

Implementation #12

Another method of initiating a support call begins with selecting a consumer device from the display of candidate consumer devices known to the home management bridge. In this method, the home management bridge supports multiple consumer devices. Responsive to a single action performed by user, the concierge device communicates with the home management bridge. This causes the home management bridge to initiate a support call for the selected consumer device and to forward consumer electronic identification information to the support center. The consumer electronic identification information can be obtained either by communications between the bridge and the selected consumer device or by entry of information through the bridge. The information may be provided in advance of the phone call, so that only a serial number or other globally unique identifier needs to be provided.

Implementation #13

A variety of devices and systems also practice the disclosed technology. One is the concierge device that initiates support calls for associated consumer devices. The support calls are initiated by the home management bridge. The concierge device includes at least one wireless transceiver adapted to be

coupled in communication with at least one home management bridge. The concierge device further includes a memory, at least one button or other single action control, speaker and microphone, and a processor coupled to the transceiver, the memory, the button, the speaker and microphone. Examples of single action controls include a button, toggle or other physical switch, touch areas on a touch screen, a motion sensor or a voice activated control. Instructions are provided running on the processor that wirelessly couples the concierge device to the home management bridge. One skilled in the art will recognize that processor is a broad term, which may include both the CPU and the wireless communications components. The instructions further forward concierge device information to the home management bridge and cause the bridge to initiate a support call, responsive to a single user action such as pressing a button. Instructions further cause a bridge to provide information regarding the associated consumer device that allows the support call to bypass an automated attendant or interactive voice recognition system and that identifies the associated consumer device to be supported. The identification may be direct or indirect, specific or categorical. Preferably, it would include the serial number of the consumer device, to facilitate verification of support eligibility and is data for subsequent analytics at the support center.

As one option, the wireless transceiver may be adapted to be coupled in communication with at least one associated consumer device. Instructions running on the processor of the concierge device may further wirelessly couple the concierge device to the associated consumer device and obtain from the associate consumer device some consumer electronic identification information. Then, the instructions cause the consumer electronic information to be forwarded to the home management bridge, which in turn is relied upon to forward the consumer electronic identification information during the support call.

A further aspect of this option is that the instructions running on the processor may further relay diagnostic status information from the consumer device to the home management bridge for use in the support call.

As another option, the concierge device may include at least one wireless transceiver adapted to be coupled in communication with at least one consumer device. Instructions running on its processor further wirelessly couple the concierge device to the consumer device, obtain some consumer electronic identification information from the device and forward this information to the bridge. The instructions further cause and rely on the bridge to pair with the consumer device using the consumer electronic identification information. This makes information available to the home management bridge for use in the support call.

As illustrated in FIG. **4**, the concierge device may be built into a refrigerator or other major appliance. In this illustration, the bridge would be built into the refrigerator as well as the concierge device. Alternatively, as depicted in FIGS. **5**-**6**, the bridge could be a standalone device or built into a TV or signal source for a TV, such as a A/V receiver, a DVD, cable or satellite box.

Yet another option is for the concierge device to have consumer electronic identification information loaded into its memory. Information from the memory of the concierge device may be forwarded to the home management bridge for use during the support call.

In connection with any of the methods and devices described above, the concierge device further may include a camera coupled to the processor. Instructions running on the processor further will wirelessly couple the camera with the home management bridge and cause the home management bridge to forward images from the camera during the support call. The images may be still or moving images.

In further connection with the methods and devices described above, the concierge device may include a display coupled to the processor. Instructions running on the processor may cause the concierge device to receive and display images received from the home management bridge during the support call. Combining the camera and display features described in these successive paragraphs essentially provides a two-way videoconference.

The concierge device as described above may be combined into a system that includes a home management bridge. Such a home management bridge includes at least one wireless transceiver adapted to be coupled in communication with at least one concierge device, a method, network interface and a processor coupled to each of the above. Instructions running on the processor wirelessly couple the home management bridge to the concierge device and receive concierge device information from the concierge device. The instructions are further adapted to initiate a support call, responsive to a request from the concierge device, and to provide information regarding the associated consumer device to a support system that allows the support call to bypass an automated attendant or interactive voice recognition system. The information further identifies the associated consumer device to be supported.

In some sense, the concierge device described may act as the eyes, ears and voice of the bridge or cloud based service for interacting with users across a wide variety of consumer device, making the connected, intelligent home a manageable reality for consumers.

On Boarding Claims

Another group of methods, devices, systems and articles of manufacture relates to using a concierge device to on-board home control devices and controllable devices to a home management gateway.

Implementation #14

One implementation describes a method of on boarding to an in-home management bridge both a control device and a controlled device. This method is including: receiving a first enrollment signal from the first home control device that uniquely identifies the first home control device, automatically determining control capabilities of the first home control device and enrolling the first home control device with the management bridge; receiving a second enrollment signal from the second controllable device that uniquely identifies the second controllable device, automatically determining control signals recognized by the second controllable device and enrolling the second controllable device with the management bridge; and receiving a dedication signal responsive to a user interface and automatically configuring a combination of the management bridge, the first home control device and the second controllable device so that at least some control signals generated by the first home control device are dedicated to controlling the second controllable device.

This method and other implementations of the technology disclosed can each optionally include one or more of the following features.

The method can further include automatically replicating the control capabilities of the first home control device on a concierge device coupled in communication with the management bridge. This can further involve displaying the user interface used to generate the dedication signal on a display of the concierge device.

Some implementations include displaying supplemental information on a display of the concierge device. This supplemental information can be a targeted or interactive advertisement.

The method can involve the management bridge requesting of and receiving from a cloud-based server at least some configuration data used when automatically configuring the combination.

The management bridge may take on alternative configurations. In one implementation, the management bridge is a physical device separate and distinct from the concierge device; and the concierge device sends messages to and receives messages from the management bridge via an in-home network. In another implementation, the management bridge is part of the same physical device as the concierge device.

Another implementation includes scanning packaging or a tag accompanying either the first home control device or the second controllable device to generate the first or second enrollment signal, respectively. Scanning may be implemented in a variety of ways, including optically scanning a pattern on a label or wirelessly scanning an RFID tag.

The dedicating action can further include receiving one or more user selections responsive to the user interface that select the first home control device from a plurality of home control devices and that select the second controllable device from a plurality of controllable devices.

Alternative messaging patterns can be implemented. The dedicating action can further include configuring one or more of the first home control device and the second controllable device for peer-to-peer control interaction. Or, it can include configuring the management bridge to receive the first control signals from the first home control device and send the second control signals to the second controllable device, responsive to the first control signals.

Inventorying devices to enroll can precede receiving enrollment signals. Some implementations further include: establishing an inventory of uniquely identified home control devices and controllable devices with the management bridge, the inventory including at least the first home control device and the second controllable device; matching information in the first enrollment signal to the inventory during the enrolling of the first home control device with the management bridge; and matching information in the second enrollment signal to the inventory during the enrolling of the second controllable device with the management bridge. The inventorying can further include scanning packaging or a tag accompanying either the first home control device or the second controllable device to inventory the first home control device or the second controllable device, respectively, and the options identified above for scanning

Some implementations further include authenticating a user prior to receiving the identification of the unregistered unit and initiating an enrollment mode in which enrolling and dedicating are permitted. Authenticating can require the user to physically interact with a concierge device that previously was enrolled with the management bridge or that implements the enrollment with the management bridge. Alternatively or in addition, authenticating can require receiving biometric information from the user.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Implementation #15

Another implementation of the technology disclosed is a system with a home management bridge including at least one network communication adapter, and memory; and at least one processor configured to perform operations. The operations are including: receiving a first enrollment signal from the first home control device that uniquely identifies the first home control device, automatically determining control capabilities of the first home control device and enrolling the first home control device with the management bridge; receiving a second enrollment signal from the second controllable device that uniquely identifies the second controllable device, automatically determining control signals recognized by the second controllable device and enrolling the second controllable device with the management bridge; and receiving a dedication signal responsive to a user interface and automatically configuring a combination of the management bridge, the first home control device and the second controllable device so that at least some control signals generated by the first home control device are dedicated to controlling the second controllable device.

This system and device and other implementations of the technology disclosed can each optionally include one or more of the features described above in the method context.

Some implementations involve a system including the home management bridge and further including a concierge device that comprises at least one input sensor and at least one output, in which the processor is further configured to perform operations including automatically replicating the control capabilities of the first home control device on a concierge device coupled in communication with the management bridge.

In some implementations of this system, the concierge device further includes at least one processor configured to perform operations including displaying the user interface used to generate the dedication signal on a display of the concierge device.

The concierge device in this system can further include at least one processor configured to perform operations including displaying supplemental information on a display of the concierge device. The supplemental information can be a targeted or interactive advertisement.

Systems of this sort can further include a scanning device configured to scan packaging or a tag accompanying either the first home control device or the second controllable device to generate the first or second enrollment signal, respectively.

In some implementations, the dedicating action further includes receiving one or more user selections responsive to the user interface that select the first home control device from a plurality of home control devices and that select the second controllable device from a plurality of controllable devices.

In some implementations, the management device processor is further configured to perform operations including authenticating a user prior to receiving the identification of the unregistered unit and initiating an enrollment mode in which enrolling and dedicating are permitted. Authenticating can require the user to physically interact with the concierge device, which previously was enrolled with the management bridge or which implements the enrollment with the management bridge. Alternatively or in addition, authenticating can require receiving biometric information from the user.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above.

Yet another implementation may include a method including actions implemented by the processors of the device of system as described above.

Implementation #16

Another method implementation includes: receiving an identification of an unregistered in-home unit that uniquely identifies the unit, wherein the unit is an in-home appliance control device or controllable device and control devices are complementary to controllable devices; registering the unit using the identification received; and receiving intended connection information and configuring a connection between the registered unit to a previously registered complementary unit to establish a unit pair, wherein the connection causes a controllable unit of the unit pair to be controlled responsive to control signals sent by a control unit of the unit pair.

Configuring the connection can further include configuring a bridge device to receive signals from the control unit and relay them to the controllable unit accompanied by an identifier accepted by the controllable unit. In some implementations, the bridge device adds the identifier accepted by the controllable unit to a control signal.

The bridge device can be physical distinct from and not incorporated in either the control unit or the controllable unit. It can be incorporated into a concierge device.

Configuring the connection can further include configuring the controllable unit to accept signals sent by the control unit that are accompanied by a control unit identification. When the unit registered is the control unit, registering the control unit can further include identifying control signals generated by the control unit. When the unit registered is the controllable unit, registering the controllable unit can further include identifying control signals accepted by the controllable unit.

In some implementations, the method further includes configuring a programmable home control device with a display: to allow user selection of the control device from the display; to allow user selection of controls provided by the control unit; and to send control signals from the home control device that cause the controllable unit to be responsive as if the signals had been sent by the control unit.

The method can further include authenticating a user prior to receiving the identification of the unregistered unit and initiating a registration mode in which registering and connecting are permitted. As described above, authenticating can require interaction with the concierge device and/or biometric information from the user.

Some implementations further include: registering a plurality of unregistered control units and a plurality of unregistered controllable units; and configuring connections among the control and controllable units after registering the plurality of units.

Identifications of the plurality of unregistered units can be obtained by scanning packaging or tags accompanying with the unregistered units, applying any conventional scanning technique such as those mentioned above.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Implementation #17

Some further device implementations include at least one network communication adapter, one or more input sensors, one or more outputs, and memory; and at least one processor configured to perform operations. The operations are including: receiving an identification of an unregistered in-home unit that uniquely identifies the unit, wherein the unit is an in-home appliance control device or controllable device and control devices are complementary to controllable devices; registering the unit using the identification received; and receiving intended connection information and configuring a connection between the registered unit to a previously registered complementary unit to establish a unit pair, wherein the connection causes a controllable unit of the unit pair to be controlled responsive to control signals sent by a control unit of the unit pair.



This device and other implementations of the technology disclosed can each optionally include one or more of the device features described above.

Implementation #18

Several implementations involve inventorying units before enrolling them. One of these implementations describes a method of on boarding and interconnecting home control devices with controllable devices that includes: establishing an inventory of uniquely identified home control devices and controllable devices with an in-home management bridge, the inventory including at least a first home control device and a second controllable device; receiving a first enrollment signal from the first home control device that uniquely identifies the first home control device, matching information in the first enrollment signal to the inventory, and enrolling the first home control device with the management bridge; receiving a second enrollment signal from the second controllable device that uniquely identifies the second controllable device, matching information in the second enrollment signal to the inventory, and enrolling the second controllable device with the management bridge; receiving a dedication signal responsive to a user interface and automatically configuring a combination of the management bridge, the first home control device and the second controllable device so that control signals generated by the first home control device are dedicated to controlling the second controllable device; and replicating control capabilities of the first home control device on a concierge device coupled in communication with the management bridge.

The dedicating action can further include configuring one or more of the first home control device and the second controllable device for peer-to-peer control interaction.

Some implementations further include automatically determining first control signals generated by the first home control device and second control signals that control the second controllable device; wherein the dedicating action further includes configuring the management bridge to receive the first control signals from the first home control device and send the second control signals to the second controllable device, responsive to the first control signals.

Some implementations further include providing an interface that enables a user to select dedication of control signals generated by the first home control device to control of the second controllable device.

An alternative implementation describes a method of on boarding an in-home controllable device to a management bridge and automatically configuring a concierge device to control the controllable device, including: establishing an inventory of uniquely identified controllable devices with an in-home management bridge, the inventory including at least a first in-home controllable device; receiving a first enrollment signal from the first in-home controllable device that uniquely identifies the first controllable device, matching information in the first enrollment signal to the inventory, and enrolling the first controllable device with the management bridge; and automatically determining first control signals

used to control the first controllable device and configuring a concierge device coupled in communication with the management bridge with one or more menu items that control the first controllable device using the first control signals.

Another alternative implementation describes a method of on boarding an in-home control device to a management bridge and automatically configuring a concierge device to replicate control capabilities of the controllable device, including: establishing an inventory of uniquely identified control devices with an in-home management bridge, the inventory including at least a first in-home control device; receiving a first enrollment signal from the first in-home control device that uniquely identifies the first control device, matching information in the first enrollment signal to the inventory, and enrolling the first control device with the management bridge; and automatically determining first control signals generated by the first control device and configuring a concierge device coupled in communication with the management bridge with one or more menu items that replicate control capabilities of the first control device.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Implementation #19

Another implementation describes a method of on boarding to an in-home management bridge both a control device and a controlled device. This method includes: establishing an inventory of uniquely identified home control devices and controllable devices with an in-home management bridge, the inventory including at least a first home control device and a second controllable device; receiving a first enrollment signal from the first home control device that uniquely identifies the first home control device, matching information in the first enrollment signal to the inventory and enrolling the first home control device with the management bridge; receiving a second enrollment signal from the second controllable device that uniquely identifies the second controllable device, matching information in the second enrollment signal to the inventory, and enrolling the second controllable device with the management bridge; receiving a dedication signal responsive to a user interface and automatically configuring a combination of the management bridge, the first home control device and the second controllable device so that at least some control signals generated by the first home control device are dedicated to controlling the second controllable device.

As above, this method and other implementations of the technology disclosed can each optionally include one or more of the following features.

Some implementations further include replicating control capabilities of the first home control device on a concierge device coupled in communication with the management bridge.

Dedicating can further include configuring one or more of the first home control device and the second controllable device for peer-to-peer control interaction. Or, it can involve automatically determining first control signals generated by the first home control device and second control signals that control the second controllable device, and configuring the management bridge to receive the first control signals from the first home control device and send the second control signals to the second controllable device, responsive to the first control signals.

Implementations also can include providing an interface that enables a user to select dedication of control signals generated by the first home control device to control of the second controllable device.

Another implementation describes a method of on boarding an in-home controllable device to a management bridge and automatically configuring a concierge device to control the controllable device, including: establishing an inventory of uniquely identified controllable devices with an in-home management bridge, the inventory including at least a first in-home controllable device; receiving a first enrollment signal from the first in-home controllable device that uniquely identifies the first controllable device; matching information in the first enrollment signal to the inventory; and enrolling the first controllable device with the management bridge.

This automatic configuring method can optionally include one or more of the features described above. It also can involve automatically determining first control signals used to control the first controllable device and configuring the concierge device coupled in communication with the management bridge with one or more menu items that control the first controllable device using the first control signals.

Some implementations involve on boarding either an in-home control device or a controllable device to a management bridge. When just the in-home control device is enrolled, the method can include automatically configuring a concierge device to replicate controls of the control device; establishing an inventory of uniquely identified control devices with an in-home management bridge, the inventory including at least a first in-home control device; receiving a first enrollment signal from the first in-home control device that uniquely identifies the first control device; matching information in the first enrollment signal to the inventory; and enrolling the first control device with the management bridge.

When just the in-home controllable device is enrolled to a management bridge, the method can include automatically configuring a concierge device to control the controllable device; receiving a first enrollment signal from the first in-home controllable device that uniquely identifies the first controllable device; automatically determining first control signals used to control the first controllable device; and enrolling the first controllable device with an in-home management bridge.

Some implementations further include automatically configuring a concierge device coupled in communication with the management bridge with one or more menu items that control the first controllable device, implementing at least some of the first control signals.

Another method of on boarding an in-home control device to a management bridge and automatically configuring a concierge device to replicate control capabilities of the control device, includes: receiving a first enrollment signal from the first in-home control device that uniquely identifies the first control device, automatically determining first control signals used to control the first controllable device, and enrolling the first controllable device with an in-home management bridge; automatically determining first control signals generated by the first control device; and configuring a concierge device coupled in communication with the management bridge with one or more menu items that replicate control capabilities of the first control device.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including

memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Virtual Apps and Advertising

Implementation #20

Some implementations describe a concierge device that redundantly connects to an associated consumer device to an in-home management bridge or to cloud-based management server. The concierge device includes: at least one wireless transceiver and network protocol stack adapted to be coupled in communication with at least a home management bridge and cloud-based management server; a memory; at least one user input sensor (which optionally could be the microphone identified below); a display; a speaker and microphone; a processor coupled to the transceiver, the memory, the input sensor, and the display; instructions running on the processor. The instructions, when executed, cause the concierge device to: wirelessly couple the concierge device to the in-home management bridge; wirelessly couple the concierge device to the cloud-based management server; sense availability or unavailability of the in-home management bridge and the cloud-based management server; preferentially rely on one of the in-home management bridge or the cloud-based management server and alternatively rely on the other one; register the consumer device through the in-home management bridge or alternatively through the cloud-based management server; responsive to the registration of the consumer device, receive one or more control menus for the consumer device and control strings to send directly or indirectly to the consumer device to implement selections from the control menus; and responsive to actions of a user, send directly or indirectly to the consumer device the control strings.

This device and other implementations of the technology disclosed can each optionally include one or more of the following features.

The concierge device can be coupled in communication with at least one consumer device through the in-home management bridge. This communication can be direct, through the in-home management bridge or through a wireless access point.

The user input sensor can be a button, a motion sensor, an orientation sensor, or a microphone.

In some implementations, the concierge device accepts control menus for control of appliances, including at least a refrigerator, dishwasher and washing machine.

The concierge device describe above may further include instructions running on the processor that: forward concierge device identification information to the in-home consumer management bridge or alternatively to the cloud-based consumer management services, depending on availability; and cause the in-home consumer management bridge or the cloud-based consumer management services to initiate a support call, responsive to a user pressing the button, and to provide information regarding the associated consumer device that allows the support call to bypass an automated attendant or to invoke an interactive voice recognition system using information specific to the associated consumer device.

In some implementations, the concierge device includes instructions that cause the concierge device to store information particular to a plurality of consumer devices as they are registered and to make that information available for control or support of the consumer devices either directly or via the bridge, responsive to selection of a particular associated consumer device.

Instructions running on the processor can cause the processor of the concierge device to receive alert messages regarding completion of a task by an in-home consumer device. Instructions running on the processor also can cause the processor of the concierge device to receive alert messages regarding interruption of a task being performed by an in-home consumer device. The concierge device can be configured to emit an audible alert or display a message in response to the alert messages.

Instructions running on the processor further can cause the processor of the concierge device to check for updates to the control menus without need for user intervention.

Implementation #21

Another implementation describes a method including: receiving an identification of an unregistered consumer device from which at least a make and model of the consumer device can be determined; registering the consumer device using the identification received; and automatically configuring a home control device with menus and control codes that control the consumer device and with support information, wherein the home control device includes one or more input sensors and a display.

This implementation optionally includes, responsive to a single user action sensed by the input sensors, the home control device initiating contact with a service center that supports the consumer device, including automatically transmitting information from which the service center can identify the consumer device and determine whether to engage an automated support protocol based on the consumer device to be supported.

This method and other implementations of the technology disclosed can each optionally include one or more of the following features.

Other implementations include: automatically transmitting status information regarding the consumer device to the service center; and displaying information received from the service center during the automated support protocol.

In some implementations, the wherein the home control device is coupled in communication with the service center by an in-home support gateway; and the method further includes the in-home support gateway relaying communications between home control device and the service center.

In other implementations, the home control device is coupled in communication with a cloud-based support gateway via a network that extends beyond the home and the method further includes the cloud-based support gateway implementing the registering of the consumer device and the automatically configuring of the home control device.

Some implementations further include causing the consumer device to be coupled in data communication with the support center, thereby allowing diagnostic communications between the consumer device and the support center.

A support call can be conducted using the home control device to capture the user's voice and to reproduce audio for the user to hear. It can use at least one video camera on the home control device to provide visual information to the support center during the support call.

Further implementations include the home control device receiving a data stream from the consumer device and displaying information from the data stream on the home control device in coordination with interactions between the home control device and the consumer device.

When the consumer device is a television or video image source coupled to a monitor, the information displayed on the home control device display can be coordinated with images displayed on the television or monitor.

The information displayed on the home control device can identify a company or product and can be coordinated with

product placement in an advertisement or program scene. Or it can be coordinated with subject matter of an advertisement or program scene.

Information can be displayed on the home control device as a user navigates through content by fast forwarding, rewinding or skipping.

Implementation #22

Some implementations describe a system including: at least one wireless data communication adapter, one or more input sensors, one or more outputs, and memory; and at least one processor configured to perform operations. The operations are including: receiving an identification of an unregistered consumer device from which at least a make and model of the consumer device can be determined; registering the consumer device using the identification received; and automatically configuring a home control device with menus and control codes that control the consumer device and with support information, wherein the home control device includes one or more input sensors and a display. In this system, responsive to a single user action sensed by the input sensors, the home control device initiating contact with a service center that supports the consumer device, including automatically transmitting information from which the service center can identify the consumer device and determine whether to engage an automated support protocol based on the consumer device to be supported.

This system and other implementations of the technology disclosed can each optionally include one or more of the following features.

In some implementations, the system further includes the processor configured to perform operations including: automatically transmitting status information regarding the consumer device to the service center; and displaying information received from the service center during the automated support protocol.

Some system implementations further include an in-home support gateway that comprises at least one gateway processor configured to perform operations including relaying communications between home control device and the service center. In these implementations, the home control device can be coupled in communication with the service center by through the in-home support gateway. The gateway processor can be further configured to perform operations that implement the registering of the consumer device and the automatically configuring of the home control device.

Other system implementations further include a cloud-based support gateway that comprises at least one gateway processor configured to perform operations that implement the registering of the consumer device and the automatically configuring of the home control device. In these implementations, the home control device is coupled in communication with the cloud-based support gateway via a network that extends beyond the home.

The processor used can be further configured to perform operations including causing the consumer device to be coupled in data communication with the support center, thereby allowing diagnostic communications between the consumer device and the support center.

The processor on the home control device can be further configured to perform operations including conducting a support call with the support processor regarding the consumer device using the home control device to capture the user's voice and to reproduce audio for the user to hear. The processor on the home control device can be further configured to perform operations including using at least one video camera on the home control device to provide visual information to the support center during the support call.



Any of these implementations can further include the processor on the home control device is further configured to perform operations including receiving a data stream from the consumer device and displaying information from the data stream on the home control device in coordination with interactions between the home control device and the consumer device. When the consumer device is a television or video image source coupled to a monitor, the information displayed on the home control device display can be coordinated with images displayed on the television or monitor. The information displayed on the home control device can identify a company or product and is coordinated with product placement in an advertisement or program scene. Or it can be coordinated with subject matter of an advertisement or program scene. The information can be displayed on the home control device as a user navigates through content by fast forwarding, rewinding or skipping.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a method including actions implemented by the processors of the device of system as described above.

Implementation #23

Some implementations describe a method of delivering information to a consumer, including: pairing a concierge device with a consumer electronic (abbreviated CE) device via a two-way wireless RF connection; the concierge device receiving a data stream from the CE device and displaying information from the data stream on a display integral to the remote control.

This method and other implementations of the technology disclosed can each optionally include one or more of the following features.

In some implementations, the concierge device relies on the CE device to transcode information from an MPEG transmission stream into a simplified concierge device format.

As above, when the consumer device is a television or video image source coupled to a monitor, the information can be displayed on the concierge device display is coordinated with images displayed on the television or monitor. Other features of information displayed apply to this method as well as the prior methods.

I claim:

**1**. A method of initiating a support session for a consumer device using a concierge device, the method including:

- associating the concierge device with a selected consumer device;
- responsive to a single action performed by a user, the concierge device communicating with a home gateway, including
  - causing the home gateway to buffer consumer device identification information for the selected consumer device and determine a support center for a support session; and
  - causing the home gateway to initiate the support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either
    - to bypass an automated attendant or interactive voice recognition system or
    - to initiate an automated support protocol.

**2**. The method of claim **1**, wherein the associating further includes wirelessly pairing the concierge device with the selected consumer device and identifying the paired selected consumer device to the home gateway.

3. The method of claim 1, wherein the associating further includes selecting the consumer device from a menu of candidate consumer devices known to the home gateway.

4. The method of claim 3, wherein the menu is an audio menu.

5. The method of claim 1, wherein the menu is displayed visually.

6. The method of claim 1, wherein the home gateway is a physical device separate and distinct from the concierge device, to which the concierge device sends messages via an in-home network.

7. The method of claim 1, wherein the home gateway is part of the same physical device as the concierge device.

8. The method of claim 1, wherein the home gateway is a cloud-based device to which the concierge device sends messages via a network that extends outside the home.

9. The method of claim 1, further including the concierge device receiving status information from the selected consumer device and forwarding the status information to the home gateway for use in the support session.

10. The method of claim 1, further including the home gateway connecting with and receiving status information from the selected consumer device and using the status information in the support session.

11. The method of claim 1, further including the home gateway relaying messages to and from the selected consumer device during the support session.

12. The method of claim 1, further including displaying information received during the automated support protocol on a display of the concierge device.

13. The method of claim 1, further including enabling a user of the concierge device to bypass interactive response systems and begin the support session by talking to a human support agent, based on the forwarded consumer device identification information.

14. The method of claim 1, further including causing the home gateway to determine which of several support centers to initiate contact with to support the particular consumer device.

15. The method of claim 1, further including displaying on a display of the concierge device a targeted or interactive advertisement.

16. A concierge device comprising:

at least one wireless data communication adapter, one or more input sensors, one or more outputs, and memory; and

at least one processor configured to perform operations including:

associating the concierge device with a selected consumer device including selecting the consumer device from a menu of candidate consumer devices known to a home gateway;

responsive to a single action performed by a user, the concierge device communicating with the home gateway, including

causing the home gateway to buffer consumer device identification information for the selected consumer device and determine a support center for a support session; and

causing the home gateway to initiate a support session for the consumer device and to forward automatically the consumer device identification information during a support session, thereby allowing the support session either

to bypass an automated attendant or interactive voice recognition system or

to initiate an automated support protocol.

17. The concierge device of claim 16, wherein the associating further includes wirelessly pairing the concierge device with the selected consumer device and identifying the paired selected consumer device to the home gateway.

18. The concierge device of claim 16, wherein the menu is an audio menu.

19. The concierge device of claim 16, wherein the menu is displayed visually.

20. The concierge device of claim 16, wherein the home gateway is a physical device separate and distinct from the concierge device and having its own processor, to which the concierge device is configured to send messages via an in-home network.

21. A system including the concierge device of claim 16, wherein the home gateway is part of the same physical device as the concierge device.

22. The concierge device of claim 16, wherein the home gateway is a cloud-based device to which the concierge device sends messages via a network that extends outside the home.

23. The concierge device of claim 16, further comprising the processor configured to perform operations including receiving status information from the selected consumer device and forwarding the status information to the home gateway for use in the support session.

24. A system including the concierge device of claim 16, further comprising the home gateway including a processor configured to perform operations including connecting with and receiving status information from the selected consumer device and using the status information in the support session.

25. A system including the concierge device of claim 16, further comprising the home gateway including a processor configured to perform operations including relaying messages to and from the selected consumer device during the support session.

26. The concierge device of claim 16, further comprising the processor configured to perform operations including displaying information received during the automated support protocol on a display of the concierge device.

27. The concierge device of claim 16, further including enabling a user of the concierge device to bypass interactive response systems and begin the support session by talking to a human support agent, based on the forwarded consumer device identification information.

28. The concierge device of claim 26, further including displaying supplemental information on the concierge device as the user is participating in the support session.

29. The concierge device of claim 28, where the supplemental information displayed includes a targeted or interactive advertisement.

* * * * *

US008885802B2

(12) **United States Patent**
**Stepanian**

(10) **Patent No.: US 8,885,802 B2**
(45) **Date of Patent: *Nov. 11, 2014**

(54) **TETHERED DIGITAL BUTLER CONSUMER ELECTRONIC REMOTE CONTROL DEVICE AND METHOD**

(71) Applicant: **Nexstep, Inc.**, San Jose, CA (US)

(72) Inventor: **Robert Stepanian**, San Jose, CA (US)

(73) Assignee: **Nexstep, Inc.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/948,061**

(22) Filed: **Jul. 22, 2013**

(65) **Prior Publication Data**

US 2014/0049383 A1 Feb. 20, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/047,445, filed on Mar. 14, 2011, now Pat. No. 8,494,132, which is a continuation of application No. 12/758,241, filed on Apr. 12, 2010, now Pat. No. 7,907,710, which is a continuation of application No. 12/572,677, filed on Oct. 2, 2009, now Pat. No. 7,697,669, which is a continuation of application No. 12/420,723, filed on Apr. 8, 2009, now Pat. No. 7,609,824, which is a continuation of application No. 12/210,782, filed on Sep. 15, 2008, now Pat. No. 7,542,753, which is a continuation of application No. 11/465,749, filed on Aug. 18, 2006, now Pat. No. 7,444,130, which is a continuation-in-part of application No. 11/350,980, filed on Feb. 8, 2006, now Pat. No. 7,389,103.

