**Nos. 2022-1815, -2005, -2113**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

NEXSTEP, INC.,

*Plaintiff-Appellant*,

*v.*

COMCAST CABLE COMMUNICATIONS, LLC,

*Defendant-Cross-Appellant.*

On Appeal from the United States District Court for the District of Delaware in Case No. 1:19-cv-01031-RGA, Judge Richard G. Andrews

## CORRECTED BRIEF FOR DEFENDANT-CROSS-APPELLANT COMCAST CABLE COMMUNICATIONS, LLC


WILLIAM F. LEE
SARAH B. PETTY
GEORGE F. MANLEY
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

LAUREN MATLOCK-COLANGELO
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center,
250 Greenwich Street,
New York, NY 10007
(212) 230-8800

THOMAS G. SAUNDERS
AMY K. WIGMORE
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

MARY V. SOOTER
WILMER CUTLER PICKERING
HALE AND DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80202
(720) 274-3135

*Attorneys for Defendant-Cross-Appellant Comcast Cable Communications, LLC*


November 9, 2022

# PATENT CLAIMS AT ISSUE

## U.S. Patent No. 8,280,009

Representative claim 1 recites:

1. A method of initiating a support session for a consumer device using a concierge device, the method including:

associating the concierge device with a selected consumer device;

***responsive to a single action performed by a user***, the concierge device communicating with a home gateway, including causing the home gateway to buffer consumer device identification information for the selected consumer device and determine a support center for a support session; and

causing the home gateway to initiate the support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either to bypass an automated attendant or interactive voice recognition system or to initiate an automated support protocol.

Appx210(42:45-63) (emphasis added).

## U.S. Patent No. 8,885,802

Representative claim 1 recites:

1. A remote control device with slaved audio input, the device including:

a wireless link transceiver;

at least one slaved audio input built into the remote control;

a navigation control built into the remote control;

hardware resources coupled between the wireless link transceiver, the slaved audio input and the navigation control;

> a stack running on the hardware resources and exchanging packets with a master device; and
>
> an encoder logic running on the hardware resources, logically coupled to the stack, adapted to encode signals from the slaved audio input into a remote control audio format, and adapted to send audio packets in the remote control audio format to the master device;
>
> wherein the remote control depends on the master device to transcode input from the slaved audio input to ***VoIP*** from the remote control device format and relies on the master device to respond to control signals sent by the remote control device in the packets.

Appx229-230(20:63-21:16) (emphasis added).

## CERTIFICATE OF INTEREST

Counsel for Defendant-Cross-Appellant Comcast Cable Communications, LLC certifies the following:

**1. Represented Entities**. Fed. Cir. R. 47.4(a)(1). Provide the full names of all entities represented by undersigned counsel in this case.

Comcast Cable Communications, LLC

**2. Real Party in Interest**. Fed. Cir. R. 47.4(a)(2). Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

**3. Parent Corporations and Stockholders**. Fed. Cir. R. 47.4(a)(3). Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

Comcast Cable Communications LLC is a wholly-owned, indirect subsidiary of Comcast Corporation

**4. Legal Representatives**. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP: Jack B. Blumenfeld, Brian P. Egan, Andrew Mark Moshos

WILMER CUTLER PICKERING HALE AND DORR LLP: Alexis Cohen; Arthur W. Coviello; Nina Garcia; Rauvin A. Johl; Jason H. Liss; Aaron Macris; H. Rachael Million-Perez; Kevin J. O'Brien; Nora Q.E. Passamaneck; Kelli J. Powell; Kate M. Saxton; Phillip Takhar; Kathryn Zalewski

**5. Related Cases**. Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). See also Fed. Cir. R. 47.5(b).

Ex parte reexamination No. 90/014,991 (U.S.P.T.O.)

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

None.

Dated: November 9, 2022

/s/ Thomas G. Saunders
THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

# TABLE OF CONTENTS

Page

PATENT CLAIMS AT ISSUE

CERTIFICATE OF INTEREST .....i

TABLE OF AUTHORITIES ..... vii

STATEMENT OF RELATED CASES .....1

JURISDICTIONAL STATEMENT .....1

INTRODUCTION .....2

STATEMENT OF ISSUES ON APPEAL .....4

STATEMENT OF ISSUE ON CONDITIONAL CROSS-APPEAL .....4

STATEMENT OF THE CASE .....5

I. ’009 PATENT AND ACCUSED PRODUCTS .....5

A. ’009 Patent .....5

B. My Account App .....8

1. Xfinity Assistant .....8

2. Troubleshooting .....14

3. Diagnostic Check .....16

II. ’802 PATENT AND ACCUSED PRODUCTS .....16

A. ’802 Patent .....16

B. Xfinity Voice Remotes .....18

III. DISTRICT COURT PROCEEDINGS .....21

A. Claim Construction .....21

B. Pretrial Motions ....................................................................................22

1. Summary Judgment ..............................................................22

2. Daubert ..............................................................................24

C. Exclusion of Damages ...............................................................25

D. Trial ........................................................................................26

E. Judgment As A Matter Of Law ...................................................26

SUMMARY OF ARGUMENT ..............................................................28

ARGUMENT ........................................................................................31

I. STANDARD OF REVIEW .................................................................31

II. THE DISTRICT COURT CORRECTLY DETERMINED THAT A REASONABLE JURY COULD NOT HAVE FOUND THAT COMCAST INFRINGES THE '009 PATENT UNDER THE DOCTRINE OF EQUIVALENTS ..........................................................................32

A. The District Court Correctly Found That There Was Insufficient Evidence To Support Infringement Under The Doctrine of Equivalents ..........................................32

B. NexStep's Failure Of Proof Is Not Surprising Because Multiple User Actions Are Not Equivalent To A Single User Action ........................................................................42

1. Multiple user actions are substantially different from a single user action ...............................................42

2. NexStep's DOE theory would vitiate the "single action" requirement .......................................................44

C. NexStep's Other Appellate Arguments Are Unavailing .................46

1. The documentary evidence does not support infringement under the DOE ...............................................46

2. The jury rejected NexStep's single tap theory ..........48

3. NexStep's reliance on Comcast witness testimony is misplaced ..........50

4. NexStep's cases are inapposite ..........52

5. The district court did not focus only on testimony explicitly referencing the DOE ..........53

III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF NONINFRINGEMENT ON THE '802 PATENT ..........54

A. NexStep's Challenge To The Construction Of "VoIP" Should Be Rejected ..........54

B. NexStep Cannot Show Infringement Under The District Court's Correct Construction Because The Accused Products Are Not Capable Of Transmitting And Receiving Two-Way Voice Conversations ..........61

IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING NEXSTEP'S DAMAGES CASE FOR THE '009 PATENT ..........63

A. The District Court Acted Within Its Discretion In Excluding Mr. Reading's Royalty Rate Opinions Under Daubert and Rule 702 ..........63

1. The district court properly performed its gatekeeping function in excluding Mr. Reading's royalty rate opinions ..........63

2. NexStep forfeited its right to seek leave to amend Mr. Reading's report ..........69

B. The District Court Acted Within Its Discretion By Excluding NexStep's Untimely Damages Theory ..........69

CROSS-APPEAL ..........72

V. THE '009 PATENT IS DIRECTED TO INELIGIBLE SUBJECT MATTER ..........72

A. *Alice* Step 1: The ’009 Patent Is Directed To An Abstract Idea, Namely Exchanging Information To Obtain Customer Support ..........72

B. *Alice* Step 2: The Remaining Limitations Of The ’009 Patent’s Claims Add Nothing Inventive To The Abstract Idea Of Obtaining Customer Service ..........75

CONCLUSION ..........78

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

## CASES

Page(s)

*8x8 Inc. v. United States*,
854 F.3d 1376 (Fed. Cir. 2017) ....................54

*Accenture Global Services, GmbH v. Guidewire Software, Inc.*,
728 F.3d 1336 (Fed. Cir. 2013) ....................75

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co.*,
616 F.3d 1283 (Fed. Cir. 2010) ....................60

*Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*,
811 F.3d 1334 (Fed. Cir. 2016) ....................41

*Alice Corp. Party Ltd. v. CLS Bank International*,
573 U.S. 208 (2014)....................72, 75

*American Calcar, Inc. v. American Honda Motor Co.*,
651 F.3d 1318 (Fed. Cir. 2011) ....................45, 46

*Andersen Corp. v. Fiber Composites, LLC*,
474 F.3d 1361 (Fed. Cir. 2007) .................... 58-59

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ....................71

*Apple v. Wi-LAN Inc.*,
25 F.4th 960 (Fed. Cir. 2022) ....................67

*AquaTex Industries, Inc. v. Techniche Solutions*,
479 F.3d 1320 (Fed. Cir. 2007) ....................*passim*

*Atlas IP, LLC v. Medtronic, Inc.*,
809 F.3d 599 (Fed. Cir. 2015) ....................58

*Augme Technologies, Inc. v. Yahoo!*,
755 F.3d 1326 (Fed. Cir. 2014) ....................39, 41

*Cambrian Science Corp. v. Cox Communications, Inc.*,
617 F. App’x 989 (Fed. Cir. 2015) (nonprecedential)....................39

*Dealertrack, Inc. v. Huber*,
674 F.3d 1315 (Fed. Cir. 2012) ....................................................................77

*Electric Power Group v. Alstom S.A.*,
830 F.3d 1350 (Fed. Cir. 2016) ....................................................................75

*ePlus, Inc. v. Lawson Software, Inc.*,
700 F.3d 509 (Fed. Cir. 2012) ......................................................................70

*Exmark Manufacturing Co. v. Briggs & Stratton Power Products Group, LLC*, 879 F.3d 1332 (Fed. Cir. 2018)...........................................65, 67

*FairWarning IP, LLC v. Iatric Systems, Inc.*,
839 F.3d 1089 (Fed. Cir. 2016) ....................................................................74

*Fonar Corp. v. General Electric Co.*,
107 F.3d 1543 (Fed. Cir. 1997) ....................................................................52

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) ....................................................................42

*Gonzalez v. Secretary of Department of Homeland Security*,
678 F.3d 254 (3d Cir. 2012) .........................................................................32

*GREE, Inc. v. Supercell Oy*,
No. 2:19-cv-237, 2021 WL 514757 (E.D. Tex. Feb. 11, 2021) .........................68

*In re TLI Communications LLC Patent Litigation*,
823 F.3d 607 (Fed. Cir. 2016) ......................................................................74

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
850 F.3d 1315 (Fed. Cir. 2017) ..............................................................77, 78

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001) ....................................................................52

*InterDigital Communications, Inc. v. International Trade Commission*,
601 F. App'x 972 (Fed. Cir. 2015) (nonprecedential).......................................58

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ........................................................................65

*Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan, Inc.*,
873 F.2d 1422 (Fed. Cir. 1989) ....................29, 53

*Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*,
895 F.2d 1403 (Fed. Cir. 1990) ....................71

*Malta v. Schulmerich Carillons, Inc.*,
952 F.2d 1320 (Fed. Cir. 1991) ....................39

*Mercedes-Benz USA, Inc. v. Coast Automotive Group*,
362 F. App'x 332 (3d Cir. 2010) (nonprecedential)....................65

*MicroStrategy Inc. v. Business Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005) ....................71

*MLC Intellectual Property, LLC v. Micron Technology, Inc.*,
10 F.4th 1358 (Fed. Cir. 2021) ....................70

*NICE Systems Ltd. v. Clickfox, Inc.*,
207 F. Supp. 3d 393 (D. Del. 2016), *aff'd,* 698 F. App'x 615 (Fed. Cir. 2017) (nonprecedential)....................74

*Planet Bingo, LLC v. GameTech International, Inc.*,
472 F.3d 1338 (Fed. Cir. 2006) ....................45

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
843 F.3d 1315 (Fed. Cir. 2016) ....................45

*Rembrandt Patent Innovations, LLC v. Apple, Inc.*,
716 F. App'x 965 (Fed. Cir. 2017) (nonprecedential)....................41, 44

*Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharmaceuticals Inc., USA*,
No. 7-cv-5855, 2011 WL 383861 (D.N.J. Feb. 3, 2011)....................68

*Seachange International, Inc. v. C-COR, Inc.*,
413 F.3d 1361 (Fed. Cir. 2005) ....................32

*SpeedTrack, Inc. v. Amazon.com*,
998 F.3d 1373 (Fed. Cir. 2021) ....................32, 56

*Sprint Communications Co. v. Charter Communications, Inc.*,
No. 17-cv-1734, 2021 WL 982732 (D. Del. Mar. 16, 2021)....................68

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ....................................................................31, 71

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
90 F.3d 1558 (Fed. Cir. 1996) ........................................................39, 40, 41, 42

*Tronzo v. Biomet, Inc.*,
156 F.3d 1154 (Fed. Cir. 1998) ....................................................................39, 44

*Tyger v. Precision Drilling Corp.*,
832 F. App'x 108 (3d Cir. 2020) (nonprecedential)..........................................32

*Uniloc USA, Inc. v. Big Fish Games, Inc.*,
320 F. Supp. 3d 1178 (W.D. Wash. 2018), *aff'd,* 777 F. App'x 517
(Fed. Cir. 2019) (nonprecedential) ...................................................................74

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) .................................................................*passim*

*Vehicular Technologies Corp. v. Titan Wheel International, Inc.*,
212 F.3d 1377 (Fed. Cir. 2000) ........................................................................46

*Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*,
809 F. App'x 965 (Fed. Cir. 2020) (nonprecedential)......................................52

*ViaTech Technologies Inc. v. Microsoft Corp.*,
733 F. App'x 542 (Fed. Cir. 2018) (nonprecedential)......................................53

*VirnetX, Inc. v. Cisco Systems, Inc.*,
767 F.3d 1308 (Fed. Cir. 2014) ......................................................25, 30, 66, 67

*Warner-Jenkinson Co. v. Hilton Davis Chemical, Co.*,
520 U.S. 17 (1997).............................................................................................33

## STATUTES AND RULES

28 U.S.C.
§ 1295(a)(1) .........................................................................................................1
§ 1331....................................................................................................................1
§ 1338(a) ..............................................................................................................1

35 U.S.C.
§ 101 .......... *passim*
§ 284 .......... 30, 71

Fed. R. Civ. P.
Rule 26 .......... 30
Rule 26(a) .......... 26, 70
Rule 26(a)(1)(A)(iii) .......... 70
Rule 37(c) .......... 70
Rule 37(c)(1) .......... 70
Rule 50(a)(1) .......... 31

Fed. R. Evid. 702 .......... 64

## OTHER AUTHORITIES

*Verinata Health, Inc. v. Ariosa Dianostics, Inc.*, No. 18-2198 (Fed. Cir.) (ECF No. 69) .......... 52

## STATEMENT OF RELATED CASES

No other appeal in or from the same district court proceeding has been before this or any other appellate court.

