# United States Court of Appeals for the Federal Circuit

---

**NEXSTEP, INC.,**
*Plaintiff-Appellant*

**v.**

**COMCAST CABLE COMMUNICATIONS, LLC,**
*Defendant-Cross-Appellant*

---

2022-1815, 2022-2005, 2022-2113

---

Appeals from the United States District Court for the District of Delaware in No. 1:19-cv-01031-RGA, Judge Richard G. Andrews.

---

Decided: October 24, 2024

---

PAUL J. ANDRE, Kramer Levin Naftalis & Frankel LLP, Redwood Shores, CA, argued for plaintiff-appellant. Also represented by CHRISTINA M. FINN, JAMES R. HANNAH, LISA KOBIALKA; AARON M. FRANKEL, CRISTINA MARTINEZ, CARLOS J. TIRADO, New York, NY.

THOMAS SAUNDERS, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, DC, argued for defendant-cross-appellant. Also represented by AMY K. WIGMORE; WILLIAM F. LEE, GEORGE FANTON MANLEY, SARAH B. PETTY, Boston, MA; LAUREN MATLOCK-COLANGELO, New York, NY; MARY VIRGINIA SOOTER, Denver, CO.

Before REYNA, TARANTO, and CHEN, *Circuit Judges*.

Opinion for the court filed by *Circuit Judge* CHEN.

Opinion concurring-in-part and dissenting-in-part filed by *Circuit Judge* REYNA.

CHEN, *Circuit Judge*.

NexStep, Inc., (NexStep) appeals from a final judgment that Comcast Cable Communications, LLC, (Comcast) did not infringe U.S. Patent Nos. 8,885,802 ('802 patent) and 8,280,009 ('009 patent). After construing the term "VoIP" in the '802 patent, the district court granted summary judgment of non-infringement. The '009 patent proceeded to a jury trial, and the jury found no literal infringement but infringement under the doctrine of equivalents. Following a post-trial motion by Comcast, the district court found NexStep's proof inadequate and granted judgment as a matter of law of non-infringement of the '009 patent. On appeal, NexStep argues that the district court erred in its construction of VoIP in the '802 patent and further erred in granting Comcast's motion for judgment as a matter of law for the '009 patent. We reject those challenges and *affirm* as to both issues. In light of that disposition, we do not reach NexStep's contentions related to damages or Comcast's conditional cross-appeal related to validity.

I.

NexStep filed suit in the United States District Court for the District of Delaware asserting infringement of nine patents, including the '802 and '009 patents. Following *Markman* proceedings, the district court granted summary judgment of non-infringement of the '802 patent, adopting Comcast's view that VoIP was a term of art with a meaning that excluded NexStep's sole infringement theory. At the same time, the district court denied Comcast's summary judgment motion relating to the '009 patent; that motion

argued that the ’009 patent was ineligible under 35 U.S.C. § 101.

After a jury trial for the ’009 patent, the jury found that the asserted patent claims were infringed under the doctrine of equivalents. In response to the verdict form’s question addressing literal infringement, the jury found that the ’009 patent was not literally infringed.

Following post-trial motions under Federal Rule of Civil Procedure 50(b), the district court set aside the jury verdict and granted judgment of non-infringement as a matter of law, finding the evidentiary record inadequate to support infringement under the doctrine of equivalents. *NexStep, Inc. v. Comcast Cable Commc’ns*, *LLC*, No. 19-cv-1031, 2022 WL 1503922, at *7 (D. Del. May 12, 2022) (*JMOL Decision*). The district court primarily reasoned that the testimony of NexStep’s expert, Dr. Ted Selker, was too conclusory to sustain the verdict. Describing portions of Dr. Selker’s testimony as “word salad,” the district court concluded that Dr. Selker’s testimony lacked the specificity and analysis required by our precedent. *Id.* Among other things, the district court concluded that Dr. Selker failed to identify specific components in the accused products and failed to offer a reasoned basis for concluding that those specific components were equivalent to the relevant claim limitations. *Id.* at *5–7. Thus, the court entered final judgment of non-infringement with respect to the ’802 and ’009 patents. The final judgment further reflected the district court’s summary judgment ruling rejecting Comcast’s affirmative defense that the ’009 patent is ineligible under 35 U.S.C. § 101.

NexStep appeals, and Comcast conditionally cross-appeals. We have jurisdiction over NexStep’s appeal under 28 U.S.C. § 1295(a)(1), and we do not reach Comcast’s cross-appeal.

## II.

### A.

The ’802 patent is directed to a “digital butler” that controls consumer electronics based on audio data. ’802 patent Abstract; *id.* col. 16 ll. 20–30. Broadly speaking, the digital butler relies on two components: a handheld device capable of receiving audio input and a separate “master device” (or console)[1] for processing that input. The audio-controlled handheld device “needs only limited computing capabilities” because it is “tethered” to the more robust master device supporting it. *Id.* claim 7, col. 1 ll. 34–43, col. 2 ll. 56–63. The ’802 patent describes its handheld device as a “remote control,” which “may resemble a handheld personal computer (HPC), a palm-held personal computer (PPC or PDA) or a smart phone.” *Id.* Title, col. 1 ll. 39–41.

Several of the claims—including claims 1 and 7, the only claims at issue in this appeal—further specify how the audio data must be processed in the claimed system. Claim 1 is representative:

> 1. A remote control device with slaved audio input, the device including:
>
> a wireless link transceiver;
>
> at least one slaved audio input built into the remote control;
>
> a navigation control built into the remote control;

---

[1] The specification uses the phrase “console” and “master device” interchangeably, as do the parties in their briefing before us.

> hardware resources coupled between the wireless link transceiver, the slaved audio input and the navigation control;
>
> a stack running on the hardware resources and exchanging packets with a master device; and
>
> an encoder logic running on the hardware resources, logically coupled to the stack, adapted to encode signals from the slaved audio input into a remote control audio format, and adapted to send audio packets in the remote control audio format to the master device;
>
> wherein the remote control depends on the master device *to transcode input from the slaved audio input to VoIP from the remote control device format* and relies on the master device to respond to control signals sent by the remote control device in the packets.

*Id.* claim 1 (emphasis added). Claim 1 requires that the remote control can "encode" the audio data from a user's voice into "a remote control audio format," and that the remote can "send audio packets in the remote control audio format to the master device." *Id.* Then, the master device performs a further conversion on the audio packets: "the remote control depends on the master device to transcode" the audio input "from the remote control device format" to "VoIP." *Id.* Finally, the master device "respond[s] to control signals sent by the remote control device in" the audio packets. *Id.* In short, the remote control can receive audio data and transmit it to the master device, and—after transcoding the audio data to VoIP—the master device can decide how to respond to that audio data and acts accordingly. *Id.*

B.

The term "VoIP" forms the basis of NexStep's appeal for the '802 patent. The district court[2] construed VoIP in light of the parties' agreement that VoIP is a well-established term of art within the relevant industry. Specifically, the parties "agreed that [VoIP] is an industry standard term, and the patentee did not deviate from the plain and ordinary meaning of the term as understood by a person of ordinary skill in the art." *NexStep, Inc. v. Comcast Cable Commc'ns*, *LLC*, No. 19-cv-1031, 2020 WL 6375575, at *10 (D. Del. Oct. 30, 2020) (*Markman Op.*); *see also, e.g.*, J.A. 2930 (NexStep arguing that "VoIP stands for Voice Over Internet Protocol," which is "a well-known protocol to" a skilled artisan.). Given this agreement, the district court turned to extrinsic "[e]vidence of the industry standard definition for VoIP." *Markman Op.*, 2020 WL 6375575, at *10.

Based on the extrinsic evidence, the district court construed "VoIP" as "protocols and data formats for transmitting *voice conversations* over a packet-switched network, such as the Internet." *Id.* (emphasis added). The district court rejected NexStep's broader construction, which covered any "audio data," and instead relied on several technical dictionaries that defined VoIP as

---

[2] The district court referred claim construction proceedings to a magistrate judge, who issued a report and recommendation addressing the meaning of VoIP. *NexStep, Inc. v. Comcast Cable Commc'ns*, *LLC*, No. 19-cv-1031, 2020 WL 6375575, at *10–11 (D. Del. Oct. 30, 2020). The district court adopted the report and recommendation in full with respect to the term VoIP. *See NexStep, Inc. v. Comcast Cable Commc'ns*, *LLC*, No. 19-cv-1031, 2021 WL 3489983, at *1 (D. Del. Aug. 9, 2021). We refer to the opinions by the magistrate judge and district court judge collectively as the district court's opinion.

specifically transmitting "voice conversations" in a manner analogous to conventional telephone calls. *Id.* at *10–11.

Comcast moved for summary judgment of non-infringement because its accused Voice Remote products did not infringe the VoIP limitation under the district court's construction. In considering the motion, the district court noted that the factual operation of Comcast's accused Voice Remotes was not disputed. *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. 19-cv-1031, 2022 WL 911252, at *2 (D. Del. Mar. 29, 2022) (*Summary Judgment Op.*). The parties agreed that each Voice Remote captures voice commands from a user (for example, "turn the television to channel 5") and that the set-top box sends the captured audio to Comcast's servers, using a type of protocol called HTTP.