(60) Provisional application No. 60/709,666, filed on Aug. 19, 2005.

(51) **Int. Cl.**
*H04M 11/00* (2006.01)

(52) **U.S. Cl.**
USPC .................................... **379/102.03**; 370/352

(58) **Field of Classification Search**
USPC ......... 455/403; 713/186; 725/11, 6; 382/124; 379/88.17, 102.03; 370/352
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,546,471 A 8/1996 Merjanian
5,650,831 A 7/1997 Farwell
(Continued)

FOREIGN PATENT DOCUMENTS

JP 2001095067 A 4/2001
JP 2002543647 A 12/2002
(Continued)

OTHER PUBLICATIONS

Office Action from corresponding Japanese Application No. 2012-250247 (including English translation), mailed Oct. 7, 2013, pp. 1-7.
(Continued)

*Primary Examiner* — Olisa Anwah
(74) *Attorney, Agent, or Firm* — Haynes Beffel & Wolfeld LLP; Ernest J. Beffel, Jr.

(57) **ABSTRACT**

The present invention relates to a digital butler consumer electronics product and method. The digital butler, of a price and form factor suitable for consumer electronics markets of developed and developing countries, includes a communications and multi-media console and a wireless remote. The remote may resemble a handheld personal computer (HPC), a palm-held personal computer (PPC or PDA) or a smart phone, but has a low cost and feature set supported by the console that is novel in the consumer electronics market.

**7 Claims, 6 Drawing Sheets**




Joint Trial Exhibit
**JTX-4**
Case No. 19-cv-01031-RGA

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,097,441 A | 8/2000 | Allport | |
| 6,710,790 B1 | 3/2004 | Fagioli | |
| 6,906,635 B1 | 6/2005 | Moutaux et al. | |
| 6,970,098 B1 | 11/2005 | Adams et al. | |
| 7,389,103 B2 | 6/2008 | Stepanian | |
| 7,444,130 B2 | 10/2008 | Stepanian | |
| 7,542,753 B2 | 6/2009 | Stepanian | |
| 7,609,824 B2 | 10/2009 | Stepanian | |
| 7,627,825 B2 | 12/2009 | Kakuda | |
| 7,697,669 B2 | 4/2010 | Stepanian | |
| 7,907,710 B2 | 3/2011 | Stepanian | |
| 8,494,132 B2 | 7/2013 | Stepanian | |
| 2002/0002707 A1 | 1/2002 | Ekel et al. | |
| 2002/0044199 A1 | 4/2002 | Barzebar et al. | |
| 2002/0045484 A1 | 4/2002 | Eck et al. | |
| 2002/0059588 A1 | 5/2002 | Huber et al. | |
| 2002/0073416 A1 | 6/2002 | Ramsey Catan | |
| 2002/0092025 A1 | 7/2002 | Klumpp | |
| 2002/0158812 A1 | 10/2002 | Pallakoff | |
| 2002/0174444 A1 | 11/2002 | Gatto et al. | |
| 2003/0035075 A1 | 2/2003 | Butler et al. | |
| 2003/0171127 A1 | 9/2003 | White | |
| 2003/0188322 A1 | 10/2003 | Bontempi | |
| 2003/0210126 A1 | 11/2003 | Kanazawa | |
| 2003/0228883 A1 | 12/2003 | Kusakari et al. | |
| 2004/0008287 A1 | 1/2004 | Johnston et al. | |
| 2004/0024638 A1 | 2/2004 | Restis | |
| 2004/0066308 A1 | 4/2004 | Sampsell | |
| 2004/0087369 A1 | 5/2004 | Tanaka et al. | |
| 2004/0110563 A1 | 6/2004 | Tanaka et al. | |
| 2004/0174863 A1 | 9/2004 | Caspi et al. | |
| 2004/0176170 A1 | 9/2004 | Eck et al. | |
| 2004/0187157 A1 | 9/2004 | Chong et al. | |
| 2004/0214562 A1 | 10/2004 | Adan et al. | |
| 2004/0224638 A1 | 11/2004 | Fadell et al. | |
| 2004/0227859 A1 | 11/2004 | Liang | |
| 2004/0249925 A1 | 12/2004 | Jeon et al. | |
| 2004/0249962 A1 | 12/2004 | Lecomte | |
| 2005/0012723 A1 | 1/2005 | Pallakoff | |
| 2005/0122649 A1 | 6/2005 | Yamamoto | |
| 2005/0130744 A1 | 6/2005 | Eck et al. | |
| 2005/0181877 A1 | 8/2005 | Kuwahara et al. | |
| 2005/0197187 A1 | 9/2005 | Mitsuyoshi et al. | |
| 2005/0262535 A1 | 11/2005 | Uchida et al. | |
| 2005/0282634 A1 | 12/2005 | Yamada et al. | |
| 2005/0282639 A1 | 12/2005 | Tanaka et al. | |
| 2006/0037045 A1 | 2/2006 | Hsieh | |
| 2006/0040638 A1 | 2/2006 | McQuaide | |
| 2006/0041923 A1* | 2/2006 | McQuaide | 725/131 |
| 2006/0052136 A1 | 3/2006 | Harris | |
| 2006/0079329 A1 | 4/2006 | Yamada et al. | |
| 2006/0106963 A1 | 5/2006 | Sasaki et al. | |
| 2006/0107281 A1 | 5/2006 | Dunton | |
| 2006/0271791 A1 | 11/2006 | Novack et al. | |
| 2006/0282572 A1 | 12/2006 | Steinberg et al. | |
| 2007/0011604 A1 | 1/2007 | Chiu | |
| 2007/0018845 A1* | 1/2007 | Sutardja | 340/825.69 |
| 2007/0121606 A1 | 5/2007 | Scheinert | |
| 2007/0129106 A1 | 6/2007 | Liu | |
| 2007/0183401 A1 | 8/2007 | Bennett | |
| 2009/0009586 A1 | 1/2009 | Cassanova | |
| 2011/0298581 A1 | 12/2011 | Hsu | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| JP | 2003116074 A | 4/2003 |
| JP | 2003529959 A | 10/2003 |
| JP | 2004040656 A | 2/2004 |
| JP | 2004172695 A | 6/2004 |
| JP | 2004235962 A | 8/2004 |
| JP | 2005510965 A | 4/2005 |
| JP | 2005518741 A | 6/2005 |
| JP | 2005-184350 A | 7/2005 |
| WO | 00/65553 A1 | 11/2000 |
| WO | 0105155 A1 | 1/2001 |

OTHER PUBLICATIONS

Apr. 6, 2012 Office Action in CN 200680037375.9.
European Search Report for Application EP 06801953, mailed Oct. 22, 2009.
PCT International Search Report for International Application No. PCT/US06/32527, mailed Sep. 24, 2007.
Bluetooth Doc—Audio/Video Remote Control Profile, ver 1.0, May 22, 2003.
Bluetooth Network Encapsulation Protocol (BNEP) Specification, Revision 0.95a, Jun. 12, 2001, 50 pp.
European Examination Report, Application No. 06 801 953.8-2414, mailed Aug. 9, 2010.
Office Action mailed Jan. 17, 2012, related Chinese App. 200680037375.9.
May 14, 2012 OA in JP 2008-527199, 6pp.
Feb. 14, 2011 OA in JP 2008-527199, 10pp.
Prosyst.com, Technical White Paper—'The world's smallest OSGI solution', pp. 1-3, Sep. 2010, www.prosyst.com.
Santo, Brian, 'The Evolution of Residential Gateways', pp. 1-7, May 31, 2011, Communications, Engineering and Design (CED) Magazine.
Prosyst.com, Smart Home, 'Best of Breed Home Gateway Middleware—and beyond', pp. 1-2, accessed May 8, 2012 www.prosyst.com/indexphp/de/html/content/38/Smart-Home-Products/.
Prosyst.com, Smart Home, 'We help you creat your Solution', Jun. 22, 2011, pp. 1-2, www.prosyst.com.
Motorola, 'Motorola's 4home Software Solutions', pp. 1-5, Feb. 11, 201, www.motorola.com/Video-Solutions/US-EN/Products-and-Services/Software/4Ho- me-Software-Solutions/4HOME-CONTROL-HOME-MANAGEMENT-US-EN.
Ionics, Ionics Stratus Plug, Feb. 9, 2010, pp. 1-3, www.ionicsplug.com/stratus.html.
Office Action in U.S. Appl. No. 11/350,980, mailed Sep. 18, 2007.
Response to Sep. 18, 2007 Office Action, U.S. Appl. No. 11/350,980.
Notice of Allowance, U.S. Appl. No. 11/350,980, mailed Jan. 23, 2008.
Office Action in U.S. Appl. No. 11/465,749, mailed Sep. 18, 2007.
Response to Sep. 16, 2008 Office Action, U.S. Appl. No. 11/465,749.
Final Office Action, U.S. Appl. No. 11/465,749, mailed Jan. 24, 2008.
Response to Jan. 24, 2008 Final Office Action, U.S. Appl. No. 11/465,749.
Notice of Allowance, mailed Jun. 24, 2008, U.S. Appl. No. 11/465,749.
Office Action, mailed Jan. 15, 2009, U.S. Appl. No. 12/210,782.
Response to Jan. 15, 2009 Office Action, U.S. Appl. No. 12/210,782.
Notice of Allowance, U.S. Appl. No. 12/210,782, mailed Sep. 15, 2008.
Notice of Allowance, U.S. Appl. No. 12/420,723, mailed Jul. 29, 2009.
Office Action, U.S. Appl. No. 12/572,677, mailed Nov. 13, 2009.
Response to Nov. 13, 2009 Office Action, U.S. Appl. No. 12/572,677.
Notice of Allowance, U.S. Appl. No. 12/572,677, mailed Nov. 23, 2009.
Office Action, U.S. Appl. No. 12/572,685, mailed Nov. 9, 2009.
Resp to Nov. 9, 2009 Office Action, U.S. Appl. No. 12/572,685.
Noitce of Allowance, U.S. Appl. No. 12/572,685, mailed Dec. 1, 2009.

* cited by examiner


100
FINGER CHIP SENSOR
121
SPI/HIGH SPEED PARALLEL PORT UART0
111
KEYPAD
GPIO
P89LPC931 KEYBOARD CONTROLLER
122
I2C
LPC 2132
TRACK BALL
123
GPIO EXT INT
GPIO
POWER FROM CRADLE SUPPLY
112
3.6V NI-NM BATTERY
113
3.3V REG BUCK/BOOST
124
Reset Input
DEBUG
8Mb Flash
131
ZEEVO ZV4301 BLUETOOTH SOC
132
LCD MODULE
133
Debug Header
134
Codec
141
MIC
151
SPEAKER
152
HEAD PHONE
153

FIG. 1

FIG. 2


TRST1 TMS1 TCK1 TD1 TDO1
100
XtaC
X12LL RESET
251
230
231 Test/Debug Interface
232
ARM7TDMI-S
233 AHB Bridge
234
Emulation
Trace
Module
241
PLL
System Clock
System Functions
252
Vectored Interrupt Controller
253
211
ARM7 Local Bus
AMBA AHB
(Advanced High-performace Bus)
235
Internal SRAM Controller
212
8/16/32 kB SRAM
213
Internal Flash Controller
222
8/16/512 kB FLASH
223
AHB Decoder
254
236
237
AHB to VPB Bridge
VPB Divider
VPB (VLSI Peripheral Bus)
EINT3:0
External Interrupts
224
8 x CAPO
8 x MAT
Capture/Compare (w/external clock) TIMER 0 & 1
225
AD0.7:0
AD1.7:02
A/D Converters 0 and 12
226
Aout3
D/A Converter2
227
P0.31:0
P1.31:16, 1:0
General Purpose I/O
228
PWM6:1
PWM0
229
PC Serial Interfaces 0 and 1
244
SCL0.1
SDA0.1
SPI and SSP Serial Interfaces
245
SCK0,1
MCXSI0,1
MISO0,1
SSEL0,1
UART 0 & 1
246
TxC0,1
RxD0,1
OSN12, CTS12, RTS14
DTR12, OCD12, R012
Real Time Clock
247
RTXC1
RTXC2
Vtel
Watchdog Timer
248
System Control
249


4.0 GB
0xFFFF FFFF
AHB Peripherals
3.75 GB
0xF000 0000
VPB Peripherals
3.5 GB
0xE000 0000
3.0 GB
0xC000 0000
Reserved Address Space
2.0 GB
0x8000 0000
Boot Block (re-mapped from On-Chip Flash memory)
Reserved Address Space
0x4000 8000
0x4000 7FFF
32kB On-Chip Static RAM (LPC2138)
0x4000 4000
0x4000 3FFF
16kB On-Chip Static RAM (LPC2132)
0x4000 2000
0x4000 1FFF
8kB On-Chip Static RAM (LPC2131)
1.0 GB
0x4000 0000
Reserved Address Space
0x0008 0000
0x0007 FFFF
512kB On-Chip Non-Volatile Memory (LPC2138)
0x0001 0000
0x0000 FFFF
64kB On-Chip Non-Volatile Memory (LPC2132)
0x0000 8000
0x0000 7FFF
32kB On-Chip Non-Volatile Memory (LPC2131)
0.0 GB
0x0000 0000

FIG. 3


100
Main Proc
LPC 2132
404
Keyboard Ctlr
P89LP931
406
Keyboard Matrix
(8 return lines x 13 scan lines)

FIG. 4


100
LPC 2132
CPU
501
AT49 BV802A
8Mb Flash
UART
EBI
502
ZV4301 Bluetooth SOC
PCM
141
MSM 7716
OKI codec
151 Mic
152 Speaker

FIG. 5


System Block
600
Display2
621
Display1
622
610
611B
Serial Port 2
USB Port 3
USB Port 4
USB Port 5
USB Port 6
612B
VGA Connector
VGA Connector
613
PCI-VGA Add On Card
614
MOTHERBOARD
On Board Headers
615
IDE2
IDE1
Serial Port 1
USB Port 1
USB Port 2
PS2 Mouse Port
PS2 Keyboard Port
RJ45 LAN Port
611A
612A
613
614
EXTERNAL INTERFACE
EXTERNAL INTERFACE
EXTERNAL INTERFACE
RS232 Converter
631
Socket Modem Module
634
RJ11 Connector
635
USB WiFi Module
632
USB Bluetooth Module
633
DVD Drive
624
Hard Disk Drive
623

FIG. 6


700
INTEL XScale MicroController
732
BLUETOOTH
SPI 1 INTERFACE
VIDEO CAPTURE PORT
750
3MP CMOS CAMERA MODULE
751
WiFi 802.11b/g
USB HOST
733
LCD INTERFACE
LCD 2.2", 320x240 TFT
752
SPEAKER
751
MIC
AUDIO JACK
753
HEADSET
741
AUDIO CODEC
PCM/AC97
711
KEYPAD SCAN INTERFACE
QWERT KEYPAD
721
FINGER PRINT SENSOR
SPI0 INTERFACE
723
GPIO + ANALOG INTERFACE
JOY STICK
724
DC INPUT
713
Battery Charger and Power Management
3.3 Volts
1.2 Volts
712
Battery Pack
Media Reader 760
USB Adapter 770

FIG. 7

# TETHERED DIGITAL BUTLER CONSUMER ELECTRONIC REMOTE CONTROL DEVICE AND METHOD

## RELATED APPLICATIONS

This application is a continuation U.S. patent application Ser. No. 13/047,445, filed Mar. 14, 2011, entitled "TETHERED DIGITAL BUTLER CONSUMER ELECTRONIC REMOTE CONTROL DEVICE AND METHOD", which is a continuation of U.S. Pat. No. 7,907,710, issued Mar. 15, 2011 from application Ser. No. 12/758,241, filed 12 Apr. 2010, by inventor Robert Stepanian, entitled, "TETHERED DIGITAL BUTLER CONSUMER ELECTRONIC DEVICE AND METHOD", which is a continuation of U.S. Pat. No. 7,697,669, filed 2 Oct. 2009, which is a continuation of U.S. Pat. No. 7,609,824, filed 8 Apr. 2009, which is a continuation of U.S. Pat. No. 7,542,753, filed 15 Sep. 2008, which is in turn a continuation of U.S. Pat. No. 7,444,130, filed 18 Aug. 2006, which is a continuation-in-part of U.S. Pat. No. 7,389,103, filed Feb. 8, 2006, which claims the benefit of U.S. Provisional Application No. 60/709,666, filed 19 Aug. 19, 2005.

This application is related to US Design Pat. Application Nos. 29/236,023, 29/236,022 and 29/236,022, filed on Aug. 10, 2005 by inventors Phoebe Ng, Robert Stepanian and Allison S. Conner, entitled, "NAVIGATION BUTTON ARRAY FOR REMOTE CONTROL HOUSING", "REMOTE CONTROL HOUSING" and "CONSOLE HOUSING". The priority, provisional and related design applications are incorporated by reference.

## BACKGROUND OF THE INVENTION

The present invention relates to a tethered digital butler consumer electronics product and method. The tethered digital butler, of a price and form factor suitable for consumer electronics markets of developed and developing countries, includes a communications and multi-media console and a wireless remote. The remote may resemble a handheld personal computer (HPC), a palm-held personal computer (PPC or PDA) or a smart phone, but has a low cost and feature set supported by the console that is novel in the consumer electronics market. In particular, this disclosure relates to combining telephone service, device control and, optionally, a fingerprint reader for easy user identification/authorization and personalization. The remote may be packaged separately from a console and sold to interact with capabilities of a communications and multi-media console from a different source, such as one running on a Windows, OS X or Linux platform.

Convergence of digital devices is not unbounded, because it is guided by market realities. Many concepts are floated as trial balloons that burst, never to see an enabling development effort or a reduction to practice. Some convergence trends are strong and noteworthy. Cellular smartphones or business phones such as Treo or Blackberry products are becoming powerful and supplanting separate PDAs. These smartphones go with the user across a cellular network and even overseas. They are untethered, packing many features into a small form factor, not requiring a console. Another trend is to repackage a PC as media center, complete with a wireless keyboard. Recent announcements suggest interfacing a Microsoft media center with a Bluetooth-equipped cellular telephone to use the sound reproduction of a TV as a sort of speaker phone, relying on the cellular telephone for network connectivity. In both instances, the telephone features are untethered from and do not depend on availability of a console.



For developing countries and cost-conscious buyers, the Treo and media center approaches are over-built and too expensive. An opportunity arises to provide a low-cost integrated consumer electronics system that includes a novel feature set and a cost-effective allocation of technical tasks between a remote and a console.

## SUMMARY OF THE INVENTION

The present invention relates to a tethered digital butler consumer electronics product and method. The tethered digital butler, of a price and form factor suitable for consumer electronics markets of developed and developing countries, includes a communications and multi-media console and a wireless remote. The remote may resemble a handheld personal computer (HPC), a palm-held personal computer (PPC or PDA) or a smart phone, but has a low cost and feature set supported by the console that is novel in the consumer electronics market. In particular, this disclosure relates to combining telephone service, device control and, optionally, a fingerprint reader for easy user identification/authorization and personalization. As another option, a camera can be incorporated into the remote, thereby enabling video conferencing and other visual features. Alternatively, the remote may be packaged separately from a console and sold to interact with capabilities of a communications and console, set-top box, multi-media PC or other consumer electronics device from a different source, such as one running on a Windows, OS X or Linux platform, with or without telephone capabilities. The remote may include a media reader and remote USB port. Particular aspects of the present invention are described in the claims, specification and drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a block diagram of the digital butler remote.

Details of the main processor are depicted in FIG. **2**.

The LPC 2132 memory maps are shown in FIG. **3**.

FIG. **4** shows the 8051 based Philips LPC89LPC931 controller.

FIG. **5** shows the ZV4301 to other CPU and peripheral interfaces.

FIG. **6** is a block diagram of the console.

FIG. **7** is an alternative block diagram of the digital butler remote, with a CMOS camera module and/or memory card reader.

## DETAILED DESCRIPTION

The following detailed description is made with reference to the figures. Preferred embodiments are described to illustrate the present invention, not to limit its scope, which is defined by the claims. Those of ordinary skill in the art will recognize a variety of equivalent variations on the description that follows.

A tethered digital butler produces a low cost, palm-held remote with a novel combination of features that are implemented by logic and resources of the console, connected wirelessly to the palm-held remote. Tethering the palm-held device, so that it depends on logic and resources of the console, runs against the trends and teachings of the consumer electronics industry and particularly against the trend toward more powerful smartphones.

Various novel combinations of features are emphasized in this application. One will recognize that the features discussed can be combined in many ways, while remaining faithful to the tethered digital butler concept.

In a first embodiment of the tethered digital butler, the palm-held remote allows a user to select among and use logic and resources of a bread-box or smaller sized console to authenticate users from a fingerprint reader on the remote, to personalize the user's telephone, TV viewing, media access and internet browsing experiences, to connect the user to a telephone network consistent with the user's authentication, and to control multi-media features, such as channel control, volume control, DVD/CD playback control, and digitally stored music access and playback. In this embodiment, the palm-held remote integrates at least a fingerprint reader, a speaker, microphone and volume control adapted for use as a telephone, a display at least capable of showing a telephone number, a cursor control and trigger adapted to select and control resources of the console, a compact keypad including numeric keys usable for telephone dialing, the compact keypad further including alphabetic keys usable for web browsing. The bread-box or smaller sized console integrates at least a DVD/CD player, a network port and logic and resources adapted to authenticate users of the palm-held remote and personalize their telephone network connection and their Internet browsing based on fingerprints received from the palm-held remote, connect telephone features of the palm-held remote to the telephone network, respond to Internet browsing commands from the palm-held remote and display web pages on a monitor or television, control channels accessed by a video receiver, drive speakers and provide volume control, provide playback control for the DVD/CD player, and access and playback digitally stored music.

In a second embodiment of the tethered digital butler, the palm-held remote has fewer components; the console supports fewer features; thus, the combination will be less expensive and more attractive in many markets. Remote components then include a speaker, microphone and volume control adapted for use as a telephone, a display at least capable of showing a telephone number, a cursor control and trigger adapted to select and control resources of the console, and a compact keypad including numeric keys usable for telephone dialing. The fingerprint reader is not included, nor is the alphabetic keypad. The logic and resources of the console are reduced accordingly. Logic and resources of the console need not authenticate and personalize based on fingerprints or access and playback digitally stored music. Internet browsing may be limited or may be supported by an on-screen keyboard.

In a third embodiment of the tethered digital butler, the DVD/CD player is omitted from the console. The features of the palm-held remote do not much change, but the logic and resources required of the console are reduced.

In fourth embodiment, the console is implemented on a PC, which may be larger than bread-box sized. This typically would be less desirable, as most PCs do not fit a media room décor and are relatively loud, due to fans and hard disk rotation. A new generation of PCs, such as the Mac Mini, presents a small form factor (presently 6.5×6.5×2 inches) and quiet operation, while including enough computing power to function as PC.

In a fifth embodiment, the remote is emphasized. One aspect of the remote is to provide a complete I/O platform in the palm of the user's hand. Features adaptable to VoIP and/or video phone operation, such as a microphone, can be used for other purposes, such as dictation, note taking, voice messaging, listening to music or remote viewing video. To support the high demands of streaming video, a broader communications channel, such as Bluetooth version 2 or later or 802.11n, and a more powerful processor are included. The remote may function in tandem with a console, PC or set top cable or satellite box. It also could be configured to control other consumer electronics device such as a TV, IP-TV, home theater system, component stereo, digital video recorder, DVD player or recorder, VCR, etc. It can receive streaming media directly from a server. The palm-held remote may be combined with a glue logic application that enables a console, PC, set top box or other consumer electronics device to utilize the special purpose controls of the remote. The remote may be adapted to invoke a glue logic application supplied for or native to a communications and/or multi-media console, such as one running under Windows, OS X or Linux.

In a sixth embodiment, a remote control for a gateway device t is coupled to multimedia and communication resources. The gateway device including logic and resources to process wireless input and provide access to the multimedia and communication resources. The remote control includes a palm-held remote adapted to invoke glue logic running on the gateway device by wirelessly directing input to the gateway device. It integrates at least a speaker and volume control adapted for use as a remote speaker, a fingerprint reader and a cursor control and trigger adapted to select and control resources of the console. Glue logic invoked wirelessly by the remote control is adapted to connect the speaker to a sound reproduction module and connect the fingerprint reader to an authentication and personalization module that selects a user profile based on activation of the fingerprint reader and authentication of the user. The personalization module adapted to present the user's personalized favorite media access, present the user's personalized history lists, automatically authenticate the user for digital rights management, automatically authenticate the user for communication access, and automatically authenticate the user for electronic wallet reproduction of purchasing credentials.

An alternative to video operation of a camera is still operation of the camera. The still camera may be wirelessly coupled to a photographic capture module running on another device, which persists the pictures taken. The persistence at the other device can simplify the remote and reduce its cost, as only temporary buffering in the remote is needed.

An aspect of this disclosure that can be combined with any of the foregoing embodiments is remote on-screen menu and controls display, translating a device menu and controls display that would normally appear on a TV or monitor for reproduction on a display that is part of the remote. To implement this capability, a menu-generating device can assemble on-screen menus and controls as separate data stream, apart from any video image that the menus and controls overlay. The data stream can be supplied both to the device's own on-screen overlay generator and to a communications module coupled to the remote. The remote uses the data stream to render the on-screen display in a legible format, adapted to the reduced size of a screen on the remote. Preferably, the menu and control organization format on the remote mimics what the viewer can see on the screen, to minimize confusion. Technologies such as a subset of HTML and JavaScript allow a designer to specify a menu and control layout in terms that permit rendering to a variety of display sizes. Remote display of the on-screen menu and control data stream may preempt a video image display or may be overlaid on top of the video image. Optionally, the device's on-screen menu and controls can be supplied to the remote exclusively as a data stream and not as part of a rendered video stream, to avoid confusing menus of different sizes. Alternatively, the on-screen menus and controls may just appear on the remote's display as a consequence of being rendered to a TV or monitor that is reproduced on the remote's display.

In any of these embodiments, a camera module can be incorporated into the remote, thereby enabling video conferencing and other visual features. The camera is complemented by a glue logic application supplied for or native to a communications and/or multi-media console, such as one running under Windows, OS X or Linux. To support full motion video, Bluetooth version 2 or later or a wireless Ethernet protocol may be used to supply the required bandwidth.

As a further aspect of these embodiments, the console may be equipped with a non-volatile memory sized to time-shift playback from the video receiver and its logic and resources are further adapted to provide a menu of upcoming video content, schedule recording of the video content and replay the video content. Alternatively, the non-volatile memory may be sized to hold a library of digital music.

The I/O platform in the palm of our hand concept can be enhanced by adding a memory card reader to the remote. One or more of the many memory card formats now in use or as may be developed in the future can be accommodated.

Another form of I/O is provided through a USB or Firewire port. The remote may integrate a USB connector and port or similar Firewire support. Glue logic running on the host device may be adapted to treat the USB or Firewire port as if it were local to a machine being accessed using the remote.

In another aspect of these embodiments, the remote may hold a DRM key and automatically deliver the key to DRM-enabled device. Either memory on the remote, a memory module or an identification reader combined with the remote may hold the DRM key. The identification reader can read a smart card or similar module with memory or can read a fingerprint in order to authorize automatic use of the DRM key to exercise DRM-evidenced rights. When a user visits a neighbor's console, they may take along their hand-held remote and the associated digital rights for use on the neighbor's console or other device.

Another feature that can be combined with any of these embodiments is personalization based on a single action, a swipe of the fingerprint reader. Coupled wirelessly to the fingerprint sensor software is a personalization module. If a user does not identify himself by swiping the fingerprint sensor, then a generic profile is applied to personalization of music, movies, photos, videos, files and telephone access. If the user swipes the fingerprint sensor, then personalization can be applied, analogous to switching users in current Windows XP implementations. This degree of context shifting based on a single action at a remote control is believed to be new and unique. The personalization may include: favorite channels/movies/shows in a streaming video environment; favorite music, photos or video in an on demand environment; approved access to DRM-controlled content using one or more keys linked to the fingerprint; history of searches, recent topics, personal interest (a la Google Sidebar or Claria PersonalWeb), personal receptiveness to advertising content, recently accessed files; automatic authenticated access to communication channels linked to the fingerprint, such as voice over IP, instant messaging, web conferencing and e-mail; electronic wallet access, automatically looking up credit card information and other account authorization information; and sharing of information by person logged in.



The console may be equipped with a remote locator control button that causes the remote to emit a tone which makes it easier to locate.

The form factor of a palm-held remote should be easily recognized.

The form factor of a bread-box or smaller sized console can be judged by volume. A smallish consumer electronics component uses an enclosure (from which connectors and feet protrude) that is 12 by 15 by 3 inches and has a volume of 540 cubic inches. This is an approximately bread-box sized enclosure, although the shape differs from a loaf of bread.

Remote Hardware

Introduction

The digital butler remote is a gadget based on the Bluetooth or another wireless technology used for communications and remote control applications.

Features

The digital butler remote board is an ARM7 processor based solution.

This remote is built around the Philips LPC2132 ARM controller. The main processor provides interfaces for the Keypad, Trackball or other pointing device, 128*32 graphics LCD module, fingerprint sensor, and Bluetooth SOC. The Bluetooth SOC and Zeevo ZV4301 interface with a microphone, speaker and headphone for voice utilities. The system may use a Philips 89LPC931 controller for the keypad interface through a I2C Bus. Alternative hardware configurations are illustrated in FIGS. **7** and **8**.

FIG. **1** is a block diagram of the digital butler remote.