This appeal involves U.S. Patent Nos. 8,280,009 ("the '009 patent") and 8,885,802 ("the '802 patent"). The '009 patent is at issue in USPTO Reexamination No. 90/014,991. Counsel is not aware of any other case that will directly affect or be directly affected by this appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this patent infringement action brought by NexStep, Inc. ("NexStep") against Comcast Cable Communications, LLC ("Comcast") under 28 U.S.C. §§ 1331 and 1338(a). The district court entered final judgment on July 7, 2022. Appx1-3. NexStep filed an initial notice of appeal on May 17, 2022, Appx16829-16830, and a supplemental notice of appeal on July 8, 2022, Appx16841-16842. Comcast filed a timely cross-appeal on August 4, 2022. Appx16844-16845. This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## INTRODUCTION

NexStep's appeal continues its effort to stretch its patent claims and damages theories far beyond the scope of what it patented and disclosed. The asserted claims of the '009 patent require that four particular troubleshooting steps occur "responsive to a ***single*** action performed by a user." Appx210(42:45-63).[1]
But based on overwhelming evidence that Comcast's accused My Account App requires ***multiple*** actions by the user, the jury found no literal infringement. Nor, as the district court correctly concluded, did NexStep present a legally sufficient case under the doctrine of equivalents ("DOE"). The court noted that NexStep's expert's testimony was a "word salad" and, where the testimony was understandable, it "did not provide particularized testimony or a linking argument for why several button presses perform the claimed method in the same way as the claimed single action." *Id*.

NexStep's expert never clearly identified what specific set of user actions was purportedly equivalent to the "single action" limitation, leaving it unclear what was being compared. He also failed to connect those unspecified multiple actions to each of the four troubleshooting steps that the claims require to occur in response to a single user action. And, on top of these other failings, his discussion of the function/way/result test relied on precisely the type of "conclusory" testimony

[1] All emphasis added unless otherwise indicated.

"untethered from the claim language" that this Court has previously rejected. Appx17. NexStep's efforts to backfill this testimony on appeal cannot supply what was missing at trial: the linking testimony required by this Court's precedent. Nor, even if it had built a more complete record, could NexStep equate the multiple actions required by Comcast's product with the single action required by the claims without vitiating the single action limitation.

Unable to identify any error in the district court's JMOL ruling on the '009 patent, NexStep reaches back to try to revive the '802 patent on which the district court granted summary judgment of non-infringement. But NexStep's appeal depends on an untenable construction of VoIP (Voice Over Internet Protocol). As the district court correctly determined, VoIP is a standard term used to refer to a protocol capable of two-way voice communication, and it does not refer to a protocol only capable of carrying speech in one direction, as reflected in the '802 patent's focus on combining "telephone service" and "device control." Appx220(2:19-22). NexStep admitted, however, that Comcast's accused voice-activated remote controls are not capable of handling two-way speech.

NexStep's effort to revive its damages case also fails for multiple reasons. As an initial matter, the issue is moot in light of the non-infringement ruling on the '009 patent. In any event, the district court properly exercised its discretion to exclude NexStep's expert opinions, which were based on an arbitrary 50/50 starting point for

a cost-saving split that was untethered to the facts of this case. The court further acted well within its discretion when it prevented NexStep from presenting untimely new damages theories to the jury.

Finally, affirming the judgment of non-infringement on the ’009 patent would moot Comcast’s cross-appeal, but to the extent the Court reaches the issue, it should hold that the asserted claims are invalid under 35 U.S.C. § 101 or, at a minimum, that the analysis cannot stop at *Alice* Step 1.

## STATEMENT OF ISSUES ON APPEAL

1. Whether the district court correctly granted JMOL of non-infringement under the DOE on claims 1, 16, and 22 of the ’009 patent.

2. Whether the district court properly granted summary judgment of noninfringement on claims 1 and 7 of the ’802 patent.

3. To the extent the issue is not moot, whether the district court acted within its discretion by (a) excluding NexStep’s royalty rate opinion under *Daubert* and (b) excluding NexStep’s alternative damages theory as untimely.

## STATEMENT OF ISSUE ON CONDITIONAL CROSS-APPEAL

1. Whether the asserted claims of the ’009 patent are directed to patent-ineligible subject matter under 35 U.S.C. § 101.

## STATEMENT OF THE CASE

### I. ’009 PATENT AND ACCUSED PRODUCTS

#### A. ’009 Patent

The ’009 patent discloses automating “routine tasks” previously carried out in person or over the phone between a customer and a customer service agent. Appx193(8:25-31). By the ’009 patent’s alleged March 2010 conception, the prior art relating to automated customer service had already disclosed (1) context-aware help that already had information about the environment in which assistance was needed; (2) automated troubleshooting; (3) chatbot support; (4) selection among multiple support centers; (5) smartphone apps; (6) remote restarting and rebooting; and (7) one-touch help. Appx540(606:23-608:7); *see also* Appx540-542(608:12-617:23) (discussing the prior art); Appx367-368(222:18-226:18). Given this crowded field, the claims of the ’009 patent are directed to specific methods and devices that “initiat[e] a support session” by causing four automated steps to occur in response to “a single action performed by a user.” *See, e.g.*, Appx210(42:45-63).

To initiate this support session, the ’009 patent discloses using a “concierge device.” Appx190(2:45-46); Appx201(23:66-24:2). Under the district court’s construction, the “concierge device” is a “device including functionality for the remote control of at least one consumer device and that meets the other claim requirements.” Appx38. The ’009 patent explains that the consumer device

controlled by the concierge device can be any "consumer appliance or electronics device," such as conventional "lighting, entertainment appliances, heating, ventilation, air conditioning, laundry, and kitchen appliances." Appx190(2:6-7, 3:62-64).

The '009 patent discloses that the concierge device works in conjunction with a "home gateway" that "can be a physical device separate and distinct from the concierge device, to which the concierge device sends messages via an in-home network." Appx201(24:30-32). Alternately, the home gateway "can be part of the same physical device as the concierge device," or "can be a cloud-based device to which the concierge device sends messages via a network that extends outside the home." Appx201(24:32-36).

As relevant here, the concierge device "allows the user ***in a single action*** to initiate a support call, automatically identify the consumer device, and optionally either bypass automated attendant choice trees or invoke an interactive voice response protocol or invoke a visual interaction protocol that takes into account information about the consumer device in the home." Appx190(2:53-58); Appx210(42:45-63). To that end, all the asserted claims require that the following four-step sequence (hereinafter the "Four Troubleshooting Steps") occur in response to "a single action performed by a user": (1) "causing the home gateway to buffer consumer device identification information for the selected consumer device;"

(2) "causing the home gateway to … determine a support center for a support session;" (3) "causing the home gateway to initiate the support session for the consumer device;" and (4) "causing the home gateway … to forward automatically the consumer device identification information during the support session." Appx210(42:45-63)(claim 1); Appx211(43:44-44:8)(claim 16); Appx211(44:25-28)(claim 22); *see also* Appx456-457(430:24-431:3) (NexStep's expert agreeing that "in response to the single action, these four things must occur").

The specification explains that "[t]he single action could be a button press, a single or double tap of a pad, a wave of the device or spoken word(s)." Appx195(12:21-22); *see also* Appx193(8:42-44); Appx205(31:6-8). For example, "[a] dedicated button on the concierge device might select a support call or navigation keys on the concierge device might be used with a single click to initiate a support call or session." Appx195(11:18-21). Representative claim 1 recites:

> 1. A method of initiating a support session for a consumer device using a concierge device, the method including:
>
> associating the concierge device with a selected consumer device;
>
> ***responsive to a single action*** performed by a user, the concierge device communicating with a home gateway, including [1] causing the home gateway to buffer consumer device identification information for the selected consumer device and [2] determine a support center for a support session; and
>
> [3] causing the home gateway to initiate the support session for the consumer device and [4] to forward automatically the consumer device identification information during the support session, thereby allowing

> the support session either to bypass an automated attendant or interactive voice recognition system or to initiate an automated support protocol.

Appx210(42:45-63) (brackets added).

Independent claim 16 recites a concierge device with a "processor configured to perform" the method steps recited in claim 1. Appx211(43:43-44:9). Claim 22 depends from claim 16, and further provides that "the home gateway is a cloud-based device to which the concierge device sends messages via a network that extends outside the home." Appx211(44:25-28).

### B. My Account App

NexStep accused Comcast's My Account App of infringing the '009 patent. The My Account App is a free and optional software application that allows Comcast's subscribers to manage various aspects of their Comcast services. Appx6595. NexStep accused three different functionalities that a user can access from within the My Account App: (1) the Xfinity Assistant, (2) the Troubleshooting Card, and (3) the Diagnostic Check.

#### 1. Xfinity Assistant

Xfinity Assistant is a computerized chatbot incorporated into the My Account App. Appx467(472:1-18).[2] A customer who wants technical support can begin a

---

[2] A chatbot is "an unassisted channel where the customer could type questions and would interface back and forth with a computer." Appx467(472:15-18).

chat session using Xfinity Assistant, which guides the customer through an interactive session before the customer can be connected with a live support agent. Appx376(259:19-260:5); Appx423(297:8-12); Appx468(477:8-478:17). During that session, Xfinity Assistant walks the customer through a flexible, multi-step process consisting of a series of interactive questions or prompts designed to accommodate customers with different circumstances and problems.

This session may resolve the customer's issue, or after a troubleshooting session, may connect the customer with a customer service agent for further chatting. Appx468(477:8-478:17). This computerized "two-way dialogue back and forth with the customer is critical" because it allows Comcast to determine the customer's question or concern before determining a support center and connecting that customer with a live agent. *Id.*

To use Xfinity Assistant, a customer must perform several discrete actions. First, the customer must tap the My Account logo on the customer's mobile device's home screen to open the application. Appx466(469:7-14). The customer may then be prompted to enter an Xfinity ID and password if they were not previously saved. Appx17306; Appx466(469:7-14); Appx5299.




Appx17306-17307. This causes the My Account home screen to be displayed. Appx17308; Appx466(469:15-19).




Appx17308.

The customer then launches Xfinity Assistant by clicking on the corresponding icon at the top of the screen. Appx429(319:5-11); Appx434(340:18-25); Appx467(471:7-24); Appx17119.




Appx17308(annotation added); *see also* NexStep Br. 30.

Xfinity Assistant will initiate a generic chat session, allowing the customer to "indicate, through additional communications such as by providing answers to questions posed by the automated chat system, why the customer has initiated the chat." Appx6596-6597; Appx468(475:14-19).




Appx17708.

For example, the customer can type "agent" to indicate that the customer wants to chat with an agent. Appx468(476:3-9). The customer then clicks "send." Appx468(476:14). Rather than connecting the customer to an agent, Xfinity Assistant will first suggest different categories of assistance, such as help with Xfinity Home. Appx468(476:25-477:5); Appx468(477:2-5). Depending on the customer's selection, the customer may be presented with further prompts designed to identify, for example, which feature of the Xfinity Home system needs assistance. Appx468(478:9-17).

Only after the customer makes additional selection(s) will the customer be presented with an option to schedule a call or start a chat with a representative. Appx469(479:18-23). The customer can then click on the desired action. Up until

this point, the customer has not been given the option of interacting with anything other than a computerized chat bot. Appx376(259:19-260:5); Appx468(477:8-478:17). Moreover, the Xfinity Assistant chat service has not determined a customer support center because all the customer support "functionality [wa]s provided through the same server." Appx550(648:20-649:5); Appx549-550(645:11-646:11); Appx551(650:3-6).

Customers can also use Xfinity Assistant to troubleshoot problems with their service or device. Appx423(296:22-297:24). Again, the customer must open the My Account App and select the Xfinity Assistant button on the top of the home screen. Appx429(319:2-18). If the Xfinity Assistant detects a problem, a troubleshooting card will appear as one of many options the customer can select.



Appx17118(annotation added).

The customer can click "More Details" to be taken to a troubleshooting interface. Appx16949. To begin the troubleshooting process, the customer must select "start troubleshooting." *Id.* The customer will then be presented with a prompt suggesting a possible solution (e.g., refreshing the customer's television). *Id.*; Appx429(321:23-322:8); Appx537(594:9-11). To implement the solution, the customer must actively select the desired option. Appx16949; Appx429(321:23-322:8); Appx537(594:9-11).