Importantly, in its summary judgment briefing to the district court, NexStep did "not suggest that [Comcast's] accused products are capable of two-way voice conversations." *NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. 19-cv-1031, 2021 WL 4077778, at *9 (D. Del. Aug. 20, 2021) (*Summary Judgment R. & R.*). NexStep identified no evidence that the accused products used a protocol configured to send *two-way* audio communications. Instead, NexStep argued that the VoIP limitation could be met by a protocol capable of only one-way audio transmission, contrary to Comcast's assertion that VoIP, as construed by the district court, required capability for two-way voice conversations. *See, e.g.*, J.A. 8475–76 (NexStep's summary judgment briefing).

The district court agreed with Comcast's view. *See Summary Judgment Op.*, 2022 WL 911252, at *2. The court again rejected NexStep's attempt to broaden the meaning of VoIP to cover a protocol for any transmission of audio data, instead agreeing that "voice conversations" required capability for two-way communication. *Id.* Because NexStep's opposition to summary judgment

hinged on its claim construction arguments, the district court found no genuine dispute of material fact. Accordingly, it granted summary judgment of non-infringement of the asserted claims of the ’802 patent.

C.

“We review a district court’s grant of summary judgment according to the law of the regional circuit.” *Amgen Inc. v. Sandoz Inc.*, 923 F.3d 1023, 1027 (Fed. Cir. 2019). Here, we apply the law of the Third Circuit, which reviews “a district court’s grant of summary judgment *de novo*, applying the same standard the district court applied.” *Viera v. Life Ins. Co. of N. Am.*, 642 F.3d 407, 413 (3d Cir. 2011). We apply Federal Circuit law to substantive questions of patent law, including claim construction. *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1228 (Fed. Cir. 2011).

“Claim construction requires determining how a skilled artisan would understand a claim term ‘in the context of the entire patent, including the specification.’” *Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc)). “We review claim construction based on intrinsic evidence de novo and review any findings of fact regarding extrinsic evidence for clear error.” *Id.*; *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332–33 (2015); Fed. R. Civ. P. 52(a)(6). Under the clear-error standard, we defer to the district court’s findings “in the absence of a definite and firm conviction that a mistake has been made.” *Par Pharm., Inc. v. Eagle Pharms., Inc.*, 44 F.4th 1379, 1383 (Fed. Cir. 2022) (citation omitted).

In general, the specification is the “single best guide to the meaning of a disputed term” and “is, thus, the primary basis for construing the claims.” *Grace Instrument*, 57 F.4th at 1008 (citations omitted). But extrinsic evidence takes on particular importance when construing a term

that skilled artisans recognized as a term of art at the relevant time. *Phillips* permits courts to consider extrinsic evidence to determine whether a claim term was, in fact, recognized as a term of art. 415 F.3d at 1318 (indicating that courts may rely on extrinsic evidence "to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field"). If the court finds that the relevant skilled artisans understood the phrase as a term of art, then the court may make factual findings as to what meaning a skilled artisan would ascribe to that term. *Teva*, 574 U.S. at 331 (explaining that sometimes "the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand . . . the meaning of a term in the relevant art during the relevant time period"). The court must focus its analysis on the term's meaning "as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313, 1318; *Teva*, 574 U.S. at 331.

D.

NexStep fails to show that the district court clearly erred by construing VoIP to require capability for two-way voice communications.

The district court's construction is supported by its reliance on two technical dictionaries, which defined VoIP to require voice conversations. The first dictionary—Newton's Telecom Dictionary—defined VoIP as "[t]he technology used to transmit voice conversations over a data network." *Markman Op.*, 2020 WL 6375575, at *10 (quoting J.A. 2998). Similarly, the Dictionary of Computer and Internet Terms defined VoIP as "the transmission of voice telephone conversations through the Internet or through IP networks." *Id.* (quoting J.A. 3003).

These definitions are consistent with the district court's construction and support a two-way voice communication requirement. Both dictionaries liken VoIP to other forms of telephony, such as cellular calls and

landline calls, which are two-way voice communication systems. The association between VoIP and other forms of telephony reasonably supports the inference that VoIP is also a two-way voice communication system. Given this evidence, the district court had a sufficient basis for its construction.

NexStep's principal rebuttal is that Newton's dictionary supports NexStep's view by indicating that VoIP includes "voice emails." NexStep reasons that if VoIP includes voice emails, a one-way communication, then the district court clearly erred in limiting VoIP to two-way communications.

The district court considered and rejected this argument because Newton's dictionary "confirms that VoIP protocols must be capable of facilitating 'phone calls' and *may include additional* new services such as voice emails." *Summary Judgment Op.*, 2022 WL 911252, at *2 (emphasis added) (citation omitted). In other words, the district court read Newton's dictionary as discussing "voice emails" as a supplemental service, and the district court did not clearly err in its reading of the dictionary definition.

Similarly, the district court did not clearly err in rejecting the testimony of NexStep's expert, Dr. Selker. The sole source cited by Dr. Selker undermined his claim that VoIP is broad enough to cover all audio data transmission by explaining that "VoIP is a category of technologies that *route real-time voice conversations over the internet*." *Markman Op.*, 2020 WL 6375575, at *10–11. That Dr. Selker's underlying evidence contradicted his opinion testimony provided ample basis for the district court to reject the testimony. Accordingly, the district court did not clearly err in this respect either.

E.

For the first time on appeal, NexStep asserts the '802 patent adopted an unconventional definition of VoIP that

departs from its established meaning. Appellant's Br. 56 (arguing that the "scope VoIP was given in NexStep's patents" is broad enough to cover one-way audio transmission).

NexStep never made that argument below, and instead affirmatively asserted the opposite view by contending that the established meaning of VoIP controlled the interpretation of the term. *See supra* Section II.B. The district court expressly relied on NexStep's representations in construing VoIP in accord with its industry standard meaning at the relevant time. *Markman Op.*, 2020 WL 6375575, at *10. Based on these representations, NexStep forfeited any argument that the '802 patent redefined VoIP to differ from its industry standard meaning.

Nevertheless, we note that NexStep's contentions about the intrinsic evidence are plainly incorrect. The written description repeatedly associates VoIP with telephony services that require capability for two-way voice communications. For example, the written description describes a list of hardware and software features that are "within the scope of this disclosure for providing services described" and lists as the first entry of such services, "Communication, including Phone (LL/Cell/IP)." '802 patent col. 20 ll. 11–13, 39–41.[3] This reference to "[p]hone" services, followed by three subtypes of phone service (landline, cellular, and VoIP), suggests that the written

---

[3] The specification makes clear that when "IP" is referred to in conjunction with "landline" and "cellular" services, it means VoIP. *See, e.g.*, '802 patent col. 18 l. 65 – col. 19 l. 2 (explaining that the master console may connect to a landline-based "telephone system," "to a cellular or similar telephone system[,] or to a voice over IP (VoIP) system"); *id.* col. 20 ll. 11–13, 20 (listing "Voice (Landline/cell/IP)" as a "feature[] . . . within the scope of this disclosure").

description understood VoIP as a type of phone service akin to those that support two-way voice conversations. And when describing how the claimed master device can communicate externally, the ’802 patent explains that it may connect to (1) a conventional landline telephone system, (2) “a cellular or similar telephone system,” or (3) “a voice over IP (VoIP) system.” *Id.* col. 18 l. 65 – col. 19 l. 2. These portions of the written description are consistent with the district court’s findings about the established meaning of VoIP. NexStep has identified nothing in the written description to the contrary.

Indeed, the sole portion of the written description cited by NexStep is inapposite. NexStep argues that the written description equates VoIP with one-way communication tools, such as “dictation” or “note taking.” Appellant’s Br. 56. But the written description simply does not equate VoIP with those tools. The relevant portion provides:

> In a fifth embodiment, the remote is emphasized. One aspect of the remote is to provide a complete I/O platform in the palm of the user’s hand. Features *adaptable to VoIP* and/or video phone operation, *such as a microphone*, *can be used for other purposes*, such as dictation, note taking, voice messaging, listening to music or remote viewing video.

’802 patent col. 3 ll. 58–63 (emphases added). As the district court correctly observed, this passage merely notes that hardware components used in VoIP conversations—“such as a microphone”—can also be used for “other purposes” (such as dictation). *Id.*; *Markman Op.*, 2020 WL 6375575, at *11. Nothing in this paragraph redefines VoIP to encompass protocols not capable of supporting two-way communication.