Embodiment Details

| Chip Name | Chip number | Description |
|---|---|---|
| Main processor (100) | LPC2132, Philips. | Main CPU, 60 MHz/64 Kb flash/16 Kb SRAM |
| Keypad controller (122) | 89LPC931, Philips. | 8051 MCU compatible with 8 KB flash, 12C interface. |
| LCD Display module (133) | DDG128032AAD, DDTL. | 128*32 graphics parallel/serial LCD Module. |
| TrackBall (123) | TBWB2A00, ITT Industries, Cannon; Omni- or Vari-Point or Omni- or Vari-Disk devices, ITT Industries, Cannon. | Miniature all directional scanning switch. |
| Fingertip sensor (121) | AES3400, Authentech. | Fingertip sensor with SPI interfaces. |
| Bluetooth SOC (132)) | ZV4301, Zeevo or equivalent by Broadcom or RSMD. | Bluetooth SOC with, UART interface. |
| Flash Memory (131) | AT49BV802A, Atmel. | Bluetooth SOC Flash, 8 Mb |
| Codec IC (141) | MSM7716, OKI. | Single rail codec. |
| Power Supply (113) | LTC 3440EDD - Linear Technology. | Micro power synchronous 600ma Buck-Boost Dc-DC converter |

Additional details of the main processor are depicted in FIG. **2**. The LPC2132 (**100**) is based on a 32/16-bit ARM7TDM1-S CPU (**232**) with real time emulation and embedded trace support, together with 64 Kbytes (KB) of embedded high speed flash memory (**223**). A 128 bit wide memory interface (**211**, **212**, **222**) and accelerator architecture enable 32 bit code execution at maximum clock rate. For critical code size applications, an alternate 16 bit "thumb mode" reduces code by more then 30% with minimal performance penalty. Due to their tiny size and low power consumption, these micro controllers are typically used for miniaturized applications, such as hand-held equipment. Most peripheral pins can also be remapped as General Purpose I/O pins. The system includes on-chip SRAM of 16 KB (**213**) and is well suited for communication gateways and protocol converters, soft modems, voice recognition and low end managing, providing both large buffer size and high processing power. Various 32-bit timers (**247**, **248**), 10-bit 8 channel ADC(s) (**226**), 10-bit DAC (**227**), PWM channels (**225**) and 47 GPIO lines (**228**) with up to nine edge or level sensitive external interrupt pins, make these microcontrollers particularly suitable for industrial control and hand-held systems.

The integrated ARM microprocessor operates at 60 MHz and, in one embodiment, supports the following features:

16/32-bit ARM7TDM1-S microcontroller (**232**) in a tiny LQFP64 package. 8/16/32 KB of on-chip static RAM (**213**) and 64/512 KB of on-chip Flash program memory (**223**). A 128 bit wide interface/accelerator (**211**, **212**, **222**) enables high speed 60 MHz operation.

In-System/In-Application Programming (ISP/IAP) via on-chip boot-loader software. Single Flash sector or full chip erase in 400 ms and programming of 256 bytes in 1 Ms. Embedded Trace interfaces (**231**) offer real-time debugging with the on-chip real monitor software and high speed tracing of instruction execution. One 8 channel 10-bit A/D converters (**226**) provides a total of up to 16 analog inputs, with conversion times as low as 244 μs per channel.

Single 10-bit D/A converter (**227**) provides variable analog output.

Two 32-bit timers/counters (with four capture and four compare channels each) (**225**), PWM unit (six outputs) (**225**) and watchdog (**248**).

Real-time clock (**247**) equipped with independent power and clock supply permitting extremely low power consumption in power-save modes. Multiple serial interfaces including two UART (16C550) (**246**), two Fast I2C-bus (400 Kb/s) (**244**), SPI and SSP (**245**) with buffering and variable data length capabilities.

Vectored interrupt controller (**253**) with configurable priorities and vector addresses.

Up to 47 5 V tolerant general purpose I/O pins (**228**) in tiny LQFP64 package.

Up to nine edge or level sensitive external interrupt pins (**224**) available.

60 MHz maximum CPU clock available from programmable on-chip PLL (**241**).

On-chip crystal oscillator with an operating range of 1 MHz to 30 MHz.

Power saving modes include idle and Power-down.

Individual enable/disable of peripheral functions as well as peripheral clock scaling down for additional power optimization.

Processor wake-up from Power-down mode via external interrupt (**224**).

Single power supply chip with POR and BOD circuits.

CPU operating voltage range of 3.0 V to 36 V (33 V±10%) with 5 V tolerant I/O pads.

The LPC 2132's 64 KB of flash memory (**223**) may be used for both code and data storage. Programming of the flash memory may be accomplished in several ways. It may be programmed in the system via the serial port (**245**). The application program may also erase and/or program the flash while the application is running, allowing flexibility for data storage field firm grade upgrades, etc. While the on chip boot loader is used, 64 KB flash memory is available for user code. The LPC2132 flash memory provides a minimum of 100,000 erase/write cycles and 20 years of data retention. On-chip static RAM (**213**) may be used for code and/or data storage. The SRAM may be accessed as 8 bits, 16 bits or 32 bits wide. General purpose parallel I/O is supported by device pins that are connected to a specific peripheral function are controlled by the GPIO registers. Pins may be dynamically configured as inputs or outputs. Separate registers allow setting or clearing any number of outputs simultaneously. The value of the output register may be read back, as well as the current state of the port pins. The GPIO lines have the following features.

Direction control of individual bits.

Separate control of output set and clear.

All I/O default to inputs after reset.

The LPC 2132 memory maps shown in FIG. **3** incorporate several distinct regions. In addition, the CPU interrupt vectors may be re-mapped to allow them to reside in either Flash memory (by default) or on-chip static RAM.

The vectored interrupt controller (VIC) accepts all of the interrupt request inputs and categorizes them as FIQ, vectored IRQ, and non vectored IRQ as defined by programmable setting. The programmable assignment scheme means that priorities of interrupts from the various peripherals can be dynamically assigned and adjusted.

Fast interrupt request (FIQ) has the highest priority. If more than one request is assigned to FIQ, the VIC combines the requests to produce the FIQ signal to the ARM processor. The fastest possible FIQ latency is achieved when only one request is classified as FIQ, because then the FIQ service routine can simply start dealing with that device. But if more than one request is assigned to the FIQ class, the FIQ services routine can read a word from the VIC that identifies an FIQ source that is requesting an interrupt. Vectored IRAs have middle priority. Sixteen of the interrupts can be assigned to this category. Any of the interrupt requests can be assigned to any of the 16 vectored IRQ slots, among which slot 0 has the highest priority and slot 15 has the lowest. Non-vectored IRQ's have the lowest priority.

The VIC combines the requests from all the vectored and non-vectored IRAs to produce the IRQ signal to the ARM processor. The IRQ service routine can start by reading the register from the VIC and jumping there. If any of the vectored IRAs are requested, the VIC provides the address of the highest-priority requesting IRAs service routine, otherwise it provides the address of a default routine that is shared by all the non vectored IRAs. The default routine can read another VIC register to see what IRAs are active.

The LPC 2132 contains two UARTs (**246**). One UART provides a full modem control handshake interface, the other provides only transmit and receive data lines. The features of UART is listed below:

16 byte, receive and transmit FIFO s.

Register locations conform to '550' industry standard.

Receiver, FIFO trigger points at 1, 4, 8, and 14 bytes.

Built in baud rate generator.

Standard modem interface signals included on UART 1.

I2C (**244**) is a bi-directional bus for inter IC control using only two wires, a serial clock line (SCL) and a serial data line (SDA). Each device is recognized by a unique address and can operate as either a receiver only device or a transmitter with the capability both to receive and send information.

Transmitters and/or receivers can operate in either master or slave mode, depending on whether the chip has to initiate a data transfer or is only addressed. I2C is a multi-master bus that can be controlled by more than one bus master connected to it.

I2C implemented in LPC2132 support bit rate up to 400 kbit/s (Fast I2C). The features of LPC2132 I2C bus is listed below:

Standard I2C compliant bus interface.

Easy to configure as master, slave, or line-select master or slave.

Programming clocks allow versatile rate control.

Bi-directional data transfer between masters and slaves.

Multi master bus (no center master)

Arbitration between simultaneously transmitting masters without corruption of serial data on the bus.

Serial clock synchronization allows devices with different bit rates to communicate via one serial bus.

Serial clock synchronization can be used as a hand shack mechanism to suspend and resume serial transfer.

The I2C bus may be used for test diagnostics purposes.

The SPI (**245**) is a full duplex serial I/O interface, designed to be able to handle multiple masters and slaves connected to a given bus. A single master and a single slave communicate on the interface during a given data transfer. During a data transfer, the master always sends a byte of data to the slave, and the slave always sends a byte of data to the master. The features of the SPI controller is listed below:

Compliant with serial peripheral interface (SPI) specification.

Synchronous, serial, full duplex, communication.

Combined SPI master and slave.

Maximum data bit rate of one eighth of the input clock rate.

The real time clock (RTC) (**247**) is designed to provide a set of counters to measure time when normal or ideal operating mode is selected. The RTC uses little power, making it suitable for battery powered systems where the CPU is not running continuously (idle mode). The features of RTC are described below.

Measures the passage of time to maintain a calendar and clock.

Ultra low power design to support battery powered systems.

Provides seconds, minutes, hours, day, month, year, day of week, and the day of year.

Programmable reference clock divider allows adjustment of the RTC to match various crystal frequencies.

The 8051 based Philips LPC89LPC931 controller in FIG. **4** is suitable for keyboard interface. The P89LPC930/931 (**404**) is based on a high performance processor architecture that executes instructions in two to four clocks, six times the rate of standard 80051 devices. Many system-level functions have been incorporated into the P89LPC930/931 in order to reduce component count, board space, and system cost. The P89LPC931 has the following enhanced features:

A high performance ARM processor 80C51 CPU provides instruction cycle times of 111 ns to 222 ns for instructions except multiply and divide, when executing at 18 MHz. This is six times the performance of the standard 80051 running at the same clock frequency. A lower clock frequency for the same performance results in power savings and reduced EMI.



2.4 V to 3.6 V VDD operating range. I/O pins are 5 V tolerant.

8 kB flash code memory with 1 kB sectors, and 64-byte page size.

Byte-erase allowing code memory to be used for data storage.

Flash program operation completes in 2 ms.

256-byte RAM data memory.

Real-time clock that can also be used as a system timer.

Enhanced UART with fractional baud rate generator, break detect, framing error detection, automatic address detection and versatile interrupt capabilities.

400 kHz byte-wide I2C-bus communication port.

Eight keypad interrupt inputs, plus two additional external interrupt inputs.

Four interrupt priority levels.

On-chip power-on reset allows operation without external reset components. A reset counter and reset glitch suppression circuitry prevent spurious and incomplete resets. A software reset function is also available.

The keypad 8*13 matrix (**406**) is connected to the GPIO lines of P89LPC931 micro controller (**404**). The keypad has 8 return lines and 13 scan lines. The return lines are connected to the keyboard port of the P89LPC931 micro controller. The P89LPC931 is connected to the main processor LPC2132 through the I2C bus to minimize the number of pins on the main processor.

The custom software is loaded into the flash program memory of the P89LPC931 micro controller which scans the keypad and generates ASCII codes and communicates to the main processor through the I2C bus. The P89LPC931 micro controller is normally kept in power save mode, and it will awaken in response to keyboard interrupts after the key press. The keyboard port of P89LPC931 has a change on status interrupt feature, and hence any key press will generate the keyboard interrupt. The key bounces are taken care of by the software.

The QWERTY keyboard may have a Chinese character entry feature and the software transfers the Chinese corresponding ASCII codes to the main processor in Chinese key entry mode.

The following tables describe interfaces among the CPU (**100**), keyboard controller (**404**) and matrix (**406**):

Keyboard Controller to CPU Interface

| Signal | LPC2132 | P89LPC93 | Remarks |
|---|---|---|---|
| Serial I2C Data | SDA | SDA | I2C interface |
| Serial I2C clock | SCL | SCL | I2C interface |

Keyboard Controller to Matrix Interface

| Signal | P89LPC93 Signal Name | key board | Remarks |
|---|---|---|---|
| K131.0 Keybd input 1 | P0.0 | RET LINE 1 | Keybd Return line 1 |
| KBI.1 Keybd input 2 | P0.1 | RET LINE 2 | Keybd Return line 2 |
| K13I.2 Keybd input 3 | P0.2 | RET LINE 3 | Keybd Return line 3 |
| K13I.3 Keybd input 4 | P0.3 | RET LINE 4 | Keybd Return line 4 |
| KBIA Keybd input 5 | P0.4 | RET LINE 5 | Keybd Return line 5 |
| K13I.5 Keybd input 6 | P0.5 | RET LINE 6 | Keybd Return line 6 |
| K13I.6 Keybd input 7 | P0.6 | RET LINE 7 | Keybd Return line 7 |
| K13I.7 Keybd input 8 | P0.7 | RET LINE 8 | Keybd Return line 8 |
| K130.0 Keybd output 1 | P2.0 | SCAN LINE 1 | Keybd Scan line 1 |

-continued

Keyboard Controller to Matrix Interface

| Signal | P89LPC93 Signal Name | key board | Remarks |
|---|---|---|---|
| K130.1 Keybd output 2 | P2.1 | SCAN LINE 2 | Keybd Scan line 2 |
| K130.2 Keybd output 3 | P2.2 | SCAN LINE 3 | Keybd Scan line 3 |
| K130.3 Keybd output 4 | P2.3 | SCAN LINE 4 | Keybd Scan line 4 |
| KBOA Keybd output 5 | P2.4 | SCAN LINE 5 | Keybd Scan line 5 |
| K130.5 Keybd output 6 | P2.5 | SCAN LINE 6 | Keybd Scan line 6 |
| K130.6 Keybd output 7 | P2.6 | SCAN LINE 7 | Keybd Scan line 7 |
| K130.7 Keybd output 8 | P2.7 | SCAN LINE 8 | Keybd Scan line 8 |
| K130.8 Keybd output 9 | P1.0 | SCAN LINE 9 | Keybd Scan line 9 |
| K130.9 Keybd output 10 | P1.1 | SCAN LINE 10 | Keybd Scan line 10 |
| K130.10 Keybd output 11 | P1.4 | SCAN LINE 11 | Keybd Scan line 11 |
| K130.11 Keybd output 12 | P1.6 | SCAN LINE 12 | Keybd Scan line 12 |
| K130.12 Keybd output 13 | P1.7 | SCAN LINE 13 | Keybd Scan line 13 |

The LCD display (**133**) DD12803AAD, in one embodiment, is a 128*32 dot matrix LCD module. The LCD Module can be easily accessed via parallel micro controller GPIO interface. Its features include:

Transflective display mode and positive type, B/W mode, FSTN LCD.
Graphic 128*32 dot-matrix display format.
Parallel input data from micro controller.
1/33 duty multiplexing ratio.
1/16 bias.
6 o'clock viewing direction.
Dimension outline 35(W)*28.9(H)*1.75(D) mm.
Resolution 128*32 dots.
Active area 29.66(W)*8.45(W) mm.
Dots pitch 0.232(W)*0.265(H) mm.
Dots size 0.202(W)*0.235(H) mm.

The ITT Industries, Cannon TBWB2A00 trackball (**123**) is a miniature all directional scanning switch developed for mobile, remote, PDA, notebook PC, and hand-held device applications. It includes two perpendicular rollers actuated by friction on the ball and two spring contacts which generate (by contact closing and opening) the electrical pulses and a light tactile effect (click) at each pulse. A switch called "Select" is integrated in the trackball. Optimally, two LEDs can be included with the trackball and driven according to the wishes of the user. Several tactile effects can be obtained according to the number of tooth integrated in the gear axle; the standard resolution is 12 pulses per ball rotation. When the Trackball is activated, its relative position changes are analyzed in two directions X and Y. The two perpendicular rollers are actuated by friction on the ball. During their revolution, the rollers activate two spring contacts which generate (by contact closing and opening) the electrical pulses.

To track the ball movements, a simple electronic device tied to the direction contacts converts the vertical and horizontal displacements of the both perpendicular rollers in logical levels of X-axis and Y-axis displacements: Some pull-up resistors (or respectively pull down resistors) are tied to the axis direction contacts while the common contact is tied to the



ground (or respectively to the power supply potential). The change in state interrupts the main LPC2132 processor (**100**). The output pulse frequency is directly proportional to the moving speed and the direction. The pulse frequency is processed by the main processor LPC2132 and the corresponding PS2 data sent to the host system.

Alternatively, the ITT Industries, Cannon Omni- or Vari-Point joystick or the Omni- or Vari-Disk navigation disk can be used instead of a trackball.

The AuthenTec EntrePad, AES3400, AuthenTec's 3rd generation low power, small form-factor fingerprint identification sensor IC (**121**). This product combines silicon-based image capture with a proprietary sensor control and matching algorithms to deliver ability-to-acquire (ATA) fingerprint images and authentication. AuthenTec's EntrePad AES3400 utilizes TruePrint Technology, allowing the sensor to look past the easily obscured outer surface of the skin to the living layer below where the unique ridge and valley patterns of the fingerprint originate. Trueprint is AuthenTec's unique patented imaging technology. During imaging, a small near-field signal is generated between the IC and the finger's living tissue layer. 16,384 individual elements in the sensor matrix form a planar antenna array that receives this signal, creating a digital pattern that accurately reproduces the fingerprint's underlying structure. A powerful utility within TruePrint is Dynamic Optimization. This tool analyzes each image, controlling up to 15 sensor parameters to optimize the fingerprint image, regardless of unusual skin conditions or surface contamination. The TruePrint high-quality fingerprint imaging technology enables reliable authentication.

The fingerprint sensor is small, battery friendly and well-suited to Bluetooth communications. These sensors automatically generate interrupts and reduce system overhead needed for finger detection.

Features of the fingerprint component, in one embodiment, include:

TruePrint technology for ability to acquire (ATA)
Compact industry standard 100-Pin LQFP Package
High definition 128×128 TruePrint technology based pixel array
500 pixels per inch (ppi)
Extended Range 2.7V to 3.6V single power supply
0° C. to +70° C. operating temperature range
Easy to integrate USB 2.0 full speed, synchronous & asynchronous serial, & 8-bit parallel system interfaces
6 or 12 MHz operation with crystal or supplied clock input
USB selective suspend support
Ultra-hard surface coating
1 million rubs w/o degradation
Highly scratch resistant
IEC 61000-4-2 level 3 ESD capability (+/−8 KV)
Built-in low power finger detection w/system interrupt capability
Low power operation; <6 mW/imaging event.
The interface of these fingertip sensors is pin selectable choices. The SPI interface finger chip sensor is selected so that the finger tip sensor is connected to the SPI port (**245**) of the main processor.

The Zeevo ZV4301 in FIG. **5** used in one embodiment is a Bluetooth SOC adapted to provide a high bandwidth CPU system to add wireless connectivity to their product. The ZV 4301 (**502**) incorporates the industry standard 32 bit ARM7TDM1 CPU core with high bandwidth processing capability sufficient to support a wide range of embedded applications. The ZV4301 operates from −25 C to 85 C and comes in a lead free version. The ZV4301 is implemented in a 0.18 micro meter CMOS process and includes the integra-

tion of all RF components and digital circuitry. The only external components needed are an antenna, crystal, reference resister, decoupling capacitors, and flash memory. The ZV4301 is designed for low power applications including sleep and deep sleep modes, and operates from a single 3.3V supply. The ZV4301 is manufactured in an 8.6×8.6×1.65 mm LTCC BGA package with 100 balls.

The ZV4301 is supplied with a link library for a complete lower layer protocol stack and source code to the blueOS operating system, target manager and link manager API. Upper layers are supported through the Zeevo partner program with firmware, Bluetooth protocol stack software and Bluetooth profiles available from Zeevo's extensive partner list.

The Zeevo4301 typical application supports AV equipment, smart phones, personal digital assistants, printers, cellular peripherals, access points and industry controls. Features include:

Bluetooth 1.2 compliant.
High bandwidth ARM7TDM1 processor subsystem.
12, 24 and 48 MHz CPU clocks—selectable on chip PLL from single 12 MHz input.
Highly integrated low cost solution: Radio, link control and CPU are integrated.
High throughput.
Tested qualified software stack available.
Support for very low power modes—sleep and deep sleep.
Audio capability on an SCO channel.
On chip crystal tuning and power calibration.
Complete co-location and co-existence solutions with 802.11 supported through AWMA, AFH and SFH.
The CPU and memory support include:
ARM7TDMI processor core.
12 24 and 48 MHz operation.
32/16 bit RISC architecture, 32 bit ARM instruction.
16 bit Thumb instruction set for increased code density.
32 bit ALU and high performance multiplier.
Extensive debug facilities—JTAG.
8 K bytes of boot ROM.
64 K bytes of SRAM.
The radio features include:
Integrated RF interface connects directly to antenna.
Integrated power amplifier supports up to +4 dBm output power for class 2 & 3 operation.
High sensitive design (−86 dBm typically).
Class 1 operation is supported with an external power amplifier/LNA interface.
IF-enhanced direct conversion receiver architecture.
Integrated TX/Rx switch, balun, and matching network in an LTCC package.
Low power consumption receiver design.
Multiplexed RX/TX antenna interface.
Fully integrated PLL synthesizer and loop filter—requires external 12 MHZ crystal.
The baseband and software features include:
Required and optional Bluetooth 1.2 features faster connection, extended SCO link, adaptive frequency hopping (AFH), QOS, flow control.
Direct memory access (DMA) for low overhead UART control.
Standard Bluetooth HCI interface over UART and USB.
Support for a range of Bluetooth data rates (57.6-723 Kb/sec)
Support for multiple ACL and HC-SCO packet types.
Park, sniff, and hold modes.
Point-to-point, point-to-multipoint, and scatter net.
Up to 7 slaves and up to 4 Pico nets supported.



u-Law, A-Law and CVSD transcoders on SCO channel
Full 8- to 128 bit encryption.
The baseband modem includes:
Demodulator, modulator, RX/TX self calibration, burst timing control and transmitter burst spectral shaping.
FEC encoder/decoder, data whitening, encryption-decryption, and cyclic redundancy check.
Link controller for synchronization, frequency hope control, and receiver/transmitter slot timing.
The external bus interface includes:
8,16-bit data bus.
23-bit address bus.
Support for 2 memory banks Each bank supports up to 16 Mbytes flash and SRAM, with independent timing control for each bank.
GPIO can function as additional interrupts.
3 dedicated chip selects, each with independent timing control.
3 indicated interrupt lines.
The UART includes:
16450 register set compatible UART.
9600, 19.2K, 38.4K, 57.61K, 115.2K, 230.4K, 460.8K, and 921.6 Kbs UART baud rates.
RTS and CTS flow control signals for UART.
Direct Memory Access (DMA) for low overhead UART control.
The USB support includes:
USB version 2.0 compliant interface.
USB wakeup and detach sideband signals supported.
Direct Memory Access (DMA) for low overhead USB control.
The general purpose I/O features:
Sixteen individually programmable general purpose I/O.
Configurable for UART wake up hand shaking
Base band and CPU activity indication.
USB/UART mode select.
Each GPIO can be used as interrupt.
The pulse code modulator support includes:
PCM interface for audio applications: PCM-OUT, PCM IN, PCM CLK, and
PCM SYNC.
Linear u-Law and A-Law codes supported.
Interface to OKI MSM 7732-01 and OKI 7716 codec.
Direct Memory Access (DMA) for low overhead PCM control
A 12 MHZ crystal serves as the primary clock crystal.

FIG. **5** shows the ZV4301 to other CPU and peripheral interfaces. The ZV4301 is interfaced with the main processor LPC2132 (**100**) through the UART port. The 8 Mb Flash memory AT49BV802A (**501**) is interfaced with ZV4301 through the external bus interface. The single rail linear codec (**141**) is interfaced with the ZV4301 through the PCM interface.

Debugging of the remote is supported by JTAG header and BDM header is used in the board for the debugging purposes. This section gives the details of the JTAG header and BDM header.

The processor complies with the IEEE 1149.1A JTAG testing standard. The JTAG test pins are multiplexed with background debug pins.

The system is fed with 5 volts input power. The input power is passed through a diode to provide the protection against reverse polarity. The power to the digital butler remote comes from an external power supply module. The external power supply module will provide power to the remote and for charging the battery. The input power is fed through a connector. From the 5 volts input, the following voltages are

derived on the CPU card: Processor core voltage: The core supply for the processor is generated through a low dropout regulator that can support current up to 1.5 A operating from a 5V-input. The output 1.8V is fed to the core of the processor. PLL voltage: The core voltage is the input to the PLL through a ferrite bead, which supplies power to clock generation and PLL circuits of the processor.

Data sheets publicly available for the major IC components include:

1. LPC213x Philips User manual Nov. 22, 2004.
2. Zeevo ZV4301 Datasheet Jan. 24, 2005.
3. P89LPC930/931 Data Sheet, Rev.05-15 Dec. 2004.
4. DDG128032AAD Data sheet, Rev1.0, Issue date: 2004/10/06
5. ITT Cannon, Miniature all direction scanning switch Data sheet.
6. Authentec Fingerprint sensor AES 3400 Data sheet.
7. MSM7716 OKI Datasheet Version August 1998.
8. AT49BV802A Datasheet, Document 3405D-Flash-March/2005.

In addition, a camera can be incorporated into the remote, thereby enabling video conferencing and other visual features. The camera is complemented by a glue logic application supplied for or native to a communications and/or multimedia console, such as one running under Windows, OS X or Linux. A CMOS camera commercially available for incorporation in camera phones may be suitable for this application. This is illustrated in FIG. **7**.

FIG. **7** depicts building the digital butler remote board as an XScale processor based solution with a camera module and/or memory card reader. This remote is built around the Intel XScale micro controller or a digital signal processor (DSP). The main processor provides interfaces for the Keypad, Joystick, 320*240 graphics LCD module, fingerprint sensor, Bluetooth SOC, WiFi 802.11b/g module, audio codec, camera module and memory card reader. The audio codec interfaces with a microphone, speaker and headphone for voice utilities. Alternatively, the microphone, speaker and headphone could interface through the Bluetooth module, as described in the context of FIG. **1**. A general USB dongle interface (not shown) could be provided to allow the user to use the USB port as if it resided on the host device. The USB port of the remote would function as a remote USB connection for the host.

From FIG. **7**, the components include the main processor **700**, which couples to the Bluetooth module **732**, WiFi module **751** and audio codec **741**. The audio codec couples to speaker **752**, microphone **751**, audio jack **753**. The main processor also may couple to a fingerprint sensor **721** and a battery pack **712**. A battery charger and power management component **724**, such as a cradle, couples to a DC power input **713** and charges the battery **712**. The main processor also may couple to a camera module **750**, a display **733**, a keypad **711** and joy stick **723**. The camera module may, for instance, be a 3 mega pixel CMOS component. The memory card reader **760** can support one or more memory card formats. Currently used memory card formats, as of submission of this disclosure, include PC Card, CompactFlash I and II, SmartMedia, Memory Stick, Memory Stick Duo and Micro M2, Multimedia regular, reduced size and micro, Secure digital regular, mini and micro, xD-Picture card and μ card. The main processor **700** provides an array of ports for interfacing with these various components. While currently available components are generally identified, such as by resolution or wireless standard, one of skill in the art will recognize that these components will evolve over the 20 year life of a patent.

Remote Software

Software components of the palm-held remote include an LCD interface module, a keyboard interface module, a fingerprint sensor module, trackball or other directional device interface module and a Bluetooth module. Other wireless protocols such as IEEE 802.1/x protocols can be substituted for Bluetooth. Wireless protocols developed for cordless telephones also might be used. Data is transmitted and received over Bluetooth or another wireless connection between the console and the palm-held remote in a custom data format. In this format, a record may have fields including start of packet, packet type, links, data and checksum. Different packet types are assigned to keyboard, trackball, fingerprint and LCD packets. The start of packet field indicates that the packet starts here. For instance, 0x7C can be used as a start of packet flag. A data field of just two bytes may be sufficient. When the checksum contains an XOR of all the data, link and packet type fields, the checksum field can be used to discard corrupted data packets.

Audio support enables the remote to act as a remote speaker and/or microphone system for the host system. Audio support can be for mono, stereo or other advanced sound reproduction modes. The audio can function in an on-the-ear mode (e.g., like a telephone headset), with a headset or as a speaker phone. These audio features can enable telephonic capabilities for voice, place-shifting audio from the host location to another room or floor in a home, private listening via a wired or wireless headset and multiple stream playback, so that the audio reproduced at the remote is different from the audio reproduced on speakers wired to the host.

The LCD connected to the main controller uses the GPIO interface, including data and control lines. The LCD can be used to display data received over the wireless link. The data could be received in an HTML or HTML subset format and rendered by a compact browser module. Or, a custom-designed packet format could be used for LCD data. This format includes eight fields: start of packet, packet type, link, mode, x-position, y-position, data and checksum. The mode field indicates the mode in which the data is to be displayed. This module operates in two modes, a so-called font mode and a byte mode. In a phone mode, the given string is displayed on the LCD display in the predefined font shape and size. In the byte mode, the given date is displayed as raw data, which allows the user to design their own shapes. X- and Y-position coordinates indicate the row and column position on the LCD.

The remote control can duplicate the visual operation of an on-screen display generated by a controlled device, using a display on the remote. The on-screen display interface is designed to provide easy, smooth, seamless operation of the device. However, most remotes provide an array of buttons and much different interface than the on-screen display. Sometimes, the array of buttons anticipates that no screen will be available for display. Other times, the manufacturer over-builds the remote control. They attempt to expose all of the functionality of the host device through individual keys on the remote. The sheer number of keys sometimes pushes controlled devices into states of operation that are surprising, confusing and difficult to undo. A high resolution display on the remote control can enhance the user interface. For devices that accept keyboard or joystick/mouse responses to an on-screen display, the remote can substantially duplicate the look and feel of the on-screen display. In this instance, substantially means to the extent allowed by the form factor of the remote display. For instance, the same HTML code may be differently rendered to the on-screen display and the remote display, given the different dimensions of the displays.

An on-screen menu and controls module can render a control interface, translating a device menu and controls display that would normally appear on a TV or monitor for reproduction on a display that is part of the remote. To implement this capability, a menu-generating device can assemble on-screen menus and controls as a separate data stream, apart from any video image that the menus and controls overlay. The data stream can be supplied both to the device's own on-screen overlay generator and to a communications module coupled to the remote. The remote uses the data stream to render the on-screen display in a legible format, adapted to the reduced size of a screen on the remote. Preferably, the menu and control organization format on the remote mimics what the viewer can see on the screen, to minimize confusion. Technologies such as a subset of HTML and JavaScript allow a designer to specify a menu and control layout in terms that permit rendering to a variety of display sizes. Remote display of the on-screen menu and control data stream may preempt a video image display or may be overlaid on top of the video image. Optionally, the device's on-screen menu and controls can be supplied to the remote exclusively as a data stream and not as part of a rendered video stream, to avoid confusing menus of different sizes. Alternatively, the on-screen menus and controls may just appear on the remote's display as a consequence of being rendered to a TV or monitor that is reproduced on the remote's display.