The customer is not connected with a customer service agent during this process. Instead, a customer is only connected with a service agent after performing multiple additional user actions that help the My Account App identify the customer's specific problem. *See, e.g.*, Appx468(477:10-478:17) (explaining why the My Account app does not automatically connect customers with customer service agents). And again, Xfinity Assistant has not determined a support center because the troubleshooting session was interacting with the same Comcast server. Appx549-550(645:11-646:11); Appx550(648:20-649:5); Appx551(650:3-6).

### 2. Troubleshooting

Customers can also use the Troubleshooting Card on the My Account home screen to troubleshoot problems with their Comcast devices and services. To use the Troubleshooting Card, the customer must first open the My Account App, sign

in, and scroll to the icon representing the device or service to be troubleshot. Appx437(353:15-354:1); *see also* Appx350-351 (155:9-157:13); Appx470(485:2-11); Appx17239. For example, if the customer would like to troubleshoot a television, the customer can click the icon for televisions. In the event a customer has multiple televisions, the customer will be asked to pick the specific device. Appx350(156:15-17); Appx470(485:12-22).

Once the customer selects a specific device or service, a troubleshooting card will appeal. Appx437(353:15-354:1); *see also* Appx350-351(156:3-157:13); Appx470(486:3-28); Appx17239. The customer can then press "continue" or "start troubleshooting" to launch the troubleshooting process. Appx350(156:19-25); Appx437(353:15-354:1); Appx470-471(486:19-488:6); Appx17239.

The customer will then be presented with additional options, such as restarting or refreshing the desired device or service. Appx351(157:2-13); Appx471(487:8-489:2); Appx471-472(490:21-491:23). The customer needs to manually choose which action to take before anything will happen. Appx472-473(494:15-495:3).

Again, this part of the troubleshooting process deliberately does not route the customer to a customer service agent. *E.g.*, Appx423(297:8-23); Appx468(477:10-478:17); Appx469(481:16-482:13). Further, the troubleshooting session does not determine a support center because it always interacts with the same Comcast server. Appx549-550(645:11-646:11); Appx550(648:20-649:5).

### 3. Diagnostic Check

The My Account App can also be used to run a "Diagnostic Check." To access the Diagnostic Check, a customer first opens the My Account App, and then scrolls down and selects the icon for the service or device the customer wants to check. Appx431(329:17-25). If the customer has multiple devices (for example, multiple televisions), the customer can select a specific device to investigate. Once a specific device has been selected, the customer can select "Run Diagnostic Check" to check whether there are any detectable problems with that device. Appx17165; Appx16726. The My Account App will alert the customer to any service issues that are detected. If no such issues are found, the customer will be presented with another prompt asking if the customer would like to restart the device. Appx17165.

This process deliberately does not route the customer to any of Comcast's customer service agents. *See* Appx468(477:10-478:17); Appx469(481:16-482:13). Nor does it determine a support center because the Diagnostic Check always interacts with the same Comcast server. Appx549-550(645:11-646:11); Appx550(648:20-649:5).

## II. '802 PATENT AND ACCUSED PRODUCTS

### A. '802 Patent

The '802 patent aims to make smart phone features more affordable by using a low-cost device "tethered" to a more powerful "console." Appx220(2:1-15). At

the time of the alleged invention, "[c]ellular smartphones or business phones such as Treo or Blackberry products [we]re becoming powerful and supplanting separate PDAs." Appx220(1:55-57). The patent proposes that using the combination of a tethered device and console would be more accessible for "developing countries and cost-conscious buyers." Appx220(2:1-2).

The patent describes its purported invention as "relat[ing] to combining telephone service [and] device control." Appx220(2:19-22); Appx2933. For example, the patent discloses a "palm-held remote" that could be used "to connect the user to a telephone network" and includes "a speaker, microphone and volume control adapted for use as a telephone." Appx221(3:1-13). Another embodiment similarly discloses a remote that "include[s] a speaker, microphone and volume control adapted for use as a telephone." Appx221(3:31-35).

The patent also explains that the remote must work in conjunction with a "multi-media console," which itself contains modules that "interface the motherboard to a cellular or similar telephone system or to a voice over IP (VoIP) system." Appx228-229(18:67-19:2); *see also* Appx229(20:20) (disclosing "Voice (Landline/cell/IP)" as "[s]upported by the console"). Representative claim 1 recites:

> 1. A remote control device with slaved audio input, the device including:
>
> a wireless link transceiver;
>
> at least one slaved audio input built into the remote control;

> a navigation control built into the remote control;
>
> hardware resources coupled between the wireless link transceiver, the slaved audio input and the navigation control;
>
> a stack running on the hardware resources and exchanging packets with a master device; and
>
> an encoder logic running on the hardware resources, logically coupled to the stack, adapted to encode signals from the slaved audio input into a remote control audio format, and adapted to send audio packets in the remote control audio format to the master device;
>
> wherein the remote control depends on the master device to transcode input from the slaved audio input to ***VoIP*** from the remote control device format and relies on the master device to respond to control signals sent by the remote control device in the packets.

Appx229-230(20:63-21:16).

Independent claim 7 recites a "master device, adapted to be controlled by a remote control device that needs only limited computer capabilities and that includes slaved control and audio input features," comprising, as relevant here, "audio processing logic running on the hardware resources … that receives ***voice over IP (VOIP)*** audio signal packets from the signal source and transcodes the audio signal packets into transcoded audio packets and forwards the transcoded audio packets to the remote control device." Appx230-231(22:47-23:1-7).

**B. Xfinity Voice Remotes**

NexStep accused Comcast's XR11, XR15, and XR16 remotes (hereinafter "Voice Remotes") of infringing the '802 patent. Appx229-230(20:63-21:15). The Voice Remotes allow customers to issue verbal commands to control their television,

but the Voice Remotes do not speak back to the customer. Appx5375-5376(¶114). It is uncontested that the Voice Remotes are only capable of ***one-way*** transmission of audio signals between the remote and the customer's set-top box. Appx5417(¶42) (stating that Comcast's accused products do "one-way communication of sound recordings via HTTP"); Appx5420(¶73) (same); *see also* Appx5385(¶177).

To issue a command, a customer presses and holds the microphone button on the remote, speaks, and then releases the microphone button. Appx5375(¶114); Appx5452(35:5-25). For example, the customer can say "Watch NBC" if the customer would like to change the channel to NBC.

The microphone in the remote receives the customer's command in the form of an analog signal. Appx5376(¶115). This signal is ultimately transcoded by the remote into an adaptive differential pulse-code modulation ("ADPCM") format. Appx5376(¶115); Appx5453(37:24-38:16). This ADPCM data is transmitted from the remote to the customer's set-top box via RF4CE, which is a communication protocol for remote control devices. Appx5453(38:13-20); Appx5575-5576; Appx5581.

The set-top box then sends the same ADPCM data upstream using HTTP via Internet Protocol to Comcast's VREX server, which converts the ADPCM data into a pulse code modulated ("PCM") audio format. Appx5378-5379(¶129); Appx5454(43:24-44:2). The PCM data is then forwarded to a third-party server, the

Nuance server, which converts the audio data to text and sends it back to VREX. Appx5378-5379(¶129); Appx5454(44:10-15). VREX is then able to transmit the text to Comcast's natural language processor ("NLP"), which determines the meaning of the command. Appx5379. If the command is recognizable, VREX receives the relevant information indicating what action should be taken and sends this data to the XRE server, which runs the application logic for the customer's set-top box. Appx5378-5379(¶129); Appx5379-5380(¶131). In the case of the earlier example, this will cause the set-top box to play NBC. Appx5378-5379(¶129). This process is shown in the simplified diagram below:




Appx5379-5380(¶¶130-131) (wherein "remote" is the Xfinity voice remote and "RDK" is the set-top box).

## III. DISTRICT COURT PROCEEDINGS

### A. Claim Construction

NexStep does not dispute any constructions for purposes of the ’009 patent. For the ’802 patent, the parties contest the meaning of “VoIP.”

The Magistrate Judge construed “VoIP” to mean “protocols and data formats for transmitting voice conversations over a packet-switched network, such as the Internet.” Appx41. The Magistrate Judge found that it was uncontested that VoIP “is an industry standard term, and the patentee did not deviate from the plain and ordinary meaning of the term.” *Id.* The Magistrate Judge credited Comcast’s evidence of the industry standard definition of VoIP as a protocol ***capable*** of handling voice conversations, such as for purposes of telephony. *Id.* The Magistrate Judge additionally found that the sources relied on by NexStep’s own expert, Dr. Selker, confirmed that “the term refers to voice communications.” Appx42. Accordingly, the Magistrate Judge determined that the “extrinsic evidence uniformly defines the term in the context of voice communications.” *Id.*

NexStep objected to the Magistrate Judge’s recommendation, but primarily focused on matters not at issue on appeal and devoted only a single paragraph to the construction of “VoIP.” Appx4026. The district court adopted the Magistrate Judge’s recommendation. Appx47.

## B. Pretrial Motions

### 1. Summary Judgment

Comcast moved for summary judgment on two issues relevant to this appeal: (1) summary judgment of non-infringement on the ’802 patent, Appx4931-4937; and (2) summary judgment that the ’009 patent was invalid under 35 U.S.C. § 101, Appx4910-4919.

**’802 patent.** The Magistrate Judge recommended that the district court grant summary judgment of noninfringement on the ’802 patent. Appx72. The Magistrate Judge found no evidence that Comcast’s Voice Remotes in combination with its set-top boxes “are capable of satisfying the ‘voice conversation’ requirement of the VoIP limitation.” Appx73.

As explained above, Comcast’s set-top box sends ADPCM voice commands over HTTP to Comcast’s servers. *See supra* p. 19; Appx5378-5379(¶129); Appx5454(43:24-44:2). The Magistrate Judge relied on a concession from NexStep’s expert, Dr. Wolf, that this constituted “***one-way*** communication of sound recordings via HTTP.” Appx73(citing Appx5417(¶42)). The Magistrate Judge also emphasized that Dr. Wolf (1) “was unable to testify that the accused Voice Remotes allow for two-way real-time voice conversations,” *id.*, and (2) admitted that she was not aware of any VoIP system that uses HTTP, *id.* (citing Appx5466(250:4-14)). Finally, the Magistrate Judge noted that while NexStep “argue[d] that one-way

communication of audio data may constitute a 'voice conversation,' [NexStep's] expert, Dr. Reinman, confirm[ed] that a voice conversation requires two-way communication." Appx72.

The district court adopted the Magistrate Judge's recommendation. Appx123. The court noted that there "d[id] not appear to be any dispute regarding how the accused devices operate." Appx122. Specifically, "[a] user speaks a command … into the microphone of the voice remote, and the captured audio is sent by the set-top box over a protocol called HTTP to Comcast's servers." *Id.* The court then found that NexStep had offered no evidence "showing that HTTP can carry out two-way voice conversations." *Id.* Rather, NexStep's expert "present[ed] only conclusory statements that HTTP is VoIP." *Id.*

The district court also rejected NexStep's "effort to broaden the definition" of VoIP "to encompass all audio data." Appx122. Finally, the court concluded that Comcast's cited dictionary definition confirmed that VoIP protocols "must be ***capable*** of facilitating 'phone calls' and may include additional new services such as voice emails." Appx123.

**Section 101.** The Magistrate Judge recommended denying Comcast's motion of invalidity under § 101. Appx59; Appx61. Comcast objected, but the district court agreed with the Magistrate Judge that the claims of the '009 patent were not patent ineligible at *Alice* Step 1 because they were directed to "a particular improvement

over prior computing technologies in the form of a concierge device that links to consumer devices and forwards a malfunctioning device's identification information and diagnostic data to customer service." Appx173.

### 2. Daubert

Comcast timely moved to exclude the opinions of NexStep's damages expert, Mr. Reading. As relevant here, Mr. Reading opined that Comcast's alleged use of the '009 patent's claimed invention allowed Comcast to avoid the costs associated with customer service calls and truck rolls. Appx6000-6001(¶¶118-121).[3] Mr. Reading used this total alleged cost savings as the royalty base the parties would use in a hypothetical negotiation. He then opined that a 50/50 split of these cost savings would be a reasonable starting point for a hypothetical negotiation "[a]bsent any other evidence." Appx9410(¶132). With that arbitrary starting point locked in, Mr. Reading made small adjustments and ultimately opined that the parties would have agreed to a 40/60 split of the cost savings. Appx6073(¶¶377-379). Comcast moved to exclude several aspects of Mr. Reading's opinion under *Daubert*, including Mr. Reading's arbitrary use of a 50/50 split as a starting point. Appx4947.

The district court granted Comcast's *Daubert* motion with respect to Mr. Reading's use of a 50/50 cost-savings split. Appx140-142; Appx143. Relying on

---

[3] A truck roll, or "technician visit," occurs when a technician is dispatched to deal with a technical issue or to provide assistance in a customer's home.

the rejection of a 50/50 starting point in *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308 (Fed. Cir. 2014), as well as other precedent rejecting damages theories insufficiently tied to the facts of the case, the district court found that NexStep's arguments regarding cost savings being pure profit to Comcast and Comcast needing an incentive to use the technology were not "particular to the facts of [the] case" and "could be true" of "any two parties" negotiating over "cost-savings technology (or anticipated profits)." Appx141. Mr. Reading's 50/50 cost savings split was therefore unreliable because it was not supported "with facts specific to the case at hand." Appx142.