NexStep also presses an argument based on the doctrine of claim differentiation. Specifically, NexStep asserts that the inclusion of an audio-output limitation in

unasserted, independent claim 4 of the ’802 patent implies that VoIP, as used in claims 1 and 7, must not require capability for two-way communication. *See* Appellant’s Br. 57. However, “we have been cautious in assessing the force of claim differentiation in particular settings, . . . discounting it where it is invoked based on independent claims.” *Atlas IP, LLC v. Medtronic, Inc.*, 809 F.3d 599, 607 (Fed. Cir. 2015). We are unconvinced that construing VoIP to require capability for two-way communication renders superfluous claim 4’s requirement for an audio output, particularly because claim 4 does not even recite a VoIP limitation. *See also Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007) (declining to apply claim differentiation where “there are numerous other differences varying the scope of the claimed subject matter”).[4]

F.

Finally, NexStep argues that even if we agree with the district court’s construction of VoIP, we should remand for a trial on infringement because NexStep showed genuine disputes of material fact even under the court’s clarified construction.

NexStep forfeited this argument by failing to present it to the district court. “We have regularly stated and applied the important principle that a position not presented in the

---

[4] NexStep’s reply brief raises additional claim differentiation arguments, including as to other independent claims of the ’802 patent and claims of other patents. Arguments not raised in an opening brief are forfeited. *Stinson v. McDonough*, 92 F.4th 1355, 1362 n.5 (Fed. Cir. 2024). In any event, for the same reasons, we remain unpersuaded that affording VoIP its industry standard meaning would render superfluous the audio output limitations of these claims.

tribunal under review will not be considered on appeal in the absence of exceptional circumstances." *In re Google Tech. Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020). Before the district court, NexStep opposed summary judgment by arguing that one-way audio transmissions satisfied the district court's construction of VoIP. *See supra* Section II.B. As a result, the magistrate judge explained her understanding that NexStep "does not suggest that Defendant's accused products are capable of two-way voice conversations." *Summary Judgment R. & R.,* 2021 WL 4077778, at *9. And the district court judge characterized NexStep's summary judgment briefing as instead "advanc[ing] several claim construction arguments" about the meaning of VoIP and the best understanding of the court's *Markman* order. *Summary Judgment Op.*, 2022 WL 911252, at *2.

NexStep's briefing to this court gives us no basis to disagree with the district court's characterization of the arguments before it. NexStep failed to identify anything in the record asserting that Comcast's accused products use a protocol configured to send two-way voice conversations. Indeed, NexStep's reply brief points to evidence NexStep cited below that was expressly premised on the assertion that *one-way* communications are sufficient to infringe. *See, e.g.*, Appellant's Reply Br. 33 (citing J.A. 9062). Accordingly, NexStep forfeited this argument.

For the reasons explained above, we affirm the district court's construction of VoIP and affirm its grant of summary judgment of non-infringement of the asserted claims of the '802 patent.

III.

The second principal issue on appeal relates to the district court's disposition of the '009 patent. For the reasons that follow, we agree that the district court correctly granted Comcast's motion for judgment as a

matter of law of non-infringement under the doctrine of equivalents.

A.

The ’009 patent is directed to a “concierge device” that offers a streamlined approach for initiating technical customer support. ’009 patent Abstract. With the advent of the “Internet of things,” the ’009 patent observed that customers were increasingly swapping out traditional home appliances in favor of smart devices. *Id.* col. 2 ll. 14–27. This changeover of devices created an “opportunity for innovation” to enhance the customer service experience by allowing consumers to more easily and efficiently control and support the interconnection of consumer devices with services outside of the home. *Id.* col. 2 ll. 28–41. Specifically, the ’009 patent discusses a concierge device that initiates technical support in response to only “a single action” of the user. *Id.* Abstract. The parties agree that the point of novelty for the claimed invention is initiating a customer service support session through just a “single action,” saving the user time and the hassle of all the steps inherent in calling a support center and having to provide the model, serial number, or other information to identify what products are malfunctioning.

Claim 1 is illustrative for purposes of the issues on appeal. It provides:

> 1. A method of initiating a support session for a consumer device using a concierge device, the method including:
>
> associating the concierge device with a selected consumer device;
>
> *responsive to a single action performed by a user*, the concierge device communicating with a home gateway, including

> causing the home gateway to buffer consumer device identification information for the selected consumer device and determine a support center for a support session; and
>
> causing the home gateway to initiate the support session for the consumer device and to forward automatically the consumer device identification information during the support session, thereby allowing the support session either
>
> > to bypass an automated attendant or interactive voice recognition system or
> >
> > to initiate an automated support protocol.

’009 patent claim 1 (emphasis added).

According to claim 1, when a troubleshooting issue arises, *all* the claimed steps must occur “responsive to a *single* action performed by a user.” *See, e.g.*, ’009 patent claim 1 (emphasis added). That “single action” could be, for example, “a single press of a button,” a “shake of the device,” or a “spoken response.” *Id.* col. 4 l. 65 – col. 5 l. 3; *see also id.* col. 11 ll. 18–21 (describing a “dedicated button” used to initiate a support call).

Following the user’s “single action,” the concierge device of claim 1 responds by taking four specific “troubleshooting” steps to initiate a personalized customer support session. First, the concierge device conveys “consumer device identification information” for the product at issue. Second, the concierge device identifies an appropriate technical team to support the relevant product by “determin[ing] a support center” that can offer a “support session” for the user’s device. Third, the concierge device causes the home gateway to initiate the support

session for the consumer device. Fourth, the concierge device causes the home gateway to automatically forward the consumer device information during the support session.

As a result, the ’009 patent discloses a user-friendly, streamlined system that bypasses the need for a user to undertake a series of actions before a support session can begin and instead “allows the user *in a single action* to initiate a support call without requiring the user” to engage in any additional steps before receiving technical support. *Id.* col. 5 ll. 20–25 (emphasis added). The claimed invention is thus directed to minimizing a user’s interaction with a device to just one action to initiate a support session.

B.

Before the district court, NexStep asserted that three different tools in Comcast’s mobile smartphone application (My Account App) infringed claims 1, 16, and 22 of the ’009 patent. The first tool is the “XfinityAssistant,” an interactive chatbot that can help customers with services related to the customer’s account, billing, privacy, and troubleshooting. The second tool is a “Troubleshooting Card,” which triggers a multi-step process for troubleshooting a given device associated with the customer’s Comcast account. And the third tool is the “Diagnostic Check,” which allows a user to investigate whether a particular device has detectable issues. Initiating each of these three tools requires a user to press a series of buttons on the smartphone’s display.[5]

---

[5] The parties dispute on appeal how many individual steps are involved for each of the accused tools. We note that Dr. Selker’s doctrine-of-equivalents testimony assumed the tools require “several button presses.”

At trial, the parties' dispute focused heavily on the "single action" limitation. Comcast argued that the multiple actions—the several user button presses—required as a predicate to using any of the three troubleshooting tools meant that the My Account App did not infringe. NexStep focused its infringement theory on the view that a series of steps, when taken together, can be appropriately described as a single action. *See, e.g.*, J.A. 460 at 443:24–445:4 (arguing that "multiple steps might be contained in a single action"). Thus, NexStep argued, even if using each of the three accused tools involved multiple steps, those steps should be understood as a single action.

The jury returned a verdict of no literal infringement (thus necessarily rejecting NexStep's view that the series of user steps needed for each of the accused tools amounted to "a single action") but found infringement under the doctrine of equivalents. *JMOL Decision*, 2022 WL 1503922, at *1. Following trial, both parties moved for judgment as a matter of law: NexStep for literal infringement and Comcast for non-infringement under the doctrine of equivalents. The district court denied NexStep's motion, and it granted Comcast's motion because NexStep failed to offer the particularized testimony and linking argument required by our precedent for a doctrine of equivalents case.

NexStep appeals. It challenges only the district court's decision to set aside the infringement verdict under the doctrine of equivalents; NexStep does not challenge the denial of judgment as a matter of law of literal infringement.

---

J.A. 445 at 383:25–384:10. The actual number of button presses is not material to our analysis for the reasons given below.

C.

1.

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). The Third Circuit reviews de novo a district court's grant of judgment as a matter of law, viewing the record evidence in the light most favorable to and drawing all reasonable inferences in favor of the verdict winner. *Pitts v. Delaware*, 646 F.3d 151, 155 (3d Cir. 2011).

2.

"Patent infringement is principally determined by examining whether the accused subject matter falls within the scope of the claims" as literally written. *Eli Lilly & Co. v. Hospira, Inc.*, 933 F.3d 1320, 1330 (Fed. Cir. 2019). But "[t]he doctrine of equivalents provides a limited exception to the principle that claim meaning defines the scope of the exclusivity right in our patent system." *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1341 (Fed. Cir. 2023). "The limits reflect a familiar balance among the importance of preserving the public's ability to rely on claims' meaning to define patent scope, the ability of patentees to protect their inventions through their claim drafting, and (yet) the occasional need to recognize some non-literal scope of protection to avoid undermining the exclusivity rights authorized by Congress to incentivize certain innovations." *Id.* at 1342. A finding of infringement under the doctrine of equivalents is "exceptional," *Honeywell International, Inc. v. Hamilton Sundstrand Corp.*, 523 F.3d 1304, 1313 (Fed. Cir. 2008), and "[w]e have emphasized . . . that the doctrine of equivalents is the exception, however, not the rule," *Eli Lilly*, 933 F.3d at 1330 (internal quotation marks omitted).

Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)). Typically, patentees seek to prove infringement under the doctrine of equivalents in one of two ways. *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866 (Fed. Cir. 2017). One way, often referred to as the function-way-result test, asks "whether the accused product performs 'substantially the same function in substantially the same way to obtain the same result.'" *Id.* (quoting *Graver Tank*, 339 U.S. at 608). And the other way asks whether "differences between the claimed invention and the accused device or process are 'insubstantial.'" *Tex. Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1563–64 (Fed. Cir. 1996). "Different linguistic frameworks may be more suitable to different cases, depending on their particular facts," but these formulations all aim to investigate the same "essential inquiry." *Warner-Jenkinson*, 520 U.S. at 40.

Regardless of how the test is phrased, courts must employ "special vigilance" to avoid overbroad applications of the doctrine of equivalents. *Id.* "There can be no denying that the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement." *Id.* at 29. We have accordingly imposed "specific evidentiary requirements necessary to prove infringement under the doctrine of equivalents." *Tex. Instruments*, 90 F.3d at 1566.

First, proof under the doctrine of equivalents must be on a limitation-by-limitation basis: "[T]he doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole." *Warner-Jenkinson*,

520 U.S. at 29. This requirement means that equivalency is determined by comparing "the elements of the accused product or process and the claimed elements of the patented invention." *Id.* at 21 (citing *Graver Tank*, 339 U.S. at 609); *see also VLSI*, 87 F.4th at 1344–45.

Second, "both the Supreme Court and this court have made clear that the evidence of equivalents must be from the perspective of someone skilled in the art, for example through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) (cleaned up). "[W]hen the patent holder relies on the doctrine of equivalents," we "require that evidence be presented to the jury or other fact-finder through the particularized testimony of a person of ordinary skill in the art, typically a qualified expert." *Id.*

Third, and most relevant to this appeal, "we have long demanded specificity and completeness of proof as crucial to enforcing the limits on the doctrine: The patentee must provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device." *VLSI*, 87 F.4th at 1343 (internal quotation marks and citations omitted). "Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice." *Tex. Instruments*, 90 F.3d at 1567. Rather, the patentee must provide a "meaningful explanation of why" the element or elements from the accused product or process are equivalent to the claimed limitation. *VLSI*, 87 F.4th at 1344; *see also Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1327 n.5 (Fed. Cir. 1991) (Our precedent "at least requires the *evidence* to establish *what* the function, way, and result of *both* the claimed device and the accused device are, and *why* those functions, ways, and results are substantially the same.").

"Our court set forth these evidentiary requirements in those earlier cases because, although the standard for infringement under the doctrine of equivalents is simple to articulate, it is conceptually difficult to apply." *Tex. Instruments*, 90 F.3d at 1566–67. "These evidentiary requirements assure that the fact-finder does not, under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." *Id.* at 1567 (internal quotation marks and citation omitted). Plus, "without these requirements, the fact-finder has no analytical framework for making its decision and is put to sea without guiding charts when called upon to determine infringement under the doctrine," and "we, as the reviewing court, would lack the assurance that the jury was fully presented with a basis for applying the doctrine of equivalents." *Id.* (cleaned up).

Though "we do not doubt the ability of a jury to decide the factual issue of equivalence, to enable the jury to use its ability," the patentee's case "must be presented in the form of particularized testimony and linking argument." *Lear Siegler, Inc. v. Sealy Mattress Co. of Mich.*, 873 F.2d 1422, 1426 (Fed. Cir. 1989). These evidentiary requirements therefore serve to "ensure that a jury is provided with the proper evidentiary foundation from which it may permissibly conclude that a claim limitation has been met by an equivalent." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1188 (Fed. Cir. 1998).

So though "[a] finding of equivalence is a determination of fact," *Graver Tank*, 339 U.S. at 609, "the various legal limitations on the application of the doctrine of equivalents are to be determined by the court, either on a pretrial motion for partial summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict," *Warner-Jenkinson*, 520 U.S. at 39 n.8. Accordingly, we have consistently rejected doctrine of

equivalents theories as a matter of law when a patentee's case lacks particularized testimony and linking argument. *See, e.g.*, *VLSI*, 87 F.4th at 1344–45 (reversing jury verdict); *Tex. Instruments*, 90 F.3d at 1567–68 (affirming grant of judgment as a matter of law); *Lear Siegler*, 873 F.2d at 1423, 1425–27 (reversing jury verdict); *Malta*, 952 F.2d at 1321, 1327 (affirming grant of judgment as a matter of law); *AquaTex*, 479 F.3d at 1323 ("[W]e affirm the grant of summary judgment because [patentee] did not satisfy its burden to present particularized evidence of equivalents in opposition to the motion for summary judgment."); *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374–75 (Fed. Cir. 2014) (affirming grant of summary judgment).

3.

With these principles in mind, we turn to the evidence that NexStep adduced to support a finding of infringement under the doctrine of equivalents. NexStep points us to the following testimony from Dr. Selker, who relied on the function-way-result test to attempt to prove that the "single action" limitation is met under the doctrine of equivalents:

> Q. In terms of the elements of the '009 patent, can you explain why the – I understand that you believe that a single action is met literally, but can you explain why at the very least the single action element is met by the doctrine of equivalents? And the –
>
> A. When you – when you go to debug your – to diagnose your device, you're going through a single action. It might be that there's several button presses along the way, but I say that's the same function. And that it's going to have the same purpose which is what I was talking about, I hope. I don't know if I'm –

> Q. No, you're doing fine, Doctor. Keep going.
>
> A. I was confused by that.
>
> Q. It's the same function – I'll just help you out here. So it has the same function and it's a legal doctrine and so we have to go through it. Okay? Can you explain to the jury why it's done in substantially the same way?
>
> A. Well, it's done in the same way in that the stuff is all kept up in the cloud for the purpose of doing this and it's going to go and diagnose it using the home gateway and it's going to solve my problem without me having to go through and put in my model numbers and all of that stuff. So it's really literally using – using this Concierge as more of a – somebody to give authorization than to do the actual function. I'm not down there in the machine room, you know, putting instructions into a computer to make it do each of these things.
>
> Q. And can you explain why the single action achieves substantially the same result?
>
> A. Yeah, the result is that this thing is going to be restarted, refreshed, whatever is going to have to happen with it without me having to tangle with understanding all of the issues of being an IT professional or whatever it takes to get this thing up. And so it's going to come with a result of my modem working, you know.

J.A. 445 at 383:25–385:9. This is the only testimony that we are aware of in which NexStep asserted infringement specifically under the doctrine of equivalents.

NexStep "had to prove—with particularized testimony and linking argument—that the elements of the [accused] arrangement were substantially the same as the elements of the claimed arrangement." *VLSI*, 87 F.4th at 1344–45.

Though "infringement under the doctrine requires 'only' substantial identity, substantial identity must be proven with regard to all three elements of the" function-way-result test. *Lear Siegler*, 873 F.2d at 1425. Meeting this evidentiary burden "at least requires the *evidence* to establish *what* the function, way, and result of *both* the claimed device and the accused device are, and *why* those functions, ways, and results are substantially the same." *Malta*, 952 F.2d at 1327 n.5. NexStep failed to meet its evidentiary burden for several reasons.

First, Dr. Selker's testimony never identified a particular element or elements in the My Account App as being equivalent to the "single action" limitation. Because the test is to determine whether "the elements of the [accused] arrangement [are] substantially the same as the elements of the claimed arrangement," a patentee must identify what element or elements in the accused device are equivalent to the claimed limitation. *VLSI*, 87 F.4th at 1344–45; *see also Malta*, 952 F.2d at 1327 n.5 (Our precedent "at least requires the *evidence* to establish *what* the function, way, and result of *both* the claimed device and the accused device are."). Dr. Selker's generalized reference to "several button presses" fails to identify what specific elements in the My Account App are allegedly equivalent to the clamed "single action" limitation. This lack of specificity is particularly problematic because Dr. Selker identified three separate literal infringement theories (XfinityAssistant, Troubleshooting Card, and Diagnostic Check), each with its own distinct series of button presses. Yet Dr. Selker's passing reference to "several button presses" did not guide the jury to focus on what theory or what button presses are allegedly equivalent. In short, Dr. Selker's testimony simply does not include a particularized identification of what elements in the accused device are equivalent to the claimed limitation.

By itself, the failure to explicitly identify the alleged equivalent is fatal to NexStep's doctrine of equivalents theory. If a jury is not told what components are equivalent, it necessarily cannot find those components to be equivalent to a claim limitation. But Dr. Selker's testimony was also deficient because it failed to provide a "meaningful explanation of *why*" the element or elements from the accused product or process are equivalent to the claimed limitation for each part of the function-way-result test. *VLSI*, 87 F.4th at 1344 (emphasis added).