One of skill in the art will recognize that a display in the palm of the hand will be useful to many people, because it reduces demands for eye-hand coordination and short-term memory. The form factor is convenient. A single remote can control for many devices. Depending on the features combined into the remote, varying complexity can be delivered at varying prices.

The on-screen display module can be more or less stateful. JavaScript, for instance, can be used to keep track of the user's intermediate selections until they are sent to the host. Or, a Java or similar application could replicate the states of the host. More simply, the display could be essentially stateless and rerendered by the host after each data transfer from the remote to the host.

The form factor of the remote display could alternatively be a full display with touch sensitive areas and rendered buttons that provide visual and/or audio feedback (as opposed to the tactile feedback of pressed buttons.)

The keyboard module of the remote is implemented using an 8051. The key press data is sent to the main microcontroller through an I2C interface for further processing. The keyboard is a matrix keyboard including 13 scan lines and eight return lines. A key press causes the 8051 to generate make and break codes along with key press values. This data is given to the main micro controller, which operates in an interrupt mode. Here, the 8051 acts as a master and the LPC2132 acts as a slave.

Fingerprint sensor software uses SPI code on the main controller. The fingerprint data will be sent in a particular packet format over the wireless link to be processed on the host side. Authentec provides a useable appropriate library of routines for fingerprint authentication.

Coupled to the fingerprint sensor software is a personalization module. If a user does not identify himself by swiping the fingerprint sensor, then a generic profile is applied to personalization of music, movies, photos, videos, files and telephone access. If the user swipes the fingerprint sensor, then personalization can be applied, analogous to switching users in current Windows XP implementations. This degree of context shifting based on a single action at a remote control is new in this disclosure. The personalization may include: favorite channels/movies/shows in a streaming video environment; favorite music, photos or video in an on demand environment; approved access to DRM-controlled content using one or more keys linked to the fingerprint; history of searches, recent topics, personal interest (a la Google Sidebar or Claria PersonalWeb), recently accessed files; automatic authenticated access to communication channels linked to the fingerprint, such as voice over IP, instant messaging, web conferencing and e-mail; electronic wallet access, automatically looking up credit card information and other account authorization information; and sharing of information by person logged in.

The trackball or other pointing device interface module uses sampling techniques to read the ball movement and click button states. The outputs of the trackball are connected to general-purpose I/O channels. The modules sense the state of the general-purpose I/O's at a predetermined frequency, such as 1 kHz.

A Bluetooth wireless interface module may be based on Zeevo ZV4301 Bluetooth SOC or a Broadcom or RFMD design with headset and serial port profile (SPP) firmware. This module is coupled to the main controller through a UART. The module is adapted to convey wirelessly a mix of keyboard data, trackball data, fingerprint sensor data for authentication and data to be displayed on the remote module's display.

Console Hardware

Introduction

The core component of the console or host system may be a standard mini ITX mother board with ports to add peripherals. A USB Bluetooth module and USB WLAN module may be connected to the motherboard through USB ports. A display is connected through VGA connector and the socket modem with RJ11 connector is connected through serial port **2**. The remaining ports can be used for external interface. The wireless remote communicates over Bluetooth with the USB Bluetooth module.

Features

FIG. **6** is a block diagram of the console (**606**). The host console of the system may be built on a standard Mini-ITX motherboard and an additional add-on board to support the features like WAP, Bluetooth, and a MODEM for PSTN and a PCI-VGA Card. A standard Mini ITX is available in a 17 cm×17 cm form factor. The motherboard and/or add-on board may include two VGA connectors; for example, a VGA connector from motherboard (**613**) and a second VGA connector using a PCI add-on card (**614**). The design also may include a serial port for external interface (**611**A) and another serial port for a modem (**611**B), two USB ports (**612**B), support for a USB-hub, an 802.11g WLAN module (**632**), preferably interoperable with 802.11b, with a separately connected antenna. Other console components may include a USB to Bluetooth module (**632**) with chip antenna, a standard PC hard disk drive (**623**) and DVD drive (**624**) and an ATX power supply or Mini-ITX power module.

Motherboard support may include a VIA Eden/C3 processor at operating at 1.0-1.5 GHz or another rate, integrated Castle Rock graphics with MPEG-2 decoder (optionally an MPEG-4 decoder for video), a memory socket, such as al DDR266 SODIMM socket, a PCI slot, two UltraDMA 66/100/133 connectors (SATA connectors can be used), a 10/100 Base-T Ethernet physical connection, PS2 mouse and keyboard ports; a parallel port, an RJ-45 LAN port, a serial port, two USB 2.0 ports and a VGA port.

A socket modem module (**634**) is one component used to connect the motherboard to a POTS telephone system. Alternatively, modules can interface the motherboard to a cellular

or similar telephone system or to a voice over IP (VoIP) system. One suitable module is a WMV34-0-TSM-100 from Analog Devices. This serial socket modem provides complete worldwide support. An Analog Devices serial socket modem features a solid state DAA that supports international operation with compliance to international telephone standards. The modem module can be plugged on the carrier board by means of board to board connectors and will be interfaced to the additional serial port available on the motherboard header. The socket modem module is powered by 3.3V DC supply and the interfacing signals are in the 3.3V LVTTL level. The socket modem module has the connections for a telephone line. This connection will be terminated to a RJ11 jack (**635**) on the carrier board for this purpose. The serial port signals in the motherboard are terminated to header COM2 which is in RS232 level. A RS232 transceiver interfaces (**631**) to the modem (**634**).

A standard, off-the-shelf 802.11g WLAN module (**632**) is available module with USB interface. The module can be connected to the USB port available on the motherboard header. An external antenna may be positioned at the rear panel of the host system for maximum sensitivity. Some suitable modules include the Linksys-WUSB54GP and NetGear-WG111. These modules are interoperable with 802.11b. A WLAN module may be an alternative to a Bluetooth module for communications with the remote, or can provide a network interface for the console.

A standard, off-the-shelf Bluetooth module (**633**) is available module with USB interface. The module may be connected to the USB port available on the motherboard header. The module will be connected to the host system by the USB port available on the motherboard header. The modules built around CSR chipset may be suitable.

The power supply used may be a standard mini ITX power supply. A standard 12 volts DC power module also can be used for this purpose. The power supply board includes DC-DC converters to provide output voltages of +12V, −12V, +3.3V, and +5V DC, similar to an ATX power supply. These power supply tapping is used in the carrier board to supply power to the add on modules such as socket modem, WLAN, and Bluetooth modules.

Console Software

Introduction

A Linux core runs on the VIA Eden processor. The module drivers loaded on the OS core takes control the peripheral devices. A dedicated software application running parses data received wirelessly, such as over Bluetooth. It also redirects the data to corresponding modules.

Modules

The modem connected with the host system motherboard is used to make the dial-up connections. This makes the socket modem module as a portable one.

On the console or host system processor side, the serial driver initializes and configures the serial port baud rate equal to the modem baud rate. An appropriate modem driver is loaded to manipulate the connected socket modem. A WLAN module is a port of the Linux-WLAN driver, adapted to the host board. The USB WLAN modules identified from Linksys and NetGear use the same driver. Once the WLAN hardware is connected to the USB port, it is logically connected to the access point using the WLAN control utility.

A suitable Linux Bluetooth software stack is BlueZ. Processing data from the stack involves developing parsing the data received from the remote. The communication with the remote is established using the Bluez utilities from the host for remote headset and serial port functionalities. Once the application knows the source of the data packet, it redirects the data to the appropriate module for the required functionality. The software also provides a facility to send the data to the LCD available on the remote side. The application developer can use the fingerprint raw data received from the Bluetooth remote and the authentication code libraries provided by the vendor to achieve the matching operation.

The console may support the following functions:

Bluetooth remote access.

WLAN enabled for network communication.

Socket modem module for dial-up network connection.

The following combinations of hardware and software features are within the scope of this disclosure for providing services described. Supported by the console, one or any combination of the following:

General Purpose Computer
TV Set Top Box w/optional personal video recorder (PVR)
Terrestrial, Cable, Satellite, IP
Messaging console (one or any combo)
Text (SMS/Webpages)
Voice (Landline/cell/IP)
Video
Network Port
TV and/or Monitor Out
Optionally
Hard Drive
Media Card Reader (non-volatile memory)
CD/DVD (Writable versions possible)
Wireless network router

Supported by the hand-held remote, one or any combination of the following:

Fingerprint—Optional
Speaker/Mic/Vol control
Display
Cursor Control
Thumb-board (Alphanumeric)
Video Camera
Media Reader
USB port

Applied to the following services:

Communication, including Phone (LL/Cell/IP), Internet, email, and text/voice/video messenger

Entertainment, including Multimedia apps, including TV, PVR, DVD, Video, Photo, Music, Radio, and Games.

Productivity apps, such as a personal information manager (PIM), contacts, calendar, editor.

Some Particular Embodiments

The present invention may be practiced as a method or device adapted to practice the method. The same method can be viewed from the perspective of a console adapted for use with a remote, a remote adapted to control a console or a combination of console and remote.

While the present invention is disclosed by reference to the preferred embodiments and examples detailed above, it is understood that these examples are intended in an illustrative rather than in a limiting sense. It is contemplated that modifications and combinations will readily occur to those skilled in the art, which modifications and combinations will be within the spirit of the invention and the scope of the following claims.

I claim:

**1**. A remote control device with slaved audio input, the device including:

a wireless link transceiver;

at least one slaved audio input built into the remote control;

a navigation control built into the remote control;

hardware resources coupled between the wireless link transceiver, the slaved audio input and the navigation control;

a stack running on the hardware resources and exchanging packets with a master device; and

an encoder logic running on the hardware resources, logically coupled to the stack, adapted to encode signals from the slaved audio input into a remote control audio format, and adapted to send audio packets in the remote control audio format to the master device;

wherein the remote control depends on the master device to transcode input from the slaved audio input to VoIP from the remote control device format and relies on the master device to respond to control signals sent by the remote control device in the packets.

**2**. The remote control device of claim **1**, further including voice recognition logic running on the hardware resources.

**3**. The remote control device of claim **1**, wherein the remote control further relies on the master device to provide voice recognition.

**4**. A remote control device with slaved audio and video reproduction, the device including:

a wireless link transceiver;

slaved audio and video outputs, including at least one slaved audio output and one slaved video display built into the remote control;

a navigation control built into the remote control;

hardware resources coupled between the wireless link transceiver, the slaved audio output, the slaved video display and the navigation control;

a stack running on the hardware resources and exchanging packets with a master device; and

a decoder logic running on the hardware resources, logically coupled to the stack, adapted to receive the packets processed by the master device into a remote control device format and to decode the remote control device format into signals to drive the slaved outputs;

voice recognition logic running on the hardware resources;

wherein the remote control

depends on the master device to transcode audio and video from a streaming audio and video format to the remote control device format, wherein the streaming audio and video format is at least one of mpeg 2, mpeg 4, or ip-tv, and

relies on the master device to respond to control signals sent by the remote control device in the packets at least to select among audio and video for the remote control device to receive.

**5**. A remote control device with slaved audio and video reproduction, the device including:

a wireless link transceiver;

slaved audio and video outputs, including at least one slaved audio output and one slaved video display built into the remote control;

a navigation control built into the remote control;

hardware resources coupled between the wireless link transceiver, the slaved audio output, the slaved video display and the navigation control;

a stack running on the hardware resources and exchanging packets with a master device; and

a decoder logic running on the hardware resources, logically coupled to the stack, adapted to receive the packets processed by the master device into a remote control device format and to decode the remote control device format into signals to drive the slaved outputs;

wherein the remote control



depends on the master device to transcode audio and video from a streaming audio and video format to the remote control device format, wherein the streaming audio and video format is at least one of mpeg 2, mpeg 4, or ip-tv,

relies on the master device to provide voice recognition, and

relies on the master device to respond to control signals sent by the remote control device in the packets at least to select among audio and video for the remote control device to receive.

**6**. A master device, adapted to be controlled by a remote control device that needs only limited computing capabilities and that includes slaved control and audio I/O features, the master device including:

a wireless link transceiver;

hardware resources coupled to the wireless link transceiver;

a first stack running on the hardware resources and exchanging packets with a remote control device;

a second stack running on the hardware resources and exchanging packets with at least one signal source;

control interpretation logic running on the hardware resources, logically coupled to the first stack, that processes input received from a slaved keyboard and from a slaved navigation device on the remote control device and responsively controls the master device, including selection of audio and/or video for playback;

call processing logic running on the hardware resources, logically coupled to the second stack and the first stack, that

receives voice over IP (VOIP) audio signal packets from the signal source, transcodes them to a remote control device format suitable to drive at least one slaved output on the remote control device, and forwards them to the remote control device;

receives control signals from the remote control device and responsively initiates or answers a telephone call; and

receives audio signal packets from a slaved microphone on the remote control device, transcodes the audio signal packets into transcoded audio packets and forwards the transcoded audio packets to the signal source.

**7**. A master device, adapted to be controlled by a remote control device that needs only limited computing capabilities and that includes slaved control and audio input features, the master device including:

a wireless link transceiver;

hardware resources coupled to the wireless link transceiver;

a first stack running on the hardware resources and exchanging packets with a remote control device;

a second stack running on the hardware resources and exchanging packets with at least one signal source;

control interpretation logic running on the hardware resources, logically coupled to the first stack, that processes control input packets received from a slaved navigation device on the remote control device and responsively controls the master device; and

audio processing logic running on the hardware resources, logically coupled to the second stack and the first stack, that

receives voice over IP (VOIP) audio signal packets from the signal source and transcodes the audio signal

packets into transcoded audio packets and forwards the transcoded audio packets to the remote control device;

receives audio packets from a slaved audio input on the remote control device, transcodes the audio signal packets into transcoded audio packets and forwards the transcoded audio packets to the signal source.

* * * * *

US009866697B2

(12) **United States Patent**
**Stepanian**

(10) **Patent No.: US 9,866,697 B2**
(45) **Date of Patent: Jan. 9, 2018**

(54) **CONSUMER ELECTRONIC REGISTRATION, CONTROL AND SUPPORT CONCIERGE DEVICE AND METHOD**

(71) Applicant: **Robert Stepanian**, San Jose, CA (US)

(72) Inventor: **Robert Stepanian**, San Jose, CA (US)

(73) Assignee: **NEXSTEP, INC.**, San Jose, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 244 days.

(21) Appl. No.: **14/281,781**

(22) Filed: **May 19, 2014**

(65) **Prior Publication Data**

US 2014/0342709 A1 Nov. 20, 2014

**Related U.S. Application Data**

(63) Continuation of application No. 13/344,529, filed on Jan. 5, 2012, now Pat. No. 9,614,964.
(Continued)

(51) **Int. Cl.**
***H04M 3/523*** (2006.01)
***H04W 4/16*** (2009.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... ***H04M 3/5235*** (2013.01); ***G06F 21/10*** (2013.01); ***G06F 21/32*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ..... G06F 21/10; G06F 21/32; G06Q 30/0241; H04L 12/2818; H04L 12/2834;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,410,326 A 4/1995 Goldstein
5,546,471 A 8/1996 Merjanian
(Continued)

FOREIGN PATENT DOCUMENTS

CN 101821720 A 9/2010
JP 2001095067 A 4/2001
(Continued)

OTHER PUBLICATIONS

CN 201310699468X—3nd Office Action dated Feb. 3, 2016, 24 pages.
(Continued)

*Primary Examiner* — Kenneth M Lo
*Assistant Examiner* — Yuhui R Pan
(74) *Attorney, Agent, or Firm* — Haynes Beffel & Wolfeld LLP

(57) **ABSTRACT**

We disclose a concierge device that can be configured to register, control and support a consumer device. It can alternatively or redundantly connect to a home management bridge and/or cloud-based management servers. It can accept menus that allow a single concierge device to provide a wide range of functions for various consumer devices. The concierge device allows the user in a single action to initiate a support session, automatically identifying the consumer device. The concierge device can be configured for voice or video support calls. The concierge device in conjunction with a home management bridge or gateway can manage on boarding of components of an automated home, such as switches and lamps. Implementations of the concierge device that include a display can show supplemental information, such as advertising, optionally in coordination with media being played on a consumer device coupled in communication with the concierge device.

**20 Claims, 12 Drawing Sheets**




Joint Trial Exhibit
**JTX-6**
Case No. 19-cv-01031-RGA

**Related U.S. Application Data**

(60) Provisional application No. 61/561,732, filed on Nov. 18, 2011, provisional application No. 61/530,370, filed on Sep. 1, 2011, provisional application No. 61/430,099, filed on Jan. 5, 2011, provisional application No. 61/430,103, filed on Jan. 5, 2011.

(51) **Int. Cl.**

| | |
|---|---|
| ***G06F 21/10*** | (2013.01) |
| ***G06F 21/32*** | (2013.01) |
| ***G06Q 30/02*** | (2012.01) |
| ***H04L 12/28*** | (2006.01) |
| ***H04L 12/24*** | (2006.01) |
| ***H04M 1/725*** | (2006.01) |
| ***H04N 21/41*** | (2011.01) |
| ***H04N 21/4147*** | (2011.01) |
| ***H04N 21/422*** | (2011.01) |
| ***H04N 21/4223*** | (2011.01) |
| ***H04N 21/433*** | (2011.01) |
| ***H04N 21/4405*** | (2011.01) |
| ***H04N 21/4623*** | (2011.01) |
| ***H04N 21/472*** | (2011.01) |
| ***H04W 4/00*** | (2009.01) |
| ***H04L 29/08*** | (2006.01) |
| ***H04L 29/06*** | (2006.01) |

(52) **U.S. Cl.**
CPC ..... ***G06Q 30/0241*** (2013.01); ***H04L 12/2818*** (2013.01); ***H04L 12/2834*** (2013.01); ***H04L 41/00*** (2013.01); ***H04L 67/28*** (2013.01); ***H04L 67/303*** (2013.01); ***H04L 69/24*** (2013.01); ***H04M 1/72533*** (2013.01); ***H04N 21/4126*** (2013.01); ***H04N 21/4147*** (2013.01); ***H04N 21/422*** (2013.01); ***H04N 21/4223*** (2013.01); ***H04N 21/42201*** (2013.01); ***H04N 21/4333*** (2013.01); ***H04N 21/4334*** (2013.01); ***H04N 21/4405*** (2013.01); ***H04N 21/4623*** (2013.01); ***H04N 21/47214*** (2013.01); ***H04W 4/003*** (2013.01); ***H04W 4/16*** (2013.01); *H04M 1/72575* (2013.01); *H04M 2203/1016* (2013.01); *H04M 2250/12* (2013.01)

(58) **Field of Classification Search**
CPC ....... H04L 41/00; H04L 67/28; H04L 67/303; H04L 69/24; H04M 1/72533; H04M 1/72575; H04M 2203/1016; H04M 2250/12; H04M 3/5235
USPC .................................. 379/265.13; 455/414.1
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS


| | | | |
|---|---|---|---|
| 5,650,831 | A | 7/1997 | Farwell |
| 6,088,731 | A | 7/2000 | Kiraly et al. |
| 6,097,441 | A | 8/2000 | Allport |
| 6,710,790 | B1 | 3/2004 | Fagioli |
| 6,906,635 | B1 | 6/2005 | Moutaux et al. |
| 6,970,098 | B1 | 11/2005 | Adams et al. |
| 7,389,103 | B2 | 6/2008 | Stepanian |
| 7,444,130 | B2 | 10/2008 | Stepanian |
| 7,467,186 | B2 | 12/2008 | Attar et al. |
| 7,526,539 | B1 | 4/2009 | Hsu |
| 7,542,753 | B2 | 6/2009 | Stepanian |
| 7,609,824 | B2 | 10/2009 | Stepanian |
| 7,627,825 | B2 | 12/2009 | Kakuda |
| 7,697,669 | B2 | 4/2010 | Stepanian |
| 7,907,710 | B2 | 3/2011 | Stepanian |
| 8,494,132 | B2 | 7/2013 | Stepanian |
| 2002/0002707 | A1 | 1/2002 | Ekel et al. |
| 2002/0044199 | A1 | 4/2002 | Barzebar et al. |
| 2002/0045484 | A1 | 4/2002 | Eck et al. |
| 2002/0059588 | A1 | 5/2002 | Huber et al. |
| 2002/0073416 | A1 | 6/2002 | Ramsey Catan |
| 2002/0092025 | A1 | 7/2002 | Klumpp |
| 2002/0095269 | A1 | 7/2002 | Natalini et al. |
| 2002/0158812 | A1 | 10/2002 | Pallakoff |
| 2002/0174444 | A1 | 11/2002 | Gatto et al. |
| 2002/0180579 | A1* | 12/2002 | Nagaoka ............ H04L 12/2803 340/3.1 |
| 2003/0002479 | A1 | 1/2003 | Vortman et al. |
| 2003/0035075 | A1 | 2/2003 | Butler et al. |
| 2003/0100293 | A1 | 5/2003 | Hunt |
| 2003/0171127 | A1 | 9/2003 | White |
| 2003/0188322 | A1 | 10/2003 | Bontempi |
| 2003/0210126 | A1 | 11/2003 | Kanazawa |
| 2003/0228883 | A1 | 12/2003 | Kusakari et al. |
| 2004/0008287 | A1 | 1/2004 | Johnston et al. |
| 2004/0019395 | A1 | 1/2004 | Maymudes |
| 2004/0024638 | A1 | 2/2004 | Restis |
| 2004/0066308 | A1 | 4/2004 | Sampsell |
| 2004/0070491 | A1 | 4/2004 | Huang et al. |
| 2004/0087369 | A1 | 5/2004 | Tanaka et al. |
| 2004/0110563 | A1 | 6/2004 | Tanaka et al. |
| 2004/0174863 | A1 | 9/2004 | Caspi et al. |
| 2004/0176170 | A1 | 9/2004 | Eck et al. |
| 2004/0187157 | A1 | 9/2004 | Chong et al. |
| 2004/0214562 | A1 | 10/2004 | Adan et al. |
| 2004/0224638 | A1 | 11/2004 | Fadell et al. |
| 2004/0227859 | A1 | 11/2004 | Liang |
| 2004/0249925 | A1 | 12/2004 | Jeon et al. |
| 2004/0249962 | A1 | 12/2004 | Lecomte |
| 2005/0012723 | A1 | 1/2005 | Pallakoff |
| 2005/0122649 | A1 | 6/2005 | Yamamoto |
| 2005/0130744 | A1 | 6/2005 | Eck et al. |
| 2005/0159823 | A1 | 7/2005 | Hayes et al. |
| 2005/0181877 | A1 | 8/2005 | Kuwahara et al. |
| 2005/0197187 | A1 | 9/2005 | Mitsuyoshi et al. |
| 2005/0262535 | A1 | 11/2005 | Uchida et al. |
| 2005/0282634 | A1 | 12/2005 | Yamada et al. |
| 2005/0282639 | A1 | 12/2005 | Tanaka et al. |
| 2006/0037045 | A1 | 2/2006 | Hsieh |
| 2006/0040638 | A1 | 2/2006 | McQuaide |
| 2006/0041923 | A1 | 2/2006 | McQuaide |
| 2006/0052136 | A1 | 3/2006 | Harris |
| 2006/0079329 | A1 | 4/2006 | Yamada et al. |
| 2006/0106963 | A1 | 5/2006 | Sasaki et al. |
| 2006/0107281 | A1 | 5/2006 | Dunton |
| 2006/0208889 | A1* | 9/2006 | Shaffer ................. G06Q 30/02 340/572.1 |
| 2006/0271791 | A1 | 11/2006 | Novack et al. |
| 2006/0282572 | A1 | 12/2006 | Steinberg et al. |
| 2007/0011604 | A1 | 1/2007 | Chiu |
| 2007/0018845 | A1 | 1/2007 | Sutardja |
| 2007/0121606 | A1 | 5/2007 | Scheinert |
| 2007/0129106 | A1 | 6/2007 | Liu |
| 2007/0183401 | A1 | 8/2007 | Bennett |
| 2008/0003945 | A1 | 1/2008 | Wenham |
| 2008/0034081 | A1 | 2/2008 | Marshall et al. |
| 2008/0062034 | A1 | 3/2008 | Harris et al. |
| 2008/0143489 | A1* | 6/2008 | Castaldo .................. G06F 9/54 340/286.01 |
| 2008/0240376 | A1* | 10/2008 | Conway ............. H04M 3/5232 379/211.01 |
| 2008/0263621 | A1 | 10/2008 | Austerlitz et al. |
| 2009/0009586 | A1 | 1/2009 | Cassanova |
| 2009/0008300 | A1 | 3/2009 | Sherman et al. |
| 2009/0083000 | A1* | 3/2009 | Sherman ............... G06Q 30/06 702/184 |
| 2010/0262467 | A1 | 10/2010 | Barnhill, Jr. et al. |
| 2011/0293078 | A1* | 12/2011 | Saylor .................. H04M 3/493 379/88.13 |

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 2011/0298581 | A1 | 12/2011 | Hsu | |
| 2012/0221502 | A1* | 8/2012 | Jerram .................. | G06Q 30/02 706/46 |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| JP | 2002162149 | A | 6/2002 |
| JP | 2002315079 | A | 10/2002 |
| JP | 2002543647 | A | 12/2002 |
| JP | 2003116074 | | 4/2003 |
| JP | 2003-163786 | A | 6/2003 |
| JP | 2003-173207 | A | 6/2003 |
| JP | 2003241827 | A | 8/2003 |
| JP | 2003308130 | A | 10/2003 |
| JP | 2003529959 | A | 10/2003 |
| JP | 2004040656 | A | 2/2004 |
| JP | 2004128859 | A | 4/2004 |
| JP | 2004172695 | A | 6/2004 |
| JP | 2004235962 | A | 8/2004 |
| JP | 2005510965 | A | 4/2005 |
| JP | 2005518741 | A | 6/2005 |
| JP | 2005-184350 | A | 7/2005 |
| JP | 2005196770 | A | 7/2005 |
| JP | 2005354340 | A | 12/2005 |
| JP | 2006100951 | A | 4/2006 |
| JP | 2006262021 | A | 9/2006 |
| JP | 2006332891 | A | 12/2006 |
| JP | 2008187632 | A | 8/2008 |
| JP | 2009212706 | A | 9/2009 |
| JP | 2010220079 | A | 9/2010 |
| WO | 00/65553 | | 11/2000 |
| WO | 00/65553 | A1 | 11/2000 |
| WO | 01/05155 | A1 | 1/2001 |
| WO | 0105155 | A1 | 1/2001 |
| WO | 2007041284 | A2 | 4/2007 |
| WO | 2007041284 | A3 | 5/2009 |

OTHER PUBLICATIONS

prosyst.com, "The World's Smallest OSGI Solution," prosyst.com, Technical White Paper, Sep. 2010, pp. 1-3, www.prosyst.com.

Santo, B., "The Evolution of Residential Gateways," Communications, Engineering and Design (CED) Magazine, May 31, 2011, pp. 1-7.

prosyst.com, "Best of Breed Home Getaway Middleware—and Beyond," Smart Home, Retrieved from the Internet: <www.prosyst.com/index.php/de/html/content/38/Smart-Home-Products/> on May 8, 2012, pp. 1-2.

prosyst.com, "We Help You Create Your Solution," www.prosyst.com, Jun. 22, 2011, pp. 1-2.

Motorola, "Motorola's 4Home Software Solutions," Motorola, Retrieved from the Internet: < www.motorola.com/Video-Solutions/US-EN/Products-and-Services/Software/4Home-Software-Solutions/4HOME-CONTROL-HOME-MANAGEMENT-US-EN> on Feb. 11, 2011, pp. 1-5.

Ionics, "Ionics Stratus Plug," Retrieved from the Internet: < www.ionicsplug.com/stratus.html> on Feb. 9, 2010, pp. 1-3.

EP 06801953, European Search Report, dated Oct. 22, 2009.

PCT/US2006/032527, International Search Report, dated Sep. 24, 2007.

Bluetooth Doc—Audio/Video Remote Control Profile, ver 1.0, May 22, 2003.

Bluetooth Network Encapsulation Protocol (BNEP) Specification, Revision 0.95a, Jun. 12, 2001, 50 pp.

EP 06801953.8-2414—European Examination Report, dated Aug. 9, 2010.

CN 200680037375.9—Office Action, dated Apr. 6, 2012.

JP 2008-527199—Office Action, dated May 14, 2012, 6 pages.

JP 2008-527199—Office Action, dated Feb. 14, 2011, 10 pages.

PCT/US2012/020363—International Search Report and Written Opinion, dated Jun. 29, 2012, 40 pages.

U.S. Appl. No. 11/350,980—Non Final Office Action, dated Sep. 18, 2007, 9 pages

U.S. Appl. No. 11/350,980—Response dated Sep. 18, 2007—Non Final OA, dated Dec. 18, 2007, 8 pages.

U.S. Appl. No. 11/350,980—Notice of Allowance, dated Jan. 23, 2008, 9 pages.

U.S. Appl. No. 11/465,749—Non Final Office Action, dated Sep. 18, 2007, 13 pages.

U.S. Appl. No. 11/465,749—Response dated Sep. 18, 2007—Non Final OA, dated Dec. 18, 2007, 13 pages.

U.S. Appl. No. 11/465,749—Final Office Action, dated Jan. 24, 2008, 25 pages.

U.S. Appl. No. 11/465,749—Response dated Jan. 24, 2008—Final OA, dated May 26, 2008, 27 pages.

U.S. Appl. No. 11/465,749—Notice of Alllowance, dated Jun. 24, 2008, 7 pages

U.S. Appl. No. 12/210,782—Non Final Office Action, dated Jan. 15, 2009, 5 pages.

U.S. Appl. No. 12/210,782—Response dated Jan. 15, 2009—Non Final OA, dated Jan. 16, 2009, 7 pages.