### C. Exclusion of Damages

After the exclusion of Mr. Reading's damages opinions shortly before trial was scheduled to begin, NexStep tried to pursue an entirely new damages theory based on a royalty rate never disclosed as such in either its initial disclosures or its responses to Comcast's discovery requests. Indeed, the only place NexStep could identify in which this new royalty rate appeared was on a single page—page 256—of a 268-page document. Appx16277-16278(16:21-17:22). That document had been identified solely by Bates range in a Rule 33(d) interrogatory response "related to the earliest making, using, selling, offering for sale, and disclosure" of the inventions at issue, with that response then cross-referenced in its entirety in another interrogatory response. Appx148; Appx16199; Appx16278(19:19-20:4).

The district court granted Comcast's motion to strike, finding that "NexStep did not meet the disclosure requirements of Rule 26(a)" because it failed "to tie each step of its calculation to the specific documents or other evidentiary materials that support it." Appx150. Further, the district court determined that NexStep had not "properly and timely disclosed" any "viable damages theory." Appx136.

### D. Trial

Next Step tried the '009 and U.S. Patent No. 9,866,697 ("the '697 patent") to the jury. Appx161. With respect to the '009 patent, NexStep argued both literal infringement and infringement under the DOE. Appx157-158. NexStep's sole theory under the DOE was that a "single action" was equivalent to many user actions, as shown through the function/way/result test. Appx445(384:5-12).

The jury found that Comcast did not literally infringe either patent. Appx157. The jury additionally determined that Comcast did not infringe the '697 patent under the DOE. Appx158. However, the jury found that Comcast infringed the asserted claims of the '009 patent under the DOE. *Id*. Finally, the jury found that the claims of the '009 patent were not shown to be invalid. Appx159.

### E. Judgment As A Matter Of Law

As relevant here, Comcast sought JMOL of noninfringement on the '009 patent under the DOE. Appx5. The district court stated that the relevant inquiry was whether Dr. Selker presented "sufficient particularized testimony … such that a

reasonable jury could have made an equivalency finding." Appx12. The district court determined that Dr. Selker had not, finding that his testimony was "too vague to support the jury's verdict." Appx13. The district court explained that "Dr. Selker's DOE testimony suffer[ed] from a lack of precision regarding both the claim limitations and the purported equivalent." *Id*. "The fatal flaw in Dr. Selker's testimony, however, [wa]s failure to provide a linking argument." *Id.*

The district court expressly acknowledged that, in theory, "Dr. Selker's literal infringement testimony c[ould] support NexStep's DOE contentions" if it had been sufficient to do so. Appx14. But even considering this testimony, the district court held that Dr. Selker "fail[ed] to describe what steps in Comcast's app are equivalent to the 'single action' limitation." *Id*.

Moreover, the district court found that even if the jury somehow "had enough of an understanding of Comcast's accused devices to piece together on their own the function, way, and result of the accused devices," there was still insufficient testimony explaining "how [the] plaintiff compares the function, means, and results of its claimed invention with those of the accused device." Appx15.

With respect to the function prong, the district court noted that Dr. Selker testified only that "several button presses along the way" was the same function as the "single action" limitation because "I say that's the same function." Appx15-16. The district characterized Dr. Selker's testimony on the way prong as "word salad"

that "did not provide particularized testimony or a linking argument for why several button presses perform the claimed method in the same way as the claimed single action." Appx17 (quoting Appx445(384:17-385:1)). Finally, the district court determined that Dr. Selker's testimony "regarding the result [prong] [wa]s untethered from the claim language" and "amount[ed] to little more than 'generalized testimony as to the overall similarity between the claims and the accused infringer's product.'" Appx17.

## SUMMARY OF ARGUMENT

The district court properly determined that Comcast did not infringe the '009 and '802 patents in light of the many differences between the accused products and the asserted claims. The district court also acted within its discretion by excluding the arbitrary royalty rate opinion of NexStep's expert, as well as NexStep's untimely damages theory.

I. The district court correctly determined that a reasonable jury could not have found that Comcast infringes the '009 patent under the DOE. Dr. Selker's confusing and conclusory testimony never (1) identified what specific user actions in Comcast's My Account App were purportedly equivalent to the "single action" limitation; (2) explained how this combination of multiple user actions allegedly caused the Four Troubleshooting Steps to occur; and (3) explained why this series of user actions was insubstantially different from the claimed "single action"

requirement. Accordingly, Dr. Selker failed to provide the "particularized testimony" necessary to "establish[] that those skilled in the art would recognize the equivalents." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1329 (Fed. Cir. 2007).

NexStep's reliance on Dr. Selker's literal infringement testimony is unavailing. "The evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." *Lear Siegler, Inc. v. Sealy Mattress Co. of Michigan, Inc.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989). In any event, the district court expressly considered this testimony and correctly found it wanting. Appx14.

But even if Dr. Selker had provided the requisite testimony, NexStep could not have established infringement under the DOE because the multiple actions required by Comcast's products are not equivalent to a single action, and a contrary determination would vitiate the single action limitation. Accordingly, the district court's grant of JMOL should be affirmed.

II. The district court correctly granted summary judgment of non-infringement on the '802 patent. NexStep's infringement theory relies on an untenable construction of VoIP that would encompass protocols capable of handling only one-way audio transmission. But such a construction is not only contrary to the plain and ordinary definition, but also wholly unsupported by the intrinsic and

extrinsic evidence, which requires that a protocol be at least capable of handling two-way voice conversations to be considered VoIP.

Moreover, NexStep failed to identify any issues of material fact that would preclude summary judgment under the district court's construction. As the district court found, there is simply no evidence that Comcast's Voice Remotes are capable of audio conversations. Appx73. Under the district court's construction of VoIP, there can therefore be no infringement.

III. The Court need not reach NexStep's damages arguments if it affirms the judgment of non-infringement on the '009 patent. But to the extent the Court reaches the issue, the district court properly performed its gatekeeping role in excluding Mr. Reading's arbitrary royalty opinions. Mr. Reading's theory that the parties would have agreed to a 50/50 split of the alleged cost savings as the starting point to negotiations was untethered to the facts of this case. As such, the district court properly applied *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308 (Fed. Cir. 2014), and other precedent, to exclude this testimony.

The district court also acted well within its discretion by excluding NexStep's untimely damages theory. As the district court found, NexStep never properly disclosed its new royalty rate as required under Federal Rule of Civil Procedure 26. While NexStep makes much of 35 U.S.C. § 284, it does not relieve NexStep of its disclosure obligations under the Federal Rules. Nor does "[t]he statute … require

an award of damages if none are proven that adequately tie a dollar amount to the infringing acts." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020). Here, the district court properly found that there was no evidence in the record from which the jury could assess damages. Accordingly, it acted well within its discretion to prevent NexStep from presenting a damages case at trial.

IV. Affirming the judgment of non-infringement on the '009 patent would also eliminate the need to address Comcast's conditional cross-appeal under 35 U.S.C. § 101. But if it does reach the issue, the Court should hold that the asserted claims of the '009 patent are invalid or, at a minimum, that the analysis cannot stop at *Alice* Step 1. The claims of the '009 patent are directed to the abstract idea of exchanging information to obtain customer support. Indeed, the '009 patent itself states that the invention can be used to "automate … routine tasks." Appx193(8:25-26). Further, the elements of the asserted claims do not provide an inventive concept sufficient to transform the abstract idea of automating certain aspects of customer support.

## ARGUMENT

### I. STANDARD OF REVIEW

JMOL is appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" that prevailed at trial. Fed. R. Civ. P. 50(a)(1). Under Third Circuit law, a JMOL ruling is reviewed "de novo by

reapplying the JMOL standard." *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1368 (Fed. Cir. 2005). A decision regarding summary judgment is also reviewed de novo. *Gonzalez v. Secretary of Dep't of Homeland Sec.*, 678 F.3d 254, 257 (3d Cir. 2012).

A district court's claim construction is reviewed de novo to the extent it relies on intrinsic evidence, with any subsidiary fact findings about extrinsic evidence reviewed for clear error. *SpeedTrack, Inc. v. Amazon.com*, 998 F.3d 1373, 1378 (Fed. Cir. 2021).

A district court's evidentiary rulings are reviewed only for abuse of discretion. *Tyger v. Precision Drilling Corp.*, 832 F. App'x 108, 111 (3d Cir. 2020). "An evidentiary ruling constitutes an abuse of discretion if it is arbitrary, fanciful or clearly unreasonable," and should not be disturbed "unless no reasonable person would adopt the district court's view." *Id*. (quotation marks omitted).

## II. THE DISTRICT COURT CORRECTLY DETERMINED THAT A REASONABLE JURY COULD NOT HAVE FOUND THAT COMCAST INFRINGES THE '009 PATENT UNDER THE DOCTRINE OF EQUIVALENTS

### A. The District Court Correctly Found That There Was Insufficient Evidence To Support Infringement Under The Doctrine of Equivalents

At trial, the jury found that Comcast does not literally infringe the claims of the '009 patent. Appx157. Accordingly, the jury implicitly rejected NexStep's argument that a single user action causes Comcast's My Account App to perform

the Four Troubleshooting Steps. NexStep does not appeal this determination. The question on appeal is therefore properly limited to whether NexStep presented evidence at trial sufficient for a jury to find that NexStep identified a specific series of user actions that are equivalent to a ***single*** user action, and that trigger ***all Four*** Troubleshooting Steps. As the district court correctly determined, a reasonable jury could not find infringement under any DOE theory presented.

Under the DOE, "a product or process that does not literally infringe … may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem., Co.*, 520 U.S. 17, 21 (1997). But "[w]here the evidence is such that no reasonable jury could determine two elements to be equivalent," district courts are "obliged" to direct judgment of no infringement. *Id.* at 39 n.8.

To establish infringement under the DOE, the patentee must "provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents." *AquaTex*, 479 F.3d at 1328 (emphasis omitted). Moreover, "the difficulties and complexities of the doctrine require that evidence be presented to the jury … through the

particularized testimony of a person of ordinary skill in the art, typically a qualified expert, who (on a limitation-by-limitation basis) describes the claim limitations and establishes that those skilled in the art would recognize the equivalents." *Id.* at 1329.

Here, the district court correctly determined that the confusing and conclusory testimony of Dr. Selker did not meet this standard. The district court first noted that Dr. Selker's testimony "suffer[ed] from a lack of precision regarding both the claim limitations and the purported equivalent." Appx13. It further found that the "fatal flaw" in Dr. Selker's testimony was his failure to provide the requisite "linking argument." Appx13.

A review of Dr. Selker's testimony confirms that he never presented a clear theory of infringement under the DOE. Critically, Dr. Selker never (1) identified the specific user actions in Comcast's My Account App that he alleged were equivalent to the "single action" limitation; (2) explained how this combination of user actions allegedly caused the Four Troubleshooting Steps to occur; or (3) explained why this series of user actions was insubstantially different from the claimed "single action" requirement. Appx14-15. Each of these fundamental failings is sufficient to support the district court's determination that no reasonable jury could find infringement under the DOE.

*First*, Dr. Selker provided only conclusory testimony that "to diagnose your device, you're going through a single action," even though "there's several button

presses along the way." Appx445(384:5-7); Appx16690-16691. This testimony was silent as to ***which specific "button presses"*** or other user actions he believed were equivalent to the claimed "single action."

Dr. Selker's testimony on literal infringement failed to provide any clarification. His testimony was premised on the assumption that a customer performed only a single action and therefore did not address which of the multiple user actions required by the My Account App were purportedly equivalent to the claimed single user action. *E.g.*, Appx428(316:4-7).

Simply put, Dr. Selker never truly argued in the alternative. He discussed the DOE at a high-level of abstraction, but he did not even perform the basic first step of specifying what multiple actions he was comparing to the required single action to demonstrate equivalence. This alone was sufficient for the district court to correctly conclude that Dr. Selker had not provided the required linking testimony. *E.g.*, *AquaTex*, 479 F.3d at 1329 (affirming summary judgment of non-infringement under the DOE where patentee provided "generalized testimony about the accused product").[4]

---

4 On appeal, NexStep now argues that three specific multi-user-action processes are equivalent to the claimed single-user-action process. NexStep Br. 28-34. But Dr. Selker never presented this theory at trial. Nor are these multiple actions equivalent to the required single user action. *See infra* §§ II.B.1 & II.C.2.

*Second*, Dr. Selker also did not explain how any specific set of "several button presses," Appx445(384:7), purportedly caused ***all Four Troubleshooting Steps*** to occur "***responsive to a single action*** performed by a user." Appx16693-16694. Dr. Selker acknowledged that using the My Account App requires multiple, discrete user actions, or "several button presses." Appx428-430(318:21-326:16); Appx431 (329:13-330:16); Appx434-435(340:18-345:14); Appx445(384:7). However, his DOE testimony never addressed the connection between these actions and the Four Troubleshooting Steps. Instead, he asserted in conclusory fashion that the "several button presses along the way" have "the same purpose." Appx445(384:7-9). Dr. Selker's testimony on the DOE was thus too incomplete and vague to support infringement on the single action limitation, which has to trigger all of the Four Troubleshooting Steps.

Dr. Selker's testimony on literal infringement also did not provide the requisite analysis. Dr. Selker addressed each of the Four Troubleshooting Steps in isolation, failed to tie any particular action to any particular troubleshooting step, and failed to explain how multiple user actions that were purportedly equivalent to a single user action could cause all Four Troubleshooting Steps to occur together. *E.g.*, Appx432(334:13-18) (addressing only whether the Concierge device is associated with a selected consumer device); *see also* Appx447(392:6-10) (same); Appx434(340:11-341:8) (addressing only "communicating with a home gateway").