As the district court recognized and as is apparent from the claim language, the function of the "single action" limitation is to cause the home gateway to perform the four troubleshooting steps. *JMOL Decision*, 2022 WL 1503922, at *6. Indeed, the parties agree that the whole point of the claimed invention is to save a user the time and the hassle of contacting and communicating with customer service by initiating a support session through a single action, such as the click of a button. Based on Dr. Selker's testimony above, it is not clear if he identified a function, and to the extent he identified the function as "to diagnose your device," it is not clear that this function aligns with the claimed function of the "single action" limitation. J.A. 445 at 384:5–10. Putting aside these potential errors, Dr. Selker testified that "several button presses along the way" provides the same function because he "say[s] that's the same function." *Id.*

We agree with the district court that this conclusory and circular "because I said so" testimony is insufficient. Dr. Selker failed to provide what our precedent requires: "particularized testimony explaining *why* the function . . . [was] the same." *Tex. Instruments*, 90 F.3d at 1568 (citation omitted). An expert's "offhand and conclusory statements" that the purported equivalent "function[s] like" the claim limitation is insufficient. *Malta*, 952 F.2d at 1327. NexStep therefore failed to

provide a sufficient evidentiary showing under the function prong of the function-way-result test.

As for the way prong, Dr. Selker's testimony is difficult to parse:

> Well, it's done in the same way in that the stuff is all kept up in the cloud for the purpose of doing this and it's going to go and diagnose it using the home gateway and it's going to solve my problem without me having to go through and put in my model numbers and all of that stuff. So it's really literally using – using this Concierge as more of a – somebody to give authorization than to do the actual function. I'm not down there in the machine room, you know, putting instructions into a computer to make it do each of these things.

J.A. 445 at 384:17–385:1. The district court aptly described this testimony as "word salad" and noted that, to the extent it communicated anything to the jury, this testimony "did not provide particularized testimony or a linking argument for why several button presses perform the claimed method in the same way as the claimed single action." *JMOL Decision*, 2022 WL 1503922, at *7.

We agree with the district court that this testimony is insufficient because of its "failure to articulate how [the] accused process operates in substantially the same way." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.,* 811 F.3d 1334, 1343 (Fed. Cir. 2016). Once again, it is not clear that Dr. Selker identified the "way" that the accused product or the claim limitation operates. To the extent that he adequately identified the way for either, he fails to explain how the "several button presses" for any of the three My Account App tools (which the jury necessarily found to be multiple actions as opposed to a single action) should be understood to be performing the single action limitation in substantially the same way. In other words, Dr. Selker failed to provide "meaningful explanation of why" the

"several button presses" operate in substantially the same way as the "single action" limitation. *VLSI*, 87 F.4th at 1344.

Finally, for the result prong, Dr. Selker testified that:

> [T]he result is that this thing is going to be restarted, refreshed, whatever is going to have to happen with it without me having to tangle with understanding all of the issues of being an IT professional or whatever it takes to get this thing up. And so it's going to come with a result of my modem working, you know.

J.A. 445 at 385:4–9. The district court determined that this testimony was "untethered from the claim language" and "amounts to little more than 'generalized testimony as to the overall similarity between the claims and the accused infringer's product.'" *JMOL Decision*, 2022 WL 1503922, at *7 (quoting *Tex. Instruments*, 90 F.3d at 1567). We agree with the district court on both points.

The claim language provides that the result of the "single action" limitation is the home gateway performs the four troubleshooting steps. Here, Dr. Selker merely testified that something is going to happen so that the modem works. That result is not in accord with the specific result required by the claim language.

While our precedent doesn't necessarily require an expert's testimony to be an *ipsis verbis* recitation of the claim, Dr. Selker's identified result is also too generalized, unclear, and unconnected to the claimed invention. Though the result of the claimed invention as a whole is to initiate a support session, "[g]eneralized testimony as to the overall similarity between the claims and the accused infringer's product or process [does] not suffice." *Tex. Instruments*, 90 F.3d at 1567.

Overall, Dr. Selker's testimony is similar to the testimony we found inadequate in *Texas Instruments*. In

that case, one of the patentee's experts provided only "generalized testimony as to [the] overall similarity" of the claimed and accused processes. 90 F.3d at 1567–68. The patentee's other expert witness merely "testified, in conclusive fashion, that the accused processes . . . met the *Graver Tank* function, way, result test" but did not explain "whether or how the way the accused product operates was similar to the patent claim," nor provide "any particularized testimony explaining *why* the function and result were the same." *Id.* at 1568 (cleaned up). We explained that neither witness's testimony was "sufficient to support a finding of infringement under the doctrine of equivalents." *Id.* Here, Dr. Selker's testimony—including his failure to identify what particular elements are allegedly equivalent; failure to explain why the function, way, and result are substantially similar between the accused elements and the claim limitation; and resorting to comparing the overall similarities of the accused device and the claimed invention—fares no better than the testimony in *Texas Instruments*.

For all these reasons, Dr. Selker's testimony failed to provide the requisite particularized testimony and linking argument. NexStep's infringement theory under the doctrine of equivalents was therefore legally insufficient because it failed to comply with "the specific evidentiary requirements necessary to prove infringement under the doctrine" of equivalents. *Tex. Instruments*, 90 F.3d at 1566. Accordingly, the district court properly granted, and indeed was "obliged to grant," judgment as a matter of law. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997).

D.

NexStep raises several arguments in favor of nonetheless reversing the district court's order. We address each in turn, and none is persuasive.

1.

NexStep argues that it offered a sufficient basis for the jury to find infringement under the "insubstantial differences" formulation of the doctrine of equivalents. We disagree.

For starters, NexStep did not present an independent "insubstantial differences" theory at trial. Dr. Selker phrased his opinion and substantive analysis under the function-way-result test. *See* J.A. 445 at 383:25–385:15. He also agreed that his opinion was that "the single action limitation is satisfied under the doctrine of equivalents because it performs substantially the same function in substantially the same way to achieve substantially the same result." *Id.* at 385:10–15. And the phrase "insubstantial differences" (or any similar phrase) does not appear in Dr. Selker's testimony. These facts support a conclusion that Dr. Selker did not provide an insubstantial differences theory that was not dependent on his function-way-result theory.

In any event, the testimony adduced at trial confirms that Dr. Selker in fact did not provide sufficient evidence to show (separately from his function-way-result presentation or, indeed, at all) that certain elements of the accused devices are insubstantially different from the single action limitation. NexStep points us to the following direct examination testimony to support its argument that Dr. Selker testified that a sequence of screen taps is insubstantially different from the "single action" limitation:

> Q. In your view, does the – tell us in your view, what is – does a single action, can it initiate a troubleshooting process?
>
> A. Yes.
>
> Q. Can you explain why?

> A. Well, a single action like fixing your modem is something that you embark to do and, you know, whatever a single action is, let's say it's even pressing a button, you have to see the button, you have to go think about it, you have to move your finger to it, you have to go and press it and you have to see that it's responded. So whatever a single action is, whether a single press or other things, there's some parts to it. And I call those steps a single action.

J.A. 434 at 341:25–342:18 (objection omitted). NexStep also identified the following testimony from Dr. Selker's cross examination:

> Q. When you gave your equivalents opinion, you said that your opinion is that the words "single action" are substantially the same as multiple single actions; correct?
>
> A. No, not – not all single actions. They're – multiple steps might be contained in a single action. For example, when you throw a baseball, you pick it up, you orient it, you get it in your palm, you throw it. There's several steps to making a baseball, to throwing a baseball.
>
> * * *
>
> Q. Well, let's look a little bit further down [in your expert report] to see if this was, in fact, a typo. Next sentence, to the extent the action to start the troubleshooting processing is not literally a single action, it is at least equivalent to a single action because a single stream-like action starts the process to begin troubleshooting including collecting buffer data from customer service such as identification data. Do you see that?
>
> A. So this is in my data –

Q. Dr. Selker –

A. I'll just trying to explain it.

Q. I understand. And Mr. Hannah will have – he'll be able to give you a chance to frame it. My first question is just, do you see it?

A. I see it.

J.A. 460 at 444:22–445:4, 446:6–20.

In essence, NexStep has identified direct examination testimony opining that several steps can be a single action and cross examination testimony opining that multiple steps may be contained in a single action and that Dr. Selker sees in his report that a single stream-like action is at least equivalent to a "single action."[6]

As an initial matter, this testimony does not provide an insubstantial differences theory that makes up for the deficiency of the function-way-result evidence. The first two points identified above are literal infringement testimony: Dr. Selker believes that a single action can literally be satisfied by several steps. The third point, at best, states that Dr. Selker has provided a doctrine of equivalents theory, but nothing suggests that he took an "insubstantial differences" route independent of his function-way-result line of reasoning.