U.S. Appl. No. 12/210,782—Notice of Allowance, dated Jan. 29, 2009, 6 pages.

U.S. Appl. No. 12/420,723—Notice of Alllowance, dated Jul. 29, 2009, 9 pages.

U.S. Appl. No. 12/572,677—Non Final Office Action, dated Nov. 13, 2009, 9 pages.

U.S. Appl. No. 12/572,677—Response dated Nov. 13, 2009, Non Final OA, dated Nov. 13, 2009, 10 pages.

U.S. Appl. No. 12/572,677—Notice of Allowance, dated Nov. 23, 2009, 6 pages.

U.S. Appl. No. 12/572,685—Non Final Office Action, dated Nov. 9, 2009, 5 pages.

U.S. Appl. No. 12/572,685—Response dated Nov. 9, 2009—Non Final OA, dated Nov. 12, 2009, 6 pages.

U.S. Appl. No. 12/572,685—Notice of Allowance, dated Dec. 1, 2009, 6 pages.

CN 200680037375.9—Office Action, dated Jan. 17, 2012.

JP 2014-120922—1st Office Action dated May 7, 2015, 9 pages.

CN 201310699468.X—1st Office Action dated Dec. 3, 2014, 29 pages.

CN 201310699468.X—2nd Office Action dated Jul. 2, 2015, 11 pages.

CN 201280004517.7—1st Office Action dated Jun. 11, 2015, 9 pages.

JP 2013-548549—1st Office Action dated Nov. 25, 2013, 4 pages.

JP 2013-548549—Response Office Action 1, dated Nov. 25, 2013, 11 pages.

JP 2013-548549—Notice of Allowance, dated May 13, 2014, 3 pages.

EP 12731950.7, European Search Report, PCT/US2012/020363, dated Sep. 8, 2014, 6 pages.

EP 12731950.7—Response to European Search Report, PCT/US2012/020363, dated Sep. 8, 2014, 11 pages.

EP 12731950.7—Office Action, dated Jul. 7, 2015, 6 pages.

CN 201310699468.X—Response 1st Office Action dated Dec. 3, 2014, 18 pages.

U.S. Appl. No. 13/344,529—Response dated Feb. 2, 2015 Final Office Action, filed Aug. 4, 2015, 14 pages.

U.S. Appl. No. 13/344,529—Non Final Office Action dated Oct. 6, 2015, 25 pages.

CN 201310699468.X—Response to Fourth Office Action (Rejection Decision) dated Sep. 2, 2016, filed Dec. 19, 2016, 18 pages.

U.S. Appl. No. 11/350,980—Supllemental Notice of Allowance dated Apr. 10, 2008, 4 pages.

U.S. Appl. No. 11/350,980—Amendment After Allowance, 8 pages.

JP 2012250247—Response to Fourth Office Action dated Mar. 28, 2016 filed Aug. 25, 2016, 11 pages.

Motorola, 'Motorola's 4home Software Solutions', pp. 1-5, Feb. 11, 201, www.motorola.com/Video-Solutions/US-EN/Products-and-Services/Software/4Ho- me-Software-Solutions/4HOME-CONTROL-HOME-MANAGEMENT-US-EN.

U.S. Appl. No. 11/350,980—Office Action dated Sep. 18, 2007.

(56) **References Cited**

OTHER PUBLICATIONS

U.S. Appl. No. 11/350,980—Response to Sep. 18, 2007 Office Action.
U.S. Appl. No. 11/465,749—Office Action dated Sep. 18, 2007.
U.S. Appl. No. 11/465,749—Response to Sep. 16, 2008 Office Action.
U.S. Appl. No. 12/210,782—Notice of Allowance dated Sep. 15, 2008.
U.S. Appl. No. 12/572,677—Office Action dated Nov. 13, 2009.
U.S. Appl. No. 12/572,677—Response to Nov. 13, 2009 Office Action.
U.S. Appl. No. 12/572,677—Notice of Allowance dated Nov. 23, 2009.
U.S. Appl. No. 12/572,685—Office Action, dated Nov. 9, 2009.
U.S. Appl. No. 12/572,685—Response to Nov. 9, 2009 Office Action.
U.S. Appl. No. 12/572,685—Notice of Allowance dated Dec. 1, 2009.
EP 06801953—First Office Action dated Jan. 26, 2010, 8 pages
U.S. Appl. No. 11/350,980—Amendment after Notice of Allowance dated Feb. 6, 2008, 8 pages.
CN 201280004517.7—Third Office Action dated Nov. 30, 2016, 16 pages.
JP 2012250247—Notice of Allowance dated Jan. 10, 2017, 2 pages.
U.S. Appl. No. 12/758,241—Office Action dated Oct. 12, 2010, 15 pages.
U.S. Appl. No. 12/758,241—Response to Office Action dated Oct. 12, 2010 filed Oct. 25, 2010, 7 pages.
U.S. Appl. No. 12/758,241—Notice of Allowance dated Nov. 8, 2010, 7 pages.
U.S. Appl. No. 12/758,236—Office Action dated Oct. 12, 2010, 15 pages.
U.S. Appl. No. 12/758,236—Response to Office Action dated Oct. 12, 2010 filed Oct. 25, 2010, 7 pages.
U.S. Appl. No. 12/758,236—Notice of Allowance dated Nov. 9, 2010, 8 pages.
U.S. Appl. No. 13/047,445—Office Action dated Oct. 12, 2012, 25 pages.
U.S. Appl. No. 13/047,445—Response to Office Action dated Oct. 10, 2012 filed Nov. 9, 2012, 7 pages.
U.S. Appl. No. 13/047,445—Notice of Allowance dated Feb. 12, 2013, 8 pages.
U.S. Appl. No. 13/047,445—Amendment After Final dated May 13, 2013, 9 pages.
U.S. Appl. No. 13/948,061—Office Action dated Dec. 27, 2013, 9 pages.
U.S. Appl. No. 13/948,061—Response to Office Action dated Dec. 27, 2013 filed Jun. 27, 2014, 7 pages.
U.S. Appl. No. 13/948,061—Notice of Allowance dated Jul. 11, 2014, 19 pages.
U.S. Appl. No. 13/345,447—Office Action dated Apr. 23, 2012, 8 pages.
U.S. Appl. No. 13/345,447—Response to Office Action dated Apr. 23, 2012 filed May 7, 2012, 7 pages.
U.S. Appl. No. 13/345,447—Notice of Allowance dated Jun. 18, 2012, 13 pages.
U.S. Appl. No. 13/345,447—Notice of Allowance dated Aug. 27, 2012, 12 pages.
U.S. Appl. No. 13/344,529—Office Action dated Jul. 2, 2014, 33 pages.
U.S. Appl. No. 13/344,529—Response to Office Action dated Jul. 2, 2014 filed Dec. 2, 2014, 10 pages.
U.S. Appl. No. 13/344,529—Final Office Action dated Feb. 4, 2015, 22 pages.
U.S. Appl. No. 13/344,529—Supplemental Response to Final Office Action dated Feb. 4, 2015 filed Sep. 11, 2015, 10 pages.
U.S. Appl. No. 13/344,529—Response to Office Action dated Oct. 6, 2015 filed Feb. 8, 2016, 18 pages.
U.S. Appl. No. 13/344,529—Response to Final Office Action dated Mar. 9, 2016 filed Sep. 8, 2016, 20 pages.
U.S. Appl. No. 13/344,529—Notice of Allowance dated Nov. 17, 2016, 18 pages.
CN 201310699468.X—Fifth Office Action (First Board Decision) dated Mar. 29, 2017, 8 pages.
EP 17000077.2—Extended European Search Report dated Apr. 6, 2017, 10 pages.
CN 201280004517.7—Response to Third Office Action dated Nov. 30, 2016 filed Mar. 15, 2017, 28 pages.
PCT/US2012/20363—International Search Report and Written Opinion dated Jun. 29, 2012, 40 pages.
U.S. Appl. No. 11/350,980—Supplemental Response to Office Action dated Sep. 18, 2007 filed Dec. 19, 2007, 8 pages.
JP 2016-068497—Notice of Allowance dated May 16, 2017, 10 pages.
CN 201310699468.X—Response to Fifth Office Action (First Board Decision) dated Mar. 29, 2017 filed Jul. 17, 2017, 7 pages.
U.S. Appl. No. 13/344,529—Final Office Action dated Mar. 9, 2016, 30 pages.
PCT/US2012/20363—International Preliminary Report on Patentablity dated Nov. 30, 2012, 30 pages.
CN 201280004517.7—Response to First Office Action dated Jun. 11, 2015 filed Dec. 28, 2015, 5 pages.
CN 201280004517.7—Second Office Action dated Apr. 15, 2016, 16 pages.
CN 201280004517.7—Response to Second Office Action dated Apr. 15, 2016 filed Aug. 30, 2016, 24 pages.
CN 201310699468.X—Response to Second Office Action dated Jul. 2, 2015 filed Nov. 17, 2015, 4 pages.
CN 201310699468.X—Response to Third Office Action dated Feb. 3, 2016 filed Jun. 20, 2016, 8 pages.
CN 201310699468.X—Fourth Office Action dated Sep. 2, 2016, 11 pages.
EP 12731950.7—Response to European Search Report dated Sep. 8, 2014 filed Mar. 25, 2015, 11 pages.
EP 12731950.7—Response to First Office Action dated Jul. 7, 2015 filed Dec. 30, 2015, 5 pages.
EP 12731950.7—Second Office Action (Summons to Attend Oral Proceedings) dated Mar. 29, 2016, 8 pages.
EP 12731950.7—Response to Second Office Action (Summons to Attend Oral Proceedings) dated Mar. 29, 2016, Written Submissions filed Sep. 9, 2016, 18 pages.
JP 2012250247—First Office Action dated Oct. 7, 2013, 3 pages.
JP 2012250247—Response to First Office Action dated Oct. 7, 2013 filed Feb. 6, 2014, 6 pages.
JP 2012250247—Second Office Action dated Mar. 17, 2014, 4 pages.
JP 2012250247—Response to Second Office Action dated Mar. 17, 2014 filed Sep. 17, 2014, 6 pages.
JP 2012250247—Third Office Action dated Mar. 2, 2015, 3 pages.
JP 2012250247—Response to Third Office Action dated Mar. 2, 2015 filed Jul. 2, 2015, 14 pages.
JP 2012250247—Fourth Office Action dated Mar. 28, 2016, 8 pages.
JP 2012250247—Response to Fourth Office dated Mar. 28, 2015 filed Aug. 25, 2016, 11 pages.
PCT/US2006/32527—International Search Report and Written Opinion dated Sep. 24, 2007, 6 pages.
CN 200680037375.9—Second Office Action dated Dec. 22, 2011, 12 pages.
Motorola, 'Motorola's 4home Software Solutions', pp. 1-5, Feb. 11, 201, www.motorola.com/Video-Solutions/US-EN/Products-and-Services/Software/4—Ho- me-Software-Solutions/4HOME-CONTROL-HOME-MANAGEMENT-US-EN.
U.S. Appl. No. 11/350,980—Notice of Allowance dated Jan. 23, 2008, 9 pages.
U.S. Appl. No. 12/210,782—Office Action dated Jan. 15, 2009, 4 pages.
U.S. Appl. No. 12/210,782—Notice of Allowance dated Jan. 29, 2009, 6 pages.
U.S. Appl. No. 12/420,723—Notice of Allowance dated Jul. 29, 2009, 13 pages.
PCT/US2006/32527—International Preliminary Report on Patentability dated Feb. 20, 2008, 4 pages.

(56) **References Cited**

OTHER PUBLICATIONS

EP 06801953—First Office Action dated Jan. 26, 2010, 8 pages.
EP 06801953—Response to First Office Action dated Jan. 26, 2010 filed Jul. 26, 2010, 36 pages.
EP 06801953—Second Office Action dated Aug. 9, 2010, 8 pages.
EP 06801953—Response to Second Office Action dated Aug. 9, 2010 filed Dec. 6, 2010, 15 pages.
EP 06801953—Third Office Action (Summons to Attend Oral Proceedings) dated Jul. 4, 2014, 6 pages.
EP 06801953—Response to Third Office Action dated Jul. 4, 2015 (Written Submissions) filed Nov. 7, 2014, 29 pages.
JP 2008-527199—Response to First Office Action dated Feb. 14, 2011 filed Aug. 15, 2011, 13 pages.
JP 2008-527199—Response to Second Office Action dated May 14, 2012 filed Nov. 16, 2012, 18 pages.
JP 2008-527199—Notice of Allowance dated Dec. 17, 2012, 3 pages.
CN 200680037375.9—First Office Action dated Sep. 2, 2010, 9 pp.
CN 200680037375.9—Response to First Office Action dated Sep. 2, 2010 filed Mar. 16, 2011, 11 pp.
CN 200680037375.9—Response to Second Office Action dated Dec. 22, 2011 filed Mar. 6, 2012, 13 pages.
CN 200680037375.9—Third Office Action dated Apr. 6, 2012, 19 pages.
CN 200680037375.9—Response to Third Office Action dated Apr. 6, 2012 filed Aug. 21, 2012, 6 pages.
CN 200680037375.9—Fourth Office Action (Rejection Decision) dated Nov. 2, 2012 , 11 pages.
CN 200680037375.9—Response to Fourth Office Action dated Nov. 2, 2012 filed Feb. 4, 2013 (Request for Re-Exam), 8 pages.
CN 200680037375.9—Decision of Reexamination dated Nov. 28, 2014, 6 pages.
CN 200680037375.9—Notice of Allowance dated Jul. 3, 2015, 2 pages.
EP 12731950.7—Third Office Action (Decision Grounds) dated Nov. 18, 2016, 21 pages.
JP 2014-120922—Response to Office Action dated May 7, 2015 filed Nov. 9, 2015, 18 pages.
CN 201310699468.X—Response to Fourth Office Action (Rejection Decision) dated Sep. 2, 2016 filed Dec. 19, 2016, 18 pages
U.S. Appl. No. 11/350,980—Supplemental Notice of Allowance dated Apr. 10, 2008, 4 pages.

* cited by examiner


Service Delivery
Platform
In-home
bridge
Consumer Electronics
Ecosystem
Cloud Remote™

FIG. 1

FIG. 2






FIG. 3




FIG. 4




FIG. 5




FIG. 6




FIG. 7




FIG. 8

FIG. 9


Associate Con w CD
Single action
Message to Gateway
Buffer CD info
Initiate Call
Send Info for Call
Automated Trouble Shooting
Concierge Device (Con)
911
In-home bridge
Support
Transfer via Con
Gateway to CD
CD info entered
Consumer Devices (CD)
TV
Light
Refrigerator/ Washer
SW




FIG. 10A




FIG. 10B




FIG. 11A




FIG. 11B




FIG. 12A




FIG. 12B




FIG. 13A




FIG. 13B




FIG. 14A




FIG. 14B


09:44 AM
75%
NeXStep
Call duration: 12:48
Cloud Connect Concierge ™
CLOSE VIDEO CALL

FIG. 15

FIG. 16



Device 1
Device 2
Device N
Remote 1
Remote 2
Remote N
Person 1
Person 2
Person N
Cloud
Home Management, Support and Analytics In the Cloud
AP/ LAN/ cell
Router
In-home bridge
Concierge Device
Warehouse 1 2 N
Device Category 1 2 N
...
Household 1
Household 2
Household N
CE Company 1 2 N
Retail Store 1 2 N
Manufacturer 1 2 N
Fab Plant 1 2 N
Industry 1 2 N
Contract Manfc 1 2 N

FIG. 17


Concierge
Device (Con)
Initiate Call
Send Info
for Call
Guided
Trouble
Shooting
Human
Support
1711
In-home
bridge
Support
Consumer
Devices (CD)
TV
Light
Refrigerator/
Washer
SW

FIG. 18


Documentation
Pre-Support Checklist
General items
Diagnosed items
Self-help guidance
Backtracking link
Alternative directions

# CONSUMER ELECTRONIC REGISTRATION, CONTROL AND SUPPORT CONCIERGE DEVICE AND METHOD

## RELATED APPLICATIONS

This application is related to and generally consonant with U.S. Pat. No. 8,243,886, based on application Ser. No. 13/345,447 filed the same day as U.S. application Ser. No. 13/344,529, which this application continues.

This application is a Continuation of U.S. application Ser. No. 13/344,529 filed 5 Jan. 2012, entitled "Consumer Electronic Registration, Control and Support Concierge Device and Method"; which claims the benefit of the following provisional applications: U.S. Prov. App. No. 61/561,732 filed 18 Nov. 2011, entitled "Consumer Electronic Registration, Control and Support Concierge Device and Method"; U.S. Prov. App. No. 61/530,370 filed 1 Sep. 2011, entitled "Consumer Electronic Registration, Control and Support Concierge Device and Method"; U.S. Prov. App. No. 61/430,099 filed 5 Jan. 2011, entitled "Consumer Electronic Support Concierge Device and Method"; and U.S. Prov. App. No. 61/430,103 filed 5 Jan. 2011, entitled "Advertising on a Tethered Digital Butler Consumer Electronic Device and Method". These priority applications are hereby incorporated by reference.

This application is further related to U.S. application Ser. No. 13/047,445 filed 14 Mar. 2011, entitled "Tethered Digital Butler Consumer Electronic Remote Control Device and Method"; which is a Continuation of U.S. application Ser. No. 12/758,241 filed on 12 Apr. 2010 entitled "Tethered Digital Butler Consumer Electronic Remote Control Device And Method", now U.S. Pat. No. 7,907,710; which is in turn a Continuation of U.S. application Ser. No. 12/572,677 filed on 2 Oct. 2009, entitled "Tethered Digital Butler Consumer Electronic Remote Control Device And Method", now U.S. Pat. No. 7,697,669; which is in turn a Continuation of U.S. application Ser. No. 12/420,723 filed on 8 Apr. 2009, entitled "Tethered Digital Butler Consumer Electronic Device And Method", now U.S. Pat. No. 7,609,824; which is in turn a Continuation of U.S. application Ser. No. 12/210,782 filed on 15 Sep. 2008, entitled "Tethered Digital Butler Consumer Electronic Device And Method", now U.S. Pat. No. 7,542, 753; which is in turn a Continuation of U.S. application Ser. No. 11/465,749 filed on 18 Aug. 2006, entitled "Tethered Digital Butler Consumer Electronic Device And Method", now U.S. Pat. No. 7,444,130; which is in turn a Continuation-in-Part U.S. application Ser. No. 11/350,980 filed on 8 Feb. 2006, entitled "Tethered Digital Butler Consumer Electronic Device And Method", now U.S. Pat. No. 7,389,103; which claims the benefit under 35 USC 119(e) of U.S. Prov. App. No. 60/709,666 filed on 19 Aug. 2005, entitled "Tethered Digital Butler Consumer Electronic Device And Method".

## BACKGROUND

The field of this disclosure for selection of an Art Unit to examine this application includes systems, processes and devices for remote control, in communication with consumer devices such as lighting, entertainment appliances, heating, ventilation, air conditioning, laundry, and kitchen appliances. The systems, processes and devices communicate with cloud-based resources via a telephone line (e.g., DSL) or other two-way electromagnetic or optical transmission. One feature of some implementations is enabling conversation; another is transmission of speech or the like.



The home of the future has captured our imagination for decades and probably for centuries. For instance, Disneyland hosted a home of the future from 1957 to 1967, as a joint project of Monsanto, MIT and Disney. In that era, resources were plentiful and computers were expensive corporate devices.

Recently, IBM has published "The IBM vision of a smarter home enabled by cloud technology" (September 2010), which offers a much different vision of the home of the future, one supported by evolving cloud-based analytics. This white paper, which describes IBM's vision of a connected home and of the "Internet of things," accompanied one or more of the provisional applications and is hereby incorporated by reference.

The evolving vision of the home of the future creates an ongoing opportunity for innovation, for communication devices and home accessories that will improve our lives, control and support the interconnection of our consumer devices with services outside our homes. For some purposes, one can distinguish between consumer appliances (CA) and consumer electronics (CE), distinguishing between appliances such as dishwashers, washing machines, heaters, air conditioners, lighting and the like, versus CE television, entertainment and media center devices. New methods and devices may enhance the service experience of consumers, particularly users of leading consumer electrical and electronic devices.

## SUMMARY

We disclose a concierge device that can be configured to register, control and support a consumer device. In various implementations, it alternatively or redundantly connects to a home management bridge and/or to cloud-based management servers. It can dynamically accept menus that allow a single concierge device to provide a wide range of functions customized to particular consumer devices in a home. The concierge device, when associated with a consumer device, allows the user in a single action to initiate a support call, automatically identify the consumer device, and optionally either bypass automated attendant choice trees or invoke an interactive voice response protocol or invoke a visual interaction protocol that takes into account information about the consumer device in the home. The concierge device can be configured for voice or video support calls. The concierge device in conjunction with a home management bridge or gateway can manage on boarding of components of an automated home, including home control devices and controllable devices such as switches and lamps that are connected wirelessly. Implementations of the concierge device that include a display can show supplemental information, such as advertising, optionally in coordination with media being played on a consumer device coupled in communication with the concierge device. Particular aspects of the present invention are described in the claims, specification and drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a high level conceptual diagram that includes a concierge device, a variety of consumer devices in a home, a home management bridge and a cloud-based system delivery platform connected by a network.

FIG. **2** depicts a concierge device in a variety of form factors.

FIG. **3** depicts telephone and support service as functions that might be selected using a concierge device.

FIGS. **4**-**8** show configurations of concierge device and home management bridge, either integrated or standalone. FIG. **4** depicts a concierge device built into a refrigerator or other major appliance. FIGS. **5** and **6** depict scenarios using a concierge device without a display. FIG. **7** depicts a concierge device that includes a display, in use with a home management bridge or alternatively connecting directly to cloud-based management servers. FIG. **8** depicts a concierge device with an integrated bridge and touch screen display.

FIG. **9** is a flowchart of methods consistent with this disclosure.

FIGS. **10**A-**15** are example screens for a concierge device that includes a display. In FIG. **10**A, users are presented with choices, including invoking the concierge service described. FIG. **10**B depicts selection of TV channels from live TV. FIGS. **11**A-B depict a video phone call. FIG. **12**A shows an example of user authentication using biometric data. FIG. **12**B shows an example of an alert that a new home control device, a switch is available for on-boarding. FIG. **13**A is an example GUI that used to select among device types to which a user can connect the new switch. FIG. **13**B is an example GUI that presents devices that a user can connect to the new switch. FIG. **14**A is an example of GUI from which a user can select a device and cause initiation of a support session. FIG. **14**B is an example of a suggested fix presented to a user in a support session prior to connection with a human agent. FIG. **15** depicts a video call with a human support agent.

FIG. **16** depicts information that may be useful for the home management bridge or the concierge device to communicate to the support center.

FIG. **17** is a high level diagram of adding to support an automated interaction for the user.

FIG. **18** represents a sample of information that may be supplied as part of an automated interaction.

## DETAILED DESCRIPTION

The following detailed description is made with reference to the figures. Preferred embodiments are described to illustrate the technology disclosed, not to limit its scope, which is defined by the claims. Those of ordinary skill in the art will recognize a variety of equivalent variations on the description that follows.

### Concierge Device Range of Capabilities

We disclose a concierge device that can be configured to register, control and/or support a consumer appliance or electronics device (collectively, "consumer devices"). It is particularly innovative to register, control and/or support consumer appliance devices, as appliances have not traditionally been smart, have not been managed in the home, and have not been connected to the cloud. The concierge device, in various implementations, may connect to a home management bridge or to cloud-based management servers. In other implementations, it uses one as a back-up to the other.

In some implementations, the concierge device accepts consumer device control menus from either a home management bridge or cloud-based servers that are appropriate to a registered consumer device. These dynamically accepted menus allow a single concierge device to provide a wide range of functions customized to particular consumer devices in a home. Optional authentication security can be implemented to satisfy security conscious home owners.

The concierge device also can, in some implementations, display supplemental information to the user, such as targeted or interactive advertising.

While this disclosure refers to a home, the technology disclosed can also be applied in a business, such as a small business. Where reference is made to "in-home" technology, this translates to "on premises" for a business.

### Easy on Boarding Devices to Home Automation

Easy on boarding of a new device in the home can be part of a registration process. This registration process can be made secure by authentication. Any of the concierge device, home management bridge, or cloud-based service can recognize the presence of the new device in the home network. The new device can communicate via a wireless or wired protocol as part of the home network. Optionally, the new device could communicate with the concierge device and the concierge device could relay registration communications between the new device and the bridge, the cloud based service or both.

The concierge device can participate in registration and, optionally, authentication of the new device being on boarded. A concierge device with a speaker or other audio output can receive voice prompts for confirming registration of the new device and can accept single user actions in response to the prompts, such as button presses, menu selections or verbal responses to the verbal prompts. Alternatively, a concierge device with a display can receive visual prompts for confirming registration of the new device and can accept single user actions in response to the prompts, such as button presses, menu selections or verbal responses to the visual prompts.

### Authenticated on Boarding

Easy on boarding can be made secure by an authentication protocol. One authentication protocol would rely on voice prints. The concierge device preferably would relay spoken words to the in home bridge or the cloud-based service and rely on the other device to use voice printing or another biometric analysis of the voice to authorize on boarding the new device. Alternatively, the concierge device could, at a higher cost, analyze spoke words using resources built into the concierge device and perform local authentication from spoken words. Another authentication protocol would involve reading a user's fingerprint, using a fingerprint reader. The concierge device preferably would relay raw fingerprint data to the bridge or cloud based service. Alternatively, again at an increased device cost, the concierge device could locally process the fingerprint data for authentication. Other challenge and response authentication protocols could easily be implemented using the concierge device in communication with the bridge or cloud based service or using local resources of the concierge device. Possession of the concierge device combined with an additional authentication would provide two-factor authentication.

At the simplest authentication level, the concierge device could be paired with the bridge or cloud based service and a single press of a button, shake of the device (sensed by an accelerometer, compass, gyroscope or other motion sensitive electronic, MEMS or other device) or spoken response to complete the on boarding. In this simple case, possession of the concierge device and a single user action would be enough to satisfy one factor authentication of the new device. Requiring such authentication inhibits new devices from registering themselves and becoming viruses or Trojans on a home network.

In combination with either one or two factor authentication, the bridge or cloud based service could describe the device being on boarded or added to the home network and have the user confirm that the device being added matches the description. The description could be either audio or

visual. This is an additional safeguard against mistaken or malicious registration of new devices onto the network.

Among the functions that can be implemented, the concierge device may rely on either the bridge or cloud-based services to transcode media from other sources to a concierge-standard format, which reduces the complexity and cost of the concierge device. Optionally, the concierge device, when associated with a consumer device, allows the user in a single action to initiate a support call without requiring the user to look up or recall the support phone number, automatically identifying at least the consumer device and optionally the user or household. Using the automatically provided information, the concierge device, optionally, could further allow a user to bypass automated attendant choice trees, to invoke an interactive voice response protocol that takes into account information about the consumer device in the home, to invoke a session using a display of the concierge device (when it includes a display), and/or to initiate a coordinated browser-based session involving a home computer. Examples of consumer devices include televisions, stereos, A/V receivers, satellite and cable receivers, DVD players, media servers, telephone systems, dishwashers, ovens, refrigerators, other kitchen appliances, washing machines, dryers, spas, HVAC, pool equipment, lighting, security sensors, medical devices, vehicles, utilities, personal computers, and network attached appliances.

A concierge device, in some implementations, alternatively connects through redundant devices, which reduces the chance of consumer frustration with a smart home that needs to be rebooted or that has inaccessible functions, due to management device malfunctions or inaccessibility. By redundant devices, we mean a home management bridge and one or more cloud-based management servers. Examples of home management bridges include those under development (at the time of this application) by Ionics EMS and 4Home. These devices are sometimes referred to as gateways. Being cloud-based, the management servers are accessed via the Internet or another network such as a telephone, cellular, cable or fiber optic connection to a home network. By server, we mean a computing device that can be a workstation, server, server cluster, server farm or the like. The server may be an array of servers connected to a load-balancing device.

The concierge device is wirelessly coupled to the home management bridge and/or the cloud-based management servers. In some environments, it is coupled through an access point, which is connected in turn to both the Internet and an in-home network. Many other configurations are possible, consistent with this disclosure, that also afford alternative connections from the concierge device to the home management bridge and/or the cloud-based management servers.

The concierge device's first choice between alternative connections can be the in-home device, as latency on a local network should be less than latency in connecting to a cloud-based service. The in-home device can store information that the user does not want to have leave the home. The in-home device can obtain information as necessary from the cloud-based servers, connecting with them via the Internet or another network. For cloud-based services, a telecom or cable company could respond to IP messages from a concierge device without the messages ever leaving the company's network, without a hand-off from the originating network to a network owned by a second entity. Both connection via the network and a connection hosted by or affiliated with a last mile service provider are part of what we refer to as cloud-based.

Alternatively, the concierge device may first attempt to connect to the cloud-based service and then fall back to an in-home bridge as an alternative. The fall back may result from unavailability of or excessive latency in connecting to the cloud-based home management server.

The home management bridge, in one implementation, mediates registration and deployment of menus to the concierge device. The concierge device connects to the home management bridge to register an associated consumer device. The operation of the home management bridge is transparent to the concierge device. The home management bridge may already have cached or permanently installed information for the specific associated consumer device, for instance cached from the cloud. Or, it may have manufacturer connection information that allows the bridge to resolve a particular model number of the associated consumer device, register that type of device, retrieve control menus and retrieve other information. Alternatively, the bridge may rely on information initially stored by the associated consumer device. This information may be forwarded by the concierge device or obtained by the bridge directly.

In another implementation, the concierge device and associated consumer device begins by interacting with the cloud-based home management server and the role of the home management bridge is to back up information solicited by the concierge device or associated consumer device from the cloud-based home management server.

Virtual Apps—Downloaded Menus

Following registration either with, through or bypassing any in-home bridge, the concierge device receives and optionally stores menus and/or control codes for the registered consumer devices. Periodically, the concierge device may check for updated menus and/or control codes. It can check with the home management bridge or with cloud-based servers. The home management bridge may periodically refresh a cache of menus and control codes for devices registered by the concierge devices and other in-home devices that it can detect.