Nor could he have done so. For example, Dr. Selker never explained how the accused features of the My Account App purportedly cause the "home gateway to ... determine a support center," i.e., choose a particular support center from among multiple options. Instead, he confusingly testified:

> Basically the idea is that this gateway up there has this information and it's going to keep it at the ready and add to it to make – to make this, to solve this problem for this person we call a support session.

Appx436(349:22-350:4); *see also* Appx438(358:8-14) ("Well, it is definitely very engaged in identifying. It's so engaging that they're using medical technology about what's going to be the problem.").

By contrast, Comcast's expert, Dr. Villasenor, explained that the accused features of the My Account App do not need to determine a support center because their functionalities are all provided by the same Comcast server. Appx549-550(645:11-646:11); Appx550(648:20-649:5); Appx551(650:3-6); *see also* Appx16749-16750. Accordingly, there is simply no evidence that any of the accused functionalities of the My Account App "determine a support center," let alone do so as part of a four-step process initiated by a "single action performed by a user." Appx16696-16697.

There is also no evidence that the My Account App has any "single button [the user] can push to automatically begin a support session and connect [the user] with a live agent." Appx469(481:4-19); Appx16750. Instead, the My Account App

is ***designed*** to walk the customer through an interactive, multi-step process ***before*** connecting the customer with an agent because this allows Comcast "to understand specifically what it is [the customer is] concerned about." Appx469(481:21-482:13). Having a single action that could immediately connect a user with a customer service agent would defeat this purpose.

*Third*, beyond these general failures, which cut across all his testimony, Dr. Selker provided only conclusory testimony concerning each element of the function/way/result test.

The district court characterized the function of the "single action" limitation as causing the Four Troubleshooting Steps to occur. Appx15. The entirety of Dr. Selker's testimony regarding the "function" prong of the function/way/result test is shown below:

> A. When you—when you go to debug your—to diagnose your device, you're going through a single action. It might be that there's several button presses along the way, but I say that's the same function. And that it's going to have the same purpose which is what I was talking about, I hope. I don't know if I'm …
>
> Q. No, you're doing fine Doctor. Keep going.
>
> A. I was confused by that.
>
> Q. It's the same function—I'll just help you out here. So it has the same function and it's a legal doctrine and so we have to go through it. Okay? Can you explain to the jury why it's done substantially the same way?

Appx445(384:5-16).

In other words, Dr. Selker testified that "several button presses along the way" is the same function as the "single action" limitation because he said so. Appx445(384:5-12). But, as noted, he never identified which button presses he alleged to be equivalent to the "single action." Nor did he connect those button presses to the specific Four Troubleshooting Steps that must occur "responsive to a single action performed by a user."

This Court has repeatedly rejected such conclusory testimony. *E.g.*, *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1566-1568 (Fed. Cir. 1996) (affirming JMOL of non-infringement under the DOE in light of conclusory testimony); *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1326-1327 (Fed. Cir. 1991) (expert's "offhand and conclusory statements" that purported equivalent to buttons "function[ed] like buttons" was not sufficient).[5]

*Texas Instruments* is particularly instructive. There, one of the patentee's experts provided only "generalized testimony as to [the] overall similarity" of the

---

[5] *See also Cambrian Science Corp. v. Cox Commc'ns, Inc.*, 617 F. App'x 989, 994 (Fed. Cir. 2015) (affirming summary judgment of non-infringement in light of "conclusory" expert report lacking "any particularized testimony or linking arguments"); *Augme Techs., Inc. v. Yahoo!*, 755 F.3d 1326, 1336 (Fed. Cir. 2014) (affirming summary judgment of non-infringement under the DOE in light of expert's "conclusory" testimony stating "only that the product would 'operate the same,' 'perform [the functions described in the patent] in essentially the same way,' and 'would [produce] the same result"); *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998) (concluding that the accused product could not infringe under the DOE as a matter of law in light of "conclusory" "testimony as to function and way").

claimed and accused processes. 90 F.3d at 1567-1568. The patentee's other expert witness merely "testified, in conclusive fashion, that the accused processes … met the *Graver Tank* function, way, result test" but did not explain "whether or how the way the [accused product] operates was similar to the patent claim," nor provide "any particularized testimony explaining *why* the function and result were the same." *Id.* at 1568 (emphasis in original; original brackets omitted). This Court explained that neither witness's testimony was "sufficient" to "support a finding of infringement under the doctrine of equivalents." *Id.* at 1567. Dr. Selker's testimony that the My Account App functions in the same way as the "single action" limitation because he says it does, Appx445(384:5-12), fares no better.

Next, the district court characterized Dr. Selker's testimony on the "way" prong as "word salad" that "did not provide particularized testimony or a linking argument for why several button presses perform the claimed method in the same way as the claimed single action." Appx17. Again, the entirety of Dr. Selker's testimony on this point was:

> Well, it's done in the same way in that the stuff is all kept up in the cloud for the purpose of doing this and it's going to go and diagnose it using the home gateway and it's going to solve my problem without me having to go through and put in my model numbers and all of that stuff. So it's really literally using – using this Concierge as more of a – somebody to give authorization than to do the actual function. I'm not down there in the machine room, you know, putting instructions into a computer to make it do each of these things.

Appx445(384:17-385:1).

This is precisely the kind of conclusory and unhelpful testimony that this Court has previously found to be insufficient. *E.g.*, *Rembrandt Patent Innovations, LLC v. Apple, Inc*., 716 F. App'x 965, 977 (Fed. Cir. 2017) ("conclusory testimony … on the 'way' prong is insufficient to create a genuine issue of material fact for trial regarding infringement by equivalents"); *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1343 (Fed. Cir. 2016) (affirming summary judgment of non-infringement under the DOE in light of expert's "failure to articulate how [defendant's] accused process operates in substantially the same way"); *Augme Techs.*, 755 F.3d at 1336 (testimony that the accused product would "operate the same" or "perform [the functions described in the patent] in essentially the same way" were not sufficient at summary judgment).

Finally, the district court correctly determined that Dr. Selker's testimony on the "result" prong was "untethered from the claim language" and amounted to "little more than 'generalized testimony as to the overall similarity between the claims and the accused infringers product.'" Appx17 (quoting *Texas Instruments*, 90 F.3d at 1567). With respect to the "result" prong, Dr. Selker said only:

> [T]he result is that this thing is going to be restarted, refreshed, whatever is going to have to happen with it without me having to tangle with understanding all of the issues of being an IT professional or whatever it takes to get this thing up. And so it's going to come with a result of my modem working, you know.

Appx445(385:4-9). As the district court found, this kind of "[g]eneralized testimony … will not suffice." *Texas Instruments*, 90 F.3d at 1567.

Dr. Selker's literal infringement testimony also did not explain why a particular series of user actions would be equivalent to the claimed single user action. Instead, Dr. Selker appeared to wholly ignore the fact that he listed multiple user actions when describing how to operate the My Account App. Appx441(369:10-370:25); Appx429(320:5-322:8).

Each of these failures alone is fatal to NexStep's DOE case. Collectively, they represent exactly the type of hand-waving the function/way/result test is designed to guard against. *E.g.*, *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014) ("[P]articularized testimony and linking argument" is necessary to "assure that the fact-finder does not, 'under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'" (citation omitted)).

### B. NexStep's Failure Of Proof Is Not Surprising Because Multiple User Actions Are Not Equivalent To A Single User Action

#### 1. Multiple user actions are substantially different from a single user action

Even if Dr. Selker had performed a more complete analysis, he faced an impossible task because the multiple user actions in Comcast's products are

substantially different from a single user action. NexStep argues on appeal that multiple user actions are equivalent to a single action because "every action can have multiple sub-parts." NexStep Br. 35. Dr. Selker similarly argued that "no single action does anything in the world," Appx458(438:18-22), and resorted to irrelevant hypotheticals and metaphysical musings involving the breakdown of a single "stream-like action" into parts. *See* Appx434(341:25-342:18) (Dr. Selker breaking down the process of pressing a button into sub-parts); Appx460(444:22-445:4) (Dr. Selker analogizing to the process of throwing a baseball).

But the multiple, discrete user actions required to perform any of NexStep's three infringement theories simply cannot be analogized to NexStep's inapt examples. Comcast never argued that a user performs multiple actions because of purported "sub-parts" involved in clicking a button. Rather, as explained above, Comcast identified multiple discrete user actions that must be performed in sequence to follow any of NexStep's three infringement theories. *Supra* pp. 8-16.

Comcast's design for the My Account App requires customers to perform multiple debugging and troubleshooting steps before allowing customers to initiate a support session with an agent. This "two-way dialogue" with the app makes sure each customer that ultimately wants to speak to customer service gets "linked up

with the right agent." Appx468(477:10-478:14).[6] Comcast therefore did not rely on artificial distinctions like NexStep's example of dividing a single button click into seeing the button, moving your finger, and pressing the button. Appx434(342:10-18). Rather, each of the multiple actions identified by Comcast were separate user inputs requiring independent thought, an elapse of time, and the appearance of a new screen or prompt between each action.

This kind of multi-step process is substantially different from the automated process claimed by the '009 patent. *See, e.g.*, *Rembrandt*, 716 F. App'x at 976-977 (finding no infringement under the DOE for claims directed to an automated recovery process for consumer electronic devices where accused products required user to manually plug in the device and "click[] on a button in a pop-up message box").

#### 2. NexStep's DOE theory would vitiate the "single action" requirement

NexStep's DOE theory suffers from another fatal flaw: Equating the multiple actions required by the accused products with a "single action" would improperly write the single action limitation out of the claims. *E.g.*, *Tronzo*, 156 F.3d at 1160 (equating "*any* shape" with a limitation reciting a "generally conical outer surface"

---

[6] Comcast does not concede that the My Account App functionalities identified by NexStep actually determine a support center in the end. *Supra* pp. 13, 15-16. But Comcast certainly does not do so until after the customer has completed multiple steps.

would write the limitation out of the claims); *see also* Appx16691. Such a theory vitiating a claim limitation "is legally insufficient." *American Calcar, Inc. v. American Honda Motor Co*., 651 F.3d 1318, 1339 (Fed. Cir. 2011); *see also Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 843 F.3d 1315, 1344 (Fed. Cir. 2016) (reversing jury verdict of infringement under the DOE because such a finding "would vitiate" a claim requirement); Appx16692.

The '009 patent emphasizes using a single user action to automate specific multi-step tasks. Appx193(8:25-31). In this context, multiple is the direct opposite of single, and the DOE cannot be used to erase that distinction. *See Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1344-1345 (Fed. Cir. 2006) (affirming determination that "the game method in which the winning combination is not known until after the game begins cannot be equivalent to a game method where this occurs before because 'after is opposite of before, not equivalent'"); *see also* Appx16691.

This Court has previously rejected similar theories that attempted to equate single and plural. For example, in *American Calcar*, the claims required radio signals be received by a "'plurality of sources,'" but the accused radio system received "a single signal from [a] single source." 651 F.3d at 1337-1338. This Court found non-infringement under the DOE because "finding a signal from one source to be equivalent to 'signals from a plurality of sources' would vitiate that claim

limitation by rendering it meaningless." *Id.* at 1339. Here, finding multiple user inputs to be equivalent to a single user input would similarly render the claim limitations meaningless. *See also Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1378, 1382 (Fed. Cir. 2000) (affirming noninfringement where the "claim language expressly requires two springs," but the accused device "contains a single spring").

### C. NexStep's Other Appellate Arguments Are Unavailing

#### 1. The documentary evidence does not support infringement under the DOE

NexStep erroneously argues that Comcast's technical documents support infringement under the DOE. NexStep Br. 42-43. But NexStep was required to present testimony "establish[ing] that those skilled in the art would recognize the equivalents." *AquaTex*, 479 F.3d at 1329. None of NexStep's purported evidence provides this analysis, nor can it make up for NexStep's lack of "particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process." *Id.* at 1328.

In any event, NexStep's cited technical documents do not tie any of the Four Troubleshooting Steps to user actions. As such, these documents do not advance NexStep's argument that any particular series of user actions—let alone the specific user actions that NexStep now identifies for the first time on appeal—is equivalent to the claimed single user action. For example, Dr. Selker's description of

Comcast's Mobile Architecture (Appx17004-17017) addressed only whether there would be some type of "communication between the Concierge device and the gateway." Appx435-436(345:15-347:24). Stating that the concierge device and gateway are in some form of communication does not support the inference that the My Account App causes the Four Troubleshooting Steps as claimed, nor that it does so using multiple user actions that are equivalent to a single user action.

Dr. Selker's cited testimony concerning the My Account source code related only to individual steps discussed separately. It did not speak to whether multiple user actions are equivalent to a single user action, and Dr. Selker never tied the execution of the specific source code to any particular user action or series of actions. Moreover, this evidence was insufficient on its own terms. For example, none of the accused My Account App functionalities determines a support center because they always interact with the same Comcast server. Appx549-550(645:11-646:11); Appx550(648:20-649:5); Appx551(650:3-6).

Similarly, Dr. Selker's testing screenshots addressed only whether the My Account App performs "issue detection." Appx435(344:8-345:4). Again, whether issue detection is being performed is irrelevant to whether a specific series of user actions (1) causes the Four Troubleshooting Steps and (2) is equivalent to a single user action.