But even if we consider the merits of NexStep's argument, this testimony still fails to provide

---

[6] To the extent NexStep relies on counsel's questions, "[s]tatements of counsel . . . are not evidence." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1339 (Fed. Cir. 2004). And it is black letter law that counsel's unsworn fact statements are not evidence and therefore cannot sustain an infringement finding. *Gemtron Corp. v. Saint-Gobain Corp.*, 572 F.3d 1371, 1380 (Fed. Cir. 2009).

particularized testimony and linking argument. Under an "insubstantial differences" formulation, "a patentee must still provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process" to show infringement under the doctrine of equivalents. *Tex. Instruments*, 90 F.3d at 1567. Similar to his testimony under the function-way-result test, Dr. Selker's testimony neither particularly identified *what* specific elements of the accused products are allegedly equivalent to the "single action" limitation nor offered the required testimony explaining *why* those elements were only insubstantially different in light of the claim language reciting what is being avoided by the "single action." To put it simply, Dr. Selker never stated or explained why several button presses are insubstantially different from a single action, particularly given that the point of the "single action" limitation was that a single action saved the user from undertaking the multiple steps typically required to initiate a customer support session. Either of these shortcomings is sufficient to foreclose a verdict of infringement under the doctrine of equivalents.

2.

NexStep also argues that we should reverse the district court because NexStep's literal infringement testimony coupled with its doctrine of equivalents testimony provides an adequate basis for finding infringement under the doctrine of equivalents. NexStep contends that the district court failed to consider Dr. Selker's literal infringement testimony, rendering its conclusion to grant judgment as a matter of law erroneous. This argument is unpersuasive for two reasons.

First, the premise of this argument is incorrect. The district court expressly considered Dr. Selker's literal infringement testimony in rendering its decision to grant judgment as a matter of law. After articulating the law,

the district court noted that "Dr. Selker's literal infringement testimony can support NexStep's DOE contentions." *JMOL Decision*, 2022 WL 1503922, at *5. Indeed, the district court found that "Dr. Selker's literal infringement testimony somewhat cures the vagueness of his DOE claim limitation testimony." *Id.* But the district court concluded that "NexStep has simply not met its burden." *Id.* Thus, it is not true that the district court failed to consider Dr. Selker's literal infringement testimony.

Second, this argument also fails on the merits. Though "[o]ur 'particularized testimony' standard does not require [an expert witness] to re-start his testimony at square one when transitioning to a doctrine of equivalents analysis," *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007), "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement," *Lear Siegler*, 873 F.2d at 1425. That is, even if there "was evidence and argument on literal infringement[] that may also bear on equivalence," that "does not satisfy" the requirements of the doctrine of equivalents in the absence of particularized testimony and linking argument. *Lear Siegler*, 873 F.2d at 1425.

Here, even incorporating the literal infringement testimony, NexStep fell short of providing particularized testimony and linking argument. As already discussed, NexStep failed to produce "*evidence* to establish *what* the function, way, and result of *both* the claimed device and the accused device are, and *why* those functions, ways, and results are substantially the same." *Malta*, 952 F.2d at 1327 n.5; *see supra* Section III.C. Even if we assume, as the district court did, that the literal infringement testimony allowed the jury to understand what "several button presses" Dr. Selker alleged to be equivalent and if we assume that the literal infringement testimony provided the function, way, and result of the "single action" limitation, Dr. Selker failed to explain why the function,

way, and result of the accused elements and the claimed limitation are substantially the same. In short, Dr. Selker's conclusory testimony is on par with other testimony we have rejected as inadequate. *See, e.g.*, *VLSI*, 87 F.4th at 1343–45; *Tex. Instruments*, 90 F.3d at 1567–68; *Lear Siegler*, 873 F.2d at 1425–26.

3.

NexStep's final argument is that we should adopt a novel exception to the requirement of particularized testimony and linking argument. According to NexStep, for certain "easily understandable" technologies, a patentee simply need not offer particularized testimony and linking argument from a skilled artisan. We reject this argument because it is contrary to both our precedent and the policies underlying why we require particularized testimony and linking argument.

NexStep's ask for an "easily understandable" technology exception is particularly unpersuasive because the cases in which we explicated the particularized testimony and linking argument requirement dealt with "easily understandable" technologies. In 1989, we first coined the phrase "particularized testimony and linking argument" in the seminal case of *Lear Siegler*, noting that "the three *Graver Tank* [function-way-result] elements must be presented in the form of particularized testimony and linking argument." *Lear Siegler*, 873 F.2d at 1426. Two years later, we explained that our precedent "at least requires the *evidence* to establish *what* the function, way, and result of *both* the claimed device and the accused device are, and *why* those functions, ways, and results are substantially the same." *Malta*, 952 F.2d at 1327 n.5. *Lear Siegler* and *Malta* respectively dealt with inventions for box springs used with a mattress and handbells used in churches and schools. Yet we still required particularized testimony and linking argument to prove infringement under the doctrine of equivalents. That this court

explicated the particularized-testimony-and-linking-argument requirement in cases dealing with "easily understandable" technologies cuts sharply against now making an exception that would apply to those very same cases.

Indeed, more than 30 years later, we have stayed the course. In *VLSI*, the jury was confronted with the "not-so easily understandable" technology of managing the memory-operating-voltage and clock speed in electronic devices. Consistent with our precedent, the patentee was required to provide "particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device." *VLSI*, 87 F.4th at 1343 (collecting cases). Thus, from handbells to complex electronics, particularized testimony and linking argument is always required.

In fact, we have never recognized a technology-specific exception to the evidentiary rules governing the doctrine of equivalents. Simply put, our precedent requires particularized testimony and linking argument, regardless of the complexity or the simplicity of the underlying technology. *See, e.g.*, *VLSI*, 87 F.4th at 1336–39, 1342–45 (patents for adjusting operating voltage and clock speed in electronic devices); *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1336–37, 1342–43 (Fed. Cir. 2016) (patent "directed to an extrusion process that generates low viscosity aqueous polymer dispersions"); *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1366, 1374 (Fed. Cir. 2014) ("The asserted claims are directed to applications that are converted from a high level programming language into another format that is suitable for resource-constrained computing devices."); *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1323, 1328–29 (Fed. Cir. 2007) ("The '977 patent claims a method for cooling a person through evaporation by use of a multi-layered, liquid-retaining composite material in evaporative cooling garments."); *Paice*, 504 F.3d at 1296–1301, 1304–06 ("The three patents

at issue in this case relate to drive trains for hybrid electric vehicles."); *Tex. Instruments*, 90 F.3d at 1560, 1566–67 ("These patents claim different aspects of a process for encapsulating electronic components in plastic."); *Malta*, 952 F.2d at 1321–22, 1327 ("The patent in suit . . . is directed to improvements in the design of handbells, of the type used by music groups in churches, schools, and the like."); *Lear Siegler*, 873 F.2d at 1423–26 (springs used in a mattress's box spring assembly); *see also Malta.*, 952 F.2d at 1330 (Michel, J., concurring) ("The simplicity of the [claimed invention], so emphasized by the dissent, is not relevant either. . . . [T]he rule of *Lear Siegler* is a prophylactic rule of general applicability. As such, it must cover the whole range of infringement cases, many of which do indeed involve complex technology."); *id.* at 1334 (Newman, J., dissenting) ("[T]hese [evidentiary] requirements must be fulfilled no matter how simple the invention.").[7]

It makes sense that the patentee must provide particularized testimony and linking argument in every

---

[7] NexStep cites only *WCM Industries, Inc. v. IPS Corporation*, 721 F. App'x 959 (Fed. Cir. 2018), to support its argument. That case is non-precedential. It is also inapposite. In that case, we reversed the district court's grant of judgment as a matter of law because the patentee "provided sufficient" evidence under the doctrine of equivalents. *Id.* at 969. Along the way, we reaffirmed that "the difficulties and complexities of the doctrine[] must be presented to the jury or other fact-finder through the particularized testimony of a person of ordinary skill in the art." *Id.* at 966 (internal quotation marks omitted) (quoting *AquaTex*, 479 F.3d at 1329). Thus, we merely found, on the facts of that case, the patentee had presented particularized testimony and linking argument sufficient to support the jury's verdict.

case because “the difficulties and complexities of the *doctrine* require” it. *AquaTex*, 479 F.3d at 1329 (emphasis added); *see also Tex. Instruments*, 90 F.3d at 1566–67 (“Our court set forth these evidentiary requirements in those earlier cases because, although the standard for infringement under the doctrine of equivalents is simple to articulate, it is conceptually difficult to apply.”). The difficulties and complexities of the doctrine are present regardless of the simplicity of the underlying technology. Even if a jury understands the underlying technology, the doctrine of equivalents itself introduces a distinct and complex inquiry that requires appropriate guidance. *See AquaTex*, 479 F.3d at 1329; *Tex. Instruments*, 90 F.3d at 1566–67.

Accordingly, regardless of the technology at issue, patentees must still present juries with particularized testimony and linking argument to ensure that the jury does not misapply the doctrine and thereby stray beyond the doctrine’s “properly limited” role. *VLSI*, 87 F.4th at 1342 (citing *Warner-Jenkinson*, 520 U.S. at 35, 39). An example of a misapplication of the doctrine is if the factfinder relies on “merely generalized testimony as to overall similarity.” *Tex. Instruments*, 90 F.3d at 1568. By guiding the jury’s attention to particularized testimony and linking argument that compares the accused elements to the claimed limitation at issue, we avoid inviting the jury to resort to improper generalized comparisons between the overall claimed invention and the accused product. This requirement therefore “ensure[s] that a jury is provided with the proper evidentiary foundation from which it may permissibly conclude that a claim limitation has been met by an equivalent.” *Comark Commc’ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1188 (Fed. Cir. 1998).