A concierge device can obtain from a home management bridge menu, control code and other information, even if the concierge device was not involved in registration of in-home consumer devices. For instance, a replacement or second concierge device can be reloaded by the home management bridge with information previously used by a first concierge device. Or, a first concierge device can be introduced into a home in which the bridge already had discovered consumer devices and downloaded appropriate information from cloud-based management servers.

One use of the concierge device is as a remote control. Another is to control display of information buffered by the home management bridge on a television or other available on the same network as the bridge. A further use of the concierge device is to provide support for the consumer device.

Concierge Device for One Action Support

Four levels of support automation are described. At the basic level, the concierge device provides telephone support, following automatic identification of user/household and/or consumer device to the support center by either the concierge device or a home management bridge.

At the next level, the concierge device includes a camera that provides still or video information to a support center during the support call. Optionally, a personal computer, television or other device with a display can receive visual information to assist the user during the support call. The visual information may be an image of the support person,

pictures illustrating aspects of the consumer device, textual instructions or a combination thereof.

Automated troubleshooting can be pursued before a user is connected with a human support agent, using either a visual based interaction or an interactive voice system. The automated trouble shooting may require mandatory responses from the user, or it may be optional: opt in by asking a user if they want to try automated trouble shooting; opt out by starting the automated protocol and giving the user the option to proceed to human support without further automated support; or opt in combined with opt out. Alternatively, the automated troubleshooting may happen while waiting in queue to be connected to a human support agent. The troubleshooting may involve a traditional interactive voice response system, a browser-based visual troubleshooting protocol, or an advanced interactive system based on the Watson artificial intelligence technology demonstrated by IBM. Trying the automated trouble shooting may be optional during the queue period. A support system may be configured to allow a user to postpone human support, if automated support seems to be working, either by using the support interface or by telling the human support agent to come back later. A user whose turn to talk to a human support agent comes up in queue while pursuing automated trouble shooting may be kept at the top of the queue, so that they receive assistance promptly after completing automated trouble shooting, to improve user reception of the automated trouble shooting option.

Instead of performing automated trouble shooting with a display, an automated voice response (AVR) system could be used to collect information and lead the user through basic troubleshooting steps. Much of what can be done with a display could, alternatively, be done using voice interactions with an automated system.

At the third level, the concierge device causes diagnostic status information to be forwarded from the consumer device to the support center. This level optionally includes the camera of the previous level. Alternatively, configuration of the concierge device with the consumer device and the home management bridge may enable the consumer device periodically or occasionally to provide status and/or diagnostic information to a support center, without the need for the user to initiate a support call. Then, when the user initiates a support call, the support center may already have the information needed to identify problems with the consumer device, not necessarily limited to the problem that leads to the support call. Optionally, automated troubleshooting, described above, also can be pursued before a user is connected with a human support agent. The availability of this feature and option, of course, depends on the status of the consumer device. The device may be dead, diagnostically accessible, or working and diagnostically accessible. By "dead," we mean that there is no electronic communication with the consumer device, either directly or indirectly. By diagnostically accessible, we mean that the concierge device or a bridge working with the concierge device is able to communicate with the consumer device, at least for diagnostic purposes. This may involve a special mode, such as the "safe boot mode" on a personal computer. By working and diagnostically accessible, we mean that the consumer device is largely functional, but requires support. The diagnostic information forwarded may include one or more status codes. It may include software/firmware version information and component inspection results.

At the fourth level, the concierge device or a bridge working with the concierge device relays communications between the consumer device and the support center in a diagnostic session. This level optionally includes features of the prior levels and nicely builds upon them. The diagnostic session may involve the support center triggering a self-diagnostic routine or selective retrieval of information helpful to diagnostics, such as a history of status/error codes or operating status, configuration information, or a dump created when the consumer device malfunctioned. It also may involve sending information from the support center to the consumer device, such as new firmware, revised configuration data or reset commands. The stream of communication or diagnostic session status information optionally may be displayed or summarized for the user to monitor on a personal computer, television or other device with the display. Even before a human support agent becomes involved, an automated support protocol could, optionally, be used to engage the user in the communications between the consumer device and the support center diagnostics. A system could automate such routine tasks as obtaining the user's permission to engage in interactive diagnostics, obtaining user visual observations of the device, identifying procedures that the user already has followed, obtaining user contact and/or registration information. A wide range of information collection and diagnostics could be automated, not limited to these examples.



The simplest concierge device lacks a display or includes a minimal monochrome display. It need only have a microphone, speaker, one to a few function buttons or input sensors, a memory and at least one wireless transceiver. The simple concierge device could rely on a bridge to transcode voice communications and, optionally, pictures. It also relies on the bridge to maintain communications with the support center during the support call. In operation, the simple concierge device is associated with the consumer device and then the user initiates the support call for the associated consumer device with a single action. For instance, the user could press a support button or utter a command that the concierge device or the bridge would interpret. Then, the user proceeds with the support call.

The bridge can communicate directly with the Internet or a private network or may be attached through a router, bridge or other network device. The bridge may include router and/or modem functionality, as is found among cable and DSL modems. Preferably, malfunctioning of the home management bridge will not interfere with connection to the Internet or a private network.

The concierge device, even in its simplest configuration, can support multiple devices and/or multiple brands of devices. Given the functionality and alternative protocols disclosed, almost any configuration of concierge device could be used with a TV from one manufacturer, a DVR from another, and a washing machine from a third manufacturer. The one exception might be a crippled configuration shipped with a device and purposely limited to a single device or single manufacturer.

Associating (Linking) the Concierge Device and Consumer Devices

There are a variety of options for associating the simple concierge device with a particular consumer device for support calls. One association model is the familiar Bluetooth pairing model, in which the consumer appliance or electronic device and simple concierge device are placed in pairing mode and allowed to pair. Information is transferred from the consumer device to the concierge device during or following the pairing. Another option is for the in home bridge to discover consumer devices and for the concierge device to pair with the bridge, without having to pair with any of the consumer devices. In some implementations, a

consumer may find it more convenient to pair just once with a bridge than to pair repeatedly with a wide variety of devices. Pairing with just one bridge would save the consumer from recognizing slight variations on pairing protocols that would inevitably follow from pairing with devices of all sizes, shapes and origins.

Information provided by the consumer device to the concierge device or bridge may be as simple as a serial number or it may include further information that identifies the device manufacturer and model number. Alternative identifiers may be globally unique user identifiers (GUIDs) or identifiers that are unique within a realm, such as unique to a manufacturer or a trade group. Optionally, it may identify the device category and/or family so that appropriate support staff can be reached, even if the precise model number is not in a support database. The consumer device may have embedded a unique resource identifier (URI), such as a universal resource locator (URL), with or without additional parameters, that identifies or allows lookup of the support center, as an alternative to identifying the manufacturer and model. Pre-installation inventory of control and/or controllable device components can be accomplished using camera or bar code reader to read a bar code or similar label. Or, an RFID reader can be used to read a tag. Optionally, a digital floor plan could be used to ease the burden of commissioning or on boarding of devices.

Another association model uses the home management bridge to associate the concierge device with the particular consumer device that needs support. The home management bridge can be used to register one or more consumer devices with at least one support center. The bridge and the simple concierge device are paired or at least coupled in communication. The user interacts with the bridge to select the particular consumer device that needs service. Then, a single action at the concierge device or bridge initiates the support call. The concierge device participates in a support session at one of the support levels described above.

A third association model programs the concierge device with the consumer device information without requiring direct communication with the particular consumer device by either the home management bridge or the concierge device. For instance, the concierge device can be preprogrammed at the factory. Or, it can be programmed using the bridge or any personal computer, television or other device with the display. For instance, it could be coupled using a wired USB connection or a wireless Bluetooth connection to a personal computer, television or DVD player that runs a small application which loads the consumer device information into the concierge device.

Of course, other association models could be used and remain consistent with the teachings of this disclosure.

Example of Support Session Implementation

At the outset of the support session, the bridge sends the support center at least consumer device information and, preferably, user identification information. The user identification information can be as simple as a globally unique identifier (GUID) of the concierge device, home management bridge or consumer. For the concierge device and home management bridge, a MAC address may serve as a GUID. This GUID may be registered with the support center before the support call or registration information may be collected during the support call. Preferably, the user's name would be associated with the GUID. The user identification information may be household related, individual related, or both. Either a household or individual can have more than one concierge device. Information about the consumer device or a plurality of consumer devices may be implied in the GUID. Optionally, the GUID, the particular consumer device identification or a combination of the GUID and consumer device identification can be associated with a premium support level, such as contract support or extended support. Premium support association entitles the support call to special handling, such as a shorter wait queue or different support personnel.



A display equipped concierge device adds a display to the simple concierge device. The display equipped concierge device can have navigation controls or a touch sensitive screen. It can have a keyboard implemented with buttons or on-screen. The display equipped concierge device can interact with the bridge and the support center without involvement of a personal computer television. The display equipped concierge device can be used to register the consumer devices with the support center or to enter information that will be useful at the outset of the support call. It also can be used to answer diagnostic questions at the beginning of the support session, before a support person comes on the phone. The diagnostic questions may depend on the consumer device information supplied to the support center.

The display equipped concierge device can rely on the home management bridge for services including transcoding voice communications and, optionally, pictures and maintaining communications with the support center.

Another hardware configuration includes the concierge device with integrated bridge. For instance, the concierge device may be a smart phone that runs a concierge application. If the consumer already owns an Android phone, an iPhone, an iPad or other portable device that includes wireless communication, a concierge application may be a low cost implementation of the concierge device. The service levels and association models described above still apply to concierge device with integrated bridge.

In yet another configuration, the concierge device is built into the consumer device, in the sense that the speaker and microphone are built into a major appliance, apropos to Internet surfing on a refrigerator door. In this configuration, the bridge could be built into the major appliance (integrated bridge) or it could be a separate device coupled wirelessly or by powerline connection to the major appliance.

The home management bridge, again, optionally transcodes voice communications and, as a further option, pictures. The bridge establishes and maintains communications with the support center during the support call. It includes in the data stream with the support center identification information and, optionally, diagnostic information, consistent with the four service levels identified above or variations on those service levels.

## DESCRIPTION OF FIGURES

FIG. **1** is a high level conceptual diagram that includes a concierge device, labeled Cloud Remote™, a home management bridge, a variety of consumer devices in a home and a service delivery platform connected by a network to the home. The service delivery platform can provide functionality such as navigation, communication, personalization security, search and ad display, digital rights management, gaming and virtual entertainment, data access and upload and place shift. The service delivery platform provides cloud-based management servers. While there is a significant list of functions in this figure, many additional functions could be supplied upon connecting a consumer device through the technology disclosed to services accessible via a network.

The concierge device may take on a variety of form factors as depicted in FIG. **2**. In FIG. **2**, from left to right, we see a wand, which includes one or more function buttons, a speaker and microphone. With voice activation, even the button might be eliminated, in favor of a microphone and speaker. The device could turn on with motion sensing instead of button activation, utilizing an electronic or MEMS sensor of motion or orientation such as an accelerometer, inclinometer, compass or gyroscope. In the middle is a simple concierge device with a thumb board and navigation controls. To the right is a concierge device with a touch screen. The concierge device can take on any of these form factors. Some of the scenarios described in this disclosure vary, depending on whether the form factor of the concierge device includes a display or not.

FIG. **3**. depicts telephone and support service as functions that might be selected using a concierge device. A dedicated button on the concierge device might select a support call or navigation keys on the concierge device might be used with a single click to initiate a support call or session.

FIGS. **4-8** show configurations of concierge device and bridge, either integrated or standalone. FIGS. **5** and **6** depict scenarios using a concierge device without a display. In these scenarios, AVR automated troubleshooting could be made available, in any of the modes described above. In FIG. **5**, the concierge device can be associated directly with one of the consumer devices, such as a TV, light, refrigerator or washer or coupled to the consumer devices through the bridge. A computer, TV or other monitor can be used to confirm actions performed using the concierge device or for configuration of the concierge device. Any of these monitors can be used for visually based automated trouble shooting, as described above. Alternatively, verbal commands and confirmations could be exchanged between the concierge device and the home management bridge. Upon request, the bridge can initiate a phone call, using the concierge device as a handset. This support session will typically be handled via VoIP through the Internet to a support server. Alternatively, cloud-based management servers coupled in communication with the concierge device could be used to initiate the phone call.

Optionally, the concierge device may communicate with the in-home bridge via **511** through a built in or separate access point or through an in home network. The concierge device can rely on the in-home bridge to relay its messages to other devices or to process its messages directly. In this scenario, a home management bridge handles communications between the concierge device and consumer devices. In some implementations, the home management bridge also forwards signals from home control devices such as a wireless switch (SW) to controllable devices, such as the TV, light, refrigerator or washer. The functions of such home control devices may be replicated on the concierge device, especially when the device has a display, as in FIGS. **7-8**.

In FIG. **6**, the bridge is built into the television. Given the functionality included in televisions, the bridge described in this disclosure could readily be incorporated into a TV. Many TVs already are capable of communication through the Internet to a server. Alternatively, the bridge could be built into the concierge device and the TV used merely as a monitor to confirm actions being taken by the concierge device.

FIG. **7** depicts a concierge device that includes a display, in use with a home management bridge that is a separate and distinct physical device. Because this concierge device includes a display, it is unnecessary to use a personal computer or television to confirm actions being taken. Optionally, the concierge device may communicate with the in-home bridge via **711** through a built in or separate access point and rely on the in-home bridge to relay its messages to other devices or process its messages directly.

FIG. **8** depicts a concierge device with an integrated bridge and display. In this figure, a touch screen device is depicted. The concierge device may be implemented in this configuration as an application running on a smart phone, tablet or similar device.

FIG. **4** depicts a concierge device built into a refrigerator or other major appliance. In this illustration, the bridge would be built into the refrigerator as well as the concierge device. Alternatively, as depicted in FIGS. **5-6**, the bridge could be a standalone device or built into a TV or signal source for a TV, such as an A/V receiver, a DVD, cable or satellite box.

FIG. **9** is a flowchart of methods consistent with this disclosure. In the left column are a series of actions. First, the concierge device is associated with the consumer device. Several ways of handling this association are described in the body and claims of this document. A single action using the concierge device initiates the support activities that follow. The single action could be a button press, a single or double tap of a pad, a wave of the device or spoken word(s). Responsive to the single action, the concierge device causes a message to be sent to the bridge. The bridge buffers consumer device information for use in a support call and then initiates the call, responsive to the single action. The bridge sends information to the support center in support of the call. The information may be used to bypass automated response trees and menus, to personalize the user experience. The information optionally may be used to offer or initiate automated troubleshooting, as described above. The bridge also may send consumer device status information in aid of troubleshooting or, in some cases, even bridge a diagnostic session between a support server and the consumer device being supported. In the right-hand column of FIG. **9**, we see alternative ways in which consumer electronic information can be buffered to the bridge. It could be transferred via the concierge device. The bridge could communicate directly with the consumer device. Or, the consumer device information could be entered using any general data entry method, such as a keyboard or voice recognition. Optionally, the concierge device may communicate with the in-home bridge via **911** through a built in or separate access point and rely on the in-home bridge to communicate relay its messages to other devices or process its messages directly.

FIG. **17** is a high level diagram of adding to support an automated interaction for the user. Building on FIG. **9**, this figure illustrates using the information sent to support to generate or select a relevant automated interaction. For instance, the system sends the user a document for display with troubleshooting hints and directions. The interaction may be optional, as some users may prefer guided trouble shooting to talking with a support person. Or, an automated protocol may be a required preliminary that addresses frequently encountered issues. More alternative modes of automated or guided trouble shooting are given above. Optionally, the concierge device may communicate with the in-home bridge via **1711** through a built in or separate access point and rely on the in-home bridge to communicate relay its messages to other devices or process its messages directly.

FIG. **18** represents a sample of information that may be supplied as part of an automated interaction. For instance, a variety of documentation such as manuals, data sheets, part

lists and feature guides can be available. Pre-support checklists can be provided to cover steps such as checking the power and rebooting the device. Support can be provided in response to general questions from a user. Alternatively, support can be provided for diagnosed faults. These faults may be reported with status or configuration data or diagnosed using status and configuration data. The data available from the consumer device can be combined with user responses to focus the investigation. Self-help guidance can be provided for those interested.

FIGS. **10A-15** are exemplary screens for a concierge device that includes a display. In FIG. **10**A users are presented with choices, including invoking a concierge service to initiate a support call. Users are presented with choices of watching live TV or IP TV, controlling consumer devices within the home, initiating a VoIP call, playing games or invoking the concierge service to initiate a support session.

FIG. **10**B depicts selection of TV channels from live TV. Customizable buttons can be provided and a user's favorite channels featured.

FIGS. **11**A-B depict a video phone call. FIG. **11**A is an example of a contacts list used to initiate calls. FIG. **11**B is an example of a video phone call in progress.

FIG. **12**A shows an example of user authentication using biometric data. In this example, use of a fingerprint for authentication is illustrated. Voice prints or facial recognition also can be implemented on a concierge device, as can many forms of challenge and response.

FIG. **12**B shows an example of an alert that a new home control device, a switch is available for on-boarding. The home management bridge monitors the availability of new devices for on boarding. It can listen continuously for new signals or can be placed in a listening, pairing or enrollment mode when a new device is to be added. The concierge device receive alerts from the bridge and alerts the user by visual, audible or tactile cues.

FIG. **13**A is an example GUI that presents devices that a user can connect to the new switch.

FIG. **13**B is an example GUI that used to select a device to control. When a device is selected, another screen may appear that provides access to controls beyond a simple toggle.

FIG. **14**A is an example of GUI from which a user can select a device and cause initiation of a support session. The devices illustrated as having available concierge support include a TV, projector, home theater, radio, washer and oven. As easy as identifying devices for remote control, the concierge panel allows a user to select a device and cause initiation of a support telephone call. The call may be a video call or audio-only. The system may automatically select the best communications available. A video call may include pictures from a front facing camera, directed towards the user, a back facing camera directed to the device that is being serviced or some combination of the two. The information displayed from the support center may be directions, photographs of what to look for, or the support person. As illustrated in other figures, interaction with a human support agent may be preceded by an automatic support protocol, optionally with diagnostic responses by the consumer device to queries received at the outset of a support session.

FIG. **14**B is an example of a suggested fix presented to a user in a support session prior to connection with a human agent. The session example involves a television. Status information and, optionally, diagnostic responses to queries have been provided digitally to the support session. An automated support protocol has been invoked to suggest possible resolutions of the user's problems. The problems



resolved may be suggested by the user, the support servers or both. For instance, in this example, the user might only have mentioned a video resolution problem. Upon detecting a similar audio resolution problem the suggested fix can be extended from the first problem that the user presented to another, related problem. The user has the option of moving forward with human agent contact by pressing the "start call" button.

FIG. **15** depicts a video call with a human support agent.

FIG. **16** depicts types of information that may be useful to the support center. In a home, devices **1** through N may be present. Controls **1** through N may correspond to individual devices or persons within the home. They may be linked through the bridge or directly to the Internet. The form factors for the concierge device may include any of the form factors in FIG. **2**, or built into a major appliance, or as an application running on a smart device such as a tablet or smart phone. Alternatively, a programmable face plate or remote could be mounted on a switch box, cradled in a charger or surface mounted on the wall. May be portable, especially from the charger. A screen saver of this remote could be a dimmer control. A home computer could also be used as a remote device, although the range of communications via Bluetooth or Zigbee may be more difficult to accomplish between a stationary computer and a consumer device.

In the left-hand column, any number of persons may be located in the same household as the consumer electronic and concierge devices.

More generally, the support service needs to handle multiple households. Consumer electronic information that may be of interest for service purposes includes the company that marketed the device, the manufacturer of the device, or the industry supported. For an individual device, the warehouse that shipped the device and the device category may be of interest, as may be the retail store that sold it, and either the fabrication plant or contract manufacturer that produced the device. In a full implementation, analytics hosted at a support center accessed via the Internet or so-called cloud helps the support staff quickly diagnose the problem being encountered. These analytics may take advantage of information about the device manufacturing, but beyond the information that the consumer is able to supply. Given the reliable transmission of information from the household through the bridge and network to the support center, it is anticipated that service will be significantly improved.

Problems and Solutions

The technology disclosed is useful to address a variety of problems. For instance, the problem of providing a user centric, multi-purpose interface to diverse consumer devices (CA and CE devices) in a home can be addressed using a handheld concierge device (a remote control) that relies redundantly or alternately on a home management bridge and/or cloud-based management servers, depending on their availability and the configuration selected. This concierge device sends input to and relies on the home management bridge, working in conjunction with the cloud-based management servers, to register devices in the home to be managed consumer devices. It accepts dynamically supplied menus verified to be up-to-date for control of the managed consumer devices. These menus may be updated from time to time, either to fix bugs or as device capabilities are updated. It can act as a remote control for the consumer devices, using the dynamically supplied menus. In some implementations, it relies on the home management bridge

or the cloud-based management servers to transcode multimedia to format used by the remote control.

Another problem of providing efficiently connecting a user to technical support can be solved by the technology disclosed using a low cost concierge device with minimal processing power, a microphone, a speaker, one to a few function buttons and a wireless transceiver; and by pairing the concierge device with a consumer device, pressing one of the function buttons to initiate a call to a service center and utilizing resources in a bridge to 1) identify the consumer device and any current status codes to the service center and 2) convert voice communications between the concierge device and the bridge to a VoIP and relay the VoIP communications to the service center.

One option is for the consumer device to communicate with the bridge, after setting up the bridge with household information and enrolling the consumer device with the bridge. The bridge could be a computer or TV with a wireless or powerline connection to particular consumer devices and pairing protocols. A wireless connection could be direct or via a mesh, per Zigbee, Zwave, Lutron ClearConnect™ or enOcean-like communication protocols. The wireless connection may be WiFi, 3G, BT, DECT, Zwave, Zigbee or virtually any RF that is low cost. The distinguishing protocol could involve promiscuous identification of visible consumer devices, graphic depiction from a cache or network connection of the consumer devices identified on a display, accepting selection of a particular consumer device from a display, and instructing a user to adjust one or more settings of the particular consumer device to confirm pairing.

Consider the following example of on boarding a lamp to a home network and using the concierge device to control the lamp. The in home gateway detects the new lamp and communicates with the Cloud Remote™ resulting in an alert such as, "detected a new connected device 'Lamp'. To Accept device please voice authenticate by saying 'Confirm'" The user says "Confirm." Simple menu screen is loaded onto the concierge device following the registration, which optionally may include authentication by voice authentication. Optionally, a default or custom setup screen for the lamp setup appears with a few parameters. User presses "Defaults Accepted" on this screen. Of course, some devices may be so simple that no user setup is required, beyond registration. Subsequent menus of "Devices" include the now-registered lamp. The user can turn the lamp on and off from this screen. The user also can on board a switch and dedicate that switch to controlling the lamp. Then, the user can use either the switch or the concierge device to control the lamp.

The bridge alternatively could be a network appliance with a web server that is accessed from a computer or TV that provides a display. The bridge has a wireless or powerline connection to particular consumer devices and a pairing protocol that distinguishes consumer devices in the household from consumer devices visible but outside the household. The distinguishing protocol could involve promiscuous identification of visible consumer devices, serving a graphic depiction from a cache or network connection of the consumer devices identified on a display, accepting selection of a particular consumer device from a display, and instructing a user to adjust one or more settings of the particular consumer device to confirm pairing. The installation optionally includes reading a bar code on a device being coupled to the home management bridge.

Another option is for the concierge device to communicate with both the paired consumer device and a paired bridge, relaying information from the consumer device to the bridge.

The information relayed from the consumer device to the bridge could be pairing information that enables the consumer device and the bridge to pair, based on the concierge device having paired with each, or at least with the bridge.

Alternatively, the bridge could be a computer with a Bluetooth adapter and a device pairing protocol for pairing with the concierge device. The computer could set up the bridge with household information and enroll particular consumer devices with the bridge, using the concierge device to manage pairing. Or, the bridge could be housed in a refrigerator or other major appliance. Some refrigerators now include a display and even a Windows-based operating system. Similarly, A/V receivers and DVD players include substantial resources that could be harnessed by a bridge application and, optionally, a digital concierge application.

The concierge device could further include a camera that allows the user to show the service center a problem with the consumer device. The bridge could cause instructional images to be relayed to a display on the concierge device.

Sample Support Dialogs

Problems with a TV

1) Picture Resolution—In this dialogue, system configuration information has been relayed from the consumer device to the support center for use by the support person. The information may be relayed when the support call is initiated, after it begins, or even before the call, if it was sent by the consumer device to the support center in advance, following the disclosed setup. However the information is relayed to the support center, it is available in the support call without the user needing to verbalize or print and fax the configuration parameters. During the session, the support staff remotely reconfigures settings on the device. In practice, the dialog may require additional permission steps, such as verbally granting permission or taking an action using the concierge device or controls of the consumer device to give permission to the support staff to adjust settings. The user and support parts of the dialog are illustrated below:

USER: I cannot see the corners of the picture on the screen. The picture seems to be cropped.

SUPPORT: I see that even though your TV supports 1080P HD resolution, its resolution is set to 480i Video letter box mode. I have now adjusted the resolution to be set to 1080P full screen mode when you operate your set top box, Blu-Ray Player and gaming box which I see as the devices connected through your receiver to the screen. Can you see a full Test pattern on your screen now?

USER: Oh yes, thanks! The problem seems to have been resolved now.

2) Audio Fidelity—In this dialog, the support staff again uses configuration information and remote configuration adjustment to solve the user's problem.

USER: I cannot hear any sound from the rear speakers at all in my surround sound system.

SUPPORT: I see that the audio on your receiver is set to Dolby 2.1 mode. I will now change that to Dolby 5.1. Can you confirm audio from the rear speakers now?

USER: Oh yes, thanks! The problem seems to be resolved now.

3) Download issues—In this dialog, identification of the household or user allows the support person to spot an issue that has not generated a very informative error message.

USER: I don't seem to be able to download any movies. Can you please help me with that?

SUPPORT: Certainly. My Log shows that the Internet connection to your household has been up and running for the last 2 weeks without any interruptions. However, I am showing here that the primary credit card on your file has expired. Would you like me to update that information now? I can link the card ending in digits 5202 as the valid credit card. Is that OK?

USER: Oh yes, thank you.

SUPPORT: You should be able to download any movies at this point.

USER: Thank you!

4) Gamebox connection and control—Information from multiple devices is used for problem solving in this dialog. The bridge has been configured to forward information to the support center for more than just the Gamebox. This information may be forwarded after configuration of the TV to work with the bridge, as described above, or during the diagnostic session. Further permission dialog may be required to cause status information to be forwarded by more than just the Gamebox.

USER: Hi, I don't seem to be able to connect my Gamebox to my receiver and TV. Can you help me with that?

SUPPORT: Oh, certainly. I am showing here that your Gamebox reports correct functionality. However, your receiver is not set to select the proper video input when selecting the Gamebox. May I take corrective action for that?

USER: Yes, please.

SUPPORT: OK. The problem is now resolved. Also, your remote control programming has been set the proper input settings for next time.

USER: Great, thank you.

5) Gifting or cross-selling—In combination with problem solving, the support staff can either offer a gift or cross-sell a product or service that a happy customer might be enticed to buy:

If Picture problem, then Audio gift

If Audio problem, then Picture gift

Free movie/trailer download

6) Coupon: Support assistance redeeming a free music/movie download coupon

SUPPORT: Can I help you with anything else?

USER: Oh yes . . . Can you tell me what this means? User holds up a coupon in front of the remote camera for which a video image is seen: coupon is recognized.

SUPPORT: Oh you're entitled to a free view of the new feature film "Help". Would you like me to authorize that?

USER: Certainly.

SUPPORT: Anything else I can do?

USER: No thank you, appreciate the help

SUPPORT: You're welcome. And thank you for using CCC. Until next time, Goodbye!

USER: So long!

7) Market Research: survey followed by a free movie download coupon

SUPPORT: Before we finish the call, I would like to offer you a free movie download coupon in exchange for a few minutes of your time to conduct a brief survey on your most recent consumer device purchase. Would you like to accept the offer?

USER: Yes, of course.

SUPPORT: I am showing that the TV is your most recent purchase, is that right?

USER: Yes, that is correct.

SUPPORT: What is the one feature that you're the most happy with?

USER: The fact that it has a very easy-to-use customer support feature!

SUPPORT: Thank you. What is the one feature you're the least happy with?

USER: The intrusive nature of firmware updates. I wish I did not have to deal with that!

SUPPORT: What is the one feature that is missing that you would love to have on the next generation device?

USER: Automatic remote control configuration without me having to do anything or download an App.

SUPPORT: How can we improve our products or service for you?

USER: I wish I did not have to download a new app for every new device I purchase. And also, I am tired of trying to manage my applications . . . . This should all be a whole lot simpler given the degree of connectivity and intelligence in these devices.

SUPPORT: What is the next consumer device that you're planning to purchase?

USER: A Blu-ray player

SUPPORT: Thanks! We would like to show you a promotional video on our new advanced Blu-Ray player that would be a perfect match for your current system. You will receive your coupon for free movie

Problems with the Washing Machine

1) Not washing properly

USER: My washing machine is working but the clothes do not smell clean anymore.

SUPPORT: I see that you've run 20 wash cycles without a clean cycle. Lingering bacteria from multiple washes builds up after a while. I would suggest that you leave the washer door open after you're done with the washer. You can also use clean cycle chemicals for maximum affect. I can send you a sample . . . if you order online here's a coupon for 20% off

2) Cross selling—The support staff uses supply level information to offer refills, supplies and content in the following samples:

SUPPORT: Water filter on your refrigerator needs to be replaced. May I send you a refill pack?

SUPPORT: AC filter needs to be replaced. May I send you a refill pack?

SUPPORT: There are free promotional downloads for the Blu-Ray player that you recently purchased. May I authorize the downloads for you?

3) Coupon for free sample detergent, similar to above.

SUPPORT: Can I help you with anything else?

USER: Oh yes . . . Can you tell me what this means? User holds up a coupon in front of the remote camera for which a video image is seen: coupon is recognized

SUPPORT: Oh you're entitled to free samples of detergent and fabric softener. May I have them sent to you?

USER: Certainly.

SUPPORT: Anything else I can do?

USER: No thank you, appreciate the help

4) Market Research, as illustrated above.