Finally, Dr. Selker's cited testimony concerning the Xfinity Assistant functionality expressly acknowledged that the "single action [of] pressing Xfinity Assistant" must be followed by another "single button press to go for more details." Appx17118; Appx435(345:5-14). But Dr. Selker did not explain how these separate actions were supposedly equivalent to a single action, let alone with respect to triggering the Four Troubleshooting Steps. *Id.*

### 2. The jury rejected NexStep's single tap theory

NexStep's brief repeatedly frames the relevant inquiry as one "where a single tap of the touchscreen or a short sequence of taps causes the required Troubleshooting Steps to be initiated." NexStep Br. 28; *see also id*. at 23 ("Either way, the single or short sequence of taps was literally or, at a minimum, the equivalent to a single action."); *id*. at 35 (referencing a "single tap" as well as "multiple taps"). But, as explained above, NexStep did not appeal the jury's finding that Comcast does not literally infringe the claims of the '009 patent, and consequently the only question on appeal is whether ***multiple*** user actions are equivalent to a single user action.

Moreover, none of NexStep's three purported infringement theories involves a "single action." With respect to Xfinity Assistant, the customer must at least (1) open the My Account App; (2) tap the icon for Xfinity Assistant; (3) click the desired prompt (e.g., "More Details" under "Troubleshoot TV issues"); and

(4) follow further prompts depending on the results of the troubleshooting analysis. Appx428-429(318:19-322:8); Appx434(340:11-341:8); *supra* pp. 8-13.

Troubleshooting via Xfinity Assistant requires the customer to (1) open the My Account App; (2) tap the icon for Xfinity Assistant; (3) click "more details" on the relevant prompt; (4) click "continue" to begin troubleshooting; and (5) select any additional action the customer would like the app to perform (e.g., refreshing the customer's television). Appx17239; *supra* pp. 13-14. Similarly, troubleshooting using the MyAccount Home screen requires the customer to (1) open the My Account App; (2) scroll to the appropriate device or service to be troubleshot; (3) click the prompt to open the troubleshooting card; (4) press "continue" or "start troubleshooting" to launch the troubleshooting process; and (5) select any additional actions the customer would like the app to perform (e.g., restarting a television). Appx17239; *supra* pp. 14-15.

Finally, to perform a diagnostic check, the customer must (1) open the My Account App; (2) scroll to the service or device they want to check; (3) if the user has multiple devices, select the specific device to be investigated; (4) select "Run Diagnostic Check; and (5) follow any additional prompts. Appx431(329:13-330:16); Appx16726; Appx17165; *supra* p. 16.

### 3. NexStep's reliance on Comcast witness testimony is misplaced

Contrary to NexStep's assertions, Comcast's expert, Dr. Villasenor, did not concede that a single screen tap initiates the Four Troubleshooting Steps. NexStep Br. 43-45. Instead, he confirmed the uncontroversial position that "[p]ressing [a] button is a single action." Appx562(696:11-697:5). Dr. Villasenor also emphasized, however, that this single action was surrounded by other separate required user actions. *Id*. ("that itself is a single action subsequent to opening the app").

Nor did his acknowledgement that tapping a single button is one action somehow "concede[] that in each of the three cases, a single screen tap initiates troubleshooting," NexStep Br. 45. In any event, "initiating" a troubleshooting ***process*** is not the same thing as causing the ***four required troubleshooting steps*** of causing the home gateway to (1) buffer consumer device identification information; (2) determine a support center; (3) initiate the support session; and (4) automatically forward consumer device information. Dr. Villasenor never opined that these two different things were equivalent.

Comcast's fact witness also did not confirm that a single tap causes all Four Troubleshooting Steps to occur. NexStep Br. 45-46. Instead, Mr. Karinshak stated only that pressing the icon to open Xfinity Assistant was one action.

Appx482(531:10-19).[7] Again, it is not disputed (nor sufficient) that pressing a button is one user action. To the contrary, Mr. Karinshak explained why Comcast's multi-action troubleshooting processes were fundamentally different from a single action process. Appx469(481:16-482:13).

NexStep's attempt to stretch all this testimony is a bit like a tennis player saying it was fine to hit the ball on the fourth bounce because, as long as you ignore the other three bounces and focus on one act in isolation, there was a single bounce before the hit.

[7] The jury's verdict of no literal infringement, which NexStep has not appealed, forecloses the theory that merely opening Xfinity Assistant is the claimed single user action. In any event, NexStep could not show that pressing the icon to open Xfinity Assistant causes all Four Troubleshooting Steps to occur responsive to this single action. For example, as explained above, opening Xfinity Assistant does not cause the My Account App to "determine a support center," Appx210(42:54-55) (claim 1), because Xfinity Assistant interacts with the same Comcast server rather than choosing a particular support center from among multiple options. *See supra* pp. 13-14. Moreover, NexStep did not establish that opening Xfinity Assistant would cause the "home gateway to buffer consumer device identification information," Appx210(42:52-55) (claim 1). Indeed, Dr. Selker never identified a specific "home gateway" that allegedly performs this buffering step and testified that the alleged buffering occurs without any user action at all. Appx434-435(342:22-343:8) (stating that the home gateway is "everything in service of the home"); Appx436-437(350:16-351:2) (purported buffering occurs "without the person involved" and My Account App is "already … out there doing it"); Appx16410-16412; Appx16696-16698. There is therefore no evidence that either of these two required steps occurs "responsive to" opening Xfinity Assistant.

#### 4. NexStep's cases are inapposite

None of the cases cited by NexStep involved similar circumstances. NexStep Br. 47-48. Instead, in each case the patentee provided particularized expert testimony and evidence. As explained above, NexStep has not.

For example, in *Verinata Health, Inc. v. Ariosa Diagnostics, Inc.*, the claim at issue recited "determining the presence or absence of a fetal aneuploidy comprising using a number of enumerated sequence reads." 809 F. App'x 965, 968 (Fed. Cir. 2020). This Court affirmed the district court's denial of JMOL, explaining that Verinata Health's expert provided particularized testimony that the accused products "serve substantially the same function of 'immobiliz[ing] onto a solid support'; in substantially the same way of 'hybridization of [the] DNA molecule'; to achieve the same result of 'detection of the target sequences that were in the original mixture.'" *Id.* at 973; *Verinata Health*, No. 18-2198, D.I. 69 at Appx1979-1985 (showing extent of expert's DOE testimony); *see also Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543, 1555-1556 (Fed. Cir. 1997) (defendant's own publication provided "reported values" for claimed metric that showed "insubstantial difference, if any, between standard values required by [the claim] limitation and [defendant's] compiled values"); *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1382 (Fed. Cir. 2001) (discussing extensive expert testimony).

#### 5. The district court did not focus only on testimony explicitly referencing the DOE

Contrary to NexStep's contention that the district court ignored its direct infringement testimony, the district court expressly stated that, in theory, "Dr. Selker's literal infringement testimony c[ould] support NexStep's DOE contentions." Appx14. However, the district court correctly found that even considering this testimony, Dr. Selker "fail[ed] to describe what steps in Comcast's app are equivalent to the 'single action' limitation." *Id.*

Moreover, this Court has held that "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." *Lear*, 873 F.2d at 1425; *see ViaTech Techs. Inc. v. Microsoft Corp.*, 733 F. App'x 542, 553 (Fed. Cir. 2018) (cannot "merely reassert[] its literal infringement arguments as doctrine of equivalents argument"). Even if its literal infringement testimony could fill the gaps in NexStep's case—which it does not—NexStep cannot rely solely on its literal infringement testimony to support infringement under the DOE.

* * *

This Court should affirm the district court's determination that no reasonable jury could find infringement of the '009 patent under the doctrine of equivalents.

## III. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT OF NONINFRINGEMENT ON THE '802 PATENT

### A. NexStep's Challenge To The Construction Of "VoIP" Should Be Rejected

The district court properly construed "VoIP" as "protocols and data formats for transmitting voice conversations over a packet-switched network, such as the Internet." Appx41. Contrary to NexStep's assertion, this construction does not require that the protocol be ***used only*** to handle two-way communication. NexStep Br. 55. But it does correctly require that a protocol be ***capable*** of handling two-way voice communications in order to be considered VoIP. *Id.*; Appx71. This construction is consistent with both the intrinsic and extrinsic evidence and should be affirmed.

*First*, it is uncontested that VoIP is a well-known Internet telephony protocol and that "the patentee did not deviate from the plain and ordinary meaning of the term." Appx41; *see also* Appx2930 ("VoIP [is] a well-known protocol …."). As this Court has previously recognized, VoIP stands for Voice Over Internet Protocol and refers to protocols that can be used for internet telephone services. *See, e.g.*, *8x8 Inc. v. United States*, 854 F.3d 1376, 1378 (Fed. Cir. 2017) ("8x8 is a provider of local and long-distance telephone services over a broadband internet connection via Voice over Internet Protocol ('VoIP')."). The district court's construction of VoIP

as requiring the ability to facilitate two-way voice conversation reflects the standard industry meaning of VoIP.

*Second*, this construction is consistent with the disclosures in the specification. Significantly, the patent describes devices called "tethered digital butlers" that can be used as both remote controls and telephones, but are reliant upon (tethered to) a separate "console" or "master" device to perform the more intensive processes required. Appx220(1:34-50; 2:10-32). The specification describes telephony as a critical aspect of the purported invention. *E.g.*, Appx220(1:43-45) ("[T]his disclosure relates to combining telephone service, device control and, optionally, a fingerprint reader …"); Appx221(3:1-29) (embodiment "connect[s] the user to a telephone network" and "personalize[s] their telephone network connection"); Appx2933.

Moreover, when describing the tethered digital butler, the specification consistently equates VoIP with telephony. *E.g.*, Appx221(3:60-63) ("Features adaptable to VoIP and/or video phone operation"); Appx228(18:66-19:2) ("Alternatively, modules can interface the motherboard to a cellular or similar telephone system or to a voice over IP (VoIP) system."); Appx229(20:20) ("Voice(Landline/cell/IP)"); Appx2883-2884. Accordingly, the specification does not disclose voice remotes like Comcast's, but instead discloses remote controls that can also be used as telephones.

*Third*, the district court's construction is consistent with the prosecution history. During the prosecution of the '802 patent's parent application, the examiner described the claims as "being based in a ***telephony*** art." Appx3630; *see also* Appx2933. NexStep acknowledged this characterization, and then amended its claims to add the VoIP limitations, stating that its amendments "closely paralleled language suggested by the Examiner." Appx3630; Appx2933; Appx4932. The examiner then allowed the claims because the prior art did not disclose VoIP. Appx3637; Appx2933-2934. NexStep's brief wholly ignores the prosecution history.

*Finally*, the district court's construction is consistent with the extrinsic evidence. The district court found that Comcast's cited dictionary definition confirmed that VoIP protocols "must be ***capable*** of facilitating 'phone calls' and may include additional new services such as voice emails." Appx123. This factual finding is reviewed for clear error. *SpeedTrack*, 998 F.3d at 1378. Critically, all the technical dictionaries and papers in the record are consistent with the district court's finding and construction. Appx2934. For example, the Newton Telecom Dictionary defined "Voice over Internet Protocol" as "[t]he technology used to transmit voice conversations over a data network using the Internet Protocol." Appx2998; *see also* Appx2997 ("A VoIP … phone call is transmitted over a data network."); Appx3003 ("[T]he transmission of voice telephone conversations through the Internet or

through IP networks."); Appx3006 ("A large number of factors are involved in making a high-quality VoIP call.").

Even the testimony of NexStep's expert supports this construction. Significantly, NexStep's invalidity expert on the '802 patent, Dr. Reinman, admitted that VoIP protocols are different from those used for other audio alone. Appx5484(90:14-23); Appx4035. Indeed, Dr. Reinman agreed that the district court's construction was "fair." Appx5484-5485(92:25-93:2).

NexStep's arguments to the contrary are unavailing. NexStep incorrectly argues that the language of claim 1 and 7 demonstrates that VoIP does not need to be capable of transmitting two-way voice conversations because "the audio data [in both claims] refers to voice commands." NexStep Br. 56-57. That is incorrect. NexStep's argument with respect to claim 1 appears to rest on the claim's recitation of "control signals sent by the remote control," which NexStep equates with voice commands. NexStep Br. 56. But the claim separately lists "transcod[ing] input from the slaved audio input to VoIP" and "respond[ing] to control signals." Appx230(21:11-15). Nothing about this disclosure broadens VoIP from its accepted industry meaning.

For claim 7, NexStep points out that the claim recites "transcod[ing] the audio data from the remote control and send[ing] it to the 'signal source'" as purported evidence of one-way audio transmission. NexStep Br. 56-57. But claim 7 expressly

describes two-way audio transmission from and to this signal source. Appx230-231(22:63-23:7) ("receives voice over IP (VOIP) audio signal packets from the signal source … and forwards the transcoded audio packets to the remote control device" and "receives audio packets from a slaved audio input on the remote control device … and forwards the transcoded audio packets to the signal source"). Accordingly, neither claim establishes that VoIP encompasses protocols that can only handle unidirectional voice commands and lack even the capability to handle two-way voice conversations.