In summary, NexStep has provided no persuasive reason to break with decades of our precedent, which has been explicit and consistent in requiring particularized

testimony and linking argument regardless of the complexity or simplicity of the underlying technology.

IV.

We briefly address two points that are central to the dissent's disagreement with the majority opinion.

First, the dissent states that "[t]he majority concocts a rigid new rule that in all cases a patentee must present expert opinion testimony to prove infringement under the doctrine of equivalents," and "disagree[s] with the majority's extrapolation that expert testimony is always required." Dissenting Op. 7. That is not correct, for our discussion of the use of expert testimony in proving infringement under the doctrine of equivalents is limited to quoting the standard articulated in *AquaTex Industries, Inc. v. Techniche Solutions*: "[B]oth the Supreme Court and this court have made clear that the evidence of equivalents must be from the perspective of someone skilled in the art, for example through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art." 479 F.3d at 1329 (cleaned up); *see id.* ("[W]hen the patent holder relies on the doctrine of equivalents," we "require that evidence be presented to the jury or other fact-finder through the particularized testimony of a person of ordinary skill in the art, typically a qualified expert."); *see also* Maj. Op. 20.

Second, according to the dissent, "not only did Dr. Selker testify that several button presses are the same as a single action in the context of the doctrine of equivalents, but Dr. Selker also testified on the same point in the context of literal infringement." Dissenting Op. 5. But testifying that several button presses are the same as a single action is not the correct test. To prove infringement under the doctrine of equivalents (at least when a party, like NexStep, is relying on the function-way-result framework), there must be particularized testimony

explaining why "the accused product performs 'substantially the same function in substantially the same way to obtain the same result'"—not testimony that the accused product is the same as (or meets) the claim limitation. *Mylan Institutional LLC v. Aurobindo Pharma Ltd.*, 857 F.3d 858, 866 (Fed. Cir. 2017) (quoting *Graver Tank*, 339 U.S. at 608). By finding no literal infringement, the jury rejected NexStep's position that "several button presses" are the same as a single action, and instead necessarily concluded that several button presses by a user are multiple actions. For NexStep's back-up infringement theory under the doctrine of equivalents, then, NexStep had to pivot and explain, in the alternative, *why* those several button presses—if found to entail multiple actions—nevertheless perform substantially the same function in substantially the same way to obtain the same result as the claimed "single action." But NexStep never provided that why.

V.

Based on how we resolve the infringement issues in this case, we need not address NexStep's damages argument or Comcast's conditional cross appeal.[8] We have considered the parties' remaining arguments and find

---

[8] Comcast's express making of its cross-appeal conditional means that we need not address validity if we affirm non-infringement and therefore may dismiss the cross-appeal. We also note that Comcast exclusively asserted invalidity under § 101 as a defense to liability; it did not assert a counterclaim for a declaratory judgment of invalidity. *See NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. 19-cv-1031, ECF No. 40 at 32 (D. Del. Dec. 17, 2019); *see also Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 93–94 (1993) (distinguishing between mootness of invalidity defense and mootness of declaratory judgment claim asserting invalidity).

them unpersuasive. For the foregoing reasons, we affirm the district court's final judgment with respect to non-infringement of the '009 and '802 patents, and we dismiss Comcast's cross-appeal.

**AFFIRMED AS TO THE APPEAL AND DISMISSED AS TO THE CROSS-APPEAL**

COSTS

Costs to Comcast.

# United States Court of Appeals for the Federal Circuit

---

**NEXSTEP, INC.,**
*Plaintiff-Appellant*

**v.**

**COMCAST CABLE COMMUNICATIONS, LLC,**
*Defendant-Cross-Appellant*

---

2022-1815, 2022-2005, 2022-2113

---

Appeals from the United States District Court for the District of Delaware in No. 1:19-cv-01031-RGA, Judge Richard G. Andrews.

---

REYNA, *Circuit Judge*, concurring-in-part and dissenting-in-part.

I am pleased to concur in part with the majority opinion. I dissent only to that portion of the majority opinion that affirms the district court's entry of judgment as a matter of law of non-infringement of the '009 patent. I dissent for two reasons. First, I believe the jury's verdict that Comcast infringed the '009 patent under the doctrine of equivalents is supported by substantial evidence. Second, I believe the majority's new rule that patentees must always present expert opinion testimony to prove infringement under the doctrine of equivalents is incorrect and contrary to existing precedent. Thus, I would reverse the district court's decision that disturbed the jury verdict.

The majority is correct that in determining whether to overturn a jury verdict, the correct law in this case is that of the Third Circuit. The Third Circuit respects jury verdicts. Accordingly, "entry of judgment as a matter of law is a 'sparingly' invoked remedy." *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007), *as amended* (Aug. 28, 2007) (citation omitted). It is only in "rare cases" that, "following a jury verdict, judgment as a matter of law [is] warranted." *Fair Hous. Council v. Main Line Times*, 141 F.3d 439, 442 (3d Cir. 1998); *see also Pitts v. Delaware*, 646 F.3d 151, 152 (3d Cir. 2011). A "court may grant a judgment as a matter of law contrary to the verdict only if 'the record is critically deficient of the minimum quantum of evidence' to sustain the verdict." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 211 (3d Cir. 2009) (citation omitted). When a jury has heard extensive testimony, judgment as a matter of law is "only . . . appropriate in the *extraordinary circumstance* that none of that evidence could lead a reasonable jury to [reach its conclusion]." *Avaya Inc., RP v. Telecom Labs, Inc.*, 838 F.3d 354, 373 (3d Cir. 2016) (emphasis added).

We must "view[] the evidence in the light most favorable to the nonmovant and giv[e] it the advantage of every fair and reasonable inference." *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993) (citation omitted). The party seeking judgment as a matter of law "must show that the jury's findings, presumed or express, are not supported by substantial evidence." *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1376 (Fed. Cir. 2001) (citation omitted); *see also Lightning Lube*, 4 F.3d at 1184. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Thus, "the court must determine whether a reasonable jury could have found for the prevailing party." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 (3d Cir. 1995) (citation omitted). It is

against this backdrop that we must analyze whether substantial evidence supports the jury's verdict.

A non-technical non-complex factual issue was put to the jury: whether the process of several button presses is equivalent to a "single action," a single press. The jury heard evidence from both parties, received instructions from the court, and then answered in the affirmative. Yet, the majority overrides this finding based on its belief that NexStep failed to provide "particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device." Maj. Op. 21 (quoting *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1343 (Fed. Cir. 2023)).

In my view, the majority commits two errors. First, the majority analyzes NexStep's evidence of infringement under the doctrine of equivalents in a vacuum and fails to adhere to the substantial evidence standard of review. Second, the majority's reasoning imposes a new rule that a patentee must present expert opinion testimony to prove infringement under the doctrine of equivalents.

I

The majority disregards the totality of the evidence presented and instead analyzes NexStep's evidence of infringement under the doctrine of equivalents in a vacuum. The majority unduly focuses on testimony from NexStep's expert, Dr. Selker, on the function-way-result test of the doctrine of equivalents. Maj. Op. 22–29. In doing so, the majority ignores both the context in which the jury heard this testimony and the other evidence the jury received that is probative as to the question of equivalence. This approach is contrary to our precedent, which does not require expert witnesses to "re-start [their] testimony at square one when transitioning to a doctrine of equivalents analysis." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1305 (Fed. Cir. 2007). This is because juries do not consider evidence in categories, but rather, consider the totality of

the evidence presented. *Brooktree Corp. v. Advanced Micro Devices*, 977 F.2d 1555, 1573 (Fed. Cir. 1992).

Here, NexStep presented its doctrine of equivalents evidence in the context of its literal infringement evidence. *See VLSI*, 87 F.4th at 1343 ("[Patentee's] equivalents contention is best understood in light of its literal-infringement case."). And we must presume the jury considered all of NexStep's evidence when rendering its verdict, rather than only a subset of the evidence. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010) ("[W]e assume the jury considered all the evidence" presented in rendering its verdict.). When viewed through that lens, it becomes clear that under Third Circuit law, NexStep provided a legally sufficient evidentiary basis for a reasonable jury to decide in its favor.

This is not to say that literal infringement testimony *alone* is sufficient to show infringement under the doctrine of equivalents. As we have recognized, "[t]he evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." *Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1425 (Fed. Cir. 1989). But that is not the case here. Rather, when literal infringement evidence is coupled with evidence of infringement under the doctrine of equivalents, the combination of evidence can sufficiently show infringement under the doctrine of equivalents. *Id.*; *see also Paice*, 504 F.3d at 1305 ("Indeed, we think it desirable for a witness to incorporate earlier testimony in order to avoid duplication.").