High Level Description

The Concierge Connect Button

This button or other input sensor provides a convenient way for the user to request service for a device. When a support call is made using the concierge device—without having to even look up the number—the service person on the other side will be made aware of where the problem most probably lies. This can rely on Text, Voice or on Video+Voice. It is a game-changer when it comes to the conve-

nience it provides for both the consumer and the consumer device manufacturer. For the consumer, it means that no number needs to be looked up. The nature of the problem may already be apparent in the main database, sorted out by cloud analytics engines. Hours of wasted time can be prevented with this scheme. For the service person, it means that he is no longer at the mercy of the customer's description of the problem. The fact that the device is connected to the cloud and reports its status and any fault data to the cloud automatically, without any consumer intervention, facilitates the diagnosis and resolution of the issue by the customer service personnel, almost simultaneously as the call is made. For the consumer device company, it means that unnecessary product returns can be avoided. There is a reduced need to deeply educate the customer service personnel on all fault possibilities for all devices. The cloud computing resources sort out the problem proactively and can even provide the service personnel with appropriate actions to be taken automatically and proactively. The concierge device implementation need not be limited to thin clients. It can be provisioned as an application running on a mobile phone, tablet, and PC or other connected device.

Device Management

Upon connecting the disclosed concierge device to the Internet, it becomes possible to handle any other consumer device connected to the cloud. The concierge devices and methods of this disclosure afford several advantages. With this technology, any consumer device can connect to the cloud securely. It can interact with the cloud securely. It can use a cloud-based UI and device management. The technology disclosed caters to virtual apps: as soon as the consumer device is connected to the cloud, it is fully configured; its pre-packaged UI is associated with any concierge device, with its diagnostics/analytics package running in the cloud and ready to be leveraged. Menus, sometimes called thin clients or virtual apps, for the consumer device can be implemented on the concierge device dynamically or with a small cache. Such light weight virtual apps would not require user updating, though user permission to update could optionally be required on a device life or per installation basis. Consumer devices coupled to a concierge device are ready to be personalized, based on associated users' profiles. The are ready to be leveraged in advertising generated in the cloud, whether for purchasing related accessories or viewing relevant media.

Enhanced Concierge Device Configuration

Manufacturers should be encouraged by this technology to join a single centralized service or, at least, to rely on a single concierge device and connection with cloud-based services. A single concierge device should work with the consumer devices from at least a common manufacturer and also should work with several manufacturers' devices. The cloud could supply menus and remote control commands required for the concierge device to work with any device from any manufacturer.

Advertising Options on a Concierge Device with a Display

The concierge device configurations that include displays can be used to show advertising on the displays. U.S. application Ser. No. 11/350,980 and 60/709,666 filed Feb. 8, 2006 and Aug. 19, 2005, respectively, both entitled "Tethered Digital Butler Consumer Electronic Device and Method" depict devices that include displays. One of skill in the art will recognize that chipsets have changed since those applications were filed. At present, there are numerous suppliers of chipsets from which a designer might choose, including Broadcom, Texas Instruments, Intel, Marvell, ST Microelectronics, Nvidia and IBM.

When the concierge device is coupled to a television or source for a television signal, the display on the concierge device can be a secondary or supplemental display for supplemental information. Ads may be displayed as supplement information at opportune times. For instance, ads may be displayed while the user is fast forwarding rewinding or skipping through an ad or a series of advertisements. On the concierge device display, the user may see an ad logo, a program logo or some text. Analytics may be applied to determine the best content for the supplemental display. Alternatively, ads may be displayed while a user is viewing, fast forwarding or skipping through a program. The program logo, an ad logo, or chapter location information may be displayed on the supplemental display.

Ads that appear on the concierge device display may be synchronized with or independent of content being shown as the main program. For instance, when the main program reaches a sequence that involves product placement, such as product placement for advertising purposes, a coordinated ad may appear on the supplemental display. That is, if Ford has paid for a particular model of truck to appear in the program, the Ford logo may appear on the supplemental display or a picture of the particular truck may appear with a link for navigating to or remembering interest in that truck. Alternatively, ads for a competitor might appear on the supplemental display at the same time as the product placement. Similarly, ads may be directed to the supplemental display while advertising is being shown. On the supplemental display, the user may have a link or an option for remembering their interest in the product advertised on the main display. Alternatively, ads for competitors might appear on the supplemental display at the same time as the advertising on the main display. A variety of competitive alternatives may be offered in a single image on the supplemental display, coordinated with either the product placement or advertising on the main display.

The ad content on the concierge device may be audio, video, pictures, graphics, or web content. It may appear during a program or during advertising within a program. The ad selected for display on the supplemental screen may be program related, ad related, personal information related, user feedback related, user search related or user device related. Or, they may be served as banner ads, without consideration of user identity or recent user activity.

A server connected by a network may supply analytics for ad selection or personalization. The server may recognize the format of display on the concierge device or coordinated display and make sure that the ad is properly sized. The server may control the timing of ad delivery and which channel, audio or video, and is used to display the advertising. For instance: advertisements may relate to searches performed by the user via the remote. During a purchase cycle, ads may identify auxiliary device purchase suggestions. With an in-home device inventory, ads may describe available device upgrades based on existing devices at home. The ads may suggest media purchases related to existing devices

Advertising can be displayed on the concierge device's display while a user is watching a program on TV. For instance, ads may get the user's attention while fast-forwarding through commercials. During the fast-forwarding, the concierge device may present an ad, an ad logo, or program logo, on the displayed of the remote. While fast-forwarding through a program, the program logo, or ad logo, can be displayed on the remote. Ads, can be directed to

concierge device's display at anytime, independent of or dependent on—i.e., synced up—with the main program. Ads can play on the concierge device while a main program is running on main screen. Such ads may be, or not, related to main program content.

Ads shown on the concierge device may be identical to or secondary to ads a main ad is playing on main screen.

Virtually any content can be delivered by a concierge device with a display. The ad content may be audio, video, pictures or graphics or even web content, in its many forms.

Ads may be presented on the concierge during a program showing on a main screen or as alternative content as an ad is on-screen.

Targeted or interactive ads can be selected. Many selection criteria an be applied to ad display: ads may be program related, ad related, personal info related, user feedback related, user search related, user device related or general random.

Cloud-based servers can play a variety of roles in the systems disclosed. The cloud-based servers can provide analytics, ad selection, ad personalization, ad format, ad timing and/or an ad delivery mechanism. Virtually all ad-related functions can be served from the cloud.

Features of a concierge device can be combined in a variety of ways, depending on the configuration of the concierge device. In this disclosure, the concierge device is really a family of devices connecting to the cloud, as shown in the figures. A simple concierge device can include a microphone and speaker, without a display. On this simple device, programming options include using local or remote voice interaction to do the programming based on prompts from the device. Or, the concierge device could be programmed using a PC.

An alternative concierge device configuration includes with a thumb board or similar keyboard. In some implementations, this level of device will be similar to the simple concierge device, but with a keyboard for input and display for output.

In some implementations, a touch screen is built into a simple concierge device. The touch screen provides for input/output.

The connection architecture of a concierge device depends on the extent to which bridge and routing capabilities are built in. With an integrated router and bridge, a concierge device is direct to cloud ready (DTCR). The concierge device can interact with server in the cloud using a browser, such as a lightweight browser. Alternatively, with an integrated bridge, the concierge device interacts direct to cloud via Bridge (DTCB). The bridge has the intelligence to set up communication destinations and sessions. In some implementations, a host is built into the consumer device, such as a television or refrigerator. The concierge device communicates direct to cloud via Host (DTCH). It relies on intelligence built into the host.

Existing protocols can be adapted to the concierge devices capabilities and architectures described. Well-established protocols can be selected to handle pairing, connection, authentication and communication.

When a device, whether a concierge device, a home control device, a controllable device or a consumer device, is to be registered, cloud resource optionally are invoked. The concierge device can be registered to a cloud-based server, just like any other device. An appliance gets registered to cloud, either directly or by association with the remote.

Registration with a cloud based server can have utility in many ways. A cloud-based database can associate concierge



devices with consumer devices. It can record specifics of devices, including specifics of concierge devices with differing capabilities. When a concierge device initiates a call, the database allows support personnel to know the user, device and history of problems with the specific device and the device family. The database provides friendly script for the support person to follow.

One-touch support button can be realized, optionally accompanied by advertising during the support session. By virtue of pre-existing remote and device-aware database in the Cloud, a support person or automated protocol knows what to address and who is asking. This eliminates preliminaries that sometimes dominate support sessions. The resulting support session may involve text exchanges, a voice or video connection and/or feedback on the concierge device or an nearby monitor (TV or PC). The advertising on concierge device, as described above, can be targeted based on key searches, programs being viewed, problematic appliances and/or relevant appliance upgrades. Optionally, the concierge device supports voice commands which may be recognized locally or reported to a server for recognition using, for instance, a VoIP connection.

A thin client model fits the concierge device architecture and hardware. A thin client can support the architectures identified above: direct to cloud (DTCR), device/cloud interaction through a lightweight browser; direct to cloud via Bridge (DTCB), in which the Bridge has the intelligence to set things up; or direct to cloud via Host (DTCH), in which the Host appliance has the intelligence. Going to the cloud is useful for several reasons. The UI can be generated in the cloud or with minimal effort on the device. Ads can be targeted from the cloud to users. Auto configuration routines and devices can be hosted and maintained in the cloud.

A variety of additional features can be disclosed at this point. Some implementations include tagging of devices so that concierge device can automatically recognize the tagged devices based on proximity to device. Tags using RFID, near field communication or similar technology can be suitably employed.

Personalization can include user recognition and/or authentication based on voice, fingerprints, RFID credentials, facial scans or event the way a user holds the concierge device, sensing the user's tremor pattern. Concierge devices can be initialized directly or in communication with a PC.

A direct-to-cloud API can support either remote procedure control or Web Services document exchange protocols to connect any device for cloud concierge support.

Virtual Apps, user interfaces and device management can be consolidated in the cloud. This consolidation would eliminate any need to download any apps. Consolidation in the cloud would assure that the concierge device was always up-to-date. The majority of UI requirements can be managed in the cloud, instead of on the local device. Learned user preferences can be used to target ads.

Each device can be given a unique permanent serial number. This ID can be programmed when the device is manufactured. The same database in the cloud can track a device from birth to death, from manufacturing to retail to home and on to when it is junked.

Services can be provided by a cloud-based platform. A premium human support service loosely analogous to GM's On-Star™ service for cars can be provided for home appliances/gadgets/etc. Automatic configuration can be fed to a connected device. Automatic UI generation can be hosted in the cloud. Light weight client and simple interfaces eliminate any need to download any apps. Control can be implemented even on a concierge device without a display

using voice commands and prompts. Appliances can be shut down in cases of emergency. With the concierge device and/or a home management gateway acting in the background to monitor status without user direction, fault notification can be delivered via email, text or other messaging medium, sometimes before the user notices a problem.

Device configuration can be improved from defaults to take into account devices on the network that interacting with the device being configured.

The concierge device has the advantage of inducing one or more uniform data types, whether text, audio or video, which can be used to support all devices of interest. Moreover, support for user authentication makes the concierge device secure.

Example and Summary of Main Demo Screens

Home Screen

A variation on FIG. **10**A can include icons for each of the following:

Cloud Connect Concierge Screen

VoIP/Video Call Screen

Credit Card Transaction/Security Screen

Interactive Remote Display Screen

Touching an icon takes the user to a specific further screen.

Screen 1

FIG. **14**A is the concierge support home screen. It showcases the essence and ease-of-use with which support and services may be invoked. In some implementations, clicking on a device highlights the device briefly and transitions to Screen 2. In other implementations, screen 2 may be preceded by an automated diagnostic protocol, as in the example of FIG. **14**B.

Screen 2

FIG. **15** is a webcam shot of a concierge support person at their desk. This leads to an interaction—with full audio and, optionally, with video—between the user and the service personnel.

There is a "Close Video Call" control which upon pressing transitions to Screen 3.

Screen 3

Following a support session, the display shows a summary for the problem just resolved. The statement may be generic enough to be applicable to any device/appliance chosen on or it may track the problem and solution reached during the support session. An ad may be positioned on this screen.

Screen 4

The VoIP/Video call screens, FIGS. **11**A-B showcase a simple VoIP/Videocon interface.

There may be a banner ad on top of the contacts list screen, FIG. **11**A.

Upon touching a name, go to FIG. **11**B. Alternatively, upon launching a concierge support session, go to FIG. **15**.

Screen 5

FIG. **15** is again a webcam shot of the concierge person at their desk. There is provision to turn video off for voice-only calls.

There may be a banner ad on top of this screen.

Screen 6

The Credit Card Transaction Screen has the picture of a credit card on top. It is not shown in these figures.

Below it is a dotted box on the screen used for finger print authentication purposes. FIG. **12**A.

There may be a banner ad on top of the screen.

There can be a message saying the following: "Please touch the dotted box for secure authentication, or simply say 'I, John Smith, approve.'"



Upon touching the dotted box, a message pops us saying "Transaction Approved."

Screen 7

FIG. **10**A is a variation on an example interactive screen that displays some form of the screen below with the following four icons: LiveTV, IPTV, Home Control, and VoIP (No Games/Chat/Contacts/Settings).

There may be a banner ad on top of the screen.

Some Particular Embodiments

The technology disclosed may be practiced as a method, device or article of manufacture. One or more features of an implementation can be combined with the base implementation. Implementations that are not mutually exclusive are taught to be combinable. One or more features of an implementation can be combined with other implementations. This disclosure periodically reminds the user of these options. Omission from some implementations of recitations that repeat these options should not be taken as limiting the combinations taught—these recitations are hereby incorporated forward by reference into each of the following implementations.

Single Action Support

Implementation #1

One group of methods, devices, systems and articles of manufacture relates to using a concierge device to support consumer devices such as appliances and consumer electronics. In one implementation, a method is described that includes initiating a support session for a consumer device using a concierge device. The method includes: associating the concierge device with a selected consumer device; responsive to a single action performed by a user, the concierge device communicating with a home gateway. Communicating with the home gateway includes: causing the home gateway to buffer consumer device identification information for the selected consumer device; and causing the home gateway to initiate a support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either to bypass an automated attendant or interactive voice recognition system or to initiate an automated support protocol. Optionally, communicating with the home gateway further includes causing the home gateway to determine a support center for a support session. This eliminates any need for the user to be aware of the support center contact information.

This method and other implementations of the technology disclosed can each optionally include one or more of the following features.

Associating can further include wirelessly pairing the concierge device with the selected consumer device and identifying the paired selected consumer device to the home gateway. Or, it can further include selecting the consumer device from a menu of candidate consumer devices known to the home gateway. The menu can be an audio menu or be displayed visually.

The home gateway can be a physical device separate and distinct from the concierge device, to which the concierge device sends messages via an in-home network. Or, it can be part of the same physical device as the concierge device. Alternatively, the home gateway can be a cloud-based device to which the concierge device sends messages via a network that extends outside the home.

The method can further include the concierge device receiving status information from the selected consumer device and forwarding the status information to the home

gateway for use in the support session. Or, connecting with and receiving status information from the selected consumer device and using the status information in the support session.

The home gateway can feature relaying messages to and from the selected consumer device during the support session.

The method can further include displaying information received during the automated support protocol on a display of the concierge device. The information can include supplemental information displayed as the user is participating in the support session. This supplemental information can include a targeted or interactive advertisement.

The information transmitted during the support session can enable a user of the concierge device to bypass interactive response systems and begin the support session by talking to a human support agent, based on the forwarded consumer device identification information.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Implementation #2

Another implementation of the technology disclosed is a concierge device including at least one wireless data communication adapter, one or more input sensors, one or more outputs, and memory; and at least one processor configured to perform operations. Those operations are including: associating the concierge device with a selected consumer device; responsive to a single action performed by a user, the concierge device communicating with a home gateway. Communicating with the home gateway includes causing the home gateway to buffer consumer device identification information for the selected consumer device; and causing the home gateway to initiate a support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either to bypass an automated attendant or interactive voice recognition system or to initiate an automated support protocol. Optionally, communicating with the home gateway further includes causing the home gateway to determine a support center for a support session.

This device and other implementations of the technology disclosed can each optionally include one or more of the following features.

Associating can further include wirelessly pairing the concierge device with the selected consumer device and identifying the paired selected consumer device to the home gateway. Or, it can include selecting the consumer device from a menu of candidate consumer devices known to the home gateway. The menu can be an audio menu or it can be displayed visually.

The home gateway can be a physical device separate and distinct from the concierge device and having its own processor, to which the concierge device is configured to send messages via an in-home network. Or, it can be a part of the same physical device as the concierge device. Alternatively, the home gateway can be a cloud-based device to which the concierge device sends messages via a network that extends outside the home.

The processor of the concierge device can be further configured to perform operations that include displaying information received during the automated support protocol on a display of the concierge device. The information can include supplemental information displayed as the user is participating in the support session. This supplemental information can include a targeted or interactive advertisement.

Generally, the processor(s) implementing this technology can be configured to perform operations reflecting any of forgoing methods and their aspects or features.

Implementation #3

Another implementation of the technology disclosed is a concierge device that includes: at least one wireless data communication adapter, one or more input sensors, one or more outputs, and memory; and at least one processor configured to perform operations. Those operations are including: linking the concierge device to data that uniquely identifies a particular consumer device to be supported; and responsive to a single user action sensed by the input sensors, causing a home gateway to initiate contact with a service center that supports the particular consumer device, including automatically transmitting information from which the service center can uniquely identify the particular consumer device and determine whether to engage an automated support protocol based on the particular consumer device to be supported. The information can, for instance, be a serial number or locally unique assigned name plus a concierge device, household or home gateway identifier.

This device and other implementations of the technology disclosed can each optionally include one or more of the following features.

The device may be configured to perform operations including selecting the particular consumer device to be supported from a plurality of consumer devices. It also may determine which of several support centers to initiate contact with to support the particular consumer device.

It may further include a display; and further be configured to perform operations including: automatically transmitting status information regarding the particular consumer device to the service center; and displaying information received from the service center during the automated support protocol.

The concierge device processor can further be configured to perform operations including: causing the particular consumer device to be coupled in data communication with the support center, thereby allowing diagnostic communications between the particular consumer device and the support center. The communications between the particular consumer device and the support center can be relayed or direct, peer-to-peer.

In some implementations, the concierge device processor further configured to perform operations including conducting a support call with the support processor regarding the particular consumer device using the concierge device to capture the user's voice and to reproduce audio for the user to hear.

Some implementations of the technology disclosed include a service center that provides diagnostic support of a particular consumer device, the service center coupled in communication with the concierge device; wherein the service center includes at least one service processor configured to perform operations including: identifying the particular consumer device from the automatically transmitted information; and engaging in an automated support protocol based on the particular consumer device to be supported. alternatively, the service processor can be configured to perform operations including: determining from the automatically transmitted information to bypass auto-

mated support and connect the user with a human; and engaging in at least audio communications with the concierge device.

Other implementations include a gateway device coupled in communication with the concierge device; wherein the gateway device includes at least one gateway processor configured to perform operations including: relaying communications between the concierge device and the service center; registering a plurality of consumer devices that are linkable to the concierge device; and providing a menu from which to select of the particular consumer device for the concierge device to support. The menu services involve perceptible communications with the user using the input sensors and outputs of the concierge device.

Implementation #4

Another implementation of the concierge device includes at least one wireless data communication adapter, one or more input sensors, one or more outputs, and memory; and at least one processor configured to perform operations. The operations are including: linking the concierge device to data that uniquely identifies a particular consumer device to be supported; responsive to a single user action directed to the concierge device, initiating at least voice contact with a service center that supports the particular consumer device, including automatically transmitting to the service center information from which the service center can uniquely identify the particular consumer device; and conducting a support call with the service center regarding the particular consumer device using the concierge device to capture the user's voice and to reproduce audio for the user to hear.

The concierge device processor can further be configured to perform operations including causing the particular consumer device to be coupled in communication with the support center during the support call.

The concierge device may further include a display on the concierge device that provides visual information to the user during the support call and/or a camera on the concierge device that provides visual information to the support center during the support call.

Implementation #5

The technology disclosed can be implemented in a consumer appliance with an integrated concierge device, based on any of the devices, aspects or features described above. For instance, the concierge device can be integrated into a refrigerator, washing machine, dryer, exercise equipment, television, A/V center, stove, among other consumer appliances and electronic devices.

Generally, the technology can be implemented as a consumer appliance with an integrated concierge device, including: a consumer device with appliance features, adapted to report status information; at least one network adapter; a memory; at least one input sensor; at least one audio input; an audio output; a processor coupled to the network adapter, the memory, the audio input, and the audio output; instructions running on the processor. The instructions running on the processor may cause the integrated device to communicate with a home management gateway; and cause the gateway to initiate a support call, responsive to a user interacting with the input sensor, and to provide information regarding the associated consumer device that allows the support call to bypass an automated attendant or interactive voice recognition system and that identifies the associated consumer device to be supported. In some implementations, the consumer device can have an integrated home management gateway.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a method including actions implemented by the processors of the device of system as described above.



Implementation #6

In another implementation, a method is described that includes initiating a support session responsive to a single user action. This includes linking a concierge device to data that uniquely identifies a particular consumer device to be supported; and, responsive to a single user action sensed by one or more input sensors of the concierge device, initiating contact with a service center that supports the particular consumer device, including automatically transmitting information from which the service center can uniquely identify the particular consumer device and determine whether to engage an automated support protocol based on the particular consumer device to be supported.

This method and other implementations of the technology disclosed can each optionally include one or more of the following features.

The method may further include selecting the particular consumer device to be supported at a particular time from a plurality of consumer devices and/or determining which of several support centers to initiate contact with to support the particular consumer device.

Other implementations can include automatically transmitting status information regarding the particular consumer device to the service center; and displaying information received from the service center during the automated support protocol on a display of the concierge device.

Another optional feature includes causing the particular consumer device to be coupled in data communication with the support center, thereby allowing diagnostic communications between the particular consumer device and the support center. The communications may be relayed or direct, peer-to-peer. Some implementations include conducting a support call with the support processor regarding the particular consumer device using the concierge device to capture the user's voice and to reproduce audio for the user to hear.

The method may further include actions of a service center, including: identifying the particular consumer device from the automatically transmitted information; and engaging in an automated support protocol based on the particular consumer device to be supported. Alternatively, the service center can determine from the automatically transmitted information to bypass automated support and connect the user with a human; and to engage in at least audio communications with the concierge device.

The method may further include actions of a gateway device coupled in communication with the concierge device including: relaying communications between the concierge device and the service center; registering a plurality of consumer devices that are linkable to the concierge device; and providing a menu from which to select the particular consumer device for the concierge device to support. It also can include menu services as describe above.

Implementation #7

In another implementation, a method is described that includes: linking a concierge device to data that uniquely identifies a particular consumer device to be supported; responsive to a single user action directed to the concierge device, initiating at least voice contact with a service center that supports the particular consumer device, including automatically transmitting to the service center information from which the service center can uniquely identify the particular consumer device; and conducting a support call

with the service center regarding the particular consumer device using the concierge device to capture the user's voice and to reproduce audio for the user to hear.

The method can further include causing the particular consumer device to be coupled in communication with the support center during the support call.

In some implementations, the method further includes a camera on the concierge device displaying visual information from or sending it sending to the support center during the support call.

Linking can further include the concierge device interacting with an home management gateway that maintains a copy of the data that uniquely identifies the particular consumer device. Or, it can include the concierge device interacting with the home management gateway that maintains a copy of the data that uniquely identifies the particular consumer device.

Automatically transmitting may include sending product model information for the particular consumer device and user identifiable information to the support center.

In some implementations, the user could be directed in the support call to interact with an artificial intelligence that converses.

Implementations #8

Another implementation involves a method of initiating a service call for a consumer device using a concierge device, including: pairing the concierge device wirelessly with the consumer device; receiving from the paired consumer device some consumer device identification information; and responsive to a single action performed by a user, the concierge device communicating with a home management gateway. Communicating with the home management gateway includes forwarding the consumer device identification information to the home management gateway; and causing the gateway to initiate a support call for the consumer device and to forward the consumer device identification information during the support call, thereby allowing the support call to bypass an automated attendant or interactive voice recognition system or to engage with an online or alternative support protocol and identifying the associated consumer device to be supported.

Some implementations further include the concierge device receiving status information from the paired consumer device and forwarding the status information to the home management gateway for use during the support call.

Implementations #9-10

Another implementation involves a method of initiating a service call for a consumer device using a concierge device, the method including: selecting the consumer device from a display of candidate consumer devices known to a home management gateway. Following this initial selecting action, aspects and implementations of this method are as in the preceding methods, aspects and implementations. Another alternative for this initiating action includes: pairing the concierge device wirelessly with the consumer device; receiving from the paired consumer device some consumer device identification information; and responsive to a single action performed by a user, the concierge device communicating with a home management gateway.

Another optional feature of this technology is the home management gateway connecting with and receiving status information from the associated consumer device and forwarding the status information to a service center in advance of the service call.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above.



Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Implementation #11

One method involves initiating a support call for the consumer device using the concierge device. This method begins with associating the concierge device with the selected consumer device. Responsive to a single action performed by user, the concierge device communicates with the home management bridge. This communication causes the home management bridge to buffer consumer electronic identification information for the associated consumer device. It further causes the bridge to initiate a support call for the consumer device and to forward the consumer electronic information during the support call. Forwarding this information, optionally, allows the support call to bypass an automated attendant or interactive voice recognition system. Or, it could be used to select a tailored interactive voice or visual protocol for trouble shooting. It also could be used to initiate an artificially intelligent interaction using technology such as the Watson technology demonstrated in 2011 by IBM. It further identifies the associated consumer device to be supported. This should greatly improve the user support experience.

We refer to associating the consumer device with the concierge device, because there are several ways in which this association may take place. The concierge device may be wirelessly paired with the selected consumer device. Identification of the consumer device may be programmed into the concierge device memory, either at the factory or locally using a PC or similar device. The programming may be accomplished wirelessly using a USB connection. Alternatively, the home management bridge can be used to display candidate consumer devices and select one for temporary association with the concierge device. The concierge device can greatly simplify on boarding and optionally provide authentication during an on boarding process, which would provide a degree of assurance to consumers who are weary of home appliances connected to a cloud.

We refer to buffering consumer electronic identification information, as there are several ways in which the bridge may obtain this information. First, the home management bridge may receive consumer electronic status information associated with the consumer device from the concierge device, relayed to the bridge after pairing between the concierge device and the consumer device. Second, it may receive the information directly by communicating with the consumer device identified by the concierge device, after pairing between the concierge device and the consumer device. Third, the concierge device may identify the consumer device to the bridge and the bridge may obtain the information needed from the consumer device directly. Fourth, the relevant information can be input into the bridge, using a conventional input, such as a keyboard, mouse, touch screen or voice recognition. Fifth, information can be obtained from a cloud-based data source. For instance, the device may be registered at its point of sale with a cloud-based management server.

Methods of initiating a support call can be more directly stated, beginning with the manner in which the concierge device is associated with the consumer device. One method variation of initiating a support call for the consumer device using the concierge device begins with pairing the concierge device wirelessly with the consumer device. Those familiar with pairing Bluetooth headsets to wireless telephones or recognize a wide variety of pairing options. The method

proceeds with the concierge device receiving from the paired consumer device some consumer electronic identification information. Responsive to a single action performed by user, the concierge device communicates with the home management bridge. It forwards consumer electronic information to the home management bridge and causes the home management bridge to initiate a support call. The bridge forwards the consumer electronic identification information during the support call, thereby allowing the support call to bypass an automated attendant or interactive voice recognition system. The bridge identifies the associated consumer device to be supported during the call.

Implementation #12

Another method of initiating a support call begins with selecting a consumer device from the display of candidate consumer devices known to the home management bridge. In this method, the home management bridge supports multiple consumer devices. Responsive to a single action performed by user, the concierge device communicates with the home management bridge. This causes the home management bridge to initiate a support call for the selected consumer device and to forward consumer electronic identification information to the support center. The consumer electronic identification information can be obtained either by communications between the bridge and the selected consumer device or by entry of information through the bridge. The information may be provided in advance of the phone call, so that only a serial number or other globally unique identifier needs to be provided.

Implementation #13

A variety of devices and systems also practice the disclosed technology. One is the concierge device that initiates support calls for associated consumer devices. The support calls are initiated by the home management bridge. The concierge device includes at least one wireless transceiver adapted to be coupled in communication with at least one home management bridge. The concierge device further includes a memory, at least one button or other single action control, speaker and microphone, and a processor coupled to the transceiver, the memory, the button, the speaker and microphone. Examples of single action controls include a button, toggle or other physical switch, touch areas on a touch screen, a motion sensor or a voice activated control. Instructions are provided running on the processor that wirelessly couples the concierge device to the home management bridge. One skilled in the art will recognize that processor is a broad term, which may include both the CPU and the wireless communications components. The instructions further forward concierge device information to the home management bridge and cause the bridge to initiate a support call, responsive to a single user action such as pressing a button. Instructions further cause a bridge to provide information regarding the associated consumer device that allows the support call to bypass an automated attendant or interactive voice recognition system and that identifies the associated consumer device to be supported. The identification may be direct or indirect, specific or categorical. Preferably, it would include the serial number of the consumer device, to facilitate verification of support eligibility and is data for subsequent analytics at the support center.

As one option, the wireless transceiver may be adapted to be coupled in communication with at least one associated consumer device. Instructions running on the processor of the concierge device may further wirelessly couple the concierge device to the associated consumer device and obtain from the associate consumer device some consumer electronic identification information. Then, the instructions cause the consumer electronic information to be forwarded to the home management bridge, which in turn is relied upon to forward the consumer electronic identification information during the support call.

A further aspect of this option is that the instructions running on the processor may further relay diagnostic status information from the consumer device to the home management bridge for use in the support call.

As another option, the concierge device may include at least one wireless transceiver adapted to be coupled in communication with at least one consumer device. Instructions running on its processor further wirelessly couple the concierge device to the consumer device, obtain some consumer electronic identification information from the device and forward this information to the bridge. The instructions further cause and rely on the bridge to pair with the consumer device using the consumer electronic identification information. This makes information available to the home management bridge for use in the support call.

As illustrated in FIG. **4**, the concierge device may be built into a refrigerator or other major appliance. In this illustration, the bridge would be built into the refrigerator as well as the concierge device. Alternatively, as depicted in FIGS. **5-6**, the bridge could be a standalone device or built into a TV or signal source for a TV, such as a A/V receiver, a DVD, cable or satellite box.