NexStep also argues that under the doctrine of claim differentiation, "the express inclusion of an audio-output limitation in Claim 4 compels the conclusion that there is no audio output requirement in Claims 1 and 7." NexStep Br. 57. But this Court "ha[s] been cautious in assessing the force of claim differentiation in particular settings" including "where it is invoked based on independent claims rather than the relation of an independent and dependent claim." *Atlas IP, LLC v. Medtronic, Inc.*, 809 F.3d 599, 607 (Fed. Cir. 2015); *see also InterDigital Commc'ns, Inc. v. ITC*, 601 F. App'x 972, 979 (Fed. Cir. 2015) ("[C]laim differentiation arguments are strongest when distinguishing dependent claims from their independent claims."). Here, claims 1, 4, and 7 are independent claims that differ from one another in several material aspects. Accordingly, claim differentiation does not change the ordinary meaning of VoIP. *See, e.g.*, *Andersen*

*Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007) (declining to apply claim differentiation where claims contained "numerous other differences").

Moreover, claims 1 and 7 recite VoIP, while claim 4 does not. *Compare* Appx230(21:11-15)(claim 1), *and* Appx230(22:66)(claim 7), *with* Appx230(21:22-49)(claim 4). The recitation of specific hardware in claim 4—a claim that does not even reference VoIP—simply does not bear on the meaning of "VoIP" as recited in the other claims. In any event, there would be no inconsistency between an independent claim that requires use of a protocol with the capability to handle two-way voice conversations and another claim that actually requires two-way conversations.

NexStep also points to a single disclosure in the specification as purportedly showing that VoIP can be used for "a wide range of audio content and is not limited to two-way voice conversations." NexStep Br. 55 (citing Appx221(3:58-64)). But this statement does not support NexStep's construction. To the contrary, this passage expressly distinguishes VoIP from other audio content, stating that: "Features adaptable to VoIP … can be used ***for other purposes***, such as dictation, note taking, voice messaging, listening to music or remote viewing video." Appx221(3:58-63). Thus, the specification makes clear that ***components*** used in the two-way VoIP conversations (e.g., a microphone) can also be used for separate purposes (e.g., unidirectional audio like dictation or voice messaging).

Appx221(3:58-63). These statements stand for the unremarkable proposition that a microphone can be used for both voice conversations (requiring VoIP) and for other audio content.

These statements are also entirely consistent with the district court's construction of VoIP as ***capable*** of facilitating two-way conversation. Appx71 ("Plaintiff does not suggest that [the] accused products are ***capable*** of two-way voice conversations …."). Critically, a protocol ***capable*** of transmitting two-way conversation does not need to be used ***exclusively*** for two-way conversation. *See, e.g.*, Appx2937 (explaining that "any audio that would normally be captured by a VoIP may be transmitted"). Thus, a protocol that sometimes transmits dictation or voice messaging would still fall within the scope of the claims so long as it is also capable of transmitting two-way voice conversations.

*Adams Respiratory Therapeutics, Inc. v. Perrigo Co*., 616 F.3d 1283, 1290 (Fed. Cir. 2010), is inapposite. NexStep Br. 56. In *Adams*, the district court determined that the inventors acted as their own lexicographers and used the term "bioavailable" to encompass both release and availability in the stomach for absorption. *Id*. at 1289. On appeal this Court affirmed, noting that the defendant's proposed construction (requiring actual absorption in the stomach) would exclude the primary embodiment, a drug primarily absorbed in the small intestine. *Id*. at 1290. Here, by contrast, there is no embodiment excluded by the district court's

construction because, again, a protocol capable of transmitting two-way voice conversation would also be able to transmit other audio data. Further, there is no contention that the patentee acted as his own lexicographer or departed from the industry use of VoIP.

The district court's construction should be affirmed.[8]

### B. NexStep Cannot Show Infringement Under The District Court's Correct Construction Because The Accused Products Are Not Capable Of Transmitting And Receiving Two-Way Voice Conversations

NexStep has identified no issues of material fact that would preclude summary judgment under the district court's construction. As the district court found, there is no evidence that Comcast's set-top boxes are capable of transmitting and receiving two-way voice conversations. Appx73. Over the course of the entire case, NexStep never identified a single document saying that Comcast's set-top boxes use VoIP to transmit commands from the voice remotes. Appx4934. Comcast's witnesses confirmed that commands are not transmitted using VoIP. Appx5385-5386(¶¶177-178); Appx5388-5389(¶¶208-209). Instead, voice commands are sent from the customer's set-top box to Comcast's VREX servers using ADPCM over HTTP. Appx5376-5377(¶116); Appx5379-5380(¶131); Appx5454(41:19-25).

---

8 If the Court were to reverse the district court's construction—which it should not—a remand would be necessary to address Comcast's non-infringement arguments under NexStep's construction.

Critically, NexStep's own expert, Dr. Wolf, refused to testify that HTTP allows for voice conversations as required by the district court's construction. Appx5465(247:8-248:4). She additionally did not cite a single document stating that HTTP can be used for VoIP. Appx5401-5407(¶¶156-160); Appx5417-5418(¶¶41-43); Appx4936. Finally, Dr. Wolf admitted that she was not aware of any VoIP system that uses HTTP. Appx5466(250:4-14); Appx4936. Accordingly, there is simply no evidence in the record warranting reversal of the district court's grant of summary judgment.

NexStep next incorrectly argues that the parties' disagreement regarding the VoIP limitation relates to the application of the district court's construction to the accused products, which constitutes a fact dispute for the jury. NexStep Br. 60. But NexStep never suggested before the district court that the Voice Remotes are capable of two-way voice conversations as required by the court's claim construction. Appx71. Instead, NexStep continued to argue that VoIP could be satisfied by a protocol that can ***only*** "be used to carry spoken words in one direction." Appx8475. This is contrary to the district court's clear determination that VoIP is a protocol capable of handling voice ***conversations***—i.e., ***two-way*** speech. Appx71. Indeed, NexStep's Dr. Reinman acknowledged that a voice conversation is not unidirectional. Appx5484(89:12-16, 91:8-19). NexStep's other expert, Dr. Wolf, agreed that Comcast's accused products are only capable of "one-way

communication of sound recordings via HTTP." Appx5417(¶42). Accordingly, there is simply no fact dispute relating to the application of the district court's construction to the accused product.

For these reasons, the district court's grant of summary judgment of noninfringement should be affirmed.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN EXCLUDING NEXSTEP'S DAMAGES CASE FOR THE '009 PATENT

The Court should affirm the judgment of non-infringement on the '009 patent, mooting NexStep's challenges to the district court's damages decisions. In the alternative, it should address Comcast's cross-appeal on the '009 patent. However, to the extent the Court reaches the question, the Court should also affirm on damages.

### A. The District Court Acted Within Its Discretion In Excluding Mr. Reading's Royalty Rate Opinions Under Daubert and Rule 702

The district court properly excluded Mr. Reading's royalty rate opinions for failing "to support a 50/50 starting point with facts specific to the case at hand." Appx142.

#### 1. The district court properly performed its gatekeeping function in excluding Mr. Reading's royalty rate opinions

Mr. Reading opined that use of the '009 patent's claimed invention allowed Comcast to avoid the costs associated with both customer services calls to a call center and customer service truck rolls. Appx6072(¶369). Mr. Reading used his

estimate of the total cost savings as his royalty base. Appx6073(¶¶374, 376); Appx6082. He then attempted to calculate a royalty rate that the parties would have used to split the cost savings royalty base during a hypothetical negotiation. Appx6073(¶¶374-377). This required Mr. Reading to find a "reasonable starting point for a negotiation of the sharing of the cost savings." *Id.*(¶377). But Mr. Reading merely asserted that NexStep and Comcast would have agreed to a 50/50 split of the total cost savings as a starting point in the negotiations. The entirety of his explanation of a 50/50 starting point is described in two sentences in his opening report:

> Clearly, Comcast would not pay 100% of the cost savings realized from the use of this technology, as it would have no incentive to utilize the technology in that case. It is reasonable to conclude that a 50/50 split of the cost savings would be a reasonable starting point for a negotiation of the sharing of the cost savings.

*Id.* Mr. Reading offered no additional support for his 50/50 split of the cost savings in his reply report. Instead, he opined that "***[a]bsent any other evidence*** 50/50 is the logical starting point to determine [the cost savings] split." Appx9410(¶132).

The district court concluded that Mr. Reading's 50/50 starting point was not based on sufficient facts and therefore was inadmissible under *Daubert* and Rule 702. Appx142-143. In particular, the district court determined that Mr. Reading's analysis regarding the 50/50 starting point "could be true of a negotiation of cost-

savings technology (or anticipated profits) by any two parties, meaning that they are not particular to the facts of this case." Appx141.

The district court's exclusion of Mr. Reading's 50/50 starting point was well within its discretion to exclude expert testimony that is based on insufficient facts and data. *E.g.*, *Mercedes-Benz USA, Inc. v. Coast Auto. Grp.*, 362 F. App'x 332, 334 (3d Cir. 2010) (finding no abuse of discretion where trial court excluded expert testimony based on unsubstantiated statements that were inconsistent with facts specific to the case). The district court was not compelled to permit Mr. Reading and NexStep to introduce a negotiation starting point at trial that was "plucked … out of nowhere," *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1351 (Fed. Cir. 2018), as that would have "taint[ed] the jury's damages calculation," *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).

This Court's precedent clearly states that the starting point for a hypothetical negotiation is admissible only if it is tied to "the facts of the case at issue." *Uniloc*, 632 F.3d at 1315; *see also LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) ("This complete lack of economic analysis to quantitatively support the one-third apportionment echoes the kind of arbitrariness of the "'25% Rule'" that we recently and emphatically rejected from damages experts.").

Indeed, NexStep does not even acknowledge, let alone attempt to distinguish, *VirnetX, Inc. v. Cisco Systems, Inc.*, 767 F.3d 1308, 1330-1334 (Fed. Cir. 2014), which rejected a damages analysis that began with a 50/50 profits split. *VirnetX* explained that "the suggestion that those profits be split on a 50/50 basis—even when adjusted to account for certain individual circumstances—is insufficiently tied to the facts of the case, and cannot be supported." *VirnetX*, 767 F.3d at 1334.

Here, Mr. Reading concluded—without considering any facts specific to this case—that a 50/50 cost-savings split would have been a reasonable starting point. This is exactly the kind of arbitrary rule of thumb "unrelated to the facts," *Uniloc*, 632 F.3d at 1315, that this Court has consistently rejected and excluded. *Id.*; *VirnetX*, 767 F.3d at 1330-1334.

NexStep incorrectly argues that the district court "applied the wrong legal standard" in its exclusion decision. NexStep Br. 66. Specifically, NexStep contends that "[t]his Court's precedent requires only that an expert identify facts in the case at issue that support the starting point …" *Id.* at 64 (citing *Uniloc*, 632 F.3d at 1317-1318); *see also id.* at 67 ("Exclusion is only warranted when the starting point is arbitrary because it has 'no relation to the facts of [a] case'…."). However, it is NexStep—not the district court—that applies the wrong legal standard.

This Court has made clear on numerous occasions that "[t]o be admissible, expert testimony opining on a reasonable royalty rate must ***carefully tie*** proof of

damages to the claimed invention's footprint in the market place." *Uniloc*, 632 F.3d at 1315 (quotations omitted); *see also Exmark*, 879 F.3d at 1349; *VirnetX*, 767 F.3d at 1330-1334. NexStep's recitation of the standard ignores that an expert's opinion on a starting point for a reasonable royalty must be "carefully tie[d]" to the facts of the case and not merely be related in some way. *E.g.*, *Apple v. Wi-LAN Inc.*, 25 F.4th 960, 972-974 (Fed. Cir. 2022) (excluding opinion based on patentee's licenses, even though the expert purported to account for differences, because the expert's analysis was "untethered to the facts of this case"); *Exmark*, 879 F.3d at 1351 ("It is not enough for an expert to simply assert that a particular royalty rate is reasonable in light of the evidence without tying the proposed rate to that evidence.").

NexStep also argues that the district court "ignored the case specific facts that supported Mr. Reading's opinion." NexStep Br. 66. But rather than ignore NexStep's arguments, the district court fully considered and rejected them. Even though the arguments did not appear as such in NexStep's expert reports, the district court specifically considered NexStep's defense of the 50/50 split on the ground that cost savings "would be pure profit to Comcast" and that Comcast "would need an incentive to use the technology." Appx140-141. The district court did not abuse its discretion, however, in ruling that these generic rationales "are not particular to the facts of this case." Appx141.

The cases NexStep cites are easily distinguishable. *Uniloc* does not endorse the use of generic facts to support a reasonable royalty starting point, as NexStep suggests. Instead, the passage from *Uniloc* that NexStep cites—when viewed in context of the entire quote—is meant to highlight the absurd results that flow from applying an arbitrary 25% starting point as a rule of thumb:

> Lacking even these minimal connections, the 25 percent rule of thumb would predict that the same 25%/75% royalty split would begin royalty discussions between, for example, (a) TinyCo and IBM over a strong patent portfolio of twelve patents covering various aspects of a pioneering hard drive, and (b) Kodak and Fuji over a single patent to a tiny improvement in a specialty film emulsion.

*Uniloc*, 632 F.3d at 1317. NexStep's arbitrary 50/50 split suffers from the same infirmity.

Nor is NexStep's theory comparable to district court cases in which the expert relied on facts like "the infringer's usual net profit," *Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*, No. 17-cv-1734, 2021 WL 982732, at *11 (D. Del. Mar. 16, 2021), or "the relationship between the parties and their relative bargaining power, the relationship between the patent and the accused product, [and] the standard profit margins in the industry," *Sanofi-Aventis Deutschland Gmbh v. Glenmark Pharms. Inc., USA*, No. 7-cv-5855, 2011 WL 383861, at *12-13 (D.N.J. Feb. 3, 2011).[9]

---

[9] *GREE, Inc.* did not even involve a 50/50 profit split, and instead relied on the "midpoint" in a range of royalties obtained from survey data. *GREE, Inc. v. Supercell Oy*, No. 2:19-cv-237, 2021 WL 514757, at *4-5 (E.D. Tex. Feb. 11, 2021).