For example, the majority faults Dr. Selker for allegedly failing to identify "a particular element or elements" that is equivalent to the "single action" limitation. Maj. Op. 24. Yet the majority recognizes that Dr. Selker identified "several button presses" as the critical function. Maj. Op. 25. The majority also acknowledges that Dr. Selker "identified three separate literal

infringement theories (XfinityAssistant, Troubleshooting Card, and Diagnostic Check), each with its own distinct series of button presses" when addressing literal infringement. *Id.* And Dr. Selker identified the distinct "series of button presses" when testifying about literal infringement under each of these theories. J.A. 431, 329:4–330:16; J.A. 434, 340:11–341:8; J.A. 437, 353:15–354:5. So, when Dr. Selker later referred to "several button presses" when addressing infringement under the doctrine of equivalents, the jury could reasonably conclude that Dr. Selker was referring them to specific elements he identified during his literal infringement testimony. *Paice*, 504 F.3d at 1305 ("The fact that [patentee's expert] did not explicitly [incorporate his earlier testimony] does not mean he did not implicitly [do so].").

The majority also faults Dr. Selker for "never stat[ing] or explain[ing] why several button presses are insubstantially different from a single action." Maj. Op. 32. This is not a shortcoming of Dr. Selker's testimony, but rather, the majority's interpretation and restrictive review of Dr. Selker's testimony. To be clear, not only did Dr. Selker testify that several button presses are the same as a single action in the context of the doctrine of equivalents, but Dr. Selker also testified on the same point in the context of literal infringement. Dr. Selker first testified that:

> [E]ven pressing [one] button, you have to see the button, you have to go think about it, you have to move your finger to it, you have to go and press it and you have to see that it's responded. So whatever a single action is, whether a single press or other things, there's some parts to it. And I call those steps a single action.

J.A. 434, 342:12–18. Further, Dr. Selker also testified that "multiple steps might be contained in a single action," *because*, "[f]or example, when you throw a baseball, you

pick it up, you orient it, you get it in your palm, you throw it. There's several steps to making a baseball, to throwing a baseball." J.A. 460, 445:1–4. Finally, when discussing the doctrine of equivalents, Dr. Selker testified that "[w]hen you . . . diagnose your device, you're going through a single action. It might be that there's several button presses along the way, but I say that's the same [as a single action]." J.A. 445, 384:5–8. The majority fails to address the substance of his opinions on this point.

In short, Dr. Selker testified that several button presses are a single action because single actions have multiple steps, such as throwing a baseball. Further, the steps a user takes to perform one button press are the same regardless of whether more than one press is taken. Yet even if several button presses are *not* literally a single action, the two are nonetheless equivalent. Having heard this evidence and argument, the jury should be permitted to reject Dr. Selker's first opinion but accept his second opinion, which is inherently based on his first opinion.

The majority's remaining criticisms of Dr. Selker's testimony are similarly unjustified and unsupported by the record. For example, the majority believes that "it is not clear that Dr. Selker identified the 'way' that the accused product or the claim limitation operates." Maj. Op. 27. But the record is not "critically deficient of the minimum quantum of evidence" on this point. *See Acumed LLC*, 561 F.3d at 211; J.A. 428–29, 318:19–322:8 (Dr. Selker demonstrating the functionality of Comcast's product); J.A. 434–36, 340:11–349:13 (Dr. Selker explaining how Comcast's product and the "single action" claim limitation operate); J.A. 431, 329:4–330:16 (Dr. Selker explaining several different ways Comcast's product starts the claimed "support session"); J.A. 437, 353:15–354:5 (Dr. Selker explaining how several different single button clicks within Comcast's product start a "system check"). Similarly, the majority asserts that "Dr. Selker merely testified that something is going to happen so that the

modem works." Maj. Op. 28. The record indicates otherwise. As a result, this is not "the extraordinary circumstance that none of that evidence could lead a reasonable jury to [reach its conclusion]." *See Avaya Inc., RP*, 838 F.3d at 373; J.A. 434–35, 342:19–343:8 (Dr. Selker explaining how Comcast's product performs the claimed communication "with a home gateway" via the cloud); J.A. 435–36, 345:5–349:13 (Dr. Selker explaining Comcast technical documents that show how the claimed "responsive to a single action" limitation causes the subsequent claim limitations to occur in Comcast's product).

A motion for judgment as a matter of law is a "narrow inquiry." *Marra*, 497 F.3d at 300. That narrow inquiry must end "when there is shown to be substantial evidence, on the record as a whole, as could have been accepted by a reasonable jury as probative of the issue." *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996) (citation omitted). As illustrated above, Dr. Selker's testimony is substantial evidence on which a reasonable jury could find for NexStep. Thus, the inquiry should end. But there is more.

## II

The majority concocts a rigid new rule that in all cases a patentee must present expert opinion testimony to prove infringement under the doctrine of equivalents. The majority's new rule is superficial because it fails to recognize that each individual patent infringement case presents unique facts and circumstances. There is no cookie-cutter approach to patent infringement.

I agree with the majority's observation that "our precedent at least requires the *evidence* to establish what the function, way, and result of both the claimed device and the accused device are, and why those functions, ways, and results are substantially the same." Maj. Op. 35 (internal quotation marks and some emphasis omitted) (quoting

*Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320, 1327 n.5 (Fed. Cir. 1991)); *see also Lear Siegler*, 873 F.2d at 1425. But I disagree with the majority's extrapolation that expert testimony is always required. Indeed, our precedent establishes that "testimony of experts" is an "example" of the type of evidence that can be employed in a doctrine of equivalents analysis. *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) ("[E]vidence of equivalents must be from the perspective of someone skilled in the art, *for example* through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art." (emphasis added) (citation and internal quotation marks omitted)).

There is also no doubt that in complex cases, expert testimony must be offered. *See VLSI*, 87 F.4th at 1335–39 (describing memory-operating-voltage and clock speed of electronic devices). But the same is not true where the technology or the specific doctrine of equivalents issue is so simple that evidence other than expert testimony is more than adequate for a jury to understand the issues and find equivalence.[1] That is the case here. While I would find Dr. Selker's testimony is sufficient to support the jury's verdict, I would also find that the jury did not need expert testimony to answer the technologically-simple question presented here of whether several button presses are equivalent to a "single action."

---

[1] Such an approach would also be consistent with our law on expert testimony for nonobviousness. *See Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336, 1348 (Fed. Cir. 2017) ("[S]ome cases involve technologies and prior art that are simple enough that no expert testimony is needed." (citation omitted)); *Inline Plastics Corp. v. Lacerta Grp., LLC*, 97 F.4th 889, 897 (Fed. Cir. 2024).

Indeed, one of our cases already resolves this exact issue. In *WCM Industries, Inc. v. IPS Corporation*, we found:

> [O]ur precedent does not require opinion testimony, and certainly does not require expert opinion testimony, for a finding of equivalence. Rather, "[p]roof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art." . . . [W]here the technology is "easily understandable without the need for expert explanatory testimony," expert testimony is not required.

721 F. App'x 959, 966–67 (Fed. Cir. 2018) (citations omitted). While this decision is non-precedential, I find that it accurately characterizes our precedent which, again, largely speaks in terms of "evidence" generally, or at times "testimony," but not *expert* testimony specifically. Maj. Op. 21–22, 35–37 (collecting cases on testimony generally).

The majority rationalizes its new rule of "evidentiary requirements" by reasoning that the doctrine of equivalents itself is "conceptually difficult" and therefore "the difficulties and complexities of the *doctrine* require" rigid rules. Maj. Op. 21, 37. The majority goes on, stating that: "The difficulties and complexities of the doctrine are present regardless of the simplicity of the underlying technology." Maj. Op. 37. I disagree. The majority claims its new rule is necessary so that experts may ease the jury's burden of understanding the complexity of a legal doctrine. But our law does not require, and in fact it chastises, witnesses who testify as to the meaning of legal doctrines themselves. *See* Fed. R. Evid. 702 (An expert witness must "help the trier of fact to understand the *evidence* or to determine a *fact* in issue." (emphasis added)); *see also*

*Stobie Creek Invs. LLC v. United States*, 608 F.3d 1366, 1383–84 (Fed. Cir. 2010) (The district court properly excluded expert testimony that "would not assist the court because the opinion concerned a question of law, not fact." (citation and internal quotation marks omitted)). Instead, the proper way to remedy the complexity of legal doctrines is for the district court to instruct the jury on the law, as the district court did here. *Trading Techs. Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1360 (Fed. Cir. 2010) (An expert cannot "usurp the district court's role of instructing the jury on the law."). At least in the Third Circuit, the law recognizes the role and resolve of the jury and will not, absent compelling reasons not presented here, reverse a jury verdict that stands on substantial evidence.

* * *

This case does not present extraordinary circumstances. Because I believe the majority invades the province of the jury by overturning a reasonable verdict that is supported by substantial evidence in this case and by imposing an unnecessary new rule in all future doctrine of equivalents cases to come, I respectfully dissent in part.