Yet another option is for the concierge device to have consumer electronic identification information loaded into its memory. Information from the memory of the concierge device may be forwarded to the home management bridge for use during the support call.

In connection with any of the methods and devices described above, the concierge device further may include a camera coupled to the processor. Instructions running on the processor further will wirelessly couple the camera with the home management bridge and cause the home management bridge to forward images from the camera during the support call. The images may be still or moving images.

In further connection with the methods and devices described above, the concierge device may include a display coupled to the processor. Instructions running on the processor may cause the concierge device to receive and display images received from the home management bridge during the support call. Combining the camera and display features described in these successive paragraphs essentially provides a two-way videoconference.

The concierge device as described above may be combined into a system that includes a home management bridge. Such a home management bridge includes at least one wireless transceiver adapted to be coupled in communication with at least one concierge device, a method, network interface and a processor coupled to each of the above. Instructions running on the processor wirelessly couple the home management bridge to the concierge device and receive concierge device information from the concierge device. The instructions are further adapted to initiate a support call, responsive to a request from the concierge device, and to provide information regarding the associated consumer device to a support system that allows the support call to bypass an automated attendant or interactive voice recognition system. The information further identifies the associated consumer device to be supported.

In some sense, the concierge device described may act as the eyes, ears and voice of the bridge or cloud based service

for interacting with users across a wide variety of consumer device, making the connected, intelligent home a manageable reality for consumers.

On Boarding Claims

Another group of methods, devices, systems and articles of manufacture relates to using a concierge device to onboard home control devices and controllable devices to a home management gateway.

Implementation #14

One implementation describes a method of on boarding to an in-home management bridge both a control device and a controlled device. This method is including: receiving a first enrollment signal from the first home control device that uniquely identifies the first home control device, automatically determining control capabilities of the first home control device and enrolling the first home control device with the management bridge; receiving a second enrollment signal from the second controllable device that uniquely identifies the second controllable device, automatically determining control signals recognized by the second controllable device and enrolling the second controllable device with the management bridge; and receiving a dedication signal responsive to a user interface and automatically configuring a combination of the management bridge, the first home control device and the second controllable device so that at least some control signals generated by the first home control device are dedicated to controlling the second controllable device.

This method and other implementations of the technology disclosed can each optionally include one or more of the following features.

The method can further include automatically replicating the control capabilities of the first home control device on a concierge device coupled in communication with the management bridge. This can further involve displaying the user interface used to generate the dedication signal on a display of the concierge device.

Some implementations include displaying supplemental information on a display of the concierge device. This supplemental information can be a targeted or interactive advertisement.

The method can involve the management bridge requesting of and receiving from a cloud-based server at least some configuration data used when automatically configuring the combination.

The management bridge may take on alternative configurations. In one implementation, the management bridge is a physical device separate and distinct from the concierge device; and the concierge device sends messages to and receives messages from the management bridge via an in-home network. In another implementation, the management bridge is part of the same physical device as the concierge device.

Another implementation includes scanning packaging or a tag accompanying either the first home control device or the second controllable device to generate the first or second enrollment signal, respectively. Scanning may be implemented in a variety of ways, including optically scanning a pattern on a label or wirelessly scanning an RFID tag.

The dedicating action can further include receiving one or more user selections responsive to the user interface that select the first home control device from a plurality of home control devices and that select the second controllable device from a plurality of controllable devices.

Alternative messaging patterns can be implemented. The dedicating action can further include configuring one or more of the first home control device and the second controllable device for peer-to-peer control interaction. Or, it can include configuring the management bridge to receive the first control signals from the first home control device and send the second control signals to the second controllable device, responsive to the first control signals.



Inventorying devices to enroll can precede receiving enrollment signals. Some implementations further include: establishing an inventory of uniquely identified home control devices and controllable devices with the management bridge, the inventory including at least the first home control device and the second controllable device; matching information in the first enrollment signal to the inventory during the enrolling of the first home control device with the management bridge; and matching information in the second enrollment signal to the inventory during the enrolling of the second controllable device with the management bridge. The inventorying can further include scanning packaging or a tag accompanying either the first home control device or the second controllable device to inventory the first home control device or the second controllable device, respectively, and the options identified above for scanning.

Some implementations further include authenticating a user prior to receiving the identification of the unregistered unit and initiating an enrollment mode in which enrolling and dedicating are permitted. Authenticating can require the user to physically interact with a concierge device that previously was enrolled with the management bridge or that implements the enrollment with the management bridge. Alternatively or in addition, authenticating can require receiving biometric information from the user.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Implementation #15

Another implementation of the technology disclosed is a system with a home management bridge including at least one network communication adapter, and memory; and at least one processor configured to perform operations. The operations are including: receiving a first enrollment signal from the first home control device that uniquely identifies the first home control device, automatically determining control capabilities of the first home control device and enrolling the first home control device with the management bridge; receiving a second enrollment signal from the second controllable device that uniquely identifies the second controllable device, automatically determining control signals recognized by the second controllable device and enrolling the second controllable device with the management bridge; and receiving a dedication signal responsive to a user interface and automatically configuring a combination of the management bridge, the first home control device and the second controllable device so that at least some control signals generated by the first home control device are dedicated to controlling the second controllable device.

This system and device and other implementations of the technology disclosed can each optionally include one or more of the features described above in the method context.

Some implementations involve a system including the home management bridge and further including a concierge device that comprises at least one input sensor and at least one output, in which the processor is further configured to perform operations including automatically replicating the

control capabilities of the first home control device on a concierge device coupled in communication with the management bridge.

In some implementations of this system, the concierge device further includes at least one processor configured to perform operations including displaying the user interface used to generate the dedication signal on a display of the concierge device.

The concierge device in this system can further include at least one processor configured to perform operations including displaying supplemental information on a display of the concierge device. The supplemental information can be a targeted or interactive advertisement.

Systems of this sort can further include a scanning device configured to scan packaging or a tag accompanying either the first home control device or the second controllable device to generate the first or second enrollment signal, respectively.

In some implementations, the dedicating action further includes receiving one or more user selections responsive to the user interface that select the first home control device from a plurality of home control devices and that select the second controllable device from a plurality of controllable devices.

In some implementations, the management device processor is further configured to perform operations including authenticating a user prior to receiving the identification of the unregistered unit and initiating an enrollment mode in which enrolling and dedicating are permitted. Authenticating can require the user to physically interact with the concierge device, which previously was enrolled with the management bridge or which implements the enrollment with the management bridge. Alternatively or in addition, authenticating can require receiving biometric information from the user.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a method including actions implemented by the processors of the device of system as described above.

Implementation #16

Another method implementation includes: receiving an identification of an unregistered in-home unit that uniquely identifies the unit, wherein the unit is an in-home appliance control device or controllable device and control devices are complementary to controllable devices; registering the unit using the identification received; and receiving intended connection information and configuring a connection between the registered unit to a previously registered complementary unit to establish a unit pair, wherein the connection causes a controllable unit of the unit pair to be controlled responsive to control signals sent by a control unit of the unit pair.

Configuring the connection can further include configuring a bridge device to receive signals from the control unit and relay them to the controllable unit accompanied by an identifier accepted by the controllable unit. In some implementations, the bridge device adds the identifier accepted by the controllable unit to a control signal.

The bridge device can be physical distinct from and not incorporated in either the control unit or the controllable unit. It can be incorporated into a concierge device.

Configuring the connection can further include configuring the controllable unit to accept signals sent by the control unit that are accompanied by a control unit identification. When the unit registered is the control unit, registering the control unit can further include identifying control signals generated by the control unit. When the unit registered is the controllable unit, registering the controllable unit can further include identifying control signals accepted by the controllable unit.

In some implementations, the method further includes configuring a programmable home control device with a display: to allow user selection of the control device from the display; to allow user selection of controls provided by the control unit; and to send control signals from the home control device that cause the controllable unit to be responsive as if the signals had been sent by the control unit.

The method can further include authenticating a user prior to receiving the identification of the unregistered unit and initiating a registration mode in which registering and connecting are permitted. As described above, authenticating can require interaction with the concierge device and/or biometric information from the user.

Some implementations further include: registering a plurality of unregistered control units and a plurality of unregistered controllable units; and configuring connections among the control and controllable units after registering the plurality of units.

Identifications of the plurality of unregistered units can be obtained by scanning packaging or tags accompanying with the unregistered units, applying any conventional scanning technique such as those mentioned above.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Implementation #17

Some further device implementations include at least one network communication adapter, one or more input sensors, one or more outputs, and memory; and at least one processor configured to perform operations. The operations are including: receiving an identification of an unregistered in-home unit that uniquely identifies the unit, wherein the unit is an in-home appliance control device or controllable device and control devices are complementary to controllable devices; registering the unit using the identification received; and receiving intended connection information and configuring a connection between the registered unit to a previously registered complementary unit to establish a unit pair, wherein the connection causes a controllable unit of the unit pair to be controlled responsive to control signals sent by a control unit of the unit pair.

This device and other implementations of the technology disclosed can each optionally include one or more of the device features described above.

Implementation #18

Several implementations involve inventorying units before enrolling them. One of these implementations describes a method of on boarding and interconnecting home control devices with controllable devices that includes: establishing an inventory of uniquely identified home control devices and controllable devices with an in-home management bridge, the inventory including at least a first home control device and a second controllable device; receiving a first enrollment signal from the first home control device that uniquely identifies the first home control device, matching information in the first enrollment signal to the inventory, and enrolling the first home control device with the management bridge; receiving a second

enrollment signal from the second controllable device that uniquely identifies the second controllable device, matching information in the second enrollment signal to the inventory, and enrolling the second controllable device with the management bridge; receiving a dedication signal responsive to a user interface and automatically configuring a combination of the management bridge, the first home control device and the second controllable device so that control signals generated by the first home control device are dedicated to controlling the second controllable device; and replicating control capabilities of the first home control device on a concierge device coupled in communication with the management bridge.

The dedicating action can further include configuring one or more of the first home control device and the second controllable device for peer-to-peer control interaction.

Some implementations further include automatically determining first control signals generated by the first home control device and second control signals that control the second controllable device; wherein the dedicating action further includes configuring the management bridge to receive the first control signals from the first home control device and send the second control signals to the second controllable device, responsive to the first control signals.

Some implementations further include providing an interface that enables a user to select dedication of control signals generated by the first home control device to control of the second controllable device.

An alternative implementation describes a method of on boarding an in-home controllable device to a management bridge and automatically configuring a concierge device to control the controllable device, including: establishing an inventory of uniquely identified controllable devices with an in-home management bridge, the inventory including at least a first in-home controllable device; receiving a first enrollment signal from the first in-home controllable device that uniquely identifies the first controllable device, matching information in the first enrollment signal to the inventory, and enrolling the first controllable device with the management bridge; and automatically determining first control signals used to control the first controllable device and configuring a concierge device coupled in communication with the management bridge with one or more menu items that control the first controllable device using the first control signals.

Another alternative implementation describes a method of on boarding an in-home control device to a management bridge and automatically configuring a concierge device to replicate control capabilities of the controllable device, including: establishing an inventory of uniquely identified control devices with an in-home management bridge, the inventory including at least a first in-home control device; receiving a first enrollment signal from the first in-home control device that uniquely identifies the first control device, matching information in the first enrollment signal to the inventory, and enrolling the first control device with the management bridge; and automatically determining first control signals generated by the first control device and configuring a concierge device coupled in communication with the management bridge with one or more menu items that replicate control capabilities of the first control device.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Implementation #19

Another implementation describes a method of on boarding to an in-home management bridge both a control device and a controlled device. This method includes: establishing an inventory of uniquely identified home control devices and controllable devices with an in-home management bridge, the inventory including at least a first home control device and a second controllable device; receiving a first enrollment signal from the first home control device that uniquely identifies the first home control device, matching information in the first enrollment signal to the inventory and enrolling the first home control device with the management bridge; receiving a second enrollment signal from the second controllable device that uniquely identifies the second controllable device, matching information in the second enrollment signal to the inventory, and enrolling the second controllable device with the management bridge; receiving a dedication signal responsive to a user interface and automatically configuring a combination of the management bridge, the first home control device and the second controllable device so that at least some control signals generated by the first home control device are dedicated to controlling the second controllable device.

As above, this method and other implementations of the technology disclosed can each optionally include one or more of the following features.

Some implementations further include replicating control capabilities of the first home control device on a concierge device coupled in communication with the management bridge.

Dedicating can further include configuring one or more of the first home control device and the second controllable device for peer-to-peer control interaction. Or, it can involve automatically determining first control signals generated by the first home control device and second control signals that control the second controllable device, and configuring the management bridge to receive the first control signals from the first home control device and send the second control signals to the second controllable device, responsive to the first control signals.

Implementations also can include providing an interface that enables a user to select dedication of control signals generated by the first home control device to control of the second controllable device.

Another implementation describes a method of on boarding an in-home controllable device to a management bridge and automatically configuring a concierge device to control the controllable device, including: establishing an inventory of uniquely identified controllable devices with an in-home management bridge, the inventory including at least a first in-home controllable device; receiving a first enrollment signal from the first in-home controllable device that uniquely identifies the first controllable device; matching information in the first enrollment signal to the inventory; and enrolling the first controllable device with the management bridge.

This automatic configuring method can optionally include one or more of the features described above. It also can involve automatically determining first control signals used to control the first controllable device and configuring the concierge device coupled in communication with the management bridge with one or more menu items that control the first controllable device using the first control signals.

Some implementations involve on boarding either an in-home control device or a controllable device to a management bridge. When just the in-home control device is enrolled, the method can include automatically configuring a concierge device to replicate controls of the control device; establishing an inventory of uniquely identified control devices with an in-home management bridge, the inventory including at least a first in-home control device; receiving a first enrollment signal from the first in-home control device that uniquely identifies the first control device; matching information in the first enrollment signal to the inventory; and enrolling the first control device with the management bridge.

When just the in-home controllable device is enrolled to a management bridge, the method can include automatically configuring a concierge device to control the controllable device; receiving a first enrollment signal from the first in-home controllable device that uniquely identifies the first controllable device; automatically determining first control signals used to control the first controllable device; and enrolling the first controllable device with an in-home management bridge.

Some implementations further include automatically configuring a concierge device coupled in communication with the management bridge with one or more menu items that control the first controllable device, implementing at least some of the first control signals.

Another method of on boarding an in-home control device to a management bridge and automatically configuring a concierge device to replicate control capabilities of the control device, includes: receiving a first enrollment signal from the first in-home control device that uniquely identifies the first control device, automatically determining first control signals used to control the first controllable device, and enrolling the first controllable device with an in-home management bridge; automatically determining first control signals generated by the first control device; and configuring a concierge device coupled in communication with the management bridge with one or more menu items that replicate control capabilities of the first control device.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above. Yet another implementation may include a system including memory and one or more processors configured or operable to execute instructions stored in the memory to perform a method as described above.

Virtual Apps and Advertising

Implementation #20

Some implementations describe a concierge device that redundantly connects to an associated consumer device to an in-home management bridge or to cloud-based management server. The concierge device includes: at least one wireless transceiver and network protocol stack adapted to be coupled in communication with at least a home management bridge and cloud-based management server; a memory; at least one user input sensor (which optionally could be the microphone identified below); a display; a speaker and microphone; a processor coupled to the transceiver, the memory, the input sensor, and the display; instructions running on the processor. The instructions, when executed, cause the concierge device to: wirelessly couple the concierge device to the in-home management bridge; wirelessly couple the concierge device to the cloud-based management server; sense availability or unavailability of the in-home management bridge and the cloud-based management server; preferentially rely on one of the in-home management bridge or the cloud-based management server and alternatively rely on the other one; register the consumer device through the in-home management bridge or alternatively through the cloud-based management server; responsive to the registration of the consumer device, receive one or more control menus for the consumer device and control strings to send directly or indirectly to the consumer device to implement selections from the control menus; and responsive to actions of a user, send directly or indirectly to the consumer device the control strings.

This device and other implementations of the technology disclosed can each optionally include one or more of the following features.

The concierge device can be coupled in communication with at least one consumer device through the in-home management bridge. This communication can be direct, through the in-home management bridge or through a wireless access point.

The user input sensor can be a button, a motion sensor, an orientation sensor, or a microphone.

In some implementations, the concierge device accepts control menus for control of appliances, including at least a refrigerator, dishwasher and washing machine.

The concierge device describe above may further include instructions running on the processor that: forward concierge device identification information to the in-home consumer management bridge or alternatively to the cloud-based consumer management services, depending on availability; and cause the in-home consumer management bridge or the cloud-based consumer management services to initiate a support call, responsive to a user pressing the button, and to provide information regarding the associated consumer device that allows the support call to bypass an automated attendant or to invoke an interactive voice recognition system using information specific to the associated consumer device.

In some implementations, the concierge device includes instructions that cause the concierge device to store information particular to a plurality of consumer devices as they are registered and to make that information available for control or support of the consumer devices either directly or via the bridge, responsive to selection of a particular associated consumer device.

Instructions running on the processor can cause the processor of the concierge device to receive alert messages regarding completion of a task by an in-home consumer device. Instructions running on the processor also can cause the processor of the concierge device to receive alert messages regarding interruption of a task being performed by an in-home consumer device. The concierge device can be configured to emit an audible alert or display a message in response to the alert messages.

Instructions running on the processor further can cause the processor of the concierge device to check for updates to the control menus without need for user intervention.

Implementation #21

Another implementation describes a method including: receiving an identification of an unregistered consumer device from which at least a make and model of the consumer device can be determined; registering the consumer device using the identification received; and automatically configuring a home control device with menus and control codes that control the consumer device and with support information, wherein the home control device includes one or more input sensors and a display.

This implementation optionally includes, responsive to a single user action sensed by the input sensors, the home

control device initiating contact with a service center that supports the consumer device, including automatically transmitting information from which the service center can identify the consumer device and determine whether to engage an automated support protocol based on the consumer device to be supported.

This method and other implementations of the technology disclosed can each optionally include one or more of the following features.

Other implementations include: automatically transmitting status information regarding the consumer device to the service center; and displaying information received from the service center during the automated support protocol.

In some implementations, the wherein the home control device is coupled in communication with the service center by an in-home support gateway; and the method further includes the in-home support gateway relaying communications between home control device and the service center.

In other implementations, the home control device is coupled in communication with a cloud-based support gateway via a network that extends beyond the home and the method further includes the cloud-based support gateway implementing the registering of the consumer device and the automatically configuring of the home control device.

Some implementations further include causing the consumer device to be coupled in data communication with the support center, thereby allowing diagnostic communications between the consumer device and the support center.

A support call can be conducted using the home control device to capture the user's voice and to reproduce audio for the user to hear. It can use at least one video camera on the home control device to provide visual information to the support center during the support call.

Further implementations include the home control device receiving a data stream from the consumer device and displaying information from the data stream on the home control device in coordination with interactions between the home control device and the consumer device.

When the consumer device is a television or video image source coupled to a monitor, the information displayed on the home control device display can be coordinated with images displayed on the television or monitor.

The information displayed on the home control device can identify a company or product and can be coordinated with product placement in an advertisement or program scene. Or it can be coordinated with subject matter of an advertisement or program scene.

Information can be displayed on the home control device as a user navigates through content by fast forwarding, rewinding or skipping.

Implementation #22

Some implementations describe a system including: at least one wireless data communication adapter, one or more input sensors, one or more outputs, and memory; and at least one processor configured to perform operations. The operations are including: receiving an identification of an unregistered consumer device from which at least a make and model of the consumer device can be determined; registering the consumer device using the identification received; and automatically configuring a home control device with menus and control codes that control the consumer device and with support information, wherein the home control device includes one or more input sensors and a display. In this system, responsive to a single user action sensed by the input sensors, the home control device initiating contact with a service center that supports the consumer device, including automatically transmitting information from which the service center can identify the consumer device and determine whether to engage an automated support protocol based on the consumer device to be supported.

This system and other implementations of the technology disclosed can each optionally include one or more of the following features.

In some implementations, the system further includes the processor configured to perform operations including: automatically transmitting status information regarding the consumer device to the service center; and displaying information received from the service center during the automated support protocol.

Some system implementations further include an in-home support gateway that comprises at least one gateway processor configured to perform operations including relaying communications between home control device and the service center. In these implementations, the home control device can be coupled in communication with the service center by through the in-home support gateway. The gateway processor can be further configured to perform operations that implement the registering of the consumer device and the automatically configuring of the home control device.

Other system implementations further include a cloud-based support gateway that comprises at least one gateway processor configured to perform operations that implement the registering of the consumer device and the automatically configuring of the home control device. In these implementations, the home control device is coupled in communication with the cloud-based support gateway via a network that extends beyond the home.

The processor used can be further configured to perform operations including causing the consumer device to be coupled in data communication with the support center, thereby allowing diagnostic communications between the consumer device and the support center.

The processor on the home control device can be further configured to perform operations including conducting a support call with the support processor regarding the consumer device using the home control device to capture the user's voice and to reproduce audio for the user to hear. The processor on the home control device can be further configured to perform operations including using at least one video camera on the home control device to provide visual information to the support center during the support call.

Any of these implementations can further include the processor on the home control device is further configured to perform operations including receiving a data stream from the consumer device and displaying information from the data stream on the home control device in coordination with interactions between the home control device and the consumer device. When the consumer device is a television or video image source coupled to a monitor, the information displayed on the home control device display can be coordinated with images displayed on the television or monitor. The information displayed on the home control device can identify a company or product and is coordinated with product placement in an advertisement or program scene. Or it can be coordinated with subject matter of an advertisement or program scene. The information can be displayed on the home control device as a user navigates through content by fast forwarding, rewinding or skipping.

Other implementations may include a non-transitory computer readable storage medium storing instructions executable by a processor to perform a method as described above.

Yet another implementation may include a method including actions implemented by the processors of the device of system as described above.

Implementation #23

Some implementations describe a method of delivering information to a consumer, including: pairing a concierge device with a consumer electronic (abbreviated CE) device via a two-way wireless RF connection; the concierge device receiving a data stream from the CE device and displaying information from the data stream on a display integral to the remote control.

This method and other implementations of the technology disclosed can each optionally include one or more of the following features.

In some implementations, the concierge device relies on the CE device to transcode information from an MPEG transmission stream into a simplified concierge device format.

As above, when the consumer device is a television or video image source coupled to a monitor, the information can be displayed on the concierge device display is coordinated with images displayed on the television or monitor. Other features of information displayed apply to this method as well as the prior methods.

We claim as follows:

**1**. A concierge device including at least one processor and memory holding computer instructions that, when executed on one or more processors of the concierge device, cause performance of a method of supporting a device, the method including:

receiving a first signal from a particular device to be supported, via a two-way wireless, non-audio data channel used by the particular device to provide diagnostic related information to the concierge device, wherein the first signal includes a device identifier that identifies the particular device;

responsive to a single user action directed to the concierge device, automatically determining which of a plurality of service centers with which to initiate an interactive support session and initiating an interactive support session with the determined service center, wherein the determined service center supports the particular device, including automatically transmitting to the determined service center, via a second two-way non-audio data channel, identifier information from which the determined service center can uniquely identify the particular device; and

conducting the interactive support session with the determined service center regarding the particular device using the concierge device to capture a user's voice and to reproduce audio for the user to hear via a two-way audio channel,

wherein during the interactive support session the concierge device relays diagnostic requests from the determined service center to the particular device and relays responses by the particular device back to the determined service center via the second two-way non-audio data channel.

**2**. The concierge device of claim **1**, holding computer instructions that when executed, cause performance of the method further including receiving from a user interface of the concierge device a user selection of the particular device to be supported from a plurality of devices.

**3**. A method of conducting an interactive support session, using a concierge device, the method including:

receiving a first signal from a particular device to be supported, via a two-way wireless, non-audio data channel used by the particular device to provide diagnostic related information to the concierge device, wherein the first signal includes a device identifier that identifies the particular device;

responsive to a single user action directed to the concierge device, automatically determining which of a plurality of service centers with which to initiate an interactive support session and initiating an interactive support session with the determined service center, wherein the determined service center supports the particular device, including automatically transmitting to the determined service center, via a second two-way non-audio data channel, identifier information from which the determined service center can uniquely identify the particular device; and

conducting the interactive support session with the determined service center regarding the particular device using the concierge device to capture a user's voice and to reproduce audio for the user to hear via a two-way audio channel,

wherein during the interactive support session the concierge device relays diagnostic requests from the determined service center to the particular device and relays responses by the particular device back to the determined service center via the second two-way non-audio data channel.

**4**. The concierge device of claim **3**, further comprising a display on the concierge device that displays visual trouble shooting instructions received from the service center during the interactive support session.

**5**. The concierge device of claim **3**, further comprising a camera on the concierge device that provides visual information to the service center during the interactive support session.

**6**. The method of claim **3**, further including:

receiving a request from the service center via the second two-way non-audio data channel for additional diagnostic information from the particular device;

requesting and receiving from the particular device to be supported via the two-way wireless, non-audio data channel, additional responsive diagnostic information; and

forwarding to the service center via the second two-way non-audio data channel the additional responsive diagnostic information from the particular device.

**7**. The method of claim **3**, further including receiving from a user interface of the concierge device a user selection of the particular device to be supported from a plurality of devices.

**8**. The method of claim **7**, further including, responsive to the single user action, automatically determining which of several service centers with which to initiate the interactive support session.

**9**. The method of claim **3**, further comprising a camera on the concierge device that provides visual information to the service center during the interactive support session.

**10**. The method of claim **3**, further including the concierge device interacting through a management gateway with the service center.

**11**. A concierge device including at least one processor and memory holding computer instructions that, when executed on one or more processors of the concierge device, cause performance of a method of supporting a device, the method including:

receiving a first signal from a particular device to be supported, via a two-way wireless, non-audio data channel used by the particular device to provide diag-

nostic related information to the concierge device, wherein the first signal includes a device identifier that identifies the particular device;

responsive to a single user action directed to the concierge device, determining from data stored on the concierge device or on a network accessed by the concierge device a service center that supports the particular device from a plurality of service centers and initiating an interactive support session with the determined service center, including automatically transmitting to the determined service center, via a second two-way non-audio data channel, identifier information from which the determined service center can uniquely identify the particular device; and

conducting the interactive support session with the determined service center regarding the particular device using the concierge device to capture a user's voice and to reproduce audio for the user to hear via a two-way audio channel, wherein during the interactive support session the concierge device relays diagnostic requests from the determined service center to the particular device and relays responses by the particular device back to the determined service center via the second two-way non-audio data channel.

**12**. The concierge device of claim **11**, holding computer instructions that when executed, cause performance of the method further including:

receiving a request from the service center via the second two-way non-audio data channel for additional diagnostic information from the particular device;

requesting and receiving from the particular device to be supported via the two-way wireless, non-audio data channel, additional responsive diagnostic information; and

forwarding to the service center via the second two-way non-audio data channel the additional responsive diagnostic information from the particular device.

**13**. The concierge device of claim **11**, holding computer instructions that when executed, cause performance of the method further including receiving from a user interface of the concierge device a user selection of the particular device to be supported from a plurality of devices.

**14**. A method of conducting an interactive support session, using a concierge device, the method including:

receiving a first signal from a particular device to be supported, via a two-way wireless, non-audio data channel used by the particular device to provide diagnostic related information to the concierge device, wherein the first signal includes a device identifier that identifies the particular device;

responsive to a single user action directed to the concierge device, determining from data stored on the concierge device or on a network accessed by the concierge device a service center that supports the particular device from a plurality of service centers and initiating an interactive support session with the determined service center, including automatically transmitting to the determined service center, via a second two-way non-audio data channel, identifier information from which the determined service center can uniquely identify the particular device; and

conducting the interactive support session with the determined service center regarding the particular device using the concierge device to capture a user's voice and to reproduce audio for the user to hear via a two-way audio channel,

wherein during the interactive support session the concierge device relays diagnostic requests from the determined service center to the particular device and relays responses by the particular device back to the determined service center via the second two-way non-audio data channel.



**15**. The concierge device of claim **14**, further comprising a display on the concierge device that displays visual trouble shooting instructions received from the service center during the interactive support session.

**16**. The concierge device of claim **14**, further comprising a camera on the concierge device that provides visual information to the service center during the interactive support session.

**17**. The method of claim **14**, further including:

receiving a request from the service center via the second two-way non-audio data channel for additional diagnostic information from the particular device;

requesting and receiving from the particular device to be supported via the two-way wireless, non-audio data channel, additional responsive diagnostic information; and

forwarding to the service center via the second two-way non-audio data channel the additional responsive diagnostic information from the particular device.

**18**. The method of claim **14**, further including receiving from a user interface of the concierge device a user selection of the particular device to be supported from a plurality of devices.

**19**. The method of claim **14**, further including storing user identification information, and automatically, without further data entry or spoken identification by the user, transmitting to the service center, via the second two-way non-audio data channel device, bypassing any need for the user to identify them self to the service center at an outset of the interactive support session with the service center.

**20**. The method of claim **14**, further including the concierge device interacting through a management gateway with the service center.

* * * * *

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 18, 2022 **PLAINTIFF-APPELLANT NEXSTEP, INC.'S OPENING BRIEF [NON-CONFIDENTIAL]** was filed electronically with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

Thomas Saunders
William F. Lee
Sarah B. Petty
Mary Virginia Sooter
Amy K. Wigmore
thomas.saunders@wilmerhale.com
william.lee@wilmerhale.com
sarah.petty@wilmerhale.com
Mindy.Sooter@wilmerhale.com
amy.wigmore@wilmerhale.com

Respectfully submitted,

Dated: August 18, 2022

*/s/ Paul J. Andre*
Paul J. Andre

*Attorneys for Appellant,*
NexStep, Inc.

**CERTIFICATE OF COMPLIANCE WITH RULE 32(b)**

1. This brief complies with the type-volume limitation of Fed. Cir. R. 32(b) because this brief contains 13,983 words, exclusive of the certificate of interest, table of contents, table of citations, statement of related cases, addendum and this certificate of compliance as exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2019 in Times New Roman 14 point font.

Dated: August 18, 2022

*/s/ Paul J. Andre*
Paul J. Andre

*Attorneys for Appellant,*
NexStep, Inc.