If NexStep's generic arguments were accepted, it would open the door to a 50/50 starting point whenever the patent owner alleged any cost savings or other increase in profits. The district court did not abuse its discretion by insisting, under this Court's long-standing precedent, that damages theories must be "sufficiently [tied] to the facts of the case." *Uniloc*, 632 F.3d at 1315.

#### 2. NexStep forfeited its right to seek leave to amend Mr. Reading's report

For the first time on appeal, NexStep seeks an order remanding the case "for a trial on damages in the first instance, allowing Mr. Reading to amend his damages report to address the Daubert order." NexStep Br. 72. This request to amend Mr. Reading's damages report is forfeited. NexStep never filed a motion for leave to amend the expert report in the district court. The district court cannot be faulted for failing to do something that NexStep never asked it to do.[10]

### B. The District Court Acted Within Its Discretion By Excluding NexStep's Untimely Damages Theory

After excluding Dr. Reading's opinion, the district court prohibited NexStep from offering a new damages theory that it had never properly disclosed. In doing so, the court acted well within its discretion.

[10] Although NexStep floated the possibility of bifurcation during a hearing regarding NexStep's new damages theory, it never formally moved for bifurcation. Appx16281(29:22-32:17).

Rule 26(a) requires a party to provide "a computation of each category of damages claimed by the disclosing party." Fed. R. Civ. P. 26(a)(1)(A)(iii). Further, Rule 37(c) gives the district court discretion to impose a discovery sanction to prevent the offending party from using "that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Here, NexStep simply nodded to its expert report in its Rule 26(a) disclosures and relevant discovery responses and failed, until the last business day before trial, to disclose its alternative theory, despite being aware of the deficiencies in Mr. Reading's analysis since receiving Comcast's *Daubert* motion on May 14, 2021. Appx4947-4949. The district court fully considered NexStep's alternative damages theory and its alleged pre-trial disclosure and authored a 7-page opinion that applied Rule 26(a), Rule 37(c), and the Third Circuit's untimely disclosure law, and explained its basis for prohibiting NexStep from presenting damages at trial. Appx145-151; Appx152.

The district court's decision was a straightforward and proper application of Rule 37(c). *See MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1371 (Fed. Cir. 2021) ("[B]ecause Rule 26(a)(1)(A)(iii) requires timely disclosure of damages information, the district court properly excluded the damages information under Rule 37."); *ePlus, Inc.*, 700 F.3d at 523 (affirming exclusion of

previously undisclosed damages theories); *MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1356-1357 (Fed. Cir. 2005) (affirming exclusion of "non-expert damages theories for failure to supplement discovery interrogatories"). This is confirmed by the fact that NexStep has identified no legal or factual errors in the district court's analysis.

NexStep instead advances a single argument—namely, that 35 U.S.C. § 284 allegedly requires that "reasonable-royalty damages must be awarded where infringement is found." NexStep Br. 71. This Court, however, has already rejected NexStep's reading of § 284. In *TecSec, Inc. v. Adobe Inc.*, the Court explained that "[t]he statute does not require an award of damages if none are proven that adequately tie a dollar amount to the infringing acts." 978 F.3d 1278, 1291 (Fed. Cir. 2020). Similarly, in *Apple Inc. v. Motorola, Inc.*, this Court held that summary judgment of no reasonable royalty damages is appropriate "in a case completely lacking any evidence on which to base a damages award." 757 F.3d 1286, 1328 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015); *see also Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co*., 895 F.2d 1403, 1407 (Fed. Cir. 1990).

The district court did not abuse its discretion in excluding NexStep's damages case for the '009 patent.

## CROSS-APPEAL

## V. THE ’009 PATENT IS DIRECTED TO INELIGIBLE SUBJECT MATTER

As with damages, affirming the judgment of non-infringement on the ’009 patent would obviate the need to address Comcast’s defense under 35 U.S.C. § 101. Out of an abundance of caution, however, Comcast conditionally cross-appeals the judgment that the asserted claims of the ’009 patent are directed to patent-eligible subject matter. The asserted claims of the ’009 patent are directed to the abstract idea of “initiating a support session for a consumer device using a concierge device,” and recite using conventional computer technology to “initiate [a] support session” with a “support center.” Appx210(42:45-63). The asserted claims of the ’009 patent are thus invalid under § 101 and, at a minimum, the analysis should not be stopped at *Alice* Step 1.

### A. *Alice* Step 1: The ’009 Patent Is Directed To An Abstract Idea, Namely Exchanging Information To Obtain Customer Support

Step 1 of the *Alice* test analyzes whether a claim is “directed to a patent ineligible concept,” such as an abstract idea. *Alice Corp. Party Ltd. v. CLS Bank Int’l*, 573 U.S. 208, 218 (2014). Here, the asserted claims of the ’009 patent are directed to the abstract idea of exchanging information to obtain customer support. The patent describes procedures for “enhanc[ing] the service experience of consumers, particularly users of leading consumer electrical and electronic devices.”

Appx190(2:38-41). To accomplish this, the ’009 patent automates well-known customer service processes that are typically performed by the consumer.

The patent describes routine tasks familiar to anyone who has contacted customer service, such as looking up a customer-service number, Appx192(5:20-23), navigating an automated attendant or interactive voice-recognition system, Appx201(24:7-16), conveying customer account information, Appx192(5:25-32), and providing consumer-device information to a support agent, Appx201(24:52-56). The patent merely takes such old practices and automates them in a computer environment by “associating the concierge device with a selected consumer device” and then performing the Four Troubleshooting Steps—i.e., “buffer[ing] “consumer device identification information,” “determin[ing] a support center for a support session,” “initiat[ing] the support session,” and “forward[ing] … the consumer device identification information”—“responsive to a single action performed by a user.” Appx210(42:45-60). This automation of routine tasks that might otherwise have required the user to gather and convey basic information allows the user “to bypass an automated attendant or interactive voice recognition system or to initiate an automated support protocol.” Appx210(42:61-63).[11] But this purported benefit

[11] Claim 1 of the ’009 patent is representative of the other claims on appeal.

merely reinforces the fact that the claims are directed to the abstract idea of exchanging information to obtain customer support.

This Court has held that "[i]mplement[ing] an old practice in a new [computer] environment" amounts to an abstract idea. *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1093-1094 (Fed. Cir. 2016); *see also, e.g.*, *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016) (explaining that claims "simply adding conventional computer components to well-known business practices" and "generalized steps to be performed on a computer using conventional computer activity" are directed to an abstract idea) (quotations omitted).

The summary judgment decision in this case pointed to the '009 patent's disclosure of a "concierge device that links to consumer devices and forwards a malfunctioning devices identification information and diagnostic data to customer service," as an "improvement in computer capabilities" that rendered the claims patent eligible. Appx173 (quotations omitted). But several decisions have reached the opposite conclusion regarding similar claims for obtaining customer support. *E.g.*, *Uniloc USA, Inc. v. Big Fish Games, Inc.*, 320 F. Supp. 3d 1178, 1185 (W.D. Wash. 2018), *aff'd*, 777 F. App'x 517 (Fed. Cir. 2019) ("providing customized service to customers from a central site" patent ineligible); *NICE Sys. Ltd. v. Clickfox, Inc.,* 207 F. Supp. 3d 393, 398 & n.1, 405 (D. Del. 2016), *aff'd*, 698 F.

App'x 615 (Fed. Cir. 2017) ("customer service," including "providing technical support" and "scheduling appointments" patent-ineligible).

Moreover, it is significant that the '009 patent's concierge device has been construed in purely functional terms. Appx38 ("A device including functionality …"). Indeed, NexStep's expert, Dr. Selker, argued that there are ***no*** "physical constraints for what can be a concierge device." Appx5260(133:23-134:18). Given its "result-focused, functional" nature, the claimed concierge device is not a specific technological improvement to facilitate customer service. *Electric Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1356 (Fed. Cir. 2016) (functional language is "a frequent feature of claims held ineligible under § 101"). Accordingly, at a minimum, the § 101 analysis for the '009 patent should not have ended at Step 1 of *Alice*.

### B. *Alice* Step 2: The Remaining Limitations Of The '009 Patent's Claims Add Nothing Inventive To The Abstract Idea Of Obtaining Customer Service

*Alice* Step 2 asks whether "the elements of each claim both individually and as 'an ordered combination'" provide a sufficient "inventive concept." *Alice*, 573 U.S. at 217-218. Although the district court did not address Step 2, this Court can and should reach that legal issue and hold that the asserted claims do not add an "inventive concept" and are accordingly unpatentable. *Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1340-1341 (Fed. Cir. 2013)

("Patent eligibility under 35 U.S.C. § 101 presents an issue of law we review de novo.").

*First*, the '009 patent discloses several well-known components that are used in a conventional fashion. For example, all of the '009 patent's claims require a "concierge device," which was construed to require nothing more than conventional hardware and/or software and was construed functionally. Appx38-40. The claims also require a "consumer device," which the patent does not purport to have invented and defines as "a consumer appliance or electronics device" that includes "lighting, entertainment appliances, heating, ventilation, air conditioning, laundry, and kitchen appliances." Appx190-191(2:6-7, 3:62-64). The claims also require a "home gateway" that can be part of the concierge device or separate and that can be located inside or outside the home. Appx201(24:30-36). NexStep's expert, Dr. Selker, opined that a home gateway could consist of any hardware, software, or combination thereof. Appx5265(166:14-25).[12]

All of these components were conventional. *See, e.g.*, Appx17652 (8:32-37) (customer "may press a button on their remote control to send a request for support to the call center. The request is received by the CPE [customer premise equipment]

---

12 Independent claim 16 is an apparatus claim that recites the same patent-ineligible method steps as claim 1, with only the addition of generic computer components, such as a wireless data communication adapter, input sensors, outputs, memory, and a processor. Appx211(claim 16).

35 interface … the CPE may automatically send data associated with the customer …"); Appx17673(¶23); Appx17589(¶46); Appx17595(¶ 91). Using well-known components in a conventional fashion does not constitute an inventive concept. *See, e.g.*, *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012) ("Simply adding a computer aided limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible." (quotation marks omitted)).

*Second*, the '009 patent's claims include various functional steps that are implemented by the conventional components described above. For example, the '009 patent requires "associating the concierge device with a selected consumer device," "buffer[ing]" and "forward[ing]" consumer device information, Appx210(42:45-63), and "determin[ing] a support center." Appx210(42:45-60). These functional steps were well known in the art and are implemented in a conventional fashion. *See* Appx17589(¶46); Appx17595(¶ 91); Appx17652(8:31-39); Appx17653(10:53-62); Appx17659(21:29-34); Appx17673(¶23). "[R]outine computer functions, such as the sending and receiving [of] information … are no more than the performance of well-understood, routine, [and] conventional activities previously known to the industry." *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1329 (Fed. Cir. 2017) (quotation marks omitted).

*Third*, dependent claim 22 of the '009 patent does not provide a sufficient inventive concept—instead, it describes computer functionality and does so without

claiming any improvement to that technology. For example, claim 22 requires that "[t]he concierge device … send[] messages" via a network to the home gateway. Appx211(44:25-28). But relaying communications is not a technical improvement sufficient to save a claim to an abstract idea. *See Intellectual Ventures I*, 850 F.3d at 1329.

There are no technological improvements that would save the asserted claims from being fatally abstract. There is also nothing inventive about the ordered combination of these elements. The computer components of the claims are ordered in a wholly conventional way: computers connected over a network, storing information, sending that information, and initiating communications to establish and conduct a customer-support session.

* * *

For the reasons described above, the '009 patent is directed to patent ineligible subject matter under 35 U.S.C. § 101.

## CONCLUSION

The judgment of non-infringement on the '009 patent and '802 patent should be affirmed. This would be sufficient to resolve the appeal, but to the extent the Court reaches additional questions, it should hold on the cross-appeal that the asserted claims of the '009 patent are directed to patent-ineligible subject matter. If that does not moot the question of damages, the Court should affirm the district

court's damages decisions and remand to address Comcast's remaining JMOL arguments on the '009 patent. Similarly, if the Court were to reverse the district court's construction on the '802 patent—which it should not—a remand would be necessary to address Comcast's non-infringement arguments under NexStep's construction.

Respectfully submitted,

/s/ Thomas G. Saunders

THOMAS G. SAUNDERS
AMY K. WIGMORE
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

MARY V. SOOTER
WILMER CUTLER PICKERING
HALE AND DORR LLP
1225 17th Street, Suite 2600
Denver, CO 80202
(720) 274-3135

WILLIAM F. LEE
SARAH B. PETTY
GEORGE F. MANLEY
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

LAUREN MATLOCK-COLANGELO
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center,
250 Greenwich Street,
New York, NY 10007
(212) 230-8800

*Attorneys for Defendant-Cross-Appellant Comcast Cable Communications, LLC*

November 9, 2022

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because:

1. The filing has been prepared using a proportionally-spaced typeface and includes 16,499 words.

2. The brief has been prepared using Microsoft Word for Office 365 in 14-point Times New Roman font. As permitted by Fed. R. App. P. 32(g), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

/s/ Thomas G. Saunders
THOMAS G. SAUNDERS
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 663-6000

November 9, 2022